**IN UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRIT OF NEW YORK**

-------------------------------------------------------x
                                                     :
In re:                                               :          **Chapter 11**
                                                     :
**BRICKCHURCH ENTERPRISES, INC.,**                   :          **Case No. 22-70914-ast**
                                                     :
                                                     :
                     **Debtor.**                     :
                                                     :
-------------------------------------------------------x

**AFFIDAVIT OF LOUISE BLOUIN IN SUPPORT OF (I) DEBTOR'S RESPONSE IN
OPPOSITION TO JGB'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. §§305(A)
AND 1112(B) OF THE BANKRUPTCY CODE, (II) DEBTOR'S RESPONSE IN
OPPOSITION TO JGB'S MOTION FOR RELIEF FROM AUTOMATIC STAY
PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE
AND (III) DEBTOR'S CHAPTER 11 RELIEF**

I, **LOUISE BLOUIN**, hereby states under the federal penalties of perjury as follows[1]:

1.      I, Louise Blouin, am the principal of Brickchurch Enterprises, Inc. (the "***Debtor***"

or "***BEI***"), the Debtor in these chapter 11 proceedings.  I submit this affidavit ("***Affidavit***") in

support of Debtor Brickchurch Enterprises, Inc.'s opposition to *JGB's Motion to Dismiss Pursuant*

*to 11 U.S.C. §§305(a) and 1112(b) of the Bankruptcy Code* [Dkt. No. 44], opposition to *JGB's*

*Motion for Relief from Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code* [Dkt.

No. 45] and chapter 11 relief.

2.      This Affidavit may be supplemented as necessary and appropriate.

3.      If called upon to testify, I could and would testify to the following:

---

[1] Please note that I am dyslexic so some of my communications in the attached exhibits may not be
as legible as they would be if I were not dyslexic.

**How We Got Here:  BEI's Secured Lender JGB's Unreasonable and Predatory Practices**

4.     Looking back on what landed BEI in bankruptcy, it all goes back to the failure of BEI's secured lender to be reasonable in BEI's attempt to restructure out-of-court.

5.     BEI's secured lender JGB Partners, LP, JGB Capital, LP, JGB (Cayman) Ancona, Ltd., and JGB Plymouth Rock, LLC (collectively, "***JGB***") never wanted to speak to the bank REYL to close a refinancing loan with REYL.  JGB never wanted to hear about selling or refinancing its loan agreement, they only redirected me to counsel.  As detailed in this Affidavit and the attached exhibits, JGB rejected or was nonresponsive to all reasonable offers BEI put forward to refinance their loan. JGB was more interested in obtaining the shares in both properties and title of BEI prior to the maturity of the loan.

6.     Six months prior to maturity of the loan on BEI, JGB sought to purchase the existing debt on the Adjacent Luxury Property for a combined $50 million of exposure and the shares in escrow. Ninety days prior to maturity, JGB again requested a 'transfer of title'.  In short, JGB's behavior was very predatory in nature.

7.     Upon information and belief, JGB also killed the local real estate the market in order to force a lower purchase price for BEI's property as it became known to agents and market participants that JGB would pursue foreclosure actions on November 1, 2019. As a result, brokers from Sotheby's and Douglas Elliman – who continue to work for JGB – only brought forward distressed offers and reinforced this narrative within the marketplace.

8.     The market was further negatively impacted during the COVID period, where the Hamptons real estate saw its highest prices increase in a generation, where the broker Anne Prosser of Brown Harris Stevens, organized a rental of BEI for a predatory bidder of the property, who was an expert in hostile real estate transactions and personally knew JGB. As part of the rental, the renter organized an escrow account to perform repairs of the property, and regarding the use

of funds, I was emailed by Prosser that the funds belonged to the renter, and they could spend as he "wished," as if BEI already belonged to him. The renter further did not comply with providing a damage deposit and withheld both the full value of the rent and did not pay for electricity for the entire term of the rental, despite being bound to do so. When I asked Prosser to obtain the damage deposit, she said "knock yourself out."

9.      Further, my local counsel Charles Wallshein ("***Wallshein***"),  did not meet his duties of fidelity during this period, where he met with the renter without my knowledge to discuss a proposal to purchase BEI and failed to issue demands to either the renter or Prosser to recoup such things as fees for electricity. Importantly, Wallshein also failed BEI by not objecting in a timely manner to the court issues, referees report, thus prejudicing BEI in its foreclosure proceedings.

10.     As a result of these challenges and in order to preserve the value of the asset, I am obliged to find new brokers and a new team upon return to the United States, after the COVID induced embargo. Here I interviewed a number of the top real estate brokers in the area, settling on Nest Seekers International, whose efforts have begun to restore the standing of BEI within the marketplace.

**Asset Holdings**

11.     I am the proprietor of a historic and notable Hamptons estate in New York (the "***Estate***").  I purchased the Estate in 1996. The Estate comprises two separate parcels and homes owned through different business associations.   One home is located at 376 Gin Lane, Southampton, New York 11968 (the "***Adjacent Luxury Estate***"), which is the property that is adjacent to the property that is being reorganized in these chapter 11 proceedings.  The Adjacent Luxury Estate is owned by the non-debtor Aberdeen Enterprises, Inc.  In 1890, famed neoclassical architect Standford White constructed the Adjacent Luxury Estate.  The Adjacent Luxury Estate has an appraised value of $70 million USD.  *See* **Exhibit 1**.

12.     In 2002, I created 366 Gin Lane, Southampton, New York 11968 (the "***Beachfront Estate***), to mirror the Adjacent Luxury Estate.  The Beachfront Estate is owned by the Debtor BEI and has an appraised value of $67,500,000 million USD.  *See* **Exhibit 2** and the *Affidavit of Michael Vargas of Vanderbilt Appraisal Company, LLC in Support of (I) Debtor's Response in Opposition to JGB's Motion to Dismiss Pursuant to 11 U.S.C. §§305(a) and 1112(b) of the Bankruptcy Code, (II) Debtor's Response in Opposition to JGB's Motion for Relief from Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code and (III) Debtor's Chapter 11 Relief* [Dkt. No. 74].  The Beachfront Estate contains contemporary amenities on the property, including a pool, cinema, and tennis court.

13.     The Beachfront Estate and Adjacent Luxury Estate each sit on separate 2-acre plots of land, offer more than 10,000 square feet of living space*,* and provide beach access guarded by a lush dune.  *See* **Exhibit 1**

**The JGB Loan**

14.     In July 2018, JGB supplied the Debtor BEI, the owner of the Beachfront Estate, with a real estate mortgage (the "***JGB Loan").***  Pursuant to the JGB Loan, JGB provided BEI a loan in the amount of $26 million USD.  The JGB Loan was a 50% loan to value ratio with respect to the Beachfront Estate.  Moreover, the loan was for an 18-month term. *See* **Exhibit 3.**  BEI took this loan as a "bridge" loan in anticipation of a purchase offer (the "***2018 Purchase Offer***") on the combined Estate, both the Beachfront Estate and Adjacent Luxury Estate.  The 2018 Purchase Offer in the amount of $120 million USD was made in May 2018, two months prior to execution of the JGB Loan. The 2018 Purchase Offer, unfortunately, did not come to fruition, despite its sincerity.

**The Auction and Subsequent Bankruptcy Filing**

15.    As further discussed herein, JGB sought to foreclose on the Beachfront Estate.  The auction for BEI's Beachfront Estate was set to take place on May 2, 2022, at the Southampton Town Hall.

16.    Considering the auction, which I believe would have rendered an unfavorable price for the property, and to restructure its debt and affairs under the protection of the Bankruptcy Code, BEI filed for chapter 11 relief in this Court on April 30, 2022, prior to the scheduled auction.

**Post-Petition Refinancing Efforts**

17.    BEI has been working with Nathan Capital since May 20, 2021 to obtain new financing to pay off the JGB Loan.  Nathan Capital has shopped around for possible refinancing during the last few months BEI has been in bankruptcy.  The details of those efforts are included in the Affidavit of Nicholas Hubbard, the manager partner of Nathan Capital.

**Post-Petition Sale and Rental Efforts**

18.    The Beachfront Estate has been at all times actively marketed for sale and/or rental during this bankruptcy case.  Most recently, BEI has engaged Nest Seekers International to market the Beachfront Estate for sale and/or rental.   The details of Nest Seekers International's engagement are included it Nest Seekers International's retention application filed with the Court.

19.    As detailed in the affidavit of Geoffrey Gifkins, since Nest Seekers International has come on board, BEI received substantial interest in the Beachfront Estate.  The prior broker has not listed the property on Multiple Listing Service (MLS) since 2016 or was, upon information and belief, not returning calls from interested parties.  Upon information and belief, the prior broker represented a renter of the property that was trying to put in a low bid for the property behind my back.

**Events Prior to the Bankruptcy Filing**

*JGB's Questionable Conduct*

20.     The JGB Loan was set to mature on November 1, 2019.  Upon information and belief, in May 2019, six months before the loan's maturity, JGB's actions indicate a predatory intent and "loan to own" strategy.  This is so because, upon information and belief, in May 2019, JGB offered to purchase the debt held by Morgan Stanley on the Adjacent Luxury Estate, whereby JGB would acquire an overall exposure on the combined Estate of approximately+$50 million, before interest and exit charges**.**  *See* **Exhibit 4.**  Further, JGB also requested that I transfer the title to the Beachfront Estate to JGB so JGB could sell the property on its own terms prior to loan maturity.  *See* **Exhibit 4.**  In July 2019, JGB then sent me a 90-day notice (*see* **Exhibit 9)**, convinced that I would not get refinancing, and trying to make the decision for me in their best interest, disregarding all of my prior efforts and attempts to refinance with them.

21.     Evidently, JGB wanted more than to extend an interest-bearing bridge loan.  It opportunistically obtained equity coverage of over $75 million to $83 million USD across both properties on a loan of $26 million; all the while knowing it had sufficient value of $63 million USD on the Beachfront Estate from a loan-to-value of 41% and $70 million for the Adjacent Luxury Estate. *See* **Exhibit 1**.

22.     I rejected JGB's advances in 2019. I instead communicated to JGB my desire to act cooperatively, honor the initial loan agreement, and sell the Beachfront Estate and Adjacent Luxury Estate near their appraised values during the popular purchasing months.  *See* **Exhibit 7**. JGB then asked me to direct communications only to its counsel.  *See* **Exhibit 8**.

23.     In July 2019, JGB made its second attempt to acquire title to the Beachfront Estate: "does it make sense to just start a rational transfer of title now?", while commenting that the house

looks distressed which was not the case.  *See* **Exhibit 9**.  I rejected JGB's further attempt to acquire title to the Beachfront Estate.

24.     Further, in parallel to the above timeline, I sought new financing.  I approached Morgan Stanley and UBS, with whom I shared a long-term relationship.  However, the lenders told me that changes in bank financing underwriting rules prohibited them from providing new mortgages under the following conditions: (1) the lenders could not extend a new mortgage if 12 months had not lapsed since an owner rented out the properties, and (2) the lenders could not extend a new mortgage if 6 months had not lapsed after the owner took the properties off the market for sale. *See* **Exhibit 10**. Thus, I took the Beachfront Estate and Adjacent Luxury Estate off the market for sale to seek refinancing at $31 million USD for the Beachfront Estate on December 5, 2019 (*see* **Exhibit 11**), well in the money to cover the outstanding balance of  $30.5 million USD that included a huge penalty of $2 million that JGB exercised with force via threats to me such as when their only communications were demanding the titles.  *See* **Exhibit 4**. This offer of $31 million USD was the first attempt to cure just a few days from the maturity date of the loan which was October 31, 2019.  Late by approximately 25 days, I could not get them to collaborate, as their goal was to take the titles of both homes.  *See* **Exhibit 4**.

25.     On October 23, 2019, JGB reportedly received notice of an offer on the Beachfront Estate for $25 million USD.  I rejected the offer.  In JGB's subsequent statement it submitted to the Court, it criticized me for not accepting the offer. *See* **Exhibit 12**.  However, such a sale price represents a steep discount from its appraised value, a 39.7% discount. *See* **Exhibit 1**.  The Beachfront Estate cost me approximately $10 million USD to build in 2002; today's construction prices for a like home would be significantly greater due to inflation, supply chain and labor force challenges.

26.     On October 29, 2019, JGB received notice of an offer of $50 million USD on the combined Estate, and then on October 31, 2019, it received notice of a $55 million USD offer on the combined Estate. Those two offers also represented steep discounts from the combined Estate's then appraised value of $133 million USD.  *See* **Exhibit 1**.  The $55 million offer was presented by JGB's broker who still represents them.

27.     It is obvious that they were trying to panic the market through their pushing through of 3 sudden and sequential bids, coming in abruptly before the maturity of the loan on October 31, 2019. Their objective was to deflate the assets and show low market value so they could take over the shares of both properties at a discount as per **Exhibit 4** and **Exhibit 9** and therefore forcing me to take their deal at $50 million of debt on both properties (*see* **Exhibit 4**).

28.     If JGB proposed $50 million of debt in their proposal, this means that the offers of $50 million or $55 million or $25 million are too low and orchestrated as lenders lend on loan-to-value of 50 percent.  The May 28, 2019 proposal form JGB gives a value for the properties of $100 million. The borrower was begging to speak to the lender and the lender would shut down any communication when I was not accepting their proposals. They were not interested in my refinancing (*see* **Exhibit 16**).  Communication was reciprocated with JGB only if I was willing to accept the transfer of the shares of my properties (*see* **Exhibit 8**). The two emails from Thursday May 30, 2019 and May 31, 2019 show that JGB was never interested in my various refinancing attempts.

29.     As a result of the impasse and the lack of interest to work together or even communicate with me, the JGB Loan expired on or around October 31, 2019.   JGB then commenced an action to foreclose their mortgage on the Beachfront Estate by filing a complaint and summons on November 22, 2019.  Based on JGB's action, the low offers and the properties'

proximity to one another, I emailed JGB asking for its good faith and non-aggressive action. I pleaded with JGB not to hurt the market and depreciate the asset, as per notice from local brokers to me. JGB refused and persisted with its action. *See* **Exhibit 17**. They still were not interested in my term sheet, the loan agreement or closing. *See* **Exhibits 13, 14, 15, 25**.

30.     On May 30, 2020, after the onset of the pandemic, I offered JGB $28 million USD to cure the loan. *See* **Exhibit 18**. However, after JGB told the bankruptcy court that I should have accepted the $25 million USD offer for the Beachfront Estate around 6 months prior, JGB rejected my offer and attempt to cure the loan at $28 million. JGB told me it would only accept approximately $33 million USD plus significant growing costs. S*ee* **Exhibits 19 and 25**. Based on a calculation of annual 12 percent interest, the interest from $25 million USD would have accrued to $26.5 million USD at the time I offered $28 million USD.

31.     **On top of the lending risk of JGB's attempted foreclosure on the Beachfront Estate, the following months welcomed unique and unprecedented challenges from the COVID-19 pandemic. Despite the devastation to my business, which focuses on cultural tourism with art and media, I found a Swiss lender who, although based in Europe, could perform lending transactions within the US without the underwriting limitations under applicable New York lending rules.** In November 2020, REYL & Cie. presented me and BEI with a loan agreement for $32.4 million USD, ready to close. *See* **Exhibit 20**. The $32.4 million offered by REYL & Cie. was the approximate amount then owed to JGB with accrued interest thus would fully satisfy the JGB Loan. REYL retained Phillips Nizer LLP to finalize the agreement and paid legal fees totaling $36,045.36 USD for the same. *See* **Exhibit 21**. I suggested that JGB have a call with REYL and once again JGB ignored this. *See* **Exhibit 16**.

32.    When I wished to execute the REYL agreement, I immediately tried to contact JGB to engage them in a negotiation with them to pay off the JGB Loan.   JGB was unavailable. Over the next 6 months, I then tried to contact JGB through my attorney, Charles Wallshein, who operates his own practice in local Suffolk County.  I retained Wallshein around November 24, 2020.  *See* **Exhibit 22**.

33.    Wallshein reported that when JGB responded it indicated that they did not "believe" that I had the capacity to close, despite contrary evidence found in the REYL loan agreement. From November 26, 2020 until the end of March 2021, and again in the late autumn of 2021, I had the opportunity with REYL to close the JGB Loan.

34.    During the JGB-induced standstill, changes occurred at REYL, where one of Italy's largest banks, Intesa San Paolo, purchased a stake in the company.  *See* **Exhibit 23**. Thus, while REYL was still committed to the lending transaction with me and BEI, it had to place the mortgage agreement on hold due to regulatory approval as part of Swiss governance of mergers and acquisitions between financial institutions. Concurrently, I was also working with REYL to refinance my Paris property. The Paris loan agreement, which had similar terms to the JGB Loan, was also temporarily placed on hold, however, REYL successfully completed the refinancing in early December of 2021, after the hold period.

35.    **Because of JGB's delay, REYL, which could only hold the funds for a certain period of time, so I could never close any refinancing on 366 Gin Lane.**

36.    Around the same time that I engaged REYL, during the autumn 2020, the COVID rental market in the Hamptons intensified when thousands of New Yorkers were exiting New York City.  As a result, the Hamptons, which historically had a rental season exclusive to the summer months, booked rentals through autumn and winter, commanding escalated prices due to demand.

*See* **Exhibit 24**. Sotheby's retained no rental clients for either property during the most prolific rental market in Long Island history.

***The Rental Debacle and Grievances***

37.     Thus, I decided to try to rent out the Beachfront Estate. A broker named Anne Prosser ("***Prosser***") from Brown Harris Stevens ("***BHS***") approached me to conduct the rental process. Prosser worked with me on a previous transaction, selling my lower Manhattan penthouse in 2017.

38.     BHS accessed the Beachfront Estate through winter, knowing it had a client in place to rent the estate during the summer months – Memorial Day to Labor Day – of 2021. However, BHS' rental mandate did not include the Adjacent Luxury Estate. I did not grant BHS or Prosser the right to freely enter the Adjacent Luxury Estate. I gave Prosser the only key to the Adjacent Luxury Estate, so she could access the home only when necessary and with my prior consent.

39.     However, upon information and belief and unbeknownst to me, while Prosser was preparing the Debtor's Beachfront Estate for rent and showing it to potential clients, Prosser was repeatedly accessing the Adjacent Luxury Estate for personal use. Prosser filled the fridge with junk food (*see* **Exhibit 27**)**,** invited friends to the property (*see* **Exhibit 28; Exhibi**t: https://www.dropbox.com/s/rjwo0jzqtx7wf5w/WhatsApp%20Video%202022-07-30%20at%2010.40.53%20AM.mp4?dl=0), and spent time lounging on different floors (*see* **Exhibit 29**). Prosser, too, during the summer of 2020 was unable to obtain a renter during the most prolific rental market in Long Island history in Summer 2020, as she was too preoccupied with using the home for personal use.

40.     **In December 2020, Prosser winterized the Debtor's Beachfront Estate in anticipation of a renter. While utilizing the Adjacent Luxury Estate for her personal needs, Prosser told me by email that she turned the water on at the property to complete laundry**

**service, located in the basement.** *See* **Exhibit 30**. **I answered immediately, telling Prosser to turn off the water. Prosser previously charged me for a 3ʳᵈ party laundry service**. *See* **Exhibit 31**. **This is contradictory to her statement "The only work I did on 376 was cleaning (Little Elves) and the plumber work on both sinks"** (*see* **Exhibit 74**). **The items sent to the 3ʳᵈ party service are missing. I retorted that the water should be turned off and remain off immediately because of potential pipe exposures during winter, and that heat should be set to the appropriate minimum temperature**. *See* **Exhibit 30**. **The water was not turned off; it remained running**. *See* **Exhibit 30**. **Prosser stated that this was the only time and the only reason she ever accessed the Adjacent Luxury Estate**. *See* **Exhibit 35**. **However, the foregoing evidence proves this was false. Furthermore, Prosser indicated that it had left the heat on at a sufficient level in the Adjacent Luxury Estate to ensure that the 'pipes would not freeze**. *See* **Exhibit 36.**

41.     **Because of Prosser's actions, in the cold spell of February 2021, many pipes burst in the Adjacent Luxury Estate. It is unclear whether Prosser engineered the flood and acted with disobedience to my express instructions or if it resulted due to lack of attention. The water inundated several rooms and caused extensive damage**. *See* **Exhibit 37.** The flood was discovered by my caretaker who retrieved the key from Prosser.

42.     During the height of the pandemic, the United States and Western Europe were under stringent COVID lockdown restrictions. As a result, I could not travel to the United States from Europe to inspect and tend to my properties; thus, I placed my trust in those local to the area with whom I had a contractual relationship.

43.     When confronted with the damage, Prosser denied responsibility. Concurrently, Prosser found a rental client for the Beachfront Estate. However, Prosser's commentary during

this time is revealing; she suggested that I remain away from the estate during the summer to allow the renter his quiet enjoyment to the Debtor's Beachfront Estate (*see* **Exhibit 38**), even though I would be in a different home.  The renter's term began close to Memorial Day weekend on May 27, 2021. *See* **Exhibit 39**.  However, the renter or his personnel accessed and lodged in the Debtor's Beachfront Estate before the lease commenced, without my consent or knowledge. I called the police on May 25, 2021 to remove the trespassers. A police report was filed.

44.     The rental agreement for the Beachfront Estate included a clause that no major works on the Adjacent Luxury Estate could occur during the summer season, in order to minimize disruption for the renter. *See* **Exhibit 39**.  However, because of the flood, I was placed in an unfavorable position whereby performing repairs to the Adjacent Luxury Estate would constitute a breach of contract.  But, by not remedying the damages from the flood meant that I could not sell the estate in appropriate conditions during the recent market cycle's peak.

45.     Before the renter's term began, I authorized Prosser to only make improvements to the Beachfront Estate. I informed Prosser that she should discuss any improvements and other work with me and to respect a budget that I supplied her.  *See* **Exhibit 41**.  Prosser spent $84,567, of which a considerable amount of charges were excessive – for instance Prosser organized cleaners from New York City to come clean the Beachfront Estate, which cost approximately $10,000 USD when local alternatives could have been found at a much lower price. *See* **Exhibit 42**.

46.     For the rental, BHS refused to take an inventory of the Debtor's Beachfront Estate and Prosser failed to collect the deposit of $75,000. I paid Prosser $75,000, a 10% commission of the rental term's cost of $750,000. The renter then appointed an escrow lawyer with whom I corresponded. The renter's actions foreshadowed his later attempt to purchase the property. The

renter was confident he would soon 'win' the property, evidenced by his diversion of a rent installment held in escrow, totaling $355,000, from Debtor BEI to improvements on the Beachfront Estate.

47.     I initially consented to the usage of $125,000 from the escrow account for more repairs, renovations, and modifications.  *See* **Exhibit 39**.  I specifically created a total budget that the renter could use per line item of improvement.  This was quickly abused. Furthermore, Prosser contacted my husband who had contractual authority over the escrow account. Prosser told my husband that I consented to further payments. I did not. My husband withdrew his contractual powers to prevent the abuse, when he discovered that Prosser was bypassing my budget. Prosser justified the total $355,000 charge by explaining that the home needed that value of work. However, the only work exercised inside the home was air conditioning installations and painting of a wall.  Other charges were inflated.  For example, the cost for cleaners was approximately $10,000. Landscaping bills totaled $170,500.  *See* **Exhibit 47**.  The pool was reconstructed at the expense of $26,400 from the escrow account, which was not authorized in the budget, thus bypassing my instructions and making contracts under her name.  *See* **Exhibit 48**.  Furthermore, a charge was included for painting the exterior of the Adjacent Luxury Estate for $16,000; it was never painted. However, Debtor BEI's Beachfront Estate already had its own painting charge. *See* **Exhibit 49**.

48.     The renter spent $27,000 from his own pocket installing a new security system. *See* **Exhibit 50**.  The installation process cut my existing wires that controlled the gates which provided access to both 376 and 366 Gin Lane, which now need replacement. The renter also withheld approximately $23,000 in rent and did not pay the electricity bill for his time at the property despite being contractually engaged to do so. *See* **Exhibits 39 and 51**.  Wallshein was instructed to send

a demand letter for the missing utilities payments to Brown and Prosser, which his failure to do so or to recommend alternative counsel, sheds light on his mis-allegiance to BEI. *See* **Exhibit 51**. The renter poached my longtime house workers by going to the Adjacent Luxury Estate. *See* **Exhibit 52**. The renter previously said he would not. *See* **Exhibit 53**. I expressly prohibited such attempts; however, the renter did not care. The renter also assumed ownership over gate access to Adjacent Luxury Estate despite the lease stating that the renter had only access to the Beachfront Estate, thus showing that the renter had the view that he already owned the Beachfront Estate.

49.     During this time, I explored working with other lenders as a backup to REYL. In one instance, a lender required a new evaluation of the property. The renter had a contractual obligation to provide property access given 24-hr notice. On July 21, 2021 I notified the renter of the evaluation to be conducted on July 25, 2021—a four-day notice. *See* **Exhibit 55**. The renter prevented access. The renter maintained such a capability because he previously changed the gate codes. The renter denied receiving notice. *See* **Exhibit 56**.   Appraisers were turned away at the gates. I called the police on June 5, 2021, because of the renter's actions. The police submitted another report. The renter claimed he did not change the gate code, yet he installed a new security system. In fact, the gate code was found to be changed from #2092 to 2092*. Prosser claimed to not be involved in this. *See* **Exhibit 58**.

50.     At this stage, I learned that the renter of BEI's Beachfront Estate is a seasoned expert in real estate transactions and has known JGB for approximately 20 years. *See* **Exhibit 59**. The renter asked Blouin to speak to her about JGB. *See* **Exhibit 60**. Blouin also discovered that Prosser had previously known the renter and represented him on other transactions. Prosser did not disclose this conflict of interest. Furthermore, Wallshein emailed me and stated that "[Prosser]

must represent you as a broker per tenant's wishes." *See* **Exhibit 62**. Wallshein detailed in a recording that his wife has become a close friend of Prosser's.

*JGB's Foreclosure Action*

51.     After JGB's commenced action to foreclose its mortgage on Debtor BEI's Beachfront Estate, the state court issued a default judgment on June 1, 2021. The order of reference was served on my then counsel by notice of entry dated June 29, 2021, Index No. 623208/2019 Suffolk County. The state court appointed a referee pursuant to RPAPL 1321, for a judgment of foreclosure and sale pursuant to RPAPL 1351, and for associated legal fee reimbursements.

52.     Wallshein emailed me on Friday July 16, 2021 in respect to the ruling: "A referee to compute has been appointed.  I have not received any correspondence from the plaintiff regarding the referee's hearing. The referee is supposed to serve me with the documents needed to get a judgment. This has not happened. So I think you are safe for at least six months." *See* **Exhibit 64**.

53.     **However, Wallshein was wrong. The referee gave an initial report only 11 days later, on July 27, 2021. Wallshein failed to object to the referee's report. Because Wallshein did not object upon receipt of the report, I lost the right to submit my own computation of the outstanding amount under the JGB Loan, and therefore, JGB's computation prevailed. At this stage, I wanted Wallshein to present to the court my frequent attempts to cure the loan. Wallshein's non-objection ruined my chances of doing so. The referee granted JGB a judgment of foreclosure and sale, and reimbursement for all legal fees, costs, and disbursements**. *See* **Exhibit 65**.  **We have appealed the referee's findings and the decision on the foreclosure action and the lower court's decision.  The appeal is still pending.**

54.     **Further, on January 12, 2022, the Court ruled on JGB's motion to confirm the judgment. The court stated, "Brickchurch was provided notice of the hearing but failed to**

submit any evidence to the referee in connection with the computation of the amount due plaintiffs. By failing to appear at a hearing having received notice of the same, Brickchurch waived its right in regards thereto." *See* **Exhibit 66**. **Wallshein breached his duty of diligence to BEI. Upon information and belief, a failure to appear at a hearing is emblematic of a breach of a lawyer's professional responsibility. Furthermore, Wallshein failed to timely submit demand letters for the renter's unpaid electricity cost.** *See* **Exhibit 51. Wallshein also neglected to help me obtain the necessary documentation and information for a different lender.** *See* **Exhibit 68. Additionally, Wallshein gatekept for 20 days communications from agents representing new prospective buyers (***see*** Exhibit 63), with some communications about offers never reaching me**.

### *Renter's Offers to Purchase and JGB's Refinancing Refusals*

55.     Meanwhile, following the termination of the rental lease, the renter made a series of purchase offers on the Beachfront Estate. On November 17, 2021, he submitted a purchase offer on the property for $32 million USD—the same approximate amount that I previously presented to JGB months earlier, in the form of the mortgage agreement proposed by REYL. I rejected it. On December 7, 2021, the renter wanted to purchase JGB's outstanding debt, so he asked me for the property's deed by way of Wallshein. Wallshein specified over a subsequent recording that he went to the renter's office to discuss the proposal and found the renter "to be impressive."   I had no knowledge of their meeting and never provided consent. I rejected it.

56.     On March 29, 2021, the renter submitted a purchase offer for the Beachfront Estate for approximately $40 million USD using Prosser as his agent. *See* **Exhibit 70**. I rejected it. I asked Wallshein not to speak with Prosser regarding the transaction, and instead speak with attorneys on the transaction. *See* **Exhibit 71**. Wallshein disobeyed. In addition to the renter's bad faith, I believed REYL's assurances, with whom I recently completed refinancing on my Paris

apartment. I also knew that a sale at this price constituted a significant discount because the Beachfront Estate held an approximate value of $63 million USD. *See* **Exhibit 1**.  In short, my rejection of the myriad offers was reasonable and based on the fact that the purchase offer amounts were too low; they did not reflect the market value of the property.

57.     Because of the renter's actions and JGB's refusal to correspond to REYL's agreement, I lost valuable time and a probable opportunity to attain new financing. Despite presenting a viable solution for months, exposures confronting REYL's new partner, Intesa San Paolo, prevented them from proceeding with the mortgage.

58.     The facts indicate that JGB was content to wait and deliberately did not respond to my refinance offer from REYL. JGB could maximize its investment by collecting default interest at an accelerated rate and push the property into auction whereby they could either purchase the property themselves at a discount or recoup any losses from a lower-valued sale through a collateralized interest in the Adjacent Luxury Estate owned by non-debtor Aberdeen Enterprises, Inc.  The facts also suggest that JGB's unwillingness to work with me, allowed their longtime 20-year associate, the renter, to unleash those series of offers on the property's debt and the property, equipped with wrongful advantages.

59.     On March 4, 2022, I instructed Wallshein, BEI's lawyer, to reach out to JGB (as they would only speak to counsel) to provide an offer of $32million + $2 million in cash and to understand the position of the firm. *See* **Exhibit 65**.  This is the proof that it was done.

60.     The auction for the Beachfront Estate was scheduled for May 2, 2022, at the Southampton Town Hall.  On April 22, 2022, Wallshein says the notice of sale was addressed improperly, and I was not informed, neither from our broker or our lawyer. Upon information and

belief, Prosser appeared at the auction along with the legal representative of the renter.  *See* **Exhibit 77**.  **I received late notice of the auction date**.

61.    The renter then submitted an offer on the entire Estate for $75 million USD in collaboration with another party who would assume the purchase of the Adjacent Luxury Estate. I rejected it because the combined Estate is worth more than $133 million. Furthermore, I then found that the renter displaced various items in the Beachfront Estate in contravention of his previous lease terms. *See* **Exhibit 75**.  The items were severely damaged.  *See* **Exhibit 76**.

62.    I reasonably believed that I engaged in a business transaction with a reputable partner, JGB; instead, I engaged with a predator. My inability to travel to the United States during COVID lockdowns, allowed Prosser and the renter to unleash a coercive and unlawful campaign to purchase the estate at a severe discount.

63.    In its filing in this Court, JGB reproached me for not accepting an initial lower offer of $25 million just prior to the JGB Loan's maturity on November 1, 2019. However, this reproach is inconsistent and in bad faith since not only was the offer of $25 million below what JGB was owed at the time – $26 million plus penalties as part of the forbearance agreement – but JGB communicated to me that it would only accept "full-value" of the JGB Loan when I offered more than $25 million.  JGB further displayed inconsistency when the offer of $32 million - which was also below face value - was made by the renter, who would only have made the offer knowing that JGB would accept a lower value than what was owed during the summer of 2021 **JGB was in negotiation to sell its debt to the renter at $32 million earlier on.  I, in good faith, made two offers and many attempts at communication with JGB that went unanswered.  The offers were for approximately $28 million in May 2020, which at the time reflected six months of additional interest and $32.4 million plus $2 million of prepaid interest, totaling $34.4**

**million, as part of the REYL loan agreement in November of 2020.  JGB's lack of response to these offers suggests bad faith on their part, especially given that the facts strongly indicate that JGB never wanted to be refinanced by BEI and myself.**

64.    It is my personable good faith belief that the facts plead a probable claim of wrongdoing, not only one of mere possibility. The damage caused to BEI is immense. The harm committed is of the most egregious kind for which the law must provide a remedy and safeguard.

***Sotheby's Misconduct***

65.    Sotheby's also revealed themselves as a bad actor through agent Harald Grant. Sotheby's presented a conflict of interest, disrespectful conduct, price manipulation, and while contracted for sale at $140 million, did not honor this and wrongfully internally believed the houses should be sold for $80 million. The bidder that was working with JGB was also a client of Grant's. Grant did not list the property on MLS, and left numerous calls unanswered from other brokers, such as Sara Burack from Nest Seekers.  *See* **Exhibit 77**.

66.    I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

[*Signature Page Follows*]

Dated:  August 22, 2022

/s/  _Louise Blouin_
**Louise Blouin, Director**
Brickchurch Enterprises, Inc.

STATE OF NEW YORK

  I HEREBY CERTIFY that on or about this $2{2}_{nd}$ day of August, 2022, before me, a Notary Public for the state aforesaid, personally appeared **Louise Blouin**, known to me or satisfactorily proven to be the Person whose name is subscribed to the foregoing instrument, is duly authorized to execute, and has executed, such instrument on its behalf for the purposes therein set forth; and that the same is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Notary Public

My commission expires on 04/12/2025

KEVIN RODRIGUEZ OSORIO
NOTARY PUBLIC, STATE OF NEW YORK
NO.01RO6416209
QUALIFIED IN SUFFOLK COUNTY
TERM EXPIRES APRIL 12, 2025

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on August 22, 2022 a true and correct copy of the foregoing *Affidavit of Louise Blouin in Support of (I) Debtor's Response in Opposition to JGB's Motion to Dismiss Pursuant to 11 U.S.C. §§305(a) and 1112(b) of the Bankruptcy Code, (II) Debtor's Response in Opposition to JGB's Motion for Relief from Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code and (III) Debtor's Chapter 11 Relief* was served electronically upon the counsel and parties of record through the Court's Electronic Case Filing System.

/s/ *Camisha L. Simmons*
Camisha L. Simmons