Exhibits

**Exhibit 1**



# VANDERBILT
## APPRAISAL COMPANY

**APPRAISAL REPORT**
**366 GIN LANE & 376 GIN LANE**
**SOUTHAMPTON NEW YORK, NY 11968**



**PREPARED FOR:**
**REYL & Cie SA**
**Rue du Rhone 62**
**1204 Geneve**
**SUBMITTED BY:**
**MICHAEL VARGAS, CREA**
**PRESIDENT/CEO**

**November 4, 2020**

**REYL & Cie SA**
Rue du Rhône 62
1204 Genève

**Re: Appraisal Report 366 & 376 Gin Lane, Southampton, NY 11968**

(Two single-family dwellings totaling approximately 22,000 square feet on 4.02 acres with 404' of ocean frontage)

To Whom It May Concern:

This report serves as an appraisal update of a report completed in December 10, 2019 by us for the purpose of formulating an opinion of the market value as of the new effective date of the appraisal for an evaluation of loan collateral. The properties were last inspected December 2019 for the previous appraisal but not re-inspected for this update. The property owner confirmed that there have been no material changes to the building. The effective date of this update is October 15, 2020. The appraisal report includes the assumption that the property was in the same condition as found in Dec 2019.

The value opinion reported is qualified by certain assumptions, limiting conditions, certifications, and definitions, which are set forth in the report.

Based on the analysis contained in the following report, the market value of the referenced properties, as of October 15, 2020 are as follows:

| MARKET VALUE CONCLUSION |
| :---: |
| *376 Gin Lane: $70,000,000* |
| *366 Gine Lane: $63,000,000* |
| |
| *Total Market Value: $133,000,000* |

The attached report includes definitions of market value and the property rights appraised. The properties are appraised on an all cash basis, free and clear of mortgages and/or debt instruments. The appraisal is subject to the basic assumptions and limiting conditions set forth in this appraisal report.

The Sales Comparison Approach was the only valuation methodology employed in the appraisal report. The other common approaches to value - the Cost Approach and the Income Capitalization Approach - were not considered in the appraisal of the property because these approaches are not relevant for this particular property.

The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with our interpretation of the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code

of Professional Ethics and The Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA), Title XI Regulations.

The attached appraisal report sets forth the identification of the property; the assumptions, definitions and limiting conditions; pertinent facts about the neighborhood; pertinent facts about the subject property; comparable sales data and analysis; description of the appraisal process and the final reconciliation of value.

We have performed our services and prepared this report in accordance with applicable, generally accepted appraisal and consulting practices.

It has been a pleasure to assist you in the assignment. If you have any questions concerning the analysis, or if Vanderbilt Appraisal Company, LLC can be of further service, please contact us at (212)546-1070.


Respectfully submitted,


Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

366 & 376 Gin Lane, Southampton, NY 11968                                                    FILE #2010-50070

## Appraisal Certification

### Effective Date of Value: October 15, 2020

I hereby certify that:

1. The statements of fact contained in this report are true and correct to the best of my knowledge and belief;

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and represent my personal, unbiased, professional analyses, opinions, and conclusions;

3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved;

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of this report;

5. My analyses, opinions, and conclusions have been developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute, and also according to the Uniform Standards of Professional Appraisal Practice ("USPAP") as set forth by the Appraisal Foundation, and with Title 12 of the Code of Federal Regulations, Part 1608 and 1608.4.

6. The subject was previously inspected by Michael Vargas in December 10, 2019. Prior appraisal services were performed in December 2019 for the same client and same intended use. No new site inspection was completed for current assignment

7. Significant professional research assistance was provided by Laura Villarnizar, Research Analyst;

8. The appraiser has sufficient experience in the appraisal and review of similar properties;

9. The appraiser is appropriately licensed and certified to appraise the subject in the state in which the property is located;

10. This appraisal assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan;

11. After consideration of data and performance of methodologies deemed relevant to value, the most important of which are set forth in the body of this appraisal report, it is my unbiased, professional opinion that the "as is" market value of the subject property, 366 & 376 Gin Lane, as of October 10, 2020 are as follows:

| MARKET VALUE CONCLUSION |
| :---: |
| 376 Gin Lane: $70,000,000 |
| 366 Gin Lane: $63,000,000 |
| |
| Total Market Value: $133,000,000 |

Respectfully submitted,

Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

**Assumptions & Limiting Conditions**

This appraisal report has been made with the following **general assumptions:**

1. No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2. The property is appraised as if free and clear of any or all liens or encumbrances except those specifically set forth in the report. We are unaware of any liens on the property, but such liens may exist.

3. Responsible ownership and competent property management are assumed.

4. The information furnished by others is believed to be reliable and has been verified to the extent feasible. However, no warranty is given for its accuracy.

5. All engineering is assumed to be correct except as otherwise noted. The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

6. It is assumed that there are no hidden or unapparent conditions of the property subsoil or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

8. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity or noncompliance has been stated, defined, and considered in the appraisal report.

9. It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10. It is assumed that the utilization of the land and improvements is within the boundaries of the property lines of the property described herein and that there is no encroachment or trespass unless noted in the report.

11. An investigation makes it reasonable to assume, for appraisal purposes, that no insulation or other product banned by the Consumer Product Safety Commission has been introduced into the appraised premises. The heating, electrical, plumbing and other mechanical systems have not been tested specifically, but are assumed to be in good working order unless otherwise specified.

This appraisal is made subject to the following **general limiting conditions:**

1. Any value estimates provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the value estimate, unless such proration or division of interests has been set forth in the report.

2. Possession of this report, or a copy thereof, does not carry with it the right of publication.

3. The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made thereof.

4. This appraisal is to be used in whole and not in part. No part of it shall be used in conjunction with any other appraisal.

5. Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales or other media without the written consent and approval of the appraisers, particularly as to valuation conclusions, the identity of the appraisers or the firm with which the appraisers are connected.

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| Property Appraised: | 366 & 376 Gin Lane, "the subject property", are two joined beach front properties located in Southampton, NY. The total property is comprised of 2-single family residences that total approximately 22,000+/- sf of gross building area (including fully finished basement level). |
| Appraisal Report Client: | REYL (c/o Christophe Dubois, Credit Officer) |
| Location: | Southampton, NY "The Hamptons"<br>Section: 29.00 Block: 1.00 Lots:17.014 / 17.013 |
| Interest Appraised: | Fee Simple Interest |
| Effective Date of Appraisal: | October 15, 2020 |
| Intended Use: | The intended use of this appraisal is to assist the client in determining the current market value of the asset for an evaluation of the properties as loan collateral. |
| Year Constructed: | 1910/2004 |
| Current Owner (Public Records): | #366: Brickchurch Enterprises<br>#376: Abreeden Enterprises<br>c/o Private Office of Louise Blouin |
| Current Occupancy: | The "subject" is a mansion quality compound comprised of two mansion style single-family dwellings featuring a total of 21 bedrooms; 18 bathrooms and 3 powder rooms (among both houses) plus full finished basements with additional staff, guest, and recreation space. |
| Gross Building Area (in square feet): | 22,000 +/- (including basements) |
| Lot Size: | 4.02 Acres |
| Zoning: | R20 |
| Highest and Best Use "As Vacant" | Development to maximum floor-area ratio of a Single-Family Residence |
| Highest and Best use "As Improved" | Single Family Residence |

**Value Conclusions:**

| | |
|---|---|
| **Cost Approach** | **Not developed** |
| **Income Approach** | **Not developed** |

| | |
|---|---|
| **Sales Comparison Approach:** | **376 Gin Lane: $70,000,000** |
| | **366 Gin Lane: $63,000,000** |

**RELEVANT TERMS OF THE APPRAISAL ASSIGNMENT**

<u>**Intended Users/Use**</u>

The intended users of the appraisal report are the stated Client – REYL Bank.

Additional intended users include the property owners of record (c/o Louise Blouin).

The intended use of this appraisal is to assist the Client in determining the current market value of the real estate assets as potential collateral for a loan.

<u>**Property Rights Appraised**</u>

The property rights appraised consist of the Fee Simple Estate in the subject property.

**Fee Simple Estate**, which is defined in the <u>Dictionary of Real Estate Appraisal</u> as:

*Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation.*

<u>**Scope of the Appraisal**</u>

USPAP defines Scope of Work as the type and extent of the process of collecting confirming and reporting data and the type and extent of analysis in an assignment. It is the work an appraiser performs to develop credible assignment results. Credible assignment results require support, relevant evidence and logic, to the degree necessary for the intended use. Disclosure of the Scope of Work in this report is intended to provide the Intended Users with an understanding of the appraiser's actions in arriving at assignment conclusions.

The Scope of Work Rule states that an appraiser's Scope of Work is acceptable when it meets or exceeds both (1) the expectations of parties who are regularly intended users of similar assignments; and (2) what an appraiser's peers' actions would be in performing a similar assignment. The report must contain sufficient information to allow the users to understand the Scope of Work performed.

Assignment elements define and characterize the problem to be solved in an appraisal, which in turn determines the type and extent of research and analysis to include in the development process. Assignment elements include client, intended use, intended users, type and definition of value, effective date, relevant characteristics of the subject property, and assignment conditions.

Assignment conditions include assumptions, extraordinary assumptions, hypothetical conditions, jurisdictional exceptions, and other conditions that affect the Scope of Work.

This Appraisal Report is prepared in conformity with the Uniform Standards of Professional Appraisal Practice. Following are major elements in the Scope of Work leading to the conclusion of value:

1.  A thorough physical inspection of the property and the surrounding area, similar to the inspection that would be performed by a potential purchaser but less comprehensive than would be performed by a professional engineer which a purchaser might hire. The inspection does not include determination of the existence of harmful substances such as asbestos.

2.  An investigation of relevant zoning codes and building regulations. The scope of this investigation is not as thorough as would be performed by a contractor or architect but is sufficient to determine the feasible alternative uses for the subject property.

3.  Investigation of market activity in order to accumulate sufficient data from which to derive indications of market value by the relevant approaches. This investigation may be limited by the amount of activity in the marketplace, the availability of reliable data, and the willingness of principals to divulge the details of their transactions.

4.  Analysis of the accumulated data by the recognized and relevant approaches to value. We have valued the property via the Sales Comparison Approach. As indicated in the Reconciliation and Final Opinion of Value sections, an "as is" value was derived from an analysis of all pertinent data.

## Definition of Market Value

**"Market Value"** is defined by the Office of the Comptroller of the Currency under 12 CFR, Part 34,

Subpart C - Appraisals, 34.42 Definitions, as:

> "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby:

1.  buyer and seller are typically motivated;

2.  both parties are well-informed or well advised, and acting in what they consider their own best interests;

3.  a reasonable time is allowed for exposure in the open market;

4.  payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.      the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

This value is estimated in terms of cash or terms equivalent to cash. The subject property is appraised on an "as is" basis.

## Statement of Ownership

The Uniform Standards of Professional Appraisal Practice require the appraiser to report on, and take into consideration, any sales of the subject within the last three years, as well as any pending contracts and/or listings of the subject.

According to public records, the property has not transferred in the last 3 years.

According to review of available data sources, the property has not been formally listed for sale. There was a prior listing of the property for $140,000,000. The listing broker was Sotheby's international Realty. Currently, the property is not officially listed for sale. There is no marketing campaign or promotion for the property.

## Inclusions and Exclusions

The property appraised consists of the real estate only. Furnishings, personal property, supplies and any current or intangible assets that may exist are excluded from this appraisal.

## Extraordinary Assumptions and Hypothetical Conditions

### Extraordinary Assumptions

An extraordinary assumption is defined by the *Uniform Standards of Professional Appraisal Practice* as "an assumption directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This report employs no extraordinary assumptions.

### Hypothetical Conditions

A hypothetical condition is defined by the *Uniform Standards of Professional Appraisal Practice* as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This report employs no hypothetical conditions.

**Exposure Time**

Exposure time is not intended to be a prediction of a date of sale. Instead, it is an integral part of the appraisal analysis and is based on one or more of the following:

- statistical information gathered about days on the market for comparable properties
- information gathered through sales verification
- interviews of market participants.

The reasonable exposure period is a function of price, time, and use. It is not an isolated estimate of time alone. Exposure time is different for various types of real estate and under various market conditions. Exposure time is the estimated length of time the property would have been offered prior to a hypothetical market value sale on the effective date of appraisal. It is a retrospective estimate based on an analysis of recent past events, assuming a competitive and open market. It assumes not only adequate, sufficient, and reasonable time but also adequate, sufficient, and reasonable marketing effort.   Exposure time is therefore interrelated with appraisal conclusion of value.

In consideration of these factors, we have analyzed the following:

- Appraisal Files
- Broker Marketing Reports
- Opinions of knowledgeable real estate professionals.

The following table presents the information derived from these sources:

**Exposure Time**

| | Range | Average |
|---|---|---|
| Data Source | | |
| Appraisal Files | 1.0-28.0 | 18.00 |
| Local Market Professionals | 3.0-29.0 | 16.00 |

Based on the foregoing data, an exposure time of 12-18 months is reasonable and appropriate for the subject property to achieve the stated value. We assume the property would have been competitively priced and aggressively promoted to procure hypothetical sale within the estimated exposure time.

## Marketing Time

Marketing time is the period a prospective investor would forecast to sell the subject property immediately after the date of value, at the value estimated. The marketing time is an estimate of the number of months it will require to sell the subject from the date of value, into the future. The anticipated marketing time is essentially a measure of the perceived level of risk associated with the marketability, or liquidity, of the subject property. The marketing time estimate is based on the data used in estimating the reasonable exposure time, in addition to an analysis of the anticipated changes in market conditions following the date of appraisal.

The future price for the subject (at the end of the marketing time) may or may not equal the appraisal estimate. The future price depends on unpredictable changes in the physical real estate, demographic and economic trends, real estate markets in general, supply/demand characteristics for the property type, and many other factors.

Based on research of broker publications, appraisal files and discussions with knowledgeable brokers, the market is currently strong for this property asset class and public demand is sufficient that the property (if priced accurately) would sell with 12-18 months of marketing time.

## Valuation Methods

### Cost Approach

In order to complete the Cost Approach, the value of the land is added to the replacement cost of the improvements less depreciation. In New York City, there are a limited number of land transactions, which makes the valuation of land challenging. Furthermore, estimating accrued depreciation accurately is often difficult for a property like the subject which is over 100 years old. The Cost Approach is typically used to value special purpose properties such as schools, government buildings, and houses of worship. For these reasons, we do not consider the Cost Approach to be applicable in this appraisal.

### Income Capitalization Approach

The Income Capitalization Approach to value consists of methods, techniques and analytical procedures used by the appraiser to analyze an income producing property's capacity to generate monetary benefits by converting future benefits into a present value. Both the quantity and quality of an income stream are determined and then processed to produce an indication of value. Capitalization is defined as the process of converting anticipated future installments of net income into present value. The two most common techniques for converting net income into value are direct capitalization and discounted cash flow analysis. There is a market for seasonal rentals of properties like the subject and the properties individually and together have the capacity to generate rental income. However, sale prices in the market are not determined by rental income capacity. As such, the Income Capitalization Approach to value is not applicable.

### Sales Comparison Approach

The Sales Comparison Approach determines value by comparing the property being appraised (i.e. subject property) against properties that have recently sold in the area and are similar in location, size, age, construction, style, appeal, and special amenities. These properties are also known as comparable properties (or comps). Properties used in estimating a value are selected on the basis of similar property and non-property characteristics as applied to the subject. An opinion of market value for the subject property is formulated from the analyzed data. This approach to value is the most useful for a property like the subject which has as its highest and best use, the continued use as single family dwellings. As such, this approach to value is the only relevant approach to determine value of the subject.

## MARKET CONDITIONS

**The housing market comprised of ultra-luxury, mansion quality dwellings and compounds in The Hamptons is largely tied to economic conditions evident in the NYC market area. While technically part of Long Island and Suffolk County, the relative trends of The Hamptons upper-end housing markets are directly tied to the NYC economy. As such, we present in following section, general economic conditions in the NYC area.**

SUMMARY OF ECONOMIC ACTIVITY
NEW YORK STATE
October 2020

Economic activity in the Second District economy grew slightly in the latest reporting period, as the pace of re-opening has been gradual and the virus spread has remained subdued across most of the District. Employment has been steady overall, with some industries adding jobs but others reducing headcounts. Input prices continued to rise moderately, while selling prices were little changed. Consumer spending has flattened out, while tourism has picked up somewhat but remains depressed. Housing markets have been mixed but, on balance, somewhat stronger, while markets for office and retail space have softened further. Commercial construction activity has remained depressed, though residential construction has shown scattered signs of picking up. Finally, banks reported increased demand for commercial and home mortgages, tighter credit standards, and a downward shift in delinquency rates for commercial and residential mortgages. Overall, business contacts have become somewhat less optimistic about the near-term outlook.

**Employment and Wages**

The labor market has been steady, on balance, in recent weeks. Manufacturers, wholesalers, and leisure & hospitality firms have reported some net hiring, whereas contacts in the information, transportation, and construction sectors have reported modest staff reductions. A major upstate New York employment agency noted a pickup in hiring, particularly for manufacturing and customer support jobs. A New York City agency specializing in office jobs noted scattered hiring in the financial sector but characterized the job market overall as sluggish, with many job-seekers laid off from retail and hospitality. This contact also noted that many companies are still largely operating remotely and are reluctant to on-board new staff to work from home.

Business contacts in most sectors said they plan to increase staffing levels in the months ahead, with the most widespread gains anticipated among manufacturers. In contrast, more transportation & warehousing firms plan to reduce than expand employment.

Wages have edged up overall, except in the information sector, where contacts mostly reported flat to declining wages. Looking ahead, businesses generally expect wages to accelerate modestly—particularly in the trade & transportation sector.

**Prices**

Business contacts reported that input costs continued to rise moderately. In particular, contacts involved in construction noted sharply increasing prices for lumber and other construction materials. A number of contacts noted that, aside from the prices of inputs, they have incurred additional costs in adapting to new safety concerns and complying with regulations. Retailers and wholesalers reported some increases in selling prices, but businesses in other sectors indicated that selling prices were little changed. Looking ahead, somewhat more contacts than in recent months indicated plans to raise their selling prices—most notably, in the retail sector.

**Consumer Spending**

Consumer spending showed signs of leveling off since the last report. Retailers reported that sales grew at a subdued pace in recent weeks, as restrictions continued to be gradually eased, though business remained well below pre-pandemic levels. Stores in upstate New York tended to outperform those in other areas. New vehicle sales softened further in the latest reporting period, with sales down from brisk summer levels, according to dealers in upstate New York. This continued pullback is largely attributed to low inventories, though one contact noted that inventory levels picked up starting in late September. Sales of used vehicles have held up better due to less pronounced inventory problems. Separately, consumer confidence among New York State residents rose notably in September, reaching its highest level since the beginning of the pandemic.

**Manufacturing and Distribution**

Manufacturing activity has picked up in the latest reporting period, growing at a moderate pace. Wholesale trade firms noted a brisk rebound in activity, which had been flat or declining since the onset of the pandemic. In contrast, contacts in the transportation & warehousing sectors continued to report weakening business activity, with some noting difficulties in replenishing inventories.

Looking ahead, manufacturers and wholesalers remained largely optimistic, while transportation & warehousing contacts have grown increasingly pessimistic.

**Services**

Service industry contacts generally reported that business activity has been steady to slightly lower, after weakening during the late summer. Contacts in the professional & business services and education & health sectors reported steady activity, while those in leisure & hospitality and information reported slight declines. Service firms generally indicated they do not expect activity to change significantly in the months ahead

Tourism has shown scattered signs of a pickup. The more rural tourist destinations across the region have reportedly fared reasonably well. New York City's tourism sector, in contrast, has been depressed, though there have been signs of modest improvement. Hotels have seen some pickup in occupancy, but a sizable proportion remain closed, and those that are open are still at somewhat below half capacity—with about half of that reflecting arrangements with the city to house the homeless. While business travel has remained moribund, a pickup in weekend

occupancies signals some return of leisure visitors—a trend that was also evident in strong attendance at the 9-11 memorial site and a modest increase in visits to local museums. New York City restaurants, which benefited from a broad expansion in outdoor dining during the summer, have more recently been allowed to restart indoor dining with limited capacity—a change that occurred earlier on in the rest of the District. As the onset of cold weather inevitably reduces outdoor dining, many are concerned that demand for indoor dining will be limited by safety concerns. Movie theaters have reopened in New Jersey and Connecticut but remain closed in New York.

**Real Estate and Construction**

Housing markets have improved somewhat across much of the District. New York City's sales and rental markets have continued to weaken, while markets elsewhere— particularly for single-family homes—have been increasingly robust. New York City's rental vacancy rate has surged to a multi-decade high, and rents have fallen by roughly 10 percent from pre-pandemic levels, as landlord concessions have become more common. Demand for smaller units has fallen particularly sharply. Rents and rental vacancy rates across the rest of the District have generally been stable.

The residential sales market has been mixed. Sales of Manhattan condos and co-ops have been sluggish and running nearly 50 percent lower than a year earlier, while the listing inventory has risen sharply; still, prices have been reasonably steady thus far. Across the rest of the District—even in other parts of New York City and the metro area—inventories have fallen to low levels and prices have climbed. Sales volume has risen but continues to be constrained by limited supply. In some areas, bidding wars were reported to be increasingly common.

Commercial real estate markets have weakened further. Office availability and vacancy rates have risen sharply in New York City and moderately across the rest of the District. Similarly, office rents have declined noticeably in New York City, running about 8 percent lower than a year ago. Across the rest of the District, office rents were steady to down modestly. Retail vacancies have continued to increase, and asking rents have declined further.

New construction activity has remained sluggish and well below year-earlier levels. Single-family construction has increased somewhat in recent months, while multifamily construction has remained sluggish, and commercial construction has been particularly depressed. Contacts in real estate and construction expressed increasing concern about the near-term outlook.

**Banking and Finance**

 Small to medium-sized banks in the District reported increased demand for residential and commercial mortgages but little change in demand for other categories of loans. Refinancing activity increased. Bankers reported some tightening in credit standards on commercial mortgages but stable credit standards across all other categories. Delinquency rates declined for residential and commercial mortgages but remained stable for consumer and commercial & industrial loans. Finally, bankers reported increasingly lenient policies for delinquent accounts across all categories.

**SUMMARY OF ECONOMIC ACTIVITY**
**NEW YORK CITY**
**October 2020**

Comprising the five boroughs of Manhattan, Brooklyn, Queens, the Bronx, and Staten Island, New York City has a population of around 8.6 million that is ethnically and culturally diverse. Its economy is the largest in New York State and among the largest in the world. Nearly 70 percent of households rent their homes, many of which are rent-stabilized. Land prices and thus home prices are exceptionally high—particularly in or near prime areas of Manhattan. The Great Recession was less severe in New York City than in most of the nation, and since then, the City has experienced its strongest economic boom in decades, with much of this growth seen in the City's outer boroughs. The recent growth has come with little contribution from the securities industry, which had historically been a key driver of economic expansions. Many different sectors, including leisure and hospitality, education and health, and construction, have seen robust job growth, and employment in the relatively well-paying tech cluster has expanded sharply. These trends have led to an increasingly diversified New York City economy in recent years.

| | NEW YORK CITY | ORANGE-ROCKLAND-WESTCHESTER* | LONG ISLAND* | NEW YORK STATE | USA |
|---|---|---|---|---|---|
| Population 2018 | 8,399,000 | 1,675,000 | 2,839,000 | 19,542,000 | 327,167,000 |
| Population growth 2018, 10-year change | 0.6% | 3.9% | 1.2% | 1.7% | 7.6% |
| GDP 2017, billions | $937 | $118 | $186 | $1,598 | $19,485 |
| Job growth 2018, 5-year change | 13.2% | 6.7% | 5.0% | 8.0% | 9.3% |
| Median household income 2017 | $60,000 | $83,000 | $100,000 | $64,000 | $60,000 |
| Median home price 2017 | $575,000 | $326,000 | $420,000 | $300,000 | $200,000 |
| Population share age 25+ with BA+ 2017 | 37.3% | 43.0% | 40.6% | 36.0% | 32.0% |

Sources: U.S. Census Bureau, U.S. Bureau of Labor Statistics, U.S. Bureau of Economic Analysis, IPUMS USA, University of Minnesota, Trad-Prod Rate statistics. Data derived through American FactFinder; Moody's Economy.com; or directly from source.





*Source: Beige Book – Federal Reserve; newyorkfed.gov*

**LONG ISLAND REGION ECONOMIC SNAPSHOT**

The Long Island Region covers Nassau and Suffolk Counties and is part of the New York City metropolitan area. The region's economy has greatly benefited from this connection.

Some of the nation's first suburbs were in Nassau County, which grew rapidly in the middle of the 20th century. It now contains some very wealthy areas alongside areas that have lower incomes and problems usually associated with large cities.

Suffolk County developed at a somewhat slower pace and benefitted from continued population growth over the last few decades, though this growth has also slowed. Estimates show a moderate decline since 2010.

Broadly speaking, Long Island residents enjoy a high quality of life, reflected in high median incomes, relatively low unemployment and crime rates, strong public schools, numerous higher educational opportunities and many cultural and natural recreational activities.

However, the region's population and economic growth comes with challenges, such as traffic congestion and high property taxes. Long Islanders face some of the highest tax burdens in the State. The recent federal tax law caps the deductibility of State and local taxes, making the burden even higher for many taxpayers. The region also struggles with high housing costs.

Local governments on the Island are currently undertaking projects meant to improve the quality of life. Downtown corridors and railroad hubs are among the economic development projects in both counties.

• Long Island is home to 2.8 million people. The population rose rapidly from less than 1 million in 1950 to more than 2.5 million in 1970. Since 1970, the pace of growth has slowed. From 2010 to 2018, growth was only 0.1 percent, with Suffolk County losing population.

• Long Island added 115,400 jobs between 2009 and 2018, reaching a record of more than 1.3 million jobs.

• The unemployment rate fell from 7.5 percent in 2010 to 3.7 percent in 2018.

• The region had the second highest average wage in the State in 2017, $60,084.

• The median household income in 2017 was $105,744 for Nassau County and $92,838 for Suffolk County, higher than the State median of $62,765.

• In 2017, the homeownership rate for the region was 72 percent, compared to 48 percent for the State.

• The 2017 median home value was $460,700 in Nassau County and $379,400 for Suffolk County, much higher than the State median of $293,000.

• Despite high incomes, 43 percent of homeowners have housing costs exceeding 30 percent of income in 2017, compared with 36 percent in the State overall.

• Long Island's violent crime rate was less than one-third of the State and national rates in 2017. Property crime was also below the State and national rates. There are, however, some areas where crime remains a problem.

• Commute times are long, and 2018 saw the worst on-time performance by the LIRR since 1996.

• Wastewater treatment is one of the region's most critical challenges, especially in Suffolk County, where home septic tanks and cesspools are contaminating surface water.

*Source: Office of the New York State Comptroller*

**HAMPTONS MARKET REPORT**
**The South Fork – 3 Quarter 2020**
Source: Corcoran



South Fork reported closed sales increased 38% year-over-year. Median price was up 21% from Third Quarter 2019, resulting in the highest median price on record. The high-end had a notable increase in transactions as the number of reported sales over $2M increased by 88%.

The number of sales increased in all but one South Fork village or hamlet. The largest increase in sales occurred in Southampton Village, where closings swelled 89% year-over-year. Bridgehampton/Sagaponack also had a sizable increase of 80%. The other villages and hamlets ranged from 18% up to 60% increases versus Third Quarter 2019. The only area with a decrease in sales was East Quogue/Hampton Bays, where there was a slight 4% decline in closings. Sales volume increased in 11 of 13 areas, most notably in East Hampton Village and Quogue Village/Quogue, where it rose 330% and 104%, respectively.

Due to added deals at the high-end, average and median price both rose. Average price was up 11% to $2.041M, the highest third quarter on record. Median price increased 21%, the largest annual increase in over fi ve years, to $1.2M, the highest South Fork median price on record.

Most villages and hamlets saw their price statistics rise year-over-year. The most dramatic change was in East Hampton Village, where average price was up 187% and median price was up 104%, the result of fi ve sales over $5M, compared to zero in Third Quarter 2019.

| SOUTHAMPTON | 3Q20 | 3Q19 | %CHG (YR) |
|---|---|---|---|
| SALES | 71 | 45 | 58% |
| VOLUME | $100.135M | $61.630M | 62% |
| AVERAGE | $1.140M | $1.370M | 3% |
| MEDIAN | $990K | $1.050M | -6% |

| SOUTHAMPTON VILLAGE | 3Q20 | 3Q19 | %CHG (YR) |
|---|---|---|---|
| SALES | 34 | 18 | 89% |
| VOLUME | $111.392M | $106.375M | 5% |
| AVERAGE | $3.276M | $5.910M | -45% |
| MEDIAN | $2.383M | $2.688M | -11% |

East of the canal on the South Fork, the biggest drop in market share occurred between $500K and $1M, which fell by 4%. Due to a 150% increase in the number of sales from $2M to $3M, that price range's share increased 6%.

West of the canal, the only drop in market share happened under $500K, which fell by 10%. The most notable increase occurred from $500K to $1M, up 3% from Third Quarter 2019, but the second greatest increase in share was at the very high-end over $5M, up 2%.

The Residential Luxury Market

The luxury market is defined as the top 10% of all residential sales made within the period being reported. As various factors redefine the high-end market in any given period, these numbers may exhibit more volatility than the market overall. Because the luxury market is a fixed percentage of the overall market, the change in reported luxury sales will always match the overall market.

The top of the market on the South Fork was quite active. Although luxury average price increased minimally, median price increased 26% to nearly $5.8M. In Third Quarter 2020, there were 50% more sales over $10M. The most expensive sale was at 38 Two Mile Hollow Road, which sold for $24M.

On the North Fork, the luxury average and median price increased 19% and 34%, respectively. Although there was a similar number of sales over $2M, the top 10% of deals in Third Quarter 2020 has a lower concentration of sales under $1.5M, causing average and median price to increase.

| SOUTH FORK | 3Q20 | 3Q19 | %CHG (YR) |
|---|---|---|---|
| SALES | 60 | 44 | 36% |
| VOLUME | $475.989M | $346.084M | 38% |
| AVERAGE | $7.933M | $7.866M | 1% |
| MEDIAN | $5.795M | $4.600M | 26% |

| NORTH FORK | 3Q20 | 3Q19 | %CHG (YR) |
|---|---|---|---|
| SALES | 14 | 12 | 17% |
| VOLUME | $27.597M | $19.827M | 39% |
| AVERAGE | $1.971M | $1.652M | 19% |
| MEDIAN | $1.718M | $1.279M | 34% |

**Hamptons Real Estate Prices Break Records As New York City Wealthy Flee to The Beach**
**Oct 22, 2020 – Robert Frank**
CNBC.com

Key Points

- The average sales price in the Hamptons soared 46% in the quarter to just over $2 million, according to a report from Douglas Elliman and Miller Samuel.

- The surge in the Hamptons came as hundreds of thousands of New Yorkers fled the city during the coronavirus pandemic and searched for homes with more space and fewer neighbors.

- Home sales in the Hamptons remain strong at all levels, brokers say, from under $1 million to more than $20 million. Bidding wars are frequent due to soaring demand.

The average sales price in the Hamptons soared 46% in the quarter to just over $2 million, according to a report from Douglas Elliman and Miller Samuel. The median sales price jumped 40% to $1.2 million, which is now higher than Manhattan's median sales price of $1.1 million.

"I've never seen a market like this," said Gary DePersia, a Hamptons broker with Corcoran. "It doesn't show any signs of slowing down."

**The surge in the Hamptons comes as hundreds of thousands of New Yorkers fled the city during the coronavirus pandemic and searched for homes with more space outside the city. While it's unclear how many New Yorkers will return to the city, and how the flight of the wealthy will affect New York's economy longer term, the pandemic has dramatically redrawn the urban real estate landscape. The Hudson Valley, western Connecticut and the Hamptons all saw a surge in sales in the third quarter, while Manhattan saw a 46% drop in sales.**

While the Hamptons has long been the high-priced weekend escape for the New York wealthy, it has quickly become the year-round bunker for the New York elite during Covid. Normally, the restaurants and shops empty out by Labor Day. But DePersia said restaurants and bars are still full and many families aren't sure when or if they will return to the city.

"They want to get back to their lives in Manhattan," he said. "But no one knows when that will be".

Home sales in the Hamptons remain strong at all levels, brokers say, from under $1 million to more than $20 million. Miller said that 15% of homes sold in the quarter went for more than the asking price, likely the result of a bidding war. That total, he said, is about twice the historical average for the Hamptons.

Last year's third quarter saw record high inventory as a result of changes to the treatment of state and local taxes, which hurt all areas of New York real estate. Now, inventory is shrinking fast and there are waiting lists for newly built homes. Listing inventory of luxury homes in the Hamptons fell 43% in the quarter.

The most expensive sale in the quarter was a 3-acre property at 38 Two Mile Hollow Road in East Hampton, with a tennis court, pool and 8,000-square-foot house, that went for $24 million.

**Conclusion of Market Trends**

Fueled in part by concerns related to the Covid-19 pandemic, an increased demand for primary and secondary homes on the East End resulted in a surge of Third Quarter sales, driving up the Total Dollar Volume an unprecedented 101.5% to over $973M from $483M in the Third Quarter of 2019.

Rising by an impressive 51.4%, sales of single-family homes in the Hamptons totaled 448 in 3Q20, the highest number of third quarter sales in 5 years. As restrictions on in-person showings eased, the pent-up demand for housing from the Second Quarter resulted in a seller's market. Reflecting this, the average and median prices both rose significantly in the Third Quarter of 2020 as compared to 3Q19.

Percentage of Sales by Area



Hamptons East of the Shinnecock Canal

The single largest category of sales in the eastern part of the Hamptons was the $1 million to $2 million range, with 104 sales in 3Q20, accounting for 31.7% of transactions, closely followed by the $500,000 to $1 million range, with 28.7% of sales at 94 transactions.



### Southampton Village

|       | Median Price | Average Price | Sales | 0 to 500K | >500K –1M | >1M–2M | >2M–3M | >3M–5M | >5M–10M | >10M |
|-------|--------------|---------------|-------|-----------|-----------|--------|--------|--------|---------|------|
| 3Q18  | $1,495,000   | $2,385,288    | 13    | 0         | 1         | 6      | 1      | 2      | 1       | 0    |
| 3Q19  | $1,675,000   | $1,901,667    | 12    | 0         | 3         | 4      | 3      | 2      | 0       | 0    |
| 3Q20  | $2,437,500   | $3,060,881    | 27    | 0         | 2         | 7      | 6      | 9      | 3       | 0    |

The subject dwellings, both individually or as a joint estate compound, are competitive within the top 1% of market area sales. By virtue of the ocean frontage and prime location on Gin Lane, the competitive market segment is >$25mil. The chart below are the top 10 sales or listings by sale price in the market area or competing areas such as Bridgehampton and East Hampton. The highest sale in 2020 was $84.4m. The highest sale in 2019 was $39.250m.

There is far less demand for top end, estate, mansion, compound properties like the subject than there was in 2013-2016 when there was more international money flowing to the area. This caused stagnation in housing prices in this segment from 2017-2019. The Covid-19 crisis fueled renewed interest in large, Hamptons homes resulting in strong market conditions throughout 2020 and likely into 2021 than was seen in 2019.

| Address | Sale price | Sale Date | Bldg Size SF +/- | Lot Size Acres | Water Front Feet +/- |
|---------|------------|-----------|------------------|----------------|----------------------|
| 1080 Meadow Lane | $150,000,000 | Active | 20,000 | 14 | 700 |
| 650 Meadow Lane | $84,445,726 | 3/2/2020 | 10,834 | 6.68 | Unk |
| 301 / 317 Murray Place | $57,500,000 | 2/6/2020 | 10,565 | 5.44 | 200 |
| 1050 Meadow Lane | $40,910,000 | 1/24/2020 | 5,251 | 2.6 | 200 |
| 263 Surfside Drive | $39,250,000 | 6/20/2019 | 7,354 | 1.3 | Unk |
| 1116 Meadow Lane | $36,000,000 | 8/23/2020 | 8,585 | 2.96 | 200 |
| **Average** | **$68,017,621** | | | | |

## NEIGHBORHOOD OVERVIEW



**Southampton** is a village in Suffolk County, New York, United States. The village is named after the Earl of Southampton. The **Village of Southampton** is in the southeast part of the county in the Town of Southampton.

The population was 3,109 at the 2010 census.

Southampton is the oldest and largest of communities in the summer colony known as The Hamptons. It is also arguably the commercial center of the southern "fork" of Long Island, serves as the home base for several region-wide businesses and has the area's only hospital. Southampton Village is generally considered one of the area's two most prestigious communities.

Many wealthy and influential people have homes in the "estate section" of the village, the area immediately north of the Atlantic Ocean front. Southampton has historically been home to prominent residents including members of the Ford, Du Pont, Eisenhower, Vanderbilt and Morgan families. Today, the village is itself home to approximately half of the billionaires who have residences in the eight hamlets and villages that constitute the Hamptons.

Southampton Village has a relatively large year-round population, at approximately 3,100 residents. It has 2 - 3x the population of any of the other villages or hamlets in the Hamptons. As a result, it is the most densely populated and most built up of the communities in the Hamptons. It is also the most diverse of the villages and hamlets that constitute the Hamptons. The incorporated Village of Southampton is headed by Mayor Jesse Warren. This area is policed by the Southampton Village Police Department.

**The Hamptons** are home to many communities. Historically, it has been devoted to agriculture and fishing. Many farms are still in operation in the area. There are three commercial vineyards operating in the Hamptons as well.

Given the area's geographic location, it maintained stronger commercial and social links to New England and the nearby states of Connecticut and Rhode Island. Many of the original settlers were from and most of the trade links were with communities in Connecticut. Indeed, much of the older architecture and aesthetics of the villages in the Hamptons resemble New England. This is especially true for Sag Harbor Village and East Hampton Village.

Once direct rail links to New York City were established, the community of summer vacation residents expanded significantly. The agriculture community became supplemented by artisans and professionals (mainly in Southampton Village and Sag Harbor Village), and then by a large influx of artists. As a result, the arts community in the Hamptons has origins extending back to the nineteenth century.

**The Hamptons** are a group of towns, villages, and hamlets scattered along the eastern end of Long Island, New York, about two-and-a-half hours by car from New York City. The Hamptons are known for their beaches, farms, golf clubs, and equestrian events, and are a highly popular seaside resort for residents of the New York region. Much of the area is a magnet for celebrities and the well-to-do, who summer on spacious estates nestled along the Atlantic Ocean or hidden behind tall hedgerows. But while many visitors here are wealthy, not all are. New Yorkers of varying ages and tax brackets come to visit less-tony areas like <u>Montauk</u>, <u>Noyack</u>, and Westhampton, and enjoy the ocean breezes, white sand beaches, excellent seafood, lively parties, and rural atmosphere of the East End.

The Hamptons lie on the far southeastern end of New York's Long Island — known as the South Fork — about 80 miles from Manhattan. Starting on the western edge, the Hamptons begin at Westhampton and Westhampton Dunes, and extend east for nearly 50 miles through Southampton, Water Mill, Bridgehampton, Sagaponack, Wainscott, East Hampton, Amagansett, and finally Montauk, at the very eastern end of Long Island.

The North Fork of Long Island, stretching from Riverhead to Greenport to Orient, offers a similarly rural, relaxed environment as the Hamptons, but is usually considered a distinct area. While growing in popularity with vacationers, and offering many unique charms, the North Fork is less developed and less exclusive than much of Long Island's South Fork. North Fork beaches also front Long Island Sound or Peconic Bay, rather than the Atlantic Ocean.

The Hamptons are made up of two proper towns, Southampton and East Hampton, each of which administers a smattering of villages and hamlets.

Southampton's villages include Westhampton Beach, Quogue, the Village of Southampton, Sagaponack, and Sag Harbor (which is shared with the town of East Hampton). Southampton hamlets are Eastport, Speonk, Remsenburg, Westhampton, East Quogue, Hampton Bays, Shinnecock Hills, Water Mill, and Bridgehampton.

East Hampton's villages include Sag Harbor (shared with Southampton) and the Village of East Hampton. Its hamlets are Wainscott, Springs, Nepeague, Amagansett, and Montauk.

## SUBJECT PROPERTY DESCRIPTION

**366 - 376 Gin Lane description**
**As Excerpted from Prior Broker Listing – Sotheby's**

*Regarded as among the finest oceanfront estates in all of the Hamptons, this iconic estate with links to architect Stanford White offers two extraordinary residences on more than four acres, with over 400 ft. of bulkhead beach front, gorgeous hedged lawns, two custom Gunite pools, and sunken all-weather tennis on Gin Lane.*

*Security gates and hedging open to a wide gravel drive, with the main four-story residence rising majestically from its front parking court. Constructed in the early 1900s, 376 Gin is the classic shingle-sided structure that presides over Rosa Rugosa dunes that slope down to the wide sandy beach. The gathering rooms across the second level open across a series of decks and patios that all take in ocean breezes, and from which one can watch the ceaseless waves. The second, wholly separate residence, 366 Gin Lane, was built to reflect the design and proportions of the main house.*

*Both homes are designed similarly, from dark polished wood floors, to white interiors with detailed moldings (original in the main house), bead boards, French doors, transom windows, and coffered ceilings. Both homes offer gyms and saunas. In addition, the 366 Gin Lane residence offers a home theater and billiards room. There is ample parking and separate staff areas which is key for large, entertaining opportunities.*

*Special Design Features: Fireplaces (12), Hardwood Flooring, Brick Flooring, Tile Flooring, Floor to Ceiling windows, Stone Countertops, Multi Zone Central AC, Chef's Kitchens, Washer/Dryer units.*

*Additional Rooms: Basement: Finished Basement, Fitness Room, Home Theatre, Library, Wine Cellar, Grotto, Bonus Room, Guest Suite, Sun Room, Home Office.*

*Other Features: Balconies, Direct Beach Access, Deck / Patio, Deeded Access Beach, Electronic Gates, Sculpted Gardens, Guest Quarters, Heated Pool, Inground Pool, Outdoor BBQ / Fireplace, Outdoor Shower, Tennis Court, Terraces.*

## HIGHEST & BEST USE ANALYSIS

### Highest and Best Use "AS VACANT"

According to the *Dictionary of Real Estate Appraisal, Fifth Edition (2010)*, a publication of the *Appraisal Institute*, the highest and best use of the site as though vacant is defined as:

> Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements.

### Physically Possible

Utilities would adequately provide for nearly all residential uses. Street improvements are also adequate. The topography and shape of the site are not detrimental to new development.

### Legally Permissible

The subject is located in a R20 zone. The Zoning section of this report briefly describes the permitted legal uses for the site.

### Financially Feasible

The subject property is located in an ultra prime residential area with estate and mansion style single family homes.  There is good/steady demand for housing in the area.

Based on all consideration, we have concluded that the highest and best use of the subject, as though the site were vacant and available for new development, is construction of a single family residential building to maximum allowable height and square footage on both lots to operate as individual properties or jointly as one estate compound.

### Highest and Best Use "AS IMPROVED"

According to the *Dictionary of Real Estate Appraisal*, highest and best use of the property as improved is defined as:

> The use that should be made of a property, as it exists.  An existing property should be renovated or retained so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.

Unlike the previous analysis of the subject site as vacant, this analysis considers the subject property as currently improved with an evaluation as to the physical, legal, and financial appropriateness of the existing land use.

### Physical Considerations

The subject site has been improved with the existing structure since the early 1900's and 2000's and, based upon our observation, there are no apparent adverse physical factors of the land that would adversely affect the continued utility and/or existence of the subject improvements.

**Legal Considerations**

The subject site, as presently improved, represents a legal, complying use.

**Financially Feasible**

The current structures were built as mansion style, single family dwellings. The 2 lots offer either two independent single-family houses or the opportunity for a multi-residence, estate compound. The interior layout and style is reminiscent of large single-family style mansions. The Southampton market area is characterized and coveted for these types of large, ocean front, estate style buildings.

Concluding from the above discussion and based on current zoning and market conditions, it is our opinion that 'as improved' the highest and best use is the continued use of the property as single-family dwellings. No other use is warranted.

**VALUATION METHODOLOGY**

*With the highest and best use being established as the continued use of the properties as they currently exist - either as individual dwellings or one compound estate - the next step is to apply the applicable approaches to value. The most applicable approach to value for a property representing highest and best use as a single family dwelling is the Sales Comparison Approach.*

In this appraisal, we have used the Sales Comparison Approach to develop a Market Value Opinion. As stated previously, the Cost and Income Capitalization Approaches are not relevant nor would they produce credible and reliable results.

In the **Sales Comparison Approach**, we performed the following steps:

- Searched the market for recent transfers or offerings of comparable properties within the immediate and general market, including properties which contain similar physical and economic characteristics to the subject.

- Analyzed and adjusted differences between those sales and the subject.

- Correlated the relevant value indicators (price per sf and/or adjusted sale prices) from within the adjusted price range established by the comparable properties.

In estimating the final value, we performed the following:

- Considered the type and reliability of the data used and its applicability.
- Reviewed and re-examined the Sales Comparison Approach.
- Reconciled the Sales Comparison Approach to a final value estimate.

In the Sales Comparison Approach, we estimated the value of the subject by comparing the subject with similar, recently sold, contracted, and/or listed mansion quality dwellings in the immediate, surrounding or competing areas. Inherent in this approach is the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arms-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The properties comparable to the subject in location, physical attributes, and economic attributes are the most relevant in the analysis.

The basic steps of this approach are:

- research recent, relevant property sales and current offerings throughout the competitive area:

- select and analyze properties that are similar to the subject, considering changes in economic conditions that may have occurred between the various sale dates and the date of value; and consider other physical, functional, or location factors;

- reduce or raise the sale prices or the sale prices per square foot of the comparable sales based on market derived adjustments for relevant differences;

- make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

- Interpret the adjusted sales data and draw a logical value conclusion.

## COMPETITIVE MARKET ANALYSIS

The elite Village of Southampton shares its name with the town of Southampton, which also encompasses Quogue, Sagaponack, North Haven, and other tony villages, and more than a dozen posh hamlets, including Westhampton, Water Mill, Bridgehampton, and North Sea. Southampton Village is the most developed for mansion quality housing and the most densely populated by mansion owners. Therefore, Southampton is the most cosmopolitan place to buy a home in the Hamptons. The stability of Southampton market can be attributed to the uniqueness and over-all desirability of its coveted location. The area offers a characteristic life-style that can be very attractive to elite buyers. **As stated, by virtue of the ocean frontage and prime location on Gin Lane, the general competitive market segment is properties valued >$25mil and up to the most expensive offerings in the market area which tend to be >$100mil. The chart below summarizes competitive current listings and closed sales over the past 2 years.**

| Address | Sale price | Sale Date | Bldg Size SF +/- | Lot Size Acres | Water Front Feet +/- |
|---|---|---|---|---|---|
| 1080 Meadow Lane | $150,000,000 | Active | 20,000 | 14 | 700 |
| 650 Meadow Lane | $84,445,726 | 3/2/2020 | 10,834 | 6.68 | Unk |
| 301 / 317 Murray Place | $57,500,000 | 2/6/2020 | 10,565 | 5.44 | 200 |
| 1050 Meadow Lane | $40,910,000 | 1/24/2020 | 5,251 | 2.6 | 200 |
| 263 Surfside Drive | $39,250,000 | 6/20/2019 | 7,354 | 1.3 | Unk |
| 1116 Meadow Lane | $36,000,000 | 8/23/2020 | 8,585 | 2.96 | 200 |
| **Average** | **$68,017,621** | | | | |

## Direct Comparable Analysis

**In the chart displayed below, we have applied a direct comparable analysis of 376 Gin Lane to what we have determined to be the three most relevant and most reliable comparable properties when analyzing the properties as individual residences. Once the value of 376 Gin Lane has been established, the indicated value can be used to determine the market value estimate for 366 Gin Lane. The homes, as individual properties, offer nearly identical size, acreage, and amenities. The most important difference is that 376 Gin Lane offers 275' of ocean frontage as compared to 366 Gin Lane which offers 129' feet.**

## VALUE CONCLUSION: 376 Gin Lane

The properties analyzed were determined to be the best available and most suitable for comparison to the subject property. In order to complete a proper sales comparison analysis, it was necessary to utilize the best available data and apply appropriate adjustments for time of sale; location; condition; view, etc.

From within the adjusted comparable sales summarized on the prior pages, most weight is given to Comparable #1, a recent sale that required adjustment only for acreage.

The 3 properties where direct comparable analysis was performed indicate an average adjusted price of $64,000,000. Given current market conditions at the effective date; the ultra-prime street location; the size of the subject property; and, the ocean frontage - a value assigned above this average and closer to the high end is logical. In particular, strong market conditions are likely to result in a hypothetical sale price for 376 Gin Lane that is closer to the high end of this range. As stated, there is a renewed interest in large, mansion quality homes post-pandemic, and this surge in demand in the market area is pushing values higher. In consideration of the average adjusted price being approximately $64,000,000 and more weight applied to 650 Meadow Lane which has an adjusted price of $73,000,000, a market value estimate of $70,000,000 is reasonable and reliable for 376 Gin Lane.

Based on the Sales Comparison Approach, the "as is" value from the applied analysis, as of October 15, 2020, for 376 Gin Lane Southampton, NY 11968 is:

**MARKET VALUE CONCLUSION**

**376 Gin Lane: $70,000,000**

## VALUE CONCLUSION: 366 Gin Lane

As stated, once the value of 376 Gin Lane has been established, the indicated value can be used to determine the market value estimate for 366 Gin Lane. The homes, as individual properties, offer nearly identical size, acreage, and amenities. The most important difference is that 376 Gin Lane offers 275' of ocean frontage as compared to 366 Gin Lane which offers 129' feet. In a direct comparison between 366 Gin Lane vs 376 Gin Lane, a 10% adjustment is reasonable to account for the difference in ocean frontage.

Based on the Sales Comparison Approach that determined the value of 376 Gin Lane as $70,000,000, and the determination that 366 Gin Lane is nearly identical in offering with exception of less ocean frontage, for which a 10% adjustment was considered, the "as is" value from the applied analysis, as of October 15, 2020, for 366 Gin Lane Southampton, NY 11968 is:

**MARKET VALUE CONCLUSION**

**366 Gin Lane: $63,000,000**

## FINAL VALUE CONCLUSION 376 & 366 Gin Lane Southampton, NY 11968

Based on the analysis contained in the preceding report, the market value of the referenced properties, as of October 15, 2020, are as follows:

| *MARKET VALUE CONCLUSION* |
|:---:|
| *376 Gin Lane: $70,000,000* |
| *366 Gine Lane: $63,000,000* |
| |
| *Total Market Value: $133,000,000* |

*The subject properties 366 & 376 Gin Lane presently function as one comprehensive, estate compound. The property can be one property having two houses offering luxury, mansion-quality living. The preceding analysis determined estimates of market value of the properties as individual residences. The valuation was performed by direct comparison analysis as individual properties because the sales comparable information was more reliable for a comparison as individual properties rather than as a two-lot combination. As displayed on overall comparable sales sample, there was limited data with which to compare the subject as one, two-lot property compound. The limited availability of data to compare to the subject as one compound led the analysis to be performed as two individual properties.*

*The individual values were determined to be $70,000,000 for 376 Gin Lane and $63,000,000 for 366 Gin Lane. These estimated were largely based on the recent sale on Meadow Lane for $84.4mil in March 2020.*

*The sum total market value of the two individual properties is $133,000,000. It is possible, although not certain, that an "estate premium" can potentially materialize, and that the property sold together, as one individual compound, would command a premium over the $133,000,000 total market value. This premium may potentially materialize because of the coveted nature of ocean front lots and ocean frontage. In present strong market conditions, it is possible that a "compound" premium might materialize which would result in a possible total value of $146mil (note: the subject was once listed for $140mil in the 2017-2018 period.*

*In terms of marketing time, it would take about as long to find 2 buyers for $60-$70mil range as it would for one buyer at $133+mil. As indicated, the estimated value of 366 Gin Lane individually is $63,000,000. If this property were required to be separated from 376 Gin and sold individually (i.e. in the unlikely event of foreclosure by lender), the total cost to effectively separate this parcel from the adjoining in functionality is relatively minimal as compared to overall value (i.e. less than 1%-2%).*

Respectfully submitted,

Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

**Exhibit 2:**



# VANDERBILT
### APPRAISAL COMPANY

**APPRAISAL REPORT**
**366 GIN LANE**
**SOUTHAMPTON NEW YORK, NY 11968**



**PREPARED FOR:**
**REYL & Cie SA**
**Rue du Rhone 62**
**1204 Geneve**

**SUBMITTED BY:**
**MICHAEL VARGAS, CREA**
**PRESIDENT/CEO**

**August 3, 2022**

**REYL & Cie SA**
Rue du Rhône 62
1204 Genève

**Re: Appraisal Report 366 Gin Lane, Southampton, NY 11968**
(A single-family dwelling totaling approximately 11,000+/- square feet on 1.90 acres with 129' of ocean frontage)

To Whom It May Concern:

This report serves as an appraisal update of a report completed in October 2020 for the purpose of formulating an opinion of the market value as of the new effective date of the appraisal for an evaluation of loan collateral. A new inspection was performed for this update on June 1st, 2022.

**\*\*\* For the October 2020 appraisal report the appraiser was engaged to value 366-376 Gin Lane, NY. For this update, the appraiser has been engaged to generate a value opinion of 366 Gin Lane only (i.e., the final value will not include #367 Gin Lane). The properties (#366 & #367) are currently merged and operate as one, but a separation can be done by erecting fencing and landscaping.**

The value opinion reported is qualified by certain assumptions, limiting conditions, certifications, and definitions, which are set forth in the report.

Based on the analysis contained in the following report, the market value of the referenced property, as of August 1st, 2022, is as follows:

| MARKET VALUE CONCLUSION |
| :---: |
| **Market Value: $67,500,000** |

The attached report includes definitions of market value and the property rights appraised. The properties are appraised on an all cash basis, free and clear of mortgages and/or debt instruments. The appraisal is subject to the basic assumptions and limiting conditions set forth in this appraisal report.

The Sales Comparison Approach was the only valuation methodology employed in the appraisal report. The other common approaches to value - the Cost Approach and the Income Capitalization Approach - were not considered in the appraisal of the property because these approaches are not relevant for this particular property.

The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with our interpretation of the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code

of Professional Ethics and The Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA), Title XI Regulations.

The attached appraisal report sets forth the identification of the property; the assumptions, definitions and limiting conditions; pertinent facts about the neighborhood; pertinent facts about the subject property; comparable sales data and analysis; description of the appraisal process and the final reconciliation of value.

We have performed our services and prepared this report in accordance with applicable, generally accepted appraisal and consulting practices.

It has been a pleasure to assist you in the assignment. If you have any questions concerning the analysis, or if Vanderbilt Appraisal Company, LLC can be of further service, please contact us at (212)546-1070.


Respectfully submitted,


Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

## Appraisal Certification

### Effective Date of Value: August 1, 2022

I hereby certify that:

1. The statements of fact contained in this report are true and correct to the best of my knowledge and belief;

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and represent my personal, unbiased, professional analyses, opinions, and conclusions;

3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved;

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of this report;

5. My analyses, opinions, and conclusions have been developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute, and also according to the Uniform Standards of Professional Appraisal Practice ("USPAP") as set forth by the Appraisal Foundation, and with Title 12 of the Code of Federal Regulations, Part 1608 and 1608.4.

6. The subject was previously inspected by Michael Vargas in December 10, 2019. Prior appraisal services were performed in December 2019 for the same client and same intended use. A new inspection of #366 Gin Lane was performed for the current assignment on June 1st, 2022.

7. Significant professional research assistance was provided by Laura Villarrizar, Research Analyst;

8. The appraiser has sufficient experience in the appraisal and review of similar properties;

9. The appraiser is appropriately licensed and certified to appraise the subject in the state in which the property is located;

10. This appraisal assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan;

11. After consideration of data and performance of methodologies deemed relevant to value, the most important of which are set forth in the body of this appraisal report, it is my unbiased, professional opinion that the "as is" market value of the subject property, 366 Gin Lane, as of August 1st, 2022, is as follows:

| MARKET VALUE CONCLUSION |
|---|
| $67,500,000 |

Respectfully submitted,

Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

**Assumptions & Limiting Conditions**

This appraisal report has been made with the following **general assumptions:**

1. No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2. The property is appraised as if free and clear of any or all liens or encumbrances except those specifically set forth in the report. We are unaware of any liens on the property, but such liens may exist.

3. Responsible ownership and competent property management are assumed.

4. The information furnished by others is believed to be reliable and has been verified to the extent feasible. However, no warranty is given for its accuracy.

5. All engineering is assumed to be correct except as otherwise noted. The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

6. It is assumed that there are no hidden or unapparent conditions of the property subsoil or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

8. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity or noncompliance has been stated, defined, and considered in the appraisal report.

9. It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10. It is assumed that the utilization of the land and improvements is within the boundaries of the property lines of the property described herein and that there is no encroachment or trespass unless noted in the report.

11. An investigation makes it reasonable to assume, for appraisal purposes, that no insulation or other product banned by the Consumer Product Safety Commission has been introduced into the appraised premises. The heating, electrical, plumbing and other mechanical systems have not been tested specifically, but are assumed to be in good working order unless otherwise specified.

This appraisal is made subject to the following **general limiting conditions:**

1. Any value estimates provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the value estimate, unless such proration or division of interests has been set forth in the report.

2. Possession of this report, or a copy thereof, does not carry with it the right of publication.

3. The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made thereof.

4. This appraisal is to be used in whole and not in part. No part of it shall be used in conjunction with any other appraisal.

5. Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales or other media without the written consent and approval of the appraisers, particularly as to valuation conclusions, the identity of the appraisers or the firm with which the appraisers are connected.

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| Property Appraised: | 366 Gin Lane, "the subject property", is a single family, beach front property located in Southampton, NY. The dwelling is approximately 11,000+/- sf of gross building area (including fully finished basement level). |
| Appraisal Report Client: | REYL (c/o Christophe Dubois, Credit Officer) |
| Location: | Southampton, NY "The Hamptons"<br>Section: 29.00 Block: 1.00 Lot:17.014 |
| Interest Appraised: | Fee Simple Interest |
| Effective Date of Appraisal: | August 1st, 2022 |
| Intended Use: | The intended use of this appraisal is to assist the client in determining the current market value of the asset for an evaluation of the property as loan collateral. |
| Year Constructed: | 2004 |
| Current Owner (Public Records): | Brickchurch Enterprises |
| Current Occupancy: | The "subject" is a mansion style, single-family dwelling featuring a total of 19 room; 9 bedrooms; 7 bathrooms and 2 powder rooms including full finished basement. |
| Gross Building Area (in square feet): | 11,000 +/- (including basement) |
| Lot Size: | 1.90 Acres |
| Zoning: | R20 |
| Highest and Best Use "As Vacant" | Development to maximum floor-area ratio of a Single-Family Residence |
| Highest and Best use "As Improved" | Single Family Residence |

**Value Conclusions:**

| | |
|---|---|
| **Cost Approach** | **Not developed** |
| **Income Approach** | **Not developed** |
| **Sales Comparison Approach:** | **$67,500,000** |

**RELEVANT TERMS OF THE APPRAISAL ASSIGNMENT**

<u>**Intended Users/Use**</u>

The intended users of the appraisal report are the stated Client – REYL Bank.

Additional intended users include the property owners of record (c/o Louise Blouin).

The intended use of this appraisal is to assist the Client in determining the current market value of the real estate assets as potential collateral for a loan.

<u>**Property Rights Appraised**</u>

The property rights appraised consist of the Fee Simple Estate in the subject property.

**Fee Simple Estate**, which is defined in the <u>Dictionary of Real Estate Appraisal</u> as:

*Absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation.*

<u>**Scope of the Appraisal**</u>

USPAP defines Scope of Work as the type and extent of the process of collecting confirming and reporting data and the type and extent of analysis in an assignment. It is the work an appraiser performs to develop credible assignment results. Credible assignment results require support, relevant evidence and logic, to the degree necessary for the intended use. Disclosure of the Scope of Work in this report is intended to provide the Intended Users with an understanding of the appraiser's actions in arriving at assignment conclusions.

The Scope of Work Rule states that an appraiser's Scope of Work is acceptable when it meets or exceeds both (1) the expectations of parties who are regularly intended users of similar assignments; and (2) what an appraiser's peers' actions would be in performing a similar assignment. The report must contain sufficient information to allow the users to understand the Scope of Work performed.

Assignment elements define and characterize the problem to be solved in an appraisal, which in turn determines the type and extent of research and analysis to include in the development process. Assignment elements include client, intended use, intended users, type and definition of value, effective date, relevant characteristics of the subject property, and assignment conditions. Assignment conditions include assumptions, extraordinary assumptions, hypothetical conditions, jurisdictional exceptions, and other conditions that affect the Scope of Work.

This Appraisal Report is prepared in conformity with the Uniform Standards of Professional Appraisal Practice. Following are major elements in the Scope of Work leading to the conclusion of value:

1.  A thorough physical inspection of the property and the surrounding area, similar to the inspection that would be performed by a potential purchaser but less comprehensive than

would be performed by a professional engineer which a purchaser might hire. The inspection does not include determination of the existence of harmful substances such as asbestos.

2. An investigation of relevant zoning codes and building regulations. The scope of this investigation is not as thorough as would be performed by a contractor or architect but is sufficient to determine the feasible alternative uses for the subject property.

3. Investigation of market activity in order to accumulate sufficient data from which to derive indications of market value by the relevant approaches. This investigation may be limited by the amount of activity in the marketplace, the availability of reliable data, and the willingness of principals to divulge the details of their transactions.

4. Analysis of the accumulated data by the recognized and relevant approaches to value. We have valued the property via the Sales Comparison Approach. As indicated in the Reconciliation and Final Opinion of Value sections, an "as is" value was derived from an analysis of all pertinent data.

## Definition of Market Value

**"Market Value"** is defined by the Office of the Comptroller of the Currency under 12 CFR, Part 34,

Subpart C - Appraisals, 34.42 Definitions, as:

> "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well-informed or well advised, and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

This value is estimated in terms of cash or terms equivalent to cash. The subject property is appraised on an "as is" basis.

## Statement of Ownership

The Uniform Standards of Professional Appraisal Practice require the appraiser to report on, and take into consideration, any sales of the subject within the last three years, as well as any pending contracts and/or listings of the subject.

According to public records, the property has not transferred in the last 3 years.

According to review of available data sources, the property has not been formally listed for sale. There was a prior listing of the property (#366 and #367 together) for $140,000,000. The listing broker was Sotheby's international Realty. Currently, the property is not officially listed for sale. There is no marketing campaign or promotion for the property.

## Inclusions and Exclusions

The property appraised consists of the real estate only. Furnishings, personal property, supplies and any current or intangible assets that may exist are excluded from this appraisal.

## Extraordinary Assumptions and Hypothetical Conditions

Extraordinary Assumptions

An extraordinary assumption is defined by the *Uniform Standards of Professional Appraisal Practice* as "an assumption directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This report employs no extraordinary assumptions.

Hypothetical Conditions

A hypothetical condition is defined by the *Uniform Standards of Professional Appraisal Practice* as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

This report employs no hypothetical conditions.

## Exposure Time

Exposure time is not intended to be a prediction of a date of sale. Instead, it is an integral part of the appraisal analysis and is based on one or more of the following:

- statistical information gathered about days on the market for comparable properties
- information gathered through sales verification

- interviews of market participants.

The reasonable exposure period is a function of price, time, and use. It is not an isolated estimate of time alone. Exposure time is different for various types of real estate and under various market conditions. Exposure time is the estimated length of time the property would have been offered prior to a hypothetical market value sale on the effective date of appraisal. It is a retrospective estimate based on an analysis of recent past events, assuming a competitive and open market. It assumes not only adequate, sufficient, and reasonable time but also adequate, sufficient, and reasonable marketing effort.   Exposure time is therefore interrelated with appraisal conclusion of value.

In consideration of these factors, we have analyzed the following:

- Appraisal Files
- Broker Marketing Reports
- Opinions of knowledgeable real estate professionals.

The following table presents the information derived from these sources:

**Exposure Time**

| Data Source | Range | Average |
|---|---|---|
| Appraisal Files | 1.0-28.0 | 18.00 |
| Local Market Professionals | 3.0-29.0 | 16.00 |

Based on the foregoing data, an exposure time of 12-18 months is reasonable and appropriate for the subject property to achieve the stated value. We assume the property would have been competitively priced and aggressively promoted to procure hypothetical sale within the estimated exposure time.

## Marketing Time

Marketing time is the period a prospective investor would forecast to sell the subject property immediately after the date of value, at the value estimated. The marketing time is an estimate of the number of months it will require to sell the subject from the date of value, into the future. The anticipated marketing time is essentially a measure of the perceived level of risk associated with the marketability, or liquidity, of the subject property. The marketing time estimate is based on the data used in estimating the reasonable exposure time, in addition to an analysis of the anticipated changes in market conditions following the date of appraisal.

The future price for the subject (at the end of the marketing time) may or may not equal the appraisal estimate. The future price depends on unpredictable changes in the physical real estate, demographic and economic trends, real estate markets in general, supply/demand characteristics for the property type, and many other factors.

Based on research of broker publications, appraisal files and discussions with knowledgeable brokers, the market is currently strong for this property asset class and public demand is sufficient that the property (if priced accurately) would sell with 12-18 months of marketing time.

## Valuation Methods

### Cost Approach

In order to complete the Cost Approach, the value of the land is added to the replacement cost of the improvements less depreciation. In New York City, there are a limited number of land transactions, which makes the valuation of land challenging. Furthermore, estimating accrued depreciation accurately is often difficult for a property like the subject which is over 100 years old. The Cost Approach is typically used to value special purpose properties such as schools, government buildings, and houses of worship. For these reasons, we do not consider the Cost Approach to be applicable in this appraisal.

### Income Capitalization Approach

The Income Capitalization Approach to value consists of methods, techniques and analytical procedures used by the appraiser to analyze an income producing property's capacity to generate monetary benefits by converting future benefits into a present value. Both the quantity and quality of an income stream are determined and then processed to produce an indication of value. Capitalization is defined as the process of converting anticipated future installments of net income into present value. The two most common techniques for converting net income into value are direct capitalization and discounted cash flow analysis. There is a market for seasonal rentals of properties like the subject and the properties individually and together have the capacity to generate rental income. However, sale prices in the market are not determined by rental income capacity. As such, the Income Capitalization Approach to value is not applicable.

### Sales Comparison Approach

The Sales Comparison Approach determines value by comparing the property being appraised (i.e. subject property) against properties that have recently sold in the area and are similar in location, size, age, construction, style, appeal, and special amenities. These properties are also known as comparable properties (or comps). Properties used in estimating a value are selected on the basis of similar property and non-property characteristics as applied to the subject. An opinion of market value for the subject property is formulated from the analyzed data. This approach to value is the most useful for a property like the subject which has as its highest and best use, the continued use as single family dwellings. As such, this approach to value is the only relevant approach to determine value of the subject.

## MARKET CONDITIONS

**The housing market comprised of ultra-luxury, mansion quality dwellings and compounds in The Hamptons is largely tied to economic conditions evident in the NYC market area. While technically part of Long Island and Suffolk County, the relative trends of The Hamptons upper-end housing markets are directly tied to the NYC economy. As such, we present in following section, general economic conditions in the NYC area.**

**SUMMARY OF ECONOMIC ACTIVITY**
Partnership for New York City - June 2022

During the second quarter, the city has experienced job gains, an uptick in international tourism and better-than-expected tax revenues. Of concern are the potential impact of inflation and stock market volatility. In May, public transit ridership increased to the highest levels since the onset of the pandemic.

Key Statistics

Unemployment Rates

- 6.4% unemployment rate in April, unchanged from March but down from a peak of 21% in May 2020.

- 254,066 unemployed city residents in April 2022.
  - 159,874 New Yorkers were unemployed in February 2020.

- 58,300 city residents received unemployment insurance benefits in April, down 12% from 66,200 in March and the fewest since November 2019.
  - In 2019, there was an average of 62,700 monthly beneficiaries.

- 69.2% of city residents aged 16 to 64 were either working or actively looking for work during the three months ending April 2022, down slightly from 70.9% during the three months ending February 2020.

Employment

- New York City added 36,500 private sector jobs in April, the largest monthly jobs gain since April 2021.

- Industries that added the most jobs include:
  - Health care: 11,000 jobs added
  - Accommodation and food services: 5,900 jobs added
  - Administrative services: 5,200 jobs added
  - Professional services: 4,000 jobs added

- As of April 2022, the city has recovered 717,100 jobs, or 79% of the 909,300 private sector jobs lost during the early months of the pandemic.
  - 3.89 million total private sector jobs as of April 2022, down 192,100 jobs (5%) from the pre-pandemic peak of 4.09 million in February 2020.

Tourism

- 80.5% occupancy rate in New York City hotels during the week ending May 14, up from 76.6% during the preceding week.
  - Occupancy has nearly recovered to the pre-omicron peak of 81.9% during the week ending December 11, 2021.

- Broadway shows attracted 256,000 theatregoers and grossed $30.3 million in sales during the week ending May 15.
  - Attendance was down 21% from 311,000 during the same week in 2019 and gross sales declined 14% from $35.1 million.
  - 
- 286,032 average daily visitors to Times Square in April 2022, up 114% from April 2021 but down 14% from February 2020.


**LONG ISLAND REGION ECONOMIC SNAPSHOT**

The Long Island Region covers Nassau and Suffolk Counties and is part of the New York City metropolitan area. The region's economy has greatly benefited from this connection.

Some of the nation's first suburbs were in Nassau County, which grew rapidly in the middle of the 20th century. It now contains some very wealthy areas alongside areas that have lower incomes and problems usually associated with large cities.

Suffolk County developed at a somewhat slower pace and benefitted from continued population growth over the last few decades, though this growth has also slowed. Estimates show a moderate decline since 2010.

Broadly speaking, Long Island residents enjoy a high quality of life, reflected in high median incomes, relatively low unemployment and crime rates, strong public schools, numerous higher educational opportunities and many cultural and natural recreational activities.

However, the region's population and economic growth comes with challenges, such as traffic congestion and high property taxes. Long Islanders face some of the highest tax burdens in the State. The recent federal tax law caps the deductibility of State and local taxes, making the burden even higher for many taxpayers. The region also struggles with high housing costs.

Local governments on the Island are currently undertaking projects meant to improve the quality of life. Downtown corridors and railroad hubs are among the economic development projects in both counties.

*Source: Office of the New York State Comptroller*

**HAMPTONS MARKET REPORT**
**The South Fork – 2nd Quarter 2022**
Source: Corcoran

<u>Overview</u>



Sales remained solid despite tight inventory and rising prices. While the number of sales dropped 28% compared to Second Quarter 2021, sales activity increased 7% compared to the previous quarter. Reported closed sales were the second highest of any second quarter since 2014. Median price has increased year-over-year for 12 consecutive quarters. However, median price did back off somewhat from its peak reached in First Quarter 2022, registering a quarter-over-quarter decline of 8%. Fewer sales translated to a 24% drop in sales volume annually. While sales declined for nearly all price categories, one exception was sales west of the canal over $5M, which increased 117%.

Reported sales decreased annually in all South Fork villages and hamlets but increased in more than half of the areas compared to First Quarter 2022. Southampton and Southampton Village improved most significantly quarter-over-quarter, increasing 41% and 43%, respectively. Sales west of the canal typically make up about a quarter of overall South Fork sales, and altogether there were 11% more deals there than in First Quarter 2022.

Median price increased in all areas but Water Mill. Median price increased most significantly in Westhampton Beach, where it jumped 82% to $3.2M. Although sales volume was down overall, many of the hamlets displayed annual increases. Most notably, volume in Westhampton Beach jumped 13%.

<u>Southampton</u>

| SINGLE FAMILY | 2Q22 | 2Q21 | %CHG (YR) | 1Q22 | %CHG (QTR) |
|---|---|---|---|---|---|
| SALES | 82 | 98 | -16% | 58 | +41% |
| VOLUME | $167.065M | $156.385M | +7% | $122.266M | +37% |
| AVERAGE PRICE | $2.037M | $1.596M | +28% | $2.108M | -3% |
| MEDIAN PRICE | $1.603M | $1.200M | +34% | $1.590M | +1% |



## Southampton Village

| SINGLE FAMILY | 2Q22 | 2Q21 | %CHG (YR) | 1Q22 | %CHG (QTR) |
|---|---|---|---|---|---|
| SALES | 43 | 51 | -16% | 30 | +43% |
| VOLUME | $250.113M | $272.146M | -8% | $231.048M | +8% |
| AVERAGE PRICE | $5.817M | $5.336M | +9% | $7.702M | -24% |
| MEDIAN PRICE | $3.350M | $3.250M | +3% | $4.296M | -22% |



The Residential Luxury Market

The luxury market is defined as the top 10% of all residential sales made within the period being reported. As various factors redefine the high-end market in any given period, these numbers may exhibit more volatility than the market overall. Because the luxury market is a fixed percentage of the overall market, the change in reported luxury sales will always match the overall market.

South Fork luxury sales volume fell 47%, outpacing the percentage drop in sales. Median price increased 13% compared to Second Quarter 2021 but average price fell 26% as there were several sales over $40M a year ago but only one reported this quarter. More reported luxury market closings occurred in Bridgehampton/ Sagaponack and Southampton Village than any other village or hamlet. Each area had 15 luxury transactions. The most expensive sale of the quarter was at 35 Potato Road in Sagaponack, which sold for $46.5M.

On the North Fork, luxury median price jumped 15% but average price decreased 2%. More than three-quarters of luxury sales were over $2M in Second Quarter 2022 while fewer than half met the same threshold the year before. Luxury sales volume fell 38% given there were fewer sales.

| SOUTH FORK | 2022 | 2021 | YEAR OVER YEAR | 1Q22 | QUARTER OVER QUARTER |
|---|---|---|---|---|---|
| SALES | 69 | 96 | -28% | 65 | +6% |
| VOLUME | $788.260M | $1.486B | -47% | $1.002B | -70% |
| AVERAGE | $11.424M | $15.480M | -26% | $15.420M | -71% |
| MEDIAN | $8.865M | $7.850M | +13% | $10.200M | -73% |

**Article**
**The Hamptons Covid-Era Buying Frenzy Is Officially Over**
**July 1, 2022 – James Tarmy**
bloomberg.com

An elegant 5,500 square-foot home set on nearly four acres in Bridgehampton came onto the market almost exactly a year ago with an asking price of $21.9 million. After what Zillow shows is three price cuts, it's down to $17 million and is still unsold.

One hamlet over, in Wainscott, a massive 10,000 square foot mansion on about 14 acres overlooking Georgica Pond hit the market last year for $70 million; its price was subsequently cut more than 14%, to just under $60 million. It also has yet to find a buyer.

The Hamptons Covid-era buying frenzy is a thing of the past. "It's certainly not gangbusters like it was," says Paul Brennan, a broker with Douglas Elliman. "Things have slowed down. There's still lots of activity, but people are not pulling the trigger as quickly as they did a few months ago."

May's sales numbers were lackluster, according to an Elliman report, with new signed contracts for single family homes down 38% from last May, even as 14% more listings came onto the market. The numbers for June aren't out yet, but analysts and brokers say it isn't getting better.

"The market is transitioning," says Jonathan Miller, president and chief executive officer of the appraiser Miller Samuel. "What's happening in the Hamptons seems to be happening throughout the country."

**Buying Mindset**

But unlike most US housing markets, the Hamptons is mostly second homes which are bought, occupied, and sold by some of the richest people in the world—people who at least in theory can pay cash rather than worry about mortgage rates.

"The market out here is a little different than the rest of the country," says Douglas Elliman broker Martha Gundersen, who represents the $60 million Georgica Pond listing. "A lot of purchases aren't contingent upon mortgages, and [buyers] can always get private funding."

And yet, even the richest buyers have tended to take out loans. "I find it's at almost every price level," says Corcoran broker Gary DePersia. "After the contract is signed, no matter what, they're getting financing. They don't want to take the money out from where they have it to buy a house."

And so the end of cheap mortgages has, brokers say, begun to impact the spending habits of those who don't need one.

"You have to feel very good about the world and your economic situation to go out and buy a second home, which very often can be more expensive than your first," says DePersia. "It's not so much about interest rates as it is about [buyers'] general feeling of well-being."

**Price Cuts**

The market could slide further before it stabilizes, since sellers have yet to recognize buyers' new reality. "The inventory doesn't match buyers' expectations," says Gundersen. "Let's say they were getting a 2% mortgage, now they're getting 5%, and there's a disconnect for what their monthly costs will be." Sellers, meanwhile, "are still looking at the most expensive" comparisons when they go to price their house.

Inventory, meanwhile, is set to rise. "There will be more [houses] coming onto the market, and as more comes on, [sellers] will have to take a price concession," says Brennan.

Current closings, he adds, are mostly holdovers from when people committed to a purchase during the boom market. "That residual effect will maintain itself for probably another two to three months," he says. "The money that was in the pipeline will dry up, and then we'll see what happens."

There isn't a single tier of the market, brokers say, that could be immune.

"It's across the spectrum," says Gundersen. The only exception? "If you have a house that's in really, really good condition and it's on the water, and there's acreage and a dock and a tennis court, and it's one of a kind and it's priced well, you don't have to reduce it. You'll sell it at or maybe slightly below the current ask." That said, she continues, "during Covid if it was priced

correctly and had all those things it would go into a bidding war. Now, bidding wars are not happening unless the house is dramatically underpriced."

**Looking Toward August**

It's not all doom and gloom. DePersia says demand is still there.

"June in particular is not a particularly good gauge of anything," he says. "Most of the serious buyers looking to buy a house have bought one already—if they buy a house in June, there's a very good chance they won't have it before summer's over. So the big motivation to buy at that time of year is gone." Come August, he promises, "things will ramp up again."

He acknowledges things have slowed down from where they were a year ago but says he still has active buyers. "Today I put a house on the market in the $8 million-plus range, and already I had three brokers call to show it," DePersia says. "And it's not inexpensively priced."

Gundersen points out that unlike in 2008, "we're not in a banking crisis, so we'll still have a healthy real estate market, just not as crazy as the last few years."

And yet, she says, past performance might be a decent indicator of future results. "If I could predict the future based on experience, [the Hamptons market] is going to slow down before more inventory comes in, and a lot of buyers are waiting for the fall to buy."

Still, she adds, "price your house to sell right now and you'll get a buyer. A good deal is always a good deal."

## NEIGHBORHOOD OVERVIEW



**Southampton** is a village in Suffolk County, New York, United States. The village is named after the Earl of Southampton. The **Village of Southampton** is in the southeast part of the county in the Town of Southampton.

The population was 3,109 at the 2010 census.

Southampton is the oldest and largest of communities in the summer colony known as The Hamptons. It is also arguably the commercial center of the southern "fork" of Long Island, serves as the home base for several region-wide businesses and has the area's only hospital. Southampton Village is generally considered one of the area's two most prestigious communities.

Many wealthy and influential people have homes in the "estate section" of the village, the area immediately north of the Atlantic Ocean front. Southampton has historically been home to prominent residents including members of the Ford, Du Pont, Eisenhower, Vanderbilt and Morgan families. Today, the village is itself home to approximately half of the billionaires who have residences in the eight hamlets and villages that constitute the Hamptons.

Southampton Village has a relatively large year-round population, at approximately 3,100 residents. It has 2 - 3x the population of any of the other villages or hamlets in the Hamptons. As a result, it is the most densely populated and most built up of the communities in the Hamptons. It is also the most diverse of the villages and hamlets that constitute the Hamptons. The incorporated Village of Southampton is headed by Mayor Jesse Warren. This area is policed by the Southampton Village Police Department.

**The Hamptons** are home to many communities. Historically, it has been devoted to agriculture and fishing. Many farms are still in operation in the area. There are three commercial vineyards operating in the Hamptons as well.

Given the area's geographic location, it maintained stronger commercial and social links to New England and the nearby states of Connecticut and Rhode Island. Many of the original settlers were from and most of the trade links were with communities in Connecticut. Indeed, much of the older architecture and aesthetics of the villages in the Hamptons resemble New England. This is especially true for Sag Harbor Village and East Hampton Village.

Once direct rail links to New York City were established, the community of summer vacation residents expanded significantly. The agriculture community became supplemented by artisans and professionals (mainly in Southampton Village and Sag Harbor Village), and then by a large influx of artists. As a result, the arts community in the Hamptons has origins extending back to the nineteenth century.

**The Hamptons** are a group of towns, villages, and hamlets scattered along the eastern end of Long Island, New York, about two-and-a-half hours by car from New York City. The Hamptons are known for their beaches, farms, golf clubs, and equestrian events, and are a highly popular seaside resort for residents of the New York region. Much of the area is a magnet for celebrities and the well-to-do, who summer on spacious estates nestled along the Atlantic Ocean or hidden behind tall hedgerows. But while many visitors here are wealthy, not all are. New Yorkers of varying ages and tax brackets come to visit less-tony areas like <u>Montauk</u>, <u>Noyack</u>, and Westhampton, and enjoy the ocean breezes, white sand beaches, excellent seafood, lively parties, and rural atmosphere of the East End.

The Hamptons lie on the far southeastern end of New York's Long Island — known as the South Fork — about 80 miles from Manhattan. Starting on the western edge, the Hamptons begin at Westhampton and Westhampton Dunes, and extend east for nearly 50 miles through Southampton, Water Mill, Bridgehampton, Sagaponack, Wainscott, East Hampton, Amagansett, and finally Montauk, at the very eastern end of Long Island.

The North Fork of Long Island, stretching from Riverhead to Greenport to Orient, offers a similarly rural, relaxed environment as the Hamptons, but is usually considered a distinct area. While growing in popularity with vacationers, and offering many unique charms, the North Fork is less developed and less exclusive than much of Long Island's South Fork. North Fork beaches also front Long Island Sound or Peconic Bay, rather than the Atlantic Ocean.

The Hamptons are made up of two proper towns, Southampton and East Hampton, each of which administers a smattering of villages and hamlets.

Southampton's villages include Westhampton Beach, Quogue, the Village of Southampton, Sagaponack, and Sag Harbor (which is shared with the town of East Hampton). Southampton hamlets are Eastport, Speonk, Remsenburg, Westhampton, East Quogue, Hampton Bays, Shinnecock Hills, Water Mill, and Bridgehampton.

East Hampton's villages include Sag Harbor (shared with Southampton) and the Village of East Hampton. Its hamlets are Wainscott, Springs, Nepeague, Amagansett, and Montauk.

## HIGHEST & BEST USE ANALYSIS

### Highest and Best Use "AS VACANT"

According to the *Dictionary of Real Estate Appraisal, Fifth Edition (2010)*, a publication of the *Appraisal Institute*, the highest and best use of the site as though vacant is defined as:

> Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements.

### Physically Possible

Utilities would adequately provide for nearly all residential uses. Street improvements are also adequate. The topography and shape of the site are not detrimental to new development.

### Legally Permissible

The subject is located in a R20 zone. The Zoning section of this report briefly describes the permitted legal uses for the site.

### Financially Feasible

The subject property is located in an ultra-prime residential area with estate and mansion style single family homes.  There is good/steady demand for housing in the area.

Based on all consideration, we have concluded that the highest and best use of the subject, as though the site were vacant and available for new development, is construction of a single family residential building to maximum allowable height and square footage on both lots to operate as individual properties or jointly as one estate compound.

### Highest and Best Use "AS IMPROVED"

According to the *Dictionary of Real Estate Appraisal*, highest and best use of the property as improved is defined as:

> The use that should be made of a property, as it exists.  An existing property should be renovated or retained so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.

Unlike the previous analysis of the subject site as vacant, this analysis considers the subject property as currently improved with an evaluation as to the physical, legal, and financial appropriateness of the existing land use.

### Physical Considerations

The subject site has been improved with the existing structure since the early 1900's and 2000's and, based upon our observation, there are no apparent adverse physical factors of the land that would adversely affect the continued utility and/or existence of the subject improvements.

**Legal Considerations**

The subject site, as presently improved, represents a legal, complying use.

**Financially Feasible**

The current structure was built as mansion style, single family dwelling. The interior layout and style is reminiscent of large single-family style mansions. The Southampton market area is characterized and coveted for these types of large, ocean front, estate style buildings.

Concluding from the above discussion and based on current zoning and market conditions, it is our opinion that 'as improved' the highest and best use is the continued use of the property as single-family dwellings. No other use is warranted.

**VALUATION METHODOLOGY**

*With the highest and best use being established as the continued use of the property as it currently exists, the next step is to apply the applicable approaches to value. The most applicable approach to value for a property representing highest and best use as a single family dwelling is the Sales Comparison Approach.*

In this appraisal, we have used the Sales Comparison Approach to develop a Market Value Opinion. As stated previously, the Cost and Income Capitalization Approaches are not relevant, nor would they produce credible and reliable results.

In the **Sales Comparison Approach**, we performed the following steps:

- Searched the market for recent transfers or offerings of comparable properties within the immediate and general market, including properties which contain similar physical and economic characteristics to the subject.

- Analyzed and adjusted differences between those sales and the subject.

- Correlated the relevant value indicators (price per sf and/or adjusted sale prices) from within the adjusted price range established by the comparable properties.

In estimating the final value, we performed the following:

- Considered the type and reliability of the data used and its applicability.
- Reviewed and re-examined the Sales Comparison Approach.
- Reconciled the Sales Comparison Approach to a final value estimate.

In the Sales Comparison Approach, we estimated the value of the subject by comparing the subject with similar, recently sold, contracted, and/or listed mansion quality dwellings in the immediate, surrounding or competing areas. Inherent in this approach is the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arms-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The properties comparable to the subject in location, physical attributes, and economic attributes are the most relevant in the analysis.

The basic steps of this approach are:

- research recent, relevant property sales and current offerings throughout the competitive area;

- select and analyze properties that are similar to the subject, considering changes in economic conditions that may have occurred between the various sale dates and the date of value; and consider other physical, functional, or location factors;

- reduce or raise the sale prices or the sale prices per square foot of the comparable sales based on market derived adjustments for relevant differences;

- make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

- interpret the adjusted sales data and draw a logical value conclusion.

**COMPETITIVE MARKET ANALYSIS**

The elite Village of Southampton shares its name with the town of Southampton, which also encompasses Quogue, Sagaponack, North Haven, and other tony villages, and more than a dozen posh hamlets, including Westhampton, Water Mill, Bridgehampton, and North Sea. Southampton Village is the most developed for mansion quality housing and the most densely populated by mansion owners. Therefore, Southampton is the most cosmopolitan place to buy a home in the Hamptons. The stability of Southampton market can be attributed to the uniqueness and over-all desirability of its coveted location. The area offers a characteristic life-style that can be very attractive to elite buyers. **As stated, by virtue of the ocean frontage and prime location on Gin Lane, the general competitive market segment is properties valued >$35mil and up to the most expensive offerings in the market area which tend to be >$100mil. The chart below summarizes competitive current listings and closed sales over the past 3 years.**

| Address | Sale price | Sale Date | Bldg Size SF +/- | Lot Size Acres | Water Front Feet +/- |
|---|---|---|---|---|---|
| 153 Lily Pond Lane | $84,500,000 | 1/6/2021 | 11,425 | 8.5 | 385 |
| 650 Meadow Lane | $84,445,726 | 3/2/2020 | 10,834 | 6.68 | Unk |
| 301 / 317 Murray Place | $57,500,000 | 2/6/2020 | 10,565 | 5.44 | 200 |
| 1080 Meadow Lane | $44,950,000 | Active 11/16/2021 | 20,000 | 14 | 700 |
| 40 Meadow Lane | $42,923,600 | 4/5/2021 | 6,878 | 0.73 | Unk |
| 1050 Meadow Lane | $40,910,000 | 1/24/2020 | 5,251 | 2.6 | 200 |
| 263 Surfside Drive | $39,250,000 | 6/20/2019 | 7,354 | 1.3 | Unk |
| 1116 Meadow Lane | $36,000,000 | 8/23/2020 | 8,585 | 2.96 | 200 |
| **Average** | **$53,809,916** | | | | |

**Direct Comparable Analysis**

In the chart displayed below, we have applied a direct comparable analysis of 366 Gin Lane to what we have determined to be the three most relevant and most reliable comparable properties when analyzing the property as an individual residence.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vanderbilt Appraisal Company, LLC **Residential Appraisal Report** | | | | | | | 366 Gin Lane File No. 2208-50015 | | |
| FEATURE | SUBJECT | COMPARABLE SALE NO 1 | | COMPARABLE SALE NO 2 | | COMPARABLE SALE NO 3 | | | |
| 366 Gin Lane | | 1116 Meadow Lane | | 40 Meadow Lane | | 153 Lily Pond Lane | | | |
| Address | Southampton, NY 11968 | Southampton, NY 11968 | | Southampton, NY 11968 | | East Hampton, NY 11937 | | | |
| Proximity to Subject | | 3.48 miles SW | | 1.44 miles SW | | 9.74 miles NE | | | |
| Sale Price | $ | $ 43,000,000 | | $ 63,000,000 | | $ 84,500,000 | | | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 5,594.18 sq. ft. | | $ 3,257.82 sq. ft. | | $ 7,396.06 sq. ft. | | | |
| Data Source(s) | | Geodata | | Geodata | | Property Shark | | | |
| Verification Source(s) | | Geodata | | Property Shark | | Geodata | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | | |
| Sale or Financing | | None | | None | | None | | | |
| Concessions | | | | time adj +10% | | | | | |
| Date of Sale/Time | | 09/01/2022 Closed | | 04/05/2021 Closed | 4,300,000 | 9/19/2022 Closed | | | |
| Location | S.Hampton/Gin Lane | S.Hampton/Meadow | 4,890,000 | S.Hampton/Meadow | 4,300,000 | E.Hampton/Lily Pond | 0 | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | | | |
| Site | 1.9 ac | 2.96 ac | -2,690,000 | 0.73 ac | 2,925,000 | 7.5 ac | -19,500,000 | | |
| View | Excellent/Waterfront | Excellent/Waterfront | | Excellent/Waterfront | | Excellent/Waterfront | | | |
| Design (Style) | Shingle Style | Shingle Style | | Contemporary | 0 | Post Modern | 0 | | |
| Quality of Construction | Good | Good | | Good | | Good | | | |
| Actual Age | 2004 | 2010 | 0 | 2017 | 0 | 1931 | 0 | | |
| Condition | Excellent | Good/Interior | 3,000,000 | Excellent | | Good/Interior | 3,000,000 | | |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths |
| Room Count | 19 | 7 | 7.66 | 12 | 6 | 6.6 | 20 | 10 | 12 |
| Gross Living Area 1,800.00 | 11,000 sq. ft. | 8,585 sq. ft. | 4,347,000 | 8,678 sq. ft. | 7,415,000 | 11,425 sq. ft. | -765,000 | | |
| Basement & Finished Rooms Below Grade | Full Finished | Full Finished | | Full Finished | | Full Finished | | | |
| Functional Utility | Good/1 Family | Good/1 Family | | Good/1 Family | | Good/1 Family | | | |
| Heating/Cooling | OAC | Similar | 0 | Similar | 0 | Similar | 0 | | |
| Energy Efficient Items | Windows/Doors | Windows/Doors | | Windows/Doors | | Windows/Doors | | | |
| Garage/Carport | 6 Car Garage | 2 Car Garage | 800,000 | 3 Car Garage | 600,000 | 3 Car Garage | 600,000 | | |
| Porch/Patio/Deck | Patio/Porch/Terr | Patio/Porch/Terr | | Patio/Porch/Terr | | Patio/Porch/Terr | | | |
| Amenities | In Ground Pool | In Ground Pool | | In Ground Pool | | In Ground Pool | | | |
| Amenities | Tennis Ct | None | 750,000 | None | 750,000 | Pool House | | | |
| Beach Front | 129 Ft | Similar | | Interior 10% | 4,300,000 | Similar | | | |
| Net Adjustment (Total) | | X + | 11,047,000 | X + | 24,594,000 | + X - | 13,085,000 | | |
| Adjusted Sale Price of Comparables | | Net Adj 23.0% Gross Adj 34.1% | 54,047,000 | Net Adj 57.2% Gross Adj 57.2% | 87,594,000 | Net Adj -16.2% Gross Adj 24.7% | 70,835,000 | | |

366 Gin Lane with 1.9 acres, in excellent condition, with excellent views, 11,000sf, abundant amenities and 129 feet of ocean frontage was analyzed in a direct comparison to 1116 Meadow Lane, 40 Meadow Lane, and 153 Lily Pond Lane.

366 Gin Lane v. 1116 Meadow Lane: no time of sale adjustment was necessary as this was sold in June 2022. This is the most recently closed comparable sale. The property has a total of 2.96 acres with similar ocean frontage and is similar in overall style and appeal. This dwelling is smaller and in inferior condition.

366 Gin Lane v. 40 Meadow Lane: a time of sale adjustment was applied as market prices have increased since this 2021 closing date. This sale was included as it is the most proximate sale. The property is on a very small lot less than 1 acre. It is smaller overall and has less ocean frontage.

366 Gin Lane v. 153 Lily Pond Lane: no time of sale adjustment was necessary as this was sold in January 2022. The property has a total of 8.5 acres with similar ocean frontage and is similar in overall style and appeal. This dwelling is larger and was in inferior condition.

These three properties provide an adjusted price range of $59,047,000 to $70,835,000.

| |
|---|
| ***Implied overall range of value for the subject by means of adjusted prices of the 3 comparable sales:*** |
| ***Low: $59,000,000*** |
| ***High: $71,000,000*** |
| ***Average: $66,000,000*** |

The adjusted sales chart on the prior page produces the overall range from within which the market value of 366 Gin Lane is ultimately selected.

The adjustment process is the vital step conducted after selection of the most relevant comps. Adjustments are applied only for the items that are determined to be a priority to value or that clearly impact buyer and seller actions in a significant manner. The process of adjustments allows otherwise dissimilar properties to be compared in the absence of ideally similar properties recently sold in the market area.

The adjustments applied are market specific and are based on 1) paired sales analysis performed by the appraiser; 2) market participant surveys performed by the appraiser; and 3) by the method known as sensitivity analysis.

**As indicated, the range of adjusted prices reveals a low of $59,000,000 to a high of $71,000,000. The indicated average adjusted price is $66,000,000.**

## VALUE CONCLUSION

The properties analyzed were determined to be the best available and most suitable for comparison to the subject property. In order to complete a proper sales comparison analysis, it was necessary to utilize the best available data and apply appropriate adjustments for time of sale; location; condition; view, etc.

From within the adjusted comparable sales summarized on the prior pages, equal weight was given to the three comparable sales.

The 3 properties where direct comparable analysis was performed indicate an average adjusted price of $66,000,000. Given current market conditions at the effective date; the ultra-prime Gin Lane location; the size of the subject property; and the ocean frontage - a value assigned above this average and closer to the high end is logical.

In particular, strong market conditions are likely to result in a hypothetical sale price for 376 Gin Lane that is above the adjusted average price. There remains strong interest in large, mansion quality homes post-pandemic, although sales volume and demand is appearing to level off given concerns about possible economic recession which is lowering buyer confidence.

Based on the Sales Comparison Approach, the "as is" value from the applied analysis, as of August 1, 2022, for 366 Gin Lane Southampton, NY 11968 is:

**MARKET VALUE CONCLUSION**

**366 Gin Lane: $67,500,000**

Respectfully submitted,

Michael Vargas
President/CEO
Vanderbilt Appraisal Company, LLC
New York CREA #45-26321

**Exhibit 3**

# MORTGAGE

Brickchurch Enterprises, Inc., a Delaware corporation
and
Aberdeen Enterprises, Inc., a Delaware corporation

- to -

JGB Partners, LP,
JGB Capital, LP
JGB (Cayman) Ancona Ltd.
and
JGB Plymouth Rock LLC

PARCEL I
District:      0900
Section:      029.00
Block:        01.00
Lot:          017.014
County:       Suffolk
Premises:     366 Gin Lane, Southampton, NY 11968
Owner:        Brickchurch Enterprises, Inc., a Delaware
              corporation

PARCEL II
District:      0900
Section:      029.00
Block:        01.00
Lot:          017.013
County:       Suffolk
Premises:     376 Gin Lane, Southampton, NY 11968
Owner:        Aberdeen Enterprises, Inc., a Delaware
              corporation

Record and Return to:
Haynes and Boone, LLP
Attn: Greg Kramer Esq.
30 Rockefeller Plaza
26th Floor
New York, NY 10112

4819-8839-7932 v.7

# MORTGAGE

**THIS MORTGAGE**, made as of the 25th day of July, 2018, by **Brickchurch Enterprises, Inc.**, a Delaware corporation having an address at **Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801** and **Aberdeen Enterprises, Inc.**, a Delaware corporation having and address at **Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801** (hereinafter referred to t o g e t h e r as the "Mortgagor(s)"), to **JGB Partners, LP**, a Delaware limited partnership, having an address at 21 Charles Street, Westport, CT 06880, **JGB Capital, LP** a Delaware limited partnership, having an address at 21 Charles Street, Westport, CT 06880, **JGB (Cayman) Ancona Ltd.** having its address at c/o Harneys Services (Cayman) Limited, 4th Floor, Harbour Place, 103 South Church Street, PO. Box 10240, Grand Cayman KY1-1002 Cayman Islands, and **JGB Plymouth Rock LLC**, a Delaware limited liability company, having an address at 21 Charles Street, Westport, CT 06880 (hereinafter referred to collectively as the "Mortgagee").

**WITNESSETH,** that to secure payment of an indebtedness in the sum of TWENTY-SIX MILLION AND 00/100 ($26,000,000.00) DOLLARS, lawful money of the United States, to be paid with interest thereon, according to that certain Secured Promissory Note (the "Note" and capitalized terms used herein but not otherwise defined herein shall have the respective meanings given such terms in the Note) or obligation bearing even date herewith, the Mortgagor hereby mortgages to the Mortgagee the premises known as and by the street number **366 Gin Lane, Southampton, NY 11968 and 376 Gin Lane, Southampton, NY 11968** more fully described in Schedule "A" attached hereto and incorporated herein,

**TOGETHER** with any and all articles of personal property attached to or used in any way in connection with the operation or renting of the premises, including, but not limiting the generality of the foregoing to, all partitions, elevators, engines, motors, dynamos, boilers, furnaces, fuel oil, coal; heating, refrigerating, air conditioning, plumbing, gas and electric light equipment; vacuum cleaning systems; sprinkler system or other fire preventing or extinguishing equipment and materials; stoves, ranges, refrigerators, washing machines, clothes dryers, dishwashers, refuse compactors, saunas, awnings, screens, window shades, furniture and furnishings for the common halls and lobbies; furnishings and equipment of any hotel, motel, resort, health spa, restaurant, recreation facility, hospital, nursing home, adult residence or other health care related facility, theater, bowling alley, place of public or private assemblage, club and lodge, constituting all or part of the mortgaged premises; also all other articles constituting a part of or used in connection with the operation of the buildings and other structures situated upon and constituting part of the mortgaged premises, to all of which the Mortgagor represents that the Mortgagor has title free from any prior liens or encumbrances, and all buildings, structures, improvements, fixtures and articles of personal property at any time, now or hereafter, constructed, affixed to or placed upon the premises or used in connection with the operation thereof. This provision shall apply to any personalty or fixtures, now or hereafter in the premises, even though any fixture or article of personal property may not form a part of the realty as a matter of law or may not be essential to the support of the realty, it being intended hereby that such fixtures and articles of personal property shall become a part of the mortgaged realty and shall be covered by the lien of this mortgage and shall be subject to a security interest in accordance with Article 9 of the Uniform Commercial Code. If any other security agreement and/or financing statement is executed simultaneously with the execution hereof, said security agreement and/or financing statement shall be deemed to be given by the Mortgagor and

4819-8839-7932 v.7

accepted by the Mortgagee as additional security and shall be in confirmation of the foregoing; the execution or delivery of such other security agreement and/or financing statement shall not render the security interest created hereby ineffective or without force, whether said security agreement and/or financing statement is filed or re-filed or not, the security interest herein created being, notwithstanding the execution and delivery of such other security agreement and/or financing statement, fully effective and operative. Should any of such fixtures and/or articles of personal property be placed in the premises by the Mortgagor herein or any successor in interest subject to any prior security interest deemed superior to that created hereby, the lien of this mortgage shall be deemed to include the equity and interest of the Mortgagor or any such successor in interest in any of such fixtures and/or articles of personal property and, in the event of any default hereunder, all the right, title and interest of the Mortgagor or of any such successor in interest in and to any and all such property is hereby assigned to the Mortgagee together with any benefits of any deposits or payments theretofore made thereon by the Mortgagor or any such successor in interest. The provisions hereof are intended by Mortgagor and Mortgagee, and shall be deemed and construed to constitute a security agreement in accordance with Article 9 of the Uniform Commercial Code, creating a security interest in the property described in this paragraph. The Mortgagee is hereby authorized to file and re-file financing statements relating to the security interests created hereby on behalf of and in the name of Mortgagor without the Mortgagor's consent to or execution of such filings whenever the Mortgagee deems it advisable for the purpose of complying with the Uniform Commercial Code and of effectuating, continuing or renewing the liens hereby created.

**TOGETHER** also with any and all award and awards heretofore made and hereafter to be made by any municipal, county, state, federal or other governmental authority to the present and/or all subsequent owners of the premises herein described including any award and awards for any change or changes of grade of streets affecting said premises, which said award or awards are hereby assigned to the said Mortgagee and the legal representatives, successors and assigns of the Mortgagee, and the said Mortgagee, and the legal representative, successors and assigns of the Mortgagee (at its or their option), are hereby authorized, directed and empowered to collect and receive the proceeds of any such award and awards from the authorities making the same and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the amount owing on account of this mortgage and its accompanying Note, notwithstanding the fact that the amount owing on account of this mortgage and said Note may not be then due and payable; and the said Mortgagor for the said Mortgagor and the legal representatives, successors and assigns of the Mortgagor hereby covenants and agrees to and with the said Mortgagee and the legal representatives, successors and assigns of the Mortgagee, upon demand by the holder of this mortgage, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid award and awards to the holder of this mortgage, free, clear and discharged of any and all encumbrances of any kind or nature whatsoever.

The Mortgagor covenants with the Mortgagee as follows.

1.    The Mortgagor will pay the indebtedness as provided in the Note and the other Loan Documents.

2.    The Mortgagor will keep the buildings on the premises continuously insured, by policies in form and substance approved by Mortgagee, to the extent of their full

4819-8839-7932 v.7

insurable value, against loss or damage by fire, with extended coverage, and coverage against loss or damage by vandalism, malicious mischief, sprinkler leakage and, if available, against flood and against other hazards as Mortgagee may reasonably require from time to time (such insurance to be in such amounts and with such insurance carriers as the Mortgagee may in its sole discretion require and approve) for the benefit of the Mortgagee, and the Mortgagor will assign and deliver to the Mortgagee fully prepaid, unassigned, unpledged, and unencumbered policies of such insurance, as the Mortgagee may require, the unexpired premium or premiums on which shall at all times likewise be unassigned, unpledged and unencumbered, except that, in the event of any default hereunder, any unearned premium on any policy of insurance required by the Mortgagee is hereby assigned to the Mortgagee; that the Mortgagor will reimburse the Mortgagee for any premiums paid for insurance by the Mortgagee on the Mortgagor's default in so insuring the buildings or in so assigning and delivering said policies.

In the event of loss, Mortgagor will give immediate notice thereof to Mortgagee, and Mortgagee may make proof of loss if not made promptly by Mortgagor; provided, however, that any adjustment of a proof of loss shall require the prior written consent of Mortgagee.

3.    The Mortgagor will insure and keep insured all of the articles of personal property referred to herein against loss or damage by fire, with extended coverage, and coverage against loss or damage by vandalism, malicious mischief, sprinkler leakage and, if available, against flood and against other hazards as Mortgagee may reasonably require from time to time to be insured for the benefit of the Mortgagee. This provision shall be construed in the same manner as the foregoing provision for the keeping of the buildings on the premises insured against loss by fire and any other casualty or hazard.

4.    The Mortgagor will maintain the buildings on the premises in good repair; if all or any portion thereof is rented or adapted for renting, then the Mortgagor will maintain same in good rentable condition at all times, whether or not occupied. Neither the value of the mortgaged premises nor the lien of this mortgage will be diminished or impaired in any way by any act or omission of the Mortgagor or any successor in interest thereto and Mortgagor will not do or permit to be done to, in, upon or about said mortgaged premises or any part thereof, anything that may in any way substantially impair the value thereof or substantially weaken, diminish or impair the security of this mortgage. The Mortgagee may make whatever advances it deems necessary as a result of Mortgagor's default and/or in order to preserve and protect the mortgaged premises and all such advances shall be deemed secured hereby, shall bear interest at the rate(s) specified in the Note and shall be allowed and collectible in any action to foreclose.

5.    No structural changes shall be made to the buildings on the premises without the prior written consent of the Mortgagee and that no building on the premises shall be removed or demolished without the prior written consent of the Mortgagee.

6.    The whole of said principal sum of the Note and the interest thereon and other amounts payable under the Note and the Other Loan Documents shall be due, at the option of

the Mortgagee, after default in: a) payment of any interest, principal or other amounts due and payable under the Note, or of any payment of an escrow deposit hereinafter referred to for real estate taxes, water rates, sewer charges, vault taxes, assessments or other charges, for five (5) days; or b) payment of any taxes, including Corporate franchise taxes, payable by any corporate owner of the premises for thirty (30) days; c) delivering receipted bills showing payment of such real estate taxes, water rates, sewer charges, vault taxes or assessments for thirty (30) days after demand therefor; d) either assigning and/or delivering the policies insuring the buildings against loss by fire or any other hazard or casualty referred to in paragraph 2 or paragraph 3 hereof or in reimbursing the Mortgagee for premiums paid on such insurance as hereinbefore provided; e) furnishing upon request a statement setting forth the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided; or f) performance of any other covenant, agreement, term or condition of the Note or the Other Loan Documents. The holder of this mortgage in any action to foreclose it, shall be entitled to the appointment of a receiver.

7.  The Mortgagor will pay all taxes, including, but not limited to, corporate franchise taxes and real estate taxes, water rates, sewer charges, vault taxes and assessments and will submit to the Mortgagee receipted bills therefor on demand, and in default thereof, the Mortgagee may pay the same. If any duplication of payment results from the failure of the Mortgagor to submit receipted bills, the cost and expense of procuring refund of duplicate payments shall be borne by the Mortgagor.

8.  The Mortgagor within six (6) days upon request in person or within fifteen (15) days upon request by mail will furnish a written statement, duly acknowledged, setting forth the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt.

9.  Notice, notice and demand or request may be in writing and may be served in the manner set forth in the Note.

10. The Mortgagor warrants the title to the premises.

11. In the event of the passage after the date of this mortgage of any law of the State of New York deducting from the value of land for the purposes of taxation any lien thereon or changing in any way the laws of taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, so as to affect said mortgage, the holder of this mortgage and of the debt which it secures shall have the right to give thirty days' written notice to the owner of the land requiring the payment of the mortgage debt. If such notice be given, the said debt shall become due, payable and collectible at the expiration of said thirty days.

12. If said mortgage is now or shall hereafter be protected or affected by moratorium laws or by any other statute or statutes preventing the Mortgagee from foreclosing for nonpayment of the principal at the expiration date hereof, the Mortgagor hereby undertakes to continue to pay interest to the Mortgagee (if the Mortgagee so elects and only so long as the moratorium laws or any such other statute or statutes protect said Mortgagor from foreclosure for nonpayment of the balance of the principal debt), at the

4819-8839-7932 v.7

Default Rate set forth in the Note, on the maturity date on the Note and, thereafter, on the same days of the months set forth in the Note.

13.     If any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby) to which action or proceeding the holder of this mortgage is made a party or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the holder of this mortgage for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees) shall be paid by the Mortgagor, together with interest thereon, at the rate or rates specified in the Note secured hereby and any such sums, with the interest thereon, shall be a lien on said premises attaching or accruing subsequent to the lien of this mortgage and shall be deemed to be secured by this mortgage and by the Note which it secures. In any action or proceeding to foreclose this mortgage and/or to recover or collect the debt secured thereby, the provisions of law respecting the recovery of costs, disbursements and allowances shall continue unaffected by this covenant.

14.     If the said premises as existing or used at any time are in violation any state or local statute, ordinance, code, rule, regulation or requirement or of any order issued or filed by any municipal or governmental authority or subdivision thereof, or if by reason of any change either in the physical condition of the premises or its use or in the aforesaid laws, statutes, ordinances, codes, rules, regulations or requirements, or direction of any municipal or governmental authority or subdivision thereof or if, by reason of the filing of a violation against the said premises they shall become and be in violation of any of the foregoing, the Mortgagor shall take immediate steps to alter the premises as required to comply therewith. In any of the aforementioned events, (a) any necessary alteration or repair shall proceed with all due diligence and shall be completed within a reasonable time and (b) there shall be submitted to the Mortgagee, upon completion, (i) receipted bills evidencing the payment of the cost thereof and (ii) satisfactory proof that no liens or encumbrances have been or will be filed on account thereof; if such alterations or repairs require filing and approval of plans or specifications, said plans and specifications must first be approved by the Mortgagee before they are filed with the governmental department having jurisdiction thereof and the Mortgagor, on completion, shall procure and exhibit to the Mortgagee a Certificate of Occupancy issued by said governmental department and a Notice of Dismissal of all violations; if the alterations do not require filing and approval of plans, the Mortgagor shall produce, on completion, a Notice of Dismissal of all violations. For the purpose of this mortgage, any attempted compliance with the above by the partial or total vacating of the premises shall not be considered compliance with the requirements hereof. On any occasion when the premises shall be deemed to be in violation of any law, order, decree, code, rule or requirement relating to said premises, it shall be deemed so to be on the assumption that the premises are or will be fully occupied. The repairs and alterations to be made in order to comply with the foregoing shall include all unoccupied portions of the premises with like effect as though they were fully occupied.

15.     The Leases and Rents, as defined in that certain Collateral Assignment of Leases and Rents of even date herewith between Mortgagor and Mortgagee (the "Assignment"), of the mortgaged premises are assigned to the holder hereof pursuant to the provisions of the Assignment collateral hereto as further security for the payment of the obligations

evidenced by the Note and secured hereby, and Mortgagee shall upon the occurrence of a default hereunder which shall not have been cured within applicable grace and cure periods, if any, have all rights provided in the Assignment in consequence thereof. The Mortgagor covenants that it will not assign, pledge or otherwise alienate any of the rents, issues and profits from said premises without prior written consent of the Mortgagee, except as set forth in the Assignment, and any such attempted assignment, pledge or alienation of said rents shall be subject and subordinate to the rights of the Mortgagee.

16. In the event of any such entry and in the event of such taking of possession by the Mortgagee pursuant to the provisions above stated, or in the event of the appointment of a receiver of rents or profits in any action brought by the Mortgagee by reason of the provisions of this mortgage, the Mortgagor or any subsequent owner, if in possession of any portion of the mortgaged premises, shall be obligated to pay to the Mortgagee or to the receiver of rents a reasonable rental monthly in advance for the portion of the premises so occupied. In the event a receiver is appointed by reason of such default or breach, the amount of rent payable shall be determined upon an application to be made by the receiver to the court for a determination of the reasonable rental value payable by the Mortgagor or any subsequent owner. In the event of a default in the payment of any amount of rent monthly in advance to be determined as above stated, the Mortgagor or any subsequent owner may be dispossessed by the usual summary proceedings in the same manner that any defaulting tenant may likewise be dispossessed.

17. The Mortgagor will not assign, pledge or otherwise alienate any of the rents, issues and profits from said premises without prior written consent of the Mortgagee and any such attempted assignment, pledge or alienation of said rents shall be subject and subordinate to the rights of the Mortgagee.

18. Mortgagor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Mortgage or to any action brought to enforce the Note or any other obligation secured by this Mortgage.

19. The Mortgagor or any subsequent owner of said premises will, annually within sixty (60) days after the end of the Mortgagor's fiscal year, furnish to the Mortgagee or any subsequent holder of this mortgage, a full and complete statement of all income and expenses incurred in the operation and maintenance of the said premises. Such a statement shall include a rent roll and such other information relating to the property as the Mortgagee may require. Such statement will also be furnished to the Mortgagee at any other time on demand.

20. The Mortgagor represents that it is now the owner of the premises described in the mortgage. That this is a valid second ranking lien for the principal sum of **$26,000,000.00** on the parcel known as 376 Gin Lane, Southampton, NY 11968 and a valid first ranking lien for the principal sum of **$26,000,000** on the parcel known as 366 Gin Lane, Southampton, NY 11968, in each case with interest thereon as aforesaid, and that there are no defenses or offsets to this mortgage or to the Note or obligation which it secures.

21. The Mortgagor covenants to pay to the Mortgagee a reasonable fee which the Mortgagee may impose, at its option, for the processing on its records of any change of ownership or

4819-8839-7932 v.7

substitution of bondsman or for any letter advice as to the amount of principal and interest owing on the mortgage or for inspections of the mortgaged premises in connection with payment of fire loss proceeds or condemnation award, or for any release, modification, extension, consent, easement, special agreement, reduction certificate, assignment, satisfaction of mortgage or other instrument relating to this mortgage.

22.    Any and all articles of personal property now or hereafter attached to or used in any way in connection with the operation or renting of the premises shall be a part of the security for the indebtedness hereinabove referred to, including, but not limiting the generality of the foregoing to, all partitions, elevators, engines, motors, dynamos, boilers, furnaces, fuel oil, coal; heating, refrigerating, air conditioning, plumbing, gas and electric light equipment; vacuum cleaning systems; sprinkler system or other fire preventing or extinguishing equipment and materials; stoves, ranges, refrigerators, washing machines, clothes dryers, dishwashers, refuse compactors, saunas, awnings, screens, window shades; furniture and furnishings for the common halls and lobbies; furnishings and equipment of any hotel, motel, resort, health spa, restaurant, recreation facility, hospital, nursing home, adult residence or other health care related facility, theater, place of public or private assemblage, club and lodge, constituting all or part of the mortgaged premises; also all other articles constituting a part of or used in connection with the operation of the buildings and other structures situated upon and constituting part of the mortgaged premises, to all of which the Mortgagor represents that the Mortgagor has title free from any prior liens or encumbrances, and all buildings, structures, improvements, fixtures and articles of personal property at any time, now or hereafter, constructed, affixed to or placed upon said premises or used in connection with the operation thereof. This provision shall apply to any personalty or fixtures, now or hereafter in the premises, even though any fixture or article of personal property may not form a part of the realty as a matter of law or may not be essential to the support of the realty, it being intended hereby that such fixtures and articles of personal property shall become a part of the mortgaged realty and shall be covered by the lien of the mortgage and shall be subject to a security interest in accordance with Article 9 of the Uniform Commercial Code. If any other security agreement and/or financing statement is executed simultaneously with the execution hereof, said security agreement and/or financing statement shall be deemed to be given by the Mortgagor and accepted by the Mortgagee as additional security and shall be in confirmation of the foregoing; the execution or delivery of such other security agreement and/or financing statement shall not render the security interest created hereby ineffective or without force, whether said security agreement and/or financing statement is filed or re-filed or not, the security interest herein created being, notwithstanding the execution and delivery of such other security agreement and/or financing statement, fully effective and operative. Should any of such fixtures and/or articles of personal property be placed in the premises by the Mortgagor herein or any successor in interest subject to any prior security interest deemed superior to that created hereby, the lien hereof shall be deemed to include the equity and interest of the Mortgagor or any such successor in interest in any of such fixtures and/or articles of personal property and, in the event of any default hereunder, all the right, title and interest of the Mortgagor or of any such successor in interest in and to any and all such property is hereby assigned to the Mortgagee, together with any benefits of any deposits or payments theretofore made thereon by the Mortgagor or any such successor in interest. The provisions hereof are intended by Mortgagor and Mortgagee, and shall be deemed and construed to constitute a

security agreement in accordance with Article 9 of the Uniform Commercial Code, creating a security interest in the property described in this paragraph. The Mortgagee is hereby authorized to file and re-file financing statements relating to the security interests created hereby on behalf of and in the name of Mortgagor without the Mortgagor's consent to or execution of such filings whenever the Mortgagee deems it advisable for the purpose of complying with the Uniform Commercial Code and of effectuating, continuing or renewing the liens hereby created.

23. The Mortgagor does hereby assign to the Mortgagee and the legal representatives, successors and assigns of said party, as a part of the security for the indebtedness hereinabove referred to, any and all award and awards heretofore made and hereafter to be made by any municipal, county, state, federal or other governmental authority to the present and/or all subsequent owners of the premises herein described including any award and awards from any change or changes of grade of streets affecting said premises; and the said Mortgagee, and the legal representatives, successors and assigns of the Mortgagee (at its or their option) are hereby authorized, directed and empowered to collect and receive the proceeds of any such award and awards from the authorities making the same and to give proper receipts and acquittances therefrom, and to apply the same toward the payment of the amount owing on account hereof, notwithstanding the fact that the amount owing on account hereof may not be then due and payable, and the said Mortgagor for the said Mortgagor and the legal representatives, successors and assigns of the Mortgagor hereby covenants and agrees to and with the said Mortgagee and the legal representatives, successors and assigns of the Mortgagee, upon demand by the holder hereof, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid award and awards to the holder hereof, free, clean and discharged of any and all encumbrances of any kind or nature whatsoever.

24. Upon notice from the Mortgagee, the Mortgagor covenants to pay to the Mortgagee on the sixth day of each and every month commencing with the month after receipt of such notice, one-twelfth (1/12th) of the annual charges for real estate taxes, water rates, sewer charges, vault taxes and assessments affecting the premises herein mentioned and, at the option of the Mortgagee, the annual premiums for fire, flood and other hazard insurance, which sums shall be held by the Mortgagee and used by it to pay such taxes and charges as the same become due and payable. The amount of such monthly payments is to be fixed and determined by the Mortgagee immediately after the date hereof and if, on the first day of any month hereafter, the total of the monthly installments theretofore paid to the Mortgagee shall be insufficient to pay such taxes and charges as shall then or thereafter be due and payable, the Mortgagor shall pay to the Mortgagee such further sum as shall be necessary to make up such deficit within ten (10) days after written notice and demand therefor; and if there be any excess in any month over and above the sum necessary to pay such taxes and charges, it shall be applied to such taxes and charges subsequently accruing. Such funds held by the Mortgagee shall not be deemed trust or agency funds, may be co-mingled with the general funds of the Mortgagee and no interest or earnings thereon shall be payable by Mortgagee except as may be required by law. Upon Mortgagor's default in making any such payment or payments as and when herein provided, Mortgagee shall have the right (but not the obligation), in Mortgagee's sole and absolute discretion, to pay any such taxes or

4819-8839-7932 v.7

charges and Mortgagor shall be obligated to repay the same to Mortgagee with interest at the rate(s) specified in the Note secured hereby and such sums so advanced by Mortgagee, together with the interest thereon, shall be a lien on said premises and secured by this mortgage.

25. In the event of a sale, conveyance or transfer of ownership of the mortgaged premises or a portion thereof by the Mortgagor or any subsequent owner thereof, this mortgage will immediately become due and payable at the option of the Mortgagee and the Mortgagee shall be entitled to all rights and remedies under paragraph 26. As used in this paragraph, the phrase "sale, conveyance or transfer of ownership" shall be construed to include, but not be limited to, with respect to the mortgaged premises; a) an installment sales contract; b) a lease with an option to buy; c) a lease for more than eight (8) calendar weeks including renewal terms; d) a transfer of stock of the Mortgagor, if Mortgagor is a corporation or transfer of membership interest of the Mortgagor, if Mortgagor is a limited liability company; e) any change in the general partners comprising Mortgagor, as same presently exist, if Mortgagor is a partnership; and f) the creation of any other lien or encumbrance, including, without limitation, any lien or encumbrance involving a transfer of rights of occupancy.

26. Upon any default hereunder, the breach of any of the covenants hereof or the occurrence of an Event of Default (as defined in the Note), the entire principal sum secured hereby shall, at the option of the Mortgagee, become immediately due and payable and the Mortgagee shall have the right to foreclose this mortgage. Mortgagor hereby agrees that upon any action to foreclose or otherwise enforce the provisions contained in this agreement and the other Loan Documents (as defined in the Note), Mortgagor shall not interpose any counterclaim and Mortgagor hereby waives any right to a jury trial. In addition, the Mortgagee may, its option, immediately and without demand, exercise any and all rights and remedies available to a secured party under the Uniform Commercial Code as in effect from time to time. This paragraph 26 is without limitation to any other rights and remedies which the Mortgagee may have under the Loan Documents, at law or in equity.

27. All obligations of the Mortgagor hereunder shall continue until the entire debt evidenced hereby is paid, notwithstanding any action or actions, whether by foreclosure or otherwise, which may be brought to recover any sum or sums of money payable under the provisions of this agreement.

28. This instrument and all of the covenants contained herein shall bind the heirs, executors, administrators, successors and assigns of the Mortgagor and inure to the benefit of the successors and assigns of the Mortgagee, with like effect as if such heirs, executors, administrators, successors and assigns were named herein.

29. The terms and provisions of this mortgage shall not be changed, modified, or discharged in whole or in part except by an instrument in writing signed by the party against whom enforcement of such change, modification or discharge is sought or by its agent thereunto duly authorized in writing.

30. This mortgage and the execution and delivery of same by the Mortgagor have been duly

authorized by the members and officers of the Mortgagor.

31. Nothing contained herein shall be construed or operate so as to require the Mortgagor to pay interest at a greater rate than is now lawful or to make any payment contrary to law. In any event, the total charges for interest and in the nature of interest shall not exceed the maximum amount allowed by law and any excess portion of such charges that have been collected shall be refunded to the Mortgagor.

32. Mortgagor hereby covenants and agrees as follows:

   a. Within ninety (90) days after notification by Mortgagee, Mortgagor shall remove or cause to be removed any and all asbestos or correct or cause to be corrected the condition of such asbestos by enclosure or encapsulation for all asbestos which may at any time be determined to be located in or on any part of the mortgaged premises and will take or cause to be taken any and all other actions, required by law in connection therewith; and

   b. Mortgagor shall proceed promptly and with due diligence to perform or cause to be performed all actions required to be taken by law in connection therewith and/or as requested by Mortgagee; and

   c. Mortgagor shall comply with all laws, rules or regulations, as the same may from time to time be amended, modified or supplemented, and relating to acceptable levels of asbestos, asbestos-containing materials or other hazardous materials including, without limitation, all pollutants, dangerous substances, toxic substances, hazardous wastes and hazardous substances as defined or set forth in or pursuant to or covered by the Resource Conservation and Recovery Act (42 U.S.C. Section 9601, et seq.), the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. Section 6901, et seq.), or any other federal, state or local environmental law, ordinance, rule or regulation.

Mortgagor shall, whenever required hereunder, perform all of the work so required in a safe and proper manner and in accordance and in compliance with all applicable federal, state, city and building laws, rules or regulations in existence now or established from time to time hereafter. Upon completion of such work, Mortgagor shall deliver to Mortgagee certified copies of all clearance reports and testing results required by all applicable laws, rules and regulations in existence now or established from time to time hereafter.

Mortgagor, its successors and assigns, shall defend, indemnify and hold harmless Mortgagee, including its directors, officers, employees, agents, successors and assigns, from and against any and all claims, demands, judgments, damages, actions, causes of action, injuries, administrative orders, consent agreements and orders, liabilities, penalties, costs and expenses (including reasonable attorneys' fees) of any kind whatsoever, including claims arising out of loss of life, injury to persons, property, or business in connection with the acts or failure to act of Mortgagor or Mortgagor's predecessors in interest, third parties in a contractual relationship with Mortgagor, or any of them, whether or not occasioned wholly or in part by any condition, accident or event

caused by any act or omission of Mortgagor, which:

    i.    arises out of the actual, alleged or threatened discharge, dispersal, release, generation, disposal or escape of asbestos-containing materials or other hazardous materials; or

    ii.    actually or allegedly arises out of the performance or failure to perform the abatement of any asbestos or other hazardous materials source or the work required to be taken by law in connection therewith.

Mortgagee shall have the right, but not the obligation, to perform or cause to be performed all of Mortgagor's obligations hereunder. If Mortgagee shall perform or cause to be performed such obligations, Mortgagors shall, immediately and upon demand of Mortgagee, reimburse Mortgagee for all costs and expenses Mortgagee incurs in connection therewith.

The Mortgagor, its successors and assigns, shall bear, pay and discharge when and as the same becomes due and payable, any and all such judgments or claims for damages, penalties, clean-ups or otherwise against Mortgagee described in this paragraph, shall hold Mortgagee harmless for those judgments or claims, and shall assume the burden and expense of defending all suits, administrative proceedings, and negotiations of any description with any and all persons, political subdivisions or government agencies arising out of any of the occurrences set forth in this paragraph.

In the event Mortgagor fails to meet and comply with the covenants and conditions set forth in this paragraph, the entire balance of principal secured hereunder, together with all interest thereon shall immediately become due and payable at the option of the Mortgagee. Mortgagor hereby represents to Mortgagee that there is as of the date hereof no asbestos, asbestos-containing materials or other hazardous materials in, on or about the mortgaged premises. Anything contained in this agreement to the contrary notwithstanding, the Mortgagor hereby agrees that the indemnifications contained in this paragraph shall continue and survive satisfaction of the loan whether by payment or through foreclosure or acceptance by Mortgagee of a deed in lieu of foreclosure.

33.    Any provisions in this Agreement to the contrary notwithstanding, Mortgagor hereby agrees to pay any and all state and local real property and other transfer taxes payable in connection with a sale or other conveyance of the mortgaged premises arising or resulting from Mortgagee's (i) foreclosure of the mortgage as extended or (ii) acceptance of a deed to the mortgaged premises in lieu of foreclosure proceedings. Mortgagor further hereby irrevocably appoints Mortgagee its true and lawful attorney to act in Mortgagor's name and stead in completing any and all returns, questionnaires, notices of sale or other documents which may be required in connection with any such transfer or the payment of any such transfer tax or other tax.

34.    If it becomes necessary to employ counsel to collect the obligation described herein or to protect or foreclose said mortgage, the Mortgagor hereby agrees to pay reasonable attorneys' fees for the services of such counsel together with all other costs and disbursements in connection therewith whether or not suit be brought.

4819-8839-7932 v.7

35.    In the event that the Mortgagor elects to accept a payment from the Mortgagor which is received more than five (5) days late, a late charge of five (5%) percent for each $1.00 of such payment so overdue shall be changed for the purpose of defraying the expenses incidental to handling such delinquent payment. Such change may be added to the amount owing on the principal indebtedness and its payment further secured hereby. Acceptance of any late payment by the Mortgagee in one instance shall not be construed to be a waiver of any of Mortgagee's rights under this mortgage in connection with any other late payment during the term of this mortgage.

36.    Any forbearance by Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Mortgagee of payment of any sum secured by this Instrument after the due date of such payment shall not be a waiver of Mortgagee's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Mortgagee shall not be a waiver of Mortgagee's right to accelerate the maturity of the indebtedness secured by this Instrument, nor shall Mortgagee's receipt of any awards, proceeds or damages under paragraph 23 hereof operate to cure or waive Mortgagor's default in payment of sums secured by this Instrument.

37.    Mortgagor will not, without the prior written consent of the Mortgagee, create, grant or permit to be created or granted, or permit to remain, any mortgage, pledge, lien, encumbrance, option to purchase or charge, or security interest, or conditional sale or other title retention agreement, with respect to the premises secured hereunder or any part thereof or income therefrom, whether prior or subordinate to the lien of the mortgage or any extensions, renewals or modifications hereof. Any default under any other mortgage secured by the premises, shall be a default hereunder and the whole of the principal sum and the interest thereon shall become due at the option of the Mortgagee.

38.    Any advances made by the Mortgagee under any of the terms, covenants, or conditions of this agreement shall be deemed secured hereby, shall bear interest at the default rate set forth herein and shall be allowed and collectible in any action to foreclose.

39.    Mortgagor hereby warrants and represents to Mortgagee that the undersigned is receiving and will use the proceeds of the loan secured by this Mortgage and the Note exclusively to carry on a business or commercial enterprise and that none of such proceeds shall be used for personal, family, household or consumer purposes; such warranty and representation being a material inducement to the Mortgagee to make the such loan.

40.    At the Mortgagee's option and without demand, notice, or protest, the occurrence of any such default hereunder shall also constitute a default under all other agreements between the Mortgagee and the Mortgagor. Conversely, at Mortgagee's option and without demand, notice, or protest, the occurrence of any event of default under any other agreement between Mortgagee and Mortgagor shall constitute a default hereunder.

41. ☐ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This security instrument covers real property principally improved by one or more structures containing in the aggregate not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

42. ☐ Section 254, et al., of RPL.  The clauses, covenants and conditions contained in this Mortgage and in the other Loan Documents, other than those included in the New York Statutory Short Form of Mortgage, shall be construed as affording to Mortgagee rights additional to, and not exclusive of, the rights conferred under the provisions of Sections 254, 271 and 272 of the New York Real Property Law.

43. MAXIMUM AMOUNT SECURED.  NOTWITHSTANDING ANY PROVISION SET FORTH IN MORTGAGE TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS SECURITY INSTRUMENT AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS $50,000,000, PLUS ALL INTEREST AND OTHER CHARGES PAYABLE UNDER THE NOTE AND ALL AMOUNTS EXPENDED BY MORTGAGEE AFTER DEFAULT BY MORTGAGOR (A) FOR THE PAYMENT OF REAL ESTATE TAXES, CHARGES OR ASSESSMENTS WHICH ARE IMPOSED BY LAW UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED TO BE MAINTAINED BY MORTGAGOR PURSUANT TO THIS MORTGAGEAND THE OTHER LOAN DOCUMENTS; (C) FOR ANY EXPENSES INCURRED IN MAINTAING THE PROPERTY AND UPHOLDING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE; (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY; AND ALSO TOGETHER WITH INTEREST ON ALL OF THE FOREGOING AMOUNTS IN CLAUSES (A) THROUGH (D) AT SUCH RATES AS PROVIDED FOR IN THE NOTE.

**SIGNATURE PAGE FOLLOWS
NO FURTHER TEXT**

4819-8839-7932 v.7

IN WITNESS WHEREOF, this Mortgage has been executed by the Mortgagor as of the 25th day of July, 2018.

**Brickchurch Enterprises, Inc.**

By: David M. Hryck
Title: Authorized Signatory

**Aberdeen Enterprises, Inc.**

By: David M. Hryck
Title: Authorized Signatory

State of New York    )

County of *New York*

On the 25th day of July, in the year 2018 before me, the undersigned, personally appeared David M. Hryck, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the  within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the  individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY PUBLIC

Jan Kiderman
Notary Public, State of NY
No. 01KI6075678
Qualified In Westchester County
Commission Expires June 10, 2022

4819-8839-7932 v.7

**Exhibit 4**

From: Brett Cohen <BCohen@JGBCap.com>
Date: Tuesday 28 May 2019 at 17:59
To: Melanie Bonvicino <melanieinc2@aol.com>, Mathew Kabatoff
<mkabatoff@ltbholding.com>, Louise <lb@ltbholding.com>, David Hryck
<DHryck@ReedSmith.com>
Cc: Shuky Barlev-Ehrenberg <SEhrenberg@JGBCap.com>, Hunter Dorbandt
<HDorbandt@JGBCap.com>, 'RJ Solovy' <RJSolovy@marqueefg.com>
Subject: Amendment, for discussion purposes

All:
For discussion purposes only. We have taken into consideration your asks, and tried to make
accommodations.
Best,
Brett

We give:
•   JGB takes out the MS first loan $15 mln and makes it at 5%. All other additions to the loan
(interest reserve, reserve for house expenses, amendment fee) added to existing loan at
(unchanged) 12%. JGB loans $22.5 mln. $250k is escrowed for house expenses, to be spent by
JGB in consultation w the borrower. $5 mln is an interest reserve. Aprox $1M to Louise Blouin
•   Lawyers, intermediaries, taxes, tradespeople must be made current as part of the flow of
funds.
•   Maturity is pushed out to April 30, 2020

We get:
•   Borrowers pledge share in Aberdeen and Brickchurch pursuant to a pledge agree and put
shares of the company in escrow, along with executed stock powers (with medallion guarantees).
If there is an event of default, JGB can exercise the voting rights over such shares.   Idea: JGB
controls the corporations if there is a default.  The amount of any real estate transfer taxes
incurred by JGB as a result of taking ownership of shares or exercising voting rights, as
applicable, will be added to JGB's secured claim.
•   JGB to receive unconditional personal guaranties from Louise and Matthew
•   JGB receives an amendment fee of 1.75 mln added to the face amount of the loan. Face of
the loan = 26+22.5+1.75= 50.25. $15 mln earns 5%, $35.25 earns 12%. Upon maturity or sale,
JGB gets an incremental exit fee of $1.75mln. In total, on the earlier of a sale or at maturity, JGB
is owed 26(loan 1)+22.5 (new loan)+1.75 (amendment fee)+1.75 (exit fee)= $52.  Note: if the
property is sold before maturity, --ie, after 2 months— JGB gets the $52, but, unused interest
reserve goes for the benefit of Louise.
•   Subject to JGB obtaining title insurance, payment of all outstanding property taxes as well
as no existence of any liens besides the Morgan Stanley mortgage and liens of JGB.
•   Borrowers to immediately list property for sale with a reputable broker experienced with
high-end real estate approved by JGB (such approval not be unreasonably withheld or delayed).
JGB will receive weekly status report from broker regarding marketing activities and offers
received.

- The properties must be rented during the summer and JGB to receive 100% of all rental income up to the first $1M of rental income as paydown of the loan. If, for whatever reason, less than $1M rental income is paid to JGB over the summer, then whatever shortfall (ie, if JGB only gets $250k, then it is owed 750k) is due by October 31, 2019.

**Exhibit 7**

**From:** Louise <lb@ltbholding.com>
**Date:** Friday 31 May 2019 at 10:22
**To:** Brett Cohen <BCohen@JGBCap.com>
**Cc:** "Gregory Kramer (Greg.Kramer@haynesboone.com)" <Greg.Kramer@haynesboone.com>, "Cooper, Emilie" <Emilie.Cooper@haynesboone.com>, Hunter Dorbandt <HDorbandt@JGBCap.com>, Shuky Barlev-Ehrenberg <SEhrenberg@JGBCap.com>, 'RJ Solovy' <RJSolovy@marqueefg.com>
**Subject:** Re: <no subject>

Dear Brett ,

Thanks Brett we have been on time since last july 2018   except for 24 hours  because of some holiday and will be late this time as I mentioned to you , we are then perfect  until the end of your contract .


I need to put all my efforts to sell and refinance  I am not saying no to the other deal I think it is better if I focus on refinancing you fast and or sell  , we are all walking in the same direction , we want the same thing as you and as fast as we can .

The house is now on sale as a separate package to make it easier and more affordable .

I am with the brokers every  3 days  I am looking after your interest .

Thank you again for your proposal but let me make you even happier by getting you out earlier .


Have a nice weekend .

Louise

**The above, his reponse to cc lawyers, then this**
**From:** Louise Blouin <lb@ltbholding.com>
**Sent:** Friday, May 31, 2019 2:50 AM
**To:** Brett Cohen <BCohen@JGBCap.com>
**Subject:** <no subject>

Dear Brett ,

I thank you so much for your proposal at this time it is premature as it is only now that we sell houses in the Hamptons from July to sept let me give it my best shot to honor our first deal
We have a group of agents coming to the premises and two interested parties coming to visit as well .

I am as well speaking to wealth managers of banks and they are interested as well to refinance you , I was with them yesterday they know me and my family and our willing to move I meet with them in paris next week .

When one does a deal in October in the Hamptons nothing will sell before the summer as all homes are closed and wealthy people do not come visit they are in the Hamptons july august mostly aug .

I ask you to reconsider the timing of your offer as we have now many options on the table and you would waste your time and money .

We are in May season is not open lets give it our best shot Brett and do what is best for the property and for all of us .

To push a foreclosure when it is just opening the season is not the way to go or to actually speak as I will try my best as I always did in my life to honor what I promise .

Thank you again have a nice day .

We are putting 366 at 59 million as recommended by the broker last night I am with the brokers daily for the rental and the selling ,WE ARE ON IT ALL THE WAY .........

Best louise

Give it a chance as the season is now opening it is like selling ice cream to eskimo we would rather sell ice cream in the hot countries or in the summer

**Exhibit 8**

From: Brett Cohen <BCohen@JGBCap.com>
Date: Thursday 30 May 2019 at 17:20
To: David Hryck <DHryck@ReedSmith.com>, Melanie Bonvicino <melanieinc2@aol.com>,
Mathew Kabatoff <mkabatoff@ltbholding.com>, Louise <lb@ltbholding.com>, Shuky Barlev-
Ehrenberg <SEhrenberg@JGBCap.com>, Hunter Dorbandt <HDorbandt@JGBCap.com>
Cc: "Gregory Kramer (Greg.Kramer@haynesboone.com)" <Greg.Kramer@haynesboone.com>,
"Cooper, Emilie" <Emilie.Cooper@haynesboone.com>
Subject: Future communication

All,
We would prefer, going forward, if communication to JGB on this matter were handled through
counsel, CC'd here.
Best,
Brett


OR

**From:** Brett Cohen <BCohen@JGBCap.com>
**Date:** Friday 31 May 2019 at 15:26
**To:** Louise <lb@ltbholding.com>
**Cc:** "Gregory Kramer (Greg.Kramer@haynesboone.com)" <Greg.Kramer@haynesboone.com>,
"Cooper, Emilie" <Emilie.Cooper@haynesboone.com>, Hunter Dorbandt
<HDorbandt@JGBCap.com>, Shuky Barlev-Ehrenberg <SEhrenberg@JGBCap.com>, 'RJ Solovy'
<RJSolovy@marqueefg.com>, Melanie Bonvicino <melanieinc2@aol.com>
**Subject:** RE: <no subject>

Dear Louise,
Please direct communications to our counsel, cc'd. The below doesn't work for us. We expect interest to
be paid in a timely manner and our agreement to be strictly adhered to.
Regards,
Brett


**Exhibit 9**


From: Brett Cohen <BCohen@JGBCap.com>
Date: Thursday 25 July 2019 at 15:20
To: Louise <lb@ltbholding.com>
Cc: Mathew Kabatoff <mkabatoff@ltbholding.com>, David Hryck
<DHryck@ReedSmith.com>, Melanie Wiener <melanie@brilandclub.com>, Hunter Dorbandt
<HDorbandt@JGBCap.com>, "Gregory Kramer (Greg.Kramer@haynesboone.com)"
<Greg.Kramer@haynesboone.com>, "Cooper, Emilie" <Emilie.Cooper@haynesboone.com>

Subject: Process


Hey Louise,
Hope your summer is going well. I think it's about 90 days until the final maturity of our loan. It is close to a certitude that you will not be able to repay or refinance our loan at maturity. You would have needed to have properly hired a broker long ago, fixed the place up so it doesn't look distressed, asked prices that are related to the market, and basically be in contract with a buyer right now.

You and Matthew have agreed to personally guaranty the loan should you take any action to oppose our foreclosure in the event we are not repaid at maturity; does it make sense to just start a rational transfer of title now? It seems sort of a waste to lose the entire season with someone more transactional (us) working on this, and also to rack up incremental legal fees via foreclosure that will be added to the obligation.

Anyhow, we're perfectly happy to live within our deal and wait until maturity, if that is what you prefer.

Best,
Brett


**Exhibit 10:**

**From:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Sent:** Tuesday, March 24, 2020 8:54 am
**To:** Louise Blouin
**Subject:** Brett - Note

Dear Brett,

Thank you for your response and I do hope that you and your family stay health during this difficult period. In Paris, we have just completed our first week of lockdown however it does appear that there will be no quick or simple solution in halting the spread of the virus.

We have been told that a combination of anti-malaria and bronchial antibiotics may be helpful in curing the virus, although full scientific trials are still pending. These drugs are: Plaquenil and AZITHROMYCINE SANDOZ – I really urge you to purchase them, and have them on hand should you have an issue.

Unfortunately for the markets, the situation will become much worse until a vaccine is discovered. The ten years of constant growth, with little volatility has come to an end, and despite the fact that the markets attempted a correction over the past several

weeks, we have not yet found a bottom. While the Fed is reacting, we can only hope that their interventions are both timely and target the correct market segments.

As a result of this turmoil and the lack of certainty I wish to propose that we work together to find a solution to the outstanding loan at 366 Gin Lane. I may have an opportunity to refinance, however I will need your willingness to come down to the original value due at the end of the loan term, in order to provide assurances to the banks in this time of turmoil.

My refinancing efforts have hit many roadblocks due to the change in lending rules after the financial crisis, that were revealed to me while in conversation with banks. These rules consist of the inability to refinance the property should it be either listed for sale, listed for rent, or rented in the past 6 months. Apparently regulators were trying to protect Americans with smaller home values, due to the refinancing fees charged by banks, prior to a property sale.

While I realize that my original intention when I took the loan from JGB was to exit with a sale of the property, this became complicated when a buyer pulled out at the last minute. From a balance sheet perspective, it not makes more sense to refinance the property and to plan for a sale at a later date.

It is important that we act now so that you can make an exit. The situation will indeed get much worse, whether in respect to market declines, regulatory changes or other such unknowns.

I look forward to hearing from you,
Louise

**From:** ████████████████████ @ubs.com>

**To:** Louise <lb@ltbholding.com>

**Cc:** ' ████████ @ubs.com" ████████ @ubs.com>, ' ████████ @ubs.com"
████████████████████ >

**Subject:** RE: Simplified version

Louise,

We can only lend you money against a portfolio of liquid cash and securities. We refer to this as a
securities backed loan (SBL).

We cannot provide a mortgage on the real estate because they are occupied as investment
properties and they are listed for sale.

In order to revisit the mortgage discussion it needs to be at least 12 months after you stop renting
the properties and at least 6 months after you take the properties off the market. Once this occurs
we can discuss using a mortgage to replace the securities backed loan (SBL).

I know this is more restrictive than you like, however, these are the parameters we must work within
in the US.

Mike



**UBS International**
UBS Financial Services Inc.
1285 Avenue of the Americas, 19th Floor
New York, NY 10019

@ubs.com

**Exhibit 11:**

**CCONNOR**

| | |
|---|---|
| **Borrower:** | Brickchurch Enterprises Inc., an entity holding the deed to 366 Gin Lane, Southampton, NY |
| **Guarantor:** | Louise Blouin[1] |
| **Lenders:** | One or more investment funds or other entities managed by UBS O'Connor LLC ("**O'Connor**"). |
| **Loan Agent:** | [Wilmington Trust]. |
| **Term Loan Amount:** | $[25] million, approximately $[31] million funded at closing net of an Original Issue Discount (OID) of $[4] million. |
| **Maturity:** | [36] months from the Closing Date, subject to the Extension Option. |
| **Interest Rate:** | 1m Libor + [4.5]% p.a., paid monthly from the Interest Reserve and Property Maintenance Account or by the Borrower if amounts in the account are not sufficient. 1.5% LIBOR Floor.<br><br>The Lenders will allow the Borrower to credit the first interest to be accrued and credited towards the OID (i.e., the Lenders will waive the requirement to pay the first $ of interest on a cash current basis).<br><br>The Interest Rate will increase to  following an Event of Default if such event occurs within [9] months of the Closing Date, otherwise the Interest Rate will increase by an additional [500]bps p.a. following an Event of Default. |
| **Upfront Fee:** | 1.0% on the Term Loan Amount (the "**Upfront Fee**") paid according to the Expenses and Earnest Money Deposit section. |
| **Amortization:** | Mandatory sweep of all net sales proceeds from collateral sales, all remaining outstanding amounts are due in full at maturity. |

**OCONNOR**

12/5/19

| | |
|---|---|
| **Collateral:** | The Term Loan will be secured as follows at closing: |

- lien mortgage on 366 Gin Lane and pledge of the equity in Brickchurch Enterprises;
- lien mortgage on 376 Gin Lane and/or a pledge of the equity in Aberdeen Enterprises;
- Pledge of securities and cash held in the Interest Reserve and Property Maintenance Account (via SACA or DACA)

**Interest Reserve and Property Maintenance Account:**

Unfunded at closing. All rental income from 366 Gin Lane and 376 Gin Lane will be deposited in the Interest Reserve and Property Maintenance Account until the cash balance is sufficient to cover all cash interest obligations through the maturity of the Loan (the "Required Interest Amount"). The Interest Reserve and Property Maintenance Account will be pledged to the Lenders under a securities/deposit account control agreement.

Proceeds in the Interest Reserve and Property Maintenance will be used to service the interest and property maintenance throughout the life of the loan as follows:

☐ **If 100% of the rental income is earned solely from rentals of 366 Gin Lane:**
1. First, for reasonable invoiced, third-party maintenance expenses and other property-level obligations (e.g., insurance, taxes) of 366 Gin Lane;
2. Second, 100% of remaining income to remain in the Interest Reserve and Property Maintenance Account until the Required Interest Amount is satisfied;
3. Third, any amounts in excess of the Required Interest Amount to the Borrower/Guarantor

☐ **If 100% of the rental income is earned solely from rentals of 376 Gin Lane:**
1. First, for reasonable invoiced, third-party maintenance expenses and other property-level obligations (e.g., insurance, taxes) of 376 Gin Lane;

**CCONNOR**

    2.  Second, 100% of remaining income to remain in the Interest Reserve and Property Maintenance Account until the Required Interest Amount is satisfied;

    3.  Third, any amounts in excess of the Required Interest Amount to the Borrower/Guarantor

  □  If such rental income is earned from joint rentals of 366 and 376 Gin Lane:

    1.  First, for reasonable invoiced, third-party maintenance expenses and other property-level obligations (e.g., insurance, taxes) of 366 and 376 Gin Lane on a pro-rata basis;

    2.  Second, 50% of remaining income to remain in the Interest Reserve and Property Maintenance Account until the Required Interest Amount is satisfied.

    3.  Third, any amounts in excess of the Required Interest Amount to the Borrower/Guarantor.

| | |
|---|---|
| **Interest Reserve Release Procedures:** | If amounts held in the Interest Reserve Account are greater than the remaining forward interest through the maturity of the loan, so long as no event of default has occurred and is continuing, Lenders will allow release of such excess amounts to an unpledged account held in the name of Guarantor. |
| **Closing Date:** | The date on which all Conditions Precedent to closing (including execution of final documentation) have been satisfied or waived by the Lenders. |
| **Bad Acts Guarantee:** | Louise Blouin shall execute a Bad Acts Guarantee with standard recourse, "bad acts" carve-outs which shall include, without limitation, full recourse in the case of (i) fraud, negligence, misconduct by the Borrower or Guarantor, (ii) a voluntary bankruptcy filed by Borrower or Guarantor (iii) a collusive involuntary bankruptcy filed by Borrower or Guarantor, (iv) any bankruptcy filed by against Borrower or Guarantor in which the Debtor opposes Lender's application to vacate or modify the stay. |
| **Conditions Precedent for the Closing Date:** | Customary for transactions of this type, including without limitation:<br><br>• Appraisal of 366 Gin Lane and 376 Gin Lane that shows a combined value in excess of $90mm, such appraisal paid for by the Borrower;<br>• Completion of due diligence;<br>• Completion of transaction documentation;<br>• Internal approvals;<br>• Insurance in a form satisfactory to the Lenders;<br>• Confirmation and evidence of satisfactory documentation of release of liens by existing senior lender;<br>• Funding and pledge of the Interest Reserve Account;<br>• Extinguishment of mechanics and tax liens at 376 Gin Lane (see Annex C) |

**CCONNOR**

**Post-Closing Conditions:** The Term Loan will have post-closing requirements, including without limitation:

- 366 and 376 Gin Lane put on market for rental income o The Borrower will achieve a minimum target annual rental income of $[TBD], failure to achieve such amount (within timeframe TBD) will result in the Lenders obtaining the right to control the process of renting the properties

**Covenants:** Customary for transactions of this type, including without limitation: (a) limitations on additional indebtedness and other liens and claims, (b) no modifications of organizational documents, (c) limitations on asset sales or transfers, (d) restriction on dividends/distributions, (e) financial covenants (e.g., LTV, minimum net worth of the Guarantor, etc.).

**Events of Default:** Customary for transactions of this type.

**Representations & Warranties:** Customary for transactions of this type.

**Appraisal Rights:** Lenders will have the right to have independent appraisals of the Collateral to be conducted once a year at the Guarantor/Borrower's expense.

**Expenses:** All reasonable transaction expenses, including without limitation, all appraisal costs, legal, tax, accounting, audit, background checks, consulting and due diligence costs, including flights and hotels, associated with the transaction shall be paid by the Borrower and/or its affiliates.

In connection with agreeing this term sheet, the Borrower will make an initial deposit of $[100,000] to Lenders' counsel in order to cover the initial Expenses of the transaction associated with legal expenses (which will be wired according to the instructions in Annex A). Additional amounts shall be required in amounts of $[50,000] upon utilization of 75% of the legal deposit. Upon closing of the transaction or in the event a transaction does not close, upon notice from the Borrower, any amount of the deposit that has not yet been utilized will be returned to the Borrower.



**Earnest Money Deposit:** $[200,000] will be paid as an earnest money deposit and will be paid concurrently with signing of this term sheet (which will be wired according to the instructions in Annex A), and the remaining amount of the Upfront Fee to be paid in cash from the closing proceeds on the Closing Date. In the event the Lenders, for whatever reason, decide to terminate the diligence and credit approval process for this transaction, and provided that Borrower and Guarantor (when applicable) has not misrepresented any information, fully cooperated in the due diligence process and the information provided was in all material terms similar to the information provided by the Borrower and/or Guarantor before signing this term sheet, Lenders shall return the earnest money deposit to the Borrower, less any out of pocket expenses incurred by the Lenders. In the event the Lenders deliver a commitment letter or indicates in writing that are credit approved in terms substantially similar to the terms outlined in this letter and the Borrower fails to accept such financing terms, then the Lenders shall be entitled to keep such earnest money deposit as a fully earned work fee.

**Governing Law:**        New York.

**Term Sheet Expiration:** 7 calendar days from the Term Sheet date.



This Term Sheet shall be deemed to have been made in the State of New York and shall be construed in accordance with the laws of the State of New York (without regard to conflicts of laws provisions) and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York. Notwithstanding anything else to the contrary contained herein, this Term Sheet is (i) non-binding except with respect to the provisions set forth above under the headings "Expenses" and "Earnest Money Deposit" (which are legally binding upon execution of this Term Sheet and expressly survive any termination of this Term Sheet); and (ii) solely for purposes of discussion of a potential transaction. No party shall have any obligation, whether express or implied, to pursue the transaction contemplated hereby.

Very truly yours, By:

UBS    O'CONNOR

LLC _____

Title: _ Managing Director _____

ACCEPTED AND AGREED

TO  this 6th day of December,

2019 _____

**Exhibit 12:**

JGB CAPITAL, LP
JGB PARTNERS, LP
JGB (CAYMAN) ANCONA LTD.
JGB PLYMOUTH ROCK LLC
c/o JGB Management, Inc.
21 Charles Street
Westport, CT 06880

November 1, 2019

VIA FEDEX AND ELECTRONIC MAIL

Mr. Matthew Kabatoff
Haus Blauherd
Wiestistrasse 61, 3920
Zerrat, SWITZERLAND

MKabatoff@ltbholdings.com

**Re:    Secured Promissory Note due October 31, 2019**

Mr. Kabatoff:

Reference is made to (i) that certain Secured Promissory due October 31, 2019 (as amended, modified or supplemented, the "Note"), made by Aberdeen Enterprises, Inc., a Delaware corporation ("Aberdeen") and Brickchurch Enterprises, Inc., a Delaware corporation ("Brickchurch" and together with Aberdeen, "Borrowers" and each a "Borrower"), as co-borrowers, to the order of JGB Capital, LP, JGB Partners, LP, JGB (Cayman) Ancona Ltd. and JGB Plymouth Rock, LLC (collectively, "Lenders"), as lenders, relating to a loan (the "Loan") in the original principal amount of $26,000,000; (ii) the Mortgage dated July 25, 2018 (as amended, modified or supplemented, the "Mortgage") made by the Borrowers, as mortgagors, to the order of Lenders, as mortgagees, relating to the Loan; (ii) the Forbearance Agreement (the "Forbearance Agreement"), dated July 11, 2019, by and among the Lenders and the Borrowers, and (iii) the Guaranty Agreement (the "Guaranty"), dated July 11, 2019, by Louise Blouin and Matthew Kabatoff, as guarantors, for the benefit of Lenders. Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Note, the Forbearance Agreement and/or the Guaranty.

As you are aware, the Maturity Date of the Note was October 31, 2019. Borrowers failed to pay the amounts due and payable to Lenders on the Maturity Date, and this failure constitutes an Event of Default under the Loan.

In addition, as you are also aware, Termination Date under the Forbearance Agreement was also October 31, 2019, and, as a result, any agreement of the Lenders to forbear from exercising their rights and remedies with respect to the Specified Defaults has terminated and expired.

1

4828-0080-8363 v.1

**ACCORDINGLY, ALL OF BORROWERS' OBLIGATIONS UNDER THE NOTE AND THE OTHER LOAN DOCUMENTS ARE IMMEDIATELY DUE AND PAYABLE TO LENDERS.    LENDERS HEREBY DEMAND IMMEDIATE PAYMENT OF $30,257,666.67 IN CASH.  BORROWERS ARE HEREBY FURTHER NOTIFIED THAT LENDERS ARE ENTITLED TO IMMEDIATELY EXERCISE ALL RIGHTS AND REMEDIES UNDER THE NOTE, THE MORTGAGE AND THE OTHER LOAN DOCUMENTS.**

Lenders reserve the right to enforce and avail themselves of any and all rights, powers, privileges, claims and remedies provided in the Note, the Mortgage and the other Loan Documents against one or both of the Borrowers and against one or both of the Properties, including all rights and remedies available pursuant to the Loan Documents, at law or in equity (individually and collectively, as the context may require, "Enforcement of Rights").

Further, by way of reminder, pursuant to the Guaranty, you and Ms. Blouin are fully liable for the Loan if, among other things, any Borrower or Guarantor (i) asserts any defense (other than a good faith defense of payment in full) in any proceeding to foreclose on the Collateral, (ii) hinders or delays Lender's rights under the Loan Documents, or (iii) otherwise interferes with the efforts of the Lenders to exercise their rights and remedies under the Loan Documents.

All of the rights, powers, privileges, claims and remedies of Lenders under the Loan Documents, at law or in equity are hereby expressly reserved and no delay or omission by Lenders in the exercise of any Enforcement of Rights shall impair any such right, power, privilege, claim or remedy, or shall be construed to be a waiver thereof or any acquiescence therein.  The Note and the other Loan Documents shall continue to be, and shall remain, in full force and effect in accordance with their respective terms.  There is no agreement to forbear, or assurance of any forbearance, by Lenders and failure of Lenders to undertake any Enforcement of Rights at this time shall not constitute a course of dealing and may not be relied upon in any way by Borrowers.  For the avoidance of doubt, the delivery of this letter does not constitute the exercise of any Enforcement of Rights, nor does it constitute a waiver or forbearance of any right of Lenders to, at any time, commence, pursue and/or undertake any Enforcement of Rights, all of which are hereby expressly reserved by Lenders.  Any and all costs of collection including, without limitation, attorneys' fees and disbursements and including all costs and expenses incurred in connection with the pursuit by Lenders of any of its rights or remedies under the Loan Documents, with interest thereon, are the responsibility of Borrowers.

This letter does not constitute a waiver of any Events of Default or of any right, power, privilege, claim or remedy that Lenders are entitled to exercise as a result of such other Events of Default under the Loan Documents.

Lenders may, in their sole discretion, accept any partial payments made by Borrowers, but acceptance of any such partial payments shall not waive or cure existing defaults. Lenders may apply any such partial payment amounts to the Loan in their sole discretion, or otherwise in accordance with the terms of the Loan Documents.

2

You are further advised that no past or future oral or email communication, action, inaction, or course of dealing from, by or on behalf of Lenders by any party shall constitute any agreement, commitment, or evidence of any assurance or intention of Lenders with respect to the subject matter hereof, and that you may not rely on any such past or future oral or email communication, action, inaction, or course of dealing.   To the extent that Lenders have participated or will participate in any meetings, discussions or communications of any kind (the "Default Discussions") with the Borrowers or their representatives concerning, among other things, the Loan or the Mortgage, Lenders' participation in such Default Discussions shall not constitute a waiver of any rights or remedies available to the Lenders pursuant to the Loan Documents or resulting from any Events of Default.   Any agreement, commitment, assurance or forbearance of Lenders shall be binding and effective only if embodied in a written agreement duly executed by Lenders.   For the avoidance of doubt, no email communication shall constitute a written agreement.

Very truly yours,

Brett Cohen, on behalf of Lenders

3

4828-0080-8363 v.1

**Exhibit 13:**

**From:** Louise <lb@ltbholding.com>
**Date:** Sunday 15 March 2020 at 04:18
**To:** "BCohen@JGBCap.com" <BCohen@JGBCap.com>
**Subject:** <no subject>

Dear Brett ,

I hope you are keeping safe and healthy

We might I say might because I am pushing hard have an opportunity to get you out but not at the full amount we can maybe push 28.5 and I am not even sure I can get it as the market is crashing and the u s will be following Europe and shutting down .

Tell me in writing what is the lowest amount that you would take to close now and remove now the foreclosure as if they see it they will run from it .

Nothing will move for at least 16 months to 24 months after this major crisis coming at us like a hurricane .

The most reasonable you are the most likely they might do it I have a window and it is small and I am not even sure I can close .
It is with a bank and you know how hard it is in the u s our trouble came from the law that says you can not mortgage if you have a property on the market or if you rent
That came right at our face .

Thank you
We want to get you out
We might have a way but .....Not even sure in this climate they are getting colder feet

The key is to go super fast

Best Louise

**Exhibit 14:**

**From:** Louise <lb@ltbholding.com>
**Date:** Wednesday 1 April 2020 at 19:45
**To:** Brett Cohen <BCohen@JGBCap.com>
**Cc:** Melanie Wiener <melanie@brilandclub.com>, Hunter Dorbandt
<HDorbandt@JGBCap.com>, "Gregory Kramer (Greg.Kramer@haynesboone.com)"
<Greg.Kramer@haynesboone.com>, "Cooper, Emilie" <Emilie.Cooper@haynesboone.com>
**Subject:** Re: Process

Dear All,

I do hope you friends and families are well.

I was worried a few days ago and I am more worried going forward a recession and maybe a depression is coming in our way  at a rapid pace .

I am asking you if I can get you to  refinance at a lower level ,we have  smaller window of opportunity  than the last time I reached out to you , each day goes by and  the risk increases  for both of us , i have no confirmation today that the opportunity to close is available ,if you give me a green light in writing that you are willing to take 26 million plus the Fees  and interest  paid to you  in the past I might be able to close , I say I might ….i am no sure today as everything is moving at a fast pace .

Best regards ,

Louise

**Exhibit 15:**

13 May, 2020

Dear Brett,

I hope that you and your family are safe and healthy during this prolonged period of uncertainty as a result of the coronavirus pandemic.

At this stage, we would like to make best efforts to resolve the outstanding loan provided by JGB at 366 Gin Lane.

Although we are now in May, and the global financial system has been significantly altered as a result of the pandemic – both with respect to the financial markets and real economy which are now in turmoil – we continue to work with O'Connor and American banks, in particular UBS, to refinance 366.

However, while we do have an initial affirmation from O'Connor to refinance JGB, they will only do so with a commitment from UBS to refinance the property with a traditional mortgage, made possible by their private wealth division, within the next 12 – 18 months.

In order to make this possible, we have been in close conversation with UBS NY and they too are interested in moving forward, however they are reluctant to go above a mortgage size of 26 MM or 60% LTV; the value of the loan exercised by JGB.

At this stage, we propose to work with O'Connor and UBS to realize this refinancing. We do however require an acceptance from JGB to receive a payout of 26 MM or the original value of the loan amount as a payout.

While this is less than the approximately 30 MM due – if we calculate a non-default interest rate of the loan over 21 months – JGB has already recouped, 2.6 MM in fees and interest payments, arriving at a return of approximately 7% of the lending period. Further, we also feel that given the uncertainty in the markets, not only with respect to what occurred in March, with the initial shock of pandemic, but that fact that that pandemic has both significantly impaired the US economy and will drag-on over 12, 18, 24 months – that we must make haste and close this transaction before socio-economic climate, becomes worse.

Sincerely,

Louise Blouin

**From:** Louise <lb@ltbholding.com>
**Date:** Wednesday 13 May 2020 at 07:06
**To:** Brett Cohen <BCohen@JGBCap.com>
**Subject:** FW: LB  note  05132020.docx

Please take a look at this note
We are trying super hard to get you out .
France just deconfined and the numbers are terrible what will happen is we
will  Be  Reconfined

People still do not go out much deconfined  as they are scared .

Lets us move forward and we know selling will not be an option now .

Best louise Stay safe

Attachments area

**Exhibit 16:**

**From:** Brett Cohen <BCohen@JGBCap.com>
**Sent:** Tuesday, November 16, 2021 12:27:53 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Cc:** Gregory Kramer (Greg.Kramer@haynesboone.com) <greg.kramer@haynesboone.com>;
Hunter Dorbandt <HDorbandt@JGBCap.com>; Thorne, Leslie
<Leslie.Thorne@haynesboone.com>; Shuky Barlev-Ehrenberg <SEhrenberg@JGBCap.com>
**Subject:** RE: Update - 366 - Additional

Hi Louise,
Thanks for reaching out. Please have communication go through counsel (CC'd).
Best,
Brett

**From:** Louise Blouin <lt@ltbholding.com>
**Sent:** Friday, November 12, 2021 5:34 PM
**To:** Brett Cohen <BCohen@JGBCap.com>
**Subject:** Update - 366 - Additional

Dear Brett,

I am following up from my previous email with this note to describe my efforts over the past two years. I do very much apologize for the delay in curing the debt and I am glad that I am now in a position to do so.

At the time your mortgage matured at the end of October 2019, I had approached both UBS and Morgan Stanley regarding refinancing 366. After some negotiations and proposals offered by each bank, I learned that I could not in fact refinance for one year, due to the fact that I had previously listed the property for sale and rent. In fact the refinancing process could only start after one year after the end of the latest brokerage contract on the property – which was with Sotheby's and expired at the end of December 2019.

When I spoke with these banks further, I also learned that residential refinancing would not work because I intended to rent the properties in the future, and any such rental listing were against the rules of a residential mortgage. A commercial loan was discussed to enable rentals; however, this was not an option due to the fact that homes were seasonal dwellings – as well the LTV would have been lower and the IR higher.

After these discussions were exhausted with UBS and MS, the covid pandemic took hold and as we both experienced, most activities supporting real estate financings were frozen.

I myself who experience asthma as a precondition, was in Paris at the time, and decided to the South of France – not the coast but the mountains – in order to obtain protective isolation.

At this time however, and recognizing that I was blocked with American bank financing, I reconnected with contacts in Monaco and Geneva and after some efforts found a Swiss bank, who not only was interested in supporting me, they had an American footprint and whose CEO was aware of the Hamptons and the strength of its real estate market. This same CEO was also the banker who took me public with Trader Classified for 2.7 BN while he was at Credit Suisse.

Over the past number of months I have been working with this bank – who I have indicated would like to speak with you this coming week – both according to how the financing would be structured, since this bank is also currently closing financing on my Paris property, and according to their timeline, since they were recently purchased by a larger Italian bank that enabled them to expand their financing capacity.

I was in fact supposed to bring this news to you sooner, over the summer, however I was prevented from completing final due diligence in the form of an evaluation while Chris Brown was a tenant. Although I had a 24 hr. notice period for access to the property, Brown prevented access to the evaluator on numerous occasions; I'm not sure if you were aware of this, but Brown was speaking with you while blocking me from finalizing the financing solution. It was only able to perform the evaluation when he vacated the property after LD. Brown also replaced the gate call box to 376 Gin Lane, and with the help of the listing agent Anne Prosser – who was supposed to represent and protect my rights, but was in fact an agent of Brown – further obstructed access to the property.

I have attached a number of emails that show that Brown deliberately blocked access to the evaluator, made changes to the property without authorization, and made not pleasant remarks about JGB – I in fact never spoke with Brown regarding your firm or his interest in the property.

One other point that is important; I do plan on moving 376 back since it is currently in a flood zone. As a result, both properties will be much closer together. This is the only way to protect the historic nature of the property and to make it FEMA compliant.

I again apologize for the delay in bringing a concrete financing solution forward up until now. We are however ready.

On a personal note my health has suffered over the past year; while I have mentioned that I have chronic asthma and took precautions against covid, I also discovered while I was at a restorative clinic for 12 days in August, doing a full series of tests – like many I had neglected medical diagnostics for some time – it was discovered that I have an irregularity in my heart. This condition, coupled with my asthma is not ideal, and has also required my attention.

Brett, again I do apologize for not being in touch sooner. I am aware of your disappointment over the loan maturity and for the delays. You have been gracious by providing me with additional time to cure.

Brett, I look forward to speaking this weekend or on Monday, and then also connecting you with my Swiss bank-mid week to discuss the deal.

Sincere regards,
Louise

**Exhibit 17:**
**From:** Louise <lb@ltbholding.com> on behalf of Louise <lb@ltbholding.com>
**Date:** Saturday 23 November 2019 at 07:19
**To:** Brett Cohen <BCohen@JGBCap.com>
**Cc:** David Hryck <DHryck@ReedSmith.com>
**Subject:** <no subject>


Dear Brett ,

 I thank you for your patience .

We are going to get out in the next two weeks
I highly advise you to stay put and not get over aggressive .otherwise you will be in a war for years  and
hurt your outcome that we wish for .
We have the same goal to get you out fast .
The appraisal is done next week We Have the termsheet ready to go .

I was told by the brokers you called  them and that you depreciated  our asset by doing so
This is illegal according to real estate lawyer

So I highly advise you to be professional as we close and get you out

My home is worth 110 million but maybe you do not know it takes more than two months to sell

Your behavior is not professional according to other private equity
If Is not good for your reputation
If you care at all



No aggressivity as it gets us no where



**Exhibit 18:**

**From:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Date:** Saturday 30 May 2020 at 11:49
**To:** Brett Cohen <BCohen@JGBCap.com>
**Subject:** 366 / Call

Dear Brett,

I hope that you are well and remain healthy during the COIVD pandemic. I am following-up on behalf of
Louise, and in regards to the email that she sent to you several days ago.

Could we organize a call early this coming week to discuss how best to resolve 366?

As outlined in the previous email, OCS remains willing to lend against 366, however as a result of COVID and the disruption to the financial markets, they are looking for additional assurances for an exit. In this case, bank refinancing.

In order to address this concern, Louise has over the past months received interest from UBS NY in refinancing 366, however their LTV has lowered to 40% of appraised market value, or approximately 24 MM. Louise proposes to repay the original value of the loan at 26 MM, and thus raise the remaining 2 MM from other sources.

Timing however is important, and she hopes that refinancing / repayment can take place in June-July, before there are further movements in the market.

Please let me know your availability for a call. We are currently in France.

Best regards,
Mathew

**Exhibit 19:**

**From:** Brett Cohen <BCohen@JGBCap.com>
**Date:** Monday 1 June 2020 at 16:57
**To:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Cc:** Hunter Dorbandt <HDorbandt@JGBCap.com>, Shuky Barlev-Ehrenberg <SEhrenberg@JGBCap.com>, "Gregory Kramer (Greg.Kramer@haynesboone.com)" <Greg.Kramer@haynesboone.com>, "Cooper, Emilie" <Emilie.Cooper@haynesboone.com>, Louise <lb@ltbholding.com>
**Subject:** RE: 366 / Call

Dear Matthew,
Thanks for reaching out. I hope that you are all well. You and Louise should feel free to call. As we have said many times previously, we're not interested in anything less than payment in full (approx. $33 MM as of today plus significant growing costs). JGB reserves all rights and remedies.
Best,
Brett

**Exhibit 20:**



**MORTGAGE LOAN AGREEMENT**

(the "**Loan Agreement**")

between

**REYL & Cie Ltd**

62 rue du Rhône

1204 Geneva

Switzerland

(the "**Bank**")

and

**Brickchurch Enterprises, Inc.**

c/o The Corporation Trust Company

Corporation Trust Center

1209 Orange ST

Wilmington, Delaware 19801

United States of America

(the "**Borrower**")

and

**Mrs. Louise Thérèse Blouin**

Wieststrasse 61

3920 Zermatt

(the "**Guarantor**")

(the Bank, the Borrower and the Guarantor, together the "**Parties**" and individually, a "**Party**")

## PREAMBLE

A.   The Borrower, a Delaware corporation, with a registered office at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, Delaware, USA is the sole owner of, and holds good and marketable title to, the real property located 366 Gin Lane, Southampton, 11968 NY, and described more fully on Exhibit 1 to this Loan Agreement (the **"Property"**). The Borrower is a wholly owned subsidiary of, and 100% of the shares of Borrower are owned by, Brickchurch Enterprises (BVI) Ltd., a limited company incorporated under British Virgin Islands law, registered in the British Virgin Islands as an International Business Company under number 276385, with its registered office located at the Offices of Ansbacher (BVI) Limited, Road Town, Tortola, British Virgin Islands (the **"Parent Company"**).

B.   Mrs Louise Thérèse Blouin **("LTB")**, as ultimate beneficial owner and owner of 100% of the shares of the Parent Company, has recently approached the Bank in Geneva so that the Borrower can obtain a loan with the Bank. Mrs. Blouin also intends to sign this Loan Agreement as Guarantor, providing in particular some undertakings (as more described below) in favour of the Bank. Furthermore, the Guarantor shall cause the Parent Company to grant to the Bank a pledge over the shares it owns in the Borrower (the **"Share Pledge"**).

C.   The Loan (as defined in clause 1 below) shall be used by the Borrower (i) to fully or partially repay an existing loan granted by JGB Partners LP (and affiliates) to the Borrower under a certain Secured Promissory Note dated July 25, 2018 between the Borrower and JGB Partners LP (and affiliates) secured notably by a mortgage note on the Property (the **"Existing Loan"**) and (ii) to transfer the remaining portion of the Loan, immediately following the Disbursement Date (as defined below), to the Guarantor's account n°7931 with the Bank (the **"Guarantor Account"**)

D.   As part of a private banking relationship between the Guarantor and the Bank, the Guarantor undertakes (as a commitment *vis-à-vis* the Bank), to deposit on the Guarantor Account a minimum amount of USD 20'000'000.- (twenty million US dollars), or equivalent in other currencies acceptable to the Bank, prior to the Disbursement Date, such amount to be managed by the Bank on the basis of a discretionary mandate (the **"Portfolio"**) against which an additional Lombard loan will be granted (the **"Lombard Loan"**).

E.   As a result thereof, the Borrower wishes to obtain the Loan from the Bank, which Loan shall be secured by the Collateral (as described in clause 6 below), and the Bank is willing to grant the Loan to the Borrower, according to the terms and conditions set forth in this Loan Agreement.

**IN WITNESS THEREOF, the Parties agree as follows:**

**1.    Amount of Loan and LTV Ratio**

1.1    The Bank hereby agrees to grant a loan to the Borrower in the maximum amount of **USD 32'400'000.-**  (thirty-two million four hundred thousand US dollars) (the "**Loan** "), and the Borrower hereby agrees to repay the Loan, in principal and interest, to the Bank, in accordance with the terms and conditions of this Loan Agreement.

1.2    The loan-to-value ratio (the "**LTV Ratio**") of the Loan shall not exceed 60% (the "**LTV Ratio Cap**") at any time during the term of this Loan Agreement. The Bank may adjust the LTV Ratio at any time in accordance with its internal credit rules.

1.3    The LTV Ratio shall be calculated  using the following formula:

    (i)    From the signing of the Loan Agreement until the first deposit of Additional Contribution as per clause 9 (*Margin call – LTV Ratio Restoration*) below:

    *LTV Ratio = ((outstanding amount of Loan / Property Value) x 100*

    (ii)    From the first deposit of Additional Contribution as per clause 9 (*Margin call  – LTV Ratio Restoration*) below until the termination of this Loan Agreement:

    *LTV Ratio = ((outstanding amount of Loan) / (Property Value + Account Cover Value (as defined below) only taking into account the Additional Contribution(s)) x 100*

1.4    For the purpose of this Loan Agreement, the following terms shall have the following meaning: "**Initial Property Value**" shall mean the lowest appraised value of the Property based on  the two Initial Valuations (as defined in clause 2(c) of Annex 1 (*Conditions precedent*) to this Loan Agreement);

"**Property Value**" shall mean (i) from the signing date until the receipt of a Subsequent Property Valuation: the Initial Property Value, and, after that time, (ii) the most recent Subsequent Property Value; and

"**Subsequent Property Value**" shall mean, upon the receipt by the Bank of an Additional Property Valuation (cf. clause 14 (*Additional Property Valuations*) below), the Property value determined in such Additional Property Valuation. In case of two or more Additional Property Valuations requested on or about the same date, the "Subsequent Property Value" to be used shall be the lower Property value determined amongst those Additional Property Valuations.

"**Account Cover Value**" shall mean the cover value of the Portfolio and/or the Borrower's account n° 7934 opened in the books of the Bank (the "**Borrower Account**"), calculated according to the Bank's internal credit rules, as applicable from time to time (the "**Internal Rules**"). The Account Cover Value may be changed by the Bank at its entire discretion and at any time, without any obligation to notify the Borrower and/or the Guarantor.

## 2. Purpose and disbursement

2.1    The Loan shall be used as follows (the **"Purpose of the Loan"**)

(i)    up to an amount of USD XXX (XXX US dollars) to fully or partially repay the Existing loan; and

(ii)    up to an amount of USD XXX - (XXX US dollars)  to be transferred by the Borrower to the Guarantor Account to  constitute a portfolio to be managed on a discretionary basis by the Bank or use for liquidity needs.

2.2    The Loan will be made available by the Bank to the Borrower, in one or several disbursements on the Borrower Account, upon full completion of all conditions precedent as per Annex 1 (*Conditions precedent*) of this Loan Agreement (the **"Disbursement Date"**).

## 3. Duration

3.1    The Loan is granted for an initial period of twelve (12) months from the Disbursement Date. The Disbursement Date shall occur during a period from the signing date of this Loan Agreement until 30 April 2021 (included). Beyond such date, this Loan Agreement will be automatically cancelled, save clauses 13 (*Costs and Expenses*), 15 (*Payments*) and 20 (*Applicable law and jurisdiction*) that shall remain in full force and effect.

3.2    The Loan will be automatically renewed for successive twelve (12) month periods (each, a **"Renewal Period"**) on each anniversary of the Disbursement Date with an ultimate maturity date expiring ten (10) years from the Disbursement Date (the **"Ultimate Maturity Date"**), provided that no Party has served prior written termination notice to the other Party, to be received at least three (3) months (i) before the end of the first twelve (12) months period after the Disbursement Date, and (ii) before the end of each Renewal Period thereafter (the **"Termination Notice"**).

3.3    Notwithstanding the expiry or earlier termination of this Loan Agreement following an Event of Default as per clause 7 below, its provisions will remain fully applicable until the complete repayment by the Borrower of the Loan together with any and all interests and other amounts due under this Loan Agreement.

## 4 Interest Rate

4.1    The Loan shall bear interest at the 3 month Libor interest rate, with a minimum of 0.10% per annum (the **"Interest Base Rate"**) plus (i) a credit margin of 1% per annum and (ii) the Bank's internal costs of providing liquidity to the Borrower (liquidity cost) which can be adjusted to market conditions applicable to the Bank (the Interest Base Rate, the credit margin and the liquidity cost together the **"Interest Rate"**).

4.2    The Interest Rate for the first quarter of the Loan starting from the Disbursement Date shall be determined by the Bank and communicated to the Borrower on or before the Disbursement

Date. Thereafter, the applicable Interest Rate for every new quarter, determined pursuant to clause 4.1 above shall be determined by the Bank and communicated to the Borrower at the beginning of the new quarter at the latest. Moreover, the Interest Rate applied will appear in the account statements.

4.3    The interest on the Loan (the "**Interest**") will be payable quarterly by the Borrower and will be debited directly by the Bank from the Borrower Account.

4.4    In case of any delay of the Borrower in the repayment of (i) the Loan as per clause 10 (*Termination of the Loan Agreement*) below, and/or (ii) any other amounts (interest excluded) due by the Borrower under this Loan Agreement (each of such amounts which are due and remain unpaid by the Borrower, a "**Due Amount**"), a late payment interest will be due by the Borrower on the Due Amounts (the "**Late Payment Interest**").

4.5    The Late Payment Interest will be applied at the Interest Base Rate, plus (i) a credit margin of 3.5% per annum and (ii) the Bank's internal costs of providing liquidity to the Borrower (liquidity cost) which can be adjusted to market conditions by the Bank (the Interest Base Rate, the credit margin and the liquidity cost together, the "**Late Payment Interest Rate**").

4.6    The Late Payment Interest will be payable quarterly and will be debited by the Bank directly from the Borrower Account.

4.7    The Interest and the Late Payment Interest will be calculated *pro rata temporis* on the basis of the actual number of days elapsed, taking into account a calendar year of 365 days.

4.8    When the Libor rate ceases to be published as a reference interest rate, the Parties agree that the Bank will determine the Interest Base Rate based on a reference rate considered to be economically equivalent to the Libor rate applied in the context of the present Loan Agreement. If such a reference rate is not available (for any reason whatsoever), the Parties agree that the reference rate used to determine the Interest Base Rate will be calculated on the basis of the "costs of funds" incurred by the Bank in connection with the Loan, so that the Interest Base Rate fully reflects those costs. In any event, whatever the method of calculation used, the Parties agree that the minimum Interest Rate and minimum Late Payment Interest Rate will not be lower than the Interest Rate and the Late Payment Interest Rate calculated under 4.1 and 4.5 above.

**5    Conditions**

Any disbursement of the Loan and any subsequent renewal of the Loan (*i.e.* Renewal Periods) as the case may be, is subject to the full completion of the conditions precedent listed in Annex 1 (*Conditions precedent*) to this Loan Agreement to the sole satisfaction of the Bank.

**6    Mortgage and other Collateral**

6.1    The Loan, and any and all claims of the Bank against the Borrower which may arise from this Loan Agreement, as well as all costs and expenses connected with such claims, shall be secured at all times as follows:

6.1.1    a first lien mortgage or mortgages recorded on the Property ranking in first rank for a guaranteed principal amount of USD 32'400'000.- (thirty two million four hundred thousand US dollars) (the "**Mortgage**"). The Mortgage shall require that the Lender be named as an additional insured and as loss payee on Property insurance;

6.1.2    the Share Pledge in favor of the Bank;

6.1.3    a Swiss law personal guarantee (in the form of "*porte-fort*" within the meaning of Article 111 of the Swiss code of obligations or a "*cautionnement*" before a Swiss notary) provided by the Guarantor in favor of the Bank in the amount of USD 32'400'000.- (thirty two million four hundred thousand US dollars);

6.1.4    as a security for any and all claims of the Bank against the Borrower arising from business dealings with the Bank or other legal causes, including but not limited to, claims of the Bank under this Loan Agreement, as well as for all costs connected with such claims, the Borrower has pledged and assigned in favour of the Bank all present and future assets, claims and rights of any nature whatsoever which are or will be held, in whole or in part, by the Borrower with the Bank (*nantissement* within the meaning of Art. 884 and following and Art. 899 and following of the Swiss Civil Code), as per a general deed of pledge and declaration of assignment in force (the "**Borrower General Pledge**"); and

6.1.5    as a security for any and all claims of the Bank against the Borrower arising from business dealings with the Bank or other legal causes, including but not limited to, claims of the Bank under this Loan Agreement, as well as for all costs connected with such claims, the Guarantor has pledged and assigned in favour of the Bank all present and future assets, claims and rights of any nature whatsoever which are or will be held, in whole or in part, by the Guarantor with the Bank (*nantissement* within the meaning of Art. 884 and following and Art. 899 and following of the Swiss Civil Code), as per a general deed of pledge and declaration of assignment in force (the "**Guarantor Specific Pledge**").

The "**Mortgage**" and the other Collateral referred to under clauses 6.1.2 to 6.1.5 above collectively referred to as the "**Collateral**".

6.2    The Borrower agrees and acknowledges that the issuance and maintenance of the Collateral are essential elements of this Loan Agreement and that any default in the issuance and maintenance of any Collateral will constitute an Event of Default, as per clause 7 (*Events of Default*) below, and may therefore, at the sole discretion of the Bank, result in the Loan, together with any accrued interests, becoming immediately due for repayment and the Collateral becoming enforceable.

6

6.3    The Bank shall be entitled to take, at the Borrower's expenses and risks, any steps it may deem appropriate with respect to the constitution and/or perfection of all or any part of the Collateral, or which may be necessary to enable the exercise of the rights attached thereto, and the Bank shall be entitled to provide the relevant registries and other competent bodies with all information required to proceed with the relevant filings and registrations. The powers specified in this clause 6 (*Mortgage and other Collateral*) shall not expire upon the occurrence of any of the expiration events set forth in Articles 35 and 405 of the Swiss Code of Obligations. The Borrower and the Guarantor undertake to take, as the case may be, upon simple ordinary request and first demand of the Bank, all actions which may be required in order for the Bank to be able to exercise all its rights resulting from the Collateral.

6.4    Should the Borrower default on any claim arising from this Loan Agreement, including but not limited to, a default on any payment due under this Loan Agreement, the Bank shall be entitled, at its entire discretion and without regard to the formalities provided in the Federal Law on Debt Collection and Bankruptcy or the legal provisions applicable at the place outside Switzerland where disposal takes place, to enforce the Mortgage and/or all or part of the other Collateral provided as per clause 6.1 above, separately or at the same time, and may decide, at its entire discretion, its order of preference for the enforcement of such Collateral. The Bank shall be entitled to benefit from and receive the proceeds of such enforcement in payment, or partial payment as the case may be, of its claims. In any event, the enforcement of such Collateral by the Bank shall not constitute a renunciation or waiver by the Bank to any claims arising from this Loan Agreement, in case the proceeds of such enforcement would not fully cover all claims of the Bank arising from this Loan Agreement.

6.5    The Bank shall have no liability for any loss or loss of profit or gain either the Borrower or the Guarantor may incur as a result of the exercise by the Bank of its rights under this Loan Agreement and/or under one or several document(s) relating to the Collateral.

**7.    Events of Default**

7.1    Each of the following events shall constitute an event of default (each, an **"Event of Default"**):

(i)    a breach of any of the warranties, undertakings and/or obligations of the Borrower and/or the Guarantor under this Loan Agreement and/or any document in relation to the Collateral;

(ii)    any representation made and/or information provided by the Borrower and/or the Guarantor in respect of this Loan Agreement and/or any document in relation to the Collateral, were or become false or incorrect;

(iii)    any default or delay of the Borrower in the payment of any amount due under this Loan Agreement and/or any document in relation to the Collateral, including the payment on a timely basis of the real estate taxes affecting the Property;

(iv)    any default or delay of the Borrower in the deposit, and/or to maintain, the required advance of interest (initially pursuant to clause 4(a) of Annex 1 (*Conditions precedent*)

to this Loan Agreement, or in respect of any Renewal Period, pursuant to clause 12 (x) below);

(v) any sale of the Property and/or institution of any foreclosure proceedings of the Property by another creditor of either the Borrower or the Guarantor;

(vi) any substantial decrease in the Property value which would, in the sole opinion of the Bank, put the Bank's interests at stake;

(vii) any default of payment of the insurance premiums relating to the Property;

(viii) any change of Property insurer which is not a first rank reputable insurer and agreed in writing by the Bank (prior written consent);

(ix) any default or breach of the Borrower and/or the Guarantor under any contractual relationship with the Bank (including without limitation, the Lombard loan) ;

(x) any of the assets of the Borrower and/or any of the Guarantor is seized, in whole or in part;

(xi) the insolvency, cessation of payment, inability to pay and settle its debts when they fall due or the Borrower and/or the Guarantor is the subject of any collection proceedings;

(xii) any default by the Borrower to provide the Bank, or to cause the provision to the Bank of, any document required by the Bank to comply with applicable due diligence requirements, and such failure (if capable of remedy) is not remedied to the satisfaction of the Bank;

(xiii) any cessation of payment by, an enforcement proceeding, in particular, a seizure procedure, bankruptcy, execution of securities of any kind or confiscation for whatever reason or any other similar proceedings against the Borrower and/or any of the Guarantor;

(xiv) any of the Collateral would terminate or become null and/or void (partially or totally) for any reason whatsoever;

(xv) the Collateral would appear not to be sufficient to cover the obligations of the Borrower under this Loan Agreement (in accordance with the valuation made by the Bank following its internal credit rules);

(xvi) any default by the Guarantor to deliver in due time, to the Bank, the documents evidencing the Guarantor' financial ability, as per clause 12 (ix) below; and/or

(xvii) any event which would affect negatively the economic situation and/or the wealth and revenues of the Borrower and/or the Guarantor which therefore would affect their capacity, individually, or jointly and severally  to fulfill their obligations under this Loan Agreement and/or all or part of the documents in relation to the Collateral to which they are a party.

7.2    Upon the occurrence of an Event of Default, the Bank shall notify such Event of Default to the Borrower and the Borrower shall have 5 (five) Geneva business days to remedy such default or to cause such default to be remedied. Should the default not be remedied within the above-mentioned timeframe, the Bank will be entitled, at its sole discretion, to notify in writing to the Borrower and the Guarantor the immediate termination of the Loan Agreement. Upon such notification, the Loan and any outstanding interest or other amount(s) under this Loan Agreement (the "**Termination Amount**") shall become immediately due and payable

to the Bank. In case of default of the Borrower to immediately and fully pay the Termination Amount following such immediate termination, the Bank will be entitled to enforce the Collateral.

## 8. Voluntary early repayment

The Borrower shall be entitled to repay the Loan entirely or partially, on each 3 months anniversary of the Disbursement Date, together with any interests due until the end of such quarter, without any penalty. Following a repayment in full of all amounts due under this Loan Agreement, this Loan Agreement shall automatically be terminated.

## 9. Margin call – LTV Ratio Restoration

9.1 In case of notification by the Bank to the Borrower of a decrease in the value of the Property (as per the latest Property Value in its possession) resulting in a LTV Ratio greater than the LTV Ratio Cap:

9.1.1. The Borrower shall, at the Bank's first written demand and within the deadline set by the Bank pay to the Bank an amount sufficient to comply with the maximum LTV Ratio Cap (the "**LTV Ratio Restoration**"), by :

      (i)     Partially repaying the Loan and any interest due, in and/or

      (ii)    Making an additional contribution of financial assets on the Borrower Account either directly or indirectly (i.e. through an external transfer of funds).

and/or

9.1.2. The Guarantor shall, at the Bank's first written demand and within the deadline set by the Bank make an additional contribution of financial assets on the Guarantor Account increasing sufficiently the Account Cover Value to obtain the LTV Ratio Restoration.

9.2 The Bank shall freely determine, based on its Internal Rules, whether the additional contribution made by the Borrower or, as the case may be, the Guarantor is sufficient to meet the LTV Ratio Restoration. The Internal Rules may be modified form time to time with no obligation for the Bank to communicate such Internal Rules to the Borrower and the Guarantor.

9.3 Any additional contribution shall be maintained, as the case may be, on the Borrower Account and/or on the Guarantor Account, until the termination of the Loan Agreement.

## 10. Termination of the Loan Agreement

10.1 In case of termination of this Loan Agreement by either of the Parties with the serving of a Termination Notice, or at the Ultimate Maturity Date, the Borrower shall fully repay to the Bank, on the relevant anniversary of the Disbursement Date, the outstanding part of the Loan, taking into account any repayment made as per clause 8 (*Voluntary early repayment*) above, together with any interest and other amount due under this Loan Agreement until such date.

10.2  In case of termination of this Loan Agreement following an Event of Default as per clause 7 above, the Borrower shall immediately fully pay the Termination Amount to the Bank.

10.3  In case of an early and full repayment of the Loan together with any interest and other amount due under this Loan Agreement, this Loan Agreement shall be automatically terminated.

## 11.  Representations and warranties of the Borrower and the Guarantor

The Borrower and the Guarantor, jointly and severally represent and warrant to the Bank, as the case may be, that, during the entire duration of this Loan Agreement and as long as any amount is or may be outstanding in favor of the Bank thereunder :

(i)    the Borrower is validly existing and duly registered corporation and has the capacity to enter into this Loan Agreement and the related documents and to assume all the obligations that arise from it and that there is no statutory, regulatory or legal provision nor any contractual stipulation binding on the Borrower or affecting its assets which would prevent the Borrower from entering into and performing this Loan Agreement and/or any of the Collateral and related documentation;

(ii)   the Guarantor has the capacity to enter into this Loan Agreement and to assume all the obligations that arise from it and that there is no statutory, regulatory or legal provision nor any contractual stipulation binding on the Guarantor or affecting her assets which would prevent the Guarantor from entering into and performing this Loan Agreement and/or any Collateral and related documentation;

(iii)  the Guarantor guarantees that the Parent Company has the capacity to enter into the Share Pledge and assume all the obligations that arise from it and that there is no statutory or legal provision nor any contractual stipulation binding on the Parent Company or affecting its assets which would prevent the Parent Company from entering into and performing the Share Pledge and related documentation;

(iv)   the Guarantor is the sole ultimate beneficiary of the entirety of the shares  constituting the share capital of the Parent Company;

(v)    this Loan Agreement and related documents (including, but not limited to, the Security documents) to which they are a party constitutes valid, lawful and binding obligations enforceable against, as the case may be, the Borrower and/or the Guarantor and/or the Parent Company (as far as the Share Pledge is concerned) in accordance with its terms and conditions;

(vi)   the Borrower is in good standing and in compliance with all applicable legal rules and regulations;

(vii)  The Parent Company is in good standing and in compliance with all applicable legal rules and regulations;

(viii) none of the events specified in clause 7 (*Events of Default*) above has occurred and is continuing, or is likely to occur;

(ix)   The Borrower has taken and/or obtained all necessary internal approvals for the entry into and the performance of this Loan Agreement and related documents (including without limitation the Collateral documents);

(x)     The conclusion of this Loan Agreement and related documents (including but not limited to the Collateral documents) to which it is a party and the performance of the obligations arising therefrom are with respect to the Borrower consistent with its corporate purpose (*objet social*) and are in the corporate benefit (*intérêt social*) of the Borrower;

(xi)    Each of the Borrower and Guarantor have a clear understanding of any impact (including, without limitation, tax, legal and/or accounting) that this Loan Agreement may have. The Borrower and the Guarantor represent and warrant to the Bank that they have obtained any appropriate advice (including, without limitation, tax, legal and/or accounting) they may want to obtain in order to appreciate the opportunity to enter into this Loan Agreement and to obtain the Loan;

(xii)   The Guarantor has sufficient wealth and financial strength to support and perform her obligations under this Loan Agreement and related documents (including but not limited to the Collateral documents) and, more specifically, the financial risks associated with the Guarantor Specific Pledge;

(xiii)  the funds originally used for the acquisition of the Property by the Borrower are of legitimate origin;

(xiv)   the Borrower holds valid legal title on the Property;

(xv)    the Property is adequately and sufficiently insured against fire, floods or any other acts of God;

(xvi)   all insurance premiums with respect to the Property have been paid when due;

(xvii)  the Borrower shall cause the Property to be maintained in good condition and repair and will not commit or suffer to be committed any waste of the Property. The improvements and equipment shall not be removed, demolished or materially altered (except for normal replacement of the equipment) without the prior written consent of the Lender. The Borrower shall promptly comply with all existing and future governmental laws, orders, ordinances, rules and regulations affecting the Property, or any part or use thereof;

(xviii) no mortgage, charge or other security exist in respect of the Property except for JGB Partner's mortgage note, and those the Bank is benefitting from as at the date of this Loan Agreement, and for those to be constituted as a result of the Mortgage);

(xix)   the Guarantor confirms that she is currently not subject, and has never been subject to any bankruptcy, insolvency proceeding, cessation of payment, inability to pay and settle her debts when they fall due or bankruptcy, and that she is not aware of any circumstances which may give rise to such – or similar – proceedings to the exception of those that are known by the Lender at the date of this Loan Agreement (title insurance commitment dated 12 August 2020 and excerpt of the Visp insolvency registrar dated 3 November 2020); and

(xx)    the Borrower confirms that it is not currently subject, and has never been subject to any bankruptcy, insolvency proceeding, cessation of payment, inability to pay and settle its debts when they fall due or bankruptcy, and that it is not aware of any circumstances which may give rise to such – or similar – proceedings to the exception of the pending foreclosure procedure initiated by JGB Partners LP (affiliates).

12. **Undertakings of the Borrower and of the Guarantor**

The Borrower and the Guarantor, jointly and severally, undertake during the entire duration of this Loan Agreement and as long as any amount is or may be outstanding thereunder:

(i)  Not to transfer the Borrower's registered office outside of Delaware without the prior written consent of the Bank;

(ii)  To inform the Bank, in case of non-payment of any insurance premium with respect to the Property, before the termination of the insurance cover;

(iii)  Not to carry out any work on the Property without the prior written consent of the Bank;

(iv)  Not to sell the Property without the prior written consent of the Bank;

(v)  Not to change the residential use of the Property;

(vi)  Not to create any charge, mortgage or other security on the Property other than pursuant to the Mortgage or IGB Partner's mortgage note;

(vii)  To announce promptly and spontaneously, to the Bank, all Events of Default which would have occurred, or all Events of Default which are likely to occur, and provide the related documentation to the Bank;

(viii)  To provide promptly, upon the request of the Bank, all documents in relation to the Borrower, the Guarantor, the financial situation of the Borrower and the Guarantor and/or the Property;

(ix)  In respect of each Renewal Period, no later than one day prior to each anniversary of the Disbursement Date, to have transferred, on the Borrower Account, an amount equal to one year of Interest. Such amount will be calculated on the basis of the Interest Rates applied for the last quarter period of this Loan Agreement (*i.e.* the one preceding the relevant Renewal Period);

(x)  To maintain a comprehensive and adequate insurance coverage at the Bank's discretion in relation to the Property and provide the Bank upon its first demand with proof of payment of all insurance premiums; and

(xi)  To notify the Bank about any charge, lien, security or mortgage which may be established in the future on the Property, in particular for real estate taxes, for real property insurance premiums, or for other public taxes or levies, in which case the Borrower shall pay off immediately any underlying debtors or arrange for them being paid off except for such debts that are being contested in good faith, or shall provide any and all guarantees as soon as possible that may be required to procure or obtain that the related encumbrance be lifted;

13. **Costs and Expenses**

All the costs, expenses, disbursements and fees, including, but not limited to, attorney, advisory fees, notary and legal fees, evaluation, any registration fees of the Loan, the Mortgage or any other Collateral in connection with Loan Agreement, and more generally, all the amounts spent by the Bank of whatever nature whether in relation to the negotiations, the preparation and execution of this Loan Agreement and related documentation will be paid by the Borrower and/or the Guarantor at closing (i.e. at the latest on the Disbursement Date) upon presentation

of the corresponding invoices (each an **"Invoice"**). The Borrower hereby authorizes the Bank to debit the Borrower Account for the payment of the Invoices it has to pay and the Guarantor hereby authorizes the Bank to debit the Guarantor Account for the payment of the Invoices she has to pay.

**14.    Additional Property Valuations**

In addition to the Initial Valuations (as defined in clause 2(c) of Annex 1 (*Conditions precedent*), the Bank shall be entitled to request and obtain, at any time during the duration of this Loan Agreement and at the costs and expenses of the Borrower one or several Property valuation(s) prepared by independent expert(s) appointed by the Bank (each an **"Additional Property Valuation"**).

**15.    Payments**

15.1  Any and all payments under this Loan Agreement shall be made without set-off, deduction or counterclaim of any kind.

15.2  Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction or withholding for any taxes, provided if the Borrower shall be required to deduct any taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions, the Bank receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant authority in accordance with legal requirements.

**16.    Assignments and Transfers**

The Bank is authorized to transfer or assign all or any part of this Loan Agreement, with all Collateral and/or ancillary rights, to a third party in Switzerland or abroad, for example, for the purposes of securitization or outsourcing. In this respect, the Borrower and the Guarantor expressly waive their rights under Swiss banking secrecy rules, which may be applicable to such transfer or assignment (including, but not limited to, in relation to any potential sub-participant (*i.e.* in case of sub-participations)).

Neither the Borrower nor the Guarantor shall be entitled to transfer or assign all or any part of this Loan Agreement.

**17.    Communications**

The communication means described in the General Terms and Conditions approved respectively by the Borrower and the Guarantor shall apply to this Loan Agreement.

18.  **Application Fee**

An application fee equal to USD 162'000.- (one hundred and sixty-two thousand US dollars) (VAT excl.) (the "**Application Fee**") will be paid to the Bank by the Borrower on the account designated by the Bank no later than on the Disbursement Date.

19.  **Miscellaneous**

19.1  No amendment to this Loan Agreement shall be effective unless it is in writing and signed by, or on behalf of, each party to it.

19.2  A waiver of any right or remedy under this Loan Agreement or by law, or any consent given under this Loan Agreement, is only effective if given in writing by the waiving or consenting party and shall not be deemed a waiver of any other breach or default. It only applies in the circumstances for which it is given and shall not prevent the party giving it from subsequently relying on the relevant provision.

19.3  A failure or delay by a party to exercise any right or remedy provided under this Loan Agreement or by law shall not constitute a waiver of that or any other right or remedy, prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Loan Agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

19.4  The rights and remedies provided under this Loan Agreement are cumulative and are in addition to, and not exclusive of, any rights and remedies provided by law.

19.5  If any provision (or part of a provision) of this Loan Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision (or part of a provision) shall be deemed deleted. Any modification to or deletion of a provision (or part of a provision) under this clause shall not affect the legality, validity and enforceability of the rest of this Loan Agreement.

19.6  If the Bank is obliged for any reason to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower will, promptly on the request of the Bank, supply (or procure the supply of) such documentation and other evidence as is reasonably requested in order for the Bank to be able to carry out, and be satisfied that it has complied with, all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in this Loan Agreement and any other document connected to the Loan Agreement to which it is a party.

20. **General Terms & Conditions of the Bank**

The General Terms & Conditions of the Bank concerning credit facilities form an integral part of this Loan Agreement. In case of conflict between the General Terms & Conditions and the specific clauses of this Loan Agreement, the specific clauses will prevail.

21. **Applicable law and jurisdiction**

This Loan Agreement shall be governed by, and construed in accordance with Swiss law excluding the conflict of laws rules.

Any dispute, litigation, or controversy that arises from this Loan Agreement, or in connection with it (each, a **"Dispute"**), will be submitted to the exclusive jurisdiction of the tribunals of the canton of Geneva. Appeals before the Federal Tribunal are reserved.

Notwithstanding the above, the Bank shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Bank may take concurrent proceedings in any number of jurisdictions.

*Signature page – Next page*

Geneva,  March 2021

**REYL & Cie Ltd**

_____          _____

Geneva,   March 2021

**Brickchurch Enterprises, Inc.**

_____          _____

Geneva,   March 2021

**The Guarantor**

_____

Mr. Louise Thérèse Blouin

<u>**Annex 1 – Conditions precedent**</u>

As set forth in clause 5 (*Conditions*) of this Loan Agreement, this Annex 1 (*Conditions precedent*), being part of this Loan Agreement, is setting out the list of the conditions precedent that have to be verified and fulfilled, to the satisfaction of the Bank (form and substance), before any disbursement and any renewal under this Loan Agreement:

**1.  Finance documents**

(a)  The Borrower shall have signed all standard documents of the Bank for the opening and maintenance of the Account.

(b)  The Guarantor shall have signed all standard documents of the Bank for the opening and maintenance of the Account.

(c)  Execution of this Loan Agreement.

(d)  Execution of the documents in relation to the Collateral to be fully constituted and relevant steps in relation to the perfection of each Security have been performed.

**2.  Property documents**

(a)  The Property title document (*titre de propriété*).

(b)  A recent mortgage status (*état hypothécaire*) in relation to the Property.

(c)  The Bank shall initially be provided with two valuation reports of the Property from independent real estate experts appointed by the Bank (the **"Initial Valuations"**). Thereafter, as set forth in clause 14 (*Additional Property Valuations*) of this Loan Agreement, the Bank shall be entitled to request at any time an updated valuation report(s) from expert(s) appointed by the Bank.

(d)  A lender's title insurance policy in form, substance, and amount acceptable to the Bank and its counsel

**3.  Insurance documents**

(a)  The Borrower shall provide copies of all insurance policies with respect to the Property confirming an adequate insurance coverage of the Property. Thereafter, as set forth under clause 12 (xi) of this Loan Agreement.

(b)  On or about the Disbursement Date, acknowledgement the insurer of the Property of the assignment of the indemnity benefits under the insurance policy of the Property in favour of the Bank.

**4.  Other documents and conditions**

(a)  Payment of the Application Fee in accordance with clause 18;

(b)  Not later than on the Disbursement Date,  the Guarantor shall have transferred, on the Guarantor Account, an amount equal to USD 20'000'000 (twenty million US dollars). For the avoidance of doubt, the amount equal to one year of interest shall be not be included in that amount.

(c)  Proof of payment by the Borrower of all real estate taxes affecting the Property, including the ones that were due on 1st December 2020.

(d)  Undertaking letter from JGB Partners LP (and affiliates) confirming that, (i) concomitantly with the full or partial repayment of the Existing Loan, JGP Partners LP (and affiliates) shall assign the existing mortgage note on the Property to the Lender, and shall cancel and withdraw the foreclosure process initiated on the Property and another property located 376 Gin Lane, Southampton, 11968 NY and (ii) the Lender shall be the sole first ranking mortgagor on the Property.

(e)  A copy of any other authorization or other document, opinion or assurance which the Bank considers necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Loan Agreement or any other related document or for the validity and enforceability of any such documents.

**Exhibit 21:**

# PHILLIPS NIZER LLP

485 Lexington Avenue
New York, NY 10017-2643
212.977.9700
Fax 212.262.5152

New York · New Jersey

www.phillipsnizer.com

REYL & CIE SA
MS. LAURENCE TOSO
RUE DU RHONE 62
1204 GENEVE
GENEVA, SWITZERLAND
ltoso@reyl.com

INVOICE: 195618
MARCH 10, 2021

FED. ID #13-1167100

## REMITTANCE ADVICE

CLIENT NUMBER: 90552.00002
            SOUTHAMPTON MORTGAGE LOAN

| | |
|---|---:|
| CURRENT FEES | $34,659.00 |
| CURRENT DISBURSEMENTS | 1,386.36 |
| CURRENT FEES AND DISBURSEMENTS | $36,045.36 |
| **TOTAL BALANCE DUE** | $36,045.36 |

Wire Transfer:
Receiving Bank: Sterling National Bank
Receiving Bank Address: 400 Rella Boulevard, Montebello, New York, NY 10901
ABA Routing Number: 221970443
Swift Code: STETUS33
Beneficiary: PHILLIPS NIZER LLP
Account Number: 313211301

**Reference # 90552.00002 Invoice No. 195618**

# PHILLIPS NIZER LLP

485 Lexington Avenue
New York, NY 10017-2643
212.977.9700
Fax 212.262.5152

New York · New Jersey

www.phillipsnizer.com

REYL & CIE SA
MS. LAURENCE TOSO
RUE DU RHONE 62
1204 GENEVE
GENEVA, SWITZERLAND
ltoso@reyl.com

INVOICE: 195618
MARCH 10, 2021

FED. ID #13-1167100

FOR PROFESSIONAL SERVICES RENDERED THROUGH FEBRUARY 28, 2021

    CLIENT NUMBER: 90552.00002
    SOUTHAMPTON MORTGAGE LOAN

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|------|----------|----------|-------|-------|
| 09/30/20 | REVIEW AND UPDATE CLIENT RE MORTGAGE RECORDING TAX, TITLE PREMIUMS | MAL | .40 | 284.00 |
| 10/06/20 | CONF AND PREPARE RECOMMENDATIONS TO CLIENT | MAL | .50 | 355.00 |
| 10/07/20 | EXCHANGES WITH MARC LANDIS RE:  QUESTIONS RELATED TO BANK LOAN/MORTGAGE | KM | .20 | 155.00 |
| 10/13/20 | ATTENTION TO REYL & CIE ENGAGEMENT LETTER; PREPARATION AND ADMIN MATTERS (1.20 NO CHARGE) | KM | .00 | .00 |
| 10/15/20 | CORRESP W BORROWER COUNSEL | MAL | .20 | 142.00 |
| 10/15/20 | TELEPHONE WITH LAURENCE TOSO RE:  REYL MORTGAGE; TIMETABLE AND ENGAGEMENT LETTER; FINALIZE TO SEND ENGAGEMENT LETTER; REVIEW UPDATED TERM SHEET; EMAIL TO ARC RE: TIMETABLE FOR TRANSACTION; EXCHANGES WITH MARC RE:  TRANSACTION AND REQUEST FOR ADDITIONAL INFORMATION FROM BANK | KM | .90 | 697.50 |
| 10/16/20 | TELE CONF W BORROWER COUNSEL | MAL | .50 | 355.00 |
| 10/16/20 | CONFERENCE CALL TO DISCUSS LOAN AND SECURED ASSETS. | SLM | .20 | 78.00 |
| 10/17/20 | CORRESP RE PENDING FORECLOSURE | MAL | .20 | 142.00 |
| 10/18/20 | CORRESP AND TELE CONF W K MONROE RE TRANSACTION STATUS | MAL | .20 | 142.00 |
| 10/20/20 | REVIEW TITLE REPORT, JUDGMENT, FEDERAL TAX LIENS, FORECLOSURE INFO | MAL | .80 | 568.00 |

REYL & CIE SA                                    INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                      MARCH 10, 2021
                                                 PAGE    2

---

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|------|----------|----------|-------|-------|
| 10/20/20 | REVIEW TERM SHEET IN FRENCH ; COMPARE TO ENGLISH VERSION/EMAIL ; TELEPHONE WITH FLORENCE REGARDING TERM SHEET EMAIL TO MARC LANDIS RE :  TIMETABLE AND TERM SHEET; REVIEW SOUTHAMPTON PROPERTY APPRAISAL | KM | .80 | 620.00 |
| 10/21/20 | COMPLETE REVIEW OF TITLE COMMITMENT; CORRESP W CLIENT RE JUDGMENTS; CORRESP W BORROWER COUNSEL RE ORG DOCS | MAL | 1.20 | 852.00 |
| 10/21/20 | RECEIPT AND CONFIRMATION OF DRAFT OF LOAN DOCUMENTATION FROM REYL ; EMAIL TO FLORENCE RE :  SAME; REVIEW MARC LANDIS EMAIL REGARDING TITLE INSURANCE/POLICY; EMAILS RE: SAME | KM | .20 | 155.00 |
| 10/21/20 | INITIAL LOAN COMMUNICATIONS, TITLE REVIEW. | SLM | .20 | 78.00 |
| 10/22/20 | REVIEW AND REVISE CLOSING CHECKLIST; CONF RE CLOSING DOCUMENTS, STATUS OF ORGANIZATIONAL DOCUMENTS | MAL | .60 | 426.00 |
| 10/22/20 | REVIEW ALL LENDER COMMUNICATIONS; PREPARE INITIAL CHECKLIST AND  PROPOSED FORM OF LOAN DOCUMENTS; REVIEW TITLE REPORT. BORROWER'S COUNSEL COMMUNICATIONS. DRAFT CONSOLIDATED MORTGAGE. REVISE CHECKLIST. | SLM | 2.50 | 975.00 |
| 10/23/20 | REVIEW EMAIL EXCHANGE RE :  MORTGAGE TRANSACTION AND RESPOND TO FLORENCE | KM | .20 | 155.00 |
| 10/23/20 | DRAFT GAP MORTGAGE AND NOTE, PERSONAL GUARANTY, 255 AFFIDAVITS, REVISE CONSOLIDATED MORTGAGE AND NOTE, REVIEW LOAN AGREEMENT. | SLM | 2.00 | 780.00 |
| 10/24/20 | REVIEW AND RESPOND TO CLIENT QUESTIONS RE LOAN DOCUMENTATION, TITLE | MAL | 1.00 | 710.00 |
| 10/26/20 | REVIEW LENDER ADDITIONAL COMMUNICATIONS WITH RESPECT TO OPEN ITEMS. COMMUNICATIONS REGARDING MORTGAGE LOAN DOCUMENTS. | SLM | .30 | 117.00 |
| 10/27/20 | REVIEW DOCUMENTS IN CONNECTION WITH MORTGAGE LOAN; REVIEW EMAILS ; QUICK REVIEW OF LOAN DOCUMENT | KM | .80 | 620.00 |
| 10/28/20 | CORRESP W CLIENT, BORROWER TAX COUNSEL | MAL | .20 | 142.00 |
| 10/28/20 | REYL LOAN FOLLOW UP; REQUEST FOR INFORMATION RE:  SWISS BANK MORTGAGE ON NY PROPERTY | KM | .20 | 155.00 |
| 10/28/20 | MULTIPLE BORROWER AND LOAN DOCUMENT STATUS COMMUNICATIONS. | SLM | .20 | 78.00 |

REYL & CIE SA                                    INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                      MARCH 10, 2021
                                                 PAGE    3

---

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|---|---|---|---|---|
| 10/28/20 | REVIEW BORROWER AND MEMBER ORGANIZATIONAL DOCUMENTS, PROPERTY DEEDS AND MORTGAGE SCHEDULE, REVIEW AND DRAFT COMMENTS TO LOAN AGREEMENT. | SLM | 1.00 | 390.00 |
| 10/29/20 | REVIEW LOAN AGREEMENT; REVISE COMMENTS | MAL | 1.00 | 710.00 |
| 10/29/20 | REVIEW AND REVISE LOAN AGREEMENT COMMENTS. (.4 NO CHARGE) | SLM | .00 | .00 |
| 10/30/20 | REVIEW NYO COMMENTS RE:  LOAN AGREEMENT; REVIEW AND REVISE REYL LOAN AGREEMENT ; EXCHANGE OF EMAILS RE :  SAME ; SEND LOAN AGREEMENT COMMENTS TO MARC FOR COMMENT; EXCHANGES WITH MARC RE: MORTGAGE | KM | 4.80 | 3,720.00 |
| 10/31/20 | REVIEW AND FOLLOW UP RE LOAN AGREEMENT COMMENTS | MAL | .30 | 213.00 |
| 11/02/20 | CORRESP W CLIENT RE EXISTING MORTGAGE; REVIEW AND COMMENT RE DRAFT LOAN DOCUMENTS, CLIENT REQUESTS; REVIEW LOAN AGREEMENT PROVISIONS | MAL | 1.70 | 1,207.00 |
| 11/02/20 | REVIEW VARIOUS EMAILS FROM FLORENCE/REYL; AND REPLY TO SAME; FOLLOW UP WITH MARX RE : STATUS OF MORTGAGE ; QUICK REVIEW OF LOAN COMMENTS; TELEPHONE CALL WITH FLORENCE TO REVIEW LOAN COMMENTS; REVIEW AND REVISE CLOSING CHECK LIST | KM | 2.60 | 2,015.00 |
| 11/02/20 | REVISE CHECKLIST; LOAN DOCUMENT STATUS COMMUNICATIONS. REVIEW LOAN AGREEMENT COMMENTS, AND REVISE LOAN DOCUMENTS. CALL WITH K. MONROE TO DISCUSS CHECKLIST REVISIONS AND FURTHER REVISE. REVISE CHECKLIST, FINALIZE DRAFT LOAN DOCUMENTS. MULTIPLE CHECKLIST, LOAN DOCUMENT COMMUNICATIONS AND REVIEW INITIAL COMMENTS. | SLM | 2.00 | 780.00 |
| 11/03/20 | CONF RE CHECKLIST, LOAN DOCUMENTS STATUS; REVIEW AND COMMENT RE LOAN AGREEMENT PROVISIONS; PREPARE TITLE INVOICE CALCULATIONS | MAL | 1.50 | 1,065.00 |
| 11/03/20 | FOLLOW UP WITH FLORENCE RE :  LOAN AGREEMENT ; TIMETABLE AND DOCUMENT CHECK LIST; REVIEW LOAN AGREEMENT AND COMMENTS AND REVISE AND SEND; REVIEW CREDIT GENERAL CONDITIONS; WORK ON REVIEWING AND UPDATING CLOSING CHECK LIST; REVIEW PERSONAL GUARANTY (CAUTION); CONFERENCE CALL WITH MARC AND SUMANA RE: CLOSING DOCUMENTS; EMAIL TO FLORENCE RE:  KAM QUESTIONS RE:  DEED; FINALIZE FIRST DRAFT | KM | 3.60 | 2,790.00 |

REYL & CIE SA                                      INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                        MARCH 10, 2021
                                                   PAGE    4

---

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|------|----------|----------|-------|-------|
| | OF CLOSING CHECK LIST AND SEND TO FLORENCE/REYL FOR REVIEW AND COMMENTS | | | |
| 11/03/20 | REVISE CHECKLIST FOR COLLATERAL DOCUMENTS, ASSIGNMENT AND TERMINATION DOCUMENTS OF EXISTING MORTGAGE; DRAFT GENERAL SECURITY AGREEMENT. REVISE MORTGAGE; ENVIRONMENTAL INDEMNITY. CONFERENCE CALL TO DISCUSS REVISED CHECKLIST; LOAN STATUS. REVISE NOTE LIBOR PROVISIONS AND FINALIZE ALL DRAFT LOAN DOCUMENTS FOR CLIENT CIRCULATION. | SLM | 1.50 | 585.00 |
| 11/03/20 | UPDATE CLOSING CHECKLIST, ORDER FLOOD SEARCH, EMAILS  AND TELEPHONE CALLS WITH TITLE COMPANY | MAP | .50 | 155.00 |
| 11/04/20 | REVIEW REYL CORRESPONDENCE AND EMAILS; DEED; LOAN DOCUMENT; PN DOCUMENTS; ATTENTION TO FILE | KM | .40 | 310.00 |
| 11/04/20 | WORK ON MATTER FOR CLOSING. | MAP | .30 | 93.00 |
| 11/05/20 | REVISE CHECKLIST; REVIEW AND REVISE LOAN DOCUMENTS | MAL | .50 | 355.00 |
| 11/05/20 | FOLLOW UP VARIOUS OPEN ISSUES/EMAILS; EMAIL EXCHANGES WITH MARC RE: DOCUMENTS/CLOSING | KM | .50 | 387.50 |
| 11/05/20 | STATUS COMMUNICATIONS. REVIEW LENDER COMMENTS TO DRAFT LOAN DOCUMENTS, REVISE AND DRAFT COMMENTS REGARDING CHANGES. | SLM | 1.50 | 585.00 |
| 11/05/20 | WORK ON MATTER FOR CLOSING. | MAP | 1.50 | 465.00 |
| 11/06/20 | REVIEW AND COMMENT RE LOAN DOCUMENT REVISIONS; TELE CONF W BORROWERS TAX COUNSEL; CORRESP W CLIENT | MAL | 1.00 | 710.00 |
| 11/06/20 | EMAIL EXCHANGES/RESPONSES; UPDATE WITH MARC AND | KM | .20 | 155.00 |
| 11/06/20 | FURTHER REVISE MORTGAGE PURSUANT TO CLIENT COMMENT ON FINANCIAL REPORTING AND MAL ADDITIONAL COMMENT RE: GOVERNING LAW. PREPARE COMPARISONS AND CIRCULATE REVISED SET FOR BANK REVIEW. CIRCULATE TO BORROWER AND CLIENT. | SLM | .70 | 273.00 |
| 11/06/20 | WORK ON MATTER FOR CLOSING INCLUDING REVIEWING TITLE REPORT. | MAP | .50 | 155.00 |
| 11/09/20 | CONF W REED SMITH ATTORNEYS RE IRS ISSUE; CORRESP W CLIENT | MAL | .50 | 355.00 |
| 11/09/20 | QUICK REVIEW OF UPDATED VANDERBILT APPRAISAL | KM | .20 | 155.00 |
| 11/09/20 | IRS TAX LIEN STATUS COMMUNICATIONS. | SLM | .10 | 39.00 |
| 11/09/20 | WORK ON MATTER FOR CLOSING. | MAP | .10 | 31.00 |
| 11/10/20 | LENDER COMMUNICATIONS REGARDING IRS LIEN. | SLM | .10 | 39.00 |

REYL & CIE SA                                    INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                      MARCH 10, 2021
                                                 PAGE    5

---

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|------|----------|----------|-------|-------|
| 11/10/20 | WORK ON MATTER FOR CLOSING. | MAP | .10 | 31.00 |
| 11/11/20 | REVIEW MEMO | MAL | .20 | 142.00 |
| 11/11/20 | EMAIL EXCHANGE WITH MARC LANDIS RE :  IRS TAX LIEN ; UPDATE EMAIL TO FLORENCE; EMAIL EXCHANGES RE:  CLOSING DOCUMENTS | KM | .30 | 232.50 |
| 11/11/20 | CONDUCTED AND ANALYZED RESEARCH RE WHETHER A FOREIGN BANK CAN ISSUE A LOAN TO BE SECURED BY A MORTGAGE ON PROPERTY IN NYS WITHOUT BEING DEEMED AS DOING BUSINESS IN NYS, AND WITHOUT BEING OPEN TO LIABILITY FOR DOING BUSINESS IN NYS WITHOUT AUTHORIZATION. | LF | 1.40 | 483.00 |
| 11/11/20 | SWISS LAW OPINION DISCUSSIONS AND STATUS CONFERENCE. REVIEW LEGAL RESEARCH, DRAFT MEMORANDUM. | SLM | 1.00 | 390.00 |
| 11/11/20 | EMAILS WITH BORROWERS COUNSEL ON STATUS OF COMMENTS TO LOAN DOCUMENTS. | MAP | .10 | 31.00 |
| 11/12/20 | REVIEW AND CONF RE MEMO, SURVEY STATUS | MAL | .40 | 284.00 |
| 11/12/20 | EMAIL EXCHANGES RE:  NY LAW QUESTIONS/MEMO; REVIEW CORRESPONDENCE RE: CHANGE IN LOAN AMOUNT AND ADJUSTMENT TO FEES; SEND NY LAW MEMO TO REYL/FLORENCE | KM | .50 | 387.50 |
| 11/12/20 | REVISE AND FINALIZE LENDER MEMORANDUM; MULTIPLE TITLE AND SURVEY STATUS COMMUNICATIONS. | SLM | .40 | 156.00 |
| 11/12/20 | WORK ON MATTER FOR CLOSING. | MAP | 1.50 | 465.00 |
| 11/15/20 | CONF RE CLIENT REQUEST FOR MEMO EXPANSION | MAL | .20 | 142.00 |
| 11/16/20 | CORRESP W CLIENT | MAL | .10 | 71.00 |
| 11/16/20 | MULTIPLE COMMUNICATIONS REGARDING SWISS LAW OPINION; STATUS REGARDING BORROWER COMMENTS. | SLM | .20 | 78.00 |
| 11/17/20 | CONF RE STATUS; FOLLOW-UP CORRESP TO BORROWER COUNSEL RE LOAN DOCUMENT REVIEW | MAL | .30 | 213.00 |
| 11/17/20 | EMAIL EXCHANGES WITH MARC RE :  CLOSING AND NY LAW MEMO | KM | .10 | 77.50 |
| 11/18/20 | FOLLOW UP RE:  REYL FEES, OPEN CLOSING ATTERS; NY LAW MEMO AND UPDATE | KM | .50 | 387.50 |
| 11/19/20 | UPDATE EMAIL TO FLORENCE RE:  MEMO AND TIMING FOR CLOSING INCLUDING THANKSGIVING HOLIDAY; APPRAISAL STATUS | KM | .20 | 155.00 |
| 11/25/20 | REVIEW AND CORRESP W CLIENT RE BORROWER STATUS | MAL | .20 | 142.00 |
| 11/25/20 | UPDATE ON STATUS FROM FLORENCE; FOLLOW UP WITH MARC | KM | .10 | 77.50 |
| 12/06/20 | CORRESP RE BORROWER STATUS | MAL | .10 | 71.00 |
| 12/16/20 | REVIEW AND RESPOND TO FLORENCE EMAIL RE : STATUS | KM | .10 | 77.50 |

REYL & CIE SA                                    INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                      MARCH 10, 2021
                                                 PAGE    6

---

| DATE | SERVICES | ATTORNEY | HOURS | VALUE |
|------|----------|----------|-------|-------|
| 12/30/20 | REVIEW UPDATED TITLE COMMITMENT, NOTICES OF PENDENCY | MAL | .60 | 426.00 |
| 01/05/21 | CORRESP W CLIENT | MAL | .20 | 145.00 |
| 01/06/21 | ADVICE TO CLIENT; REVIEW MORTGAGE SCHEDULE, NOTICE OF PENDENCY | MAL | .40 | 290.00 |
| 01/06/21 | REVIEW/READ EMAIL EXCHANGES RE:  PROPERTY FORECLOSURES AND ORGANIZATION RE:  SAME | KM | .10 | 77.50 |
| 01/20/21 | ATTENTION TO FILE RE:  EMAILS/ CLOSING UPDATE (.10 NO CHARGE) | KM | .00 | .00 |
| 01/20/21 | CLIENT AND BORROWER COUNSEL STATUS COMMUNICATIONS. | SLM | .10 | 40.00 |
| 01/21/21 | REVIEW BORROWER COUNSEL EMAIL; CORRESP W CLIENT | MAL | .20 | 145.00 |
| 01/22/21 | CORRESP W CLIENT, CORRESP W NEW BORROWER COUNSEL RE STATUS, NEXT STEPS | MAL | .30 | 217.50 |
| 01/22/21 | REVIEW MULTIPLE EMAILS ON STATUS OF LOAN. (.1 NO CHARGE) | MAP | .00 | .00 |
| 01/27/21 | CORRESP W CLIENT; CONF AND FOLLOW UP RE STATUS; CORRESP W BORROWER COUNSEL | MAL | 1.30 | 942.50 |
| 01/27/21 | STATUS COMMUNICATIONS WITH BORROWER'S COUNSEL. | SLM | .10 | 40.00 |
| 01/28/21 | REVIEW DOCUMENT STATUS; TELE CONF W BORROWER COUNSEL; CORRESP W CLIENT RE STATUS | MAL | .70 | 507.50 |
| 01/28/21 | ATTORNEY CONFERENCE CALL TO DISCUSS LOAN DOCUMENT STATUS. | SLM | .30 | 120.00 |
| 01/28/21 | CONFERENCE CALL ON STATUS OF MATTER, EMAIL LOAN DOCUMENTS TO BORROWERS COUNSEL FOR REVIEW.  REVIEW ADDITIONAL EMAILS REGARDING MATTER. | MAP | .80 | 260.00 |
| 01/29/21 | REVIEW AND CORRESP W CLIENT | MAL | .20 | 145.00 |
| 02/01/21 | CORRESP W CLIENT | MAL | .20 | 145.00 |
| 02/11/21 | CORRESP W CLIENT | MAL | .10 | 72.50 |
| 02/11/21 | DUBOIS EMAIL RE: STATUS | KM | .10 | 77.50 |
| 02/11/21 | REVIEW EMAILS AND SEND EMAIL TO BORROWERS ATTORNEY FOR UPDATE ON LOAN DOCUMENTS CIRCULATED. | MAP | .20 | 65.00 |
| 02/17/21 | CORRESP W CLIENT RE STATUS | MAL | .10 | 72.50 |
| 02/23/21 | PRELIMINARY REVIEW OF BORROWER COMMENTS TO LOAN AGREEMENT | MAL | .30 | 217.50 |
| 02/24/21 | RECEIVE AND REVIEW BORROWER'S COMMENTS TO THE BANK'S LOAN AGREEMENT AND STRATEGY COMMUNICATIONS. | SLM | .10 | 40.00 |

                    TOTAL SERVICES                        $34,659.00

```
REYL & CIE SA                              INVOICE NO.  195618
CLIENT NUMBER:  90552.00002                MARCH 10, 2021
                                           PAGE    7
```

| ATTORNEY | | RATE | HOURS | VALUE |
|----------|---|------|-------|-------|
| M.A. LANDIS | | 725.00 | 4.00 | 2,900.00 |
| M.A. LANDIS | | 710.00 | 14.40 | 10,224.00 |
| KAREN MONROE | | 775.00 | 17.60 | 13,640.00 |
| SUMANA L. MURTHY | | 400.00 | .60 | 240.00 |
| SUMANA L. MURTHY | | 390.00 | 13.90 | 5,421.00 |
| LEAH FRANKEL | | 345.00 | 1.40 | 483.00 |
| MICHELLE A. PATALANO | | 325.00 | 1.00 | 325.00 |
| MICHELLE A. PATALANO | | 310.00 | 4.60 | 1,426.00 |
| | TOTALS | | 57.50 | 34,659.00 |

| DISBURSEMENTS | VALUE |
|---------------|-------|
| NON-ITEMIZED DISBURSEMENTS | 1386.36 |
| TOTAL DISBURSEMENTS | $1,386.36 |

### SUMMARY

| | |
|---|---|
| CURRENT FEES | $34,659.00 |
| CURRENT DISBURSEMENTS | 1,386.36 |
| CURRENT FEES AND DISBURSEMENTS | $36,045.36 |
| **TOTAL BALANCE DUE** | $36,045.36 |

**PAYMENT DUE UPON RECEIPT**