**Exhibit 22:**

CHARLES WALLSHEIN

*Attorney at Law*

35 Pinelawn Road
Suite 106E
Melville, New York 11747
cwallshein@wallsheinlegal.com

Tel: 631 824-6555                                                                    Fax: 631 824-6558

November 24, 2020

Brickchurch Enterprises Inc.
Aberdeen Enterprises Inc.
Matthew Kabatoff & Louise Blouin
Wiestistrasse 61
3920
Zermatt
Switzerland
mkabatoff@ltbholding.com

Re:    AGREEMENT FOR ATTORNEY'S SERVICES

This letter confirms the engagement of CHARLES WALLSHEIN PLLC ("the Firm") by
you ("the Client") for the performance of legal services.

1.  Description of the Scope of Services to Be Performed. The Firm will provide the following
legal services (the "Service") to the Client: Legal advice, consultation and representation
with respect to a defense of the above captioned foreclosure action against you, and for no
other matter except as authorized by you or by separate agreement.

It is understood that the firm's services shall include litigation services only unless
otherwise agreed. This retainer includes services for mortgage modification applications.
Mortgage Modifications are a separate service provided by this firm under a separate fee
schedule. Once we submit a signed application for modification the fees for modification

**Exhibit 23:**



Press release

## REYL Intesa Sanpaolo completes the integration of Intesa Sanpaolo Private Bank (Switzerland) Morval

*Geneva, 17 February 2022.* **REYL Intesa Sanpaolo, majority-owned by Fideuram - Intesa Sanpaolo Private Banking since May 2021, today announces the completion of the merger between the banks REYL Intesa Sanpaolo and Intesa Sanpaolo Private Bank (Suisse) Morval.**

The legal merger between REYL Intesa Sanpaolo and Intesa Sanpaolo Private Bank (Suisse) Morval (ISPBM) has been approved by the Swiss Financial market Supervisory Authority (FINMA). This merger is part of the strategic alliance with Fideuram – Intesa Sanpaolo Private Banking, a business controlled by the Italian banking giant Intesa Sanpaolo, which concluded at the end of May 2021. Fideuram – Intesa Sanpaolo Private Banking acquired a 69% stake in REYL Intesa Sanpaolo, partially through the contribution in kind of its Swiss banking subsidiary Intesa Sanpaolo Private Bank (Suisse) Morval, based in Lugano. The partners of REYL Intesa Sanpaolo hold collectively 31% of the combined entity.

Last year Nicolas Duchêne, Deputy Chief Executive Officer and Partner of REYL Intesa Sanpaolo, was appointed Interim CEO of ISPBM to ensure the success of the operational transition and the integration of teams. The new visual identity was applied to its marketing materials and launched in all of its markets in early 2022.

François Reyl, Chief Executive Officer and Partner of REYL Intesa Sanpaolo, says: "*This partnership will allow us to achieve our significant growth potential while preserving our 360° business model and our strong corporate culture. We look forward to forging lasting relationships with our new colleagues and tackling future challenges by working as part of a now fully-integrated team.*"

Nicolas Duchêne, says: "*In addition to the numerous synergy opportunities, this merger allows us to pursue our commercial ambitions in the Ticino region, where we intend to maintain and build our Lugano presence, allowing us to offer a sales force tailored to servicing local and Italian clients as well as those of third-party managers in this promising market.*"

Following the integration of the activities of ISPBM, REYL Intesa Sanpaolo employs more than 400 people and holds assets under administration exceeding CHF 25 billion. This figure excludes the assets managed by 1875 Finance, in which REYL Intesa Sanpaolo has recently acquired a 40% stake.

The Board of Directors now comprises the following members:
Christian Merle (Chairman), Michel Broch (Vice Chairman), Yves-Claude Aubert, Riccardo Barbarini, Tommaso Corcos, Liane Elias Hoffman, Lino Mainolfi and Ruth Metzler-Arnold.

**About REYL Intesa Sanpaolo**
[www.reyl.com](www.reyl.com)

Founded in 1973, REYL & Cie is a diversified banking group with offices in Switzerland (Geneva, Zurich, Lugano), Europe (London, Luxembourg, Malta) and the rest of the world (Singapore, Dubai). It manages assets in excess of CHF 25 billion and employs over 400 professionals. In 2021, it entered into a strategic partnership with Fideuram - Intesa Sanpaolo Private Banking, the private banking division of Italy's largest banking group Intesa Sanpaolo, a leading European player which acquired a 69% stake in REYL & Cie.



<span style="color:blue">Press release</span>

Developing an innovative approach to banking, REYL & Cie serves a clientele of international entrepreneurs and institutional investors through its *Wealth Management*, *Entrepreneur & Family Office Services*, *Corporate Finance, Asset Services* and *Asset Management* business lines. It has further diversified its activities in the areas of impact investing, through the launch of pure-play impact asset management firm Asteria Obviam, and of digital banking for mass affluent clients via the incubation of Alpian, an app-based aspiring Swiss bank. In December 2021 REYL & Cie acquired a 40% stake in 1875 Finance, a Geneva-based multi-family office and independent asset manager with over CHF 12 billion of assets under management for private clients.

REYL & Cie is licensed as a bank in Switzerland and performs its activities under the direct control of the independent Swiss Financial Market regulator (FINMA) and the Swiss National Bank (SNB). Its subsidiaries are also regulated by the LPCC in Switzerland, the FCA in the UK, the CSSF in Luxembourg, the MFSA in Malta, the MAS in Singapore, the DFSA in Dubai and the SEC in the United States.

**Press contacts**

**REYL Intesa Sanpaolo**
T +41 22 816 80 20
presse@reyl.com

**jpespartners**
Miles Donohoe
D   +44 (0)20 7520 7625
T   +44 (0)20 7520 7620
reyl@jpespartners.com

**Fideuram - Intesa Sanpaolo Private Banking**
T +39 0287963119
pierantonio.arrighi@intesasanpaolo.com

**Exhibit 24:**

This copy is for your personal  non commercial use only  Distribution and use of this material are governed by our Subscriber Agreement and by copyright law
For non personal use or to order multiple copies  please contact Dow Jones Reprints at 1 800 843 0008 or visit www djreprints com

https://www.wsj.com/articles/as coronavirus hits new yorkers wonder if they should leave 11584897686

U.S.NEW YORK

# As Coronavirus Hits, New Yorkers Wonder if They Should Leave

Rentals surge in summer destinations; East Hampton is as busy as July



*By Josh Barbanel*

Updated March 22, 2020 3:52 pm ET

As coronavirus cases rise in New York, many residents can find themselves wondering: Should they leave to ride out the pandemic elsewhere?

Home rentals have surged in places New Yorkers typically turn to in the summer, from the Hamptons to Nantucket, Mass., as travel otherwise evaporated, according to AirDNA, a travel-booking analytics site.

Rental markets in areas outside other major, crowded cities as well from San Francisco to Chicago to Boston are seeing high demand.

# Hamptons' Covid-19 Season

## Preseason bookings soar as crisis worsens

Bookings for March and April occupancy

## Bookings for March and April occupancy



Note: Airbnb bookings shown
Source: StayMarquis

Many families packed up and moved into summer homes that had been closed up for the winter in order to shelter in place. New Yorkers are ordered to stay home as much as possible and public schools are closed—raising the allure for families with small children and small apartments to find an escape, and a stroll on a beach.

Case 8-22-70914-ast    Doc 76-2    Filed 08/22/22    Entered 08/22/22 21:07:28

The parking lot at Main Beach in East Hampton, N.Y., is as full as it is in July, said Glenn Vickers II, president of Discover the Hamptons, a not-for-profit that promotes tourism and economic development. People can be seen strolling along ocean beaches in hats and gloves, with children or pets in tow, maintaining a discrete distance between groups.

The new renters are choosing homes that have been thoroughly cleaned and still they arrive with buckets of cleaning supplies and gloves and masks and clean all over again, said Eddie Shapiro, president of NestSeekers International, a brokerage specializing in the Hamptons and other luxury markets.

This influx has in turn has triggered concerns that vacation getaways might not have enough resources to cope in the event that the number of people needing hospitalization soars in the weeks and months ahead.

"We are at summer population now," said Judi Desiderio, chief executive of Town & Country Real Estate, a brokerage based on the east end of Long Island. She said her firm handled 250 rentals so far this month, triple that of a normal March, with most set to start immediately and rented sight unseen. One renter is paying $250,000 in rent for April and May, normally a turgid period for rentals in the Hamptons.

Local medical services aren't geared to meet the needs of the peak summer population in normal times, she said. The population at least triples in many places in the summer.

Stony Brook University Hospital, the nearest tertiary-care hospital, has said it is adding beds to cope with Covid-19 cases and it suspended elective surgery and procedures. In East Hampton, the town supervisor, Peter Van Scoyoc, said Friday that the town was working with state and county officials to identify "locations for satellite hospital services."

The move to the country by more affluent city residents, echoes the response to past contagions, such as the great plague in London in 1665-1666 that saw most doctors, lawyers and merchants as well as the royal court flee, according to many accounts of the plague.

Some are ambivalent about the decision to leave the city.

Jill Laurie Goodman, a retired lawyer and a photography student; her husband, Melvin Jules Bukiet, a novelist, and their cat, Tio, fled their home on Manhattan's Upper West Side last week for a weekend home they had been renovating in New Windsor, NY., next to a state park and hiking trail, just over an hour's drive from the city.

They left after her daughter, Louisa, convinced her that at the age of 71, moving out of the city gave her the best chance of staying well, she said. "So I don't get sick, with the implications of that for spreading the virus and its effect on the health-care system."

"We are trying to do the best we can and make difficult decisions," she said.

# Shelter-in Place Hot Spots
## Vacation rentals close to home soar.

## Change in bookings for March occupancy

### Chatham, Mass.
683%

### Nantucket, Mass.
448

### East Hampton, N.Y.
442

### Southampton, N.Y.
420

### Sag Harbor, N.Y.
412

### Michigan City, Ind.
282

### Edgartown, Mass.
207

### Pebble Beach, Calif.



139
Napa, Calif.

115
Grand Haven, Mich.

108
Tahoe, Calif.

41
South Haven, Mich.

32

Note: Through March 19 of each year
Source: AirDNA

Bookings for March as of last Thursday were up more than 400% in the Hamptons, in Nantucket and in Chatham on Cape Cod, compared with the same period in 2019, according to the AirDNA analysis of Airbnb bookings.

Bolstered by people leaving Chicago and San Francisco, rentals more than doubled in Michigan City, Ind., near Chicago, and in Pebble Beach and Napa, Calif., and are up 41% in bookings near Lake Tahoe.

On the south shore of Lake Tahoe, tourism officials have urged visitors to stay away, warning that visitors could overwhelm existing resources and risk lives, due to the limited capacity of health facilities. "This is something I thought I'd never have to say throughout my tourism career, but please stay home at this time," said Carol Chaplin, chief executive and president of the Lake Tahoe Visitors Authority in a press release.

In the Hamptons, the surge built up a week ago, especially around March 15, when Mayor Bill de Blasio announced that New York City public schools would close, said Bryan Fedner, a co-founder of vacation-rental company StayMarquis, with listings on Long Island and the Hudson Valley, north of the city.

In the seven day period ended March18, his agency booked 87 rentals for March check-ins, compared with six during the same period in 2019. This included two bookings for more than $90,000 for a month,

Mr. Fedner's research also found that on a single day, March 15, visitors made a total of 201 bookings for occupancy in March on Airbnb and HomeAway, compared with an average of 31 such bookings in the rest of the month.

"People were booking sight unseen, with no negotiations, which was very unusual," he said.

With museums and cultural institutions closed, most stores shut, restaurants open only for delivery and drive-by pickups, there is little to do in the Hamptons beyond strolling and biking.

Lauren Spiegel, a Douglas Elliman broker, said that just being in the Hamptons was enough.

"If they are going to be shut down and locked down, at least they can be in the Hamptons," she said. "If they come out here, they can feel at peace even if the coronavirus is all around them."

**Write to** Josh Barbanel at josh.barbanel@wsj.com

*Appeared in the March 23, 2020, print edition.*

**Exhibit 25:**

**From:** "baxter.wasson@oconnorfunds.com" <baxter.wasson@oconnorfunds.com>
**Date:** Wednesday 20 November 2019 at 15:15
**To:** Louise <lb@ltbholding.com>
**Cc:** David Hryck <dhryck@reedsmith.com>, "jaeho.choi@ubs.com"
<jaeho.choi@ubs.com>
**Subject:** RE: Updated Term Sheet

Louise,

To be clear, we do not need cash per se. What we need is clear visibility on how you will service the interest (if you have liquid securities, that would work as well).

If you have no liquidity, then we will require an appraisal before closing.

If the appraisal shows a combined value in excess of $90 million, then we would propose the following:

1. Loan amount owed is $35 million
2. Initial funded loan amount is $31 million
3. We will waive the first $4 million of interest payments
4. You are required to rent the properties
   a. 100% of rental income will be allocated to the interest reserve account until the cash balance in the interest reserve account is sufficient to cover all cash interest obligations (at L+9.50%) through the maturity of the loan.
5. Minimum cash-on-cash return of 25% ($7.75 million). Please note, the $4mm of non-cash interest will count towards this minimum return.

If these high level terms are generally acceptable to you, then we will send you a term sheet.

Thank you.

Best regards,
Baxter


**BAXTER WASSON**
**Co-Head of Capital Solutions**


787 7th Avenue – 13th Floor
New York, NY 10019
Direct: (1) 212-821-5942
Mobile: (1) 202-270-5261

**Exhibit 27:**

**Exhibit 28:**









**Exhibit 29:**









**Exhibit 30:**

**From:** Anne Prosser <APROSSER@bhsusa.com>
**Date:** Saturday 19 December 2020 at 11:11
**To:** Louise <lb@ltbholding.com>
**Cc:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** Renting houses

Hi Louise and Mathew,

We had to use water to clean houses and do all of the laundry. I just couldn't leave the mountains of laundry from several years.
It all had to be cleaned very carefully and thoroughly as it had been sitting around in piles in  the laundry rooms for over a year.

 The houses hadn't been cleaned in almost two years and they needed thorough cleaning. I had to use water for this.

I have the temperature in both houses as low as possible, but high enough so the pipes don't freeze.

The big bills on the houses go back to 2018. They are not from this Fall. Because the irrigation system is broken, we did not use as much water as normally one might to bring the lawns back. I bought individual sprinkler heads and new hoses.

The main house pool was not opened per se. it was cleaned enough to be presentable to prospective off season renters. All of that furniture had been left out for several years and was completely rotten with mice living inside. We had to dispose of some of the really bad ones. Several could be saved and we cleaned and repaired those.

The main thing other than the cleaning , laundry and gardens, has been servicing the systems. Nothing had been serviced in four or five years. Heating AC, dishwashers, plumbing. Lots of service, filters, lightbulbs needed , cleaning supplies etc.

It has taken about four and half months but the houses are very presentable and ready to be shown and rented.

Both gates are completely broken. Michael has been chaining them up unless he's there doing work or service people are there fixing things. You should think about whether you wish to replace. Also the deer fence needs replacing at some point. We have fixed some of the really bad parts but deer are living still in dunes I believe.

I will put together a "manual" of renting each house with processes in place.

Anne

Anne Prosser

Ph: 917 710 8686

On Dec 19, 2020, at 10:29 AM, Louise Blouin <lb@ltbholding.com> wrote:

we need to verify the temperature of the houses we are not there and it should be at a minimum so the freezing does not attack the pipes the water should be shut so they do not burst a big cold front is coming in is mike on top of this
in the summer were the pools on
if we are not there these bills should be very low

**Exhibit 35:**

**From:** Anne Prosser<APROSSER@bhsusa.com>
**Date:** Friday 16 April 2021 at 15:52
**To:** Louise <lb@ltbholding.com>
**Cc:** Mathew Kabatoff<mkabatoff@ltbholding.com>
**Subject:** 366 Gin Lane/376 Gin Lane

Hi Louise,

I never went into 376 Gin Lane except once nor was it my responsibility to look after that house. The one time was when the water was shut of in 366 due to nonpayment of arrears bill and the workers had to complete
the huge mound of laundry from the previous 366 rentals; we went into the laundry room of 376 and completed the
laundry. I did not leave them during this work.
I then put the water SCWA account of 366 in mv name so it would be turned on and cleaning could be completed
I was only taking care of 366. I had Hardy Heating Services there four times and had all heating systems serviced and a lot or antifreeze put in so there would be no mishaps with that house. I paid approximately 4500 for those four services.

….

**Exhibit 36:**



**From:** Anne Prosser <APROSSER@hhsusa.com>
**Date:** Saturday 19 December 2020 at 16:11
**To:** Louise <lb@ltbholding.com>
**Cc:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** Renting houses

Hi Louise and Mathew,

We had to use water to clean houses and do all of the laundry. I just couldn't leave the mountains of laundry from several years.
It all had to be cleaned very carefully and thoroughly as it had been sitting around in piles in the laundry rooms for over a year.

The houses hadn't been cleaned in almost two years and they needed thorough cleaning. I had to use water for this.

I have the temperature in both houses as low as possible, but high enough so the pipes don't freeze.

The big bills on the houses go back to 2018. They are not from this Fall. Because the irrigation system is broken, we did not use as much water as normally one might to bring the lawns back. I bought individual sprinkler heads and new hoses.

The main house pool was not opened per se, it was cleaned enough to be presentable to prospective off season renters. All of that furniture had been left several years and was completely rotten with mic living inside. We ~~had to dispose of some~~ of the really

**Exhibit 37:**










**Exhibit 38:**

On Jul 18, 2021, at 8:24 AM, Louise Blouin <lt@ltbholding.com> wrote:

Anne you just do not get it I called not knowing you called then they said what you said about me
Your job is the lease nothing else we do not need to maman he my properties I have done it for all these years

Stay on your job and read the lease and your contract that is the scope of work nothing else you are off boundaries

Any problem goes to me my office
We manage

---

**From:** Anne Prosser <APROSSER@bhsusa.com>
**Sent:** Sunday, July 18, 2021 1:21:03 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Excelsior plumbing

I had excelsior plumbing coming and you called them and blocked the appointment saying they could only work on 376 …

So YOU caused this septic problem to be extended…YOU caused ultimately the sisal carpet to be ruined…YOU

Everything you touch turns to shit…LITERALLY

Go back to the spa and stay out of things that you're just mentally incapable of handling ..
You're a menace

Anne Prosser

Ph: 917 710 8686

> On Jul 18, 2021, at 6:47 AM, Louise Blouin <lt@ltbholding.com> wrote:
>
> Stick to respecting the contract you were hired for that and nothing else
>
> The wind storm was out first one in 23 years and we have insurance to cover it
> So to say it is abandon while inside our perfect until you got involved and destroyed the 376 gin lane and now 366 trying to fix on your own instead of just saying we have a problem and I have called people and can not fix it and it is not your job to call people
> Read the lease the law is what stands not your
> Limited experience  in high end
>
> So make sure the contract is respected if bot you need to give some explanations

**Exhibit 39:**

3/15/21

# LEASE AGREEMENT

The undersigned parties hereby enter into this lease agreement as Landlord and Tenant for the lease of the premises described herein (the "Premises") for the term set forth herein and pursuant to, and in accordance with, the following terms and conditions.

| | |
|---|---|
| LANDLORD: | Brickchurch Enterprises LLC |
| LANDLORD ADDRESS: | 366 Gin Lane<br>Southampton, NY 11968 |
| | |
| TENANT:<br>TENANT ADDRESS: | Christopher Brown<br>828 Fifth Avenue, New York, NY 10065 |
| | |
| ADDRESS OF PREMISES: TAX MAP ID NUMBER: | 366 Gin Lane, Southampton, New York 11968<br>0904-029.00-01.00-017.014 |
| LEASE TERM: | Commencing at 12:01 a.m. on 5/27/2021, ending at 11:59 p.m. on 07/31/21 |
| TOTAL RENT FOR TERM: PAYMENT OF RENT: | $500,000 payable as follows by bank check drawn on an American bank[a1] or electronic transfer. Tenant shall pay entire rent as follows. Payment details included at the end of document. |

Installment 1 due at execution of lease: By March 15, 2021

$250,000 due upon signing the lease agreement[a2]:
$125,000 payable to Landlord, Louise Blouin.
$125,000 to Escrow Agent for repairs and improvements as per separate agreement.

Installment 2:Due on April 30, 2021[a3]
$200,000 to Louise Blouin
$ 50,000 to Anne Prosser

## TERMS

1, USE: The "Premises", defined as including but not limited to the house, garage, tennis court, pool, shall be used as a private single family dwelling only by the Tenant and the Tenant's family, domestic employees, and non- paying guests and invitees in a manner consistent with the terms of this lease agreement and any applicable law.  Both Landlord and Tenant shall comply with all applicable laws and ordinances of the town and village (if any) within which the Premises are located, including, but not limited to, all applicable laws governing group occupancy, orderliness, cleanliness, preservation and use of the Premises.  Landlord agrees that if Tenant pays the rent and is not in default of any of the terms or conditions of this lease agreement, Tenant may peaceably have, hold and enjoy the Premises for the term of this lease agreement.

2.  UTILITIES and SERVICES: During the lease term, the utilities and services for the Premises shall be paid as set forth below and as expressly provided for elsewhere in this lease agreement:

| Utilities and Services: | Party responsible for cost: | If Tenant's cost, method of payment: |
|---|---|---|
| A,  Natural Gas: | Tenant | deduct from the utility and service deposit |
| B. Public Water: | Tenant | |
| C. Electricity: | Tenant | deduct from the utility and service deposit |
| D. Telephone Service: | Tenant | |
| E. Cable/ Satellite Television: | Tenant | |
| F. High-Speed Internet: | Tenant | |
| G. Weekly Garbage / Trash Removal: | ~~Landlord~~  Tenant | |
| H. Weekly Lawn Mowing: | Landlord | |
| I.  Weekly Garden Maintenance: | Landlord | |
| J.  Seasonal Leaf and Snow Removal: | Landlord | |
| K. Seasonal Swimming Pool Opening and Closing: | Landlord | |
| L. Weekly Swimming Pool Maintenance: | Landlord | |
| M. Seasonal Tennis Court Opening and Closing: | Landlord | |
| N. Tennis Court Maintenance (if necessary); | Landlord | |
| 0.  Maid/ Cleaning Service: | Tenant | pay directly to the service provider |

Landlord makes no representation or warranty as to the availability of any utilities or services at the Premises due to causes beyond Landlord's control. The cost and expense of all utilities and services required by this, or any other, paragraph of this lease agreement to be paid by Tenant, shall be deemed additional rent chargeable to Tenant.  Accounts for utilities and services that are designated herein as Tenant's obligation to pay shall remain in Landlord's name, with copies of bills sent to Tenant during the lease term. All costs required to be paid by Tenant directly to the service provider shall be paid as such within ten (10) days of Tenant's receipt of the bill for same. All costs required to be deducted from the utility and service deposit or from the security deposit, if any, shall be so deducted by Landlord as and when appropriate during the lease term so as to make timely payment of each such bill. Tenant shall comply with all governmental refuse and recycling laws applicable to the Premises.  In the event Landlord fails to pay any utility or service which prevents such utility or service from being provided to Tenant during the Lease Term, then Tenant may satisfy such payment and Landlord shall be obligated to reimburse Tenant accordingly.

3.  (a) SECURJTY DEPOSIT: On or before May 15, 2021, Tenant shall pay the amount of $28,000 to the order of <u>Landlord's Attorney</u> by bank/cashier's check drawn on a U.S. bank or by electronic wire

transfer, to be held as security by <u>Landlord's Attorney</u> in a segregated account, as required by law. The security deposit may not be used as payment of rent. It is expressly understood and agreed that Tenant's liability to perform the terms of this lease is in no way limited to the amount of the security deposit. Within forty-five (45) days following expiration of the lease term, <u>Landlord's Attorney</u> shall return the security deposit to Tenant, adjusted for any damages or outstanding bills, with copies of bills for any deductions from the security deposit. In no event shall Brown Harris Stevens be required to hold the security deposit or mediate any disputes with regards thereto.

(b) UTILITY and SERVICE DEPOSIT: On or before 5/15/21 [a4], Tenant shall pay the amount of $5,000 to the order of Landlord by bank/cashier's  check drawn on a US Bank or by electronic wire transfer to be held by landlord for the purposes of this paragraph. Unless otherwise specified herein, all  costs for utilities and services at the Premises that are required by this lease agreement to be paid by tenant shall be deducted from the utility and service  deposit by Landlord  during  the  term  of  the  lease  as and when necessary  to  make  the  payments of tenant herein. It is expressly understood and agreed that Tenant shall  remain  fully liable  for  the  payment  of  any and  all  costs for utilities and services incurred during the term of this lease that  exceed  the  amount  of said utility  and  service  deposit.   Within Forty-five days (45) following expiration of the lease term , Landlord shall return the remaining balance of the utility and service deposit, if any, to tenant. In no event shall  Brown Harris Stevens be required  to  hold  the  utility  and service deposit or mediate any disputes with regards thereto.

4.  CONDITION OF THE PREMISES: The Landlord shall deliver the Premises in clean condition, furnished as shown to Tenant, with all plumbing (including water supply and septic), heating and air conditioning, electrical and mechanical systems, equipment, machinery and appliances in  good  working order. The Landlord will provide sheets and towels for Tenant's use during the lease term. Tenant shall return the Premises at the end of the lease term in the same condition as received, subject only to reasonable wear and tear. Tenant agrees to make no alterations to the Premises, including but  not limited to moving within the Premises, or removing to storage, any of Landlord's furniture or furnishings without Landlord's express written consent. Tenant represents and warrants that it has examined the demised Premises, knows the condition thereof and the parties have agreed to escrow a portion of the lease proceeds for the purposes of making such repairs reasonably acceptable to Tenant upon an interim inspection on April 30, 2021 ("Interim Inspection") and then  subject to a final inspection by Tenant prior to, or upon the commencement of, the lease term thereby confirming that there have been no changes in the condition of the Premises and confirmed by Tenant's inspection prior to commencement of the Lease Term {"Final Inspection").  In the event the substantial repairs have not been made by the Interim Inspection then such date to make the corresponding lease payments shall be extended to allow reasonable time for Landlord to complete such repairs.  In the event the repairs are not complete by May 15, 2021 then Tenant has the right to take possession on the lease commencement date and shall receive an immediate reduction in rent equal to $7,692 per day (the "Rent Reduction Rate") until such time as all repairs have been completed to the reasonable approval by Tenant.

5.  NOTICE OF DEFECTS: Within seventy two (72) hours after taking possession of the Premises, Tenant shall notify Landlord in writing of any malfunction in equipment, breakage or damage, which existed at the Premises at the commencement of the term of the lease.

6.  REPAIRS: Landlord shall be responsible for all necessary repairs, except when a repair is required as a result of the fault or abuse of Tenant. Any fault or abuse by Tenant's family, guests, employees or invitees shall be deemed the fault or abuse of Tenant. In such a case of Tenant's fault or abuse requiring repair to the Premises, Tenant shall pay for such repair within ten (10) days of Tenant's receipt of a bill for same from Landlord. Tenant shall immediately notify Landlord or Landlord's agent of any condition requiring repair. No repair or alteration shall be made without written authorization from Landlord. If, through no fault or negligence of the Tenant, the Premises are damaged by fire or any other unavoidable casualty, Landlord shall make repairs within a reasonable a unit of time after

3

receiving notice of same. If such damage shall be so extensive as to render the Premises uninhabitable, the rent shall be apportioned and paid up to the date of such damage and any overpayment shall be refunded to Tenant whereupon this lease shall terminate.

7. TENANT LIABILITY /CONTENTS: Landlord shall not be responsible for (a) any injury, loss or damage to Tenant's contents or (b) any injury, loss or damage for which Tenant is liable or (c) a injury loss or damage suffered by Tenant, Tenant's family, guests, domestic employees or other invitees, unless caused by Landlord's gross negligence. Landlord shall not be liable for injury or damage to Tenant or any person who occupies or visits the Premises, nor shall Landlord be liable for damage to any such person's property unless the same results from Landlord's gross negligence. Tenant is responsible for all acts of Tenant's family, employees and persons Tenant invites onto the Premises. Tenant hereby indemnifies and holds Landlord harmless, to the extent permissible by law, including reasonable attorney's fees, from and against any liability, damage, expense, judgment, claim or other loss arising from Tenant's use and occupancy of t Premises, unless caused by Landlord's gross negligence.

8. SUBLET or ASSIGNMENT: Tenant may not sublet any part of the Premises and Tenant may not assign this lease.

9. TENANT'S DEFAULTS:

   A. Landlord may give five (5) days written notice to Tenant to correct any of the following defaults: (1) Failure to pay rent or security deposit or utility and service deposit on time except in the event of any extension for the payment of lease payments as provided for herein; (2) Improper assignment of the lease, subletting all or part of the Premises, or any violation of Paragraph I hereof; (3) Improper conduct by Tenant or other occupant of the Premises; or (4) Failure to fully perform any term in this lease agreement.

   B. If Tenant fails to correct any default in Section 9A within five (5) days of the notice stated in 9A above, Landlord may cancel the lease agreement by giving Tenant a written three (3) day notice s ting the date this lease agreement will terminate. On that date this lease and Tenant's rights in this lease shall automatically terminate and Tennant must immediately vacate the Premises and return the keys to Landlord. Thereafter, in addition to the accelerated rent, Tenant shall be liable to Landlord for the fair value of the use and occupancy of the Premises and all costs for utilities and services, from the date of termination until the date Tenant actually vacates the Premises. Tenant shall also be liable to Landlord for all expenses (including reasonable attorney's es), liability, damages and other loss incurred by Landlord arising out of or in connection with Tenant's breach or default under this lease agreement. If Landlord is required to bring any action or proceeding to enforce the terms of this lease agreement and/or to recover for any o Tenant's defaults, Landlord shall be entitled to recover reasonable attorney's fees from Tenant. Tenant hereby waives the right to a jury trial in any summary proceedings commenced by Landlord. Tenant hereby waives any counterclaims in any summary proceedings

4

commence by Landlord and fu1iher agrees not to attempt to join said summary proceedings with any other action or claim.

C. Notwithstanding the remedies available to Landlord under the terms of this ease agreement and by law, if Tenant's payment of rent becomes ten (10) days past due, Landlord may charge Tenant a late charge of five percent (5%) of the amount of the past due rent except in the event of any extension for the payment of lease payments as provided for herein.

I 0. ACCESS TO PREMISES: Tenant shall permit Landlord or Landlord's agent to inspect the Premises during reasonable daytime hours, including weekends, by prior appointment with twenty-four (24) hours advance written notice to Tenant. Landlord acknowledges that Tenant is entitled to quiet enjoyment of the Premises under the laws of New York State. Landlord owns the property immediately adjacent to the Premises at 376 Gin Lane, Southampton (the "Adjacent Property"). Landlord represents and warrants that it will not have construction and/or renovation work performed at the Adjacent Property other than quiet repair work inside the house and/or reasonable maintenance of the grounds of the Adjacent Property. In the event the Landlord breaches this provision, then the Tenant shall be entitled to Rent Reduction Rate for each day the violative condition exists.

II. LANDLORD'S AUTHORITY: Landlord hereby represents that Landlord is the sole owner of the Premises with due power and authority to enter into this lease agreement with Tenant.

12. BROKER: The parties acknowledge and agree that (a) Brown Harris Stevens is the broker that brought about the within transaction; (b) a ten percent (10%) commission on the total rent is due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of this lease agreement by all parties; (c) a ten percent (1 0%) commission on the total rent shall be due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of any extension or renewal of this lease agreement; and (d) if the subject Premises are sold to the tenant named herein, a 1.5% commission on the total sale price shall be due and payable in full by Landlord to Brown Harris Stevens. The parties acknowledge that Brown Harris Stevens may, under certain circumstances, work with the Landlord and Tenant to resolve disputes or other issues arising from, or pertaining to, this lease agreement; however, all parties expressly agree that Brown Harris Stevens shall not be liable to either party in connection with the condition of the Premises or the default of any of the terms of this lease agreement by either party and (the parties shall indemnify and hold harmless Brown Harris Stevensfrom and against and loss, liability or expense (including reasonable attorney's fees) arising from Brown Harris Steven's good faith efforts to resolve any such dispute between the parties.

13. LEAD-BASED PAINT/HAZARD DISCLOSURE: Only the section below marked shall apply to this lease agreement:

NOT       PLICABLE: LEASE TERM UNDER 100 DAYS.

14. ACCELERATION: In the event of a material default by Tenant, Landlord shall have

the right to accelerate all payments owed herein such that the entire outstanding balance of rent and any other amounts owed by Tenant shall become immediately due and payable in full to Landlord.

15. ENTIRE AGREEMENT: This agreement constitutes the entire agreement of the parties as to the subject matter hereof, and supersedes all prior discussions, negotiations and agreements, ether written or oral, between the parties with respect to the subject matter of this lease agreement.

16.                          MODIFICATION:   This lease agreement may not be modified except by a writing duly executed by all of the parties hereto.

17.                          SEVERABILITY:   A determination that any provision or provisions of this lease agreement is unenforceable or invalid shall not affect the enforceability or validity of any remaining provisions of this lease agreement.

18.                          DELIVERY OF LEASE:  No rights or obligations herein are conferred upon either party until both Landlord and Tenant have executed this lease agreement and a fully executed copy of this lease agreement has been delivered to both parties pursuant to the terms hereof.

19. NOTICES:  Any notice or communication under this lease shall be sent in writing via certified mail to the parties' respective addresses as listed above.

20. WAIVER: No assent, express or implied, by Landlord, to any breach of any of Tenant's covenants waiver of any succeeding breach of the same covenant or agreement.

21. PREPARATION OF LEASE AGREEMENT: Landlord and Tenant each hereby expressly acknowledge and agree that this lease agreement has been drafted as a service to Brown Harris Stevens only, and that both Landlord and Tenant have had the opportunity to consult their own individual attorneys with regards to their respective rights and obligations under this lease agreement and any applicable law, including but no limited to, the need for any permits, accounts or other arrangements necessary to fulfill their respective obligations and to protect their respective rights's further acknowledged that Brown Harris Stevensh as provided this lease agreement as a courtesy to the parties and that the drafter of this lease agreement does not represent the Landlord or the Tenant with regards to this lease agreement.

22. NO SMOKING: The parties hereby agree that Tenant shall not smoke on the Premises and that Tenant shall not permit any of domestic employees, guests or invitees to smoke anywhere on the Premises.

23. PETS: No Pets shall be allowed on the premises.

24. NO SPECIAL EVENTS. Tenant agrees not to cause or permit any special events including but not limited to weddings, photo shoots, and TV or movie filming, at the Premises without Landlord's prior written consent.

25. FUEL/PROPANE TANK FILL-UP: Prior to the commencement of the lease term, Landlord shall, at Landlord's sole cost and expense, fill the fuel/propane tank at the Premises to capacity for delivery of the leased Premises to the Tenant. Upon, n the expiration of the lease term, Tenant shall fill the fuel/propane tank at the Premises to capacity for the return of the leased Premises to the Landlord. All payments required of Tenant by the terms of

6

this paragraph shall be paid in accordance with the terms of Paragraphs 2.

**26. RENTAL PERMIT and/or REGISTRATION REQUIREMENT: Landlord and Tenant each hereby expressly acknowledge that if the**
subject premises is located within the jurisdiction of the Town of Southampton [Suffolk County Tax Map District 0900, *see Tax Map ID Number above* ], **the Town of East Hampton** [District 0300], **the Town of Southold** [District 1000], **the Town of Riverhead** [District 0600/0900], **the Village of Westhampton Beach** [District 0905], **the Village of Quogue** [District 0902], **the Village of Westhampton Dunes** [District 0907], **the Village of** North Haven [District 0901], the Village of Greenport [District 1001], the Village of Sagaponack [District 0908] or the Village of Dering Harbor [District 0701], **the town/village code of such municipality may require that a Rental Permit be obtained or the Premises be registered with said municipality, before the above-referenced premises may be legally occupied as rental property pursuant to this lease agreement. It is incumbent upon both Landlord to confirm with the respective municipality as to any relevant rental permit laws, registries and/or requirements. By initialing at the end of this paragraph 26, both Landlord and Tenant acknowledge receipt of this advisory, and hereby indemnify and hold harmless Brown Harris Stevens, the drafter of this lease and any real** estate **broker associated with this transaction, from and against any liability, damage, expense, judgment, claim or other loss arising from the failure to obtain a valid rental permit, registering with the relevant municipality or otherwise complying with any rental permit law, prior to causing, permitting or allowing the occupancy of the above- referenced premises as a rental property.**

**INITIAL HERE:** Type text here

27. SWIMMING POOL OPENING/CLOSING and MAINTENANCE: The parties agree that the Landlord shall, at Landlord's sole cost and expense, deliver the swimming pool and all related systems and equipment in good working order subject to, and in accordance with, the terms of paragraph 6 above. The swimming pool shall be opened for use prior to, and for the duration of, the lease term to be, in either event, paid for as set forth in paragraph ·. 2 above. If required by paragraph 2 above, professional pool maintenance shall occur no less than once per week (while the pool is open for use) during the lease term by a professional pool company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the swimming pool and all related systems and equipment in good working order, subject to reasonable wear and tear.

28. TENNIS COURT OPENING/CLOSING and MAINTENANCE: The parties agree that the Landlord shall, at Landlord's sole cost and expense, deliver the tennis court and all related equipment in good working order subject to, and in accordance with, the terms of paragraph 6 above. The tennis court shall be opened for use prior to and for the duration of the lease term to be, in either event, paid for as set forth in paragraph 2 above. If required by paragraph 2 above, professional tennis court maintenance shall

occur no less than once per week (while the tennis court is open for use) during the lease term by a professional tennis court maintenance company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the tennis court and all related equipment in good working order, subject to reasonable wear and tear.

29. MAID/CLEANING SERVICE: The entire interior of the house shall be cleaned twice per week during the lease term by a maid/cleaning service to be paid for as set forth in paragraph 2 above.

30. COUNTERPART SIGNATURES: This lease agreement may be executed in several counterparts, each of which shall be deemed an original, and

All such counterparts together shall constitute one and the same instrument; however, this lease agreement shall not be effective or enforceable against any party hereto until all parties have executed at least one counterpart of the lease and all parties have received a counterpart of all signatures.

31. FACSIMILE and/or SCAN/EMAIL SIGNATURES: The parties acknowledge and agree that this lease agreement may be executed by scan/email or facsimile delivery and that scanned/emailed and/or faxed signatures shall be deemed original signatures for the purposes of this lease agreement.

32. **NO INDOOR SPRINKLER SYSTEM: It is expressly acknowledged and agreed that there is not a "maintained and operative 'sprinkler system' in the leased premises." A "Sprinkler System" is a system of piping and appurtenances designed and installed in accordance with generally accepted standards so that heat from a fire will automatically cause water to be discharged over the fire area to extinguish it or prevent its further spread (Executive Law of New York, Article 6-C, Section 155-1(5)). This required disclosure is made pursuant to New York** Real Property Law Article 7, Section 231-A.

33. TENANT INSURANCE: Tenant shall at Tenant's expense maintain renter's insurance for the duration of this lease covering Tenant's possessions at the Premises as well as Tenant liability coverage in the amount of $500,000 while at the Premises. Tenant shall provide evidence of such insurance to Landlord upon demand for same.

34. CERTIFICATE OF ~~OCCUPANCY~~: Landlord represents and warrants that a valid Certificate of ~~Occupancy~~ exists for the Premises. Landlord shall provide a copy of such proof of insurance to Tenant prior to the commencement of the lease term.

*Insurance*          *Insurance*

This lease agreement has been executed by the parties hereto on the dates written below

**Brickchurch Enterprises Inc.,** *Landlord*

_____   Dated 03/18/2021   _____   Dated
Landlord by:                                  Tenant by:

8

**Exhibit 41:**

**Pools - Opening / Maintenance**

| | Weeding/Pruning Hours per job (edging, prep mulch) (Since last clean up not done) Inc. fertilizer | 366 Pool Opening (unit price) | 376 Pool Opening (unit price) | Weekly Cleaning 376 (unit price) | Weekly Cleaning 366 | (100 yards) Hours, units Hours, rope Hours per job |
|---|---|---|---|---|---|---|
| Big Blue Pools  2017 | | 550 | | 550 | 105 | |
| Whitefork (Chris)  2019 | | | | 100 | 105 | 400 |

**Exhibit 42:**

**Expenses on re-opening 366/#76 Gin Lane/ Louise Blouin**

| Item | Amount | Note |
|---|---|---|
| pool cleaning/opening | $500 | we pay when, we have rental |
| rental Dumpster | $650 | included in the clean up with insurance |
| Little Elves cleaning 366 | $4,159 | we pay  1200 with harald inside home clean up same amount of people and. Hours |
| Little Elves cleaning 376 | $6,000 | |
| tennis court prep | $2,091 | why open when, the season is. Finished |
| air conditioning service | $627.31 | why fix when no rental as we are preparing to remove the units |
| Plumber | $379.88 | fine |
| Optimum guest house | $626.00 | why have the internet when no one is. There |
| Dan Silberman AV | $627.31 | why have when no one is. There |
| laundry of previous linens | $211.00 | I have a cleaner when we open |
| cleaning supplies | $800 | we. Had some. In the main house cleaners come with their own as well |
| demo Tennis pavillion | $13,000 | was not to be touched insurance pays and we open if we rent. |
| grounds/hiring caretaker | $34,000 | was not authorize we use others suppliers from my list |
| water bill past due | $4,968 | you did not have to pay now as we were in a difficult situation they still have it. Running even with unpaid it was your choice |
| gas bill past due | $460.69 | |
| electric bill past due | $4,678 | fine |
| HARDY HEATING | $163 | fine |
| HARDY HEATING | $244 | fine |
| HaRDY heating | $2,272 | fine |
| National GRID | $819 | gaz  fine |
| Cable/Internet | $562 | we do not pay if not in use |
| Caretaker Nov Dec | $5,750 | the house is closed we have one person do the rounds  how can he take care as he is charging  34.000 we close house. And have someone. Do the rounds |
| Hardy Heating/plumb | $206 | |
| | $84,567 | |

**Exhibit 47:**

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:   Brick Church Enterprise
       366 Gin Lane
       Southampton, NY 11968


DATE:    4/13/2021

       **QUOTE**
       **50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH**
**PROJECT**

   -  Refurbish 4 gates for 366 Gin Lane

              Material   $   5,600.00
              Labor      $   8,640.00
                         $ 14,240.00

*Nathaniel should pay 50%.*

*$7,120*

*Carpentry around tennis pavillion done*

*interior painting is done*

*DONE Carpentry and painting around garbage area*

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
      366 Gin Lane
      Southampton, NY 11968


DATE:      5/8/2021

**ADDITIONAL WORK REQUESTED ON 366 GIN LANE PROPERTY**

**Shutters**
- Remove approximately 6 shutters from main house
- Paint removed shutters black color to match existing color
- Install shutters on guest house

|          |            |
|----------|------------|
| Material | $ 86.00    |
| Labor    | $ 480.00   |
|          | $ 566.00   |

**Deck**
- Sand entire deck near 366 pool area (underneath south upper deck)

|          |            |
|----------|------------|
| Material | $ 1,800.00 |
| Labor    | $ 2,100.00 |
|          | $ 3,900.00 |

**Lawn**
- Remove old grass from area around guest house entrance and main driveway grass square
- Purchase and put down new top soil
- Purchase new sod carpet and put down on the same area

    Labor and material $ 2,850.00

**376 Main Gate**

- Repair wood paneling and trim on main gate ( replace panels as necessary)
- Repair tops on the gate posts
- Paint entire gate black color

     Material  $ 4,650.00
     Labor    <u>$ 3,600.00</u>
              $ 8,250.00

### Maintenance

- Cut twice grass at 366 Gin Lane $ 160.00 per cut    ( 4/30 & 5/7)

     Labor    $ 320.00

### Deer Fence

- Purchase deer fence
- Install deer fence next to guess house beach walkway from the neighbor side

     Material  $ 1,100.00
     Labor    <u>$ 1,440.00</u>
              $ 2,540.00

### Outside Furniture

- Take out outside furniture from storage shed
- Prep and paint outside furniture
- Place outside furniture throughout 366 property only
- Take out cushions from basement
- Wash cushions and put on the furniture

     Total for labor and material $ 3,510.00

**There are no covers that I can find for outside furniture and they will have to be purchased separately**

### Driveway hole

- Fill driveway by garage with asphalt ( damage due to collapse)
  This is access from 376 Gin Lane

     Total for labor and material  1,200.00

### Mailbox

- Build new mailbox for 366 Gin Lane
- Place mail box on the opposite side of the street

Material    $ 600.00
Labor       $ 840.00
            $ 1,440.00

### Upper decks
- Power wash both upper decks on the guest house

Labor and material $ 680.00

### New Privet/New Trees and Bushes
- Purchase 26 privet 5 '- 6' tall and plant around 366 property and front of Gin Lane

Material    $ 2,054.00
Labor       $ 1,440.00
            $ 3,494.00

- Purchase 2 pine trees
- Plant pine trees next to the guest house beach walkway

Material    $ 1,200.00
Labor       $   980.00
            $ 2,180.00

- Purchase 6 hydrangea bushes and plant on the side of steps of the tennis court

Material    $ 1,800.00
Labor       $   600.00
            $ 2,400.00

### High Hats
- Replace 8 outside high hats located on garage door suffits

Material    $  520.00
Labor       $  900.00
            $ 1,420.00

### Access Doors
- Repair 2 access doors to the guest house pool
 ( one door in dining room and one in living room)

Labor and material $ 1,750.00

**<u>Flower Pots/Vegetable Garden</u>**
- Purchase ivy and white impatiens plants and plant in flower pots around 366 Gin Lane property
- Purchase herbs and vegetable plants and plant in the vegetable garden

| | |
|---|---|
| Material | $ 1,700.00 |
| Labor | <u>$ 1,440.00</u> |
| | $ 3,140.00 |

**Amount due for all labor and material $ 39,640.00**

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:     4/25/2021

           **INVOICE**


-     Refurbish 4 gates for 366 Gin Lane

        Material     $ 5,600.00
        Labor        <u>$ 8,640.00</u>
                 $ 14,240.00


**Total                    $ 14,240.00**
**Less: Deposit Received $  7,120.00**

**Amount Due $ 7,120.00**

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:      4/25/2021

### INVOICE

### Spring Cleanup

- Weed all flower beds
- Perform edging around flower beds
- Cut back perennials
- Weed guest house driveway
- Disposal of all debris
- Put down natural brown mulch on all beds previously mulched

      Labor and material $ 15,000.00

### Lawn Care

- Cut lawn (first cut for the year)
- Aerate lawn
- Reseed lawn and apply lime and starter fertilizer

      Labor and material $ 4,100.00

### Hedge and Shrub Trimming - 1 occurrence (366 Gin Lane only)

- Trim boxwood and privet to maintain shape

      Labor and material $ 3,750.00

### Tree and Shrubs

- Purchase and apply fertilizer on all shrubs and privet

  Labor and material $ 2,500.00

**Total $ 25,350.00**
**Less: Deposit Received $ 15,975.00**

**Amount Due $ 9,375.00**

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
      366 Gin Lane
      Southampton, NY 11968


DATE:      5/20/2021

   **ADDITIONAL WORK REQUESTED ON 366 GIN LANE PROPERTY**

   **Irrigation System**

- Checked sprinkler system
- Replaced approx. 86 sprinkler heads and around 400 feet of drip hose where necessary
- Repaired leaks
- Repaired old cracked pipes around the property as necessary (cracks due to no winterization)

   Total for labor and material $ 8,950.00

** The sprinkler system was not winterized and the pipes are weak.  There might be more issues with crack pipes later on and they will need to be replaced on as need basis.**


   **Access Doors - Upstairs**

- Repaired in each of four bedrooms one access door to the upstairs balcony  (one door in each bedroom)

   Total for labor and material $ 2,700.00

   **Bali Bed**

- Removed bushes and prepared area next to guest house beach access for Bali Bed

Total for labor and material $ 2,300.00

**<u>Maintenance</u>**

- Cut  grass at 366 Gin Lane on 5/18 - $ 160.00
- Cut grass field at 376 Gin Lane on 5/18 - $ 120.00
  (As per discussion with Chris Brown kids will use field to play sports)
- Weed maintenance of 366 Gin Lane - $ 600.00

**Total Due $ 14,830.00**

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:   Brick Church Enterprise
        366 Gin Lane
        Southampton, NY 11968


DATE:      4/2/2021

**QUOTE**
**50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH**
**PROJECT**


-  Repair of beach stairs at 366

| | |
|---|---|
| Material | $ 2,800.00 |
| Labor | <u>$ 1,980.00</u> |
| | $ 4,780.00 |

**<u>WHITE FORK CONSTRUCTION INC.</u>**

7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
       366 Gin Lane
       Southampton, NY 11968


DATE:      4/2/2021

**QUOTE
50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH
PROJECT**


-  Paint hallway on main level of 366 Gin Lane (damage due to removing
paintings)

| | | |
|---|---|---|
| Material | $ | 980.00 |
| Labor | $ | 2,160.00 |
| | $ | 3,140.00 |

**<u>WHITE FORK CONSTRUCTION INC.</u>**

7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
        366 Gin Lane
        Southampton, NY 11968


DATE:      4/2/2021

**QUOTE**
**50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH PROJECT**


- Install new panelling on garbage container
- Build new doors for the garbage container
- Paint entire garbage container with black paint

Material  $ 2,450.00
Labor     <u>$ 2,100.00</u>
          $ 4,550.00

## **WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:    4/13/2021

         **QUOTE**
         **50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH**
**PROJECT**


   -  Refurbish 4 gates for 366 Gin Lane

        Material  $   5,600.00
        Labor     $   8,640.00
                  $ 14,240.00

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
       366 Gin Lane
       Southampton, NY 11968


DATE:     4/2/2021

   **QUOTE**
   **50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH**
**PROJECT**

       TENNIS AREA

   -  Build decorative covers for metal posts

       Material   $  1,840.00
       Labor      $  1,920.00
                  $  3,760.00

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:    4/13/2021

- Spackled all holes and uneven areas on all  main level hallway walls
- Primed and painted entire hallway

| | |
|---|---|
| Material | $    980.00 |
| Labor | $  2,160.00 |
| | $  3,140.00 |
| Deposit Received | $  1,570.00 |
| **Amount Due** | $  1,570.00 |

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
       366 Gin Lane
       Southampton, NY 11968


DATE:     4/13/2021


- Installed new panelling on garbage container
- Built new top covers
- Stained entire garbage container with black paint

| | |
|---|---|
| Material | $ 2,450.00 |
| Labor | $ 2,100.00 |
| | $ 4,550.00 |
| Deposit Received | $ 2,275.00 |
| **Amount Due** | $ 2,275.00 |

## WHITE FORK CONSTRUCTION INC.

7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net

TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968

DATE:    4/18/2021

### QUOTE for 366 GIN LANE

### 50% DEPOSIT REQUIRED BEFORE COMMENCEMENT OF EACH PROJECT

#### Spring Cleanup

- Weed all flower beds
- Perform edging around flower beds
- Cut back perennials
- Weed guest house driveway
- Disposal of all debris
- Put down natural brown mulch on all beds previously mulched

    Labor and material $ 15,000.00

#### Lawn Care

- Cut lawn (first cut for the year)
- Aerate lawn
- Reseed lawn and apply lime and starter fertilizer

    Labor and material $ 4,100.00

#### Hedge and Shrub Trimming

- Trim boxwood and privet to maintain shape

- Two occurrences per season

　　　Labor and material $ 7,500.00

**Lawn**

- Remove old grass from area around front guest house entrance and main driveway grass square
- Purchase and put down new top soil
- Purchase new sod carpet on put down on the same areas

　　　Labor and material $ 2,850.00

**Tree and Shrubs**

- Purchase and apply fertilizer on all shrubs and privet

　　　Labor and material $ 2,500.00

**Total $ 31,950.00**

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:     4/25/2021

        **INVOICE**


-   Power wash wood columns and lattice around entire tennis court
-   Prep tennis court fence for stain application
-   Cut overgrown privet as necessary around tennis court parameters
-   Stain entire fence around tennis court with duration solid black color


        Material  $ 2,800.00
        Labor      $ 4,500.00
                 $ 7,300.00

**Amount Due $ 7,300.00**

**WHITE FORK CONSTRUCTION INC.**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
     366 Gin Lane
     Southampton, NY 11968


DATE:     4/25/2021

           **INVOICE**


     -    Replacement of garden privet
     -    Purchase and plant approximately 40 privet hedges


          Material   $ 5,530.00
          Labor      $ 4,320.00
                     $ 9,850.00

     **Amount Due $ 9,850.00**

**<u>WHITE FORK CONSTRUCTION INC.</u>**
7 Lily Pond Lane
Eastport, NY 11941
Tel: 516-445-7369
whitefork@optonline.net


TO:  Brick Church Enterprise
      366 Gin Lane
      Southampton, NY 11968


DATE:    4/13/2021


      TENNIS AREA

    -  Built decorative covers for metal posts
    -  Primed and stained decorating covers

| | |
|---|---|
| Material | $ 1,840.00 |
| Labor | <u>$ 1,920.00</u> |
| | $ 3,760.00 |
| Deposit Received | <u>$ 1,880.00</u> |
| **Amount Due** | **$ 1,880.00** |

**Exhibit 48:**

**RACHEL LYNCH SWIMMING POOLS & SPAS, INC.**

**375 David Whites Lane**
**Southampton, NY 11968**
(631) 283-0820
www.rachellynch.com
**JOB ESTIMATE**

**DATE:**  April 1, 2021

**CLIENT:** Ms. Anne Prosser
C/O BHS
445 Park Avenue
New York, New York 10022

**RE:  366 GIN LANE RESIDENCE SHV  SWIMMING POOL RENOVATION ESTIMATE**

Dear Ms. Prosser,

**Rachel Lynch Pools of Southampton** is pleased to submit following cost estimate for the gunite swimming pool renovation work at the above referenced job location.

**NEW SWIMMING POOL TILE:**
Jackhammer off existing swimming pool tile. Prepare concrete surfaces and flash patch in preparation for  tile installation.
Install new  6" x 6" or  6" x 12"  tile we stock or equivalent.   Construction debris will be hauled away to proper recycling facility.
**TOTAL FOR NEW POOL TILE**                                                                         $  7,800.00

**MARBLEDUST SWIMMING POOL:**
Drain pool.  Saw cut around all  fixtures in preparation to receive new marbledust surface. Clean and power wash pool  surface and apply Bond Kote.  Remarbledust pool  Shade of Gray TBD  to match existing steel trowel to ultra smooth finish.
**TOTAL FOR MARBLEDUST POOL:**                                                               $ 15,900.00

**NEW MARBLEDUST START UP:**
As per National Plasters Council (NPC) guidelines for proper curing, pool /spa finish needs to be brushed up to two times per day for a minimum of two weeks and until the chemicals are properly balanced and water is clear.  Heat and salt are not recommended for 30 days.  *This is in addition to the normal pool/spa service contract previously sent to you.*
**TOTAL FOR START UP:**                                                                            $  1,450.00

**LIFT AND REST LOOSE COPING/REGROUT ALL MISSING COPING JOINTS**          $  1,250.00

**TOTAL FOR THE ABOVE**                                                                             $26,400.00

**PAYMENT SCHEDULE:**
$    **11,900.00**  Due upon Signing
$    **11,900.00**  Due upon marbledust prep, coping repair
$      **2,600.00**  Due upon Completion

==ADDITIONAL==
**DEWATERIZATION:**
If ground water condition exists, there will be an **additional charge of $3,800.00 per foot of ground water encountered**.  This would include the cost of weep lines, hydrostatic relief valves and crushed stone.

**PLEASE NOTE:**

*If any unforseen hollow spots are found, removal and patching will be billed on a time and material basis **at $175 per hour for a two man crew plus materials**. If the gunite/concrete pool beam and/or structure under marbledust is found to be deteriorated and in non-repairable condition, the cost to rebuild such damage will be additional.  All material is guaranteed to be as specified.  All work to be completed in a workmanlike manner according to standard practices.  Any alteration or deviation from above specifications involving extra cost will be executed only upon written orders and will become an extra charge over and above the estimate. Rachel Lynch, Inc will look to the owner for the payment of work completed in a timely manner and will not proceed from one completed phase of construction to the next until such payment has been received   Manufactures parts are guaranteed for a period of one (1) year from the installation date.*

**Authorized Signature _____**
**John Rachel**

**Acceptance of Proposal –** The above prices, specifications and conditions are satisfactory and are hereby accepted.  You are authorized to do the work as specified.  Payment will be made as outlined above.

**Date of Acceptance _____**                    **Signature _____**

*Void after 30 days of non-acceptance*

# RACHEL LYNCH SWIMMING POOLS & SPAS, INC.

375 David Whites Lane
Southampton, NY 11968
(631) 283-0820
www.rachellynch.com
**JOB ESTIMATE**

**DATE:** April 1, 2021

**CLIENT:** Ms. Anne Prosser
C/O BHS
445 Park Avenue
New York, New York 10022

**RE: 366 GIN LANE RESIDENCE SHV SWIMMING POOL RENOVATION ESTIMATE**

Dear Ms. Prosser,

**Rachel Lynch Pools of Southampton** is pleased to submit following cost estimate for the gunite swimming pool renovation work at the above referenced job location.

**NEW SWIMMING POOL TILE:**
Jackhammer off existing swimming pool tile. Prepare concrete surfaces and flash patch in preparation for tile installation. Install new 6" x 6" or 6" x 12" tile we stock or equivalent. Construction debris will be hauled away to proper recycling facility.
**TOTAL FOR NEW POOL TILE** $ 7,800.00

**MARBLEDUST SWIMMING POOL:**
Drain pool. Saw cut around all fixtures in preparation to receive new marbledust surface. Clean and power wash pool surface and apply Bond Kote. Remarbledust pool. Shade of Gray TBD to match existing steel trowel to ultra smooth finish.
**TOTAL FOR MARBLEDUST POOL:** $ 15,900.00

**NEW MARBLEDUST START UP:**
As per National Plasters Council (NPC) guidelines for proper curing, pool /spa finish needs to be brushed up to two times per day for a minimum of two weeks and until the chemicals are properly balanced and water is clear. Heat and salt are not recommended for 30 days. *This is in addition to the normal pool/spa service contract previously sent to you.*
**TOTAL FOR START UP:** $ 1,450.00

**LIFT AND REST LOOSE COPING/REGROUT ALL MISSING COPING JOINTS** $ 1,250.00

**TOTAL FOR THE ABOVE** $26,400.00

**PAYMENT SCHEDULE:**
$ 11,900.00 Due upon Signing
$ 11,900.00 Due upon marbledust prep, coping repair
$ 2,600.00 Due upon Completion

**ADDITIONAL**
**DEWATERIZATION:**
If ground water condition exists, there will be an **additional charge of $3,800.00 per foot of ground water encountered.** This would include the cost of weep lines, hydrostatic relief valves and crushed stone.

**PLEASE NOTE:**

**LAW OFFICES OF NATHANIEL MULLER PC**
IOLA ACCOUNT
1-8-210    1827
04/07/2021

Pay to the order of Rachel Lynch Swimming Pools & SPA inc. $ 11,900

Eleven Thousand Nine Hundred only

**citibank**
CITIBANK, N.A.
FIFTH AVENUE AT 27TH STREET
NEW YORK, NY 10016

for 366 GIN LANE

⑆021000089⑆ 9995779884⑈ 1827

# RACHEL LYNCH SWIMMING POOLS & SPAS, INC.

375 David Whites Lane
Southampton, NY 11968
(631) 283-0820
www.rachellynch.com
**JOB ESTIMATE**

**DATE:** April 1, 2021

**CLIENT:** Ms. Anne Prosser
C/O BHS
445 Park Avenue
New York, New York 10022

**RE: 366 GIN LANE RESIDENCE SHV  SWIMMING POOL RENOVATION ESTIMATE**

Dear Ms. Prosser,

**Rachel Lynch Pools of Southampton** is pleased to submit following cost estimate for the gunite swimming pool renovation work at the above referenced job location.

**NEW SWIMMING POOL TILE:**
Jackhammer off existing swimming pool tile. Prepare concrete surfaces and flash patch in preparation for tile installation. Install new 6" x 6" or 6" x 12" tile we stock or equivalent. Construction debris will be hauled away to proper recycling facility.
**TOTAL FOR NEW POOL TILE:** $ 7,800.00

**MARBLEDUST SWIMMING POOL:**
Drain pool. Saw cut around all fixtures in preparation to receive new marbledust surface. Clean and power wash pool surface and apply Bond Kote. Remarbledust pool Shade of Gray TBD to match existing steel trowel to ultra smooth finish.
**TOTAL FOR MARBLEDUST POOL:** $ 15,900.00

**NEW MARBLEDUST START UP:**
As per National Plasters Council (NPC) guidelines for proper curing, pool /spa finish needs to be brushed up to two times per day for a minimum of two weeks and until the chemicals are properly balanced and water is clear. Heat and salt are not recommended for 30 days. *This is in addition to the normal pool/spa service contract previously sent to you.*
**TOTAL FOR START UP:** $ 1,450.00

**LIFT AND REST LOOSE COPING/REGROUT ALL MISSING COPING JOINTS** $ 1,250.00

**TOTAL FOR THE ABOVE** $26,400.00

**PAYMENT SCHEDULE:**
$  11,900.00 Due upon Signing
$  11,900.00 Due upon marbledust prep. coping repair
$   2,600.00 Due upon Completion

**ADDITIONAL**
**DEWATERIZATION:**
If ground water condition exists, there will be an additional charge of $3,800.00 per foot of ground water encountered. This would include the cost of weep lines, hydrostatic relief valves and crushed stone.

**PLEASE NOTE:**



a two man
-repairable
leted in a
will be
the owner
xt until such

pted. You

LAW OFFICES OF NATHANIEL MULLER PC
IOLA ACCOUNT

1-6-210

1801

05/04/2021

Pay to the order of  Rachel Lynch Swimming Pools & SPA's  $ 11,900—

Eleven Thousand Nine Hundred only ———— dollars

**citibank**
CITIBANK, N.A. SW #97
FIFTH AVENUE AT 37TH STREET
NEW YORK, NY 11016

for  366 GIN LANE

⑆021000089⑆ 99957798884⑈ 1801

# RACHEL LYNCH POOLS & SPAS INC.

**375 DAVID WHITES LANE**
**SOUTHAMPTON, NY  11968**
Phone: 631-283-0820
Fax:    631-283-3640

## Invoice

| Date | Invoice # |
|------|-----------|
| 5/21/21 | 10394 |

| Bill To |
|---------|
| Ms. Anne Prosser |
| c/o BHS |
| 445 Park Avenue |
| New York NY  10022 |

| Ship To |
|---------|
| 366 Gin Lane |
| Southampton Village, NY  11968 |

| Description | | Amount |
|-------------|---|--------|
| Due Upon Completion | | $ 2,600.00 |
| | | |
| Additional to Contract: | | |
| Pressure Test All Pool Lines | | $    450.00 |
| Installed New Set of Filter Cartridges | | $ 1,250.00 |
| Jackhammer and Remove Excess Hollow Spots | | $ 2,400.00 |
| **Subtotal** | | $ 6,700.00 |
| | | |
| | | |
| **Balance Due** | | $ 6,700.00 |

**Exhibit 49:**



**ESTIMATE**
EST0026

**DATE**
04/01/2021

**TOTAL**
USD $16,000.00

# Blue house home improvement

Javier Luna
Po box 284 Hampton bays
NY, 11946
631) 2762800
bluehousehomeimprove@gmail.com

**TO**

## Anne Prosser

40 East 68th St, Apt. 4C New York NY 10065
9177108686
anneprosser60@gmail.com

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| **Exterior painting job**<br>**At 376 Gin ln**<br>**Southampton, NY 11968** | $16,000.00 | 1 | $16,000.00 |
| **Exterior Columns and railings**<br>**Exhaustive cleaning**<br>**Sending and properly preparation**<br>**Premier**<br>**2 coats of finish exterior paint** | | | |
| **Deposit of $8000**<br>**2 payments of $4000**<br>The materials are include in this estimate for this job<br>The job will start son as we receive the deposit and the job move forward upon receive the payments on time | | | |

| | **TOTAL** | USD $16,000.00 |
|---|---|---|

Any change or alteration of the estimate of this job will be
extra work and will be made by extra payment



# Blue house home improvement

Javier Luna
Po box 284 Hampton bays
NY, 11946
631) 2762800
bluehousehomeimprove@gmail.com

**ESTIMATE**
EST0036

**DATE**
05/01/2021

**TOTAL**
USD $5,600.00

**TO**

## Brickchurch enterprise llc

366 Gin lane
Southampton NY, 11946
9177108686
anneprosser60@gmail.com

| DESCRIPTION | RATE | QTY | AMOUNT |
|---|---|---|---|
| Exterior painting house | $5,600.00 | 1 | $5,600.00 |
| - sofets and facias from the corner of the garage door north of the house till corner of the back porche, southwest side of the house<br>- trim around the garage door north | | | |

| | TOTAL | USD $5,600.00 |
|---|---|---|

Any change or alteration of the estimate of this job will be
extra work and will be made by extra payment

**Exhibit 50:**

# FAIRFIELD

## INTEGRATED SYSTEMS

**YOU'VE WORKED HARD TO GET HERE, LET US TAKE CARE OF THE REST**

# 366 Gin

## Chris Brown

**366 Gin Ln**
**Southampton, NY 11968–5077 US**

# PROPOSAL

Modified:    4/8/2021

# FAIRFIELD
## INTEGRATED SYSTEMS

## About Us

We are a Greenwich, CT based automation company, working on prestigious projects primarily in Greenwich, NYC and the Hamptons.

## What We Do

Our team has a wealth of experience in the design, installation and calibration of the very best automation systems available. Underlying our dedication to providing the very finest automation systems possible is our love of technology, film and music. All of our team members are highly qualified and we hold industry certifications for the proper design and correct installation of all things technological.

## How We Can Help You

We are able to demonstrate and design a wide range of systems to get a personalised system to your particular specifications. We pride ourselves on being able to work on a one-to-one basis with clients, interior designers and architects on projects large or small.

### How We Work

### Project Process & Payment Scheme

1. Initial client meeting.

2. Proposal prepared to within 5% +/- of final contract price (excluding client revisions).

3. Client proposal presentation.

4. Design work completed and price fixed to within 5% +/- of proposal.

5. Client to sign project contract, deposit as stated in contract required before any parts are ordered.

6. We supply and install (where applicable) 1st fix cabling to site.

7. Once cables are installed we commence 2nd fix work.

8. Second payment installment required.

9. We commence final installation, commissioning & programming.

10. We hand over project practical completion payment required from client.

11. Maintenance & support contract begins, free of charge for 1 year from completion.

## Your Proposal

Following on from our initial meeting we have prepared our interpretation of your requirements and set them out within this proposal as follows:

* Price Includes Accessories

# Main Equipment



1   **Domotz XRM-DTZ1**
Domotz Box



1   **Episode WB-OVRC-UPS-1500-1**
UPS Battery Pack for IP Power Conditioners | 1500 VA



1   **IC Realtime NVR-FX16POE-1U4K1-4TB**
16 CH. EMBEDDED 4TB 240/240FPS ENHANCED H.264 1U CASE 16 POE PORTS
BUILT IN



1   **Savant SVR-5100S-00**
SAVANT PRO HOST + License



4   **Sonos AMPG1US1BLK**
Amp (Black)



1   **Ubiquiti Networks UDM-PRO**
All-in-one enterprise security gateway & network appliance for small to
medium-sized businesses

\* Price Includes Accessories

 1    **WattBox WB-800-IPVM-12**
800 Series IP Power Conditioner – 12 Individually Controlled & Metered
Outlets

| **Main Equipment Total** | **$9,408.60** |
|---|---|

## Gate

 1    **2N 01351-001**
2N IP FORCE/SAFETY-GOOSENEK

 1    **2N DOR-HDSMKB-00**
Heavy duty surface mount gate station with keypad – black

| **Gate Total** | **$2,199.00** |
|---|---|

\* Price Includes Accessories

# Theater



1    **Apple IPAD MINI 64GB WIFI [SILVER]**
7.9 Inch iPad Mini with Wi-Fi – 64GB – Silver



1    **iPort LAUNCH AM.2 SLEEVE BUTTONS 434 Mhz – BLACK**
LAUNCH AM.2 SLEEVE BUTTONS 434 Mhz works with iPad Mini 4  and iPad
Mini 5th Gen (Covers Microphone on 5th Gen) – Black



1    **iPort LAUNCH BASESTATION – BLACK**
Base station charger for iPad – Black



1    **Savant REM-4000SG-00**
Remote X2 space gray

| Theater Total | $1,580.00 |
|---|---|

* Price Includes Accessories

# Gym



1    **Apple IPAD MINI 64GB WIFI [SILVER]**
7.9 Inch iPad Mini with Wi-Fi – 64GB – Silver



1    **iPort LAUNCH AM.2 SLEEVE BUTTONS 434 Mhz – BLACK**
LAUNCH AM.2 SLEEVE BUTTONS 434 Mhz works with iPad Mini 4  and iPad Mini 5th Gen (Covers Microphone on 5th Gen) – Black



1    **iPort LAUNCH BASESTATION – BLACK**
Base station charger for iPad – Black



1    **Savant REM-4000SG-00**
Remote X2 space gray

| Gym Total | $1,580.00 |
|---|---|

# Exterior



2    **IC Realtime IPFX-B40V-IRW2**
4MP IP Indoor/Outdoor Mid Size Bullet

| Exterior Total | $880.00 |
|---|---|

* Price Includes Accessories

| Project Subtotal: | $15,647.60 |
|---|---|

* Price Includes Accessories

# PROJECT SUMMARY

| | |
|---|---|
| Equipment: | $19,247.00 |
| Discount: | ($3,599.40) |
| Labor: | $6,600.00 |
| Sales Tax: | $1,349.61 |
| **Grand Total:** | **$23,597.21** |

Client:      **Chris Brown**                                                    **Date**

Contractor:    **Fairfield Integrated Systems**                          **Date**



**Exhibit 51:**

**From:** Charles H. Wallshein <cwallshein@wallsheinlegal.com>
**Sent:** Friday, April 29, 2022 7:35 pm
**To:** Louise Blouin
**Subject:** Re: 366 - Brown / Prosser - Electricity

No.

On Fri, Apr 29, 2022 at 1:32 PM Louise Blouin <lt@ltbholding.com> wrote:
Was this done

Get Outlook for iOS

---

**From:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Sent:** Friday, February 18, 2022 7:06:45 PM
**To:** Charles H. Wallshein <cwallshein@wallsheinlegal.com>
**Cc:** Louise Blouin <lt@ltbholding.com>
**Subject:** 366 - Brown / Prosser - Electricity


Dear Charlie,


Do you mind sending demand letters to both Chris Brown and Anne Prosser for the following amounts, for unpaid electricity bills in advance and during the tenancy.


| | | |
|---|---|---|
| Amount owed to LB due to lack of payment by CB | | 5777.87 |
| Amount Owed to LB after AP reimbursement | | 4616.48 |
| | **Total due LB** | **10,394.35** |


CB simply didn't pay electricity during the tenancy; Prosser claimed that she paid electricity in 2019 for 4,678, however the only payment close to this number was on 05/17/2019 for 4,616.48, which was reversed one week later.

AP still claimed this amount to Louise, which was paid to her out of the proceed of the CB rent.

The amounts are not large but they add up, and our claim is valid. It is good to get a few dollars in the door.

Many thanks,

Mathew

**Exhibit 52:**
**From:** Louise Blouin <lt@ltbholding.com>
**Date:** Saturday, 10 July 2021 at 19:35
**To:** Mathew Kabatoff <mkabatoff@ltbholding.com>, Anne Prosser
<APROSSER@bhsusa.com>, cbrown@gemny.com <cbrown@gemny.com>, 'Frank J.
Romano' <frank@fjromano.com>
**Subject:** Re: 376 Gate Code
mr brown you just came on my property 376 gin lane and tried to hire my staff again
and told them that you would pay them cash after ruining chris with anne
stay away from my staff and I hope you did not bribe rosa as well I told you to not hire my staff in my
back you have done this with anne up 369 000 and now you want to steal other people
enough is enough
please answer if you changed my access to the property 376 gin lane and fast as the police will come
again .

**Exhibit 53:**

**From:** Chris Brown <cbrown@gemny.com>
**Date:** Thursday 3 June 2021 at 23:00
**To:** Louise <lt@ltbholding.com>, Louise <lb@ltbholding.com>
**Cc:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** RE: 366 Gin Lane

Of course, let me know Amada and Rosa's availability , and I will be pleased to take them when they are
not being utilized at 376 Gin Lane. ( aside from unethical, poaching one's staff is bad karma. You have
my word we will not poach them). On a separate note, I was very clear with Anne that she needed to
pay Harold Grant a fee, as he was the broker that originally showed me the home.

**Exhibit 55:**
**From:** Lea Toulouse
**Sent:** Wednesday, July 21, 2021 3:43 PM
**To:** Chris Brown <cbrown@gemny.com>

**Cc:** Anne Prosser <APROSSER@bhsusa.com>; Louise Blouin <lt@ltbholding.com>
**Subject:** 366 Gin Lane - Property Visit - Sunday July 25 - 16h00 EST

Dear Mr. Brown,

On behalf of Mrs. Blouin, I wanted to thank you for allowing access to both Excelsior and the restoration company, in order to address the persistent leak in the gym area at 366 Gin Lane. I do trust that Excelsior has done a professional job and that there will be no further issues for the duration of your stay.

Mrs. Blouin wishes to inform you that there will be a home visit at 366 Gin Lane on Sunday, July 25 at 16h00, for approximately 45 min. This is the same individual who attempted to gain access last July 12.

I do apologize for the timing and any inconvenience that it may cause; however, this is the only time possible since a 2.5 hr journey must be performed to reach the property.

Thank you for your understanding.

Sincere regards,
Lea Toulouse


**Exhibit 56:**

**From:** Chris Brown <cbrown@gemny.com>
**Sent:** Monday, July 12, 2021 3:18:02 PM
**To:** Louise Blouin <lt@ltbholding.com>; Anne Prosser <APROSSER@bhsusa.com>
**Subject:** Re:

No notice was given by Lea. Read the lease

Sent from my BlackBerry 10 smartphone.

**….**
**From:** Chris Brown <cbrown@gemny.com>
**Sent:** Monday, July 12, 2021 3:15:01 PM
**To:** Louise Blouin <lt@ltbholding.com>; Anne Prosser <APROSSER@bhsusa.com>
**Subject:** Re:

All emails and texts have been forwarded to our legal and you will be receiving a letter today. As discussed, please read the lease re any access and 24 hour notice. No access will be given otherwise.

Sent from my BlackBerry 10 smartphone.

**Exhibit 58:**





**Exhibit 59:**

**From:** Chris Brown <cbrown@gemny.com>
**Date:** Monday 7 June 2021 at 16:42
**To:** Louise <lt@ltbholding.com>
**Subject:** RE: 366 Gin Lane

BTW- small world. I have known Brett Cohen from JGB for 20 years. A real piece of work.


Chris Brown
GEM
9 West 57th Street, 49th Floor
New York, NY  10019
Tel:  212 582 3400
Fax:  212 265 4035
Email:  cbrown@gemny.com


**Exhibit 60:**
**From:** Chris Brown <cbrown@gemny.com>
**Sent:** Friday, June 25, 2021 1:15:00 AM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re: 366 Gin Lane

Good evening. Can we chat re JGB Capital?

Sent from my Blackberry 10 smartphone.

**Exhibit 62:**
**From:** Charles Wallshein <cwallshein@wallsheinlegal.com>
**Date:** Tuesday 23 February 2021 at 12:15
**To:** Louise <lb@ltbholding.com>
**Subject:** Anne Prosser Representation at BHS

Louise,
Anne is licensed at Brown Harris Stevens and must represent you as a broker per tenants wishes and the company must receive the standard fee of 10%.
She is willing to throw in another 5,000 (on top of 10,000 already pledged) of monies to be repaid to her which will go into escrow account to be put into work on the house this spring and summer.

**Exhibit 63:**

**From:** Charles Wallshein <cwallshein@wallsheinlegal.com>
**Date:** Tuesday 28 June 2022 at 17:33
**To:** Mathew Kabatoff <mkabatoff@ltbholding.com>, Louise <lt@ltbholding.com>
**Subject:** Fwd: RE- 366 & 376 Gin Lane (JGB PARTNERS, LP et al v. BRICKCHURCH ENTERPRISES, INC. et al)


---------- Forwarded message ---------
From: **Sara Burack** <Sara@nestseekers.com>
Date: Wed, Jun 8, 2022 at 1:14 PM
Subject: Re: RE- 366 & 376 Gin Lane (JGB PARTNERS, LP et al v. BRICKCHURCH ENTERPRISES, INC. et al)
To: cwallshein@wallsheinlegal.com <cwallshein@wallsheinlegal.com>
Cc: Geoff Gifkins <geoffg@nestseekers.com>


Hi Charles,

It was a pleasure speaking with you, thank you for taking my call.    I have a client that is interested in purchasing the property your client owns on Gin Lane in Southampton.   I understand there is some pending litigation with the current owner.

 I thought you may be able to help or lead me into the right direction of what we would need to do to facilitate the quickest and easiest transaction possible.

I can be reached via email or at 917-246-8354 and have included our regional manager on this thread.

I look forward to hearing from you!

Best,


**Sara Burack** | L censed Rea  Estate Adv sor
REBNY Member, LIBOR Member & Cert f ed Negot at on Expert (CNE), FL
**Nest Seekers Intl. - Ultra Luxury & Commercial Brokerage Division**
Manhattan | Hamptons | Pa m Beach | M am  | Bever y H  s | Greenw ch |
Long Is and | Brook yn | New Jersey | London | Westchester |
Mob  e: 917 246 8354     nstagram: @saraburack
e: sara@nestseekers.com  w: www.nestseekers.com
p: www.saraburack.com
2020 & 2021 Top 3 Nest Seekers Hamptons Agent w th 300 + transact ons
The Team w th #1 H ghest So d 2021 Hamptons Transact on
Featured on Netf x's M  on Do ar Beach House #M  ondo  arbeachhouse

**Exhibit 64:**
**From:** Charles Wallshein <cwallshein@wallsheinlegal.com>
**Date:** Friday 16 July 2021 at 14:36
**To:** Mathew Kabatoff <mkabatoff@ltbholding.com>, Louise <lt@ltbholding.com>
**Subject:** Re: Brickchurch / JGB - Index No.

Matt & Louise,

Index No. 623208/2019 Suffolk County

Status: the Court granted the bank's motion for a default. A referee to compute has been appointed. I appeared.
I have not received any correspondence from the plaintiff regarding the referee's hearing. THe referee is  supposed to serve me with the documents needed to get a judgment. this has not happened. so I think you are safe for at least six months.
Second, I had a unofficial proposal concerning the house. The tenant wants to buy the JGB note and take the cottage house. He will release the big house from the JGB lien. THis would leave the big house subject only to the Morgan Staney mortgage. Thats a good deal. I have a feeling that JGB is looking to get its money back sooner rather than later. Its not an official offer.

…
**From:** Charles H. Wallshein <cwallshein@wallsheinlegal.com>
**Sent:** Monday, September 27, 2021 2:43:15 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re:

louise,
i have not seen the order appointing a referee or have had the referee's preliminary report sent to me. I know the note was purchased and I think they are hiring different counsel. You may have missed the boat on the last deal that was offered. to wit a release of the sbig property in exchange for a deed in lieuon the cottage.

**Exhibit 65:**

**From:** Charles H. Wallshein <cwallshein@wallsheinlegal.com>
**Sent:** Friday, March 4, 2022 5:10:09 PM
**To:** Mathew Kabatoff <mkabatoff@ltbholding.com>
**Cc:** Louise Blouin <lt@ltbholding.com>
**Subject:** Re: JGB

Will do.

On Fri, Mar 4, 2022 at 3:40 AM Mathew Kabatoff <mkabatoff@ltbholding.com> wrote:

Charlie,


Please let Louise and I know when you have spoken with the counsel for JGB in order to: provide the offer of 32 + 2 (cash now); and to understand the position of their firm.


Many thanks,

Mathew

**Exhibit 66:**

**Exhibit 68:**
**From:** Charles Wallshein <cwallshein@wallsheinlegal.com>
**Date:** Wednesday 2 March 2022 at 11:18
**To:** Louise <lt@ltbholding.com>, Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** Re: Silver Arch

This is not a commitment to fund. It is a I hope they can close letter. why did you send this to me.

On Wed, Mar 2, 2022 at 12:06 AM Louise Blouin <lt@ltbholding.com> wrote:
Please read the bellow thank you
Mathew please urgently send silver the Morgan Stanley amount to refinance

Get Outlook for iOS

---

**From:** Jeffrey Bardos <jbardos@speritascapital.com>
**Sent:** Tuesday, March 1, 2022 7:02 pm
**To:** Louise Blouin; Mathew Kabatoff
**Subject:** Silver Arch

Hi Louise,

Silver Arch is working hard to get to a loan amount that would cover $32MM to JGB and $16MM to MS. This could be your best chance to payoff JGB entirely.

Silver Arch requested:

- current amount owed to MS (Louise indicated $16MM but they need a more precise figure)
- current interest rate on the MS loan
- whether you have any ability to pay interest out of pocket which would reduce the interest reserve on the loan

Please let me know if you can provide this information quickly.

Thanks,

Jeff

**Jeffrey Bardos**
**Speritas Capital Partners**
**Greenwich, CT**

Phone: 203-247-4358
E: jbardos@speritascapital.com
W: www.speritascapital.com
Fax: 203-486-8242
Schedule a Call
Recent blog post: Loan Covenants Explained

**Exhibit 71:**
**From:** Charles Wallshein <cwallshein@wallsheinlegal.com>
**Date:** Wednesday 17 November 2021 at 11:43
**To:** Louise <lt@ltbholding.com>, Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** Re:

Louise, I am only your lawyer. my job is to transmit all the information that I have to you. I am doing that. I have no idea what the property is worth. obviously it is very unique. I have no opinion to offer on value. I am not an appraiser. I spoke to Anne Prosser regarding your response in the negative to Mr. Brown purchasing the property and the debt.
On Wed, Nov 17, 2021 at 11:23 AM Louise Blouin <lt@ltbholding.com> wrote:

Please send me the next steps with amount of hours and dates goals

Fir the business deal
The house is on the market for 140 million abd the deal you want me to take kills 60 million it is an estate can not be split without taking a bath and we are finalizing the mortgage
Thanks for the patience


Please tell me if you spoke to browns lawyer it is important to me
Anne can not speak to you not legal
No deed is going to be done

Any matters need to go through ne regarding my asset
Thank you

**Exhibit 74:**



**Exhibit 76:**





**Exhibit 75:**

3/15/21

# LEASE AGREEMENT

The undersigned parties hereby enter into this lease agreement as Landlord and Tenant for the lease of the premises described herein (the "Premises") for the term set forth herein and pursuant to, and in accordance with, the following terms and conditions.

| | |
|---|---|
| LANDLORD: | Brickchurch Enterprises LLC |
| LANDLORD ADDRESS: | 366 Gin Lane<br>Southampton, NY 11968 |
| | |
| TENANT: | |
| TENANT ADDRESS: | |
| | |
| ADDRESS OF PREMISES: TAX MAP ID NUMBER: | 366 Gin Lane, Southampton, New York 11968<br>0904-029.00-01.00-017.014 |
| LEASE TERM: | Commencing at 12:01 a.m. on 5/27/2021, ending at 11:59 p.m. on 07/31/21 |
| TOTAL RENT FOR TERM: PAYMENT OF RENT: | $500,000 payable as follows by bank check drawn on an American bank[∗1] or electronic transfer. Tenant shall pay entire rent as follows. Payment details included at the end of document. |

Installment 1 due at execution of lease: By March 15, 2021

$250,000 due upon signing the lease agreement[∗2]:
$125,000 payable to Landlord, Louise Blouin.
$125,000 to Escrow Agent for repairs and improvements as per separate agreement.

Installment 2:Due on April 30, 2021[∗3]
$200,000 to Louise Blouin
$ 50,000 to Anne Prosser

1

<u>TERMS</u>

1, USE: The "Premises", defined as including but not limited to the house, garage, tennis court, pool, shall be used as a private single family dwelling only by the Tenant and the Tenant's family, domestic employees, and non- paying guests and invitees in a manner consistent with the terms of this lease agreement and any applicable law.  Both Landlord and Tenant shall comply with all applicable laws and ordinances of the town and village (if any) within which the Premises are located, including, but not limited to, all applicable laws governing group occupancy, orderliness, cleanliness, preservation and use of the Premises.  Landlord agrees that if Tenant pays the rent and is not in default of any of the terms or conditions of this lease agreement, Tenant may peaceably have, hold and enjoy the Premises for the term of this lease agreement.

2.  UTILITIES and SERVICES: During the lease term, the utilities and services for the Premises shall be paid as set forth below and as expressly provided for elsewhere in this lease agreement:

| Utilities and Services: | Party responsible for cost: | If Tenant's cost, method of payment: |
|---|---|---|
| A,  Natural Gas: | Tenant | deduct from the utility and service deposit |
| B. Public Water: | Tenant | |
| C. Electricity: | Tenant | deduct from the utility and service deposit |
| D. Telephone Service: | Tenant | |
| E. Cable/ Satellite Television: | Tenant | |
| F. High-Speed Internet: | Tenant | |
| G. Weekly Garbage / Trash Removal: | ~~Landlord~~  Tenant | |
| H. Weekly Lawn Mowing: | Landlord | |
| I.  Weekly Garden Maintenance: | Landlord | |
| J.  Seasonal Leaf and Snow Removal: | Landlord | |
| K. Seasonal Swimming Pool Opening and Closing: | Landlord | |
| L. Weekly Swimming Pool Maintenance: | Landlord | |
| M. Seasonal Tennis Court Opening and Closing: | Landlord | |
| N. Tennis Court Maintenance (if necessary); | Landlord | |
| 0.  Maid/ Cleaning Service: | Tenant | pay directly to the service provider |

Landlord makes no representation or warranty as to the availability of any utilities or services at the Premises due to causes beyond Landlord's control. The cost and expense of all utilities and services required by this, or any other, paragraph of this lease agreement to be paid by Tenant, shall be deemed additional rent chargeable to Tenant.  Accounts for utilities and services that are designated herein as Tenant's obligation to pay shall remain in Landlord's name, with copies of bills sent to Tenant during the lease term. All costs required to be paid by Tenant directly to the service provider shall be paid as such within ten (10) days of Tenant's receipt of the bill for same. All costs required to be deducted from the utility and service deposit or from the security deposit, if any, shall be so deducted by Landlord as and when appropriate during the lease term so as to make timely payment of each such bill. Tenant shall comply with all governmental refuse and recycling laws applicable to the Premises.  In the event Landlord fails to pay any utility or service which prevents such utility or service from being provided to Tenant during the Lease Term, then Tenant may satisfy such payment and Landlord shall be obligated to reimburse Tenant accordingly.

3.  (a) SECURJTY DEPOSIT: On or before May 15, 2021, Tenant shall pay the amount of $28,000 to the order of <u>Landlord's Attorney</u> by bank/cashier's check drawn on a U.S. bank or by electronic wire

transfer, to be held as security by <u>Landlord's Attorney</u> in a segregated account, as required by law. The security deposit may not be used as payment of rent. It is expressly understood and agreed that Tenant's liability to perform the terms of this lease is in no way limited to the amount of the security deposit. Within forty-five (45) days following expiration of the lease term, <u>Landlord's Attorney</u> shall return the security deposit to Tenant, adjusted for any damages or outstanding bills, with copies of bills for any deductions from the security deposit. In no event shall Brown Harris Stevens be required to hold the security deposit or mediate any disputes with regards thereto.

(b) UTILITY and SERVICE DEPOSIT: On or before 5/15/21[a4], Tenant shall pay the amount of $5,000 to the order of Landlord by bank/cashier's check drawn on a US Bank or by electronic wire transfer to be held by landlord for the purposes of this paragraph. Unless otherwise specified herein, all costs for utilities and services at the Premises that are required by this lease agreement to be paid by tenant shall be deducted from the utility and service deposit by Landlord during the term of the lease as and when necessary to make the payments of tenant herein. It is expressly understood and agreed that Tenant shall remain fully liable for the payment of any and all costs for utilities and services incurred during the term of this lease that exceed the amount of said utility and service deposit. Within Forty-five days (45) following expiration of the lease term , Landlord shall return the remaining balance of the utility and service deposit, if any, to tenant. In no event shall Brown Harris Stevens be required to hold the utility and service deposit or mediate any disputes with regards thereto.

4. CONDITION OF THE PREMISES: The Landlord shall deliver the Premises in clean condition, furnished as shown to Tenant, with all plumbing (including water supply and septic), heating and air conditioning, electrical and mechanical systems, equipment, machinery and appliances in good working order. The Landlord will provide sheets and towels for Tenant's use during the lease term. Tenant shall return the Premises at the end of the lease term in the same condition as received, subject only to reasonable wear and tear. Tenant agrees to make no alterations to the Premises, including but not limited to moving within the Premises, or removing to storage, any of Landlord's furniture or furnishings without Landlord's express written consent. Tenant represents and warrants that it has examined the demised Premises, knows the condition thereof and the parties have agreed to escrow a portion of the lease proceeds for the purposes of making such repairs reasonably acceptable to Tenant upon an interim inspection on April 30, 2021 ("Interim Inspection") and then subject to a final inspection by Tenant prior to, or upon the commencement of, the lease term thereby confirming that there have been no changes in the condition of the Premises and confirmed by Tenant's inspection prior to commencement of the Lease Term {"Final Inspection"). In the event the substantial repairs have not been made by the Interim Inspection then such date to make the corresponding lease payments shall be extended to allow reasonable time for Landlord to complete such repairs. In the event the repairs are not complete by May 15, 2021 then Tenant has the right to take possession on the lease commencement date and shall receive an immediate reduction in rent equal to $7,692 per day (the "Rent Reduction Rate") until such time as all repairs have been completed to the reasonable approval by Tenant.

5. NOTICE OF DEFECTS: Within seventy two (72) hours after taking possession of the Premises, Tenant shall notify Landlord in writing of any malfunction in equipment, breakage or damage, which existed at the Premises at the commencement of the term of the lease.

6. REPAIRS: Landlord shall be responsible for all necessary repairs, except when a repair is required as a result of the fault or abuse of Tenant. Any fault or abuse by Tenant's family, guests, employees or invitees shall be deemed the fault or abuse of Tenant. In such a case of Tenant's fault or abuse requiring repair to the Premises, Tenant shall pay for such repair within ten (10) days of Tenant's receipt of a bill for same from Landlord. Tenant shall immediately notify Landlord or Landlord's agent of any condition requiring repair. No repair or alteration shall be made without written authorization from Landlord. If, through no fault or negligence of the Tenant, the Premises are damaged by fire or any other unavoidable casualty, Landlord shall make repairs within a reasonable a unit of time after

3

receiving notice of same. If such damage shall be so extensive as to render the Premises uninhabitable, the rent shall be apportioned and paid up to the date of such damage and any overpayment shall be refunded to Tenant whereupon this lease shall terminate.

7. TENANT LIABILITY /CONTENTS: Landlord shall not be responsible for (a) any injury, loss or damage to Tenant's contents or (b) any injury, loss or damage for which Tenant is liable or (c) a injury loss or damage suffered by Tenant, Tenant's family, guests, domestic employees or other invitees, unless caused by Landlord's gross negligence. Landlord shall not be liable for injury or damage to Tenant or any person who occupies or visits the Premises, nor shall Landlord be liable for damage to any such person's property unless the same results from Landlord's gross negligence. Tenant is responsible for all acts of Tenant's family, employees and persons Tenant invites onto the Premises. Tenant hereby indemnifies and holds Landlord harmless, to the extent permissible by law, including reasonable attorney's fees, from and against any liability, damage, expense, judgment, claim or other loss arising from Tenant's use and occupancy oft Premises, unless caused by Landlord's ~~gross~~ negligence.

8. SUBLET or ASSIGNMENT: Tenant may not sublet any part of the Premises and Tenant may not assign this lease.

9. TENANT'S DEFAULTS:

  A. Landlord may give five (5) days written notice to Tenant to correct any of the following defaults: (1) Failure to pay rent or security deposit or utility and service deposit on time except in the event of any extension for the payment of lease payments as provided for herein; (2) Improper assignment of the lease, subletting all or part of the Premises, or any violation of Paragraph I hereof; (3) Improper conduct by Tenant or other occupant of the Premises; or (4) Failure to fully perform any term in this lease agreement.

  B. If Tenant fails to correct any default in Section 9A within five (5) days of the notice stated in 9A above, Landlord may cancel the lease agreement by giving Tenant a written three (3) day notice s ting the date this lease agreement will terminate.  On that date this lease and Tenant's rights in this lease shall automatically terminate and Tennant must immediately vacate the Premises and return the keys to Landlord. Thereafter, in addition to the accelerated rent, Tenant shall  be liable to Landlord  for the fair value  of the use and occupancy of the  Premises and all costs for utilities and services, from the date of termination until the date Tenant  actually vacates  the Premises.  Tenant shall also be liable to Landlord for  all expenses  (including reasonable attorney's  es), liability,  damages and other loss  incurred by Landlord arising out of  or in connection with Tenant's breach or default under  this lease agreement. If Landlord is required to bring any  action or proceeding to enforce the terms of this lease agreement and/or to recover for any o Tenant's defaults, Landlord shall  be entitled to  recover  reasonable attorney's fees from Tenant. Tenant hereby waives the right to a jury trial in  any summary  proceedings  commenced  by Landlord.  Tenant hereby waives any counterclaims in any summary proceedings

commence by Landlord and fu1iher agrees not to attempt to join said summary proceedings with any other action or claim.

C. Notwithstanding the remedies available to Landlord under the terms of this ease agreement and by law, if Tenant's payment of rent becomes ten (10) days past due, Landlord may charge Tenant a late charge of five percent (5%) of the amount of the past due rent except in the event of any extension for the payment of lease payments as provided for herein.

I 0. ACCESS TO PREMISES: Tenant shall permit Landlord or Landlord's agent to inspect the Premises during reasonable daytime hours, including weekends, by prior appointment with twenty-four (24) hours advance written notice to Tenant. Landlord acknowledges that Tenant is entitled to quiet enjoyment of the Premises under the laws of New York State. Landlord owns the property immediately adjacent to the Premises at 376 Gin Lane, Southampton (the "Adjacent Property"). Landlord represents and warrants that it will not have construction and/or renovation work performed at the Adjacent Property other than quiet repair work inside the house and/or reasonable maintenance of the grounds of the Adjacent Property. In the event the Landlord breaches this provision, then the Tenant shall be entitled to Rent Reduction Rate for each day the violative condition exists.

II. LANDLORD'S AUTHORITY: Landlord hereby represents that Landlord is the sole owner of the Premises with due power and authority to enter into this lease agreement with Tenant.

12. BROKER: The parties acknowledge and agree that (a) Brown Harris Stevens is the broker that brought about the within transaction; (b) a ten percent (10%) commission on the total rent is due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of this lease agreement by all parties; (c) a ten percent (1 0%) commission on the total rent shall be due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of any extension or renewal of this lease agreement; and (d) if the subject Premises are sold to the tenant named herein, a 1.5% commission on the total sale price shall be due and payable in full by Landlord to Brown Harris Stevens. The parties acknowledge that Brown Harris Stevens may, under certain circumstances, work with the Landlord and Tenant to resolve disputes or other issues arising from, or pertaining to, this lease agreement; however, all parties expressly agree that Brown Harris Stevens shall not be liable to either party in connection with the condition of the Premises or the default of any of the terms of this lease agreement by either party and (the parties shall indemnify and hold harmless Brown Harris Stevensfrom and against and loss, liability or expense (including reasonable attorney's fees) arising from Brown Harris Steven's good faith efforts to resolve any such dispute between the parties.

13. LEAD-BASED PAINT/HAZARD DISCLOSURE: Only the section below marked shall apply to this lease agreement:

NOT    PLICABLE: LEASE TERM UNDER 100 DAYS.

14. ACCELERATION: In the event of a material default by Tenant, Landlord shall have

the right to accelerate all payments owed herein such that the entire outstanding balance of rent and any other amounts owed by Tenant shall become immediately due and payable in full to Landlord.

15. ENTIRE AGREEMENT: This agreement constitutes the entire agreement of the parties as to the subject matter hereof, and supersedes all

prior discussions, negotiations and agreements, ether written or oral, between the parties with respect to the subject matter of this lease agreement.

16. MODIFICATION: This lease agreement may not be modified except by a writing duly executed by all of the parties hereto.

17. SEVERABILITY: A determination that any provision or provisions of this lease agreement is unenforceable or invalid shall not affect the enforceability or validity of any remaining provisions of this lease agreement.

18. DELIVERY OF LEASE: No rights or obligations herein are conferred upon either party until both Landlord and Tenant have executed this lease agreement and a fully executed copy of this lease agreement has been delivered to both parties pursuant to the terms hereof.

19. NOTICES: Any notice or communication under this lease shall be sent in writing via certified mail to the parties' respective addresses as listed above.

20. WAIVER: No assent, express or implied, by Landlord, to any breach of any of Tenant's covenants waiver of any succeeding breach of the same covenant or agreement.

21. PREPARATION OF LEASE AGREEMENT: Landlord and Tenant each hereby expressly acknowledge and agree that this lease agreement has been drafted as a service to Brown Harris Stevens only, and that both Landlord and Tenant have had the opportunity to consult their own individual attorneys with regards to their respective rights and obligations under this lease agreement and any applicable law, including but no limited to, the need for any permits, accounts or other arrangements necessary to fulfill their respective obligations and to protect their respective rights's further acknowledged that Brown Harris Stevensh as provided this lease agreement as a courtesy to the parties and that the drafter of this lease agreement does not represent the Landlord or the Tenant with regards to this lease agreement.

22. NO SMOKING: The parties hereby agree that Tenant shall not smoke on the Premises and that Tenant shall not permit any of domestic employees, guests or invitees to smoke anywhere on the Premises.

23. PETS: No Pets shall be allowed on the premises.

24. NO SPECIAL EVENTS. Tenant agrees not to cause or permit any special events including but not limited to weddings, photo shoots, and TV or movie filming, at the Premises without Landlord's prior written consent.

25. FUEL/PROPANE TANK FILL-UP: Prior to the commencement of the lease term, Landlord shall, at Landlord's sole cost and expense, fill the fuel/propane tank at the Premises to capacity for delivery of the leased Premises to the Tenant. Upon, n the expiration of the lease term, Tenant shall fill the fuel/propane tank at the Premises to capacity for the return of the leased Premises to the Landlord. All payments required of Tenant by the terms of

this paragraph shall be paid in accordance with the terms of Paragraphs 2.

**26. RENTAL PERMIT and/or REGISTRATION REQUIREMENT: Landlord and Tenant each hereby expressly acknowledge that if the** subject premises is located within the jurisdiction of the Town of Southampton [Suffolk County Tax Map District 0900, *see Tax Map ID Number above* ], **the Town of East Hampton** [District 0300], **the Town of Southold** [District 1000], **the Town of Riverhead** [District 0600/0900], **the Village of Westhampton Beach** [District 0905], **the Village of Quogue** [District 0902], **the Village of Westhampton Dunes** [District 0907], **the Village of** North Haven [District 0901], the Village of Greenport [District 1001], the Village of Sagaponack [District 0908] or the Village of Dering Harbor [District 0701], **the town/village code of such municipality may require that a Rental Permit be obtained or the Premises be registered with said municipality, before the above-referenced premises may be legally occupied as rental property pursuant to this lease agreement. It is incumbent upon both Landlord to confirm with the respective municipality as to any relevant rental permit laws, registries and/or requirements. By initialing at the end of this paragraph 26, both Landlord and Tenant acknowledge receipt of this advisory, and hereby indemnify and hold harmless Brown Harris Stevens, the drafter of this lease and any real** estate **broker associated with this transaction, from and against any liability, damage, expense, judgment, claim or other loss arising from the failure to obtain a valid rental permit, registering with the relevant municipality or otherwise complying with any rental permit law, prior to causing, permitting or allowing the occupancy of the above- referenced premises as a rental property.**

**INITIAL HERE:** Type text here

27. SWIMMING POOL OPENING/CLOSING and MAINTENANCE: The parties agree that the Landlord shall, at Landlord's sole cost and expense, deliver the swimming pool and all related systems and equipment in good working order subject to, and in accordance with, the terms of paragraph 6 above. The swimming pool shall be opened for use prior to, and for the duration of, the lease term to be, in either event, paid for as set forth in paragraph 2 above. If required by paragraph 2 above, professional pool maintenance shall occur no less than once per week (while the pool is open for use) during the lease term by a professional pool company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the swimming pool and all related systems and equipment in good working order, subject to reasonable wear and tear.

28. TENNIS COURT OPENING/CLOSING and MAINTENANCE: The parties agree that the Landlord shall, at Landlord's sole cost and expense, deliver the tennis court and all related equipment in good working order subject to, and in accordance with, the terms of paragraph 6 above. The tennis court shall be opened for use prior to and for the duration of the lease term to be, in either event, paid for as set forth in paragraph 2 above. If required by paragraph 2 above, professional tennis court maintenance shall

occur no less than once per week (while the tennis court is open for use) during the lease term by a professional tennis court maintenance company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the tennis court and all related equipment in good working order, subject to reasonable wear and tear.

29. MAID/CLEANING SERVICE: The entire interior of the house shall be cleaned twice per week during the lease term by a maid/cleaning service to be paid for as set forth in paragraph 2 above.

30. COUNTERPART SIGNATURES: This lease agreement may be executed in several counterparts, each of which shall be deemed an original, and

All such counterparts together shall constitute one and the same instrument; however, this lease agreement shall not be effective or enforceable against any party hereto until all parties have executed at least one counterpart of the lease and all parties have received a counterpart of all signatures.

31. FACSIMILE and/or SCAN/EMAIL SIGNATURES:  The parties acknowledge and agree that this lease agreement may be executed by scan/email or facsimile delivery and that scanned/emailed and/or faxed signatures shall be deemed original signatures for the purposes of this lease agreement.

32. **NO INDOOR SPRINKLER SYSTEM: It is expressly acknowledged and agreed that there is not a "maintained and operative 'sprinkler system' in the leased premises." A "Sprinkler System" is a system of piping and appurtenances designed and installed in accordance with generally accepted standards so that heat from a fire will automatically cause water to be discharged over the fire area to extinguish it or prevent its further spread (Executive Law of New York, Article 6-C, Section 155-1(5)). This required disclosure is made pursuant to New York** Real Property Law Article 7, Section 231-A.

33. TENANT INSURANCE: Tenant shall at Tenant's expense maintain renter's insurance for the duration of this lease covering Tenant's possessions at the Premises as well as Tenant liability coverage in the amount of $500,000 while at the Premises. Tenant shall provide evidence of such insurance to Landlord upon demand for same.

34. CERTIFICATE OF ~~OCCUPANCY~~: Landlord represents and warrants that a valid Certificate of ~~Occupancy~~ exists for the Premises. Landlord shall provide a copy of such proof of insurance to Tenant prior to the commencement of the lease term.

*~ Insurance*                     *Insurance ~*

This lease agreement has been executed by the parties hereto on the dates written below.

**Brickchurch Enterprises Inc.,** *Landlord*

Landlord by: _____  Dated 03/18/2021    _____ Dated
Tenant by:

Rider to Lease Agreement

dated as of March 6, 2021

by and between

Brickchurch Enterprises Inc., as Landlord,

And Chris Brown, as Tenant,

for premises known as 366 Gin Lane, Southampton, New York, 11968

*For the lease period of: May 27 – Jul 31, 2021*

In the event of any conflict between the terms of the Lease Agreement and the provisions of this Rider, the provisions of this Rider shall govern and prevail. All terms which are capitalized herein but not defined herein shall have the meanings ascribed to them in the Lease Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, and for such good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do agree as follows:

35. **TENANT DAMAGES**: By its initials hereof, Tenant acknowledges that the Premises contains several valuable pieces of furniture and furnishings, including, without limitation, artwork, tapestries and collectibles ("Furnishings"). Tenant further acknowledges and agrees that Tenant shall be solely responsible for the costs and expenses (including the full replacement cost) resulting from any and all damage caused, permitted or suffered by Tenant, its family, employees, guests, invitees, or licensees to the Premises, including without limitation any damage to or destruction of the Furnishings, regardless of whether such damage was caused by accident, negligence or willful misconduct. In no event shall Tenant's liability for any damage to the Premises, including any damage to or destruction of the Furnishings, be limited to the amount of the Security Deposit. Notwithstanding the foregoing, Tenant shall not be responsible for any damage to the Premises caused by Landlord's gross negligence or willful misconduct.

Tenant Initials

**IN WITNESS WHEREOF**, the parties hereto have executed this Rider the day and year first written above.

LANDLORD:

**BRICKCHURCH ENTERPRISES INC.**

By: Louise T. Blan

TENANT:

By:

**LEASE AGREEMENT**

**August 1 – September 8, 2021: 366 Gin Lane, Southampton NY**

The undersigned parties hereby enter into this lease agreement as Landlord and Tenant for the lease of the premises described herein (the "Premises") for the term set forth herein and pursuant to, and in accordance with, the following terms and conditions.

**LANDLORD**: Brickchurch Enterprises Inc.

**LANDLORD ADDRESS**: 366 Gin Lane, Southampton, NY 11968

**TENANT**

**ADDRESS OF PREMISES**: 366 Gin Lane, Southampton, NY 11968

**TAX MAP ID NUMBER**: 0904-029.00-01.00-017.014

**LEASE TERM**: 12:01 a.m. on 08/1/2021, ending at 11:59 p.m. on 09/8/21

**TOTAL RENT FOR TERM**: $250,000.00

**PAYMENT OF RENT**: Tenant shall pay Total Rent by electronic wire transfer as follows (payment details included at end of document):

Installment 1  Due at execution of lease by May 15, 2021

> $150,000 payable to Landlord, Louise Blouin
> $75,000 payable to Brown Harris Stevens
> $25,000 due at signing payable to Anne Prosser

1. **USE**: The "Premises", defined as including but not limited to the house, garage, tennis court, pool, shall be used as a private single-family dwelling only by the Tenant and the Tenant's family, domestic employees, and non- paying guests and invitees in a manner consistent with the terms of this lease agreement and any applicable law. Both Landlord and Tenant shall comply with all applicable laws and ordinances of the town and village (if any) within which the Premises are located, including, but not limited to, all applicable laws governing group occupancy, orderliness, cleanliness, preservation and use of the Premises. Landlord agrees that if Tenant pays the rent and is not in default of any of the terms or conditions of this lease agreement, Tenant may peaceably have, hold and enjoy the Premises for the term of this lease agreement.

2. **UTILITIES and SERVICES**: During the lease term, the utilities and services for the Premises shall be paid as set forth below and as expressly provided for elsewhere in this lease agreement:

| | Utilities and Services: | Party responsible for cost: |
|---|---|---|
| A. | Natural Gas: | Tenant |
| B. | Public Water: | Tenant |
| C. | Electricity: | Tenant |
| D. | Telephone Service: | Tenant |
| E. | Cable/Satellite Television: | Tenant |
| F. | High-Speed Internet: | Tenant |
| G. | Weekly Garbage / Trash Removal: | Tenant |
| H. | Weekly Lawn Mowing: | Landlord |
| I. | Weekly Garden Maintenance: | Landlord |
| J. | Swimming Pool Opening: | Landlord |
| K. | Weekly Swimming Pool Maintenance: | Landlord |
| L. | Seasonal Tennis Court Opening: | Landlord |
| M. | Tennis Court Maintenance (bi-monthly and as required): | Landlord |
| N. | Maid/Cleaning Service: | Tenant |
| O. | Cleaning Service at exit: | Tenant |

Landlord makes no representation or warranty as to the availability of any utilities or services at the Premises due to causes beyond Landlord's control. The cost and expense of all utilities and services required by this, or any other, paragraph of this lease agreement to be paid by Tenant, shall be deemed additional rent chargeable to Tenant. Accounts for utilities and services that are designated herein as Tenant's obligation to pay shall remain in Landlord's name, with copies of bills sent to Tenant during the lease term. All costs required to be paid by Tenant directly to the service provider shall be paid as such within ten (10) days of Tenant's receipt of the bill for same. All costs required to be deducted from the utility and service deposit or from the security deposit, if any, shall be so deducted by Landlord as and when appropriate during the lease term so as to make timely payment of each such bill. Tenant

1

shall comply with all governmental refuse and recycling laws applicable to the Premises. In the event Landlord fails to pay any utility or service which prevents such utility or service from being provided to Tenant during the Lease Term, then Tenant may satisfy such payment and Landlord shall be obligated to reimburse Tenant accordingly.

3. **(a) SECURITY DEPOSIT:** On or before 5/15/2021, Tenant shall pay the amount of $28,000.00 to the order of **Landlord's Attorney** by bank/cashier's check drawn on a U.S. bank or by electronic wire transfer, to be held as security by Landlord's Attorney in a segregated account, as required by law. The security deposit may not be used as payment of rent. It is expressly understood and agreed that Tenant's liability to perform the terms of this lease is in no way limited to the amount of the security deposit. Within forty-five (45) days following expiration of the lease term, Landlord's Attorney shall return the security deposit to Tenant, adjusted for any damages or outstanding bills, with copies of bills for any deductions from the security deposit. At commencement of the lease, the Tenant will be presented with a condition report, along with photo documentation of any such faults or damages at the premises. This report will then be reviewed upon exit by the Tenant with the Landlords' representative in order to certify the condition of the property.

**(b) UTILITY and SERVICE DEPOSIT**: On or before 5/15/2021, Tenant shall pay the amount of $15,000 to the order of Landlord by bank/cashier's check drawn on a US Bank or by electronic wire transfer to be held by landlord for the purposes of this paragraph. Unless otherwise specified herein, all costs for utilities and services at the Premises that are required by this lease agreement to be paid by tenant shall be deducted from the utility and service deposit by Landlord during the term of the lease as and when necessary to make the payments of tenant herein. It is expressly understood and agreed that Tenant shall remain fully liable for the payment of any and all costs for utilities and services incurred during the term of this lease that exceed the amount of said utility and service deposit. Within Forty-five days (45) following expiration of the lease term, Landlord shall return the remaining balance of the utility and service deposit, if any, to tenant. In no event shall Brown Harris Stevens be required to hold the utility and service deposit or mediate any disputes with regards thereto.

4. **(a) CONDITION OF THE PREMISES**: The Landlord shall deliver the Premises in clean condition, furnished as shown to Tenant, with all plumbing (including water supply and septic), heating and air conditioning, electrical and mechanical systems, equipment, machinery and appliances in good working order. The Landlord will provide sheets and towels for Tenant's use during the lease term. Tenant shall return the Premises at the end of the lease term in the same condition as received, subject only to reasonable wear and tear. Tenant agrees to make no alterations to the Premises, including but not limited to moving within the Premises, or removing to storage, any of Landlord's furniture or furnishings without Landlord's express written consent. Tenant represents and warrants that it has examined the demised Premises, knows the condition thereof and has accepted same in good order and repair, subject to a final inspection by Tenant prior to, or upon the commencement of, the lease term thereby confirming that there have been no changes in the condition of the Premises prior to lease signing.

Tenant represents and warrants that it has examined the demised Premises, knows the condition thereof and the parties have agreed to escrow a portion of the lease proceeds for the purposes of making such repairs reasonably acceptable to Tenant upon an interim inspection on April 30, 2021 ("Interim Inspection") and then subject to a final inspection by Tenant prior to, or upon the commencement of the lease term thereby confirming that there have been no changes in the condition of the Premises and confirmed by Tenant's inspection prior to commencement of the Lease Term {"Final Inspection"). In the event the substantial repairs have not been made by the Interim Inspection then such date to make the corresponding lease payments shall be extended to allow reasonable time for Landlord to complete such repairs. In the event the repairs are not complete by May 15, 2021 then Tenant has the right to take possession on the lease commencement date and shall receive an immediate reduction in rent equal to $7,692 per day (the "Rent Reduction Rate") until such time as all repairs have been completed to the reasonable approval by Tenant.

**(b) PROTOCOLS REGARDING CARE**: The Tenant acknowledges that care and attention must be given to the premises both for its fine build/decoration quality and its proximity to the ocean. In this regard the Tenant agrees to the following protocols of use: TENNIS COURT: only tennis court approved shoes should be worn on the court due to its har-tru surface; no footwear worn on the tennis court may be worn inside of the house; BEACH: no footwear worn on the beach can be worn into the house or placed in the pool, further, bare feet must be washed prior to reentering the house from the beach; CLIMATE CONTROLS: in order to preserve a well-functioning AC system, and to prevent salt deterioration within the house, all doors must be kept closed to the exterior; CINEMA: since the cinema is a sophisticated technological system, a request for service is required to the Landlord should an issue arise.

5. **NOTICE OF DEFECTS**: Within seventy-two (72) hours after taking possession of the Premises, Tenant shall notify Landlord in writing of any malfunction in equipment, breakage, or damage, which existed at the Premises at the commencement of the term of the lease.

6. **REPAIRS**: Landlord shall be responsible for all necessary repairs, except when a repair is required because of the fault or abuse of Tenant. Any fault or abuse by Tenant's family, guests, employees, or invitees shall be deemed the fault or abuse of Tenant. In such a case of Tenant's fault or abuse requiring repair to the Premises, Tenant shall pay for such repair within ten (10) days of Tenant's receipt of a bill for same from Landlord. Tenant shall immediately notify Landlord or Landlord's agent of any condition requiring repair. No repair or alteration shall be made without written authorization from Landlord. If, through no fault or negligence of the Tenant, the Premises are damaged by fire or any other unavoidable casualty, Landlord shall make repairs within a reasonable a unit of time after receiving notice of same. If such damage shall be so extensive as to render the Premises uninhabitable, the rent shall be apportioned and paid up to the date of such damage and any overpayment shall be refunded to Tenant whereupon this lease shall terminate.

7. **TENANT LIABILITY/CONTENTS**: Landlord shall not be responsible for (a) any injury, loss or damage to Tenant's contents or (b) any injury, loss or damage for which Tenant is liable or (c) a injury loss or damage suffered by Tenant, Tenant's family, guests, domestic employees or other invitees, unless caused by Landlord's gross negligence. Landlord shall not be liable for injury or damage to Tenant or any person who occupies or visits the Premises, nor shall Landlord be liable for damage to any such person's property unless the same results from Landlord's gross negligence. Tenant is responsible for all acts of Tenant's family, employees and persons Tenant invites onto the Premises. Tenant hereby indemnifies and holds Landlord harmless, to the extent permissible by law, including reasonable attorney's fees, from and against any liability, damage, expense, judgment, claim or other loss arising from Tenant's use and occupancy oft Premises, unless caused by Landlord's ~~gross~~ negligence. The Tenant also agrees to sign a RIDER to account for liability of damages that exceed the security deposit and impact the works of art and design found in the property – see attached RIDER and paragraph 35.

8. **SUBLET or ASSIGNMENT**: Tenant may not sublet, or any part of the Premises and Tenant may not assign this lease.

9. **TENANT'S DEFAULTS**:

   a)   Landlord may give five (5) days written notice to Tenant to correct any of the following defaults: (1) Failure to pay rent or security deposit or utility

and service deposit on time except in the event of any extension for the payment of lease payments as provided for herein; (2) Improper assignment of the lease, subletting all or part of the Premises, or any violation of Paragraph 1; (3) Improper conduct by Tenant or other occupant of the Premises; or (4) Failure to fully perform any term in this lease agreement.

b) If Tenant fails to correct any default in Section 9A within five (5) days of the notice stated in 9A above, Landlord may cancel the lease agreement by giving Tenant a written three (3) day notice stating the date this lease agreement will terminate. On that date this lease and Tenant's rights in this lease shall automatically terminate and Tenant must immediately vacate the Premises and return the keys to Landlord. Thereafter, in addition to the accelerated rent, Tenant shall be liable to Landlord for the fair value of the use and occupancy of the Premises and all costs for utilities and services, from the date of termination until the date Tenant actually vacates the Premises. Tenant shall also be liable to Landlord for all expenses (including reasonable attorney's fees), liability, damages and other losses incurred by Landlord arising out of or in connection with Tenant's breach or default under this lease agreement. If Landlord is required to bring any action or proceeding to enforce the terms of this lease agreement and/or to recover for any of the Tenant's defaults, Landlord shall be entitled to recover reasonable attorney's fees from Tenant. Tenant hereby waives the right to a jury trial in any summary proceedings commenced by Landlord. Tenant hereby waives any counterclaims in any summary proceedings commence by Landlord and agrees not to attempt to join said summary proceedings with any other action or claim.

c) Notwithstanding the remedies available to Landlord under the terms of this ease agreement and by law, if Tenant's payment of rent becomes ten (10) days past due, Landlord may charge Tenant a late charge of five percent (5%) of the amount of the past due rent except in the event of any extension for the payment of lease payments as provided for herein.

10. **ACCESS TO PREMISES**: Tenant shall permit Landlord or Landlord's agent to inspect the Premises at reasonable daytime hours, including weekends, by prior appointment with twenty-four (24) hours advance notice to Tenant.) Landlord acknowledges that Tenant is entitled to quiet enjoyment of the Premises under the laws of New York State. Landlord owns the property immediately adjacent to the Premises at 376 Gin Lane, Southampton (the "Adjacent Property"). Landlord represents and warrants that it will not have construction and/or renovation work performed at the Adjacent Property other than quiet repair work inside the house and/or reasonable maintenance of the grounds of the Adjacent Property. In the event the Landlord breaches this provision, then the Tenant shall be entitled to Rent Reduction Rate for each day the violative condition exists.

11. **LANDLORD'S AUTHORITY**: Landlord hereby represents that Landlord is the sole owner of the Premises with due power and authority to enter into this lease agreement with Tenant.

12. **BROKER**: The parties acknowledge and agree that (a) Brown Harris Stevens is the broker that brought about the within transaction; (b) a ten percent (10%) commission on the total rent is due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of this lease agreement by all parties; (c) a ten percent (1 0%) commission on the total rent shall be due and payable in full by Landlord to Brown Harris Stevens upon the execution and delivery of any extension or renewal of this lease agreement; and (d) if the subject Premises are sold to the tenant named herein, a 1.5% commission on the total sale price shall be due and payable in full by Landlord to Brown Harris Stevens. The parties acknowledge that Brown Harris Stevens may, under certain circumstances, work with the Landlord and Tenant to resolve disputes or other issues arising from, or pertaining to, this lease agreement; however, all parties expressly agree that Brown Harris Stevens shall not be liable to either party in connection with the condition of the Premises or the default of any of the terms of this lease agreement by either party and (the parties shall indemnify and hold harmless Brown Harris Stevens from and against and loss, liability or expense (including reasonable attorney's fees) arising from Brown Harris Steven's good faith efforts to resolve any such dispute between the parties.

13. **LEAD-BASED PAINT/HAZARD DISCLOSURE**: Only the section below marked shall apply to this lease agreement: IS NOT APPLICABLE: LEASE TERM UNDER 100 DAYS.

14. **ENTIRE AGREEMENT**: This agreement constitutes the entire agreement of the parties as to the subject matter hereof, and supersedes all prior discussions, negotiations and agreements, ether written or oral, between the parties with respect to the subject matter of this lease agreement.

15. **MODIFICATION**: This lease agreement may not be modified except by a writing duly executed by all of the parties hereto.

16. **SEVERABILITY**: A determination that any provision or provisions of this lease agreement is unenforceable or invalid shall not affect the enforceability or validity of any remaining provisions of this lease agreement.

17. **DELIVERY OF LEASE**: No rights or obligations herein are conferred upon either party until both Landlord and Tenant have executed this lease agreement and a fully executed copy of this lease agreement has been delivered to both parties pursuant to the terms hereof.

18. **NOTICES**: Any notice or communication under this lease shall be sent in writing via certified mail and email to the parties' respective addresses as listed above.

19. **WAIVER**: No assent, express or implied, by Landlord, to any breach of any of Tenant's covenants waiver of any succeeding breach of the same covenant or agreement.

20. **NO SMOKING**: The parties hereby agree that Tenant shall not smoke on the Premises and that Tenant shall not permit any of domestic employees, guests, or invitees to smoke anywhere on the Premises.

21. **PETS**: Pets are prohibited under the construct of this lease.

22. **NO SPECIAL EVENTS**. Tenant agrees not to cause or permit any special events including but not limited to weddings, photo shoots, and or movie filming, at the Premises without Landlord's prior written consent.

23. **FUEL/PROPANE TANK FILL-UP**: Prior to the commencement of the lease term, Landlord shall, at Landlord's sole cost and expense, fi1 the fuel/propane tank at the Premises to capacity for delivery of the leased Premises to the Tenant. Upon the expiration of the lease term, Tenant shall fill the fuel/propane tank at the Premises to capacity for the return of the leased Premises to the Landlord. All payments required of Tenant by the terms of this paragraph shall be paid in accordance with the terms of Paragraphs 2.

24. **SWIMMING POOL OPENING/CLOSING and MAINTENANCE:** The parties agree that the Landlord shall, at Landlord's sole cost and expense,

3

deliver the swimming pool and all related systems and equipment in good working order subject to, and in accordance with, the terms of paragraph 2 above. The swimming pool shall be opened for use prior to, and for the duration of, the lease term to be, in either event, paid for as set forth in paragraph 2 above. If required by paragraph 2 above, professional pool maintenance shall occur no less than once per week (while the pool is open for use) during the lease term by a professional pool servicing company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the swimming pool and all related systems and equipment in good working order, subject to reasonable wear and tear. The Landlord is not responsible for the provision of 'water toys' to be used in and around the pool area.

25. **TENNIS COURT OPENING/CLOSING, MAINTENANCE and USAGE**: The parties agree that the Landlord shall, at Landlord's sole cost and expense, deliver the tennis court and all related equipment in good working order subject to, and in accordance with, the terms of paragraph 2 above. The tennis court shall be opened for use prior to and for the duration of the lease term to be, in either event, paid for as set forth in paragraph 2 above. If required by paragraph 2 above, professional tennis court maintenance shall occur no less than twice per month (while the tennis court is open for use) during the duration of the lease term by a professional tennis court maintenance company (either designated or approved by Landlord), which maintenance shall be paid for as set forth in paragraph 2 above. Upon the expiration of the lease term, Tenant shall return the Premises to Landlord with the tennis court and all related equipment in good working order, subject to reasonable wear and tear. The Landlord is not responsible for the provision of tennis balls or other accessories to teach or play tennis. The Tenant is obliged to remove all sports shoes worn on the tennis court prior to entering the house. Should the Landlord be at the adjacent home 376 Gin Lane, the Landlord requests tennis court access based on a mutually agreed schedule.

26. **MAID/CLEANING**: The entire interior of the house shall be cleaned daily with the schedule of the Tenant during the lease term by a maid/cleaning service to be paid for as set forth in paragraph 2 above. In advance of occupation by the Tenant, the Landlord will hire 1 full-time cleaner, who can provide care and attention to the many fine woods and fabrics inside of the property. Additional cleaning staff can be organized directly by the Tenant. The Tenant will pay for cleaning services as set forth in paragraph 2.

27. **GATE ACCESS**: The Tenant shall have access to the property using the gate located at 366 Gin Lane.

28. **COUNTERPART SIGNATURES**: This lease agreement may be executed in several counterparts, each of which shall be deemed an original, and All such counterparts together shall constitute one and the same instrument; however, this lease agreement shall not be effective or enforceable against any party hereto until all parties have executed at least one counterpart of the lease and all parties have received a counterpart of all signatures.

29. **FACSIMILE and/or SCAN/EMAIL SIGNATURES**: The parties acknowledge and agree that this lease agreement may be executed by scan/email or facsimile delivery and that scanned/emailed and/or faxed signatures shall be deemed original signatures for the purposes of this lease agreement.

30. **NO INDOOR SPRINKLER SYSTEM**: It is expressly acknowledged and agreed that there is not a "maintained and operative 'sprinkler system' in the leased premises." A "Sprinkler System" is a system of piping and appurtenances designed and installed in accordance with generally accepted standards so that heat from a fire will automatically cause water to be discharged over the fire area to extinguish it or prevent its further spread (Executive Law of New York, Article 6-C, Section 155-1(5)). This required disclosure is made pursuant to New York Real Property Law Article 7, Section 231-A.

31. **TENANT INSURANCE**: Tenant shall at Tenant's expense maintain renter's insurance for the duration of this lease covering Tenant's possessions at the Premises as well as Tenant liability coverage for both the Tenant and friends/family/colleagues of the Tenant who may visit the property. Tenant shall provide evidence of such insurance to Landlord upon demand for same.

32. **CERTIFICATE OF OCCUPANCY**: Landlord represents and warrants that a valid Certificate of Occupancy exists for the Premises. Landlord shall provide a copy of such proof of insurance to Tenant prior to the commencement of the lease term.

33. RENTAL PERMIT and/or REGISTRATION REQUIREMENT: Landlord and Tenant each hereby expressly acknowledge that if the
subject premises is located within the jurisdiction of the Town of Southampton [Suffolk County Tax Map District 0900, see Tax Map ID Number above ], the Town of East Hampton [District 0300], the Town of Southold [District 1000], the Town of Riverhead [District 0600/0900], the Village of Westhampton Beach [District 0905], the Village of Quogue [District 0902], the Village of Westhampton Dunes [District 0907], the Village of North Haven [District 0901], the Village of Greenport [District 1001], the Village of Sagaponack [District 0908] or the Village of Dering Harbor [District 0701], the town/village code of such municipality may require that a Rental Permit be obtained or the Premises be registered with said municipality, before the above-referenced premises may be legally occupied as rental property pursuant to this lease agreement. It is incumbent upon both Landlord and Tenant to confirm with the respective municipality as to any relevant rental permit laws, registries and/or requirements. By initialing at the end of this paragraph 26, both Landlord and Tenant acknowledge receipt of this advisory, and hereby indemnify and hold harmless Brown Harris Stevens the drafter of this lease and any real estate broker associated with this transaction, from and against any liability, damage, expense, judgment, claim or other loss arising from the failure to obtain a valid rental permit, registering with the relevant municipality or otherwise complying with any rental permit law, prior to causing, permitting or allowing the occupancy of the above- referenced premises as a rental property.

34. CERTIFICATE OF ~~OCCUPANCY~~ INSURANCE: Landlord represents and warrants that a valid Certificate of ~~Occupancy~~ Insurance exists for the Premises. Landlord shall provide a copy of such proof of insurance to Tenant prior to the commencement of the lease term.

This lease agreement has been executed by the parties hereto on the dates written below.

**Brickchurch Enterprises Inc.,** *Landlord*

_____ Dated 03/18/2021        _____ Dated  3/19/21
Landlord by:                                Tenant by:

4

**SCHEDULE 1:**

**AMOUNTS HELD IN ESCROW TO SERVICE PROPERTY MAINTENANCE AND UTILITIES DURING THE RENTAL PERIOD, APPLICABLE TO BOTH LANDLORD AND TENANT – on or before 07/15/2021**

**ESCROW AMOUNTS:**    Approximate amounts based on past use at the property for the periods of August and September will be provided as part of the escrow schedule by the time of the second payment.

|  | Landlord Escrow | Tenant Escrow |
|---|---|---|
| Natural Gas | | x |
| Public Water | | x |
| Electricity | | x |
| Telephone Service | | x |
| Cable/ Satellite Television | | x |
| High-Speed Internet | | x |
| Weekly Trash Removal | | x |
| Weekly Lawn Mowing | x | |
| Weekly Garden Maintenance | x | |
| Weekly Swimming Pool Maintenance | x | |
| Tennis Court Maintenance (bi-monthly and as required) | x | |
| Maid/Cleaning Service | | x |
| Cleaning Service at exit | | x |

**Landlord Wire Transfer Details:**

**Account Details : Louise Blouin**

Louise Blouin
Wiestistrasse 61
3920, Zermatt
Switzerland

Coutts
440 Strand
London
WC2R 0QS

Account Holder :        Louise Blouin
Account Number:      10009078
Sort Code:             180091
IBAN:                  GB 95 COUT 180091 10009078
Swift Code:            COUTGB22

**Rider to Lease Agreement**

dated as of March .18 2021

by and between

**Brickchurch Enterprises Inc., as Landlord,**

And ▮▮▮▮▮, as Tenant,

for premises known as 366 Gin Lane, Southampton, New York, 11968

*For the lease period of: August 1 to September 10, 2021*

In the event of any conflict between the terms of the Lease Agreement and the provisions of this Rider, the provisions of this Rider shall govern and prevail. All terms which are capitalized herein but not defined herein shall have the meanings ascribed to them in the Lease Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises herein contained, and for such good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do agree as follows:

35. **TENANT DAMAGES**: By its initials hereof, Tenant acknowledges that the Premises contains several valuable pieces of furniture and furnishings, including, without limitation, artwork, tapestries and collectibles ("Furnishings"). Tenant further acknowledges and agrees that Tenant shall be solely responsible for the costs and expenses (including the full replacement cost) resulting from any and all damage caused, permitted or suffered by Tenant, its family, employees, guests, invitees, or licensees to the Premises, including without limitation any damage to or destruction of the Furnishings, regardless of whether such damage was caused by accident, negligence or willful misconduct. In no event shall Tenant's liability for any damage to the Premises, including any damage to or destruction of the Furnishings, be limited to the amount of the Security Deposit. Notwithstanding the foregoing, Tenant shall not be responsible for any damage to the Premises caused by Landlord's gross negligence or willful misconduct.

**Tenant Initials**

IN WITNESS WHEREOF, the parties hereto have executed this Rider the day and year first written above.

LANDLORD:

**BRICKCHURCH ENTERPRISES INC.**

By: *Louise T Blo*

TENANT:

By:

**Exhibit 77 -** Sotheby's Emails

**July 6, 2022**

**From:** "Grant, Harald" <Harald.Grant@Sothebys.Realty>
**Date:** Wednesday 6 July 2022 at 11:02
**To:** Louise <lt@ltbholding.com>
**Cc:** "Reale, Ed" <ed.reale@sothebys.realty>
**Subject:** RE: Bankruptcy affect on pricing

Louise….when a Bankruptcy is filled and goes public the clear message is the courts will be selling the property at a price once the dept is paid…. Buyers recognize this as a buying opportunity….the general consciences is wait till the courts proceed at auction and bid an offer to purchase just above the debt….. example if a home is on market for 100 million but is in bankruptcy and the dept is 50 million why pay the market price of 90 to 100m when u can purchase at 55 or 60m…. just over the debt owed…. That's a major reason why we are not getting showings….We need to be more aggressive in our pricing as I have asked u  to facilitate a sale before  the auction starts… again ask 99m for both and 49m for each… that should encourage showings and then bids…..Best   Harald

**From:** Louise Blouin <lt@ltbholding.com>
**Sent:** Wednesday, July 6, 2022 5:59 AM
**To:** Grant, Harald <Harald.Grant@Sothebys.Realty>
**Subject:**

Dear Harald

Please send me on the correct email the explanation regarding bankruptcy effect on price that you stated on our telephone call .

Have a great day

**November 18, 2019**

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Friday 8 November 2019 at 12:33
**To:** Louise <lb@ltbholding.com>
**Subject:** FW: offer

**From:** Keszler, Michaela [mailto:Michaela.Keszler@elliman.com]
**Sent:** Friday, November 08, 2019 12:29 PM
**To:** Grant, Harald <Harald.Grant@Sothebyshomes.com>
**Cc:** Keszler, Michaela <Michaela.Keszler@elliman.com>
**Subject:** offer
**Importance:** High

Harald,
As discussed per phone.

My client Friedrich Christian flick is offering $55,000,000 for 366 &376 Gin Lane in Southampton.
Offer is cash,closing with a clear title.

I hope we can make this work.

Best michaela

**MICHAELA KESZLER**
LICENSED ASSOCIATE REAL ESTATE BROKER
DOUGLAS ELLIMAN REAL ESTATE

**September 3, 2019**

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Tuesday 3 September 2019 at 13:56
**To:** Louise <lb@ltbholding.com>, Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** RE: <no subject>

We have from your number in the agreement, which is $135M for both together.

But the market is soft. I recommend no more than $100M for both together. We have 366 on its own as you know, active asking $59M.

**From:** Louise Blouin [mailto:lb@ltbholding.com]
**Sent:** Tuesday, September 03, 2019 11:43 AM
**To:** Grant, Harald <Harald.Grant@Sothebyshomes.com>; Mathew Kabatoff <mkabatoff@ltbholding.com>
**Subject:** Re: <no subject>

What would be a good price today for both and for 366 ?


On Tue, Sep 3, 2019 at 5:09 PM +0200, "Grant, Harald" <Harald.Grant@Sothebyshomes.com> wrote:

Gm. Trying ....Market is very finicky.... buyers are reluctant to bid unless opportunity...... but 366 gin is done which most oceanfront are redo ...we are have broker open house Wednesday so all brokers know and see first hand

Sent from my iPhone

On Sep 3, 2019, at 10:08 AM, Louise Blouin <lb@ltbholding.com> wrote:

Dear harald ,
How are you ??
What is the update ?
Anyone interested the key is to get offers on the table .
We have not used the house at all this summer .

Best louise



**November 14, 2019**

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Thursday 14 November 2019 at 17:37
**To:** Louise <lb@ltbholding.com>
**Subject:** Re: <no subject>

Louise. The market has dropped 25% since 2015/16. What's selling is new or completely renovated properties.... with discount. 55m for 376 just won't happen ....The major work needed and so close to the ocean many buyers get nervous

Sent from my iPhone

On Nov 14, 2019, at 5:30 PM, Louise Blouin <lb@ltbholding.com> wrote:

Harald did you send mick the comps I sent to you ????????he was poorly advised
55 good for one house

_____
This email has been scanned by the Symantec Email Security.cloud service.

**November 14, 2019**

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Thursday 14 November 2019 at 10:26
**To:** Louise <lb@ltbholding.com>
**Subject:** RE: Clock me s ticking

Hi   Good morning Louise………. Spoke to Michaela and Mr. Flick is staying firm at the 55m for both properties…… The engineer has specified a number of issues with 376 Gin lane……Bulk head,…. windows,…. roof,….structural foundation,….mechanicals,….and pool,… all need to be replaced…….these costs will run into millions and should be addressed ASAP……..Mr. Flick has decided to still purchase 376 and 366 Gin lane and do these repairs himself once he closes, with no additional costs to the owner…. All he expects is that both houses to be in working order……. If u decide to go forward with this new Mortgage, I recommend u spend the money to address these items,   ALL buyers will have engineer reports done and will reduce any offer with these outstanding problems….   Best    Harald

**From:** Louise Blouin [mailto:lb@ltbholding.com]
**Sent:** Thursday, November 14, 2019 9:04 AM
**To:** Grant, Harald <Harald.Grant@Sothebyshomes.com>
**Subject:** Clock me s ticking

Dear Harald i am about to lock a mortgage down for a few years I need the final bid before I sign

**November 15, 2019**

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Friday 15 November 2019 at 11:25
**To:** Louise <lb@ltbholding.com>
**Subject:** Re: gin lane properties

Joe Schmitt a licenced engineer has repairers for 376 to be 6+ million dollars. The bulk head alone 3 million. U have serious  issues

Sent from my iPhone

On Nov 15, 2019, at 11:17 AM, Louise Blouin <lb@ltbholding.com> wrote:

The house is in in top shape we have maybe one or two leaks

**From:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Date:** Friday 15 November 2019 at 17:01

**To:** Louise <lb@ltbholding.com>
**Subject:** Fwd: gin lane properties

Sent from my iPhone

Begin forwarded message:

**From:** "Keszler, Michaela" <Michaela.Keszler@elliman.com>
**Date:** November 15, 2019 at 10:28:43 AM EST
**To:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Cc:** "Keszler, Michaela" <Michaela.Keszler@elliman.com>
**Subject: gin lane properties**

Good morning Harald,
I tried hard to get you a higher offer but the buyer stays put at $55 for both properties. We had a long conversation over the phone and he had another conversation with the environmental  people about the bulkhead and there is another $3,000,000 cost in addition to all the house repairs. At this point it's not only millions of repairs but also the long time to get everything done not even be able to use the house.
Please let me know if you have heard anything.
Best Michaela

**MICHAELA KESZLER**
LICENSED ASSOCIATE REAL ESTATE BROKER
DOUGLAS ELLIMAN REAL ESTATE

**November 15, 2019**

**From:** Louise <lb@ltbholding.com>
**Date:** Friday 15 November 2019 at 14:11
**To:** "Keszler, Michaela" <Michaela.Keszler@elliman.com>, "Grant, Harald" <Harald.Grant@Sothebyshomes.com>
**Subject:** FW: <no subject>

These are the comps for some please complete and send to me for approval and we share with mick
We need to portray the truth , this house is the most beautiful house in the hamptons

I have a lot of real estate and it does not cost 6 million of repairs although most people are crooks
I built the guest house for 10 in 12 months so normal price is 5 million for a full house if you are smart at it

London i gutted all 5 million same size
In paris 5 million for 18,000 house it is a new contruction in a 17 century home
I think that we need to be professional and not get people telling non sense and to verify
There will always be leaks in a home like ours it is an ocean property
We can redo the roof and that is cheap as well but not necessary
If one wants a museum the nit is different

The house inside is in great condition it is the best house i have been with shingles in the hamptons
Electricity all redon a few years ago 8 the plumbing workd perfectly. Walls are fine

Go back to mick and show him the comps above you will need to do the work in a professional matter
We have two choices sell now one not two at a reasonable price
We do not need new windows if they want to fine
Doors to be adjusted but it will always have that
We never got hit by hurricane we are very high since centuries
We have two bulhead it cost not much
To replace it cost  1000 -2000 per linear foot you figure it out

I truly advise if you are to show this home you need to be convince if not we need to remove you from being next to harald
I am not selling a zara


**November 15, 2019**

**From:** Louise <lb@ltbholding.com>
**Date:** Friday 15 November 2019 at 17:04
**To:** "Grant, Harald" <Harald.Grant@Sothebyshomes.com>, "Keszler, Michaela" <Michaela.Keszler@elliman.com>
**Subject:** <no subject>

Dear all,

If you do your homework instead of misrepresenting me we would be in a good place .
Please stop doing so .

I am getting my financing in place in the next hours and will take the time to get for the main house a good price we put the house on the market only in sept it takes time to do this

You will stop representing me or contacting anyone until you have signed  the rules that you can write  and nda  I  will be the only point of contact  .

No transaction of any house see attachment has ever sold bellow 45 million the two at that sold bellow have a size of 2500 of house I have for one 12000
That means 90 million in total for two house

All the crap I have been hearing that it is so expensive to do ;
A bullhead new one great it is 150 000

B house renovation 8 million look at the other crap on the market they are all tear downs to tell me   I need 8 million sure why not that is the price of a new house , I am a real estate person just finishing a home for 5 million in paris for 18000 sfeet , I have heard too much non sense
C the 16 -18  gin lane were attack by sandy one had no house
D for modern house I do not want people coming to the property that like modern modern tears apart after 6 years with the salt


And the 29 million have no house on them or crap see above

So enough with the non sense and lets get to work
And represent me the client properly  without low balling and telling people around me false info
I am the only one that will look into the details because it is my houses

I do not like what I have been hearing

Send to mick the truth and I will speak to him if he heard what the people around  me heard from all of you the  no wonder he would low ball he said 30 million for the most grand house one house comparing me to  see above what you get for 30 million have a little repect at the same time