1

1

2          IN THE UNITED STATES BANKRUPTCY COURT

3           FOR THE EASTERN DISTRICT OF NEW YORK

4       -------------------------------------------x

5       In re:

6       BRICKCHURCH ENTERPRISES, INC.,

7                        Debtor.

8                          Chapter 11

9                          Case No. 22-70914-ast

10      -------------------------------------------x

11

12

13          VIDEOTELECONFERENCED DEPOSITION OF:

14                   BRETT COHEN

15               Westport, Connecticut

16             Tuesday, August 30, 2022

17

18

19

20

21

22      Reported by:
        Aydil M. Torres, CSR
23      JOB NO. J8568771

24

25

2

1

2                  August 30, 2022

3                  2:08 p.m.

4

5

6              VTC deposition of

7      BRETT COHEN, held at 21 Charles

8      Street, Westport, Connecticut,

9      pursuant to Notice, before Aydil M.

10     Torres, a Notary Public of the

11     State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

⬆

3

1

2    A P P E A R A N C E S:

3

4        SIMMONS LEGAL, PLLC

5        Attorneys for Debtor

6            1330 Avenue of the Americas, Suite 23A

7            New York, New York 10019

8        BY:  CAMISHA SIMMONS, ESQ.

9

10

11        HAYNES & BOONE, LLP

12        Attorneys for Attorneys for JGB Partners,

13        LP, JGB Capital, LP, JGB (Cayman) Ancona,

14        Ltd., JGB Plymouth Rock, LLC and their

15        affiliates

16            30 Rockefeller Plaza, 26th Floor

17            New York, New York 10112

18        BY:  RICHARD S. KANOWITZ, ESQ.

19

```
20       ALSO PRESENT:

21           Martha Wyrick

22           William Birmingham

23           Michael Freyberg

24           Leslie Thorne

25
```

♠

```
 1

 2                THE REPORTER:  My name is

 3              Aydil M. Torres, a New York State

 4              notary public and certified

 5              shorthand reporter.  This

 6              deposition is being held via

 7              videoconferencing equipment.  The

 8              witness and reporter are not in the

 9              same room.  The witness will be

10              sworn in remotely pursuant to

11              agreement of all parties.  The

12              parties stipulate that the

13              testimony is being given as if the

14              witness was sworn in person.

15   B R E T T   C O H E N,

16              called as a witness, having been

17              duly sworn by a Notary Public, was
```

18          examined and testified as follows:

19                  THE REPORTER:  Please state

20          your name for the record.

21                  THE WITNESS:  Brett Cohen.

22                  THE REPORTER:  Please state

23          the address you are currently

24          located.

25                  THE WITNESS:  21 Charles

                                                    5

1

2          Street, Westport, Connecticut

3          06880.

4    EXAMINATION BY

5    MS. SIMMONS:

6          Q.   Good afternoon, Mr. Cohen.  I am

7    Camisha Simmons, counsel to Brickchurch

8    Enterprises, Inc.

9               Do you understand that you are here

10   for a deposition for Brickchurch Enterprises,

11   Inc., the bankruptcy case?

12         A.   I do.

13         Q.   And you also understand that this

14   relates to the property 366 Gin Lane?

15         A.   I do.

16          Q.   And is this your first deposition?

17          A.   Ever?

18          Q.   Ever.

19          A.   No.

20          Q.   And is this your first virtual

21     deposition?

22          A.   I think so.

23          Q.   Is there anyone in the room with

24     you right now?

25          A.   No.

                                              6

1                    Brett Cohen

2          Q.   And have you gotten rid of all

3     distractions during this deposition?

4          A.   Yes.

5          Q.   Is there a delay in the audio?

6          A.   Not for me, no.

7          Q.   So let me know, at any time, if you

8     need to take a break, and we may periodically

9     take breaks during your deposition.

10          At the moment, are you currently

11     taking any medications that will prevent you

12     from providing complete, truthful and

13     accurate testimony today, or that may affect

14    your memory?

15         A.   No.

16         Q.   Do you have any emotional or

17    physical conditions that would prevent you

18    from providing complete, truthful and

19    accurate testimony today or that may affect

20    your memory?

21         A.   No.

22         Q.   Mr. Cohen, where do you currently

23    reside?

24         A.   26 Broadview Road, Westport,

25    Connecticut 06880.

➤

                                                  7

1                   Brett Cohen

2         Q.   And is that where you are currently

3    at?

4         A.   No.

5         Q.   Where are you located right now?

6         A.   21 Charles Street, Westport,

7    Connecticut 06880.

8         Q.   So you are here with respect to

9    your role with JGB.  What is your role with

10    JGB?

11         A.   I am a partner.

12          Q.   And as a partner, what do you --

13   what do you do as a partner at JGB?

14          A.   I am in charge of oversight of

15   investments and interactions with investors.

16   So I'm, along with a partner, I really run

17   the fund.

18          Q.   And when you say, "run the fund,"

19   is your role similar to a CEO?

20          A.   Analogous, yes.

21          Q.   And how long have you been with

22   JGB?

23          A.   I founded it in 2005.

24          Q.   Before you were with JGB, what role

25   did you have?

⬆

                                        8

1                   Brett Cohen

2          A.   I was a portfolio manager at a

3   hedge fund called Elliot Associates.

4          Q.   How long were you with them?

5          A.   Approximately, eight years.

6          Q.   And before then, how many -- I

7   guess, overall, how many jobs have you had, I

8   guess, post -- you went -- you did go to

9   college, correct?

10          A.    I did.

11          Q.    Okay, after college, how many

12     positions have you had?

13          A.    Very few.

14          Q.    And so when you say, "very few," so

15     Elliot Associates, JGB, and what was before

16     Elliot Associates?

17          A.    I went to law school.

18          Q.    Did you practice law?

19          A.    Not really.  Only for the summers.

20          Q.    So you have been, I guess, in

21     investment -- in the investment industry ever

22     since you graduated from law school?

23          A.    Correct, from 1997.

24          Q.    So with respect to JGB, how would

25     you describe JGB, the company, and what it

                                                   9

1                    Brett Cohen

2     does?

3          A.    It's an investment firm, private

4     investment firm, yeah.

5          Q.    And who are your clients?

6          A.    Our limited partners are a mix of

7     high net worth individuals, some

8    institutions, and employees of the firm.

9    Interaga -- I mean there are other stuff, but

10   that's a broad description of the investors.

11        Q.    And how large or what's the amount

12   or the value of the assets that you have

13   under management?

14        A.    Approximately, $250 million in

15   assets under management.

16        Q.    And in terms of your business model

17   or investment strategy, what sort of

18   investments do you make on behalf of your

19   investors?

20        A.    We're primarily a credit firm.  So

21   that is, we don't primarily do equities, and

22   we're, I guess, what's conventionally known

23   as a "direct lender," so opportunistic

24   lender.  So interesting opportunities come

25   through our door and we look at them, and we

10

1                   Brett Cohen

2    are primarily a -- most of our investments

3    have a fixed income component.

4         Q.    And when you are deciding when to

5    loan or how to loan, what are the factors

6    that go into whether or not JGB makes a loan

7    to a company?

8        A.    It's multivariant.

9        Q.    Could you expound on -- when you

10    say, "multivariant," what do you consider

11    when determining whether or not to make a

12    loan to a company?

13        A.    So there's many facets of it.  It's

14    almost like asking what do you consider when

15    you are thinking about litigation.  So it's a

16    big conversation.  But to synopsize, first

17    and foremost, whether we think there's asset

18    coverage, if we think we're going to get

19    repaid.  Next, the rate of return, right, I

20    think in it's most distilled version, that's

21    really what we're up -- considering, we're

22    thinking about.  Are we covered by assets,

23    can we get repaid, our rate of return, and --

24    oh, and then as a third part, is there any

25    potential upside.  Sometimes this doesn't

11

1                 Brett Cohen

2    pertain to what I call Gin Lane, you may call

3    it Brickchurch or what have you, but

4      sometimes we have deals where there's some

5      equity upside where it's a convertible or

6      there's warrants or some such thing, and we

7      might consider that as well, but that wasn't

8      the case here.

9          Q.   When you say there's upside,

10     there's convertibles, there's warrant, you

11     mean convertible from debt to equity?

12         A.   Yes, conventionally, that's how you

13     would think of a convertible loan.

14         Q.   So you would -- you also -- not

15     only are you a lender, you do take an equity

16     stake sometimes in some of your investments?

17         A.   We have the option to convert into

18     equity in some of our investments, that's

19     correct.

20         Q.   So what percentage of your

21     portfolio is -- involves positions where you

22     have an equity stake?

23         A.   Well, I want to just make sure it's

24     an -- it's -- it's a potential equity stake.

25     So we do a loan and we have the option to

                                                    12

1                   Brett Cohen

2      convert into equity.  So it's not an equity

3      state strictly speaking.  It's an option for

4      an equity stake.  What percent?  If you --

5      what percentage of our deals are convertible

6      loans?  I am going to guess, twenty-five

7      percent.

8          Q.   Twenty-five percent are convertible

9      loans.  Have you -- what -- what triggers a

10     conversion under your agreements?

11         A.   Oh, yeah, so I don't know -- and I

12     am not being disrespectful, I just don't know

13     how much you know about convertible loans.

14     I've lived with them for twenty-five years.

15     So in the convertible loan market, which is a

16     multi trillion dollar market, an issuer, a

17     borrower issues a piece of debt.  The

18     investor is the owner of that piece of debt,

19     and if the owner wishes, the owner can

20     convert that debt into equity.  What converts

21     -- what -- in ninety-nine times out of

22     one-hundred, the thing that determines

23     whether we -- whether we or anyone else would

24     convert into equity is whether the equity

25     value -- and by the way, this is in

13

1                    Brett Cohen

2    ninety-nine times out of a hundred with a

3    public company, so whether the equity value

4    has gone above your conversion price.  So you

5    have a $100 loan, it's convertible at a price

6    of $10.  If the stock said $5, you wouldn't

7    convert.  That would be money losing.  If the

8    stock said $20, you could convert at $10, and

9    if you so choose, you can sell stock at $20.

10   That's money making.  So for me and the

11   entire rest of the tens of thousands of

12   people who have done converts, convertible

13   loans, the primary thing that determines

14   whether one converts -- not the exclusive

15   thing, but really the driving thing is

16   whether the stock is in the money.

17        Q.   And does JGB have any ownership in

18   equity in any company, at the moment?

19        A.   "Does JGB have any ownership of

20   equity in any company, at the moment?"  Yes.

21        Q.   Okay.  What is the exposure, what's

22   the percentage of that equity, in terms of --

23   in relation to your overall entire portfolio?

24        A.   De minimus.

25          Q.   Do you also loan to individuals?

                                              14

1                    Brett Cohen

2          A.   Rarely.  The large majority of our

3     portfolio is with corporates.  Sometimes

4     there's a little bit of a blending --

5     blurring of the lines of what's an individual

6     or what's a corporate.  So a public corporate

7     company is obvious.  A private company with

8     250 people is obvious.  But sometimes there

9     will be an individual who has a lot of stuff

10    going on, and they might be something like a

11    corporate.  But the majority of our stuff is,

12    I would say, eighty -- eighty percent, to my

13    mind, is with what you would, properly

14    speaking, call a corporate.  There's some

15    places where that's somewhat ambiguous.  So,

16    for example, with Ms. Blouin, she has a

17    corporate -- right, a corporation.  I don't

18    know if it's an LLC or what have you.  So is

19    that a person or a corporate?  It -- for me,

20    as a lay person, it's kind of hard to

21    articulate.

22          Q.   So I guess when you do have an

23    actual legal entity created, the entity that

24    you loan to would be, let's say in this case,

25    Brickchurch Enterprises, Inc., the borrower

                                              15

1                      Brett Cohen

2     under your loan would be Brickchurch

3     Enterprises, Inc., and not any individual

4     that had an ownership piece in the property

5     or in the company?

6          A.    That's generally -- I mean, that's

7     generally the case.  I am searching my mind

8     to think of an example.  Have we ever done

9     something with a person straight up, Joe

10    Schmoe, without any kind of corporate entity.

11    It would be a very small minority of our

12    deals.  I will say, we -- while the large

13    majority of our deals are with corporates,

14    and we very, very, very rarely, to my mind,

15    do a deal directly with an actual person, we

16    sometimes get personal guarantees from

17    people.

18         Q.    And when -- the loans that you take

19    out, what is the typical loan to value ratio?

20         A.    It doesn't really work like -- so

21    we don't have a stated loan to value ratio.

22    We want to make sure that we're covered.  I

23    would say, yeah, we don't have a policy that

24    says, "Oh, gee, we loan at sixty percent of

25    loan to value."  We look at a loan and think

                                              16

 1                    Brett Cohen

 2    in, you know, in a reasonable bad case, would

 3    we be -- would we be covered by the

 4    collateral.

 5        Q.    Okay, so in this case, you loaned

 6    for -- with respect to Brickchurch

 7    Enterprises, Inc., you made a $26 million

 8    loan?

 9        A.    That's correct.

10        Q.    And the loan to value was fifty

11    percent?

12        A.    Uh-huh, and we felt that -- I -- I

13    don't know, and you don't know, what the --

14    and Ms. Blouin doesn't know what this place

15    is worth.  The market will say.  What we felt

16    is that it was likely worth more than our

17    loan.

18        Q.    And you didn't use a loan to value

19    ratio when making this loan to Brickchurch

20    Enterprises, Inc.?

21        A.    That's correct.  We just felt that

22    it was likely worth more than our loan.

23        Q.    And so you never looked at loan to

24    value, other than you wanted to know if the

25    value was more than the 26 million?

                                                    17

1                    Brett Cohen

2        A.    We never -- we don't have a policy

3    that says, "We have to loan at sixty-two and

4    a half percent of loan to value."  We did not

5    do that here, and I don't believe at any

6    point we said, "Oh, our loan is 26, and our

7    loan to value is X percent."  Did we look --

8    I just want to -- because I think you kind of

9    asked me two questions there.  Did we look?

10    So did we have a specific loan to value, no.

11    Did we look, and did we feel that the value

12    was more than what we were lending, yes.

13        Q.    And the collateral under both of

14    those -- under that loan was both for 366 Gin

15    Lane, and a second lane on 376 Gin Lane?

16        A.    Yes.

17          Q.    And are you familiar with the

18     forbearance agreement that you entered into

19     with respect to that lone?

20          A.    I have a, you know, rough

21     familiarity with it.  It was several years

22     ago, but I remember that, you know, along

23     with not paying -- Ms. Blouin, along with not

24     paying her prior lenders, and employees, and

25     contractors, and lawyers, and brokers, and


                                             18

1                    Brett Cohen

2      taxes, she ultimately didn't pay us, and so

3      we entered into a forbearance agreement with

4      her.  Interestingly enough, I think one of

5      the piece of collateral was I think we had an

6      interest reserve, if memory serves me right,

7      and I also think that as soon as the interest

8      reserve ran up, she didn't pay us, but that's

9      just recollection.  So, yes, so I -- I do

10     recall that she defaulted to us, as she has

11     defaulted to nearly everyone else in her

12     life, and then we, in an effort to, you know,

13     work things out, we entered into a

14     forbearance agreement.

15          Q.    Okay, so Mr. Cohen, I have --

16     popped up on the screen is the forbearance

17     agreement.  It was dated July 11, 2019.

18              So under paragraph 4.4 under the

19     forbearance agreement -- do you see that?

20          A.    "If the borrowers repay the loan

21     and all of the other outstanding obligations

22     under the note any time after" -- "shall be

23     $2 million."  Yes, I see that.

24          Q.    And so this exit charge, because

25     you -- what is -- what is this exit charge?

                                              19

1                    Brett Cohen

2          A.    Just -- I'm just trying to refresh

3     myself.  This is a charge that the State

4     Court approved and the referee approved?  Is

5     that -- I am just trying to refresh my memory

6     here.  Oh, they did.  I think they did.  So

7     -- so -- so this charge, you know, sanctified

8     by the State Court and referee, I think this

9     was -- this is my surmise, I am only seeing

10     one -- you know, you are showing me one

11     section of this loan, of the amendment I

12     should say, or forbearance agreement, your

13    client defaulted, and this is my surmise; in

14    the lending industry, if someone defaults and

15    then asks for a forbearance, sometimes people

16    get consideration for doing that, rather than

17    foreclosing immediately.  So this is -- just

18    looking at this one section, my surmise is

19    here that in consideration for a forbearing,

20    we probably asked for some form of

21    consideration, and this may have been that.

22        Q.    And is an exit charge typical

23    charge under your forbearance agreements for

24    JGB?

25        A.    Not only -- so it is -- is it

<br>

                                              20

1                    Brett Cohen

2    typical, in general?  Sometimes it is.  And

3    sometimes it is, not only for us, for the

4    industry broadly, and then is consideration

5    typical when somebody defaults and you

6    forbear, I would say it's nearly universal.

7        Q.    And how did you determine the

8    amount of the exit charge?

9        A.    I don't recall.

10        Q.    Does JGB have a formula or --

11          A.   No.

12          Q.   -- some sort of standard for

13   determining that amount?

14          A.   No.

15          Q.   So that amount isn't tied to JGB's

16   anticipated loss?

17               MR. KANOWITZ:   Objection to

18          form; you can answer.

19          A.   I quibble with your premise about

20   an "anticipated loss."  I would just say, the

21   -- to my mind, an exit charge is -- what it's

22   tied to is the fact that your client

23   defaulted to us, and was defaulting to people

24   left, right, and center, and asked us to

25   forbear, and we did for some of period time.

❧

                                        21

1                  Brett Cohen

2    And so we, like, I think, any other

3    counterparty, asked for some consideration

4    for that.

5           Q.   There was no standard analysis or

6    formula for calculating the amount?

7           A.   No, no.

8           Q.   Okay.  Do you -- I have another

9      screen.  This is an e-mail that I am showing

10     you now, and the subject of that e-mail, if

11     you see -- do you see is "proposed JGB

12     payoff"?

13          A.   Yes.

14          Q.   And it looks like you were cc'd on

15     that e-mail?

16          A.   Yeah.  Do you have the rest of the

17     link beneath there?

18               MR. KANOWITZ:  It's been

19               redacted for privilege.

20               THE WITNESS:  I see.

21          Q.   And this is a -- yeah, let me

22     clarify.  This is a document that, you know,

23     if you see it says, "JGB," and has a Bates

24     number, it was produced - it was produced

25     during the discovery process in this

                                                   22

1                    Brett Cohen

2      litigation.  So this is a document that you

3      did produce.

4          A.   How do you -- forgive me, how -- do

5      you want me to call you Counselor Simmons?

6      Just tell me how I should refer to you and I

7    will.

8        Q.    You can call me Ms. Simmons, you

9    know, Counselor Simmons.

10       A.    Okay.

11       Q.    Whatever.

12       A.    So Counselor Simmons, can I just

13    have a minute -- if it's okay, if we just

14    slowly -- you asked me to --

15       Q.    Sure.  So you want me to start from

16    the top and --

17       A.    I think I got -- yeah, yeah, that

18    part, I got.

19       Q.    I will go back to the top.  You got

20    that part, okay.  And there's the redacted

21    portion.

22       A.    Uh-huh.

23       Q.    And then now we're here.

24       A.    Okay.  If we can keep going down,

25    that will be great.  Uh-huh.  Yeah, I mean,

                                            23

1                Brett Cohen

2    one thing that jumps out at me here is that

3    says $21 million, and the amount -- this was

4    recently, no?  This was, what?  This was in

5    2022.  So the amount owing to us at this

6    point was probably thirty -- in the high 30

7    millions.  So, I mean, the first thing that

8    jumps out at me is -- it's a -- looking at

9    this quite quickly --

10       Q.   Oh, I didn't ask you a question

11   yet, Mr. Cohen.

12       A.   Oh, sure.

13       Q.   You see the language, it says, I

14   actually don't -- this is from Hunter.  "I

15   actually don't think we should engage on

16   this, even if it's real.  Our position has

17   never been stringer or closer, and we are

18   getting close to 17 million of potential P&L

19   from the mark."  And so "P&L" -- you are in

20   the industry -- is "profit and loss,"

21   correct?

22       A.   Correct.

23       Q.   So that would mean profit.  So he

24   is speaking of the upside, correct, of the 17

25   million?

                                                    24

1                    Brett Cohen

2        A.   That's to the best of my

3    understanding, yes.

4         Q.    And so he is saying, even if this

5    proposal is real, this refinancing proposal

6    is real, we don't want to take it because

7    we're up 17 million, and we'd rather take the

8    profit?

9         A.    No, I think you are missing --

10              MR. KANOWITZ:  Objection.

11              Brett, let me jump in, before you

12              respond.  Objection to form; you

13              can answer the question.

14        A.    Yeah, so I think you're confounding

15   a couple of stuff.  So I will just

16   disaggregate.  So, first of all, the reason

17   that we wouldn't engage in the proposal is

18   because it's at a massive discount to what we

19   are owed.  So if you scroll down, it was --

20   at the time we were probably owed close to

21   $40 million, and the proposal, if I just

22   remember from what I briefly saw, was for

23   someone giving us, I don't know, $22 million,

24   if I recall, and then some kind of paper.  So

25   a -- I want to just be absolutely sure that

1                    Brett Cohen

2    you are not misunderstanding.  This wasn't

3    someone offering to repay us our loan.  This

4    was someone offering to repay us...

5         Q.   They were offering to re --

6              MR. KANOWITZ:  Please let

7              the witness finish his question --

8              I mean his answer to your question.

9         A.   So this was someone offering to pay

10    us $21 million, out of what was probably $40

11    million at the time, and then get some paper.

12    So a bad deal.  So if you go up to -- I think

13    that's incredibly important context for the

14    e-mail up above.  Would we take this deal

15    that isn't what we're owed?  Would we even

16    engage here?  No.  So that's part one.  I

17    just want to make absolutely sure that you

18    understand, this was not somebody offering to

19    repay us our loan.  This was someone offering

20    us a -- the -- not even the consolation

21    prize.

22         Q.   But here -- continue, finish your

23    sentence.

24         A.   So that's thing one.  And then

25    thing two, the part about being up $17

26

1                         Brett Cohen

2      million from the mark, that's -- the point is

3      -- is that at that point, we felt that the

4      properties were close to being sold, and we

5      felt that if they were sold, you know, we

6      were likely to get full value between the two

7      properties, and so why would we take a subpar

8      deal when we were close to, you know, we had

9      already, I think at that point, won

10     foreclosure and were close to having an

11     auction.

12          Q.   So you weren't willing to take that

13     21 million that Ms. Blouin would pay?

14          A.   We weren't willing to enter into

15     negotiations with someone who had had twelve

16     unreal notions in the past, has defaulted to

17     everyone she's done business with, and

18     proposed paying us fifty cents on the dollar

19     in cash, no, that wasn't very exciting to us.

20          Q.   So here -- in here there's another

21     e-mail and it's from you.  You recognize that

22     as your e-mail address?

23          A.   I do.

24          Q.   And it's dated Thursday, July 25,

25     2019.  It is to Ms. Blouin.  And the subject

1                    Brett Cohen

2     is "process," and in this e-mail you're

3     informing Ms. Blouin that it's 90 days, or at

4     least you think it's 90 days into the final

5     maturity of the loan?

6          A.   Yes, I think we had -- sorry, go

7     ahead.

8          Q.   And in advance of the maturity

9     date, you have said, "It makes sense to just

10    start transfer of title of the property."

11                    MR. KANOWITZ:  Objection to

12              form; you can answer the question.

13         A.   I mean are you saying that I said

14    it makes sense or I asked, does it?

15         Q.   You say in this e-mail, does it --

16    it's -- you're inquiring regarding transfer

17    of title 90 days before maturity?

18         A.   Yeah, did I ask your client if it

19    made sense to transfer title?  Yes.  Because

20    did I believe that she was going to default

21    in 90 days, I did, and I was correct.  And by

22    the way, let me just, for your benefit, read

23    -- it seems sort of a waste to lose an entire

24    season with someone more transactional than

25    us also working on this, and also to rack up

28

1                    Brett Cohen

2    incremental legal fees, via foreclosure that

3    would be added to allegation.  This is 2019.

4    It is now 2022, and do you know what's

5    happened?  We have missed many seasons, and

6    the loan has gone up.  So you're not asking

7    this question, but, yeah, it probably would

8    have made sense.

9         Q.   So 90 days before maturity, you --

10    JGB was thinking about taking title to the

11    property?

12         A.   Oh, we asked your client if she

13    wanted -- if she had no intention of

14    refinancing, or selling, and she had, to the

15    best of my knowledge, at this time, made no

16    efforts, after we had made our forbearance,

17    at this point, it was merely impossible that

18    she would get something done before our

19    maturity.  So we asked, do you want to just

20      -- is it something you want to do to -- do

21      you want to keep your property?  By the way,

22      I'd also point out, "we are perfectly happy

23      to live within our deal and wait until

24      maturity if that's what you prefer."  So we

25      simply asked a question.


                                                    29

1                    Brett Cohen

2           Q.   And at this time, were you speaking

3       with any potential purchasers of the

4       property?

5           A.   I don't -- I don't know.  I don't

6       believe so.  People periodically called us up

7       and said, "Oh, you have this loan with Louis

8       Blouin, she defaults to everyone.  She is in

9       default with you, you know, do you want to

10      talk about us buying it?"  We would sometimes

11      get phone calls from people out of the blue.

12          Q.   When you are saying "people" --

13          A.   Yeah.

14          Q.   -- who are "people"?  Are they

15      brokers?

16          A.   It would be brokers, funds.  Every

17      now and then someone would call us up and

18    say, "Is this in default?  Is it going to be

19    in default?  Are you interested in selling

20    it?"

21        Q.    And when you mention "brokers," do

22    you recall who those brokers are that would

23    call you and ask about the property?

24        A.    There was a hodgepodge of them.

25    No, I mean, our -- maybe I recall some.  But

                                                    30

1                    Brett Cohen

2    many -- over the years, many people have --

3    it's a fairly marque property, so many people

4    have called us up.  I mean we generally don't

5    engage in long conversations with them.  But

6    many people have called us up.  People have

7    -- yeah, many people have called us up over

8    the years.

9        Q.    You said you recall some.  Who are

10    the "some" that you recall?

11        A.    So...we spoke to -- so there's

12    three or four brokers who really do -- who do

13    a bunch of business out in that high-end

14    Hampton, and so they, over the years, called

15    us.  So I remember there's Michaela

16      Keszler -- oh, also sometimes brokers who

17      were hired by Ms. Blouin, when Ms. Blouin

18      stiffed them, would call us up, or also when

19      -- and so I think -- I think over the years

20      we probably received a couple of phone calls

21      from -- this is -- Harold Grant, I may be

22      merging peoples' names.  Someone named Procer

23      called us to complain.  I think that she felt

24      that your client was insane and stiffing her.

25      Michaela Keszler we've avenue spoken to over

                                                    31

1                    Brett Cohen

2      the years.  So that's some people that I

3      recall.

4           Q.   So the specific names you recall

5      are Michaela Keszler, Harold Grant, and

6      Procer.  Is that Anne Procer?

7           A.   Yeah.

8           Q.   And you say they were inquiring

9      about the property to purchase it?

10          A.   Not from us.  We couldn't sell it.

11     We -- we're just a note holder.

12          Q.   Around this same time, you were

13     also asking Ms. Blouin if it made sense for

14    her to transfer ownership to JGB?

15                    MR. KANOWITZ:  Objection to

16            form; you can answer.

17        A.   We didn't ask her to do it.  We

18    asked her if she wanted to do it.  On the

19    basis of her defaulting to everyone in her

20    life, including her lawyers, and her brokers,

21    and taxes, and not taking action -- clearly

22    not taking action that was going to avoid a

23    costly and lengthy foreclosure.  We just

24    asked if she wanted to transfer -- if she

25    wanted to transfer title.  I don't think

                                                    32

1                    Brett Cohen

2    there's some nefarious intent.

3        Q.   So you were willing, if she wanted

4    to take title, to take title to the property?

5        A.   Can you restate that?

6        Q.   So if she would have said, "Sure, I

7    will transfer title 90 days before maturity,"

8    JGB would have taken title?

9        A.   If it was okay with lawyers.  I

10    mean this was just businessman conversation,

11    but it -- in retrospect, if I could have

12    taken title back then, and not had, you know,

13    three years, and untold dollars of expense,

14    would I have taken it then, I mean it's

15    conjecture, but I certainly would have

16    considered it.

17         Q.   Okay, so there was a communication

18    -- I'm switching over to another e-mail.

19    This e-mail is from you, and it's dated May

20    28, 2019.  So it was before that last e-mail.

21         A.   Okay.

22         Q.   And the subject is "amendment for

23    discussion purposes."  And so I guess I will

24    give you a chance to read it.  Let me know

25    when you need me to scroll down.

                                              33

1                    Brett Cohen

2         A.   If you could, yeah, that would be

3    great.  You know, keep going, if you would.

4    Okay, do you have a chain of stuff before

5    that?  Like what's this -- what that's

6    responding to?

7         Q.   Well, this, obviously, is a

8    proposal from you, correct?

9         A.   Yes, although it may be something

10     that may be responding to a proposal from

11     your client.

12         Q.   Okay, on here, just looking at this

13     e-mail alone, you were -- you were taking --

14     willing to take equity, 50.25 million loan,

15     and you were going to take an equity piece

16     under this proposal?

17             MR. KANOWITZ:   Objection to

18             form; you can answer it.

19         A.   I'm sorry, can you point out where

20     it says, "an equity piece"?

21         Q.   You were going to take -- you had

22     rights over the shares, and so you were

23     taking an interest, a security interest in

24     the stock of the company.  You see that, the

25     pledge, the shares of the company in escrow?

↟

                                        34

1                  Brett Cohen

2         A.   Yeah, I think you may be

3     misunderstanding the -- that's not an equity

4     piece, in the way it's traditionally

5     articulated.  That's just if they default, we

6     could be on the board of -- I am presuming

7     here, just looking at this quickly.  We

8       didn't have equity in the property.  We were

9       -- had stock powers over the corporation.  So

10      that --

11          Q.   You were -- so this line here says,

12      "incurred" -- "JGB, as a result of taking

13      ownership of shares or exercising voting

14      rights" -- so if there was any default, JGB

15      could take ownership of shares and exercise

16      voting rights?

17          A.   Right.  The idea was --

18          Q.   So the --

19          A.   The idea here was of this equity

20      piece was not economic, it was control.  It

21      was that we would -- my presumption here is

22      when someone talks about "stock powers with

23      medallion guarantees" over a company, what

24      this means is, we -- we would -- this would

25      facilitate foreclosure if they defaulted on

                                                35

1                   Brett Cohen

2       us.

3           Q.   So under this scenario, you had --

4       if there was a default, you would take

5       ownership of shares and exercise voting

6    rights and control of the company, correct?

7        A.   We would, I think, control the

8    Brickchurch board decisions.  I think that

9    was -- my surmise is that was the notion

10   here.  Again, I am just trying to

11   differentiate -- hold on.

12       Q.   And so under the premises you

13   loaned -- go ahead, if -- were you finishing

14   a sentence?

15       A.   So this isn't us owning equity in

16   the properties.  This is us controlling the

17   board, in case there was a further default.

18   Do you understand the distinction I'm making?

19       Q.   You can control the board and based

20   on the one e-mail where you, you know,

21   inquired as a transfer in title, with control

22   of the company, and control of the board, you

23   could, if you wanted, transfer title to JGB

24   upon default, correct?

25       A.   Don't know.  I am not sure that

                                                36

1                   Brett Cohen

2    that's how it works.  But this was meant --

3    this was, to my recollection, meant for us to

4    be able to avoid a protracted process.  It's

5    not an economic -- there's no economic

6    benefit, other than control of voting rights

7    of the board.

8        Q.   And you wanted control of the

9    voting rights of the board in May of 2019,

10    and then in July of 2019, you were asking

11    about transfer of title, correct?

12            MR. KANOWITZ:  Objection to

13            form; you can answer.

14        A.   No, I wouldn't say I wanted it.  I

15    would say this was something we were

16    discussing with them, and I don't know that

17    it was responded to.  So, no, what I really

18    wanted was to have my loan paid off.  That's

19    what I wanted.

20        Q.   Okay.  So we're going to move over

21    to an Excel spreadsheet, so this document

22    also was produced during the discovery,

23    produced by JGB, and its's a spreadsheet, and

24    it's titled "Broker Outreach," and could you

25    tell -- tell us what this document is?

37

1            Brett Cohen

    2                    MR. KANOWITZ:  Camisha, I

    3           don't see it on my screen.

    4                    MS. SIMMONS:  You don't see

    5           the Excel spreadsheet?

    6                    MR. KANOWITZ:  You are not

    7           clicked on it.  Mine is still on

    8           May 28th e-mail.

    9                    MS. SIMMONS:  Let me see.

   10           Is it showing because --

   11                    MR. KANOWITZ:  No, all we

   12           see, at least, on my screen, is the

   13           May 28th, 2019, e-mail.

   14                    MS. SIMMONS:  I wonder if it

   15           doesn't recognize -- let me...

   16                    MR. KANOWITZ:  I don't know

   17           if it's in pdf form, if not, maybe

   18           it won't recognize.

   19                    MS. SIMMONS:  It's not in

   20           pdf form and that's probably why

   21           it's not recognizing it.  So...

   22                    THE WITNESS:  Do you want to

   23           just describe it?

   24      Q.   Yeah, so there's an Excel spread

   25    sheet and it's titled "Broker Outreach and

1                    Brett Cohen

2     notes," and it was produced by JGB, and

3     there's a list of name of brokers on the

4     broker -- on the spreadsheet, and it notates

5     a March 1st, "3/1 update."  So it appears

6     that there's this list of brokers, Erika

7     Grossman, Vincent Horasetus, Emma Herman, Pat

8     Parelo, and Tim Davis.

9             And so it appears that there was

10    some sort of broker outreach, and this Excel

11    spreadsheet references the 366 property.

12    It's -- there's a notation in there that

13    says, She brokered the deal when Louis bought

14    the house for 15 in 1998.  She just closed a

15    deal at 328 Gin Lane for 31 million.  This

16    was 2.5 acres and 2,500 square feet.  These

17    two parcels being separate is good for a fire

18    sale.  Right now she would list the pair at

19    80 million.  If the list -- it's listed

20    around 40 million for main house, low 30s for

21    guest house.  Guest, rock bottom for 30

22    million for main house.  25 million for guest

23    house."  So it appears from the spreadsheet

24    that JGB was reaching out to brokers and

25      specifically with respect to Gin Lane.

                                              39

1                     Brett Cohen

2           Do you know why JGB was doing that?

3                     MR. KANOWITZ:  Objection to

4            form.  You can answer the question.

5       A.   Why, when we had a large investment

6    in a property that had defaulted, were we

7    talking to experts about what it might be

8    worth?  Because we're investors who are not

9    incompetent.

10      Q.   And why would -- do you think there

11   was a notation regarding a "fire sale" on Gin

12   Lane -- on this -- on the Gin Lane property?

13      A.    Not for the reason that I think you

14   were thinking.  We always ask -- our job as a

15   lender is to think of what is a bad case

16   scenario.  So my guess is, since I don't

17   recognize any of the names you're mentioning,

18   except maybe the last one, was it Tim Grant

19   or something like that?

20      Q.    Tim Davis.

21      A.    Yeah, so other than that, I don't

22   recognize any of the names.  And one thing we

23    do in analysis in their lives is keep

24    apprised of the value of our investments.  So

25    I am fairly confident that that's what was

↟

                                        40

1                        Brett Cohen

2    being done.  And why a notation to what would

3    be a bad price, because we're lenders.  So we

4    want to know what a bad case scenario is.

5    When you started off this deposition, you

6    asked me what our criteria were, which were,

7    oh, we want to be covered.  We want to know

8    if we are covered in a bad case scenario.  So

9    in every -- in many analysis that we do here,

10   either before making an investment or while

11   we are monitoring, we say, "Well, what's best

12   case scenario?  What's a fire sale case?"  We

13   need to know what our downside is.

14        Q.   And do you do this for any of your

15   -- what -- when do you use broker outreach or

16   do a broker outreach in your -- in JGB's

17   business operations or business model?

18        A.   Very frequently.  I would say -- I

19   would say -- hold on, let me just finish.  I

20   would say, in every instance that I can ever

21    think of, in nearly every instance I can ever

22    think of where real estate is collateral for

23    a loan, we reach out to brokers before,

24    during, and after making an investment, and

25    as would, I think, any other professional

                                            41

1                    Brett Cohen

2    investor.

3         Q.   And when you reach out to these

4    brokers, what are you -- what are you asking

5    them?

6         A.   "Hey, what's this place worth?

7    What are other places worth?  What are the

8    comps going for?  What would happen in a bad

9    case scenario?"  That's, again, what we and

10   every other professional investor who has

11   reel estate collateral, that I know of,

12   that's competent, does.

13        Q.   And do you, JGB, or any of your

14   analysts go out to the properties and inspect

15   them near sales?

16        A.   Always.  You are talking about when

17   we're -- when they are an investment property

18   of ours?

19          Q.    Yes.

20          A.    Always.

21          Q.    And so do you also send appraisers

22     out to value the property?

23          A.    Periodically.

24          Q.    So you do your own inspections, you

25     periodically send out appraisers --

➤

                                           42

1                    Brett Cohen

2          A.    We talk to brokers.

3          Q.    So why do you need to talk to

4     brokers about value, when you have your own

5     inspections, and your own appraisers?

6          A.    Oh, we have a view that -- we have

7     a skeptical view of appraisers.  And we

8     believe that the closer you get to people who

9     are actually transacting the better

10    information one gets, and I would think that

11    nearly every successful firm in my business

12    has the same view.  So we like to talk to the

13    people who actually transact, as well as the

14    people who just opine.

15         Q.    So you said you have a skeptical

16    view of appraisers.  So have you reviewed the

17      FTI appraisal report?

18           A.   I have not.

19           Q.   Have you been informed about the

20      FTI appraisal report?

21           A.   I have heard it discussed.

22           Q.   And do you know the conclusions

23      under that report?

24           A.   Sitting right here, I don't.

25           Q.   Do you know who the appraiser was

&#9650;

                                          43

1                     Brett Cohen

2      for that report?

3           A.   FTI.

4           Q.   Do you know the employee of FTI

5      that went out and conducted the appraisal?

6           A.   I think it starts with an "H."

7           Q.   You think it starts with an "H"?

8           A.   Yeah, I think his name started with

9      an "H."  Danic?  That's not with an "H."

10      Hanock.  Danic.  I am not sure.

11           Q.   I will represent it's Mark Dunec,

12      the managing director of FTI.

13           A.   I accept -- I accept that.

14           Q.   And so this appraisal report, there

15   are communications that JGB provided --

16   provided Brickchurch that shows that FTI

17   reached out to Michaela Keszler to get data

18   to -- with respect to in the process of

19   putting together the report.

20          Do you know how Michaela Keszler

21   came into contact with FTI?

22     A.   I don't.

23     Q.   And --

24     A.   I mean, maybe they used a

25   telephone.

                                              44

1                    Brett Cohen

2      Q.   Do you -- let's back up.

3           Do you know Michaela Keszler?

4      A.   How do you mean?

5      Q.   Have you ever met Michaela Keszler?

6      A.   I don't know if I have ever

7   physically met her.

8      Q.   Have you ever spoken -- spoken to

9   Michaela Keszler over the phone?

10     A.   I have, yeah.

11     Q.   Have you ever communicated with

12   Michaela Keszler through e-mail, or any other

13     electronic communication?

14          A.   I am not sure if I have, but

15     definitely the firm has.  I think -- I think

16     Hunter for sure did.

17          Q.   And what is Michaela Keszler's

18     relationship to the firm?

19          A.    Well, after your client -- after

20     the foreclosure was granted -- this is to the

21     best of my recollection.  So after

22     foreclosure was granted at the State Court,

23     it became apparent that, you know, an auction

24     was going to be coming up, and indeed it did,

25     and I think that we hired her, in relation to

                                        45

1                     Brett Cohen

2     that, to what we thought would be, before

3     your client filed for bankruptcy, what we

4     thought would be an upcoming auction.

5          Q.   And so the first -- had you ever

6     hired Michaela Keszler in the past?

7          A.   I don't believe so.

8          Q.   So she had a preexisting

9     relationship with your firm through some --

10     someone at the firm; is that correct?

11          A.   I -- I -- I -- I don't -- I don't

12     think so.  It's possible, but that's

13     surprising to me.  I think -- no, I don't

14     think we had -- to the best of my

15     recollection, we did not have a preexisting

16     relationship with -- are you saying before we

17     hired her in connection with the foreclosure

18     auction?  No, I don't believe we had a

19     preexisting relationship with her.

20          Q.   And so for the auction, was it ---

21     when did you hire her?  Do you recall when

22     you hired her for the work on the auction?

23          A.   I don't recall, and they tell you

24     not to make guesses, but my guess is, in

25     2022.  You know, on -- sometime before the

                                              46

1                    Brett Cohen

2     auction.

3          Q.   And what was her role with respect

4     to the auction?

5          A.   To the best of my recollection, to

6     help find buyers.  We didn't want nobody to

7     show up at the courthouse steps.  Contrary to

8     your insinuations, we didn't want to just end

9      up with the property.  We wanted someone to

10     buy it.  The thing that we always wanted was

11     just to be paid off our debt.  And we -- so

12     we didn't want to have a failed auction.  So

13     I think, to the best of my recollection, we

14     hired her to help get interest, to help get

15     good prices for the auction.  We were -- we

16     were indirectly helping your client, I think.

17         Q.   And, you know, there was no

18     auction, correct?

19         A.   Your client filed for bankruptcy on

20     the Saturday before, correct.

21         Q.   Uh-huh.  And so Ms. Keszler was

22     supposed to assist you with an auction of the

23     property outside of bankruptcy, and then, you

24     know -- correct?

25         A.   Yes, we -- to the best of my

                                              47

1                    Brett Cohen

2      recollection, she -- what we wanted was, you

3      know, what we didn't want was for nobody to

4      show up, or nobody to know about this

5      auction, which as an on the side, goes

6      contrary to a lot of what you are

7    insinuating, but -- so we hired her to

8    publicize it, try to find buyers.  That's --

9    that's my recollection.

10        Q.   And she was being compensated, you

11   know, to find buyers for the auction outside

12   of bankruptcy?

13        A.   Yeah, she's not working as a broker

14   pro bono, no.  She's expecting to be -- and I

15   haven't met many not-for-profit real estate

16   brokers.

17        Q.   And, then, Ms. Michaela Keszler

18   reemerges or reappears to assist FTI with its

19   appraisal in the bankruptcy?

20             MR. KANOWITZ:  Objection to

21             form; you can answer.

22        A.   No idea.  But I wouldn't be -- I

23   mean, I would say kudos to FTI if they

24   reached out to her.  I mean, she is -- I

25   think one reason we hired her is we felt she

                                        48

1             Brett Cohen

2    was knowledgeable in the area, and so if FTI

3    reached out to her, you know, amongst other

4    people they reached out to in their

5   determination of value, I would say, kudos to

6   them.

7       Q.   Are you aware that Michaela Keszler

8   put in offers on the property in 2019, as a

9   broker?

10      A.   She put in offers for herself or as

11  an intermediary for someone else?

12      Q.   As an intermediary.

13           Are you aware that she put in

14  offers as an intermediary on the property in

15  2019?

16      A.   That -- that may have been a fact I

17  knew.  I presently don't recall that, but it

18  doesn't surprise me, and I think that that

19  speaks well to her.  So she's well situated

20  to find buyers and knowledgeable about the

21  area.  I think that's -- that sounds --

22  sounds like a positive to me.

23      Q.   Okay.  So Michaela Keszler has put

24  in offers at the properties.  There were

25  offers in 2019.  Michaela Keszler has -- was

                                              49

1            Brett Cohen

2   going to be compensated -- was going to be

3    compensated by JGB to find buyers for the

4    auction that was going to occur if there was

5    not a bankruptcy, and then Michaela Keszler

6    assists FTI with its appraisal of the

7    property, 366 Gin Lane, and 376 Gin Lane

8    during the bankruptcy proceeding?

9         A.    Yes, what you are describing --

10   what you are describing is someone who sounds

11   like a reasonably competent and knowledgeable

12   broker, someone who had had offers on a

13   place, someone who, because she was well

14   situated, was hired to help draw up interest

15   on a place, and then someone who was

16   consulted on valuation for a place.  Sounds

17   like all -- you know, makes sense to me.

18        Q.    So you don't believe there was a

19   conflict of interest to have -- have an

20   interest in auction taking place outside of

21   bankruptcy, and --

22             MR. KANOWITZ:  Objection to

23        form.  Sorry go --

24             MS. SIMMONS:  I didn't

25        finish my question, right?

```
 1                    Brett Cohen
 2                    MR. KANOWITZ:  Camisha,
 3            you're rambling questions.  You did
 4            this last deposition.  And I have
 5            let you try to do this again this
 6            deposition without interfering.
 7            But you can't keep stringing these
 8            objectionable questions without me
 9            objecting.  Sorry I interrupted
10            you.  I thought you were done.  But
11            continue, and I will object to form
12            when you are done.
13      Q.    Do you believe Michaela Keszler had
14    a conflict of interest when she assisted with
15    the appraisal report?
16                    MR. KANOWITZ:  Objection to
17            form; you can answer.
18      A.    No.
19                    MR. KANOWITZ:  Can we just
20            take a five-minute break?  We've
21            been going for a little bit over
22            than an hour.  I just need a break
23            for five minutes.
24                    MS. SIMMONS:  Sure.
25                    THE WITNESS:  Okay.
```

⬆

1                    Brett Cohen

2                    MR. KANOWITZ:  Come back at

3            3:25?

4                    MS. SIMMONS:  Yes.

5                    MR. KANOWITZ:  Okay, great.

6                    (Whereupon, a recess was

7            taken at this time.)

8    BY MS. SIMMONS:

9        Q.   So we were speaking of the FTI

10   appraisal.  And are you aware of the results

11   of the FTI appraisal?

12       A.   No.

13       Q.   Do you -- I will represent that the

14   appraiser valued 366 Gin Lane at 40 million.

15       A.   Oh, okay.

16       Q.   And do you believe that's the

17   correct valuation?

18                   MR. KANOWITZ:  Objection to

19            form.  You could answer.

20       A.   If someone were going to ask me my

21   guess, that would have been my guess, would

22   be 40.  That said, the ultimate determinant

23   is Mr. Market.

24        Q.    And if that amount, 40 million, was

25    accepted, what's the current -- what do you

↟

52

1                    Brett Cohen

2    believe or what's your position on what's

3    currently owed to JGB under the loan?

4                    MR. KANOWITZ:   Objection to

5            form.  You can answer.

6        A.    Some months ago, I think when your

7    client filed, it was in the order of

8    magnitude of $43 million, and I think that

9    there's some -- yeah, I presume there's

10   interest accruing.  So if you said in the low

11   40s, you know, more than -- more than, and

12   this is just -- this is not binding in any

13   respect, this is just my -- you asked me what

14   I thought it was, you know, 43 to 45 million,

15   but please, you know, take -- I am not

16   calculating, you know, the daily accrual of

17   interest.

18       Q.    And so the FTI valuation of 40

19   million is below that ballpark amount that

20   you just gave?

21                   MR. KANOWITZ:   We'll

22          stipulate to that.

23          Q.   And are you -- do you know that --

24     Mr. Cohen, that under secured creditors are

25     not entitled to post petition interest on

↑

                                        53

1                    Brett Cohen

2      their claims in bankruptcy?

3                    MR. KANOWITZ:  Objection to

4                form, and you're asking for a legal

5                conclusion, but you can answer if

6                you have knowledge.

7          A.   I think in this case, and I am not

8      a real live lawyer, I mean, I went to law

9      school, but I mean we also have a second lien

10     in 376, so based on a nuanced discussion than

11     the way -- to my mind, in the way you are

12     setting it out.

13         Q.   So tell me about your second lien

14     in 376.

15         A.   Yeah, so we -- there's a first

16     mortgage there, and, you know, in -- in the

17     order of magnitude of $51 million, and our

18     loan is a first lien against 366, and a

19     second lien against 376.

20          Q.    So would you say you are over

21    secured with both liens?

22          A.    I guess it depends how long it --

23    in part, it depends how long this process

24    drags on, right?  I mean once upon a time

25    this was, I don't know, something like $26

↑

54

1                    Brett Cohen

2    million, and now it's 43.  If we're here X

3    years from now, I hope we're not, so I mean,

4    yeah, so I think it depends on -- I mean, in

5    part, on timing.

6          Q.    As of today, do you -- are you over

7    secured?

8                    MR. KANOWITZ:  Objection to

9              form.  Calls for a legal

10             conclusion.  You can answer, if you

11             know.

12          A.    I think we'll be repaid our debt,

13    what we're owed.

14          Q.    And why do you believe that?

15          A.    I think if you have the -- a value

16    today of 366, plus, I guess, the

17    non-bankrupt, you know, it's not part of the

18    bankruptcy estate, but 376, I think that

19    there's probably -- yeah, I think there's --

20    listen, if 366 is worth $40 million, as long

21    as 376 is worth more than $20 million, we

22    should be -- we should be good.  So, yeah, I

23    think -- I think -- I don't know for sure,

24    but -- I certainly don't know for sure, but

25    yeah, it would be my guess.

55

1                    Brett Cohen

2        Q.   It would be your guess that you are

3    currently -- the value of your collateral

4    currently exceeds the outstanding balance of

5    the loan?

6        A.   Yes.  I don't know.

7        Q.   Okay.

8        A.   And that's -- but, again, to be

9    clear, that's including the second lien in

10   376.

11       Q.   Okay.  Let's talk about Chris

12   Brown.  Do you know Chris Brown?

13       A.   I have -- I have dealt with him

14   over the years, yeah.  I know him.  I mean,

15   we're not -- it's not someone I am close

16    with.  I don't think I have seen him -- I

17    don't think I have seen him in twenty years.

18         Q.    You haven't seen him in twenty

19    years?

20         A.    I don't believe so, no.

21         Q.    And when was the last time you

22    communicated with him?

23         A.    He likes to communicate with me

24    about Gin Lane.  So he -- he asks me for

25    updates, and he knew it was any this and any

                                              56

1                    Brett Cohen

2    that, and I guess he was a renter there last

3    summer.

4         Q.    And so you are aware that he rented

5    366 Gin Lane?

6         A.    I am.

7         Q.    Did he ever make any inquiries on

8    purchasing 366 Gin Lane when he has been

9    communicating with you?

10         A.    Yes.

11         Q.    And do you recall what he has been

12    -- what he has asked you regarding the

13    property?

14          A.    Yeah, he...there was a time many

15     moons ago when he was considering buying our

16     note, and then he wasn't willing -- he

17     ultimately wasn't willing to do that, and

18     that fell apart a year or two ago.  So he

19     communicated with us on that.  But he had

20     made an offer to buy our note, and then from

21     the best of my understanding, you know, if --

22     if his representations are to be believed, he

23     wanted to -- he wanted to be present if there

24     was an auction.  So, he -- the main thing he

25     asked me, is there going to be an auction,

                                                  57

1                    Brett Cohen

2     when is there going to be an auction, any

3     progress with the auction?  That's really the

4     majority of what he reached out to me on.

5          Q.    Okay.  I am going to share another

6     document.  So I guess you said you have been

7     communicating with him over the years, and I

8     guess that includes text messages.  This is

9     -- these are some text messages that were

10     produced by JGB in the discovery and during

11     this litigation.

12          Do you recall texting back and

13  forth with Mr. Brown?

14      A.   Yes.

15      Q.   And it appears from this line of

16  questioning, that he was looking for you to

17  finance his purchase with 23 million down,

18  and seventy-five days later, 11 million?

19      A.   I think you have it opposite.  Just

20  looking at this, I think he was suggesting

21  buying our paper for, it looks like here, $34

22  million, with $23 million down upfront, and

23  $11 million down later.  I wouldn't say that

24  that's us financing, you know, I would just

25  say that's his purchasing our paper.

                                        58

1              Brett Cohen

2      Q.   So he was purchasing your paper in

3  installments?

4      A.   Well, he wasn't purchasing it.  We

5  were discussing it.  I mean, we're a market

6  business.  We -- every investment we have, we

7  will always talk to people about -- if they

8  want to buy it, I mean, we are fiduciaries,

9  we really have to listen to what people say.

10          Q.    And do you recall Ms. Blouin

11   approaching you about financing with Reil

12   Bank?

13          A.    Reil Bank, the one that was --

14   where the -- the two founders were indicted

15   multiple times for fraud, that one?  Yeah, I

16   do recall that.

17          Q.    And --

18          A.    That wasn't a real -- and the thing

19   that had an unsigned draft stuff on the -- on

20   what we saw, and also required -- had no

21   interest rate stated.

22          Q.    Yeah, so here it is, the draft you

23   are referring to, the unsigned draft.

24          A.    Yeah, yeah.

25          Q.    And you thought this was not real?

                                        59

1                 Brett Cohen

2          A.    Correct.

3          Q.    And why did you not think it was

4    real?

5          A.    Well, the two founders of the bank

6    were felons.  We never heard of the bank

7    before.  If you go to the bottom of it, it

8    says "draft," and it's all unsigned.  It

9    doesn't have a stated interest rate.  It

10   requires Ms. Blouin, by recollection, to pay

11   $162,500 to them.  It doesn't say what we

12   would be repaid.  It merely says what they

13   would loan her.  And if you go up, back to

14   the body of the agreement, further --

15   further, you may have missed it, but, yeah,

16   so on top of the -- debited against the $32

17   million that they were talking about lending

18   her, they were asking her first and foremost

19   and she was asking us to deposit $20 million

20   in a bank account for them.  I don't know if

21   you are familiar with that.  It was the most

22   ridiculous illegitimate joke I can recall

23   seeing as a professional investor.

24        Q.   So what investigation did you or

25   JGB conduct into Reil Bank?

                                        60

1                   Brett Cohen

2        A.   I don't recall, but if you go, as I

3    presume you have, you seem like you are

4    diligent, if you pull them up you will see

5    that they were -- two founders were indicted

6      for fraud, tax stuff, hiding assets, bad

7      stuff, father and son Reil.  Next, you will

8      see that this is an unsigned term sheet.

9      Next, you will see that it doesn't propose

10     how much it's going to pay us back, but they

11     wanted us to pay $20 million to them.  Sort

12     of like the Nigerian schemes where they call

13     you up and you have to deposit money and then

14     they'll give you lots of money.  So it was

15     not a serious or close to serious proposal.

16     It was rise able.

17         Q.   Did you ever call the bank?

18         A.   We didn't call them, but to the

19     best of my recollection, Ms. Blouin asked us

20     to get on the phone with them, and we did.

21     We asked them if they had a legal commitment

22     to loan, they said, no.  Then, they said, we,

23     the people who were being paid off, had to

24     pay -- I think it was $20 million, first, and

25     then they would take care of us later.  And

                                                    61

1                  Brett Cohen

2      so we said, you know, with -- with payoffs

3      like this, thanks, but no thanks.  And then

4       if you look through this, I mean, this is by

5       my recollection from a few years ago, again,

6       it didn't say what we would even be paid off,

7       it didn't have an interest rate.  It just

8       seemed like -- let me also take a step back

9       and say, in the mortgage refinance business,

10      it's not the norm or our obligation to talk

11      to potential refinancing lenders.  What

12      happens in the vast, vast majority of the

13      time, someone decides to lend to one of our

14      borrowers, and someone says, "Give us a

15      payoff letter."  And we give a payoff letter.

16      Period, end of story.  There's no obligation

17      or norm for us to hold hands, sing Kumbaya,

18      get on fourteen phone calls with, you know,

19      every potential lender who a borrower has,

20      particularly when everything the borrower has

21      said has been not in touch with reality.  So

22      the way it works is, people make a commitment

23      to lend a borrower money, someone asks us for

24      a payoff letter, and we're done.  And that's

25      what we've wanted here from the very

                                          62

1                    Brett Cohen

2      beginning, and continue to want.  If -- if

3      your client can refinance this out, we'd be

4      thrilled to do it.

5          Q.   And Ms. Blouin did ask for the

6      payoff amount with respect to Reil?

7          A.   Okay.  That's easy for her to

8      calculate.  Did she have a formal commitment

9      from them?

10         Q.   But you assumed she just asked for

11     -- she asked for the payoff amount and you

12     came to the conclusion that Reil -- the Reil

13     deal was not real.

14         A.   Well, when she was talking to us

15     she said, you have to take 50 percent of the

16     money owed, or 25 percent of the money owed,

17     or 60 percent of the money owed, the world

18     has changed, things are bad -- we

19     certainly --

20         Q.   And attached to this agreement is

21     actually an invoice from the firm that did

22     the work on this loan transaction, and do you

23     believe that this is also fake, an invoice a

24     from a firm, Phillips Nizer?

25                   MR. KANOWITZ:  Objection to

1                    Brett Cohen

2              form; you can answer.

3        A.    Are you saying do I doubt that

4    someone did legal work on this for Ms.

5    Blouin?  I doubt that she paid them.  But I

6    don't doubt that someone did legal work, no.

7    That's perfectly possible.

8        Q.    But you assumed that this was not

9    real?

10                    MR. KANOWITZ:   Objection to

11              form; you can answer.

12        A.    I think the fact that it was an

13    unsigned term sheet, from a bank where the

14    two founders had been indicted, that required

15    us to invest $20 million before we got money

16    out, that charged her $162,000 for the

17    privilege of them looking at it, that didn't

18    have an interest rate, that didn't state what

19    we would get paid off, yeah.  If there's

20    someone who thinks that that is real, I would

21    be very curious to meet them.  They would not

22    be a professional investor.

23        Q.    And do you have any e-mails or

24    other communications that document that 20

25    million request from Reil?

&

                                                    64

1                    Brett Cohen

2         A.   Oh, you have that.  If you just --

3    if you just scroll up, I am sure you read it,

4    but I will just point you to it.  Okay, so if

5    we just slowly -- "as part of the private

6    banking relationship between the guarantor

7    and the bank, the guarantor undertakes to

8    deposit on the guarantor account, a minimum

9    amount of $20 million, prior to the

10   disbursement date."

11        Q.   So you are telling -- so JGB was

12   the guarantor?

13        A.   No, but I could -- when -- to the

14   best of my recollection, when we got on the

15   phone with them, they wanted us to put this

16   money in as a precondition to some craziness.

17   It was insane.  So were we the guarantors,

18   no.  And on top of that, did Ms. Blouin have

19   $20 million sitting around?

20        Q.   So under this -- the evidence that

21   you said reflects that the 20 million -- they

22   requested 20 million from you was in this

23    agreement, and under this paragraph it says,

24    the guarantor was to deposit 20 million, so

25    then JGB must the guarantor.

↟

                                                    65

1                    Brett Cohen

2        A.    No.

3                    MR. KANOWITZ:  Objection to

4            form.  You can answer the question.

5        A.    I am saying that when this was

6    brought up, and Ms. Blouin spoke about it

7    with us, she said that we would have to put

8    that money, and then we laughed.

9        Q.    And so you said Ms. Blouin -- what

10   if Ms. Blouin says that she never spoke to

11   you about -- and told you about this 20

12   million?

13                   MR. KANOWITZ:  Objection to

14           form; you can answer, if you

15           understand it.

16       A.    Yeah, the best of my recollection

17   is we were told that we needed to put that

18   in.  And second of all, she didn't have $20

19   million, or 10, or 5.

20       Q.    And how do you know that she didn't

21    have 20 million?

22        A.    Well, the fact that she wasn't

23    paying her water bills, her insurance, her

24    lawyers, her groundkeepers, her brokers, the

25    other lender, her employees, us, that's a

66

1                    Brett Cohen

2    good starting indication that she didn't have

3    a lot of liquid capital around.

4        Q.    And are you -- do you know that

5    this deal right here, this proposal, was the

6    same financing package that Reil Bank had

7    actually transacted and closed with Ms.

8    Blouin for her Paris property?

9                    MR. KANOWITZ:  Objection to

10              form; you can answer.

11        A.    It was literally this exact same

12    agreement?  They loaned her money on a Paris

13    property based on a place in Southampton?

14        Q.    They -- they -- this was a loan --

15    on her Paris property, this was the loan with

16    the same term that they did for her for the

17    Paris property; were you aware?

18                    MR. KANOWITZ:  Objection to

19          form; you can answer.  Facts not in

20          evidence.  You can answer.

21     A.    No idea, and it's not relevant to

22  me.  If -- if she wants to come -- if at any

23  time she wants to come to me with a pay -- to

24  pay us off, we're very happy to be paid off.

25  We always have been.


                                                    67

1               Brett Cohen

2     Q.    Okay.  So let's go to another

3  e-mail.  This e-mail is dated May 31st, 2019.

4  It's from Ms. Blouin to you.  No subject.  So

5  I will scroll slowly.

6     A.    Okay.

7     Q.    And she's telling you that she's

8  putting 366 on the market for 59 million.

9     A.    59 million.  Okay.

10     Q.    And your response in another e-mail

11  to her was to "Please direct communication to

12  our counsel.  The below doesn't work for us."

13     A.    What's "the below"?  What you just

14  showed me was above.  2:50 a.m., May 31st. I

15  am not sure I follow your question.  What's

16  the below?

17          Q.   Okay, so, well, I guess the e-mail

18     is out of order, but if you look at the date

19     stamp, this is at 15:26, 3:26 p.m., and then

20     the other e-mail was at 2:50 a.m. on the same

21     day.  So this was later in order, at 15:26,

22     3:26 p.m., and it says -- after she said, "I

23     am putting the property on the market for 59

24     million," you said, "it doesn't work for us."

25          A.   I think I said, "Please direct your


                                        68

1                    Brett Cohen

2      communications to our counsel."  And it --

3      assuming that you are correct that this is

4      responsive to the first thing, "the below

5      doesn't work for us" -- so I don't accept,

6      first of all, that this is responsive,

7      necessarily, to the prior e-mail.  But if you

8      go up to that e-mail above -- so she asked us

9      to reconsider the offer.  I don't know what

10     the offer was, but perhaps I didn't want to

11     reconsider it.  She asked us not to have a

12     foreclosure.  I perhaps wanted to continue

13     pursuing our rights.  So I am not sure what I

14     said wasn't acceptable to us, but that's

15    probably why I directed her to our counsel,

16    right.  That and the fact that she accuses

17    everyone that she deals with of, like, being

18    in a conspiracy against her, right?  So

19    better to have counsel deal with it.

20        Q.   Okay, so at one point -- at one

21    point your attorneys said that you had never

22    contacted Morgan Stanley.

23            Are you aware of that statement?

24            MR. KANOWITZ:  Objection.

25            Objection to form.  You can answer.

                                                   69

1                    Brett Cohen

2        A.   Yeah, I don't believe that -- I

3    don't recall I or anyone at my firm ever

4    speaking to somebody at Morgan Stanley about

5    this loan, to the best of my recollection.

6        Q.   Would you be surprised that Morgan

7    Stanley informed Ms. Blouin that you tried to

8    negotiate to buy their debt on 376?

9            MR. KANOWITZ:  Objection to

10           form; you can answer.

11       A.   Yeah, that's -- that's false.  I

12   don't have any recollection of that.

13          Q.   And as a fund manager, and as a

14    lender, what are your fiduciary

15    responsibilities?

16          A.   My fiduciary responsibilities are

17    to my investors.

18          Q.   Do you have any disclosure

19    requirements to your borrowers?

20          A.   Are you asking for a legal

21    conclusion?

22          Q.   Do you have any disclosure

23    requirement that you have to make to your

24    borrowers?

25          A.   As a matter of statute?

                                        70

1                    Brett Cohen

2          Q.   Is it your understanding, in

3    practice -- in your position and practice,

4    that you have to make certain -- make

5    disclosures to borrowers?

6          A.   I have to honor our contracts, but,

7    no -- no -- no more and no less.  Are you

8    asking me, do I have obligations beyond, you

9    know, the four corners of our contract?  I

10    would say, certainly not.  That's why we have

11    contracts.

12        Q.   And so you don't -- based on that,

13    do you believe you were obligated to disclose

14    the -- your relationship to Brown and the

15    communications?

16                MR. KANOWITZ:  Objection to

17            form.

18        Q.   Do you believe you had an

19    obligation to disclose your relationship --

20    to disclose to Brickchurch, your relationship

21    to the renter of 366 Gin Lane?

22                MR. KANOWITZ:  Objection to

23            form; you can answer.

24        A.   When and why?

25        Q.   When the renter began inquiring

                                        71

1                    Brett Cohen

2     about purchasing the property, do you believe

3     you had an obligation to disclose that to the

4     borrower?

5         A.   No.

6         Q.   When the renter began discussions

7     with you regarding purchasing the paper, the

8     note, do you believe you had an obligation to

9    disclose that to the borrower?

10         A.   No.  Are you suggesting that every

11    time an investor gets a conversation, an

12    inquiry about buying a piece of paper, he has

13    to go talk to his borrower?  That's

14    extraordinary.  I have never heard such -- I

15    mean, that's -- that's incredible.  We get

16    inquiries all day long about our loans, as

17    does every firm.  If they had to go -- some

18    serious, some not serious.  If -- if the

19    contract specifically holds, it would be an

20    astonishing contract.  I have never seen a

21    contract like this.  So if the contract said,

22    every time you get an inquiry about your

23    paper, you have to tell a borrower -- but

24    that would be absurd, and that's why it

25    doesn't exist anywhere.  It's ridiculous.

⬆

1                   Brett Cohen

2         Q.   And do you know anyone by the name

3    of Jennifer Brennan?

4         A.   Not to my knowledge, no.

5         Q.   Do you know that Jennifer Brennan

6    says she was bullied by JGB?

```
 7              MR. KANOWITZ:  Objection to

 8          form; you can answer.

 9     A.   No.

10     Q.   Let's see if I have any...so it's

11   your position that you never approached JGB

12   about buying -- I mean, sorry, you never

13   approached Morgan and Stanley about buying

14   their debt at a discount?

15     A.   Correct, I don't recall that.

16     Q.   Do you know if any JGB employees

17   approached Morgan Stanley about buying their

18   debt at a discount?

19     A.   To the best of my knowledge, nobody

20   at JGB has ever been in contact with someone

21   from Morgan Stanley about this loan, ever.

22     Q.   Okay.

23              MS. SIMMONS:  I think we've

24          been going for a couple of hours,

25          and if I have anymore questions, I
```

                                                     73

```
 1          Brett Cohen

 2          will reserve those.  So I will pass

 3          the witness.

 4              MR. KANOWITZ:  Mr. Cohen, I
```

5           just have a few questions.

6                  THE WITNESS:  Sure.

7    CROSS-EXAMINATION BY

8    MR. KANOWITZ:

9        Q.   Does JGB want to take over either

10   366 or 376 Gin Lane for its own business

11   purposes?

12       A.   Absolutely not.

13       Q.   Can you tell me what, if anything,

14   Gin Lane -- sorry -- JGB wants out of the

15   bankruptcy case and/or the foreclosure

16   proceeding brought by Morgan Stanley, where

17   JGB is a second lien defendant in that

18   proceeding?

19       A.   We want the same thing we have

20   always wanted, which is to be paid off on our

21   debt, according to its terms.

22               MR. KANOWITZ:  I have no

23         further questions.

24               Mr. Heart, do you have any

25         questions?  Birmingham, sorry.

                                           74

1               Brett Cohen

2               MR. BIRMINGHAM:  No, no

3              questions of this witness.

4                   MS. SIMMONS:  Okay, so we'll

5              take a five-minute break, and I may

6              or may not have any questions after

7              the break.

8                   MR. KANOWITZ:  Thank you.

9              We'll be here.

10                  (Whereupon, a recess was

11             taken at this time.)

12                  MS. SIMMONS:  I have

13             probably a couple of questions.

14   RE-DIRECT EXAMINATION BY

15   MS. SIMMONS:

16        Q.   So let me get a document up.  So I

17   know you said you weren't familiar with the

18   FTI appraisal, but there's an -- here's an

19   e-mail, and it's from the appraiser, Mark

20   Dunec, and it's to Michaela Keszler, another

21   FTI employee, and then cc'd is Hunter

22   Dorbandt.

23        A.   Yes.

24        Q.   And so Hunter Dorbandt is with JGB,

25   correct?

```
 1                    Brett Cohen
 2        A.   He is, yeah.
 3        Q.   So JGB was involved in this
 4   appraisal process, and this -- in this
 5   appraisal process?
 6             MR. KANOWITZ:  Objection to
 7             form; you can answer.
 8        A.   I mean, we're a litigant and we
 9   hired the appraiser, so, yeah, we were
10   involved.
11        Q.   And did you hire Michaela Keszler?
12        A.   For what?
13        Q.   With her -- to assist with the
14   appraisal.
15        A.   I don't believe so, but I don't
16   know.
17        Q.   And do you know that FTI was paid,
18   approximately, 37,000 to conduct the
19   appraisal?
20             MR. KANOWITZ:  Objection to
21             form; you can answer.
22        A.   I would assume that they were not
23   acting in a pro bono capacity.
24        Q.   Did JGB pay FTI 37,000,
25   approximately?
```

76

1                      Brett Cohen

2          A.   I don't know, but I certainly

3     presume.  We are the litigant and they are an

4     expert for us.  Who else would pay them?

5          Q.   And do you know that 37,000 is

6     probably -- is seven times more than normal

7     for a valuation of a property?

8                      MR. KANOWITZ:  Objection to

9               form; you can answer.

10         A.   It's more than normal for a 22,000

11    foot, 4 acre -- well, let me ask you this:

12    Is 80 or $100 million more than normal for an

13    average property in the U.S.?  I will answer

14    my own question.  Yes, it is.  So I am not at

15    all surprised by that.  It's an unusual

16    property.  That's, you know, worth -- yes, it

17    -- a normal inspection for a $350,000

18    property, I would expect to be a fraction of

19    the cost.

20         Q.   And do you know or do you know that

21    the appraiser didn't fully inspect the 376

22    property?

23                     MR. KANOWITZ:  Objection to

24          form; you can answer.

25          A.   No, I didn't know that, but, you

1                 Brett Cohen

2    know, I would be curious whether they were

3    allowed in by your client, but...

4          Q.   With respect to the Reil

5    refinancing, Reil has informed -- or did

6    inform Ms. Blouin that they never talked to

7    JGB.

8          A.   Yeah, I --

9                 MR. KANOWITZ:  Objection to

10          form; you can answer.

11         A.    Yeah, I believe there was a brief

12   conversation some many years ago.  I mean, it

13   was brief.  I could check with Hunter.  It's

14   not germane.  It was -- I don't think we had

15   any obligation to speak with them.  I think

16   their thing was ridiculous.  I think they

17   have a bad reputation, and I think

18   notwithstanding all this, we have no

19   obligation to speak to them whatsoever --

20   that said, I think that we did have a brief

21   conversation with them, but I think it was

22    just a few minutes, a few years ago.

23        Q.    And do you recall that the offer

24    Ms. Blouin provided for the Reil refinancing

25    was a total of 34.7 million?

↑

                                          78

1                    Brett Cohen

2        A.    Absolutely not.  And there was no

3    offer.  There was no -- there was no binding

4    piece of paper.  It was just people talking.

5        Q.    So I think the offer was 32.4, and

6    then there were other amounts, and you are --

7    and you are saying there was --

8        A.    There was a legally binding offer

9    for me without any contingencies?  There

10    certainly wasn't.

11                  MR. KANOWITZ:  Camisha,

12                  we've gone over this.  This is not

13                  redirect, based on the questions

14                  that I asked.  This is continuing.

15                  How much more do you have?  I mean

16                  I will allow it.

17                  MS. SIMMONS:  I don't.  I am

18                  wrapping up now.  I'm wrapping up

19                  now.

20            MR. KANOWITZ:  Okay.

21            MS. SIMMONS:  So I think

22      this is a good stopping point, and

23      so I will wrap up now.  So thank

24      you, Mr. Cohen, for your time.

25            THE WITNESS:  My pleasure.

♠

                                              79

1            Brett Cohen

2            MS. SIMMONS:  If nobody has

3      any other questions, then, we can

4      conclude.

5            MR. KANOWITZ:  We don't have

6      any questions now.  We will use our

7      time, if any, tomorrow, for

8      rebuttal.

9                   -oOo-

10            (Whereupon, the examination

11      of BRETT COHEN was adjourned at

12      4:23 p.m.)

13

14

15

16            BRETT COHEN

17

18    Subscribed and sworn to

19    before me this      day

20    of              , 2022.

21

22

23    NOTARY PUBLIC

24

25

♠

                                    80

1

2    ---------------- I N D E X -----------------

3

4    WITNESS          EXAMINATION BY          PAGE

5    BRETT COHEN

6                     MS. SIMMONS           5, 74

7                     MR. KANOWITZ          73

8

9

10    ---------------------------------------------

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

↑

1

2                C E R T I F I C A T E

3

4       STATE OF NEW YORK     )
                              : ss.
5       COUNTY OF NEW YORK    )

6

7            I, AYDIL M. TORRES, a Notary Public

8       within and for the State of New York, do

9       hereby certify:

10           That BRETT COHEN, the witness whose

11      deposition is hereinbefore set forth, was

12      duly sworn by me and that such deposition is

13      a true record of the testimony given by the

14    witness.

15         I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage, and that I am in no way

18    interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20    set my hand this 30th day of August, 2022.

21

22

23

24              AYDIL M. TORRES

25


                                              82

1

2              DEPOSITION ERRATA SHEET

3

4    Our Assignment No. J8568771

5    Case Caption:  BRICKCHURCH ENTERPRISES, INC.,

6    DEBTOR.

7       DECLARATION UNDER PENALTY OF PERJURY

8         I declare under penalty of perjury

9    That I have read the entire transcript of

10   My Deposition taken in the captioned matter

11   Or the same has been read to me, and

12    The same is true and accurate, save and

13    Except for changes and/or corrections, if

14    Any, as indicated by me on the DEPOSITION

15    ERRATA SHEET hereof, with the understanding

16    That I offer these changes as if still under

17    Oath.

18    _____

19                    BRETT COHEN

20    Subscribed and sworn to on the _____ day of

21    _____, 20____ before me,

22

23    _____

24    Notary Public,

25    In and for the State of _____

83

1

2              DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change

4    to:_____

5    _____

6    Reason for

7    change:_____

8    Page No._____Line No._____Change

9    to:_____

10 _____

11 Reason for

12 change:_____

13 Page No._____Line No._____Change

14 to:_____

15 _____

16 Reason for

17 change:_____

18 Page No._____Line No._____Change

19 to:_____

20 _____

21 Reason for

22 change:_____

23 SIGNATURE:_____DATE:_____

24          BRETT COHEN

25

84

1

2          DEPOSITION ERRATA SHEET

3 Page No._____Line No._____Change

4 to:_____

5 _____

6 Reason for

7 change:_____

8       Page No._____Line No._____Change

9       to:_____

10      _____

11      Reason for

12      change:_____

13      Page No._____Line No._____Change

14      to:_____

15      _____

16      Reason for

17      change:_____

18      Page No._____Line No._____Change

19      to:_____

20      _____

21      Reason for

22      change:_____

23      SIGNATURE:_____DATE:_____

24              BRETT COHEN

25