**IN UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | : |
|  | : **Chapter 11** |
| **BRICKCHURCH ENTERPRISES, INC.,** | : |
|  | : **Case No. 22-70914-ast** |
|  | : |
| Debtor. | : |
|  | : |

**AFFIDAVIT OF LOUISE BLOUIN IN SUPPORT OF THE**
**DEBTOR'S MOTION TO APPROVE EXIT FINANCING**

I, Louise Blouin, declare as follows under penalty of perjury:

1. I, Louise Blouin, am the principal of Brickchurch Enterprises, Inc. (the "*Debtor*"), the debtor and debtor-in-possession in these chapter 11 proceedings. I submit this affidavit ("*Affidavit*") in support of Debtor Brickchurch Enterprises, Inc.'s *Motion of the Debtor for Entry of an Order Approving the Debtor's Entry into Exit Financing Commitment* [Dkt. No. 115] ("*Exit Financing Motion*")

2. This Affidavit may be supplemented as necessary and appropriate.

3. Except as otherwise noted herein, all statements set forth in this Affidavit are based on one or more of: my personal knowledge of the Debtor's operations, finances and assets; my direct participation in negotiating the exit financing Potential Lenders[1]; and information learned from my review of relevant documents. If I were called upon to testify, I would and could testify competently to the facts set forth in this Affidavit.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Exit Financing Motion.

**Exploration of Restructuring Alternatives and Negotiation of the Exit DIP Financing**

4. During the last five months, the Debtor considered and explored numerous alternatives to obtain the necessary liquidity to pay all creditors and fund this chapter 11 bankruptcy case. These alternatives included: a potential sale of the Debtor's primary real estate and potential new third-party financing.

5. The Debtor engaged real estate broker Nest Seekers International to market the Debtor's primary asset, a luxury residential estate in Southampton, for both sale and rental. The Debtor's broker continues to market the property and engage prospective buyers.

6. In the process of exploring strategic alternatives, the Debtor has sought the financing necessary to reorganize its affairs in chapter 11. After approximately five months of shopping for exit financing, the Debtor has obtained a favorable exit financing commitment from a reputable lender, Bay Point Capital Partners, LP, an affiliate of Bay Point Advisers, LLC ("***Bay Point***" or "***Exit DIP Lender***"), a $450 million hedge fund based in Atlanta, Georgia. In conjunction with the exit financing commitment, the Debtor filed its proposed Plan of Reorganization ("***Plan***") and disclosure statement (the "***Disclosure Statement***"). The Plan proposes to pay all creditors in full.

7. Further, exit financing is key and critical to the Debtor's ability to meet its cash obligations under the Plan. To ensure the financing necessary to effectuate the Plan, the Debtor has entered into the Exit Facility with the Exit DIP Lender. The Exit Facility provides the financing necessary to pay in full all allowed claims in this case.

8. The Debtor utilizing its business judgment determined that it requires the exit funding that will be made available under the Exit Facility. Additionally, on August 31, 2022, the Court entered an order providing the Debtor the option to obtain financing to effectuate its restructuring goals. The Exit Facility is therefore (i) critical to the Debtor's ability to reorganize

and (ii) in the best interests of the Debtor and its estate.

9. During the month of September, the Debtor formulated the underlying economics of the Plan and other material terms of the restructuring and financing with a term sheet with the Exit DIP Lender. The Debtor and the Exit DIP Lender further engaged in due diligence and negotiated the terms of the Exit Facility in connection with the definitive loan agreement and other documents (the "**Definitive Documents**"). Through counsel, the Debtor and Exit DIP Lender exchanged drafts of the Definitive Documents. In particular, they engaged in negotiations, communications and discussion regarding the material economics and fees of the proposed transactions, including: the allocation of funds under the Plan; the size of Exit Facility needed to implement the restructuring in chapter 11, and the associated interest and fees; the treatment of the first lien lender JGB and the Debtor's other creditors. Simultaneously with these negotiations, the Debtor also fielded due diligence and other information requests from the prepetition secured lender JGB.

## The Proposed Exit DIP Facility

10. As described in the Exit Financing Motion filed by the Debtor and as supplemented by this Affidavit and Definitive Documents, the Debtor seeks authority to obtain $52 million of debtor-in-possession financing or a larger amount of up to $62 million under the Exit Facility if necessary to pay all creditors in full under the Plan.

11. The proposed Exit Facility has a maturity of 6 months from closing, with interest payable monthly in cash at a base rate of 10% and 24% default rate of interest.

12. None of the other Potential Lenders contacted were willing to provide DIP financing on terms that were cumulatively more favorable to the Debtor than Bay Point's proposal. No lender was willing to provide unsecured DIP financing or secured post-petition financing that would be junior to the Debtor's prepetition secured debt.

13. Based on Debtor's discussions with alternate sources of potential exit financing, as well as my familiarity with the current market for DIP and other financing in the luxury residential real estate space, I believe the proposed Exit Facility with Bay Point presents the best and most favorable financing available to the Debtor under the circumstances. None of the indicative terms Debtor received from other Potential Lenders were materially better than the economics of Bay Point's proposed exit financing package.

14. In my opinion, Bay Point's proposed exit financing is of greater benefit to the Debtor, relative to potential alternative financing sources, because Bay Point's proposal provides 100% of the funds necessary to pay all creditors in full and confirm the Plan.

15. The Commitment Fee of 9% of the Exit Facility and the Debtor's agreement to pay the reasonable fees and expenses of the Exit DIP Lender are fair terms and were necessary to induce the Bay Point to provide the necessary exit financing. Courts' authorization of loan fees of this type enables chapter 11 debtors to obtain necessary funding from potential lenders. And it incentivizes lenders to invest the necessary time, money and effort to conduct business with and negotiate with a debtor undergoing in-court restructuring despite the risk and uncertainty of the chapter 11 bankruptcy process.

16. The Debtor and Bay Point negotiated the Exit Facility and other Definitive Documents in good faith and from arm's-length bargaining positions, with the advice of counsel.

17. Based on the state of the real estate market and the current market for financing of real estate holding companies seeking refinancing in chapter 11, I believe the terms of the Exit Facility are fair, reasonable, and in the best interest of the Debtor and its stakeholders.

18. **Additionally, the Debtor's prepetition secured lender JGB will not be harmed by the liens granted to the Exit DIP Lender because, at the closing of the Exit Facility, the Debtor proposes to pay JGB all undisputed claim amounts**.

19. Finally, the exit financing enables the Debtor to preserve the Property's equity and maximize creditor recoveries. The value of the Property exceeds the combined amount of the Exit Facility and the amount needed to pay off allowed claims of creditors and administrative expenses of the bankruptcy estate.

[*Remainder of page intentionally left blank; signature page follows*]

I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: October 21, 2022

/s/ Louise Blouin
**Louise Blouin, Director**
Brickchurch Enterprises, Inc.

STATE OF NEW YORK

I HEREBY CERTIFY that on or about this 21 day of October, 2022, before me, a Notary Public for the state aforesaid, personally appeared **Louise Blouin**, known to me or satisfactorily proven to be the Person whose name is subscribed to the foregoing instrument, is duly authorized to execute, and has executed, such instrument on its behalf for the purposes therein set forth; and that the same is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Notary Public

My commission expires on May 2, 2026

```
        Ivan von Hassell
NOTARY PUBLIC, STATE OF NEW YORK
        NO.01VO6432568
   QUALIFIED IN SUFFOLK COUNTY
     TERM EXPIRES MAY 2, 2026
```