UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

BRICKCHURCH ENTERPRISES, INC., Main Case No.

Debtor. 22-70914-ast

- - - - - - - - - - - - - - - - - - - - - -x

United States Bankruptcy Court
271-C Cadman Plaza East
Brooklyn, New York

October 6, 2022
11:04 AM

B E F O R E:
HON. ALAN S. TRUST
U.S. BANKRUPTCY JUDGE

ECRO: ELECTRONIC RECORDING

Status Hearing

Motion to Dismiss Case

Motion for Clarification and/or Reconsideration of Courts August 31, 2022 Orders Regarding (I) Debtors Motion for Entry of an Order Extending the Debtors Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof; (II) JGBs Motion to Dismiss Pursuant to 11 U.S.C. 305(a) and 1112(b) of the Bankruptcy Code; and (III) JGBs Motion for Relief From Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code

Transcribed by: Michael Drake

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(302)263-0885

operations@escribers.net

A P P E A R A N C E S (All present by video or telephone):

SIMMONS LEGAL PLLC
Attorneys for Debtor
1330 Avenue of the Americas
Suite 23A
New York, NY 10019

BY: CAMISHA L. SIMMONS, ESQ.

HAYNES AND BOONE, LLP
Attorneys for JGB Secured Parties
30 Rockefeller Plaza
26th Floor
New York, NY 10112

A.M. SCCULLO LEGAL, LLC
Attorneys for Sotheby's International Realty, Inc.
27 Crimson King Drive
Bear, DE 19701

BY: MARY AUGUSTINE, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
Office of the United States Trustee
560 Federal Plaza
Central Islip, NY 11712

BY: WILLIAM BIRMINGHAM, ESQ.

ALSO PRESENT:
Louise T. Blouin, Brickchurch Enterprises, Inc.

P R O C E E D I N G S

THE CLERK: Starting the 11 o'clock calendar, Brickchurch Enterprise, Inc., Case Number 22-70914.

THE COURT: I'll take appearances, please, starting with the debtor.

MS. SIMMONS: Good morning, Your Honor. Camisha Simmons on behalf of the debtor, Brickchurch Enterprises, Inc.

THE COURT: All right. Anyone else for the debtor?

MS. BLOUIN: Louise Blouin.

THE COURT: All right. And then Office of the United States Trustee?

MR. BIRMINGHAM: Good morning, Judge. William Birmingham, Office of the United States Trustee.

THE COURT: Right. Secured creditor?

MR. KANOWITZ: MR. KANOWITZ: Yes, Your Honor. Good morning, Richard Kanowitz of Haynes and Boone on behalf of the JGB entities.

THE COURT: All right. And any other appearances. All right. So --

MS. AUGUSTINE: Good Morning, Your Honor. Mary Augustine on behalf of Sotheby's International Realty, Inc. I apologize, Your Honor. I'm covering two hearings this morning simultaneously because Mr. Saccullo was called on to an emergency hearing. So I don't have really a position to provide the Court on, but I just wanted Your Honor to be aware

of why I was appearing instead of Mr. Saccullo.

THE COURT: And you're appearing on behalf of Sotheby's?

MS. AUGUSTINE: Yes.

THE COURT: All right.

MS. AUGUSTINE: Yes, Your Honor.

THE COURT: Thank you. Any other appearances?

MR. ISBELL: Your Honor, this is John Isbell. I'm not making an appearance, but I am listening the phone. I'm an attorney for Bay Point Capital Partners, the proposed lender to the debtor.

MS. SIMMONS: And, Your Honor, with that, as a preliminary matter, the debtor will be withdrawing its motion to seal. And I know Mr. Birmingham wrote a great objection to the motion to seal. And he's not going to get the opportunity to argue that with -- we will be filing an unredacted term sheet. And Bay Point Advisors, LLC is the proposed DIP lender. And I believe Charles Andros with Bay Point, the lender's representative, may also be on and attendance at this hearing.

So to the extent, Your Honor, that any -- you're taking any witness testimony today, the lender is available to answer any questions regarding the proposed DIP financing.

THE COURT: Well, I'm not planning to take any testimony today. I have both -- right now what I have in front of me is a motion to reconsider or clarify the orders that I

entered following the lift stay hearing that was held August 31st.

As the parties know, after a contested evidentiary hearing, the Court made a bench ruling. And that bench ruling that was made on August 31st was memorialized in two orders that were entered, one at docket item 104, that's an order concerning exclusivity, and the other was a lift stay order at docket 105, conditionally granting stay relief to JGB.

Both of those orders had the same condition precedent or subsequent, depending on how you look at I, that the stay would lift and exclusivity would temporarily be extended unless the debtor either files a sale motion -- and I'll just tell you what the order says. It's fairly short. Made in effect until midnight on September 30th unless the debtor filed a contract for the sale at 366 Gin Lane property that is bona fide noncontingent for a sale price of no less than fifty-two million dollars payable in cash at closing or seeking approval to enter into a contract for further refinancing or takeout financing of 366 Gin Lane that is bona fide contingent for no less than fifty two million dollars with closing date no later than November 9. That would have been the same sale closing date.

The debtor has moved to clarify and/or reconsider that order. I don't see a sale motion has been filed. It looks like the debtor filed the motion for failure to resolution

telling 364(b) DIP financing. And that's not obviously on for today. That's on for October 26th. And so I'm not taking testimony today because I'm not considering a DIP financing motion today. It's not in front of me.

I think the first issue is what is it that the debtor is saying the Court got wrong in the stay relief or the exclusivity order. And now is the debtor also saying but we are in compliance with those orders because of the motion that was filed at docket 115?

MS. SIMMONS: Well, Your Honor, first of all, the debtor is saying -- it's the debtor's position of the debtor is in compliance with those orders. But, Your Honor, we should have asked questions at the August 31st hearing when you made your rulings. In terms of takeout financing, we should have asked why fifty-two million instead of the amount of the pre-petition secured debt. So one of the questions is why Your Honor set the takeout financing at fifty-two million.

And then I guess another additional question that I show did the Court -- which we didn't ask, how did the Court arrive at the fifty-two-million number as opposed of any other number that the Court could have ordered for the takeout financing.

And also on our motion for clarification on our reconsideration, Your Honor, I noted that --

THE COURT: Well, let me -- Ms. Simmons, hang on. Let

me stop you there.

Neither of those are grounds to reconsider -- to ask the Court to reconsider a matter. Asking trial judge why did you reach that decision, that's not a motion to reconsider. That's an argument that you make on appeal. You can argue that the record was not adequate for the Court to make the ruling that it made. But you don't come back to a hearing later and say, hey, Judge, we don't know how you got there; would you might explaining that to us. That's not a motion to reconsider.

MS. SIMMONS: Yeah. Your Honor, that's why we -- it's a motion for clarification and/or reconsideration and not simply a motion for reconsideration, to the extent the Court could clarify.

THE COURT: But what part of the --

MS. SIMMONS: We're trying to apply it as best we could.

THE COURT: What part of the order was unclear that needs clarification?

MS. SIMMONS: I guess in terms of the fifty-two million. If you take out the pre-petition secured debt, should the takeout number be equal to the pre-petition secured debt. And I guess we weren't clear on that point. And so we are asking for clarification on that.

But given the discussion regarding a deadline, we did

file all of the required documents that needed to be filed on September 30th to meet that deadline. And as you see in the term sheet, given that we have a pending motion, the lender is going to lend up to that fifty-two million.

And so we -- and our position is that what we filed on September 30th, it was in compliance with the Court's orders. To the extent that the Court would want to take out financing to be equal to the pre-petition secured debt, that is what we're seeking clarification on.

THE COURT: All right. Well, the debtor and the secured creditor worked out the language of the order. I wouldn't have signed it if I thought it was vague or unclear. I don't think the order is unclear at all. I don't see anything to clarify.

But Mr. Kanowitz, is your client have a position on the motion to clarify?

MR. KANOWITZ: Yes, Your Honor. It should be denied. You made it crystal clear what your conditions are for the debtor to satisfy, as well as the reason why you selected fifty-two million. It wasn't just to take out JTB. As you said it on the record, and we cited back in our objection to the motion to reconsider that's on the docket, you said to pay all creditors. So that's where we're at concerning that motion. We believe it was just filed to delay this proceeding yet again. And we asked the Court just deny the motion to

reconsider.

THE COURT: Thank you.

Mr. Birmingham, does your office have a position on the debtor's motion to clarify or reconsider?

MR. BIRMINGHAM: No, Judge. We don't take a position on it.

MS. SIMMONS: And, Your Honor, another thing we noted in the motion to clarify is that -- and I know the Court is aware of the Suffolk County cyberattack. So from what I understand, they're up and running beginning October 3rd. And but we just don't know if there's going to be any sort of delay or lag in terms of the closing, if it's going to affect it. And if it is, we wanted to flag that for the Court in terms of maybe having some sort of wiggle room with closing if there is going to be any delay resulting from the Suffolk County records having been down because of the cyberattack and whether or not there's a large backlog that will delay anything. So we wanted to find out for the Court.

THE COURT: All right. Well, a couple of things that I think you all already know, but if not, let me repeat it for the benefit of the record.

In the context of the evidentiary hearing on stay relief, the debtor submitted the appraisal testimony of Mr. Vargas, who valued the 366 property at 67.5 million dollars. That was as of August 1, 2022. The debtor also provided the

affidavit testimony of Mr. Gifkin (sic) of Net Seekers who, among other things, testified, "Based on our experience and market research, we believe 366 Gin Lane, Southampton, will market in the range of sixty-two million dollars to sixty-five million dollars within a marketing period of less than 180 days, et cetera.

Obviously there was conflicting testimony, that JGB thought that the value was significantly lower. But I remind you all of that for a benefit of the record as I deny the motion to reconsider and/or clarify. I don't believe an error was made by the Court, either or an error and fact-finding or an error in the application of the law to the facts in reaching the ruling that later became docket items 104 and 105. I don't see anything unclear in either order that needs to be clarified.

And certainly if the debtor or JGB thought there was something unclear on the order, they would have either rectified that before submitting it on consent to the Court to enter or would have been unable to agree on the form of an order. They're able to reconcile that. So not being able to comply with an order is not a basis to seek, to clarify, or reconsider.

And that then turns me to part 2, which is -- I'm not sure if this is in filed papers or not, Ms. Simmons, but the debtor now apparently is saying, oh, we have complied with

prong 2 of the order by filing the financing motion, which is a docket 115.

MS. SIMMONS: Yes, Your Honor. We filed the motion to approve the financing for fifty-two million, which is set for a hearing for October 26th. And are have made the lender available, of course, today. But we're ready to move forward with that fifty-two million in financing. And the lender, of course, and their counsel are on the call today.

THE COURT: All right. The terms of the order are that the financing for no less than fifty-two million dollars, that the financing the bona fide and noncontingent. So those are three different prongs. We I guess now know who the proposed lender is because Mr. Isbell appeared for Bay Point capital. And you all can tell me whether or not --

MR. ANDROS: Hey -- hey -- she's -- Your Honor, I'm sorry. This is Charles Andros. I was on mute before, but I'm the phone.

I'm on an airplane that's about to take up about ten minutes. But John Isbell, our counsel, can speak for us.

THE COURT: What is your name again?

MR. ANDROS: Charles Andros.

THE COURT: All right. All right. Thank you, Mr. Andros. Go ahead and disconnect.

All right. So are there any closing contingencies? And is the loan for no less than fifty-two million dollars?

MS. SIMMONS: There are no closing contingencies, Your Honor, other than the typical bargaining and any of -- oh, Mr. Andros, are you speaking?

MR. ANDROS: I'm here.

THE COURT: Oh, yeah. I thought you were speaking.

But in terms of the -- there are no contingencies, Your Honor. There the a regular closing conditions that you have in any real estate transaction or lending transaction and every commitment by a lender. There are certain closing requirements that are listed in every lending transaction and real estate transaction. So there are no contingencies other than we need to -- there's closing requirements that must be met by the time we close on November 9th.

THE COURT: Mr. Isbell, are there any closing contingencies?

MR. ISBELL: Thanks, Your Honor. Obviously, giving claim title to the property is 1, because as was made earlier, there was a problem with getting title until recently. Otherwise, the (indiscernible) is in receipt of the bankruptcy court order. That's satisfactory to us. There will be closing documentation (indiscernible) that order that will set forth the terms of this term sheet. But we took out every contingency we could other than the ones that we have to have, which is the title and Bankruptcy Court approval.

THE COURT: The term sheet such as we have it requires

that the loan be executed by the debtor as well as the nondebtor with the Court releasing he nondebtor affiliate, Aberdeen Enterprises, and a personal guarantee executed by Louise Blouin and then provides for, again, the loan agreement that obviously nobody has, and then the origination fee of nine percent of the loan amount and the loan amount being defined as up to fifty-two million dollars, which in the Court's experience means anything from ten dollars to fifty-two million dollars. So am I missing something there on whether -- your client's not ready to wire fifty-two million into Richard Kanowitz's firm's trust account or any other account today, are they?

MR. ISBELL: Your Honor, I don't know what we have as in our accounts, but we would not find a buyer prior to closing.

THE COURT: Say it again.

MR. ISBELL: We had planned to wire the fifty-two million at closing, Your Honor.

THE COURT: Mr. Andros, can you mute your phone if you haven't yet complied with TSA directive to power it off?

Mr. Kanowitz?

MR. KANOWITZ: Yes, Your Honor. We filed a statement in connection with our carried motion to dismiss and opposition to continuation of this Chapter 11 case. It's docket 120. I won't regurgitate everything that's in there. But there are

some very big points that Your Honor is already picking up on.

First, this term sheet does not comply with Your Honor's orders. It is not solely between the debtor, a lender for fifty-two million, bona fide noncontingent. This is another Hail Mary to delay this proceeding and allow the debtor to litigate against JGB and its claim.

But assuming Your Honor wanted to allow for the continuation of this case, the DIP financing as proposed is problematic, problematic in the sense of the fees and expenses that this debtor is going to incur is actually less than -- now when you take those out less than the debt to JGB. So we gave a payoff letter to the debtor the other day, and it was forty-seven million dollars. And the clock is still moving with respect to interest and attorneys' fees that are accrued.

Aside from that, there's also going to be an indemnity obligation that's going to be required to be funded because this debtor keeps -- what I would keep saying the big lie theory that JGB somehow had misconduct in connection with this loan, the foreclosure, or otherwise. So right now we're at forty-seven million dollars.

If you look at the loan, it's fifty-two million dollars or up to, like you said, but they want 7.3 million dollars taken out of closing. So even if you said, okay, let's go forward with this financing option -- and that's what it is. It's an option. It's not a bona fide noncontingent loan

agreement that can be closed ASAP or even if you wanted to give the benefit of the doubt to the types of issues that the debtor raised in the motion for reconsideration concerning the county clerk's office, this is going nowhere, Your Honor. It also involves nondebtor entities, nondebtor collateral, which this Court respectfully does not have jurisdiction over. It was one of the points Mr. Robins and I pointed to early in this case. It was the hope to market the compound.

So what this is is a proposal that is very expensive for the debtor. It doesn't work in this Chapter 11 case. It doesn't get my client paid. the debt requires nine debtor commitments and nondebtor collateral to actually move forward on. None of that, Your Honor, satisfies Your Honor's orders. And we would respectfully request that the time is now come five months later, to dismiss this case. Let's go back to the state court. We'll tee up our auction process there. If the debtor is able to get financing outside of bankruptcy, they'll be able to take us out.

But to suggest to Your Honor that we should stay in bankruptcy, we should move forward on this path with a detailed term sheet that's a contingent term sheet, subject to final documentation, like you said, that you have a plan that seeks to litigate against JGB, which Your Honor has already pointed out to them under Rooker-Feldman, we start with the state court judgment and we go from there.

We're really just going in circles. And from my perspective and the client's perspective, we're just -- it's getting worse, not better. Your Honor, we would ask that Your Honor dismiss this case or alternatively lift the automatic stay for the debtors failure to comply with Your Honor's crystal clear, straightforward order.

And maybe this is the big point to take away for everybody. If this property, 366 Gin Lane, was worth what the debtor says it was, they would be able to meet Your Honor's order for fifty-two million dollars in a sale or a refinancing. They failed to do that to date, Your Honor, to date. And it's interesting that this is a status conference and Mr. Gifkins is not on the line. They've only received one thirty-eight-million-dollar offer for the purchase of 366 Gin Lane. They have not moved forward on that. And they have not moved forward with that because Mr. Blouin does not want to sell the property. She wants to leverage the proceedings, whether it's in state court or Bankruptcy Court, for her benefit. And that's not the purpose of Chapter 11.

So again, Your Honor, respectfully, you can take a look at the term sheet. You can see all the deficiencies we pointed out in our statement that was filed at docket120. You can come to your own conclusion. But we are going nowhere with this term sheet. We're going to only set up yet another contested hearing on a DIP financing, further contested hearing

on the plan process. All the while my client has not been paid in many, many years with interest racking up. Thank you, Your Honor.

THE COURT: Thank you, Mr. Kanowitz.

Mr. Birmingham?

MR. BIRMINGHAM: Judge, the only thing that we -- that we would really say in terms of whether there's been compliance is that since it's up to -- it's a redacted term sheet, we -- now I know who it is, Bay Port Advisors, LLC. But we've not had the opportunity to look into them whatsoever. So that's whether they have the availability to -- or the funds to actually lend to the debtor in order to reach the fifty-two-million-dollar threshold.

Aside from that, the term sheet does not look as if it's a binding noncontingent offer. It just seems it's more of an initial salvo in terms of a negotiation to eventually get to lending. So --

THE COURT: And then, Ms. Simmons or Mr. Isbell, is it Bay Point, P-O-I-N-T or P-O-I-N-T-E, Capital or Bayport? And do they have an office address that one of you can put on the record?

MR. ISBELL: Thank you, Your Honor. This is John Isbell.

It's Bay Point, B-A-Y P-O-I-N-T, Advisors, LLC is the general partner for the fund. The fund that would actually

make the loan would be Bay Point Capital Partners Sea, LP. It's a 400-million-dollar hedge fund based on one of Georgia. Address 3050 Peachtree Road, Atlanta, Georgia 30305.

In terms of the term sheet, Your Honor, we've put up 252 million dollars because the debtor thought that there was a chance that that number could be reduced to forty-two million based upon their motion. It wasn't because we did not intend to meet the fifty-two-million-dollar financing requirement. So we can take the up-to based upon the Court's prior rule.

Also, there was a misinformation stated that the origination fee would lower the financing to below two million dollars. That is not correct. It would be added to the fifty-two million. So the net proceeds would be fifty-two million to the estate after the loan was completed. I just wanted to clarify that for the record.

THE COURT: So the actual loan amount might be closer to $58 million with all was said and done?

MR. ISBELL: Correct, Your Honor. I don't know the exact math in front of me. But certainly it'll be significantly more than fifty-two.

THE COURT: All right. All right. Here's where the Court thinks we are. The debtor's tilt seems to be that's they're in one direction, which is let us play the string out of this financing and see if, in fact, we get the money. The JGB take is they've already not complied, and let's just go

ahead back to state court and foreclose. From the Court's vantage point, these are not inconsistent. In other words, I let that the debtor going forward on the financing hearing and let JGB on renoticing the foreclosure sale. The debtor gets the money and pays JGB off, there's no reason to foreclose. If the debtor doesn't get the money to pay GP off, then you got a foreclosure sale ready to go. So there would be no delay in -- dual tracking is a sometimes overused expression for that. But in Court's vantage point, there's no delay or prejudice from either party's standpoint in dual-tracking it.

I can't tell on the face of it -- and again, the loan amount -- the amount at least appears to be moving but moving potentially in the right direction. It's a somewhat thin but I'm sure standard term sheet. And maybe the debtor will actually meet the obligations of the loan and actually close on it in time to pay off JGB by the November 9 deadline.

If there was some intervening act that doesn't allow Suffolk County to actually do its part, I'm not sure what that would be because this is the borrower and the lender showing up virtually or in person at a closing table, signing documents, wiring the money, paying off JGB, and then sending in the mortgage documents to be recorded which can make a matter of days or weeks under normal circumstances anyway, I'm not sure what the impact of the cyberattack on Suffolk County would be here that might delay the closing.

But from the Court's vantage point, so that there is no misunderstanding or something sought to be later clarified, JGB is holding the foreclosure judgment and sale. That is the amount to be paid, which would include amounts that are reliable to continue to accrue until that foreclosure judgment and under the Bankruptcy Code. Typically those are post-judgment interest and reasonable attorneys' fees. There may be other items the state court allowed to be included. I'm sure you all can figure out how much those are.

But as I've said, at prior hearings, we're not -- this Court is not here to litigate the amount that's owed to JGB under applicable nonbankruptcy law. The state court has already done that. The Court will credit that as the amount to be paid with the allowable post-judgment interest and attorneys' fees and costs that were allowed under the judgment. So that part is relatively simple in terms of calculating the amount to be paid at JGB by November 9th. So you got to close it first with the wire transfer instructions.

There are sometimes some de minimis arguments about the parties, maybe 12,000 or 20,000 or 400 dollars apart on the exact payable amount. I'm sure you can work that number out between now and the October 26 hearing so that everybody knows exactly what JGB is to get by the November 9 deadline the Court has already set.

Now, that there may be other creditors in the estate

who need to be paid. I'm sure the debtor has looked at the claims register. I'm sure that there are administrative expenses. There are at least four sets of retained professionals. And so there may well be and all too well be money left over after JGB is paid. They're still a bankruptcy estate to administer after that, other creditors, et cetera, both administrative and unsecured. Maybe there are tax claims.

As far as the debtor's plan is concerned, if the debtor wants to have a confirmation hearing at the same time, we've got a lot of work to do pretty quickly to get that teed up. But the Court is essentially making that your standard liquidating plan that says we're going to pay everybody in the order of statutory priority. If the debtor wants to reserve state law rights to continue to appeal the state court foreclosure judgment, you all can do that. But the amount that's going to have to be paid here in this process is the amount of the state court judgment, as I've said now three times. And if you later end up getting it reduced or remitted, go get it from -- go get it from JHB. But I'm not holding up the bankruptcy process for that appeal to continue to play out.

I 've already denied the motion to reconsider and/or to clarify. I'm going to -- we can use the October 26th.

THE CLERK: We just have the motion from 12 o'clock.

THE COURT: Okay. So October 26 at 11:30 a.m. right now is the financing motion. That will be conducted in person,

in person. And my courtroom will send out the parameters for that hearing. I'm not otherwise modifying either of the docket 104 or docket 105 orders.

I'm also not making the finding that the offer that was filed at docket 115 meets the terms on its face of the order, of either order. But again, in the interest of preserving the status quo and avoiding harm or prejudice to either the estate or the lender, I am allowing the lender to go ahead and post for sale, that said to be held earlier than November 14th, Mr. Kanowitz. No earlier than November 14th of 2022 for the obvious reasons. There's a financial closing date, there's a pay JGB date. There may be clearing with the wire, et cetera, et cetera. So no reason to run out and incur additional unnecessary expenses on a foreclosure sale that may or may not occur. But again, if JGB is not paid by the November 9 date, then you have a foreclosure date ready to go.

I will ask Mr. Kanowitz and Ms. Simmons, if you all will work on a form of order from today's hearing.

Anything else that we need to take up this morning?

MR. KANOWITZ: Yes, Your Honor. Just so there's no misunderstanding, because we've had too much people saying wrong things in this court already, we're going to submit an order that grants the lift stay relief sought by as set forth and modified by Your Honor's order concerning the sale or auction, if you will, in state court. What happens to the

motion to dismiss? Does it get carried as well, please?

THE COURT: I believe we've already got -- don't we have an adjourn date already on that?

MR. KANOWITZ: It was today, Your Honor.

THE CLERK: It was for today.

THE COURT: Oh, that was on for status.

THE CLERK: Yes. So we need to just adjourn it to the 10/26 at 11:30.

THE COURT: We didn't have a date after that. I'll carry the motion to dismiss then also to the October 26th at 11:30.

MR. KANOWITZ: Very good, Your Honor.

MS. SIMMONS: Your Honor, in terms of the Court honoring the state court judgments pending resolution in state court, we want to state for the record that that referee report didn't award attorneys' fees. So that is something -- I know Your Honor pointed out that our attorney fees are as part of their claim. But in the referee report itself, there weren't attorneys' fees awarded in the state court.

MR. KANOWITZ: Your Honor, if I may address that.

THE COURT: Sure.

MR. KANOWITZ: So Ms. Simmons yet again misstates the record. What happened in the state court was 310,000 dollars of attorneys' fees were to be put forth in an evidentiary hearing. Instead of going forward with that 310,00-dollar

evidentiary hearing for attorneys' fees, my client decided to waive those fees so he could get the motion on foreclosure and the judgment entered ASAP. So you'll see in the judgment of foreclosure, the Court has a recital paragraph talking about the waiver of those 310,000.

It then modified the proposed point of order under the create-all (ph.) paragraph to conform to that waiver of judgment of foreclosure attorneys' fees. The amount of attorneys' fees that JGB is seeking, which is now well over a million, has nothing to do with that judgment of foreclosure pre-bankruptcy filing time frame. It is the fees and expenses that are accrued for fighting with this debtor. And that is not before the state court. It couldn't be before the state court because you've beaten essentially an advisory ruling. There is no res adjudicata, collateral estoppel (indiscernible) case or otherwise.

So yes, Your Honor hit it right on the head. To the extent that we are over secured as to this debtor, we need to demonstrate what our claim is and be paid what is appropriate under the Bankruptcy Code. To the extent we're undersecured creditor, we may not get that. But we do have a second lien. A second lien goes on 376 Ginn Lane. That is not before Your Honor.

So to the extent that the debtor believes that it's going to somehow use this Bankruptcy Court to whittle down JGB

rights, again, I would caution them, they do not have the right to eviscerate the continued fees and expenses that are due under the mortgage instrument post-judgment of foreclosure and sale, including, Your Honor -- and this is going to be a big issue when we come to the final signoff and potential release. If the debtor continues to allege, as they do, that they're somehow going to go after JGB, we are going to seek indemnity reserve that we are entitled to. And this case (indiscernible), Your Honor, concerning adequate protection of a secured letter's indemnity rights even if they're contingent.

So if the debtor is really, really intent on making peace, then it should do what Your Honor has said, which is pay us off. And if they win in state court, come back to us. If they continue to litigate with us, they litigate it at their own peril with increased fees and expenses to be charged to both the estate and the nondebtor estate. I want to be crystal clear, because throughout your motion papers, they keep hammering that somehow JGB has been anything less than trying to follow the terms and conditions of the loan documents that were signed in 2018, '19.

THE COURT: So as I've done in -- some number, more than five and less than 100 of other real estate sale, some commercial, some residential. The letter that I'm going to have the debtor and the secured creditor jointly file by October 19th, that's a week before the hearing and it's two

weeks from today, I think, or just under two weeks from today, here's the undisputed amounts. Now, if -- the debtor may want to characterize undisputed meaning without prejudice and appeal rights because they've got an appeal pending, et cetera, then find another adverb.

But here are the amounts that the parties agree are presently due under the foreclosure judgment and applicable law, bankruptcy or nonbankruptcy. Here are the amounts and categories that we dispute. And then I'll know when you-all roll in here on October 26th how much is not in dispute as I've defined it, how much is in dispute as I've defined it. I can figure out a mechanism to deal with that come October 26th, if there's actually money available to make that more than an academic exercise. Fair enough?

MR. KANOWITZ: Thank you, Your Honor. Understood completely.

MS. SIMMONS: Yes, Your Honor. And then I guess from the last hearing, we realize we need to ask better questions. In terms of your position, Your Honor, are you telling the debtor that the only objection we can make to JGB's claims that have been filed, their proof of claims, is that we can just argue that -- which is the case that they filed duplicate claims and no other justifications or arguments can be put forward in an objection to their proof of claims that have been filed?

THE COURT: I'm not giving you advisory rulings. What I'm telling you is from my vantage point, since the order to make this anything more than an academic exercise and not have continued litigation over how much the math is, the governing instrument that I work from, as I have in many, many, many other cases, is the state court foreclosure judgment and then applicable state and bankruptcy law that allows those amounts to the extent allowed to increase after the date the judgment is entered.

So if you have some other objection that you want to bring that's other than a math objection, I'm not foreclosing it. What I'm telling you is that if the debtor wants to avoid the foreclosure sale from happening on or around for November 14, 2022, it's going to need to have ready access to the amount of funds that you all are going to calculate and put forth in that letter.

And then I'll decide what to do with payment of the disputed amounts when this actually gets interesting enough to make that decision, because right now it's a whole lot of talk about we're actually going to do something that you haven't done yet. And so when there is money going to actually fund it, then I'll make that next decision of how much of that gets paid versus it's held in escrow versus, et cetera.

But I am not, not litigating anything that the state court has already decided. I think I've been crystal clear

Case 8-22-70914-ast Doc 151 Filed 10/21/22 Entered 10/21/22 17:03:07



about that.

All right. The Court is going to issue a pre-hearing, contested matter of scheduling order for the October 26th hearing, as we did for the August 31st hearing. The notable differences there are, 1, it will be in-person here in my courtroom in central Islip.

2, I do continue to operate under COVID-19 health and safety protocols, which requires the party to email the Court, not file on the docket, but to email the Court the vaccination status of any witness and attorney who may be -- or the person may be present for the in-person hearing. I do that to help shape and shape my trial protocols, as well as in-courtroom safety protocols, social distancing, things of that of that nature.

That will be contained in the contested matter, scheduling order that you're going to see, which will make clear when the affidavits are due, when the documents need to be exchanged, when to email the Court through the address will provide with that vaccination status. Don't send us vaccination cards. Don't follow the vaccination status on the docket. I don't publicly disclose that. But again, I need to know so that I can set my in-courtroom protocols. All right? All right.

So then we'll be adjourned until October 26th at 11:30 on the DIP motion and the creditor motion to dismiss. We'll

look for of order from today's hearing.

MR. KANOWITZ: One last clarification, Your Honor, not to continue the hearing, if you will. But the debtor has the exclusivity motion on. Clearly to the extent that there was noncompliance, it was going to terminate. The debtor filed the plan. What, if anything, should we do concerning the debtor's exclusivity rights? Our view is that this plan is dead on arrival, but we don't need to argue why. So we don't believe exclusivity should continue. It's not like we're going to go run out and file a plan, competing plan, because of all the other things that we have going for us in this case. But we do need to tidy up the docket, if you will.

THE COURT: I've not set at a confirmation hearing. It's already October 6th. And the next hearing is October 26th. So I don't know that I need to giving guidance on that, unless you're going to tell me you've got a competing plan in your word processor and you want to hit send as soon as the hearing is over.

So again, because I've not determined whether or not the debtor met the three elements of the sale and lift stay order, I'm not prepared to say the exclusivity continues in effect or has been extended or not. But I again, I don't know that that's anything more than academic at this point.

MR. KANOWITZ: We agree. We will abide by the nebulous time frame between now and the 26th concerning whether

or not we need to file a competing plan or ask for permission to do so.

THE COURT: All right. All right. Very well. The Court will be adjourned on Brickchurch Enterprises. We'll be in recess until 1 o'clock. Thank you all.

(Whereupon these proceedings were concluded at 11:50 AM)

I N D E X

| RULINGS: | PAGE | LINE |
|---|---|---|
| Motion to Reconsider or clarify is denied. | 12 | 9 |

**C E R T I F I C A T I O N**

**I, Michael Drake, certify that the foregoing transcript is a true and accurate record of the proceedings.**

**Michael Drake (CER-513, CET-513)**
**AAERT Certified Electronic Transcriber**

**eScribers**
**7227 North 16th Street, Suite #207**
**Phoenix, AZ 85020**

**Date: October 12, 2022**

## $

**$58 (1)** 20:17

## A

**Aberdeen (1)** 15:3
**abide (1)** 31:24
**able (5)** 12:20,20;17:17, 18;18:9
**academic (3)** 28:14;29:3;31:23
**access (1)** 29:14
**account (2)** 15:11,11
**accounts (1)** 15:14
**accrue (1)** 22:5
**accrued (2)** 16:14;26:12
**act (1)** 21:17
**actual (1)** 20:16
**actually (11)** 16:10;17:12; 19:12,25;21:15,15, 18;28:13;29:18,20, 21
**added (1)** 20:12
**additional (2)** 8:18;24:14
**address (4)** 19:20;20:3;25:20; 30:18
**adequate (2)** 9:6;27:9
**adjourn (2)** 25:3,7
**adjourned (2)** 30:24;32:4
**adjudicata (1)** 26:15
**administer (1)** 23:6
**administrative (2)** 23:2,7
**adverb (1)** 28:5
**Advisors (3)** 6:17;19:9,24
**advisory (2)** 26:14;29:1
**affect (1)** 11:12
**affidavit (1)** 12:1
**affidavits (1)** 30:17
**affiliate (1)** 15:2
**again (13)** 10:25;13:20;15:4, 16;18:20;21:11; 24:6,15;25:22;27:1; 30:21;31:19,22
**against (2)** 16:6;17:23
**agree (3)** 12:19;28:6;31:24
**agreement (2)** 15:4;17:1
**ahead (3)** 13:23;21:1;24:9
**airplane (1)** 13:18
**allege (1)** 27:6
**allow (3)** 16:5,7;21:17
**allowable (1)** 22:14
**allowed (3)** 22:8,15;29:8
**allowing (1)** 24:8
**allows (1)** 29:7
**alternatively (1)** 18:4
**among (1)** 12:2
**amount (15)** 8:15;15:6,6;20:16; 21:12,12;22:4,11,13, 17,21;23:15,17;26:8; 29:14
**amounts (6)** 22:4;28:2,6,8; 29:7,18
**and/or (4)** 7:23;9:12;12:10; 23:21
**Andros (9)** 6:18;13:15,16,21, 21,23;14:3,4;15:19
**apart (1)** 22:20
**apologize (1)** 5:22
**apparently (1)** 12:25
**appeal (5)** 9:5;23:14,20;28:3, 4
**appearance (1)** 6:9
**appearances (3)** 5:4,18;6:7
**appeared (1)** 13:13
**appearing (2)** 6:1,2
**appears (1)** 21:12
**applicable (3)** 22:12;28:7;29:7
**application (1)** 12:12
**apply (1)** 9:16
**appraisal (1)** 11:23
**appropriate (1)** 26:19
**approval (2)** 7:17;14:24
**approve (1)** 13:4
**argue (4)** 6:16;9:5;28:22; 31:8
**argument (1)** 9:5
**arguments (2)** 22:19;28:23
**around (1)** 29:13
**arrival (1)** 31:8
**arrive (1)** 8:20
**ASAP (2)** 17:1;26:3
**Aside (2)** 16:15;19:14
**assuming (1)** 16:7
**Atlanta (1)** 20:3
**attendance (1)** 6:19
**attorney (3)** 6:10;25:17;30:10
**attorneys' (9)** 16:14;22:7,15; 25:16,19,24;26:1,8,9
**auction (2)** 17:16;24:25
**August (5)** 7:1,5;8:13;11:25; 30:4
**AUGUSTINE (4)** 5:20,21;6:4,6
**automatic (1)** 18:4
**availability (1)** 19:11
**available (3)** 6:21;13:6;28:13
**avoid (1)** 29:12
**avoiding (1)** 24:7
**award (1)** 25:16
**awarded (1)** 25:19
**aware (2)** 5:25;11:9
**away (1)** 18:7

## B

**back (5)** 9:7;10:21;17:15; 21:1;27:13
**backlog (1)** 11:17
**bankruptcy (12)** 14:19,24;17:17, 20;18:18;22:6;23:5, 20;26:20,25;28:8; 29:7
**bargaining (1)** 14:2
**Based (4)** 12:2;20:2,7,9
**basis (1)** 12:21
**Bay (8)** 6:10,17,18;13:13; 19:9,19,24;20:1
**B-A-Y (1)** 19:24
**Bayport (1)** 19:19
**beaten (1)** 26:14
**became (1)** 12:13
**beginning (1)** 11:10
**behalf (4)** 5:7,16,21;6:2
**believes (1)** 26:24
**below (1)** 20:11
**bench (2)** 7:4,4
**benefit (4)** 11:21;12:9;17:2; 18:18
**best (1)** 9:16
**better (2)** 18:3;28:18
**big (4)** 16:1,17;18:7;27:4
**binding (1)** 19:15
**BIRMINGHAM (8)** 4:7;5:12,13;6:14; 11:3,5;19:5,6
**Blouin (5)** 4:10;5:9,9;15:4; 18:16
**bona (5)** 7:15,19;13:11; 16:4,25
**Boone (1)** 5:16
**borrower (1)** 21:19
**both (4)** 6:24;7:9;23:7; 27:16
**Brickchurch (4)** 4:10;5:3,7;32:4
**bring (1)** 29:11
**buyer (1)** 15:14

## C

**calculate (1)** 29:15
**calculating (1)** 22:16
**calendar (1)** 5:2
**call (1)** 13:8
**called (1)** 5:23
**Camisha (1)** 5:6
**can (20)** 9:5;13:14,19; 15:19;17:1;18:20,21, 23;19:20;20:9; 21:22;22:9,21;23:15, 22;28:11,20,21,23; 30:22
**Capital (4)** 6:10;13:14;19:19; 20:1
**cards (1)** 30:20
**carried (2)** 15:23;25:1
**carry (1)** 25:10
**Case (11)** 5:3;15:24;16:8; 17:7,10,15;18:4; 26:16;27:8;28:22; 31:11
**cases (1)** 29:6
**cash (1)** 7:17
**categories (1)** 28:9

**caution (1)**
27:1
**Central (2)**
4:5;30:6
**certain (1)**
14:9
**certainly (2)**
12:16;20:19
**cetera (6)**
12:6;23:6;24:13,13;28:4;29:23
**chance (1)**
20:6
**Chapter (3)**
15:24;17:10;18:19
**characterize (1)**
28:3
**charged (1)**
27:15
**Charles (3)**
6:18;13:16,21
**circles (1)**
18:1
**circumstances (1)**
21:23
**cited (1)**
10:21
**claim (4)**
14:17;16:6;25:18;26:19
**claims (6)**
23:2,7;28:20,21,23,24
**clarification (6)**
8:23;9:12,19,24;10:9;31:2
**clarified (2)**
12:15;22:2
**clarify (11)**
6:25;7:23;9:14;10:14,16;11:4,8;12:10,21;20:15;23:22
**clear (6)**
9:23;10:18;18:6;27:17;29:25;30:17
**clearing (1)**
24:12
**Clearly (1)**
31:4
**CLERK (4)**
5:2;23:23;25:5,7
**clerk's (1)**
17:4
**client (4)**
10:15;17:11;19:1;26:1
**client's (2)**
15:10;18:2
**clock (1)**
16:13
**close (3)**
14:13;21:15;22:17
**closed (1)**
17:1
**closer (1)**
20:16
**closing (18)**
7:17,20,21;11:12,14;13:24;14:1,7,9,12,14,20;15:15,18;16:23;21:20,25;24:11
**Code (2)**
22:6;26:20
**collateral (3)**
17:5,12;26:15
**commercial (1)**
27:23
**commitment (1)**
14:9
**commitments (1)**
17:12
**competing (3)**
31:10,16;32:1
**completed (1)**
20:14
**completely (1)**
28:16
**compliance (4)**
8:8,12;10:6;19:7
**complied (3)**
12:25;15:20;20:25
**comply (3)**
12:21;16:2;18:5
**compound (1)**
17:8
**concerned (1)**
23:8
**concerning (7)**
7:7;10:23;17:3;24:24;27:9;31:6,25
**concluded (1)**
32:6
**conclusion (1)**
18:23
**condition (1)**
7:9
**conditionally (1)**
7:8
**conditions (3)**
10:18;14:7;27:19
**conducted (1)**
23:25
**conference (1)**
18:12
**confirmation (2)**
23:9;31:13
**conflicting (1)**
12:7
**conform (1)**
26:7
**connection (2)**
15:23;16:18
**consent (1)**
12:18
**considering (1)**
8:3
**contained (1)**
30:15
**contested (5)**
7:3;18:25,25;30:3,15
**context (1)**
11:22
**contingencies (5)**
13:24;14:1,6,11,15
**contingency (1)**
14:23
**contingent (3)**
7:19;17:21;27:10
**continuation (2)**
15:24;16:8
**continue (7)**
22:5;23:14,20;27:14;30:7;31:3,9
**continued (2)**
27:2;29:4
**continues (2)**
27:6;31:21
**contract (2)**
7:14,18
**costs (1)**
22:15
**counsel (2)**
13:8,19
**County (5)**
11:9,15;17:3;21:18,24
**couple (1)**
11:19
**course (2)**
13:6,8
**COURT (89)**
5:4,8,10,14,18,25;6:2,5,7,23;7:4;8:6,19,19,21,25;9:3,6,13,15,18;10:7,10,25;11:2,8,13,18,19;12:11,18;13:9,20,22;14:5,14,20,24,25;15:2,16,19;17:6,16,24;18:18,18;19:4,18;20:16,21,22;21:1;22:8,11,12,13,23;23:11,14,17,24;24:22,25;25:2,6,9,13,14,15,19,21,23;26:4,13,14,25;27:13,21;29:1,6,25;30:2,8,9,18;31:13;32:3,4
**courtroom (2)**
24:1;30:6
**Court's (6)**
10:6;15:7;20:9;21:1,9;22:1
**covering (1)**
5:22
**COVID-19 (1)**
30:7
**create-all (1)**
26:7
**credit (1)**
22:13
**creditor (5)**
5:14;10:11;26:21;27:24;30:25
**creditors (3)**
10:23;22:25;23:6
**crystal (4)**
10:18;18:6;27:16;29:25
**cyberattack (3)**
11:9,16;21:24

**D**

**date (11)**
7:20,22;18:11,11;24:12,12,16,16;25:3,9;29:8
**day (1)**
16:12
**days (2)**
12:6;21:23
**de (1)**
22:19
**dead (1)**
31:8
**deadline (4)**
9:25;10:2;21:16;22:23
**deal (1)**
28:12
**debt (6)**
8:16;9:21,22;10:8;16:11;17:11
**debtor (51)**
5:5,7,8;6:11,13;7:12,14,23,25;8:5,7,11,11;10:10,19;11:23,25;12:16,25;15:1;16:3,5,10,12,17;17:2,10,11,17;18:9;19:12;20:5;21:3,4,6,14;23:1,9,13;26:12,18,24;27:6,11,24;28:2,20;29:12;31:3,5,20
**debtors (1)**
18:5
**debtor's (5)**
8:11;11:4;20:22;23:8;31:7
**decide (1)**
29:17
**decided (2)**
26:1;29:25
**decision (3)**
9:4;29:19,22
**deficiencies (1)**
18:21
**defined (3)**
15:6;28:11,11
**delay (8)**
10:24;11:11,15,17;16:5;21:7,9,25
**demonstrate (1)**
26:19
**denied (2)**
10:17;23:21
**deny (2)**
10:25;12:9
**DEPARTMENT (1)**
4:2
**depending (1)**
7:10
**detailed (1)**
17:20
**determined (1)**
31:19
**differences (1)**
30:5
**different (1)**
13:12
**DIP (7)**
6:17,22;8:1,3;16:8;18:25;30:25
**direction (2)**
20:23;21:13
**directive (1)**
15:20
**disclose (1)**
30:21
**disconnect (1)**
13:23
**discussion (1)**
9:25
**dismiss (6)**
15:23;17:15;18:4;25:1,10;30:25
**dispute (3)**
28:9,10,11
**disputed (1)**
29:18
**distancing (1)**
30:13
**docket (13)**
7:6,8;8:9;10:22;12:13;13:2;15:24;24:2,3,5;30:9,21;31:12
**docket120 (1)**
18:22
**documentation (2)**
14:21;17:22
**documents (5)**
10:1;21:20,22;27:19;30:17
**dollars (19)**
7:17,20;11:24;12:4,5;13:10,25;15:7,8,9;16:13,20,22,23;18:10;20:5,12;22:20;25:23

**done (4)** 20:17;22:13;27:21;29:21
**doubt (1)** 17:2
**down (2)** 11:16;26:25
**dual (1)** 21:8
**dual-tracking (1)** 21:10
**due (3)** 27:2;28:7;30:17
**duplicate (1)** 28:22

## E

**earlier (3)** 14:17;24:9,10
**early (1)** 17:7
**effect (2)** 7:13;31:22
**either (8)** 7:12;12:11,14,17;21:10;24:2,6,8
**elements (1)** 31:20
**else (2)** 5:8;24:19
**email (3)** 30:8,9,18
**emergency (1)** 5:24
**end (1)** 23:18
**enough (2)** 28:14;29:18
**enter (2)** 7:18;12:19
**entered (4)** 7:1,6;26:3;29:9
**Enterprise (1)** 5:3
**Enterprises (4)** 4:10;5:7;15:3;32:4
**entities (2)** 5:17;17:5
**entitled (1)** 27:8
**equal (2)** 9:22;10:8
**error (3)** 12:10,11,12
**escrow (1)** 29:23
**ESQ (1)** 4:7
**essentially (2)** 23:11;26:14
**estate (9)** 14:8,11;20:14;22:25;23:6;24:8;27:16,16,22
**estoppel (1)** 26:15
**et (6)** 12:6;23:6;24:13,13;28:4;29:23
**even (3)** 16:23;17:1;27:10
**eventually (1)** 19:16
**everybody (3)** 18:8;22:22;23:12
**evidentiary (4)** 7:3;11:22;25:24;26:1
**eviscerate (1)** 27:2
**exact (2)** 20:19;22:21
**exactly (1)** 22:23
**exchanged (1)** 30:18
**exclusivity (7)** 7:7,11;8:7;31:4,7,9,21
**executed (2)** 15:1,3
**exercise (2)** 28:14;29:3
**expenses (6)** 16:9;23:3;24:14;26:11;27:2,15
**expensive (1)** 17:9
**experience (2)** 12:2;15:8
**explaining (1)** 9:9
**expression (1)** 21:8
**extended (2)** 7:11;31:22
**extent (8)** 6:20;9:13;10:7;26:18,20,24;29:8;31:4

## F

**face (2)** 21:11;24:5
**fact (1)** 20:24
**fact-finding (1)** 12:11
**facts (1)** 12:12
**failed (1)** 18:11
**failure (2)** 7:25;18:5
**Fair (1)** 28:14
**fairly (1)** 7:13
**far (1)** 23:8
**Federal (1)** 4:4
**fee (2)** 15:5;20:11
**fees (15)** 16:9,14;22:7,15;25:16,17,19,24;26:1,2,8,9,11;27:2,15
**fide (5)** 7:15,19;13:11;16:4,25
**fifty (1)** 7:20
**fifty- (1)** 20:12
**fifty-two (19)** 7:16;8:15,17;9:20;10:4,20;13:4,7,10,25;15:7,8,10,17;16:4,21;18:10;20:13,20
**fifty-two-million (1)** 8:20
**fifty-two-million-dollar (2)** 19:13;20:8
**fighting (1)** 26:12
**figure (2)** 22:9;28:12
**file (5)** 10:1;27:24;30:9;31:10;32:1
**filed (16)** 7:14,24,25;8:9;10:1,5,24;12:24;13:3;15:22;18:22;24:5;28:21,22,25;31:5
**files (1)** 7:12
**filing (3)** 6:16;13:1;26:11
**final (2)** 17:21;27:5
**financial (1)** 24:11
**financing (22)** 6:22;7:19;8:1,3,14,17,22;10:7;13:1,4,7,10,11;16:8,24;17:17;18:25;20:8,11,24;21:3;23:25
**find (3)** 11:18;15:14;28:5
**finding (1)** 24:4
**firm's (1)** 15:11
**first (4)** 8:5,10;16:2;22:18
**five (2)** 17:15;27:22
**flag (1)** 11:13
**follow (2)** 27:19;30:20
**following (1)** 7:1
**foreclose (2)** 21:1,5
**foreclosing (1)** 29:11
**foreclosure (16)** 16:19;21:4,7;22:3,5;23:15;24:14,16;26:2,4,8,10;27:3;28:7;29:6,13
**form (2)** 12:19;24:18
**forth (4)** 14:21;24:23;25:24;29:15
**forty- (1)** 16:12
**forty-seven (1)** 16:20
**forty-two (1)** 20:6
**forward (9)** 13:6;16:24;17:12,20;18:15,16;21:3;25:25;28:24
**four (1)** 23:3
**frame (2)** 26:11;31:25
**front (3)** 6:24;8:4;20:19
**fund (4)** 19:25,25;20:2;29:21
**funded (1)** 16:16
**funds (2)** 19:11;29:15
**further (2)** 7:18;18:25

## G

**gave (1)** 16:11
**general (1)** 19:25
**Georgia (2)** 20:2,3
**gets (3)** 21:4;29:18,22
**Gifkin (1)** 12:1
**Gifkins (1)** 18:12
**Gin (5)** 7:15,19;12:3;18:8,14
**Ginn (1)** 26:22
**given (2)** 9:25;10:3
**giving (3)** 14:16;29:1;31:15
**goes (1)** 26:22
**Good (5)** 5:6,12,15,20;25:12
**governing (1)** 29:4
**GP (1)** 21:6
**granting (1)** 7:8
**grants (1)** 24:23
**great (1)** 6:14
**grounds (1)** 9:2
**guarantee (1)** 15:3
**guess (5)** 8:18;9:20,23;13:12;28:17
**guidance (1)** 31:15

## H

**Hail (1)** 16:5
**hammering (1)** 27:18
**hang (1)** 8:25
**happened (1)** 25:23
**happening (1)** 29:13
**happens (1)** 24:25
**harm (1)** 24:7
**Haynes (1)** 5:16
**head (1)** 26:17
**health (1)** 30:7
**hearing (27)** 5:24;6:19;7:1,4;8:13;9:7;11:22;13:5;18:25,25;21:3;22:22;23:9;24:2,18;25:25;26:1;27:25;

28:18;30:4,4,11;
31:1,3,13,14,18
**hearings (2)**
5:22;22:10
**hedge (1)**
20:2
**held (3)**
7:1;24:9;29:23
**help (1)**
30:11
**Here's (2)**
20:21;28:2
**hey (3)**
9:8;13:15,15
**hit (2)**
26:17;31:17
**holding (2)**
22:3;23:19
**Honor (53)**
5:6,15,20,22,25;
6:6,8,12,20;8:10,12,
17,24;9:11;10:17;
11:7;13:3,15;14:2,7,
16;15:13,18,22;16:1,
7;17:4,13,19,23;
18:3,4,11,20;19:3,
22;20:4,18;24:20;
25:4,12,13,17,20;
26:17,23;27:4,9,12;
28:15,17,19;31:2
**honoring (1)**
25:14
**Honor's (5)**
16:3;17:13;18:5,9;
24:24
**hope (1)**
17:8

**I**

**impact (1)**
21:24
**Inc (4)**
4:10;5:3,7,21
**include (1)**
22:4
**included (1)**
22:8
**including (1)**
27:4
**inconsistent (1)**
21:2
**in-courtroom (2)**
30:12,22
**increase (1)**
29:8
**increased (1)**
27:15
**incur (2)**
16:10;24:13
**indemnity (3)**
16:15;27:7,10
**indiscernible (4)**
14:19,21;26:15;
27:9
**initial (1)**
19:16
**in-person (2)**
30:5,11
**instead (3)**
6:1;8:15;25:25
**instructions (1)**
22:18
**instrument (2)**
27:3;29:5
**intend (1)**
20:7
**intent (1)**
27:11
**interest (5)**
16:14;19:2;22:7,
14;24:6
**interesting (2)**
18:12;29:18
**International (1)**
5:21
**intervening (1)**
21:17
**into (3)**
7:18;15:10;19:10
**involves (1)**
17:5
**Isbell (12)**
6:8,8;13:13,19;
14:14,16;15:13,17;
19:18,22,23;20:18
**Islip (2)**
4:5;30:6
**issue (3)**
8:5;27:5;30:2
**issues (1)**
17:2
**item (1)**
7:6
**items (2)**
12:13;22:8

**J**

**JGB (24)**
5:17;7:8;12:7,16;
16:6,11,18;17:23;
20:25;21:4,5,16,21;
22:3,11,17,23;23:5;
24:12,15;26:9,25;
27:7,18
**JGB's (1)**
28:20
**JHB (1)**
23:19
**John (3)**
6:8;13:19;19:22
**jointly (1)**
27:24
**JTB (1)**
10:20
**Judge (5)**
5:12;9:3,8;11:5;
19:6
**judgment (13)**
17:25;22:3,5,15;
23:15,17;26:3,3,8,
10;28:7;29:6,8
**judgments (1)**
25:14
**jurisdiction (1)**
17:6
**JUSTICE (1)**
4:2
**justifications (1)**
28:23

**K**

**KANOWITZ (18)**
5:15,15,16;10:15,
17;15:21,22;19:4;
24:10,17,20;25:4,12,
20,22;28:15;31:2,24
**Kanowitz's (1)**
15:11
**keep (2)**
16:17;27:17
**keeps (1)**
16:17
**knows (1)**
22:22

**L**

**lag (1)**
11:12
**Lane (6)**
7:15,19;12:3;18:8,
14;26:22
**language (1)**
10:11
**large (1)**
11:17
**last (2)**
28:18;31:2
**later (6)**
7:20;9:7;12:13;
17:15;22:2;23:18
**law (5)**
12:12;22:12;
23:14;28:8;29:7
**least (2)**
21:12;23:3
**left (1)**
23:5
**lend (2)**
10:4;19:12
**lender (12)**
6:10,17,21;10:3;
13:5,7,13;14:9;16:3;
21:19;24:8,8
**lender's (1)**
6:18
**lending (3)**
14:8,10;19:17
**less (9)**
7:16,20;12:5;
13:10,25;16:10,11;
27:18,22
**letter (3)**
16:12;27:23;29:16
**letter's (1)**
27:10
**leverage (1)**
18:17
**lie (1)**
16:17
**lien (2)**
26:21,22
**lift (6)**
7:1,7,11;18:4;
24:23;31:20
**line (1)**
18:13
**liquidating (1)**
23:12
**listed (1)**
14:10
**listening (1)**
6:9
**litigate (5)**
16:6;17:23;22:11;
27:14,14
**litigating (1)**
29:24
**litigation (1)**
29:4
**LLC (3)**
6:17;19:9,24
**loan (14)**
13:25;15:1,4,6,6;
16:19,21,25;20:1,14,
16;21:11,15;27:19
**look (6)**
7:10;16:21;18:21;
19:10,14;31:1
**looked (1)**
23:1
**looks (1)**
7:24
**lot (2)**
23:10;29:19
**Louise (3)**
4:10;5:9;15:4
**lower (2)**
12:8;20:11
**LP (1)**
20:1

**M**

**making (4)**
6:9;23:11;24:4;
27:11
**many (5)**
19:2,2;29:5,5,5
**market (3)**
12:3,4;17:8
**marketing (1)**
12:5
**Mary (2)**
5:20;16:5
**math (3)**
20:19;29:4,11
**matter (5)**
6:13;9:3;21:22;
30:3,15
**may (12)**
6:19;22:8,25;23:4;
24:12,14,15;25:20;
26:21;28:2;30:10,11
**maybe (5)**
11:14;18:7;21:14;
22:20;23:7
**meaning (1)**
28:3
**means (1)**
15:8
**mechanism (1)**
28:12
**meet (4)**
10:2;18:9;20:8;
21:15
**meets (1)**
24:5
**memorialized (1)**
7:5
**met (2)**
14:13;31:20
**midnight (1)**
7:14
**might (3)**
9:9;20:16;21:25
**million (31)**
7:17,20;8:15,17;
9:21;10:4,20;11:24;
12:4,5;13:4,7,10,25;
15:7,8,10,18;16:4,
13,20,21,22;18:10;
20:5,6,11,13,13,17;
26:10
**million-dollar (1)**
18:14
**minimis (1)**
22:19
**minutes (1)**
13:19
**misconduct (1)**
16:18
**misinformation (1)**
20:10
**missing (1)**
15:9
**misstates (1)**
25:22
**misunderstanding (2)**
22:2;24:21
**modified (2)**
24:24;26:6

**modifying (1)** 24:2
**money (7)** 20:24;21:5,6,21;23:5;28:13;29:21
**months (1)** 17:15
**more (6)** 19:15;20:20;27:21;28:13;29:3;31:23
**morning (6)** 5:6,12,16,20,22;24:19
**mortgage (2)** 21:22;27:3
**motion (36)** 6:13,15,25;7:12,24,25;8:4,8,23;9:4,9,12,13;10:3,16,22,24,25;11:4,8;12:10;13:1,3;15:23;17:3;20:7;23:21,23,25;25:1,10;26:2;27:17;30:25,25;31:4
**move (3)** 13:6;17:12,20
**moved (3)** 7:23;18:15,15
**moving (3)** 16:13;21:12,12
**much (6)** 22:9;24:21;28:10,11;29:4,22
**must (1)** 14:12
**mute (2)** 13:16;15:19

**N**

**name (1)** 13:20
**nature (1)** 30:14
**nebulous (1)** 31:25
**need (13)** 14:12;23:1;24:19;25:7;26:18;28:18;29:14;30:17,21;31:8,12,15;32:1
**needed (1)** 10:1
**needs (2)** 9:19;12:14
**negotiation (1)** 19:16
**Neither (1)** 9:2
**Net (2)** 12:1;20:13
**next (2)** 29:22;31:14
**nine (2)** 15:5;17:11
**nobody (1)** 15:5
**nonbankruptcy (2)** 22:12;28:8
**noncompliance (1)** 31:5
**noncontingent (5)** 7:16;13:11;16:4,25;19:15
**nondebtor (6)** 15:2,2;17:5,5,12;27:16
**None (1)** 17:13
**normal (1)** 21:23
**notable (1)** 30:4
**noted (2)** 8:24;11:7
**November (9)** 7:21;14:13;21:16;22:17,23;24:10,10,16;29:13
**nowhere (2)** 17:4;18:23
**Number (7)** 5:3;8:20,21;9:22;20:6;22:21;27:21
**NY (1)** 4:5

**O**

**objection (6)** 6:14;10:21;28:20,24;29:10,11
**obligation (1)** 16:16
**obligations (1)** 21:15
**obvious (1)** 24:11
**obviously (4)** 8:1;12:7;14:16;15:5
**occur (1)** 24:15
**o'clock (3)** 5:2;23:23;32:5
**October (14)** 8:2;11:10;13:5;22:22;23:22,24;25:10;27:25;28:10,12;30:3,24;31:14,14
**off (6)** 15:20;21:5,6,16,21;27:13
**offer (3)** 18:14;19:15;24:4
**Office (6)** 4:3;5:10,13;11:3;17:4;19:20
**one (8)** 7:6;8:16;17:6;18:13;19:20;20:2,23;31:2
**ones (1)** 14:23
**only (4)** 18:13,24;19:6;28:20
**operate (1)** 30:7
**opportunity (2)** 6:15;19:10
**opposed (1)** 8:20
**opposition (1)** 15:23
**option (2)** 16:24,25
**order (31)** 7:6,7,13,24;8:7;9:18;10:11,13;12:14,17,20,21;13:1,9;14:20,21;18:6,10;19:12;23:13;24:6,6,18,23,24;26:6;29:2;30:3,16;31:1,21
**ordered (1)** 8:21
**orders (9)** 6:25;7:5,9;8:8,12;10:6;16:3;17:13;24:3
**origination (2)** 15:5;20:11
**Otherwise (4)** 14:19;16:19;24:2;26:16
**out (20)** 9:21;10:7,11,20;11:18;14:22;16:11,23;17:18,24;18:22;20:23;22:9,21;23:20;24:1,13;25:17;28:12;31:10
**outside (1)** 17:17
**over (6)** 17:6;23:5;26:9,18;29:4;31:18
**overused (1)** 21:8
**owed (1)** 22:11
**own (2)** 18:23;27:15

**P**

**paid (11)** 17:11;19:1;22:4,14,17;23:1,5,16;24:15;26:19;29:23
**papers (2)** 12:24;27:17
**paragraph (2)** 26:4,7
**parameters (1)** 24:1
**part (6)** 9:15,18;12:23;21:18;22:16;25:17
**parties (3)** 7:3;22:20;28:6
**partner (1)** 19:25
**Partners (2)** 6:10;20:1
**party (1)** 30:8
**party's (1)** 21:10
**path (1)** 17:20
**pay (6)** 10:22;21:6,16;23:12;24:12;27:12
**payable (2)** 7:17;22:21
**paying (1)** 21:21
**payment (1)** 29:17
**payoff (1)** 16:12
**pays (1)** 21:5
**peace (1)** 27:12
**Peachtree (1)** 20:3
**pending (3)** 10:3;25:14;28:4
**people (1)** 24:21
**percent (1)** 15:6
**peril (1)** 27:15
**period (1)** 12:5
**permission (1)** 32:1
**person (4)** 21:20;23:25;24:1;30:10
**personal (1)** 15:3
**perspective (2)** 18:2,2
**ph (1)** 26:7
**phone (3)** 6:9;13:17;15:19
**picking (1)** 16:1
**plan (10)** 17:22;19:1;23:8,12;31:6,7,10,10,16;32:1
**planned (1)** 15:17
**planning (1)** 6:23
**play (2)** 20:23;23:20
**Plaza (1)** 4:4
**please (2)** 5:4;25:1
**Point (15)** 6:10,17,18;9:23;13:13;18:7;19:19,24;20:1;21:2,9;22:1;26:6;29:2;31:23
**P-O-I-N-T (2)** 19:19,24
**P-O-I-N-T-E (1)** 19:19
**pointed (4)** 17:7,23;18:22;25:17
**points (2)** 16:1;17:7
**Port (1)** 19:9
**position (7)** 5:24;8:11;10:5,15;11:3,5;28:19
**post (1)** 24:9
**post-judgment (3)** 22:7,14;27:3
**potential (1)** 27:5
**potentially (1)** 21:13
**power (1)** 15:20
**pre-bankruptcy (1)** 26:11
**precedent (1)** 7:9
**pre-hearing (1)** 30:2
**prejudice (3)** 21:9;24:7;28:3
**preliminary (1)** 6:13
**prepared (1)** 31:21
**pre-petition (4)** 8:16;9:21,22;10:8
**PRESENT (2)** 4:9;30:11
**presently (1)**

28:7
**preserving (1)** 24:7
**pretty (1)** 23:10
**price (1)** 7:16
**prior (3)** 15:14;20:9;22:10
**priority (1)** 23:13
**problem (1)** 14:18
**problematic (2)** 16:9,9
**proceeding (2)** 10:24;16:5
**proceedings (2)** 18:17;32:6
**proceeds (1)** 20:13
**process (4)** 17:16;19:1;23:16,20
**processor (1)** 31:17
**professionals (1)** 23:4
**prong (1)** 13:1
**prongs (1)** 13:12
**proof (2)** 28:21,24
**property (5)** 7:15;11:24;14:17;18:8,17
**proposal (1)** 17:9
**proposed (6)** 6:10,17,22;13:13;16:8;26:6
**protection (1)** 27:9
**protocols (4)** 30:8,12,13,22
**provide (2)** 5:25;30:19
**provided (1)** 11:25
**provides (1)** 15:4
**publicly (1)** 30:21
**purchase (1)** 18:14
**purpose (1)** 18:19
**put (5)** 19:20;20:4;25:24;28:23;29:15

**Q**

**quickly (1)** 23:10
**quo (1)** 24:7

**R**

**racking (1)** 19:2
**raised (1)** 17:3
**range (1)** 12:4
**reach (2)** 9:4;19:12
**reaching (1)** 12:12
**ready (5)** 13:6;15:10;21:7;24:16;29:14
**real (3)** 14:8,11;27:22
**realize (1)** 28:18
**really (5)** 5:24;18:1;19:7;27:11,11
**Realty (1)** 5:21
**reason (3)** 10:19;21:5;24:13
**reasonable (1)** 22:7
**reasons (1)** 24:11
**receipt (1)** 14:19
**received (1)** 18:13
**recently (1)** 14:18
**recess (1)** 32:5
**recital (1)** 26:4
**reconcile (1)** 12:20
**reconsider (12)** 6:25;7:23;9:2,3,4,10;10:22;11:1,4;12:10,22;23:21
**reconsideration (4)** 8:24;9:12,13;17:3
**record (8)** 9:6;10:21;11:21;12:9;19:21;20:15;25:15,23
**recorded (1)** 21:22
**records (1)** 11:15
**rectified (1)** 12:18
**redacted (1)** 19:8
**reduced (2)** 20:6;23:18
**referee (2)** 25:15,18
**refinancing (2)** 7:18;18:10
**regarding (2)** 6:22;9:25
**register (1)** 23:2
**regular (1)** 14:7
**regurgitate (1)** 15:25
**relatively (1)** 22:16
**release (1)** 27:5
**releasing (1)** 15:2
**reliable (1)** 22:5
**relief (4)** 7:8;8:6;11:23;24:23
**remind (1)** 12:8
**remitted (1)** 23:18
**renoticing (1)** 21:4
**repeat (1)** 11:20
**report (2)** 25:15,18
**representative (1)** 6:19
**request (1)** 17:14
**required (2)** 10:1;16:16
**requirement (1)** 20:8
**requirements (2)** 14:10,12
**requires (3)** 14:25;17:11;30:8
**res (1)** 26:15
**research (1)** 12:3
**reserve (2)** 23:13;27:8
**residential (1)** 27:23
**resolution (2)** 7:25;25:14
**respect (1)** 16:14
**respectfully (3)** 17:6,14;18:20
**resulting (1)** 11:15
**retained (1)** 23:3
**Richard (2)** 5:16;15:10
**right (26)** 5:8,10,14,18,19;6:5,24;10:10;11:19;13:9,22,22,24;16:19;20:21,21;21:13;23:24;26:17;27:1;29:19;30:2,22,23;32:3,3
**rights (5)** 23:14;27:1,10;28:4;31:7
**Road (1)** 20:3
**Robins (1)** 17:7
**roll (1)** 28:10
**Rooker-Feldman (1)** 17:24
**room (1)** 11:14
**rule (1)** 20:9
**ruling (5)** 7:4,4;9:6;12:13;26:14
**rulings (2)** 8:14;29:1
**run (2)** 24:13;31:10
**running (1)** 11:10

**S**

**Saccullo (2)** 5:23;6:1
**safety (2)** 30:8,13
**sale (16)** 7:12,15,16,21,24;18:10;21:4,7;22:3;24:9,14,24;27:4,22;29:13;31:20
**salvo (1)** 19:16
**same (3)** 7:9,21;23:9
**satisfactory (1)** 14:20
**satisfies (1)** 17:13
**satisfy (1)** 10:19
**saying (6)** 8:6,7,11;12:25;16:17;24:21
**scheduling (2)** 30:3,16
**Sea (1)** 20:1
**seal (2)** 6:14,15
**second (2)** 26:21,22
**Secured (9)** 5:14;8:16;9:21,22;10:8,11;26:18;27:10,24
**seek (2)** 12:21;27:7
**Seekers (1)** 12:1
**seeking (3)** 7:17;10:9;26:9
**seeks (1)** 17:22
**seems (2)** 19:15;20:22
**selected (1)** 10:19
**sell (1)** 18:16
**send (3)** 24:1;30:19;31:17
**sending (1)** 21:21
**sense (1)** 16:9
**September (3)** 7:14;10:2,6
**set (8)** 8:17;13:4;14:21;18:24;22:24;24:23;30:22;31:13
**sets (1)** 23:3
**seven (1)** 16:13
**shape (2)** 30:12,12
**sheet (13)** 6:17;10:3;14:22,25;16:2;17:21,21;18:21,24;19:8,14;20:4;21:14
**short (1)** 7:13
**show (1)** 8:19
**showing (1)** 21:19
**sic (1)** 12:1
**signed (2)** 10:12;27:20
**significantly (2)**

12:8;20:20
**signing (1)**
21:20
**signoff (1)**
27:5
**SIMMONS (17)**
5:6,7;6:12;8:10, 25;9:11,16,20;11:7; 12:24;13:3;14:1; 19:18;24:17;25:13, 22;28:17
**simple (1)**
22:16
**simply (1)**
9:13
**simultaneously (1)**
5:23
**sixty-five (1)**
12:4
**sixty-two (1)**
12:4
**social (1)**
30:13
**solely (1)**
16:3
**somehow (4)**
16:18;26:25;27:7, 18
**sometimes (2)**
21:8;22:19
**somewhat (1)**
21:13
**soon (1)**
31:17
**sorry (1)**
13:16
**sort (2)**
11:11,14
**Sotheby's (2)**
5:21;6:3
**sought (2)**
22:2;24:23
**Southampton (1)**
12:3
**speak (1)**
13:19
**speaking (2)**
14:3,5
**standard (2)**
21:14;23:11
**standpoint (1)**
21:10
**start (1)**
17:24
**Starting (2)**
5:2,4
**state (21)**
17:16,24;18:18; 21:1;22:8,12;23:14, 14,17;24:25;25:14, 14,15,19,23;26:13, 13;27:13;29:6,7,24
**stated (1)**
20:10
**statement (2)**
15:22;18:22
**STATES (4)**
4:2,3;5:11,13
**status (6)**
18:12;24:7;25:6; 30:10,19,20
**statutory (1)**
23:13
**stay (10)**
7:1,7,8,10;8:6; 11:22;17:19;18:5; 24:23;31:20
**still (2)**
16:13;23:5
**stop (1)**
9:1
**straightforward (1)**
18:6
**string (1)**
20:23
**subject (1)**
17:21
**submit (1)**
24:22
**submitted (1)**
11:23
**submitting (1)**
12:18
**subsequent (1)**
7:10
**Suffolk (4)**
11:9,15;21:18,24
**suggest (1)**
17:19
**sure (9)**
12:24;21:14,18, 23;22:9,21;23:1,2; 25:21

**T**

**table (1)**
21:20
**takeout (5)**
7:18;8:14,17,21; 9:22
**talk (1)**
29:19
**talking (1)**
26:4
**tax (1)**
23:7
**tee (1)**
17:16
**teed (1)**
23:10
**telling (4)**
8:1;28:19;29:2,12
**temporarily (1)**
7:11
**ten (2)**
13:18;15:8
**term (13)**
6:16;10:3;14:22, 25;16:2;17:21,21; 18:21,24;19:8,14; 20:4;21:14
**terminate (1)**
31:5
**terms (15)**
8:14;9:20;11:12, 13;13:9;14:6,22; 19:7,16;20:4;22:16; 24:5;25:13;27:19; 28:19
**testified (1)**
12:2
**testimony (6)**
6:21,24;8:3;11:23; 12:1,7
**Thanks (1)**
14:16
**theory (1)**
16:18
**thin (1)**
21:13
**thirty-eight- (1)**
18:13
**thought (5)**
10:12;12:8,16; 14:5;20:5
**three (3)**
13:12;23:17;31:20
**threshold (1)**
19:13
**throughout (1)**
27:17
**tidy (1)**
31:12
**tilt (1)**
20:22
**times (1)**
23:18
**title (3)**
14:17,18,24
**today (12)**
6:21,24;8:2,3,4; 13:6,8;15:11;25:4,5; 28:1,1
**today's (2)**
24:18;31:1
**took (1)**
14:22
**tracking (1)**
21:8
**transaction (4)**
14:8,8,10,11
**transfer (1)**
22:18
**trial (2)**
9:3;30:12
**trust (1)**
15:11
**Trustee (3)**
4:3;5:11,13
**trying (2)**
9:16;27:18
**TSA (1)**
15:20
**turns (1)**
12:23
**two (7)**
5:22;7:5,20;20:11, 13;27:25;28:1
**types (1)**
17:2
**typical (1)**
14:2
**Typically (1)**
22:6

**U**

**unable (1)**
12:19
**unclear (5)**
9:18;10:12,13; 12:14,17
**under (11)**
17:24;21:23;22:6, 12,15;26:6,20;27:3; 28:1,7;30:7
**undersecured (1)**
26:20
**Understood (1)**
28:15
**undisputed (2)**
28:2,3
**UNITED (4)**
4:2,3;5:10,13
**unless (3)**
7:11,14;31:16
**unnecessary (1)**
24:14
**unredacted (1)**
6:16
**unsecured (1)**
23:7
**up (17)**
10:4;11:10;13:18; 15:7;16:1,22;17:16; 18:24;19:2,8;20:4; 21:19;23:11,18,19; 24:19;31:12
**upon (2)**
20:7,9
**up-to (1)**
20:9
**use (2)**
23:22;26:25

**V**

**vaccination (4)**
30:9,19,20,20
**vague (1)**
10:12
**value (1)**
12:8
**valued (1)**
11:24
**vantage (4)**
21:2,9;22:1;29:2
**Vargas (1)**
11:24
**ve (1)**
23:21
**versus (2)**
29:23,23
**view (1)**
31:7
**virtually (1)**
21:20

**W**

**waive (1)**
26:2
**waiver (2)**
26:5,7
**wants (4)**
18:17;23:9,13; 29:12
**week (1)**
27:25
**weeks (3)**
21:23;28:1,1
**weren't (2)**
9:23;25:18
**whatsoever (1)**
19:10
**Whereupon (1)**
32:6
**whittle (1)**
26:25
**whole (1)**
29:19
**wiggle (1)**
11:14
**WILLIAM (2)**
4:7;5:12
**win (1)**
27:13
**wire (4)**
15:10,17;22:18; 24:13
**wiring (1)**
21:21
**withdrawing (1)**
6:13
**within (1)**
12:5
**without (1)**
28:3
**witness (2)**
6:21;30:10
**word (1)**
31:17
**words (1)**
21:2

**work (5)**
17:10;22:21;
23:10;24:18;29:5
**worked (1)**
10:11
**worse (1)**
18:3
**worth (1)**
18:8
**wrong (2)**
8:6;24:22
**wrote (1)**
6:14

## Y

**years (1)**
19:2
**you-all (1)**
28:9

## 1

**1 (4)**
11:25;14:17;30:5;
32:5
**10/26 (1)**
25:8
**100 (1)**
27:22
**104 (3)**
7:6;12:13;24:3
**105 (3)**
7:8;12:13;24:3
**11 (4)**
5:2;15:24;17:10;
18:19
**11:30 (4)**
23:24;25:8,11;
30:24
**11:50 (1)**
32:6
**115 (3)**
8:9;13:2;24:5
**11712 (1)**
4:5
**12 (1)**
23:23
**12,000 (1)**
22:20
**120 (1)**
15:24
**14 (1)**
29:14
**14th (2)**
24:10,10
**180 (1)**
12:5
**19 (1)**
27:20
**19th (1)**
27:25

## 2

**2 (3)**
12:23;13:1;30:7
**20,000 (1)**
22:20
**2018 (1)**
27:20
**2022 (3)**
11:25;24:11;29:14
**22-70914 (1)**
5:3
**252 (1)**
20:5
**26 (2)**
22:22;23:24
**26th (10)**
8:2;13:5;23:22;
25:10;28:10,12;30:3,
24;31:15,25

## 3

**30305 (1)**
20:3
**3050 (1)**
20:3
**30th (3)**
7:14;10:2,6
**310,000 (2)**
25:23;26:5
**310,00-dollar (1)**
25:25
**31st (4)**
7:2,5;8:13;30:4
**364b (1)**
8:1
**366 (6)**
7:15,19;11:24;
12:3;18:8,14
**376 (1)**
26:22
**3rd (1)**
11:10

## 4

**400 (1)**
22:20
**400-million-dollar (1)**
20:2

## 5

**560 (1)**
4:4

## 6

**67.5 (1)**
11:24
**6th (1)**
31:14

## 7

**7.3 (1)**
16:22

## 9

**9 (4)**
7:21;21:16;22:23;
24:16
**9th (2)**
14:13;22:17