Cited
As of: January 5, 2023 6:59 PM Z

# Shanley v. Louise Blouin Media, Inc.

Supreme Court of New York, New York County

November 26, 2018, Decided

151232/2014

**Reporter**
2018 N.Y. Misc. LEXIS 5629 *; 2018 NY Slip Op 32982(U) **

**[**1]** CATHERINE SHANLEY, WENDY BUCKLEY, Plaintiffs, - v - LOUISE BLOUIN MEDIA, INC., LOUISE BLOUIN, and BEN HARTLEY, Defendants. INDEX NO. 151232/2014

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

## Core Terms

commissions, advertising, counterclaims, rates, allegations, summary judgment, bartering, publisher, unjust enrichment, attests, damages, plaintiffs', sales, breach of contract, third-party, breached, breach of fiduciary duty, employees, breach of contract claim, cause of action, good faith, Labor Law, asserting, benefits, wages, card, independent contractor, triable issue of fact, terminated, faithless

**Judges:** **[*1]** PRESENT: HON. DEBRA A. JAMES, Justice.

**Opinion by:** DEBRA A. JAMES

## Opinion

**DECISION AND ORDER**

ORDER

Upon the foregoing documents, it is

ORDERED that plaintiffs' motion is granted in part and denied in part, and third-party defendant's motion is granted, and it is further

ORDERED that summary judgment is granted to plaintiffs on the third cause of action for breach of contract as to liability, with damages to be assessed at the time of trial; and it is further

**[**2]** ORDERED that summary judgment is denied to plaintiffs as to the first and second causes of action for Labor Law violations; and it is further

ORDERED that summary judgment is denied to plaintiffs on the fourth and fifth causes of action, and the claims for unjust enrichment and quantum meruit are dismissed; and it is further

ORDERED that the counterclaims against plaintiffs/counterclaim defendants are dismissed in their entirety; and it is further

ORDERED that summary judgment is granted to third-party defendant Genocchio and the third-party complaint is dismissed in its entirety.

DECISION

In this action, plaintiffs Catherine Shanley (Shanley) and Wendy Buckley (Buckley) seek to recover damages for commissions and fees allegedly owed to them by their former employer, **[*2]** defendant Louise Blouin Media, Inc. (LBM), and its owner, defendant Louise Blouin (Blouin).

The complaint alleges causes of action for breach of contract, Labor Law violations, unjust enrichment, quantum meruit, and retaliation.

Defendants have interposed counterclaims against Shanley, Buckley, and Artmedia Co. (Artmedia), for breach of contract, **[**3]** unjust enrichment, breach of loyalty, breach of fiduciary duty, and breach of the implied covenant of good faith. In addition, Defendants impleaded Benjamin Genocchio (Genocchio), alleging

causes of action for faithless servant, breach of the implied covenant of good faith, unjust enrichment, breach of fiduciary duty, conversion, and unfair competition.

Plaintiffs now move, pursuant to *CPLR 3212*, for summary judgment on their claims against defendants, and to dismiss the counterclaims (motion seq. no. 006).

By separate motion, third-party defendant Genocchio moves for summary judgment dismissing the third-party complaint (motion seq. no. 007).

The motions are consolidated for purposes of their disposition.

Background

LBM, a Delaware corporation with its principal place of business in New York, New York, publishes print and online publications, "offer[ing] **[*3]** news around the world on the arts, from performing arts to visual arts to architecture to design."

Blouin is the sole owner of LBM. Ben Hartley (Hartley) was President of LBM from September 2009 to February 2014. Genocchio was employed by LBM as an editorial director of various LBM publications, including Art + Auction, from March 2010 to March 2014.

**[**4]** Shanley worked for LBM from about June 2003 until her termination effective March 31, 2014, starting as a commission-based salesperson and subsequently becoming a publisher. In April 2009, she entered into a written agreement with LBM (Shanley agreement), under which she was to perform advertising sales services for numerous LBM publications as an independent sales consultant, and initially would report to David Gursky (Gursky), then LBM's Vice President/Group Publisher. Artmedia is a New York company owned and operated by Shanley, through which Shanley invoiced LBM for payments due to her.

Pursuant to the terms of the Shanley agreement, LBM agreed to pay commissions to Shanley as set forth in Schedule A annexed to the agreement, and $4,000 a month as a draw against commissions. Schedule A sets forth commission rates and procedures for payment. **[*4]** Commissions were "earned" when payment was received and after the advertisement ran and were paid "by the 5th of the second month after the commissions are earned." Schedule A also provided that a commission was not earned if Shanley was not employed by LBM at the time the invoice was paid, and that, as an independent contractor, she was responsible for her own tax compliance and business expenses. Id. Under the Shanley agreement, Shanley would be reimbursed' for all approved expenses incurred on behalf of the company in accordance with company policy. The Agreement stated that she **[**5]** was not an employee of LBM and would not, therefore, receive medical, vacation or other employee benefits.

In or around November 2009, Gursky left LBM, and Shanley was appointed publisher of Art + Auction magazine. Thereafter, in January 2012, the Shanley agreement, Schedule A was modified to provide her with a new compensation plan, which included an annual consultancy fee of $25,000, and a reduced commission rate, and provided commissions would be paid "on the 2nd payroll of the month after the commissions are earned." The consultancy fee was paid monthly, Shanley attests; documents indicate she submitted **[*5]** invoices for $2084 each month.

Buckley was employed by LBM, as a sales consultant, associate publisher and publisher, from May 2006 until her termination on January 31, 2014. She began working part time for LBM and then worked full time in various sales positions under a series of contracts. In January 2009, she entered into a written employment agreement with LBM (the Buckley agreement). Her agreement, like Shanley's, provided she was to perform advertising sales services as an independent sales consultant with respect to Art + Auction, and that she would initially report to Gursky. The terms of Buckley's agreement were essentially the same as the Shanley agreement except that the draw against commissions and the commission rate were different. Buckley's agreement also differed from Shanley's to the extent **[**6]** that it did not require that she be working for LBM at the time an invoice was paid to earn a commission.

In or around November 2009, Buckley became Associate Publisher of Art + Auction magazine. Buckley subsequently, in or around November 2012, became Publisher of a new LBM print publication, BLOUINARTINFO (Asian edition), and in January 2013, she entered into an agreement to provide **[*6]** her with additional compensation for that position (2013 agreement). Pursuant to the 2013 agreement, she was to receive $1000 each month for publisher services, in addition to commissions as set out in her 2009 agreement.

As defendants paid plaintiffs commissions only after

they were paid by the advertisers, plaintiffs received monthly commission reports, prepared by LBM's finance department, in the month after commissions were earned but before they were paid, stating the amount of commissions earned during the prior month. Plaintiffs were paid fees and commissions pursuant to their respective agreements with LBM, apparently without problems, until mid-2013. According to plaintiffs, in or around June 2013, defendants began delaying payment of their commissions and of Shanley's monthly fee, and Blouin started talking to them about new agreements with reduced compensation. Plaintiffs assert that, in or around September 2013, defendants stopped paying their earned commissions entirely.

**[**7]** During December 2013, plaintiffs and Blouin continued to negotiate the terms of proposed modified agreements. In late December 2013, plaintiffs received Blouin's draft agreements, which did not include **[*7]** provisions for payment of past due commissions and fees, and plaintiffs complained to Blouin and Hartley about such omission. About a week later, both plaintiffs received written notices of termination, effective January 31, 2014 for Buckley, and effective March 31, 2014 for Shanley. Plaintiffs allege that they were not paid commissions for the months of August, September, October, November and December 2013, and for the early months of 2014, although they were provided with commission reports indicating commissions were earned for those months. Shanley also alleges that she is owed monthly consultancy fees for August through December 2013.

Blouin does not dispute that she stopped paying plaintiffs in September 2013 and does not dispute that she continued to negotiate new agreements with plaintiffs into December 2013, but then terminated their employment on December 30, 2014. Blouin claims that plaintiffs were not paid because they were not respecting the company policy regarding advertising rates and up-front cash payments, and were bartering advertising, giving it away at a discount or for free, in exchange for dinners or plane tickets. She also claims that Shanley was not paid because **[*8]** she was billing certain advertising through her company. Plaintiffs **[**8]** were terminated, Blouin stated, for the same reasons that they were not paid commissions, and because they allegedly were taking commissions that did not belong to them.

This Lawsuit

Plaintiffs commenced this action in February 2014, alleging that defendants failed to pay them compensation due under their contracts. Shanley claims that she is owed commissions for August through December 2013, in the amount of $99,925.57; and for January through March 2014, in the amount of $36,519.15. She also claims that she is owed consultancy fees of $12,500. Buckley claims that she is owed $58,425.40 in unpaid commissions for 2013 and $34,638.10 for 2014. Plaintiffs also seek liquidated damages, and attorneys' fees and costs, under Labor Law § 198.

Discussion

On a motion for summary judgment, the moving party has the initial burden of demonstrating its entitlement to judgment as a matter of law, by submitting evidentiary proof in admissible form sufficient to show the absence of any material issues of fact. See *CPLR 3212 (b)*; *Stonehill Capital Mgt., LLC v Bank of the West, 28 NY3d 439, 448, 45 N.Y.S.3d 864, 68 N.E.3d 683 (2016)*; *Alvarez v Prospect Hosp., 68 NY2d 320, 324, 501 N.E.2d 572, 508 N.Y.S.2d 923 (1986)*; *Zuckerman v City of New York, 49 NY2d 557, 562, 404 N.E.2d 718, 427 N.Y.S.2d 595 (1980)*. Once such showing is made, the burden shifts to the opposing party to demonstrate, also by submitting admissible **[**9]** evidence, that **[*9]** genuine material issues of fact exist which require a trial of the action. See *Stonehill Capital Mgt., 28 NY3d at 448*; *Alvarez, 68 NY2d at 324*; *Zuckerman, 49 NY2d at 562*. The evidence must be viewed in a light most favorable to the nonmoving party (see *Nomura Asset Capital Corp. v Cadwalader, Wickersham & Taft LLP, 26 NY3d 40, 49, 19 N.Y.S.3d 488, 41 N.E.3d 353 [2015]*; *William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475, 982 N.Y.S.2d 813, 5 N.E.3d 976 [2013]*), and the motion must be denied if there is any doubt as to the existence of a triable issue of fact. See *Rotuba Extruders v Ceppos, 46 NY2d 223, 231, 385 N.E.2d 1068, 413 N.Y.S.2d 141 (1978)*. The opposing party "must assemble and lay bare its affirmative proof to demonstrate that genuine triable issues of fact exist." *Kornfeld v NRX Technologies, Inc., 93 AD2d 772, 773, 461 N.Y.S.2d 342 (1st Dept 1983)*, affd *62 NY2d 686, 465 N.E.2d 30, 476 N.Y.S.2d 523 (1984)*. "[0]nly the existence of a bona fide issue raised by evidentiary facts and not one based on conclusory or irrelevant allegations will suffice to defeat summary judgment." *Rotuba Extruders, Inc., 46 NY2d at 231*; see *Zuckerman, 49 NY2d at 562*; *Stonehill Capital Mgt., 28 NY3d at 448*.

Plaintiffs' Motion for Summary Judgment

Breach of Contract

Plaintiffs move for summary judgment on their breach of contract claims for unpaid commissions and fees, and to dismiss defendants' counterclaims for breach of contract.

**[**10]** The elements of a breach of contract claim "include the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v Seward Park Hous. Corp., 79 AD3d 425, 426, 913 N.Y.S.2d 161 (1st Dept 2010)*; see *Second Source Funding, LLC v Yellowstone Capital, LLC, 144 AD3d 445, 445-446, 40 N.Y.S.3d 410 (1st Dept 2016)*. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Marin v Constitution Realty, LLC, 28 NY3d 666, 673, 49 N.Y.S.3d 39, 71 N.E.3d 530 (2017)*, quoting *Greenfield v Phillies Records, 98 NY2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002)*. "Construction of an unambiguous contract is **[*10]** a matter of law." *Beal Sav. Bank v Sommer, 8 NY3d 318, 324, 865 N.E.2d 1210, 834 N.Y.S.2d 44 (2007)*.

There is no dispute that plaintiffs had contracts with LBM which set out the rates and procedures for payment of fees and earned commissions. There also is no dispute that plaintiffs were paid according to the terms of their agreements until around September 2013. Plaintiffs submit copies of their agreements, and other documentary evidence, as well as affidavits, showing that they performed their services under the agreements and earned commissions and fees which were not paid to them. Plaintiffs thereby have made a prima facie showing that defendant LBM breached its contracts with plaintiffs and that they are entitled to recover fees and commissions earned.

**[**11]** In opposition, defendants fail to raise triable issues of fact as to whether plaintiffs breached provisions of the contract. Defendants address the breach of contract claims in one brief paragraph, without citing any evidence or legal authority, and assert that there are triable issues of fact as to whether the commissions sought by plaintiffs were based on "their use of improper advertising rates, for their own enrichment, in violation of company policy," and whether the plaintiffs' "own breaches and disloyalty **[*11]** preclude the recovery they seek." While defendants also allege in their counterclaims that plaintiffs breached a provision requiring them to pay their own business expenses, by bartering LBM advertising space for free airline tickets and other business expenses (third counterclaim); and breached a provision prohibiting them from divulging confidential and proprietary information concerning the business of LBM to persons outside of LBM (fourth counterclaim), they present no evidence sufficient to raise triable issues of fact as to such claims.

To the extent that defendants argue that the alleged violation of a company policy regarding advertising rates was a breach of contract, they identify no contract provision that requires a rate to be charged or that conditions payment of commissions on an advertising rate. Further, Blouin testified that advertising rates fluctuated; she did not know if other **[**11]** employees always sold at rate card rates; and other employees offered lower rates to advertisers, and she could not identify a single advertiser who pays rate card rates. Hartley also attested it was "industry standard" to sell advertising at below rate card rates, and that any below rate **[*12]** card sales were disclosed on weekly sales reports provided to Blouin.

Defendants' claim that plaintiffs breached their contracts by having business expenses paid by third parties through bartering advertisements, also is not supported by the evidence. While Schedule A of the agreements states that plaintiffs were responsible for their own business expenses, the contracts also expressly state that plaintiffs would be reimbursed for all approved business expenses. Hartley attests that bartering also was a "commonly accepted industry practice", which Blouin acknowledged. Further, even if there were a dispute about whether expenses were approved or paid, the contract does not provide that a question about payment of business expenses was a basis for not paying commissions and fees. Defendants further offer no evidence showing that they were damaged because of plaintiffs' bartering. See *Apogee Handcraft, Inc. v Verragio, Ltd., 155 AD3d 494, 495, 65 N.Y.S.3d 27 (1st Dept 2017)* (no breach of contract claim where cannot establish damages).

As to defendants' claims that plaintiffs breached a confidentiality provision of the agreement, at her deposition, **[**12]** Blouin could not specify what confidential information had been divulged. In her affidavit, Blouin claimed that plaintiffs, and **[*13]** Genocchio, "initiated and fueled" negative press

coverage of LBM, but again does not identify what information was allegedly divulged because of their actions or make any showing that such information was proprietary or confidential.

LBM's counterclaims for breach of contract against Shanley and Buckley thus cannot survive, and because defendants otherwise fail to raise a triable issue of fact as to plaintiffs' breach of their agreements, plaintiffs are entitled to summary judgment as to liability on their breach of contract claims against LBM. However, as neither plaintiff establishes as a matter of law exactly what earned commissions and fees in 2013 and 2014 were not paid, damages must be determined at trial.

Labor Law

"Article 6 of the Labor Law regulates the payment of wages by employers" (*Pachter v Bernard Hodes Group, Inc., 10 NY3d 609, 614, 891 N.E.2d 279, 861 N.Y.S.2d 246 [2008]*), and "sets forth a comprehensive set of statutory provisions enacted to strengthen and clarify the rights of employees to [such payment]." *Truelove v Northeast Capital & Advisory, 95 NY2d 220, 223, 738 N.E.2d 770, 715 N.Y.S.2d 366 (2000)*.

Labor Law § 191 requires employers to timely pay wages to certain categories of employees, including "commission **[**14]** salespersons." Labor Law § 191 (1) (c); see *Pachter, 10 NY3d at 615*; *Wiggins v Hain Pure Protein Corp., 829 F Supp 2d 231, 241 (SD NY 2011)*. "Section 193 prohibits an employer from making 'any deduction from the wages of an employee' unless permitted by law or authorized by the employee for certain payments made **[*14]** for the employee's benefit." *Ryan v Kellogg Partners Inst. Servs., 19 NY3d 1, 16, 968 N.E.2d 947, 945 N.Y.S.2d 593, (2012)*, quoting Labor Law § 193 (1) (a), (b); see *Truelove, 95 NY2d at 223*. Wages are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." Labor Law § 190 (1). Thus, earned commissions are encompassed in the statutory definition of wages. see Labor Law § 190 (1); *Pachter, 10 NY3d at 616-617*; *Arbeeny v Kennedy Exec. Search, Inc., 71 AD3d 177, 185, 893 N.Y.S.2d 39 (1st Dept 2010)*.

Courts have held that a failure to pay wages, including guaranteed bonuses and commissions, can be deemed a violation of Labor Law § 193. See e.g. *Ryan, 19 NY3d at 16*; *Kieper v The Fusco Group Partners Inc., 152 AD3d 1030, 59 N.Y.S.3d 561, (3d Dept 2017)*; *Gennes v Yellow Book of N. Y., Inc., 23 AD3d 520, 521, 806 N.Y.S.2d 646 (2d Dept 2005)*; *Esmilla v Cosmopolitan Club, 936 F Supp 2d 229, 252 (SD NY 2013)*; *Bari v Morellato & Sector USA, Inc., 2012 NY Slip Op. 32122[U] [Sup Ct, New York County 2012]*. Other courts have held, however, that Labor Law § 193 "'has nothing to do with **[**15]** failure to pay wages . . ., governing instead the specific subject of making deductions from wages.'" *Fearon-Gallimore v Gottlieb, 2017 NY Slip Op 32822[U], 2017 NY Misc LEXIS 5354, 2017 WL 1335255, *4 (Sup Ct, NY County 2017)* (citations omitted); see *Matter of Angello v Labor Ready, Inc., 7 NY3d 579, 584, 859 N.E.2d 480, 825 N.Y.S.2d 674*; *Perella Weinberg Partners LLC v Kramer, 153 AD3d 443, 449, 58 N.Y.S.3d 384 (1st Dept 2017)*; *Kletter v Fleming, 32 AD3d 566, 567, 820 N.Y.S.2d 348 (3d Dept 2006)*.

Plaintiffs claim that defendants violated Labor Law § 191 or § 193 by failing to pay them fees and commissions. Plaintiffs also claim that, under Labor Law § 198, they are entitled to recover attorneys' fees and liquidated, or double, damages. In opposition, defendants argue that Labor Law Article 6 protections do not apply to plaintiffs because they are independent contractors, not employees.

To recover under Article 6, "plaintiff must first demonstrate that he or she is an employee entitled to its protections." *Kausal v Educational Prods. Info. Exch. Inst., 105 AD3d 909, 912, 964 N.Y.S.2d 550 (2d Dept 2013)*, quoting *Bhanti v Brookhaven Mem. Hosp. Med. Ctr., 260 AD2d 334, 335, 687 N.Y.S.2d 667 (2d Dept 1999)* (other citations omitted). An employee, as defined in Labor Law § 190 (2) **[*15]** , is "any person employed for hire by an employer in any employment." "Although Labor Law § 190 broadly defines an employee' . . . [the] definition excludes independent contractors.'" **[**16]** *Hernandez v Chefs Diet Delivery, LLC, 81 AD3d 596, 597, 915 N.Y.S.2d 623 (2d Dept 2011)* (citations omitted); see *Akgul v Prime Time Transp., 293 AD2d 631, 633, 741 N.Y.S.2d 553 (2d Dept 2002)*; *Bhanti, 260 AD2d at 335*.

The determination of whether one is an employee or independent contractor "is fact sensitive and often presents a question for the trier of fact." *Hernandez, 81 AD3d at 597-598*; see *Johnson v R. T. K. Petroleum Co., 289 NY 101, 103, 44 N.E.2d 6 (1942)*; *Carrion v Orbit Messenger, 192 A.D.2d 366, 367, 596 N.Y.S.2d 50 (1st Dept 1993)*, affd *82 NY2d 742, 621 N.E.2d 692, 602 N.Y.S.2d 325 (1993)*. "[T]he critical inquiry in

determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results. Factors relevant to assessing control include whether the worker (1) worked at his [or her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog v Cipriani Group, 1 NY3d 193, 198, 802 N.E.2d 1090, 770 N.Y.S.2d 692, (2003)* (citations omitted). "Beyond addressing the Bynog factors, courts must also assess the totality of a worker's relationship with a purported employer when determining whether an employment relationship existed." *Rose v Northwestern Mut. Life Ins. Co., 220 F Supp 3d 363, 377 (ED NY 2016)*. "[N]o one factor is determinative as to the ultimate question of control." *Meyer v United States Tennis Assn., 2014 US Dist LEXIS 128209, 2014 WL 4495185 (SD NY 2014)*, **[**17]** affd *607 Fed Appx 121 (2d Cir 2015)*; see *Matter of Stuckelman (Commr. of Labor), 16 AD3d 882, 882, 791 N.Y.S.2d 225 (3d Dept 2005)*.

"In this inquiry, . . . it is not significant how the parties defined the employment relationship or how the worker identified herself on tax **[*16]** forms." *Hart v Rick's Cabaret Intl., Inc., 967 F Supp 2d 901, 924 (SD NY 2013)*. The existence of a contract designating a person as an independent contractor and the manner the relationship is treated for income tax purposes thus are factors to be considered but are not dispositive. See *Hernandez, 81 AD3d at 599*; *Araneo v Town Bd. for Town of Clarkstown, 55 AD3d 516, 518-519, 865 N.Y.S.2d 281 (2d Dept 2008)*; *Sandrino v Michaelson Assocs., LLC, 2012 US Dist LEXIS 165143, *26-27, 2012 WL 5851135 (SD NY 2012)*.

In this case, plaintiffs did not receive fringe benefits, did not have taxes deducted, and were identified in their agreements as independent contractors. They were not prohibited from engaging in other employment, but were provided office space, telephone numbers and email accounts for LBM business purposes, and reported to the vice president and president of the company. They could determine their own hours and schedules, although plaintiffs attest that they were expected to work regular hours in defendants' offices, especially after they were named as publishers, and they performed the same work as other LBM employee-publishers.

**[**18]** Shanley attests that she was required to be in the office five days a week, attended weekly mandatory sales meetings, and reported directly to Gursky, advising him when she was ill or on vacation. She worked at an assigned desk in the LBM office, was given an electronic key to enter the building, which she understood was used to confirm **[*17]** that she was in the office and was assigned a telephone number and email address to use for LBM business. When she was appointed publisher of Art + Auction in November 2009, after Gursky left that position, she was given a list of Gursky's responsibilities to perform and was supervised by Hartley, and, she attests, to do her job, she worked full time on LBM projects. As she also attests, she was identified as Publisher on the masthead of Art + Auction and in her company email signature block, and in that position, was required to work with all parts of the company, wherever assistance was needed.

Buckley attests that, after working part time in 2006, her responsibilities were expanded in 2007 and she began working in the LBM offices, often 40 or more hours per week, was given a desk, phone and computer for LBM work, and made the LBM office her base. As her responsibilities increased, she attests, she was required to be in the office five days a week and informed Gursky when she was sick or on vacation, was given an electronic key for entry to the building, attended weekly sales meetings **[**19]** and submitted sales reports to Blouin and Gursky, and assisted Gursky with his work. After Gursky **[*18]** left, in or around October 2009, she was named Associate Publisher of Art + Auction magazine, and, along with Shanley, took on significant new responsibilities, including some of Gursky's responsibilities, and attended management strategy meetings to discuss new products and future company initiatives, among other things. She was assigned to starting up two new magazines in 2012 and 2013, and, as a result, was given an additional monthly fee, and, she asserts, worked exclusively for LBM, subject to the supervision, direction and control of Blouin and Hartley.

In his affidavit, Hartley attests that, during the time he was president of LBM, he supervised Shanley and Buckley, and after Gursky left as publisher of Art + Auction, Shanley took over most of his responsibilities, and Buckley assisted Shanley and took on other duties as well; both also continued to sell advertising. He states that plaintiffs worked regularly from the LBM office, where they had their own office space, and their duties were the same as all other LBM publishers, who were all employees pursuant to written agreements. According to Hartley, after plaintiffs became publishers, their "status as independent contractors **[*19]** was merely a holdover from their earlier roles."

Although Blouin attests that plaintiffs were treated as independent contractors, free from supervision, direction and **[**20]** control of the performance of their duties, the conflicting affidavits raise issues of fact as to whether, considering the totality of the circumstances, plaintiffs were employees for Labor Law purposes. See generally *Flannigan v Vulcan Power Group, LLC, 642 Fed Appx 46, 51-52, 2016 US App LEXIS 4680, 2016 WL 963935 (2d Cir 2016)* (commission salesperson seeking to recover a disputed commission could become an employee for Labor Law purposes during time at issue).

Issues of fact about the level of control defendants exerted over the means of plaintiffs' work also are raised by Blouin's deposition testimony. She testified that she was not involved in day-to-day supervision of plaintiffs, but she decided to fire them because they failed to comply with her directive to sell advertising at rate card rates and did not get her approval to barter for advertisements. According to Blouin, plaintiffs were required to sell advertising at rate card rates, although she acknowledged that others discounted those rates and she knew of no advertiser paying rate card rates; and they had no authority to barter, although it was permitted by her in some **[*20]** circumstances, and was a recognized practice in the magazine industry. See generally *Matter of Morton, 284 NY 167, 174, 30 N.E.2d 369 (1940)* (considering all circumstances, including required sales prices and techniques, "the picture presented is not that of one **[**21]** free to exercise her own discretion in the performance of a contract").

As to the Labor Law claims against Blouin, "[w]hether an individual qualifies as an employer depends on whether 'the particular defendant had the power to hire and fire employees,' whether 'he [or she] supervised and controlled the conditions of employment,' and whether 'he [or she] determined rates and methods of payment, and the like.'" *Flannigan, 642 Fed Appx at 52*, quoting *Chu Chung v New Silver Palace Rest., Inc., 272 F Supp 2d 314, 318 (SD NY 2003)*; see *Bonito v Avalon Partners, Inc., 106 AD3d 625, 626, 967 N.Y.S.2d 19 (1st Dept 2013)*; see also *Cohen v Finz & Finz, P.C., 131 AD3d 666, 16 N.Y.S.3d 70 (2d Dept 2015)*. The evidence sufficiently demonstrates that Blouin qualifies as an employer. Blouin admittedly was the sole owner of LBM, had the power to hire and fire plaintiffs, the authority to supervise and direct them, the sole authority to set policy about advertising rates, and had ultimate control over the operation of the business.

As defendants do not argue that plaintiffs' claims for fees and commissions are not wages under Labor Law § 191 and 193, the court need not reach that issue. However, plaintiffs do not make clear which section or sections they are claiming **[*21]** were violated. While the complaint alleges that defendants violated Labor Law "§§ 190 et seq., including but not limited to § 193," **[**22]** they argue in support of their motion only that § 191 was violated.

Labor Law § 215 (Retaliation)

Labor Law § 215 (1) (a) prohibits an employer from discharging or otherwise retaliating against an employee who complained that the employer has violated a provision of the Labor Law or has "instituted . . . a proceeding under or related to this chapter." See *Wigdor v SoulCycle, LLC, 139 AD3d 613, 613, 33 N.Y.S.3d 30 (1st Dept 2016)*; *Adler v 20/20 Cos., 82 AD3d 914, 914-915, 918 N.Y.S.2d 583 (2d Dept 2011)*; *Epifani v Johnson, 65 A.D.3d 224, 882 N.Y.S.2d 234, 235 (2d Dept 2009)*. A claim under Labor Law § 215 requires a plaintiff to show that "while employed by the defendant, he or she made a complaint about the employer's violation of New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result." *Higueros v New York State Catholic Health Plan, Inc., 526 F Supp 2d 342, 347 (ED NY 2007)*. A plaintiff must show that she "complained about a specific violation of the Labor Law" (*Epifani, 65 AD3d at 236*), although citation to the statute is not required. Id.; see *Weiss v Kaufman, 2010 NY Slip Op 33261[U], 2010 NY Misc. LEXIS 5699, at *4, 2010 WL 4858896 [Sup Ct, NY County 2010]*. A plaintiff must also show "a nexus between the employee's complaint and the employer's retaliatory action." *Kreinek v Showbran Photo, Inc., 2003 US Dist LEXIS 18276, *20, 2003 WL 22339268 (SD NY 2003)* **[**23]** ; see *Higueros, 526 F Supp 2d at 347*.

Although the complaint alleges, and plaintiffs attest, that their employment was terminated after they complained that they were owed commissions and fees, on **[*22]** this motion, their argument is that defendants retaliated against them by asserting counterclaims in this action.

While courts have recognized that "counterclaims can be used as a retaliatory practice, with a concrete, adverse impact on the plaintiff" (*Kreinek, 2003 US Dist LEXIS 18276, at *30*; see *Torres v Gristede's Operating Corp., 628 F Supp 2d 447, 472-473 [SD NY 2008]*), "'[i]t is the rare case that the filing of a counterclaim can serve as the basis for a retaliation claim.'" *Arevalo v*

Burg, 129 AD3d 417, 417, 10 N.Y.S.3d 231 (1st Dept 2015), quoting Klein v Town & Country Fine Jewelry Group, 283 AD2d 368, 369, 725 N.Y.S.2d 42 (1st Dept 2001). To establish that a counterclaim is retaliatory, a plaintiff must show that the counterclaim "'could have a direct, adverse impact on [plaintiff's] present employment or future employment prospects.'" Arevalo, 129 AD3d at 417, quoting Kreinek, 2003 US Dist LEXIS 18276, at *23; see D'Amato v Five Star Reporting, Inc., 80 F Supp 3d 395, 420 (ED NY 2015). Plaintiffs have made no showing that the counterclaims here had a direct, adverse impact on their employment prospects, and as they have not addressed the other allegations of retaliation in **[**24]** the complaint, and as there are issues of fact as to their status as employees, the branch of their motion seeking summary judgment on their retaliation claim is denied.

Unjust Enrichment/Quantum Meruit

Plaintiffs' alternative causes of action for unjust enrichment and quantum meruit are duplicative of the breach of contract claim. See Corsello v Verizon New York, Inc., 18 NY3d 777, 790, 967 N.E.2d 1177, 944 N.Y.S.2d 732 (2012) ("unjust enrichment claim is not available where it simply duplicates, or **[*23]** replaces, a conventional contract or tort claim"); see EBC I, Inc. v Goldman Sachs & Co., 5 NY3d 11, 23, 832 N.E.2d 26, 799 N.Y.S.2d 170 (2005) (same); Aviv Constr., Inc. v Antiquarium, Ltd., 259 AD2d 445, 446, 687 N.Y.S.2d 344 (1st Dept 1999) (same for quantum meruit claim). Searching the record, the court finds that these claims should be dismissed, even though defendants did not cross-move for such relief. See CPLR 3212 (b); Siegel Consultants, Ltd. v Nokia, Inc., 85 AD3d 654, 656-657, 926 N.Y.S.2d 82 (1st Dept 2011) (on summary judgment, court "'may search the record and, if appropriate, grant summary judgment to the nonmoving party on any related claim,'" citing Carnegie Hall Corp. v City Univ. of N.Y., 286 AD2d 214, 215, 729 N.Y.S.2d 93 [1st Dept 2001]); see also Archer Mgt. Servs. v Pennie & Edmonds, 287 A.D.2d 343, 344, 731 N.Y.S.2d 177 (1st Dept 2001).

Defendants' Counterclaims

Plaintiffs also move for summary judgment dismissing the counterclaims for breach of contract, breach of loyalty **[**25]** (faithless servant), breach of the implied covenant of good faith, breach of fiduciary duty, and, as against Artmedia and plaintiffs, unjust enrichment. The breach of contract counterclaims shall be dismissed for reasons previously state. The remaining counterclaims are dismissed for the reasons stated below.

Under the faithless servant doctrine, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his [or her] services is generally disentitled to recover his [or her] compensation, whether commissions or salary." Feiger v Iral Jewelry, Ltd., 41 NY2d 928, 928, 363 N.E.2d 350, 394 N.Y.S.2d 626 (1977). "[C]ourts apply the rule relatively narrowly" (Linder v Innovative Commcl. Sys. LLC, 41 Misc 3d 1214[A], 981 NYS2d 636, 2013 NY Slip Op 51695[U], *6 [Sup Ct, NY County 2013] [citations omitted], affd 127 A.D.3d 670, 8 N.Y.S.3d 191 [1st Dept 2015]), and generally, a claim **[*24]** for breach of loyalty "is available only where the employee has acted directly against the employer's interests - as in embezzlement, improperly competing with the current employer, or usurping business opportunities." Veritas Capital Mgt., LLC v Campbell, 82 AD3d 529, 530, 918 N.Y.S.2d 448 (1st Dept 2011); accord Pozner v Fox Broadcasting Co., 59 Misc3d 897, 900, 74 N.Y.S.3d 711 (Sup Ct, NY County, April 2, 2018); Linder, 2013 NY Slip Op 51695[U], at *6; Sullivan & Cromwell LLP v Charney, 15 Misc 3d 1128[A], 841 NYS2d 222, 2007 NY Slip Op 50889[U], at *6 [Sup Ct; NY County 2007]; **[**26]** see e.g. Visual Arts Found., Inc. v Egnasko, 91 AD3d 578, 579, 939 N.Y.S.2d 13 (1st Dept 2012) (employee admitted theft from company funds of $300,000); Soam Corp. v Trane Co., 202 AD2d 162, 162, 608 N.Y.S.2d 177 (1st Dept 1994) (employee promoted competitor's products over employer's); Matter of Blumenthal (Kingsford), 40 AD3d 318, 318, 833 N.Y.S.2d 897 (1st Dept 2007) (employee made systematic unauthorized transfers from business to himself and wife); see also Beach v Touradji Capital Mgt., LP, 144 AD3d 557, 42 N.Y.S.3d 96 (1st Dept 2016) (breach of fiduciary duty similarly requires finding that employee acted against the employer's interest). Further, "[a] salesman compensated solely on commission does not breach either a duty of good faith or of loyalty by failing to zealously pursue sales." Linder, 2013 NY Slip Op 51695[U], at *6.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance . . . [which] embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131 (2002), quoting Dalton v Educational

Testing Serv., 87 NY2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995) (other citations omitted); see New York Univ. v Continental Ins. Co., 87 NY2d 308, 318, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995). "This covenant 'is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, **[*25]** **[**27]** would deprive the other party of the right to receive the benefits under their agreement.'" Gettinger Assoc, L.P. v Abraham Kamber Co., 83 AD3d 412, 414, 920 N.Y.S.2d 75 (1st Dept 2011), quoting Jaffe v Paramount Communications, Inc., 222 AD2d 17, 22-23, 644 N.Y.S.2d 43 (1st Dept 1996); see Aventine Inv. Mgt., Inc. v Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128 (2nd Dept 1999).

To establish a breach of fiduciary duty claim, a plaintiff "must prove the existence of a fiduciary relationship, misconduct by the other party, and damages directly caused by that party's misconduct." Pokoik v Pokoik, 115 AD3d 428, 429, 982 N.Y.S.2d 67 (1st Dept 2014); see Castellotti v Free, 138 AD3d 198, 209, 27 N.Y.S.3d 507 (1st Dept 2016). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Roni LLC v Arfa, 18 NY3d 846, 848, 963 N.E.2d 123, 939 N.Y.S.2d 746 (2011) (internal quotation marks and citations omitted); see EBC I, Inc., 5 NY3d at 19. "Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions. Id. "An employment relationship . . . in itself does not create a fiduciary relationship." *Wilson v Dantas, 29 NY3d 1051, 58 N.Y.S.3d 286, 80 N.E.3d 1032, (2017)*; see Rather v CBS Corp., 68 AD3d 49, 55, 886 N.Y.S.2d 121 (1st Dept 2009).

**[**28]** An unjust enrichment claim requires a party to show "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182, 944 N.E.2d 1104, 919 N.Y.S.2d 465 (2011) (internal quotation marks and citations omitted); see Citibank, N.A. v Walker, 12 AD3d 480, 481, 787 NYS2d 48 [2d Dept 2004]. "It is available only in unusual situations **[*26]** when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello, 18 NY3d at 790. "'[A] party may not recover in . . . unjust enrichment where the parties have entered into a contract that governs the subject matter.'" Pappas v Tzolis, 20 NY3d 228, 234, 982 N.E.2d 576, 958 N.Y.S.2d 656 (2012), quoting Cox v NAP Constr. Co., Inc., 10 NY3d 592, 607, 891 N.E.2d 271, 861 N.Y.S.2d 238 (2008); see IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142, 907 N.E.2d 268, 879 N.Y.S.2d 355 (2009).

Similarly, a claim for breach of the implied covenant of good faith and fair dealing cannot be sustained where "it is premised on the same conduct that underlies the breach of contract cause of action and is 'intrinsically tied to the damages allegedly resulting from a breach of the contract/" MBIA Ins. Corp. v Merrill Lynch, 81 AD3d 419, 420, 916 N.Y.S.2d 54 (1st Dept 2011), quoting Hawthorne Group, LLC v RRE Ventures, 7 AD3d 320, 323, 776 N.Y.S.2d 273 (1st Dept 2004); see Salomon v Citigroup Inc., 123 AD3d 517, 999 N.Y.S.2d 21, 518 (1st Dept 2014). Such a claim is properly dismissed as duplicative when it arises from the same allegations underlying the breach of contract claim. See *Apogee Handcraft, Inc., 155 AD3d at 495-496*; Art Capital Group, LLC v Carlyle Inv. Mgt. LLC, 151 AD3d 604, 605, 55 N.Y.S.3d 54 (1st Dept 2017); *Amcan Holdings, Inc. v Canadian Imperial Bank of Commerce, 70 AD3d 423, 426, 894 N.Y.S.2d 47 (1st Dept 2010)*. Causes of action for breach of fiduciary duty and breach of loyalty which are duplicative of a breach of contract claim also should be dismissed. See *Mosaic Caribe, Ltd. v All Settled Group, Inc., 117 AD3d 421, 423, 985 N.Y.S.2d 33 (1st Dept 2014)*; Perl v Smith Barney Inc., 230 AD2d 664, 666, 646 N.Y.S.2d 678 (1st Dept 1996); see also Siegel Consultants, Ltd. v Nokia, Inc., 2010 NY Slip Op 33840[U], 2010 NY Misc LEXIS 6862, *31-32, 2010 WL 9067678 [Sup Ct, NY County 2010] ("breach of loyalty and breach of fiduciary duty . . . are, by definition, one and the same"), aff'd as modified 85 AD3d 654, 926 N.Y.S.2d 82 (1st Dept 2011).

As plaintiffs correctly note, defendants' cursory opposition to the branch of plaintiffs' motion seeking dismissal **[*27]** of the counterclaims consists of no more than a recitation of the elements of the claims, without applying the law to the evidence other than asserting that "[d]efendants' allegations of improper conduct, outlined in the Blouin affidavit" are sufficient to raise triable issues of fact. See Def. Memo of Law, at 15. In her affidavit, Blouin asserts that plaintiffs **[**30]** failed to respect the advertising rates set by LBM; violated their contractual obligations to pay for their own expenses and stole from LBM by bartering advertising space in LBM publications in exchange for personal benefits; and defamed her and LBM, after they were

terminated in 2014, by initiating and fueling negative press coverage.

These assertions, together with the allegations of the counterclaims and Blouin's deposition testimony, show that the faithless servant, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment claims are based on essentially the same allegations, which largely track the allegations underlying the breach of contract claims. At her deposition, Blouin testified that Shanley and Buckley violated their duties to LBM by selling advertising at below **[*28]** rate card rates, bartering free or discount advertising in exchange for plane tickets and a restaurant meal, and divulging confidential and proprietary business information; that Shanley additionally breached her duties by directing payments for LBM goods to Artmedia; and that Buckley breached her duties by disparaging LBM to advertisers.

To the extent that they are based on allegations of improper bartering, failure to follow advertising rates, and divulgence of confidential information, the faithless servant, breach of the implied covenant of good faith and fair dealing, **[**31]** breach of fiduciary duty, and unjust enrichment claims are dismissed as duplicative of LBM's breach of contract claims. As to the breach of loyalty claim, there also is no evidence that there was theft of property or active divergence of corporate opportunities. Nor did plaintiffs' failure to make sales at rate card rates amount to disloyalty. See *Linder, 2013 NY Slip Op 51695[U], at *6*. As to the allegations that Shanley and Artmedia were unjustly enriched by diverting payments for LBM goods and services to Artmedia, defendants offer no evidence to show what funds, if any, were improperly transferred; at her deposition, Blouin was unable to identify **[*29]** any improper payments made to Artmedia. Defendants also failed to show that plaintiffs' barters were not in exchange for business-related expenses or that such otherwise personally benefitted plaintiffs or damaged LBM; and defendants are unable to identify what confidential and proprietary business information was divulged or what disparaging statements were made, asserting only that "[w]e will find out later on."

The court notes that, when questioned at her deposition about what facts supported LBM's counterclaims, Blouin generally could not recall anything other than what was alleged in the answer and counterclaims, and repeatedly stated that defendants had, or would find, more information to present at trial to support their claims. To defeat summary judgment, however, **[**32]** defendants were required to "assemble and lay bare affirmative proof of the existence of any issue of fact" (*Melhado v Catsimatidis, 182 AD2d 576, 582 N.Y.S.2d 434 [1st Dept 1992]*), or demonstrate "an acceptable excuse for a failure to meet the strict requirement' for such a tender in opposition." *Sutton v East River Sav. Bank, 55 NY2d 550, 553-554, 435 N.E.2d 1075, 450 N.Y.S.2d 460 (1982)*. Defendants have done neither, and, contrary to their contention, Blouin's conclusory and speculative assertions are insufficient to establish the existence of a triable issue of fact as to **[*30]** any of the counterclaims.

Genocchio's Motion to Dismiss Third-Party Complaint

The third-party complaint (TPC) alleges that Genocchio "bartered editorial content in LBM publications in exchange for goods and services that benefitted Genocchio personally." More particularly, the TPC alleges that, in March 2013, Genocchio agreed to interview the owner of a travel agency for an LBM publication in exchange for airline tickets to Zurich to attend an art fair in June 2013. According to the third-party complaint, Genocchio benefitted personally from this barter because it was LBM's "standard practice" to deny requests by employees such as Genocchio to reimburse travel expenses. LBM further alleges that it suffered damages from this exchange "in the form of lower-quality LBM publications." Based solely on these allegations, LBM asserts causes of action for faithless **[**33]** servant, breach of implied covenant of good faith, unjust enrichment, breach of fiduciary duty, conversion, and unfair competition.

Even if true, the single incident of alleged wrongdoing, absent any proof of damages, is insufficient to sustain any of the claims against Genocchio. Moreover, in support of his summary judgment motion, **[*31]** Genocchio submits evidence, unrebutted by LBM, that he was an employee of LBM and, in his position as Editorial Director, regularly attended art fairs on behalf of LBM; that his contract expressly stated that he would be reimbursed for business-related travel expenses, that he always was reimbursed for travel expenses, and that he attended Art Basel in June 2013 with LBM's approval.

Genocchio also attests that he was provided with a "sponsored" plane ticket from Turon Travel, arranged by Shanley, to use to attend Art Basel in June 2013, that there were no written policies against using sponsored tickets, and he was never told that it was problematic to

do so. He stated that he accepted the tickets in exchange for interviewing the president of Turon, but the matter was not pursued, and no editorial content was provided to Turon. In addition, Hartley attests that, as President of LBM at the time of the June 2013 barter, he was aware of this exchange, which was arranged by Shanley, **[**34]** and believed that use of the bartered ticket was legitimate and benefitted LBM.

LBM's opposition to Genocchio's motion, like its opposition to plaintiffs' motion, relies on the allegations of improper conduct **[*32]** "outlined" in Blouin's affidavit to argue that there are triable issues of fact as to its claims against Genocchio. Blouin's conclusory assertions that Genocchio was a faithless servant and "violated his duty as an LBM employee" by "facilitating" Shanley's barter activity, however, are insufficient to raise a triable issue of fact. To the extent that Blouin claims that Genocchio defamed her and LBM, claims not set out in the third-party complaint, third-party plaintiff offers no evidence, or even factual allegations, of what defamatory statements were made. The third-party complaint, therefore, must be dismissed in its entirety.

**11/26/2018**

**DATE**

/s/ Debra A. James

**DEBRA A. JAMES, J.S.C.**

---

End of Document