1

```
 1   UNITED STATES BANKRUPTCY COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
 2   -----------------------------------X
     RE:
 3
     BRICKCHURCH ENTERPRISES, INC.,
 4
             Debtor,
 5
                             Chapter 11
 6                           Case No.:
                             2270914-ast
 7
 8   -----------------------------------X
 9               DATE:  February 10, 2023
10               TIME:  9:30
11
12
13        DEPOSITION of ANNE SYLVIA, a Witness
14   on behalf of Internal Revenue Service,
15   taken by the Debtor, pursuant to Court
16   Order, held at the Offices of Duane Morris,
17   at the above-mentioned date and time,
18   before MARINA DUBSON, a Notary Public of
19   the State of New York.
20
21
22
23
```

24

25

2

1    APPEARANCES:

2

3    DUANE MORRIS, LLP
     Attorney for Debtor
4    30 South 17th Street
     Philadelphia, New York 1903
5    (215) 979-1508
     BY: BRETT L. MESSENGER, ESQ.
6        Blmessenger@duanemorris.com

7

8    U.S. DEPARTMENT OF JUSTICE
     TAX DIVISION
9    Attorney for Witness
     P.O. Box 55
10   Washington DC, 20044
     [!PHONE NUMBER2]
11   BY: [!ATTORNEY2]

12
     [!FIRM3]
13   Attorney for Defendants
     [!ADDRESS-A3]
14   [!CITY3] [!STATE3] [!ZIP3]
     [!PHONE NUMBER3]
15   BY: [!ATTORNEY3]

16

17

18

19

20

21

22

23

24

25

3

1           REPORTER:  Mr. Murphy, will you

2       be ordering a copy of this

3       transcript?

4           MR. MURPHY: Yes, I will be.

5   EXAMINATION BY

6   MR. MESSENGER:

7       Q.    What's your name?

8       A.    Anne Sylvia.

9       Q.    Ms. Sylvia, who do you work

10  for?

11      A.    Internal revenue service.

12      Q.    What's your business address?

13      A.    Two ninety Broadway New York

14  New York one zero zero seven.

15      Q.    We talked before the deposition

16  you're from Philadelphia area correct?

17      A.    Correct.

18      Q.    What's the address Philadelphia

19  you work out of?

20        A.    I work in New York I live

21    outside of Philadelphia.

22        Q.    So we're here to take your

23    deposition today as you can see seated to

24    your left corporate stenographer she's

25    taking down what we say today because she

1    can only take down speaking at one time I

2    hope you would let me get the question out

3    before you wait?

4        A.    I will.

5        Q.    If you do it I'll say wait and

6    if you do it I say wait?

7        A.    Okay.

8        Q.    This is formal environmental

9    you're under oath the testimony you're

10    giving is same as you're giving in the

11    court of law do you understand that?

12        A.    Yes.

13        Q.    During the deposition is this

14    just question and answer I will ask

15    questions and you can answer to the best of

16    your ability I will make my questions as

17    clear as you possibly can if I fate with

18      that I don't want you to answer the

19      question I want to you tell me it's either

20      not clear or pose indeed a way you didn't

21      understand it I'll rephrase it as many time

22      you you need me to till you understand it?

23          A.    I do.

24          Q.    Would you -- do you agree to do

25      it?

5

1           A.    I do.

2           Q.    I'm going to show you some

3       documentation I'll refer to its exhibit

4       number?

5           A.    Okay.

6           Q.    When I ask you a question I may

7       focus you on a particular provision of the

8       document or part of a document when I do

9       that I want you to review as much of the

10      document you need to do to put my question

11      in a proper context I don't hear you say

12      later I didn't UPS the context in which the

13      question is asked do you agree to do that?

14          A.    Yes.

15          Q.    It's not a hurry up do best we

16    can if you need some time to look at the

17    document take all the time you wish okay?

18        A.    Okay.

19        Q.    The other thing are is but the

20    court reporter can only take down verbal

21    answers in order she can't take doeses of

22    the head wings of the eyes shrug of the

23    shoulderer nonverbal gestures you just

24    nodded?

25        A.    I do because you said nodding.

6

1        Q.    Have you ever had your

2    deposition taken before?

3        A.    No, I have not.

4        Q.    Did you previous for your

5    deposition?

6        A.    To a certain extent.

7        Q.    Tell me what you did in

8    preparation?

9        A.    We discussed Department of

10    Justice yesterday.

11        Q.    Did you review any document?

12        A.    I did review some of my

13    histories that I left on the case as well

14    as the pacer I looked at pacer only because

15    I needed to know what flagged me to this

16    whole situation that's going on right now.

17         Q.    What did you learn from pacer?

18         A.    Because I knew what flagged me

19    to it I didn't remember what exactly it was

20    called motion you guys filed to avoid the

21    liens that were filed by the IRS.

22         Q.    Actually you saw you're the one

23    who completed and executed proof of claim;

24    is that correct?

25         A.    Yes, I did.

7

1          Q.    Now I want to show you hear

2     comes your first learning SPOOERNGS with

3     documents we're going to mark this as your

4     deposition number one?

5          Q.    I'm showing you what we've

6     marked as your deposition number one do you

7     have that duplicate in front of you?

8          A.    I do you have seen that

9     document before.

10         A.    I'm going to let you know in

11    just a second.

12            (Plaintiff's Exhibit #,

13        description, was marked for

14        identification as of this date.)

15        A.    Yo I have.

16        Q.    When was the first time you saw

17   this document I'm not exactly sure?

18        Q.    Last week last month layer

19   year?

20        A.    I would say within the week.

21        Q.    And were you designated to

22   testify in regard to certain categories

23   that are listed on the notice of deposition

24   your exhibit one?

25        A.    I was.

                                              8

1         Q.    Do you know which categories

2    you were deNate today talk about category

3    one and category six?

4         Q.    So category one says the draft

5    the draft in filing preparation of proof of

6    claim filed by the internal revenue service

7    on December one 2022 in this procedure do

8    you see that yes, I do?

9         Q.    What did you review in regard

10    to preparing yourself to testify on behalf

11    of that subject?

12        A.    Can you be a little more

13    specific.

14        Q.    In preparation for your

15    deposition did you review documents in

16    preparation for your ability to testify in

17    regard to that categories?

18        A.    Yes I reviewed the actual proof

19    of claim that was filed did you review any

20    other documents besides the proof of claim.

21        A.    I can't think of any at this

22    moment.

23        Q.    Did you talk to anybody in

24    regard to your preparation today so that

25    you could testify in regard to the proof of

9

1    claim?

2        A.    Yes I discussed this with

3    counsel.

4        Q.    Did you discuss with anybody

5    else?

6        A.    No.

7        Q.    Did you do was there any

8    investigation that was required on your

9    part in order to prepare yourself to

10    testify about the proof of claim?

11        A.    No.

12        Q.    And in regard to number six

13    which reads the receipt of notice tell us

14    of the filing of this bankrupt proceeding

15    the internal operating procedures of the

16    internal revenue service that govern the

17    receipt of nods R NOTSs of bankrupt SKIS

18    and the action taken by the earn TENL REEF

19    service after receiving though bankruptcy

20    case you have designated to testify on

21    behalf of IRS on that category correct?

22        A.    Yes.

23        Q.    In regard to preparation today

24    did you review any document toss help or

25    assist and be prepared to testify on behalf

                                                10

1    of IRS in those categories?

2        A.    Yes, it's my case it's been my

3    case from the GIPing I reviewed my case

4    history just to refresh my member are there

5    internal operating procedure at the

6    internal REF service that are applicable to

7    filing proof of claims.

8         A.    Can you elaborate.

9         Q.    I wish I could are I don't know

10   what they are are DL books manual documents

11   other things training things anything that

12   helps you know what to do in regarding

13   filing a proof of claim?

14        A.    So the proof of claim is

15   handled through automatic proof of claim

16   system at the IRS so once we input the mom

17   knee in this case ITIN number it runs

18   through a search and INL natural database.

19        Q.    You can't ask him for help?

20        A.    Internal it's called IDRS I'm

21   sorry if I don't have the exact name

22   internal database system.

23        Q.    I don't care about the name

24   tell me what it does?

25        A.    It searches data for her TINZ

                                              11

1    number liability she has automatically

2    brings him over automatic proof of claim

3    system.

4       Q.      In regard to the proof of claim

5    system do you check it against any other

6    information or you just rely upon it?

7       A.      No I actually go into the

8    actual data that came over I verify if to

9    MRAK sure figurings that were entered on

10   the computer system are correct.

11      Q.      How do you verify it?

12      A.      I literally look at the actual

13   proof of claim that's filled out then I

14   match it against the liability against IDRS

15   system.

16      Q.      You make sure that the number

17   that appears on the proof of claim is

18   consistent?

19      A.      With the liability that show

20   up.

21      Q.      And you said her whose name did

22   you run?

23      A.      Louise Blouin.

24      Q.      Why did you run Louise Blouin's

25   name when you were trying to figure out

                                              12

1    what to file in regard to the proof of

2   claim?

3       A.    Because she's the owner of

4   Brickchurch.

5       Q.    How did you come to know that

6   she was the owner of Brickchurch?

7       A.    It's on the petition.

8       Q.    And are you talking about the

9   bankruptcy petition?

10      A.    I am go you think the

11  bankruptcy Petit lists Louise Blouin the

12  owner of the debtor.

13      A.    As I recall.

14      Q.    When you say owner she was

15  listed as owner of Brickchurch Enterprises

16  INS of dell swear the debtor?

17      A.    Correct.

18      Q.    If we take a look at that

19  bankrupt possession it's incorrect would

20  you agree the information you completed on

21  paragraph of claim as well incorrect as

22  well?

23      A.    No.

24      Q.    Why is that?

25      A.    Because she I DNLT prepare for

1    all of these I wasn't aware of these

2    questions I don't have the copy of the

3    actual petition in front of me .

4         Q.    Before we get to that how did

5    you know to file a proof of claim?

6         A.    So, can we start from the

7    beginning I guess.

8         Q.    I just want you to answer the

9    question if that means start from the

10   beginning that would make sense to me when

11   I originally received the case I did my

12   initial research it came up Louise Blouin

13   was the owner of Brickchurch?

14        Q.    Okay?

15        A.    It didn't matter to me at that

16   point because she wasn't in bankruptcy and

17   I had Brickchurch was my debtor I didn't

18   file any proof of claim for Brickchurch

19   because they didn't have any liability at

20   the time when I was reviewing the case

21   later it came to my attention at a liens

22   were filed that's how I knew Louise Blouin

23   had this liability.

24        Q.    How did it come to your

25    attention?

1       A.    When I was reviewing pacer, I

2    noticed that there was a motion to avoid

3    the Israel lien, I didn't file an Israel

4    lien therefore I was confused I didn't have

5    any liability under Brickchurch I contacted

6    expense certificate because his name was

7    revenue officer that filed the lien on

8    behalf of internal revenue service that's

9    when all this came to light. ).)

10             (Plaintiff's Exhibit #,

11          description, was marked for

12          identification as of this date.)

13      Q.    You have it that's the

14    information that comes from your system

15    right?

16      A.    Yes.

17      Q.    That's the -- what system is

18    this from?

19      A.    There is from automated proof

20    of claim system.

21      Q.    Is this the automatic mated

22    proof of claim system you were speaking

23    about before?

24        A.    It is.

25        Q.    Okay.  And what happens the IRS

1    monitors incoming notices of bankruptcy; is

2    that correct?

3        A.    Yes.

4        Q.    And so can we assume from this

5    document that we've marked as exhibit

6    number two that the Israel became aware

7    some time in May of 2022 about the filing

8    of the petition for Brickchurch for

9    bankruptcy?

10        A.    That's correct.

11        Q.    Allow does it I would imagine I

12    don't know there but imagine that you get a

13    lot of these at the IRS?

14        A.    Yes.

15        Q.    In fact I would bet Israel is

16    probably noticed on nearly every chapter 11

17    case right?

18        A.    True.

19        Q.    You have a SFM that monitors

20    the incoming mail regarding notices of

21    bankruptcy that lists IRS?

22         A.    Yes.

23         Q.    Is IRS interfaced with the

24    pacer system so they get automatic notices?

25         A.    Electronic notices B and C mail

                                                    16


1    yes.

2         Q.    Is there a physical person who

3    actually reviews it how does it operate is

4    there some automation to it?

5         A.    Is there the cases come in to

6    the IRS then err then entered into this

7    actually ace (NOTE! NOTE! THAT WAS  AIS.)

8    System when the cases are loaded into the

9    ace system they're automatically assigned

10   to bankruptcy specialist.

11        Q.    Is it assign today a particular

12   person?

13        A.    It's run on what we call a KEG

14   each of us is assigned certain letters of

15   the alphabet if the bankruptcy debtor name

16   falls under a certain letter you're

17   assigned that's how we get the case.

18        Q.    Your lucky day?

19        A.    Yes.

20        Q.    When it comes in are May of

21   2022 how does it cue to you how do you get

22   involved as a physical human being?

23        A.    So I get a list of cases that

24   come through my e-mail when they're assign

25   today me they also run on different reports

17

1    when I get assigned the case I do my

2    initial case review.

3         Q.    What is your initial case

4    review entail my initial case review let me

5    think when the case first comes in

6    bankruptcy first thing I do is look to see

7    automatic mated proof of claim system has

8    any flags?

9         Q.    And is that the to make sure

10   whether or not a proof of claim needs to be

11   filed?

12        A.    Correct.

13        Q.    Then what did you learn from

14   that?

15        A.    On my initial case review if

16   you see over under five twenty-seven do you

17    see it.

18        Q.    What page are you on just tell

19    me the date?

20        A.    Five twenty-seven where it

21    starts under Chapter 11 initial case review

22    these are the things we look for when we're

23    initially reviewing the case we look to see

24    if there's any stay violations that need to

25    be addressed if if was a prepackaged plan

                                            18

1    if it meets significant case criteria, if

2    TEGE needs to be involved, we look to see

3    if there's any secured periods we need to

4    adequate protection for then we do a

5    compliance review we basically look to see

6    what filing requirements the debtor has in

7    this case she only had eleven twenty filing

8    requirement or the debtor I'm sorry we also

9    look to see when their last filed tax

10    returns was if they have any deLin

11    consequent tax returns if they have any

12    nine forty-one filing requirements if they

13    do if they make their federal tax deposits

14    the Elex they make the nature of the

15    business their business operation date, who

16    the owner is or the president, and then we

17    review their schedules on pacer (NOTE!

18    NOTE! THAT WAS  election.)  And we just PAK

19    a documentation of various schedules like

20    schedule A with their real property

21    schedule B for their personal property

22    schedule D for any of their secured

23    creditors schedule E and F to see if we're

24    listed as a creditor schedule G schedule H,

25    and then we look at SOFA we look to see if

19

1    they have any gross revenue, if there's any

2    open litigation any related bankruptcy

3    cases the interested parties if FLS's been

4    any notice of federal tax leans files when

5    the refile dates are if there were we look

6    to see if there's been any collection

7    activity BIR a revenue officer we look for

8    if there's any open examinations, if

9    there's any issues for TIGDA prior

10    bankruptcy if they have LLCs we look if

11    there's any trust fund recovery penalties

12    employee leasing there's any sub did I do

13    RIs for parent companies, when the three

14    forty-one hearing so that we can determine

15    whether or not we need to attend if there's

16    any issues we make sure we mail out the

17    letters to the debtor trustee L nine eight

18    two and L nine eight six, and then we make

19    a note of any deadlines when the plan's

20    going to be filed when the disclosure

21    statement is supposed to be filed.

22        Q.    Can you tell me where you're

23    looking?

24        A.    It's my initial case review it

25    just keeps continue SZ on.

                                        20

1         Q.    I see five twenty-seven does it

2     go on to other dates as well?

3         A.    Yes I guess it continued under

4     six one.

5         Q.    And is it you plugging all this

6     information as to your queueing yes and no

7     and nones are you the ones queueing all

8     that information?

9         A.    Yes, it's all me.

10        Q.    These are questions the

11    questions are automatically generated you

12    putting the answers in?

13         A.    We have a template for each

14    case that comes in this is the template

15    this is per our IRM things we need to

16    review on each new case we're assigned.

17         Q.    And I can read that I

18    appreciate you going through that

19    comprehensive list when you're doing you're

20    looking what the debtor is you're trying to

21    whether or not open issues people or

22    entities that are relate today the entity?

23         A.    Correct.

24         Q.    In regard to that you did note

25    that there is a person who you identified

                                                    21

1    in your search named Louise Blouin right?

2         A.    Correct.

3         Q.    You got that from the petition

4    right because she had signed the PE tilts

5    is that right?

6         A.    Correct.

7         Q.    So there's some indication of a

8    relationship between Louise BLUNZ and the

9    debtor at least she signed the petition on

10   its behalf?

11       A.    That and what was listed on the

12   schedule SOFA.

13       Q.    SOVZ?

14       A.    Schedule of financial affairs.

15       Q.    So then as part of your

16   research part of the policies ever the

17   intent eve U services to identify all these

18   entities and services associated with the

19   debtor correct?

20       A.    Correct.

21       Q.    When you saw Blouin's name in

22   there what did you do in order to determine

23   whether she had some tax liability?

24       A.    So Louise Blouin did not have a

25   Social Security number it was listed on the

                                                22


1    petition I tried to access it under the

2    IDRS system which is our main frame where

3    we have all taxpayer's accounts I searched

4    her by name I didn't come up with a match.

5        Q.    As it turns out she does have

6    an assigned tax identification number?

7        A.    She does.

8        Q.    Why is it that your system

9    wasn't able to locate her as having a tax

10    identification number?

11        A.    There are various way toss

12    search our system and apparently the one

13    that I used was not accurate to find her as

14    a match.

15        Q.    And the reason she has a tax

16    identification number you learned it was

17    the Israel that assigned her one?

18        A.    Yes I learnedna later.

19        Q.    So they could put her in the

20    system right correct?

21        Q.    When the Israel had assigned a

22    tax identification number to Louise Blouin

23    why is it when you do a search of her name

24    that you're unable to locate her?

25        A.    I can't answer why the certain

                                                    23

1    command codes we use in our system pull

2    things up different there's different ways

3    to search a person at that time I searched

4    what we call name I put her name in it

5    didn't have a match.

6        Q.    If I wanted to sit DOURN at

7    your desk and do your job and locate Louise

8    Blouin how do I do that?

9        A.    Now as I was made aware name I

10   instead of NAIM S it pulled up all LOOUZ

11   Blouins in the system.

12       Q.    Name I name S what are those?

13       A.    Different way toss search.

14       Q.    Was it a training issue with

15   you that made Israel you sitting in that

16   chair was it sort of training issue you

17   didn't know how to do that?

18       A.    I wouldn't say that at the

19   time.

20       Q.    So you did know how to do it?

21       A.    I used what I had access to.

22       Q.    Did you know how to search

23   using both the I and the S code?

24       A.    No.

25       Q.    So which one did you know how

                                          24

1    to use?

2        A.    The name S.

3          Q.     And what is the S mean?

4          A.     I'm not sure.

5          Q.     It's just a code right?

6          A.     Yes.

7          Q.     So are you on -- are you not

8     allowed to use the name I code?

9          A.     No.

10         Q.     You are allowed?

11         A.     I am.

12         Q.     So you didn't know you could do

13    it?

14         A.     I did not.

15         Q.     Okay.  But you know that you

16    could do it?

17         A.     I do.

18         Q.     Did other people in your job

19    know that you could do the name I code

20    instead of name S code?

21         A.     I can't answer for other

22    people.

23         Q.     Are other people having the

24    same issue that you are is that they made a

25    search for a particular tax for a person

1    didn't come with the name?

2        A.    I can't answer that GREERT let

3    me ask you this, you said when you did the

4    name I search that you got all the Louise

5    Blouins right.

6        A.    Correct.

7        Q.    And was there more than one

8    LUSZ BLUND that came up in your search?

9        A.    There were.

10        Q.    You've know learned way you're

11    doing searches isn't the way you're going

12    to get best results; is that correct?

13        A.    You could say.

14        Q.    Have you had a situation where

15    you missed a person before?

16        A.    Not that I am aware of.

17        Q.    Before you never had there

18    issue that we have right?

19        A.    Correct.

20        Q.    If you would have done the name

21    I search that's available to you that you

22    didn't know about and you had searched

23    LOOISZ BLIND usings that indicator you

24    would have found her right?

25        A.    I would.

1          Q.    You would have found other

2    issues that the Israel had with her right?

3          A.    I would.

4          Q.    As a result of that back in May

5    early JOOUN when you were doing

6    investigation if you had done the search

7    right you would have been in a position to

8    file proof of claim; is that correct?

9          A.    That's correct.

10         Q.    As a result of doing your

11   search correctly or the way you should have

12   done it using the I search you would have

13   filed instead of December 1st 2022 you

14   would have filed your proof of claim much

15   earlier is that right?

16         A.    That is true.

17         Q.    Is there a periodic retraining

18   what is your position by the way?

19         A.    Bankruptcy specialists.

20         Q.    With bankruptcy specialists

21   it's important to know this information

22   correct?

23         A.    Correct.

```
24        Q.    And by the way are you an

25   attorney or anything like that?
```

```
 1        A.    No.

 2        Q.    CPA?

 3        A.    No.

 4        Q.    Accountant?

 5        A.    No.

 6        Q.    What is your training you have

 7   for bankruptcy specialist?

 8        A.    I've been with Israel working

 9   in this position for thirteen years.

10        Q.    And did you have to some sort

11   of educational background to be a

12   bankruptcy specialist NORNL?

13        Q.    What is your educational

14   background?

15        A.    I am a high school graduate.

16        Q.    And then is there a training

17   program that the IRS puts you through?

18        A.    There is.

19        Q.    During that training program do

20   you know one way or the other whether they

21   tell you how to search with the I search?
```

22      A.    They may have.

23      Q.    You may have missed?

24      A.    I just said I started thirteen

25    years ago.

                                                28

1       Q.    From the thirteen years ago

2    through the present do they have periodic

3    retraining on the systems?

4       A.    On the systems no.

5       Q.    So whatever you learned or

6    didn't learn on day one when you were

7    originally TRANGD right you were trained?

8       A.    Correct.

9       Q.    If you missed that part you

10    were going to miss it for the next thirteen

11    years?

12      A.    You pick things up along the

13    way.

14      Q.    But it took you thirteen year

15    toss pick up the way to do a proper search

16    correct?

17      A.    Apparently.

18      Q.    And you were also were you able

19    to you saw that there was an address some

20    where because you listed that LOOUNZ BLUNZ

21    lives in SWIT certificate land?

22         A.    Correct.

23         Q.    How did you get that

24    information?

25         A.    It's on the schedules in pacer.

29

1          Q.    And you didn't have any address

2    to your knowledge even ^ when you did the

3    research you didn't have address on GIN

4    lane in Southampton?

5          A.    Can you be more specific GRIK

6    did you have an address in your system

7    Beths the address in will you tell us land.

8          A.    Are you asking for Brickchurch

9    for Louise Blouin.

10         Q.    For LOOURZ BLUND?

11         A.    No.

12         Q.    And then, you told me go ahead?

13         A.    I'm sorry let me RI FRAN, I did

14    ACCURINT search on acure RINT it does say

15    she lives she has that address associated

16    with aher name.

17         Q.    Address is associated with her

18    name?

19        A.    Yes GRU never confirmed one way

20    or the other if she lives there.

21        A.    No.

22        Q.    You didn't send investigator

23    revenue officer out to house?

24        A.    I had no reason to.

25        Q.    So, the bankruptcy goes on and

                                              30

1    you're just monitoring the bankruptcy, you

2    know, get notifications of your cases in

3    regard to new filings correct?

4        A.    Correct.

5        Q.    And so you're get willing

6    documents and your system works to notify

7    you of new filings correct?

8        A.    Correct.

9            MR. MURPHY: Can I clarify you

10           in these question you personally or

11           Anne Sylvia or at large.

12           MR. MESSINGER: When I'm asking

13           her I'm asking the Israel because you

14           designated authorizered to testify.

15           MR. MURPHY: I want to be of

16          clear if Anne Sylvia did things or

17          anybody did things at the IRS that's

18          what imseeking clarification on.

19              MR. MESSINGER: I don't see the

20          difference you is the Israel because

21          she's binding here for the IRS.

22      Q.    You're getting documents that

23   are uploaded into the system from pacer?

24      A.    We get electronic notices when

25   new things come to the docket.

                                            31

1          Q.    When you say we you mean?

2          A.    The Israel.

3          Q.    Okay.  And you are testifying

4    on behalf of the IRS correct?

5          A.    I am.

6          Q.    When you say me or when I say

7    you you understand you're testifying on

8    behalf of IRS?

9          A.    Correct.

10         Q.    Do you get the pacer

11   notifications like I do in an e-mail or do

12   you get them in some sort of better system

13   that I VRJ no we get them in an e-mail just

14    like you do?

15        Q.    In regard to does it your name

16    is it sent to you or is there a general

17    mailbox it goes?

18        A.    It goes to a general mailbox

19    and somebody is assigned to go through that

20    mailbox and forwarded it to me.

21        Q.    Is there multiple people that

22    monitor the mail that's coming from the

23    pace certificate system?

24        A.    I don't know.

25        Q.    All you know that it come toss

                                                    32

1    you if it's assign today you?

2        A.    Correct.

3        Q.    Do they download the document

4    or do you have to access the document to

5    download?

6        A.    I have to access it.

7        Q.    And then you safe it where?

8        A.    I don't safe it because it's on

9    pacer.

10        Q.    Because I bet you unless me I

11    have to pay per page IRS probably get for

12   free?

13        A.    No we pay for person.

14        Q.    You open it any time you need

15   it you don't safe it any where?

16        A.    Document I need to safe

17   documents need to access EVEN I safe where

18   do you safe them ORNL PDF file on my desk

19   top.

20        Q.    I want to talk about that a

21   little bit the IRS don't have a central

22   document but each specialist like yourself

23   keeps it on their own hard drive?

24        A.    I can't say one hundred percent

25   because I'm not sure I know each specialist

                                             33


1    is required to safe copies of their Chapter

2    11 files.

3         Q.    Where?

4         A.    On their desk top to clarify a

5    lot of us TEL work we don't have a physical

6    desk in the office we don't safe paper

7    files.

8         Q.    Paper means that I can touch?

9         A.    Correct GRU use electronic

10    filed.

11        A.    Right.

12        Q.    Some of the IRS documents that

13    you safe are on your own personal computer?

14        A.    No.

15        Q.    So when you TEL computer you

16    LOG into a system at the IRS it's work

17    issued IRS issued laptop?

18        Q.    You have IRS laptop?

19        A.    Correct.

20        Q.    That me and two hundred people

21    live in this country pay for right you're

22    issued the laptop to take home with you

23    right?

24        A.    Correct.

25        Q.    In regard to that laptop you

                                                34

1    have a hard drive on the laptop where you

2    place your working files in?

3        A.    I guess.

4        Q.    And can anybody from the Israel

5    access your FILS on your personal laptop?

6        A.    No.

7        Q.    Conversely can you access any

8    information from your laptop to the IRS?

9        A.    I'm sorry I don't understand

10   the question.

11       Q.    Can you access information on

12   the RIRS system from your laptop at home?

13       A.    The IRS laptop has everything

14   that I need do my job regardless of where I

15   am at.

16       Q.    You don't have to log into the

17   IRS it's our automatically on the computer

18   there is a log in so I do log into it it

19   bring it is me right it's only for the IRS

20   it's not a personal laptop?

21       Q.    In regard to the information

22   you download onto your personal laptop do

23   you have to log in to the IRS's system in

24   order to access that information?

25       A.    If I am working imalready in

35

1    the IRS's system because that's why I am on

2    their laptop.

3        Q.    But I'm trying to figure out

4    the where the documents are saved do you

5    have as soon as you open it you're on their

6    system?

7         A.    Correct.

8         Q.    You're connected automatically?

9         A.    After I log in yes.

10        Q.    Then in regard to the

11   information that's's stored locally on that

12   laptop is it only for you to access?

13        A.    It is.

14        Q.    Okay.  Can you if you're not

15   logged into the IRS's system can you still

16   access those local files?

17        A.    No.

18        Q.    So as we're going through and I

19   want to bring draw your attention to the

20   entry that is on July 18th 2022, you have

21   it?

22        A.    Yes.

23        Q.    And at this point you still

24   don't have any information regarding the

25   tax potential tax liability personal to

↟

                                        36


1    LOOURZ BLUNZ correct for the penalties

2    correct?

3         A.    You're correct.

4        Q.    And you're continuing to

5    monitor the pacer right?

6        A.    Correct.

7        Q.    And then it says it says note

8    on eleven fourteen no liens have been filed

9    under EI and zero four and has the rest of

10    the number there do you see that ?

11        A.    Yes.

12        Q.    Who is TIN number is is that,

13    BRISHGZ?

14        Q.    What do you mean by no lien

15    versus been filed what does that mean?

16        A.    I believe at that point is when

17    I found that when I was doing a review of

18    this debtor's account I always look to see

19    on pacer if there's any up dates at that

20    point I found there was a motion to avoid

21    liens that were filed.

22        Q.    So in other words there were

23    liens filed by the IRS you became aware of

24    that?

25        A.    Correct.

37

1        Q.    They filed those liens against

2    Brickchurch OEFRNed property?

3        A.    Correct.

4        Q.    Brickchurch is single purpose

5    entity?

6        A.    Yes.

7        Q.    It owns property located at

8    three six six GYN lane?

9        A.    Right.

10       Q.    At the time at least November

11   14th 2022, at that time you had been no

12   liens filed against the property correct?

13       A.    Correct.

14       Q.    Do you know that whether there

15   were liens filed by the IRS ever?

16       A.    Can you ask the question again.

17       Q.    Eventually IRS filed a lien?

18       A.    Correct.

19       Q.    Did you know they were doing

20   that ?

21       A.    DI not.

22       Q.    And how did you learn that the

23   IRS had filed liens?

24       A.    Because when I was doing follow

25   up to this review I noticed there was a

1    motion to avoid IRS lien.

2        Q.    Do you remember the substance

3    of that motion?

4        A.    I remember vaguely that liens

5    were filed in August I believe of 2022 that

6    were in violation of the automatic stay.

7        Q.    You knew about this case the

8    IRS knew about this case in May of 2022

9    correct?

10        A.    Right.

11        Q.    You made an investigation

12    correct?

13        A.    I did.

14        Q.    And did you as you said you

15    didn't pick up LOOUZ BLUNTD because you had

16    done the search that didn't reveal her name

17    right?

18        A.    In another instance leer I

19    didn't have to really review LOOURZ that

20    much she didn't have nine forty-one filing

21    requirements under Brickchurch that's why

22    it wasn't I didn't look as hard to find her

23    at that time because there was no reason in

24    my mind to have to look for her.

25        Q.    You didn't look hard right?

1        A.    I did my job.

2        Q.    Did you?

3        A.    I did.

4        Q.    You did the job the way you

5    were trained to do it you did a quick

6    search?

7        A.    Objection I verified it

8    inaccurate if she had a Social Security it

9    should have showed up in the acue grant

10   you're not required to have a SWETS land a

11   Canadian citizen person residing in

12   Switzerland if they're not earning in the

13   United States they're not required to I

14   have a tax identification number right.

15       A.    That's right.

16       Q.    I know many people in the world

17   come to the United States and they're not

18   talks pairers?

19       A.    Right.

20       Q.    If you had done a proper search

21   that would have revealed lose BLUND that

22   revealed she had some issues with the IRS

23    regarding the nonpayment of penalties you

24    would have been able to cord in any degree

25    with other departments in the IRS that they

⬥
                                              40


1    shouldn't be filed a federal tax lien

2    against the property of Brickchurch right?

3         A.    That's true.

4         Q.    Your failure to search the

5    correct way for LOOUZ BLUND also resulted

6    in the IRS improperly filing the federal

7    tax LOOERNs against the Brickchurch

8    property correct?

9         A.    Again I wouldn't say that it

10   was a fail tour to search because again in

11   my defense she didn't have any nine

12   forty-one filing requirement under BRISHGZ

13   so it's not a requirement of me to have to

14   dig that deep.

15        Q.    And if you -- now in your

16   day-to-day if you had a same situation

17   right you would?

18        A.    I would go all-out.

19        Q.    You would do the I search?

20        A.    I definitely would.

21      Q.    There's a bit of egg on your

22   face right your failure to search caused

23   all the things that happened afterwards

24   right?

25      A.    I'm not saying anything to

                                                    41

1   that.

2       Q.    You have to say it there's an

3   are question?

4           MR. MURPHY: Calls for police

5       station go ahead.

6       A.    I don't agree.

7       Q.    Why don't you agree?

8       A.    I wasn't required to do that

9   deep of a search for somebody who didn't

10   have open nine forty-one filing

11   requirements .

12      Q.    What do you mean by deep search

13   to me I'm having trouble coordinating in my

14   head a search versus a deep search what do

15   you mean by that ?

16      A.    Brickchurch only has eleven

17   twenty filing requirements they have no

18   nine forty-one filing requirements the

19    reason I would looking at Louise Blouin and

20    trying to see if she had any federal tax

21    deposits would be related to the debtor

22    Brickchurch since she didn't have open nine

23    forty-one filing requirements under

24    Brickchurch it's not required for me to

25    have to really dive in to the owner.

42

1        Q.    But the dive in you're talking

2    about is doing the I search right?

3        A.    It's really not required.

4        Q.    The dive in that you're talking

5    about is doing the I search correct?

6        A.    The dive in I'm talking about

7    is if there would be some type of a red

8    flag that would make thing there's some

9    kind of fraud something going on in this

10    case that would make me do a deep dive.

11        Q.    Okay how long take tow do an I

12    search?

13        A.    It depends what I'm searching.

14        Q.    Let's say you're searching

15    LOOUZ MRUNZ and you cue her name whatever

16    this I search say I take it you click the

17    enter button how long does that take?

18        A.    Two minutes .

19        Q.    Maybe not even two minutes if

20    you had done your deep dive is over right?

21        A.    That's not really a deep dive.

22        Q.    It would have revealed

23    information that would have happened in

24    making the link between Louise Blouin and

25    Brickchurch right?

43

1        A.    It would.

2        Q.    I do have the petition here?

3            (Plaintiff's Exhibit #,

4         description, was marked for

5         identification as of this date.)

6        Q.    Do you have it?

7        A.    Yes.

8        Q.    Do you want to review it I'm

9    just going to ask you general question

10    where do you see on this that Louise BLUNSZ

11    the owner of BRISHGZ enterprises Inc.?

12        A.     It's on.

13        Q.    Pages are at the top no they're

14    not they're not even numbered.

```
15        A.    It's on the schedule of

16   financial affairs.

17        Q.    Just hold it up to me.  Which

18   page?

19        A.    Page seven.

20        Q.    Where does it say she's the

21   owner?

22        A.    Owner of a hundred percent of

23   shares of the stock in the debtor's

24   corporation.

25        Q.    Up top?
```

                                              44

```
1        A.    Yes.

2        Q.    What company is that?

3        A.    Brickchurch.

4        Q.    Brickchurch is that the same as

5   the debtor?

6        A.    Brickchurch is the debtor.

7        Q.    Are you talking where it says

8   Brickchurch Enterprises BVI limited?

9        A.    She's also listed on page six

10   as the sole director.

11        Q.    Let's go back to my question it

12   says up top it says question number
```

13    twenty-eight it says list the debtor's

14    officers directors managing members and

15    there's a place for the name there's a

16    place for the address TLES's a place for

17    position and where it says Louise blunt it

18    says sole director?

19        A.    Correct.

20        Q.    Next page it actually tells you

21    who the owner is doesn't it it identifies a

22    different corporation as the owner correct?

23        A.    Where.

24        Q.    It says Brickchurch enterprises

25    BVI limited?

                                    45


1        A.    Correct.

2        Q.    When you found that lose

3    BLUNTSZ was the owner of the company you

4    missed that part you see it now she's not

5    the owner of the company correct?

6        A.    She was the one that listed her

7    name on the petition.

8        Q.    As the director right?

9        A.    Okay.

10       Q.    Now, does director mean owner

11    does the director mean owner?

12        A.    Not necessarily.

13        Q.    BR you trained in that regard

14    as part ever your training in regard to

15    what it MEEP toss a director what it means

16    to be officer that type of stuff?

17        A.    Yes.

18        Q.    Did you understand that another

19    company can actually own shares in a

20    company?

21        A.    I do.

22        Q.    When you testified about your

23    finding LOOUZ BLUNDZ was the owner of the

24    debtor that was wrong too right?

25        A.    I don't believe so.

                                          46

1        Q.    What is the basis of that

2    belief?

3        A.    Because upon my research

4    looking over these schedules everything

5    comes back to her name.

6        Q.    Let's talk a little bit about

7    that and I am going to you do know on the

8    schedules it does identify the people with

9    ownership people or he wants TIS with

10   ownership interest in the company right?

11       A.    Yes.

12       Q.    And this one does it as well

13   right on though fame says at the top it

14   says list of equity security holder right

15   here it says that okay?

16       A.    Uh-huh.

17       Q.

18       A.    On schedule H you also have

19   co-debtors and she's listed as a co-debtor.

20       Q.    Okay and?

21       A.    She has the mortgage on the

22   property.

23       Q.    Blah do you MEEP by that before

24   you get yourself into trouble let's focus

25   on my question that's not true either?

                                    47


1           MR. MURPHY: Are you testifying

2        today Bret or you're going to ask

3        questions about the facts.

4           MR. MESSINGER: We are going to

5        talk about the facts.

6        Q.    Do you have the page we were

7    talking about that says list of equity

8    holders it's eighth PAM from the back?

9         A.    Okay.

10        Q.    It identifies actually the

11   owner of the debit there doesn't it?

12        A.    Okay.

13        Q.    Not okay does it or doesn't it?

14        A.    Yes.

15        Q.    Did you notice that when you

16   were reviewing this case when you first got

17   it?

18        A.    Yes.

19        Q.    And but you testified that you

20   thought LUSZ BLUNTDZ was the owner of the

21   company but now you see that she's not

22   correct?

23        A.    She's the one that signing.

24        Q.    As the owner?

25        A.    She signed the declaration on

                                              48


1    the bottom here.

2         Q.    As the owner?

3         Q.    You can't point stuff it's just

4    like testifying what was the question did

5      she sign as the owner?

6          A.     No.

7          Q.     You see now looking at this

8      petition that whatever KAUP conclusion you

9      had about Louise Blouin being the owner of

10     the debtor is not correct is that right?

11         A.     I don't agree with that.

12         Q.     Where on this caused you to

13     conclude that Louise Blouin was the owner?

14         A.     Can I have a moment just to

15     look through my notes.

16         Q.     Okay what did you find?

17         A.     In all my research it was

18     apparent to me that Louise BLUNTDZ was the

19     owner of Brickchurch that's what I'm

20     saying.

21         Q.     No I get that.  And I

22     understand what you're saying right you

23     need to know do that it's distracting

24     that's why?

25         Q.     I understand I understand

                                              49

1      during your research you found that or

2      believed that my question is different my

3    question is what caused to find that before

4    you had testified before that it was

5    somewhere in the petition?

6         A.    Based on what I saw.

7         Q.    In regard to when you review

8    cases for the ISZ do you because it's

9    apparent you did this here did you just

10   look to see who the signer was of the

11   bankruptcy petition?

12        A.    No that's the first place I

13   look.

14        Q.    Why do you look there?

15        A.    Because I want to know who is

16   signing the petition I want to know what

17   their relationship is to the bankrupt

18   significance it maybe surprising to you now

19   but now you know that loose BLUND is not

20   the owner of the company that the debtor

21   right.

22             MR. MURPHY: Are you putting

23        that as your testimony I said isn't

24        that right which making it question

25        do you need me to rephrase that.

1          A.    I don't agree I'll tell you why

2     I don't agree later on when I found motion

3     to avoid the LOOENS and I had to contact

4     Spencer to find out why he filed the lien

5     it is was brought to my attention Louise

6     Blouin is in fact the owner of Brickchurch.

7          Q.    So she's the owner?

8          A.    As far as I know.

9          Q.    And how did you conclude that?

10         A.    Based on my initial case review

11    and with confirmation with Spencer's view.

12         Q.    So Spencer Mr. GOUTS told you

13    Louise BLURNZ is the owner of the debtor?

14         A.    I believe so.

15         Q.    We'll get to him on that let's

16    get to the proof of claim?

17              (Whereupon, a short break was

18         taken at this time.)

19              (Plaintiff's Exhibit #,

20         description, was marked for

21         identification as of this date.)

22         Q.    I want to show you what we

23    marked as your deposition exhibit number

24    four do you have that?

25         A.    Yes, I do.

1        Q.      And proof of claim you filed

2     right?

3        A.      Correct.

4        Q.      And the proof of claim was

5     filed December one 2022; is that correct?

6        A.      That's correct.

7        Q.      It's signed by you is that

8     right?

9        A.      Yes, it is.

10       Q.      And it has you as the contact

11    on the first page correct?

12       A.      Yes, it does.

13       Q.      If I dial that phone number you

14    listed there the pen value yea number would

15    you pick that phone up or some other FOEP?

16       A.      No that's my number.

17       Q.      So, what was the bar date for

18    filing proof of claims?

19       A.      I don't know if I have that

20    information in front of me.

21       Q.      Did you have it available tow

22    when you filed this proof of claim?

23       A.      I did.

24          Q.     Was it timely or untimely?

25          A.     It was the after the bar date.

1          Q.     Had you ever filed a proof of

2     claim after the bar date before?

3          A.     Not that I am aware of.

4          Q.     Did you ask the court for

5     permission to file it after the bar date?

6          A.     I did not.

7          Q.     Did anybody in the world do?

8          A.     It I'm not sure.

9          Q.     You would have seen a filing to

10    that effect correct?

11         A.     I guess I would have.

12         Q.     And did you bring it to the

13    attention of anybody that you are preparing

14    a file a proof of claim after the bar date?

15         A.     Yes this was discussed with IRS

16    counsel.

17         Q.     Which counsel did you discuss

18    that with?

19         A.     The name of the person.

20         Q.     Name of the person?

21         A.     Theory ree saMAK quickly.

22          Q.    Who so theory samake KWEE knee?

23          A.    She's IRS counsel.

24          Q.    Based on advice she provided to

25    you did you find it okay to file a late

&

                                                    53


1    proof of claim?

2          A.    Yes.

3          Q.    Did you understand when I filed

4    it would be subject to objection?

5          Q.    But you filed it any way?

6          A.    Correct.

7          Q.    Do you know what a bar date

8    means?

9          A.    I do.

10          Q.    Does that mean name of the case

11    you're barred profiling a proof of claim by

12    a certain date?

13          A.    I do understand that.

14          Q.    But you filed it anyway?

15          A.    I did.

16          Q.    No one filed a motion for leave

17    to file the late proof of claim?

18          A.    No.

19          Q.    Was this proof of claim did you

20    anticipate that an objection would be made

21    to it?

22          A.    I figured that.

23          Q.    And did you call counsel on the

24    other side to see whether they would

25    consent to file late proof of claim?

                                                    54

1           A.    At this point this case was

2     actually referred to the Department of

3     Justice and it was being handled by the

4     defendant of justice and IRS counsel and

5     myself so working together we filed this

6     claim.

7           Q.    Okay and Ms. MAK queenee?

8           A.    Correct.

9           Q.    She's an attorney for the IRS?

10          Q.    She works for the IRS?

11          A.    Correct.

12          Q.    What did Mrs. MAKZ tell you to

13    do?

14                MR. MURPHY: Objection it calls

15          for advice of attorney.

16                MR. MESSINGER: Does it there

17          was no litigation at the time this

18          she happens to be an attorney so go

19          ahead and answer the question.

20     A.     I'm sorry can you repeat the

21   question.

22     Q.     What did Ms. MAKZ tell you in

23   regard to the filing of the proof of claim?

24          MR. MURPHY: I'm going toe

25          object and instruct you instruct the

                                              55

1          witness not to answer based on

2          attorney/client privilege.

3     Q.     How does it work within the IRS

4   did you go directly to the attorney to seek

5   advice or is it like how does it work you

6   got in touch with the attorney?

7     A.     When it was brought to my

8   attention that there were liens filed a

9   nominee lien filed against the debtor I had

10   to bring this up to my manager because of

11   the situation that was happening on the

12   revenue officer side we had to refer this

13   case to the Department of Justice and our

14   IRS counsel.

15     Q.     At the point all this is

16    happening you became aware did I think I

17    filed the objection to the lien to avoid

18    the lien right?

19        A.    Correct.

20        Q.    Was the proof of claim filed in

21    response to that objection?

22        A.    No.

23        Q.    You found that you missed it

24    right you missed making the link and

25    therefore you said let's quickly file this

                                                56

1    thing right?

2        A.    No.

3        Q.    Why did you wait till December

4    1st?

5        A.    After this case was referred to

6    counsel I was advised by IRS counsel.

7        Q.    Don't tell me what you were

8    advised tell me what you did to the

9    response to the advice?

10            MR. MESSINGER: Is that good

11        Mr. Murphy.

12            MR. MURPHY: I understand I

13        appreciate that I want to be clear

14          witness is hear testimonial

15          authorization from the IRS under the

16          terms of that authorization Ms.

17          Sylvia I need no tell you you're not

18          supposed to divulge attorney CLIEVEN

19          communication GL to the extent you

20          don't know when you start a sentence

21          what they advised you but you're

22          allowed to say what you did response

23          to advice you can say you received

24          advice then I did next step you can't

25          tell me what the advice was.

                                                    57


1          A.    Okay.

2          Q.    So by the way I'm the type of

3    attorney I don't want privileged

4    communication to come out I think it's SAKD

5    just finish your answer with that

6    instruction?

7          A.    Can you ask the question.

8          Q.    You were beginning to say you

9    had received advice Ms. MAKZ right?

10         A.    Correct.

11         Q.    But I want to know what you did

12    after you received that advice based upon

13    that advice what did you do?

14        A.    I prepared the proof of claim

15    for the trust fund liability that LOOURSZ

16    BLUNTS had and I filed it with the court.

17        Q.    And so this are is the proof of

18    claim we've marked as your deposition

19    exhibit number four?

20        A.    Right.

21        Q.    It says how much is the claim

22    it says five million seventy HOINL -- five

23    seven three five five eight two fifty-six

24    you see that it's on page two?

25        A.    Are you talking to me.

                                            58


1            (Whereupon, an off-the-record

2         discussion was held.)

3        Q.    You see that on page two?

4        A.    I do.

5        Q.    That's the amount of the claim

6    that was filed right?

7        A.    That's right.

8        Q.    So in regard to this proof of

9    claim is this auto generated?

10      A.      It is.

11      Q.      How do you cue the system to

12  tell it to generate it?

13      A.      I don't cue the system.

14      Q.      How is the system cued to

15  generate the proof of claim?

16      A.      It runs through the automatic

17  proof of claim system.

18      Q.      How does it know to run it

19  through?

20      A.      We put LUSZ BLUND's ITIN number

21  in the system it runs through to check to

22  see she has any liability under that TINZ

23  number when it finds the TLIEBLT bring it

24  is over onto the proof of claim.

25      Q.      Do you file it?

59

1       A.      Yes.

2       Q.      DPO you log onto the pacer

3   system like everybody else in the world do

4   you actually file it or have some one do it

5   for you?

6       A.      Normally we would do it through

7   automatic mated proof of claim system we

8    push a button it goes through on this

9    particular proof of claim it had to be

10    filed through paceary.

11        Q.    Yes?

12        A.    We had to put certain language

13    on the claim that we don't have an awe

14    mated symptom.

15        Q.    What specific language do you

16    need to put proof of claim?

17        A.    The specific language is on

18    page four and it says included are claims

19    for civil penalties under twenty-six USC

20    section 6672 for which the debtor is liable

21    as the nominee and alter ego of Louise T

22    Blouin, the last four the ITIN number and

23    then civil penalty is for TFRP under

24    IRC6672 entitled to priority 507 paren A

25    paren A paren C.

                                        60

1        Q.    And then the unsecured priority

2    claims that are below that are generated by

3    the computer right itemizes them?

4        A.    Correct.

5        Q.    Are there any other document

6    that are submitted with this proof of claim

7    besides what I see here?

8        A.    No.

9        Q.    Just these five pages right?

10       A.    Correct.

11       Q.    In regard to signing this do

12   you understand when you signed this that

13   you signed this under personalities of

14   perjury and everything you're saying is

15   true to the best of your knowledge

16   information and believe?

17       A.    Yes.

18       Q.    You don't know normally put

19   that language that you read to me on page

20   four of Exhibit 4 you had to manually enter

21   that correct?

22       A.    Correct.

23       Q.    And therefore you're taking an

24   affirmative duty to alter the form in its

25   normal filing way to add certain

                                              61

1    information to confirm the claim ask true

2    correct check check?

3        A.    Yes.

4       Q.    Tell me investigation did you

5    prior to filing this proof of claim where

6    you determining debtor is liability as

7    nominee and/or alter eggo of lose blunt?

8            MR. MURPHY: By you mean Anne

9      Sylvia or IRS.

10      Q.    I'm saying before you filed and

11   signed this document what investigation did

12   you do prior to affixing your signature to

13   this document?

14      A.    I discussed this with the

15   revenue officer SPENZ counts who did assess

16   for TRFP for BLUSZ BLUPT my job to file

17   proof of claim is make sure the amounts

18   that come up under her personal TINZ number

19   match what we're putting on the proof of

20   claim so as long as it shows that these are

21   her liabilities then we must file the proof

22   of claim.

23      Q.    Okay.  That's the typical thing

24   right you do that's all you do normally

25   when you get proof of claim that gets

                                              62

1    submitted in fact you told me some of the

2    proof of claims are filed automatically it

3    has your name on it right they're ones you

4    never reviewed right?

5         A.    That's not true.

6         Q.    When you say things get filed

7    automatically by whatever system you use,

8    you review those before they're accused for

9    filing?

10        A.    All proof of claims are

11   reviewed.

12        Q.    And this one wasn't in the

13   normal form because you added language to

14   it correct?

15        A.    Correct.

16        Q.    And with when you added

17   language to it you before you did that you

18   spoke with Mr. KUTSZ; is that correct?

19        A.    No.

20        Q.    No?

21        A.    This was discussed between

22   counsel.

23        Q.    I don't understand what you're

24   saying I am asking you what you did in

25   regard to determining whether or not Ms.

1   BLUNSZ is the nominee for the debtor prior

2   to affixing your signature and filing this

3   proof of claim?

4        A.    That was discussed with revenue

5   officer Spencer KUNTSZ.

6        Q.    Did you discuss it with revenue

7   officer PINSZ KOUT?

8        A.    Yes.

9        Q.    Back to my original question

10  what did he tell you that made you

11  comfortable affixing your signature to the

12  proof of claim before you filed it?

13       A.    Es's the one that researched

14  Ms. BLUSZ and found out she was the nominee

15  or alter eggo of Brickchurch and she has

16  this open TFRP liability.

17       Q.    Did you ask him how he

18  determined Ms. BLUSZ was the alter eggo of

19  Brickchurch?

20       A.    He had several research on this

21  case.

22       Q.    I am asking when you asking

23  what did he tell you you spoke with him

24  right?

25        A.     I did.

1         Q.     How long was the conversation?

2         A.     It was a while ago I don't

3    remember.

4         Q.     Was it three hour conversation

5    or more like three minute conversation?

6         A.     It was prettience tensive

7    conversation.

8         Q.     Three hours?

9         A.     I wouldn't say three hours.

10        Q.     What0 would you say?

11        A.     I don't remember maybe an hour.

12        Q.     And he walked you through

13   during that hour how he came to determine

14   Ms. BLUSZ was alter eggo of the debtor?

15        A.     He did.

16        Q.     Did he show you documents upon

17   which he relied upon?

18        A.     No.

19        Q.     Was one ever the things he came

20   to include back to you that Ms. BLUNSZ was

21   the owner of the debtor?

22        A.     Yes.

23      Q.    But we know that to not be true

24   right?

25            MR. MURPHY: Objection.

65

1      Q.    Did he show you anything that

2   made you believe to your satisfaction that

3   Ms. BLUSZ was the owner of the debtor?

4      A.    His whole investigation is in

5   the system called ICS all his notes for the

6   last couple of years on her are all

7   documented in that system in reading that

8   document I had no reason to believe she

9   wasn't the owner.

10      Q.    Did you see a memo in the

11   system written by Mr. KOURSZ that had

12   exhibits attached and all that and his

13   investigation did you review that ?

14      A.    No.

15      Q.    Do you have access to the same

16   system that Mr. KUTSZ does?

17      A.    I do.

18      Q.    When you RIEFD that system did

19   you review any material that was in the

20   system that you made you believe

21    independent of Mr. KURSZ that made you Ms.

22    BLURNZ was the nominee?

23        A.    I had no reason not to believe

24    that she wasn't.

25        Q.    And did you review any

66

1    documents that was provided to you by

2    Mr. KOUTSZ prior to filing proof of claim?

3        A.    The only documents that I

4    reviewed were the LOOEPs that he had filed.

5        Q.    So in regard to the documents

6    you reviewed you saw there was federal tax

7    LOOEPs that were filed for the trust fund

8    penalties correct?

9        A.    Correct.

10        Q.    When you reviewed those did you

11    look at any information from Mr. KOURDZ

12    that made you believe that Ms. BLUNDZ was

13    the nominee for the debtor?

14        A.    I have no reason to doubt

15    Spencer's ability to researches's been with

16    the company for with IRS for years .

17        Q.    So what you're saying is that

18    no, I didn't do any research but I relied

19    upon the research that BLCHLT GOULTS did?

20       A.    Yes.

21       Q.    In regards to the numbers on

22    page four and continuing to page five that

23    are awe to generated correct they're awe to

24    generated?

25       A.    Correct.

                                              67

1        Q.    DP you compare those numbers

2     with any document toss determine whether

3     they were correct?

4        A.    I reviewed the numbers against

5     our main data on IDRS which shows all the

6     taxpayer's liabilities to make sure they

7     populated on the proof of claim correctly.

8        Q.    Okay.

9        Q.    Did you do any independent

10    research on Ms. BLUSZ?

11       A.    No.

12       Q.    So the sole information that

13    you had is Mr. GOEL did it good job

14    researching it you rely upon it?

15       A.    I did rely upon his research.

16       Q.    You also relied upon the

17    records that were kept within the IRS's

18    system?

19         A.    Correct.

20         Q.    Would you characterize you as

21    being more of a clerical person an

22    investigator how do you characterize

23    yourself?

24         A.    As a bankruptcy specialist.

25         Q.    What other things do do you as

                                              68

1    a bankruptcy specialist?

2         A.    I review these cases to, you

3    know, protect the government's interests on

4    any liabilities that are owed through the

5    bankruptcy.  I attend three forty-one

6    meetings, I.

7         Q.    Did you attend the one in here?

8         A.    No I had no reason to she had

9    no liability.

10         Q.    You didn't know of a reason to?

11         A.    Exactly.

12         Q.    Because in retrospect you would

13    have?

14         A.    She had no liability.

15      Q.    No?

16            MR. MURPHY: Can you not cut her

17       off Bret let me finish the answer.

18            MR. MESSINGER: Go ahead.

19      A.    I had no reason to attend three

20  forty-one hearing when I first looked at

21  this case it's for Brickchurch they only

22  have eleven twenty filing requirements.

23      Q.    Let's back up let's say you did

24  that I search and you found LOOURSZ BLUND

25  would you have attended the three forty-one

69

1   here?

2       A.    I would.

3       Q.    That's the point I was making?

4       A.    Okay.

5       Q.    If you attended the three

6   forty-one hearing having the information

7   about Ms. BLURZ you would have questioned

8   Ms. BLURNZ regarding that?

9       A.    Of course that.

10      Q.    Your experience in questioning

11  people at three forty-one hearing?

12      A.    To an extent.

13      Q.    You've done it?

14      A.    I have.

15      Q.    To the extent you've done it

16   you have experience correct?

17      A.    Correct.

18      Q.    Okay.

19           MR. MESSINGER: I think done

20      with you.

21           MR. ALLERDING:  I have some

22      questions.

23           MR. MURPHY: Before John goes I

24      want to object to him Mr. Alae began

25      asking questions he represents

                                        70

1       another creditor in the bankruptcy

2       that's not party in contested matter

3       being the object shin to the IRS's

4       proof of claim that was filed by the

5       debtor Brickchurch the only party

6       toss that conterritoried matter are

7       Brickchurch and IRS non-party do not

8       have a right to ask KWERs as

9       depositions I am stating this for the

10      record I have a blanket objection to

11          what you're about to do I am happy to

12          sit here I object to to the questions

13          in the interest moving things along

14          I'm not going not refuse answer of

15          your I want will ask you to keep it

16          brief and instruct interesting her

17          not to respond tow that's on the

18          record let's procedure.

19              MR. ALLERDING:  If you try to

20          cut me off I guess we'll have to

21          objection MIEM fame sa-John I

22          represent name name LP the largest in

23          the bankruptcy case and dip lender I

24          want to go back to things Inc. you

25          said first off you have bankruptcy

71

1          expertise you are ea bankruptcy

2           specialist.

3          A.     Correct.

4          Q.     And I thought I heard you say

5      Brickchurch has no liability to the IRS; is

6      that correct?

7          A.     In my initial case review

8      Brickchurch had no liability.

9       Q.      And does Brickchurch do you

10   understand as you hear today Brickchurch

11   have liability to the IRS?

12       A.      Brickchurch does have liability

13   to the IRS.

14       Q.      What's that liability based on?

15       A.      It's a penalty a penalty under

16   IRC sixty thirty-eight A.

17       Q.      Is it what's been listed on

18   exhibit number four?

19       A.      Yes, it's the fifty thousand

20   dollar personality.

21       Q.      Other than the fifty thousand

22   dollar personality does Brickchurch have

23   any liability to the IRS?

24       A.      Not as of today.

25       Q.      Who filed the IRS tax lien?

                                                72

1       A.      SPENS GOEL.

2       Q.      And he didn't communicate with

3   you before filing that?

4       A.      He did not.

5       Q.      And you said that you believed

6   or you believe as you sit here today Ms.

```
 7    BLUNZ is the owner of BRIKZ do I recall

 8    that correct?

 9         A.    Yes.

10         Q.    Can you tell us all the of the

11    basis for that understanding?

12         A.    We discussed this already.

13         Q.    I heard that you said Spencer

14    told you she was the owner I have that

15    right?

16         A.    It came up yes.

17         Q.    Did Mr. GOEL tell you that Ms.

18    BLUNZ was the owner of Brickchurch

19    enterprises, Inc. the debtor?

20         A.    He did.

21         Q.    Do you have any other reason to

22    believe BLS BLUNZ is the owner of

23    Brickchurch enterprises, Inc. other than

24    your conversation with Mr. GOEL?

25         A.    It was my understanding when I
```

73

```
 1    did my initial case review.

 2         Q.    Based on WHARJ based on what we

 3    already discussed?

 4         Q.    I don't recall could you
```

5    enlighter I don't think that you answered

6    that question that's why I am asking it I

7    want to know what did you look at what did

8    you see what made you believe that she was

9    the owner of Brickchurch enterprises, Inc.?

10        A.    Reviewing of the schedules in

11    pacers.

12        Q.    When you say schedules the ones

13    attached to the bankruptcy petition?

14        A.    Correct.

15        Q.    Let's look at the bankruptcy

16    petition this was exhibit?

17            MR. MESSINGER: I think it was

18        three but I'm not sure.

19            MR. MURPHY: Correct it's three.

20        Q.    Let's look at Exhibit number 3

21    and I want you to start from the first page

22    flip influence first thing you see

23    indicates to you she's the owner of the

24    debtor I want you to stop there and tell me

25    about it?

74

1        A.    Page four.

2        Q.    What on page four makes you

 3    believe BLS BLURNZ is the owner of the

 4    debtor?

 5         A.    Because she signed the PE it

 6    TIGS.

 7         Q.    What does it say under her

 8    name?

 9         A.    Director.

10         Q.    Does it say owner anywhere on

11    that page?

12         A.    No it does not.

13         Q.    Is tell us director similar

14    NOUNSous with owner in your mind do they

15    mean the same thing?

16         A.    No.

17         Q.    So why would Ms. BLURNZ's role

18    as a director lead tow believe she was the

19    owner?

20         A.    It wasn't just that.

21         Q.    Okay.  Before we go like what

22    about that makes you believe she is as the

23    owner?

24         A.    It's just the first thing that

25    I review it's I look at who signs the

```
 1    petition first THOEN I verify it with other

 2    NFRGS throughout the schedules.

 3         Q.    Okay?

 4         A.    It's not that specifically.

 5         Q.    I'm just -- so this says to you

 6    that she's the director correct?

 7         A.    Yes.

 8         Q.    But you told me director

 9    doesn't mean OORN?

10         A.    Correct.

11         Q.    What's the next thing in the

12    petition makes you believe she's the owner?

13              MR. MURPHY: I will object we

14         had lengthy CLOJy about petition and

15         schedules earlier sighted many pages

16         as part of this.

17              MR. ALLERDING:  I disagree what

18         is AETS the next page that makes you

19         believe SHAES the owner.

20         A.    Under the co-debtors.

21         Q.    Can you show us what page

22    you're looking at Ms. Sylvia?

23         Q.    Schedule L?

24         A.    Yes she's listed co-debtor for

25    JJB partners.
```

1          Q.     What dose a co-debtor mean to

2     you?

3          A.     That she's has an interest in

4     the JGB partners which was a mortgage on

5     the property (NOTE! NOTE! THAT WAS  JGB is

6     right.)

7          Q.     Schedule H says Ms. BLURZ has

8     interest in JGB participates?

9          A.     Correct which I believe was

10    mortgage on the property at the time.

11         Q.     Correct I'll represent to you

12    JJ a group of them had a mortgage on the

13    property I'm trying to figure out where the

14    jump she has an ownership interest this is

15    your believe BLS BLUZ has ownership

16    interest JJ and JJ has mortgage of the

17    property how does it make you believe she's

18    own of the property?

19         A.     Because she has a financial

20    interest in it.

21         Q.     Through a mortgage so J owner

22    of the PROIBL?

23         A.     No.

24      Q.    Department they have a

25      financial interest in it?

1       A.    That's -- that was another

2    thing that I looked at.

3       Q.    Does JJ an owner of the

4    property?

5       A.    No.

6       Q.    Does JJ have a financial

7    interest in the property?

8       A.    I would believe so.

9       Q.    So having a financial interest

10   in the property doesn't make one the owner

11   of the property does it?

12      A.    No it does not.

13      Q.    All right what's the next thing

14   that made you believe she was the owner?

15      A.    On page six of the schedules of

16   financial affairs.

17      Q.    Okay?

18      A.    She was listed as sole director

19   of the debtor.

20      Q.    That's same conversation we had

21   her being listed as director on page four?

22        A.    Yes.

23        Q.    What's the next thing on the

24   petition that made you believe she was the

25   owner?

                                        78

 1        A.    The list of equity holders.

 2        Q.    Okay.  And who are listed as

 3   the equity holder of the debtor?

 4        A.    ABER dean ENT holding VVI.

 5        Q.    If you look at security class

 6   what do though own equity interest in?

 7        A.    BRISHGZ BBI -- LTD.

 8        Q.    Brickchurch enterprises BVILDT

 9   who else is list the on list?

10        A.    Brickchurch ABVI --

11        Q.    Who is Brickchurch own?

12        A.    Hundred percent of the debtor's

13   corporation.

14        Q.    Doesn't that tell you that

15   Brickchurch ENT DBI LTD is the owner of the

16   debtor?

17        A.    But it's signed by LUSZ BLUNSZ.

18        Q.    Correct.  So, LOOUKZ

19   declaration under penalty of perjury on

20    behalf of corporation or partnership I the

21    director of corporation in any degree the

22    debtor in this case deck layer under

23    personality perjury I read the foregoing

24    list of equity security holding and that it

25    is true to the best of my NFRGS and belief

79

1    did I read that correctly?

2         A.    You did.

3         Q.    Ms. BLUSZ SIEPing this as the

4    director as the debtor Brickchurch

5    enterprises, Inc. deck layering under

6    penalty of perjury that Brickchurch

7    INTROISs L was hundred person own of

8    Brickchurch enterprises, Inc.?

9         A.    Yes.

10        Q.    Let's finish it up go ahead if

11   you could go is there anything else in the

12   petition that would make you believe you

13   BLS BLURZ is the owner?

14        A.    No.

15        Q.    If we KWO look at Exhibit 4

16   hold I didn't finish so own the petition

17   and other than your conversation with Ms.

18    DPOURZ was anything that made you believe

19    Louise BLURNZ was own of Brickchurch ZIES,

20    Inc.?

21              MR. MURPHY: You as Ms. Sylvia

22         or you IRS.

23              MR. ALLERDING:  You as IRS.

24         A.    The research that was done and

25    our IDS system, the years of research that

                                             80


 1    Spencer completed.

 2         Q.    What research is that?

 3         A.    You have to defer to Spencer

 4    for that.

 5         Q.    You Anne didn't do the

 6    research?

 7         A.    No.

 8         Q.    You relied on conversation with

 9    Mr. Spencer the review of the petition the

10    I'm sorry Ms. SILDZ did you review the

11    records that Mr. GOEL prepared I didn't

12    review the records I reviewed his histories

13    that he left on the case?

14         Q.    I apologize it's my first with

15    the IRS I don't know histories versus

16   records?

17        A.    His documentation.

18        Q.    Like statements?

19        A.    Health insurance documentation

20   on the case.

21        Q.    What is that documentation

22   show?

23        A.    I can't recall all of his

24   documentation right now.

25        Q.    Just general I'm trying figure

81

1    out are these Mr. GOEL's statements or I'm

2    just to understand what the histories what

3    is a history maybe?

4              MR. MURPHY: You're asking

5          summation of large volume of

6          documents.

7              MR. ALLERDING:  I'm asking

8          general identification in general

9          what is a HIFTS.

10        A.    Every time somebody actions an

11   action on an account we have to leave

12   DUKSation on the accounts stating what the

13   actions were that we took.

14      Q.    And so let's was there more?

15      A.    No.

16      Q.    Going back to this case the

17   documentation was that all generated by

18   BLCHLT GOEL?

19      A.    I don't recall.

20      Q.    Was it all generated by an IRS

21   employee?

22      A.    Yes.

23      Q.    So they were statements made by

24   IRS employees?

25      A.    I guess you could say that.

                                    82

1       Q.    So other than histories the pen

2    TIGS and your conversation with Mr. GOEL

3    did you rely on anyone to reach a

4    conclusion that Ms. BLOURZ was an owner of

5    the debtor?

6       A.    No.

7       Q.    If you could look at Exhibit 4

8    that's the proof of claim on page four

9    there's a taxpayer ID number that ends in

10   four one five four whose taxpayers ID now

11   is that?

12          A.      It's TINZ number for lose BLUZ.

13          Q.      As in individual right?

14          A.      Yes.

15          Q.      And under unsecured general

16     claims on the next page there's a taxpayers

17     ID ends in seven five two four whose

18     taxpayer tax ID is that?

19          A.      Brickchurch.

20          Q.      Brickchurch and Ms. BLURZ have

21     separate tax ITD numbers correct?

22          A.      Correct.

23          Q.      Let's go back to the

24     conversation that you had with BLCHLT GOELZ

25     where you were led to believe BLS BLUZ was

                                                    83

1     tell us owner can you tell me everything

2     you remember about that conversation?

3          A.      I don't recall a lot of the

4     conversation because it was a while ago.

5          Q.      Okay I understand that's

6     totally reasonable can you tell me that

7     everything you do remember?

8          A.      He told me I don't want to say

9     he told me because I don't recall the

10    conversation that I feel comfortable going

11    on record saying he said I don't recall

12    like I'm comfortable to say it on record

13    that he said.

14        Q.    That's fair your truthful

15    answer you don't recall the conversation?

16        A.    I do recall the conversation I

17    just don't recall all the aspects of the

18    conversation I don't want anything

19    misconstrued because it's been a while ago.

20        Q.    You recall having a

21    conversation?

22        A.    I do.

23        Q.    You don't have a recollection

24    of anything specific from within that

25    conversation; is that correct?

                                    84

1        A.    I recall several things from

2    the conversation.

3        Q.    What do you recall?

4        A.    I recall that Louise Blouin had

5    interest in abar dean property the BRISHGZ

6    property art now and know company and the

7    art know and the other company that she was

8    I believe it was a media company BLUSZ

9    BLUNZ need yea and art now and that she was

10   found to be the owner of those two

11   companies she accrued trust fund penalty

12   for unpaid trust fund TAGSs.

13        A.    He did his research on that he

14   came up assessed balances she owed for the

15   unpaid trust funds and that she was alter

16   eggo or nominee of Brickchurch.

17        Q.    Okay do you recall anything

18   else from that conversation?

19        A.    No.

20        Q.    Okay.

21             MR. MURPHY: I will say Mr. GOEL

22        can speak to a lot of these points.

23             MR. ALLERDING:  We're going to

24        ask him.

25             MR. MURPHY:es's also designated

                                          85


1             to speak to these issues on behalf of

2             IRS today just to be clear.

3             MR. ALLERDING:  Sure.

4        Q.    And then I believe you said

5    that you had a conversation with Mr. GOEL

6    about the language on page four of Exhibit

7    4 that was added that including our claims

8    for civil penalties and it goes on?

9        A.    That wasn't a conversation I

10    had with BLCHLT GOEL.

11        Q.    I'm sorry who did you have

12    conversation with?

13        A.    He didn't have anything with

14    the filing of the proof of claim.

15        Q.    Okay so how did you come to

16    include that language on page four?

17        A.    I was advised I don't know how

18    I can say this how am I allowed to say

19    this.

20        Q.    I understand I'll withdraw the

21    question let me think if I can answer a

22    different way?

23        Q.    Why did you include the

24    language?

25        A.    I was instructed to include it.

                                        86

1        Q.    And did you ask any questions

2    regarding why you received that

3    instruction?

     4          A.    So that it was clear where the

     5     balances were coming from because it wasn't

     6     coming from Brickchurch the debtor the

     7     balances were coming from BLOOUZ BLURNZ as

     8     nominee or alter eggo of Brickchurch it

     9     needed to be specific on a proof of claim.

    10          Q.    Did you do when I say you now,

    11     did you MRRS Sylvia or anyone that you're

    12     aware of do an investigation into why the

    13     IRS was taking a position let me withdraw

    14     that we'll ask BLCHLT GOEL?

    15          Q.

    16              MR. MURPHY: Again I will

    17          suggest to you this will be better

    18          area to explore with Mr. GOEL.

    19              MR. ALLERDING:  As I just said

    20          yeah, we'll ask Mr. GOEL.

    21          Q.    Other than being instructed to

    22     include language on the proof of claim is

    23     there any other reason you included that

    24     language that you added?

    25          A.    No.

                                                     87


     1          Q.    Okay I don't have any further

2    questions Ms. E thank you Ms. Sylvia?

3              MR. MESSINGER: Thank you I have

4         nothing further Mr. Murphy.

5              MR. MURPHY: We're done.

6              MR. MESSINGER: Thank you for

7         coming.

8

9              11:55.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25