1

1          ROUGH DRAFT - FEBRUARY 10, 2023

2          UNCERTIFIED TRANSCRIPT DISCLAIMER

3

4    Counsel,

5    Please find attached the rough draft transcript.

6    At your convenience please confirm receipt.

7

8    Should you have any questions, please feel free to

9    contact Veritext Legal Solutions (800)727-6396.

10

11   Thank you for choosing Veritext Legal Solutions

12   for your court reporting needs.

13

14

15   Thank you,

16   Danielle Grant

17   Realtime Reporter

18   Independent Contractor

19   dgrantstenographer@gmail.com

20   347.752.3252 Cell

21   347.368.2300 eFax

22

23

24

25

↑

2

```
 1        ROUGH DRAFT - FEBRUARY 10, 2023

 2              The following transcript(s) of

 3   proceedings, or any portion thereof, in the above

 4   titled matter, taken on any dates, is being

 5   delivered UNEDITED and UNCERTIFIED by the official

 6   court reporter at the request of counsel.

 7              The purchaser agrees not to

 8   disclose this uncertified and unedited transcript

 9   in any form (written or electric) to anyone who

10   has no connection to this case.

11                   This is an unofficial transcript.

12                   This transcript has not been

13   checked, proofread or corrected.  It is a draft

14   transcript, NOT a certified transcript.  As such,

15   it may contain computer-generated mistranslations

16   of stenotype code or electronic transmission

17   errors, resulting in inaccurate or nonsensical

18   word combinations, or untranslated stenotype

19   symbols which cannot be deciphered by
```

20   non-stenotypists.

21

22

23

24

25

☝

3

1               ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Mr. Gould, you were sitting here

3    during the deposition of Ms. Sylvia, weren't

4    you?

5        A    Correct.

6        Q    And did you hear the instructions

7    that I gave her at the beginning of your

8    deposition?

9        A    Yes, I did.

10       Q    And do you also agree to abide by

11   those instructions, or do you need them to

12   be repeated to you to the extent you don't

13   recall them?

14       A    I agree to those instructions.  If

15   I stray aside, just remind me.

16      Q     Okay.  Very good.

17            So, first, tell me, where is your

18   place of employment?  Where is your business

19   address?

20      A     My business address is 290

21   Broadway, New York, New York 10007.

22      Q     And do you typically work out of

23   your home or do you work of that office or

24   do you work somewhere else?

25      A     I typically work out of that

↑

4

1            ROUGH DRAFT - FEBRUARY 10, 2023

2   office, although I do work at home,

3   telework.

4      Q     And you work for the Internal

5   Revenue Service, correct?

6      A     Correct.

7      Q     How long have you work for the

8   Internal Revenue Service?

9      A     Thirty-two years.

10      Q     And has your position always been

11   the same for those same 32 years?

12        A    It has.

13        Q    And just one of the things is,

14   you're kind of anticipating my question.

15   Try not to talk over the trail of my

16   question, okay?

17        A    Yes, sir.

18        Q    And what is your position for the

19   last 32 years?

20        A    I'm a revenue officer.

21        Q    What does it mean to be a revenue

22   officer?

23        A    To collect delinquent accounts and

24   secure unfiled returns and resolve any

25   issues that come up in the process of

↑

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   carrying out those duties.

3        Q    Okay.  And do you work in the

4   field or do you work primarily out of the

5   office?

6        A    I'm a field revenue officer.

7        Q    Does that mean that you might go

8    out and interview people and view

9    properties?

10        A    That's the most important part of

11    my job.

12        Q    And have you been doing that for

13    the whole 32 years?

14        A    Yes, sir.

15        Q    And is the reason why they call

16    you an officer, does that have something to

17    do with -- do you have law enforcement

18    duty-type of things, or, like, how do you

19    kind of view yourself?

20        A    Civil law enforcement.

21        Q    Okay.  And do you have any

22    training in regard to how you conduct your

23    investigations?

24        A    Yes, sir, I have.

25        Q    And tell me the -- how you went

↟

6

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    through initial training and then after

3    initial how that's updated, if at all?

4        A    We've had initial phase training

5    in the first year of employment.  And there

6    were any phases.  And then every year

7    afterwards, if there are any revisions or

8    updates or any other changes in the manual

9    or requirements of us in the law, we have

10   continuing professional education once a

11   year.

12       Q    And did you go to college?

13       A    Yes, sir.

14       Q    Where did you go?

15       A    Buffalo.

16       Q    And what was the name of your

17   degree you earned?

18       A    Bachelor's.

19       Q    And is there a specific focus in

20   your bachelor degree?

21       A    Fine arts.

22       Q    And is there -- do you receive any

23   legal training, in other words to

24   familiarize yourself with the IRS code or

25   enforcement codes that may be used by the

1          ROUGH DRAFT - FEBRUARY 10, 2023

2     IRS or similar type of laws?

3          A     On an annual basis, counsel will

4     come in and have a round table and discuss

5     certain issues that are predominant to the

6     day that may not be, you know, experienced,

7     you know, routinely.  So they'll apprise us

8     of things that are developing -- Ponzi

9     schemes, you know, fraud.  We also have the

10    fraud presentation that comes in and tells

11    us certain indicators we need to look for.

12    As well as on-the-job training when you come

13    up with certain case situations, you have

14    access to counsel to get a legal opinion on

15    that.

16         Q     Okay.  And in regard to knowing

17    the law regarding nominee liability, are you

18    familiar with that?

19         A     Yes, sir, I am.

20         Q     And tell me what you mean by

21    "nominee liability."  What does that mean to

22    you?

23         A     Well, a nominee is an entity in

24    which property is placed, but the actual

25    nominee doesn't really have any function in

✦

8

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    the operation and/or maintenance of it.

3    Somebody else does.

4        Q    And what are the indicators that

5    you look for in regard to that?

6        A    Well, I look at the actual

7    structure of the nominee to see if it is a

8    functioning organization, meaning it has

9    multiple board members, it has meetings, it

10   might have payroll.  There are a number of

11   things that shows it is an active entity

12   that stands on its own and isn't reliant on

13   any one or couple of people.

14       Q    Okay.  And do you view -- do you

15   know what I refer to as a "single purpose

16   entity"?  Have you ever heard that term?

17       A    Yes.

18       Q    And a single purpose entity, do

19   you look at nominee indicators the same as

20   you would for a construction company that

21    might have two or three people operating it?

22        A    No.  They're not the same.

23        Q    Okay.  And tell me what you

24    believe the difference is between the

25    indicators for a single purpose entity as

9

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    opposed to another type of company.  And you

3    can use the construction company, that's

4    fine, as sort of your discussion piece.

5        A    Well, I would say that they're

6    somewhat similar.  There probably is a fine

7    line of distinction between a single purpose

8    entity.  The question is, does that single

9    purpose entity, is it a standalone entity or

10    is it at the direction of or is it being

11    controlled by someone or something else.

12        Q    And is it just control, or does it

13    have -- I mean, isn't what you're looking

14    for as a nominee is to determine whether or

15    not the company has been set up in order to

16    operate sort of as the alter ego of the

17    person who set it up?

18         MR. MURPHY:  I'm going to object

19         to the extent this is just calling for

20         pure legal analysis, but go ahead.

21    Q    Okay.

22    A    Well, if you -- a single purpose

23    entity can be a nominee.

24    Q    Okay.  And what -- so when you

25    talk -- that didn't really answer my

⬆

10

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    question, but let me follow-up with that.

3    What are the indicators for the single

4    purpose entity to be a nominee from your

5    point of view?

6    A    Well, if the single purpose entity

7    functions, I'm going to say carries out all

8    the fiscal responsibilities required of it,

9    meaning it has a structure within itself

10    which directs it to do what it's supposed to

11    do, say compliance with taxes -- filing in

12    this case and/or paying in another case --

13    then it's a standalone entity.  But if there

14    is an outside agent there or an interest in

15    there that is really just using that as a

16    front for its own purposes, then that, to

17    me, is an indicator.

18        Q    Let me ask you this question:  Is

19    it unusual for a single purpose entity to

20    have a single director?  Is that unusual?

21        A    No, sir, it is not.

22        Q    Is it unusual for a single purpose

23    entity to have another company own it?

24        A    I've seen that.

25        Q    It's not unusual, right?

♠

                                        11

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        A    I'm going to say that I've seen

3    that.

4        Q    Okay.  And since you've seen it,

5    would you agree that it's not unusual?  It's

6    not against the law anyway, right?

7        A    I've seen that.

8        Q    To your knowledge, is that an

9    indicator of a nominee situation?

10        A    There are a lot more variables

11   that have to be taken into account before I

12   agree with your supposition.

13        Q    Okay.  Well, luckily for you, the

14   case law does set forth some of the

15   variables.  Are you familiar with some of

16   the variables that have been indicated in

17   finding nominee liability through your

18   experience?  Have you ever been told about

19   those indicators as in the case law?

20        A    Well, not being a lawyer --

21        Q    Yeah.

22        A    -- that's what I have counsel for.

23        Q    Okay.

24        A    So when I see an indicator -- I'm

25   sorry.  I didn't mean to cut you off.

➜

                                    12

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    Well, no, it was actually me

3    cutting you off.

4         A    No, no, no.  I'm sorry.

5      Q     So the next question is -- finish

6  your answer, please.

7      A     If I see something that looks like

8  it might be a nominee, then I will gather

9  more information about it or might end up

10  being evidence depending upon where it goes.

11  And then I will analyze it and I will seek

12  the advice of counsel and/or other subject

13  matter experts that I have available to me.

14      Q     Okay.  So during your training,

15  are you provided with any list of indicators

16  by counsel, by these other individuals, that

17  sets forth the criteria to designate one

18  person as a nominee for another entity or

19  person?

20      A     Well, you know, nominee and alter

21  ego, which maybe we'll broach that topic

22  too, are theories, right?

23      Q     Right.

24      A     So theories need to be proven.

25  So, therefore, in order to prove a theory,

ROUGH DRAFT - FEBRUARY 10, 2023

1

2    you need to get all the evidence necessary

3    to establish the fact.

4        Q    Okay.  So to your left is exhibits

5    that were previously marked.  In the first

6    one is your deposition Exhibit No. 1.

7            Do you have that in front of you?

8        A    Yes, sir, I do.

9        Q    And you've been designated, as I

10    understand it, by the Internal Revenue

11    Service to testify in regard to every single

12    category except for 1 and 6; is that

13    correct?

14        A    Yes, sir.

15        Q    And in regard to -- before coming

16    here, did you prepare for your deposition?

17        A    Yes, I did.

18        Q    How did you prepare?

19        A    Well, it started with the

20    production of documents.

21        Q    Okay.  Were you the one who

22    formulated the production of documents?

23        A    Most of them, yes.

24        Q    Okay.  Who else?

25        A    Well, I know Ms.Sylvia had to

⬆

14

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    produce some documents, and other than that,

3    I have no knowledge of any other person.

4          Q    Are you the one that actually

5    found the documents, produced them to

6    counsel so that counsel could produce them

7    to us?

8          A    Yes, sir, I am.

9          Q    And when you went through the

10   documents, was there any ones that you made

11   in your discretion, perhaps, to not produce?

12         A    I answered the list that was

13   provided me to produce.

14         Q    Okay.  And did you come across

15   other documents that were related to Ms.

16   Blouin or Brickchurch, but that you made a

17   determination were not responsive?

18         A    Not to my knowledge.

19         Q    Okay.  So not to be a trick

20   question is, in regard to any documents that

21   you reviewed, were there any that were

22    related to Brickchurch or Ms. Blouin that

23    were not produced to counsel for production?

24         A    I produced everything that was

25    asked of me.

&uarr;

                                                    15

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    That's not what I asked you.  I

3    asked, when you did your research, did you

4    come across documents that were related to

5    Brickchurch or Ms. Blouin that you decided

6    were not responsive, and, therefore, you did

7    not produce them to counsel to produce them

8    to me?

9         A    Can I question what you mean by

10   not responsive, do you mean that I purposely

11   omitted what should have been --

12        Q    Listen, you're overcomplicating

13   this.

14        A    No, you are.  But I -- please

15   restate the question.

16        Q    Okay.  So you did a review of

17   documents for production, correct?

18      A    Yes, sir.

19      Q    There was a list of documents to

20 be produced, correct?

21      A    Correct.

22      Q    Okay.  And you provided to your

23 counsel those documents that you thought

24 were responsive, correct?

25      A    Not that I thought, that were

                                                        16

1           ROUGH DRAFT - FEBRUARY 10, 2023

2 responsive --

3      Q    Okay.

4      A    -- to the document production.

5      Q    I don't understand the difference,

6 but anyway.

7           And in regard to other documents

8 that you found to be unresponsive, did you

9 come across other documents that related to

10 either Brickchurch Enterprises or Louise

11 Blouin that weren't responsive?

12      A    Put that way, yes.

13      Q    Okay.  Tell me what those -- the

14    categories of those documents were?

15        A    They were just IDRS prints at the

16    time.

17        Q    What does that mean?

18        A    Okay.  IDRS, Integrated Data

19    Retrieval System.

20        Q    Okay?

21        A    And basically, it's a mainframe to

22    which all accounts across the United States

23    or, you know, people who are in the IRS

24    system are on.  So when you look at a

25    specific account, we've mentioned several

↟

                                            17

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    command codes like NAMES, and NAMEI, and

3    then there was maybe, like, BMFOLE or

4    something like that.  You'll have these

5    snapshots in time of what the account looked

6    like.

7            So, yeah, there were a few of those

8    old prints that were not material to the

9    production, document production request.

10      Q    They were historic?

11      A    Yeah, basically.  They were like

12 taking a snapshot of somebody walking across

13 the street and you catch them maybe just

14 stepping off of a curb, but, you know, you

15 missed all -- later on, they get to the

16 other side of the street, if that helps

17 explain it a little bit.

18      Q    I think it does.  Thank you for

19 that analogy.

20           And when did you first in your

21 life ever hear of Louise Blouin?

22      A    Art Now.

23      Q    What year can you tag that to?

24      A    2016.

25      Q    And in 2016, you actually opened

↑

18

1           ROUGH DRAFT - FEBRUARY 10, 2023

2 up a file on her, right?

3      A    No.  I took over a case from a

4 prior revenue officer.

5      Q    What had happened was, is that one

6    revenue officer was investigating a company

7    called Art Now Inc., and you were

8    investigating a company called Louise T.

9    Blouin Inc. -- or Media, I'm sorry, and

10   there kind of came a point where you both --

11   you figured out that you were both working

12   the same case, right?

13        A    No.  That's not right.

14        Q    Tell me the best way to

15   characterize it.

16        A    I took over the Art Now case from

17   the prior revenue officer.  I had been doing

18   research, and I saw the connection, Louise

19   Blouin, I saw a list of entities that had

20   been identified by the prior revenue

21   officer.  And in my duties as revenue

22   officer to do full compliance, which means

23   investigate every single associated entity

24   if I feel there is a need to, to see if they

25   are also experiencing problems with keeping

✦

19

2    in compliance with the tax laws.

3              So I went down the list, and that's

4    when I discovered Louise Blouin Media Inc.

5    And then when I saw the magnitude of the

6    problems that were there with the non-filing,

7    I directed my attention to include my

8    investigation of -- include -- can we call it

9    LBM Inc.?

10       Q    Sure.

11       A    LBM Inc. or LBM.  That makes

12   things easier -- I decided to include LBM in

13   the scope of my investigation, because there

14   were hundreds of thousands of payroll

15   dollars that weren't being accounted for,

16   paid, returns filed.

17       Q    Okay.  This has more to do with

18   the fact that I want to know what I'm

19   looking at.

20              I'm going to show you what we're

21   going to mark as Deposition Exhibit No. 5.

22              (Whereupon,

23              Description

24              were/was              marked as

25              Party                      for

↟

1          ROUGH DRAFT - FEBRUARY 10, 2023

2              identification, as of this date.)

3      Q    So I'm showing you what we marked

4  as deposition exhibit No 5.

5          Can you tell me what this is,

6  like, where does it come from?  Like, what

7  is it?

8      A    Okay.  The title on the top says

9  Trust Fund Recovery Penalty Data.

10     Q    Yeah.

11     A    So that means it is an analysis or

12 a breakdown, better word, of what the trust

13 funds would be owing against the corporate

14 liabilities or the corporate 941 periods

15 that have been filed.

16     Q    Okay.  So in other words, when we

17 kind of -- there is a column that says, Tax

18 only, and then there's another column in

19 regard to FICA and then Income tax withheld.

20 And I just kind of -- maybe I should just

21 have you explain it, but I think I know what

22 it means, but can you explain what each of

23    the columns mean?

24         A    Okay.  Well, Tax only, means the

25    tax on the return, the word --

↑

21

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    Is that income tax?  Is that what

3    that means?

4         A    The tax on the return -- okay, let

5    me clarify.

6         Q    Yeah?

7         A    Let's go even further back.  You

8    see where it says, Form, all the way on the

9    left-hand side.

10        Q    I do.  I know what that means.

11        A    That 941.  So that means what

12   return we're referring to.  And in this

13   case, it's the 941.  There are other returns

14   to which the TFRP is applicable, but in this

15   case it is the 941.

16        Q    Okay.

17        A    Tax Only, the word "only" is

18   exclusive, meaning there is no penalty

19    included in that number.  So if you look at

20    that first period ended 12/31/2010, if you

21    look under Tax Only, you'll see the double

22    dotted lines.  And then you'll see period

23    12/31/2010.  7706.35.  That is the amount of

24    tax reported on the tax return.

25        Q    Okay.

✦

1              ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Do you want me to continue?

3        Q    I do.

4        A    Okay.

5        Q    I mean --

6        A    I'm happy to take your individual

7    questions about what this, what's that.  I

8    can -- if that gets you to understand

9    better.

10       Q    If you can do it by example, I

11   want to know what each of the columns

12   mean -- tax only, employees portion.

13       A    Okay.

14       Q    I just want to understand it so

15    that I can ask you questions about it.

16         A    Very good.  Anyway, that was the

17    tax computed on the return.  All right?

18    Now, that tax has components to it, three

19    specifically.  It has the employer portion

20    and the employee portion of the FICA, which

21    are two, and the third is income tax

22    withheld.

23         Q    Okay.  So, if I understand -- and

24    then the -- the total employee portion

25    withheld is the employee portion plus -- how

23

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    is that calculated?

3         A    Okay.  Well, you can see it better

4    if you actually look or you're familiar with

5    the 941 return, but let's start with the

6    easy one:  Tax withheld.

7         Q    Okay?

8         A    All of the employees submit to

9    their employer a W-4 which tells them the

10    number of exemptions they have, whether have

11    one or two kids that they're claiming or

12    whatever, a spouse.  And that will determine

13    how much income tax is withheld from their

14    salary per pay period to go against their

15    payment of -- you know, their 1040 income

16    tax return.

17        Q    Okay?

18        A    They get to claim that

19    withholding.  It's called withholding when

20    you get it on the --

21        Q    So when I complete my 1040, where

22    it says, you know, it says tax due and then

23    I minus the amount of tax paid from the

24    withholdings, that type of thing?

25        A    Yeah, it's a withholding credit.

⬆

24

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    You may make estimated payments too because

3    you're probably a principal or something

4    like that.  Let's not assume anything there.

5        Q    Right.

6        A    But, yeah, it's the amount of

7      withholding as a credit against the tax on

8      the return, right, for their 1040s, but not

9      here.  This is what the employer withholds

10     from the employee every paycheck to, in

11     trust, turn over to the government through a

12     depository account so that when that

13     employee files the 1040, they know all that

14     money that was held against their federal

15     income tax was withheld by the employer and

16     turned over to the government.

17          Q    Okay.

18          A    That's one.

19               Now, FICA is Social Security.  I

20     think that's Federal Insurance -- was it

21     Comstock Act?

22               MR. MURPHY:  Contribution Act.

23          A    I don't know where the Comstock

24     Act -- that might have been FUTA, but --

25          Q    That's okay.

↟

1          ROUGH DRAFT - FEBRUARY 10, 2023

2          A    Anyway, that is a number where

3    it's a joint tax amount from the employer as

4    well as the employee.  So the employee is

5    also contributing to FICA, right, that's

6    your Social Security that's coming out.

7    That's usually one of the biggest things you

8    see deductions coming off of your W2.

9          But the employer is required to

10   match the amount of -- that the employees

11   made.  So, on the return, it's computed

12   through, you know, you run the total salaries

13   paid, and then you run it through a

14   computational matrix, shall we say, and then

15   it bubbles down to one number, right.

16   There's also Medicare added onto that, of

17   which this is comprised.  And then you cut

18   that number in half on the return, and that's

19   where you get these two figures.

20     Q    Okay.  So, and I kind of -- I can

21   do math.

22     A    Good.

23     Q    And basically, the Tax Only is the

24   three numbers across the employee portion,

25   the employer portion, and the tax withheld,

⬆

1              ROUGH DRAFT - FEBRUARY 10, 2023

2     if you add those up it comes to $7,076.35,

3     right?

4          A     Yes, sir.

5          Q     Okay.  And then in regard to the

6     employee withheld portion, the $4,734.18,

7     that's the employee portion and the income

8     tax withheld, right?

9          A     Yes, sir.

10         Q     And that's the portion the

11    employer is required to turn over to the

12    IRS; is that correct?

13         A     Yes, sir.

14         Q     And in regard to this, the -- if

15    there was an amount paid on the next line,

16    then that would reduce the balance for each

17    of those amounts, correct?

18         A     That is correct.

19         Q     Okay.  And then just to kind of

20    finish this is, if you go through and it

21    says the balance on the total employee

22    portion withheld where it says, $4,734.18,

23    that's the amount that the IRS would claim

24    was not turned over by the employer?

25        A    Correct.

➚

27

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    And if we go through, at least for

3    Art Now Inc., we can see amounts in this --

4    in this chart where you go on for pages

5    beginning with the last quarter of 2010,

6    right?

7        A    Um-hmm.

8        Q    And it goes all the way through to

9    December 31 -- I'm sorry -- December 31,

10    2016, correct?

11        A    Are you going through all of the

12    pages, then?

13        Q    I went through the first few

14    pages, right?

15        A    I haven't -- yeah, I agree with

16    you.

17        Q    So if I were to add -- why is it

18    that this document stops at 2016 or '17 or

19    whatever it stops at?

20      A    They ceased payroll.

21      Q    Okay.

22      A    Well, actually, clarify that.

23  They did pay two quarters in 2017, their

24  last pay period or the last return filed, I

25  believe, was a fourth quarter 2017, and it

⬆

28

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  was a zero return.

3      Q    Okay.  So when they filed the zero

4  return, that indicates to someone looking at

5  this at the IRS that it doesn't seem like

6  they're paying employees anymore?

7      A    Actually, there's a box -- I never

8  saw the return, but as a matter of

9  procedure, there is a box that you check if

10  you have no further employees.  And it

11  automatically tells the system to stop

12  requiring the taxpayer to file returns.

13      Q    And in regard to Art Now Inc., how

14  is the numbers on the Tax Only part, how --

15  is that from the filed 941?  Is that where

16    you get the number from?

17         A    Yes.

18         Q    Okay.  Is there anything that's

19    estimated on this document, meaning Exhibit

20    No. 5, because there hasn't been a return

21    filed?

22         A    Well, obviously, I'm thinking that

23    if you're saying, "estimated," since all the

24    other numbers are derivative of Tax Only,

25    you would have to say, are any of the Tax

↟

                                                    29

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    Only numbers estimated?

3         Q    Right.

4         A    Yes, throughout this document

5    there are quite a few of them.

6         Q    Okay.  And the reason why they're

7    estimated is because there wasn't a Form 941

8    filed for this period?

9         A    You are correct.

10        Q    And how is it that -- how -- and

11   the reason why I kind of thought that was

12    because you can see some of the numbers were

13    duplicating themselves?

14        A    Yes.

15        Q    And can you tell by looking at

16    Exhibit No. 5 which of the numbers are

17    estimated and which of the ones are from

18    actual IRS 941s?

19        A    Well, from this exhibit, I would

20    just be guessing.  There are probably other

21    documents that were produced in there that

22    would -- like the transcripts, that would

23    give a better indication of that.

24        Q    Okay.  So we have those.

25        A    Yes, so if I could ask, not having

↑

                                                30

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    to try to guess from this document, if you

3    want the correct answer, let's get to the

4    applicable documents.

5        Q    So what am I looking for?  Does it

6    say account transcript, or what are we

7    talking about?

8        A    Yes, sir.  Bingo.  There are a

9    number of them.  I think there should be

10   for --

11       Q    Yeah, I got it.

12

13            (Whereupon,

14            Description

15            were/was            marked as

16            Party                     for

17            identification, as of this date.)

18       Q    I'm showing you what we've marked

19   as your deposition Exhibit 6.

20            Do you have it in front of you?

21       A    Yes, sir, I do.

22       Q    And is this the transcript that

23   you were referring to?

24       A    These are the transcript I ordered

25   for this purpose --

↑

                                        31

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Okay.

3        A    -- in the document production.

4       Q    And how can I tell whether a --

5    and just kind of -- I can -- I mean, I can

6    read.  Is it -- how do I make a

7    determination as to whether there was a 941

8    for each of the periods shown on Exhibit 5

9    or whether it was estimated?

10       A    Okay.  There are -- I have -- I

11    did go through the transcripts in

12    preparation for the deposition, so if that

13    answers part of your question.

14       Q    Nice.  Okay.

15       A    There are two batches in here of

16    estimated returns.  They are the ones that I

17    did, and there are ones that the service

18    center did before I even got the case,

19    before the prior revenue officer had the

20    case.

21       Q    Okay.

22       A    So it's easier to tell on the

23    transcripts which ones the service center

24    did versus the ones I did because of my

25    input stream, how I input the -- feed the

32

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    documents to be assessed.

3         Q    Okay.

4         A    Whereas, when -- take, for

5    example, let's just take this first one.

6    And you need look no further than Page 2.

7    You look at the very top, it says,

8    Substitute tax return prepared by IRS.

9         Q    Okay.

10        A    And it was done 9/14/2015 before I

11   had the case.

12        Q    Okay.  And how do I tell -- which

13   period -- like, how can I tell from the

14   transcript what period we're talking about?

15        A    Well, okay.  Go back to --

16        Q    Because that was filed on 2015?

17        A    Right.

18        Q    And then there's interim sort of

19   un-chronologically noted, a May 4, 2011,

20   date?

21        A    Okay.  Can I just get

22   clarification in your question.   I

23   understood it to be, you want to know what

24   period we're looking at here?

25     Q     Yeah, I do.

↑

1              ROUGH DRAFT - FEBRUARY 10, 2023

2     A     Go back to Page 1.

3     Q     Okay.

4     A     And if you'll notice Form No. 941.

5     Q     Yeah.

6     A     Tax period December 31, 2010.

7     Q     So is that fourth quarter 2010?

8     A     Yes, sir.

9     Q     And then you can see this kind

10    of -- and then -- so for -- from December --

11    for the period ending December 31, 2010,

12    from the transcripts, do we see that there

13    was no 941 that was filed by Art Media, but

14    that it was filed by someone at the IRS on

15    its behalf?

16    A     In this particular example, I

17    would direct your attention to noting the

18    150, the top line, 150:  Substitute tax

19    return prepared by the IRS.  Very -- right

20    under that, even though -- and I understand

21    why it might be chronologically difficult to

22    understand how you would have a transaction

23    tax return not filed, the next line, and it

24    would be dated 5/4/2011, because they tried

25    to secure the return, and they were unable

⬆

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    to.  And it looks to me like they let it sit

3    there until examination finally got around

4    to taking a look at what information was

5    available, whether they were required to

6    file a return or not.

7        Q    Okay.  So am I to assume that Art

8    Now didn't file a return from 20- -- the

9    last quarter of 2010 forward; is that

10    correct?

11        A    There may have been a couple of

12    periods in here that they did file, but

13    there were very few of them.

14        Q    So knowing they didn't, at least

15    in the last quarter of 2010, I want to go

16    back to the estimate part.  So how is it

17  that the IRS was able to -- going back to

18  Exhibit No. 5 -- determine that there was

19  7,076.35 due in taxes?

20      A    Well, at the time, they had

21  records available to match, basically what

22  was reported on the 941s.  In this case, it

23  was nothing reported on the 941 because they

24  weren't filed.  And they bounced it against

25  what was issued and reported on the W2s.

➤

35

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  Because not only do the individual taxpayers

3  include their W2s on a 1040 to claim, you

4  know, their Social Security contributions as

5  well as the federal income tax, but there's

6  also a W- -- I believe it's a W3 document

7  which the employer files with the IRS to

8  say, this is what -- you know, this is what

9  we paid these employees and this is what we

10  took out of their salary.

11      Q    I've got to tell you, I'm learning

12  way more stuff today that helps me

13    understand.  But I think I got a little bit

14    of that.

15          So basically what happens is, 941

16    is the IRS required filing for, in this

17    example, Art Media, but they also file other

18    documents like W2s that they provide to

19    their employees, correct?

20      A    I agree.

21      Q    And in regard to what I refer to

22    as estimates, they're not really estimates

23    at all.  The IRS actually has the

24    information available through the filed W2?

25      A    That's also agreed.

➦

                                              36

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    And is that, when I look at all

3    the information that has been, at least on

4    Exhibit No. 5, unless there is a form 941

5    that was actually filed, all the information

6    here wasn't pulled out of someone's ear, but

7    it's actually reflected on a document that

8    was filed with the IRS?

9       A    It's a matching -- yeah.  They

10   match one against -- and the reason, I might

11   add, you see a lot of duplicate numbers like

12   the 101.6 or whatever the amount paid is

13   here, what they'll do is they'll, in the

14   case of this entity, there were a couple of

15   years where there were complete years that

16   were not filed.  So they just took the

17   mismatch number, cut it into four

18   representing the four quarters, and that's

19   why they duplicate.

20           Now, if there was a year where they

21   filed one period, then they would take the

22   mismatched amount, divide it by three, and

23   apply that, put that on the three years that

24   weren't filed.

25           MR. MURPHY:  Quarters.

✦

37

1        ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Did that make --

3        Q    Yeah.  So I know exactly what you

4    were saying.  So they didn't miss every one;

5    they missed a bunch, but you were able to

6    fill in the full amount from the filed W2s,

7    and, therefore, if they filed one quarter,

8    and, you know, you would just deduct that

9    from the whole amount and then take the

10    remainder and divide it by three, sort of,

11    right?

12        A    You got it.

13        Q    Okay.  And the way people pay,

14    that amount's probably, if you divide it by

15    four, divide it by three, it should be about

16    the same anyway?

17        A    If you're going to estimate, but,

18    you know, we don't know; they didn't file

19    returns.

20        Q    Okay.  I want to show you the next

21    exhibit.

22            (Whereupon,

23            Description

24            were/was            marked as

25            Party                  for

1          ROUGH DRAFT - FEBRUARY 10, 2023

2               identification, as of this date.)

3     Q    I want to show you what we marked

4  as your Deposition Exhibit 7.

5          Can you tell me what that is?

6     A    That's actually a sample, or at

7  least one display of the documents that --

8  right here at the top.  Document type:  W2

9  top right-hand side.

10     Q    Okay.  And just kind of going

11  through this, it seems to be reports of W2s

12  filed between the years of 2010 and 2014.

13          Did I get that right?

14     A    Yes, sir.  These are also other

15  documents that I produced that were in my

16  case file.

17     Q    Right.  Now, in regard to back on

18  Exhibit No. 5 -- and just to be clear,

19  there's three people listed on Exhibit

20  No. 7, correct?

21     A    Yeah.

22     Q    Representing three employees of

23  Art Now, correct?

24     A    Not for all of the years, but for

25  the sake of your argument, I will not

✦

39

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    disagree with you.

3         Q    Right.  There was one in 2014.  It

4    looks like ^ Benata wasn't employed, right?

5         A    They were -- I think in 2016,

6    which wasn't available, but there is another

7    transcript of that, that you should have

8    that there were two employees.  Because --

9         Q    Oh, I have it.  I have it.  It's

10   the last page.  I have it.

11        A    Okay, maybe I missed it.

12             Oh, there it is.  Thank you.

13        Q    So this is the information

14   regarding the W2s that you were able to

15   cross-reference on to Exhibit No. 5, those

16   numbers should match, right?

17        A    No.

18        Q    Why not?

19        A    Because these -- this is just raw

20   data --

21        Q    This, being where?

22      A     This here.  Exhibit 7 --

23      Q     Yeah.

24      A     -- really just shows the raw data

25   of the wages that were paid, as well as the

⬆

40

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   Social Security that was withheld from the

3   individual employees, as well as the

4   Medicare wage -- that's Med Wage.  And as --

5   and as well as the total tax withheld, which

6   is all the way on the left side.

7           This does not calculate the tax on

8   a 941 return.  So in order to get the numbers

9   on Exhibit 5, you have to take a look at

10   what's reported on the transcript and derive

11   it from that.  So you cannot derive these

12   numbers from Exhibit 5 directly on Exhibit 7.

13      Q     Okay.  But why is it that Exhibit

14   7, why is that in your file?  This was in

15   your file, right?

16      A     Yes.

17      Q     So what are you doing with this

18    information?

19        A    Because I prepared some of the

20    returns for them.

21        Q    Okay.  So you were using this

22    information to file the IRS 941s, prepared

23    by the IRS, right?

24        A    Yes, sir.

25        Q    Because the IRS is allowed to file

41

1             ROUGH DRAFT - FEBRUARY 10, 2023

2    missing returns on behalf of people,

3    correct?

4        A    I have that delegation of

5    authority.

6        Q    Right.  And in regard to that, you

7    used the information from the W2s, which is

8    Exhibit 7, to help you calculate what the

9    return should look like?

10        A    Yes.

11        Q    I got it.  Okay.

12             And by the way, some of this stuff

13    I know, but I have to explain it to a court,

14    so that's why I have to do this.

15        A    No, you're good.  Continue,

16    please.

17        Q    And so when I went through this,

18    this goes through 2017, right?

19        A    2016, I believe.

20        Q    2016.  And so the information on

21    Exhibit 7 actually is the same time period

22    for what's on Exhibit No. 5; is that

23    correct?

24        A    2010?  Yeah, actually, it's

25    outside because you have 2009 as well in

➤

                                        42

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    there.

3        Q    Right.  But there was no problem

4    with 2009, right?

5        A    Well, it depends if you have a

6    problem with it, I don't.

7        Q    Touche.  Okay.

8            All right.  And just to kind of --

9    did you file -- and the reason why I'm

10    asking you is -- and I can show you these

11    two exhibits.

12

13              (Whereupon,

14              Description

15              were/was            marked as

16              Party                        for

17              identification, as of this date.)

18

19              (Whereupon,

20              Description

21              were/was            marked as

22              Party                        for

23              identification, as of this date.)

24    Q    So -- and we'll get to this other

25    company, but I want to ask you a question

❧

43

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    about this.  There's another company you

3    were investigating called LBM Inc., using

4    your abbreviation, correct?

5        A    Yes, sir.

6        Q    And we'll get to identifying some

7    of the other documents, but these are the

8    Form 941s that you signed and completed --

9    completed and then signed, to be filed in

10   regard to LBM Inc., correct?

11       A    Correct.

12       Q    Now, in your production, I only

13   found two.  They're both marked as Exhibit 8

14   and 9 of the 941s.

15            Do you agree that's all you

16   produced?

17       A    That is all I produced; that's all

18   I found in my paper file.

19       Q    Okay.  So let's go back to that.

20   So you have somewhere a paper file, correct?

21       A    The paper file actually is the

22   filing copies.

23       Q    And in regard to other documents,

24   do you have, like, an imaging system?  Like,

25   how are your records kept?

♠

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        A     Well, I tried to call up the ones

3    that are missing for LBM, if I'm reading

4    your question correctly.  They don't have

5    them imagined on, say, what you would get

6    your 1120s from where I got those documents.

7    So I had to request the actual filing copies

8    through our service center.  That was the

9    first thing I did upon document production,

10   and I have not received them back from the

11   service center yet.

12       Q     Do you anticipate receiving them

13   back?

14       A     Well, we've had problems producing

15   those documents upon request.  I mean, once

16   upon a time we were a finally oiled machine

17   when we were fully staffed, and we had

18   employees out there in the service center

19   that could take these requisitions and walk

20   down that long aisle past the Arc of the

21   Covenant and pull out those returns and send

22   them to the requests.

23       Q     I have a question, but I first

24   want to say, you're very funny.

25       A     We may as well have some fun,

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    right?

3         Q     In regard to walking down these

4    aisles and having employees available, are

5    you talking that these are paper files, or

6    are they --

7         A     They are paper files.

8         Q     Okay.  So back -- and I'd be

9    interesting to know where everybody is

10   filing online; not everybody, but a lot of

11   people file online?

12        A     Yes, we're encouraging that.  It's

13   faster.

14        Q     So if I needed to find, for

15   example, my tax return that I filed when I

16   was a bus boy 30 years ago, it's somewhere

17   in paper.

18        A     I believe not that long ago.

19        Q     But if it was five years ago?

20        A     Yes, you would be able to find

21   that.

22        Q     And it's just mounds and mounds of

23    paper in a warehouse, I suspect?

24        A    Now, I am speaking -- I cannot

25    speak for that portion of the IRS.   So

➤

46

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    whatever I say is supposition.  So I hope

3    this satisfies your inquiry to the best of

4    my knowledge.  They have a filing system.

5    Otherwise they wouldn't be able to find it,

6    so it wouldn't be piles and piles of paper.

7        Q    You don't have someone leafing

8    through a stack of paper.

9        A    Right.  Unfortunately, as a result

10    of the pandemic, just as an aside, you know,

11    there has been a backlog of paper because of

12    the short staffing and the ability to -- but

13    that doesn't affect these returns.   They

14    should be in a specific place where they can

15    be recalled.

16        Q    And you suspect that at some point

17    in the future, hopefully, not too distant

18    future, that you will be able to produce to

19   me additional 941s that you completed?

20       A    Right away.

21       Q    Okay.

22       A    I anticipated them earlier back

23   in -- like I said, when we were fully

24   staffed and we didn't have all of these

25   other competing issues using up our

☝

47

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    resources, you know, I would have had them

3    by how.

4        Q    And is the reason -- what is the

5    reason that you filed the 941s that are

6    missing?

7        A    To report the tax that was either,

8    A, partially paid, or, B, unpaid.

9        Q    Okay.  But --

10       A    Or fully paid.

11       Q    But just from my perspective being

12   a layman looking in, is it the 941 that

13   gives rise to the obligation, or does the

14   obligation begin before the 941 is filed?

15      A    That sounds like a rhetorical

16  philosophical question.  I can't answer

17  that.

18          MR. MURPHY:  What information are

19      you talking about?

20      A    You're going to have to clarify,

21  please.

22      Q    And I will.  There's a reason why

23  you're filing the 941 right.  It's because

24  they're missing?

25      A    Now you're talking about me or are

↑

48

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  you talking about anybody?

3      Q    I'm talking about why you complete

4  the 941?

5      A    Can we -- can you just keep it

6  specific to the case, because I think you're

7  getting too general here --

8      Q    That's okay.

9      A    -- and I would rather answer a

10  specific question than a general one.

11        Q     That's fine.  So if you look at

12   Exhibit 8.  It's a 941 filed for the year

13   2011, correct?

14        A     Yes, the first quarter.

15        Q     And you prepared four of those,

16   right, one for each quarter?

17        A     Yes, I did.

18        Q     And you went and did the same

19   thing for '12; '13, '14, '15, and '16,

20   right?

21        A     Correct.

22        Q     And there's a reason why you're

23   doing it.  You testified is to establish the

24   tax liability, correct?

25        A     The taxpayer had an obligation to

49

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    file and timely report -- or timely file and

3    report their taxes.  They did not do that.

4    My duties as a revenue officer is to bring

5    into taxpayer into compliance.  When the

6    taxpayer fails to comply or respond to my

7    efforts at compliance, then I had the

8    delegated authority to prepare the returns,

9    propose the assessment of them.  I give them

10   30 days to respond, and if they do not

11   respond then, I can file those returns on

12   their behalf with the caveat that at any

13   time they produce a valid, subsequent

14   original return, I am obligated to take that

15   return and make the corrections to what the

16   taxpayer filed.

17        Q    Okay.  And each of the 2011

18   returns and each of the years going after

19   that, you actually had information that gave

20   you some confidence that the information on

21   those returns was accurate, right?

22        A    I had -- different years had

23   different amounts of information upon which

24   I could base my -- I'm going to call it a

25   6020B.  Do you want a definition of that?

⬆

50

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    You can give it if you want,

3    but --

4        A    It's up to you; you're calling the

5    shots.

6        Q    Yeah.  Go ahead.

7        A    6020B is an Internal Revenue Code

8    subsection that entitles the Internal

9    Revenue Service to prepare and file a return

10   for the taxpayer if they fail to file the

11   return after due notice or sufficient notice

12   is the word.

13       Q    So the IRS, before you filed each

14   of these returns, sent notice to who it

15   deemed to be the responsible party for the

16   filing of them saying, if you don't do it

17   within 30 days, we're going to do it for

18   you?

19       A    You have it partially correct.

20       Q    Okay.  Tell me the part I got

21   correct; tell me the part I didn't have

22   correct.

23       A    Okay.  The Service tries to secure

24   those returns multiple times, because it

25   costs money to send me out to somebody's

1                ROUGH DRAFT - FEBRUARY 10, 2023

2    doorstep and knock on it and give them a

3    personal invitation to file returns.  So we

4    send a number of notes saying, you have

5    unfiled returns.  In some cases, there could

6    be four notices being sent to the address of

7    the taxpayer.  And then when it gets to a

8    level of nonresponsiveness, then it gets

9    sent out into field collections, which I'm

10   part of.

11       Q    And is the notice required to be

12   sent before the IRS will prepare the 941s on

13   behalf of any taxpayer?

14       A    So I think where you're getting at

15   is -- well, let me ask you.  Do you want to

16   know whether there was a notice issued with

17   this to say, these are your returns, file

18   them or -- file them -- your original

19   returns or we will file these?  Is that what

20   you're asking.

21       Q    I want to know if it was a

22   prerequisite to the filing of the returns to

23   send notices.

24      A      Okay.   I'm going to broadly answer

25      your question, okay?


⬆

                                        52

1            ROUGH DRAFT - FEBRUARY 10, 2023

2      Q      Okay.

3      A      An attempt was made to verbally

4      ask the taxpayer to file their delinquent

5      returns.  And then there have been notices.

6      I know ^ Mr. Bob Lieben, from the first --

7      with Art Now, it's fairly documented.  I

8      made attempted contact for LBM, saying we

9      have unfiled returns here.  You need to file

10      them.  It went un-responded to, so when I

11      made the determination that the 6020B

12      process is applicable in this state, then I

13      followed manual procedures as in mail the

14      return, cover it with a letter, L1085 that

15      specifies the returns that are in that

16      package and gives them the response due

17      date, the rights that they can avail

18      themselves of to avoid having the returns

19      that were proposed, in fact, filed for them.

20      Q    Okay.  Thank you for that.

21      A    All right.  I'm all ears.

22           (Whereupon,

23           Description

24           were/was              marked as

25           Party                          for

↑

1           ROUGH DRAFT - FEBRUARY 10, 2023

2               identification, as of this date.)

3       Q    So I'll show you what we've marked

4  as your Deposition Exhibit No. 10, and am I

5  right that this is the same type of document

6  that we saw that was Exhibit No. 5, but this

7  one is for Louise Blouin Media, Inc.; is

8  that right?

9       A    Yes, sir.

10      Q    And do I have the whole document,

11  and that is this is for tax years from 2011.

12  It goes to 2015, stops for some quarters,

13  and then continues to 2017.

14      A    That is correct.

15      Q    And we can see in -- was there --

16    do you know through your investigation why

17    there is nothing between 2015 and 2017, the

18    second quarter of 2017?

19        A    She filed the returns and paid

20    them.

21        Q    So this is only when there is

22    deficiency in regard to --

23        A    Yes, sir.  We're not going to

24    charge liabilities on somebody that filed

25    and paid their returns.

⬆

54

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Okay, no, just from my

3    perspective, I didn't know f I would get a

4    return from 2011 through the present --

5        A    No, because -- showing.

6            (Reporter clarification.)

7        Q    From 2011, you know, showing every

8    year paid or unpaid?

9        A    No.  Let me clarify what this

10    document is.

11        Q    Okay.

12      A    This document is the breakdown of

13   the trust fund recovery penalty that we

14   would propose to be asserted against

15   potentially responsible party.

16      Q    Okay.  And in regard to the years

17   that are missing as part of your

18   investigation, did you send someone down

19   that long hallway and look at the four 941s

20   that were filed by, in this case, LBM Inc.?

21      A    No, I did not.

22      Q    And could you do that?

23      A    I could have done that.

24      Q    And is it true that you've done

25   that for other cases that you've handled.

➤

55

1         ROUGH DRAFT - FEBRUARY 10, 2023

2      A    In this particular case, I would

3   not have requested those filed returns that

4   were satisfied in this or just about any

5   other case I thought about unless there were

6   some reason, which right now I can't explain

7   why there would be, but I'm not ruling that

8    out.

9        Q    Let's ponder that a little bit

10   together.

11       A    Please.

12       Q    So you get this case in which

13   year?

14       A    I would have to say I got it in

15   2017.

16       Q    Okay.  And you had Art Media

17   before that time?

18       A    Art Now, yes, sir.

19       Q    Art Now.  I'm sorry.

20            And when did you have Art Now?

21       A    I had that in, I believe 2016.

22       Q    Okay.

23       A    They were very close.  They were a

24   couple of months.

25       Q    Okay.  And at the time that you

↟

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    got LB -- LTB Inc., when that was assigned

3    to you, you were still trying to figure out

4    who, if anybody, could be responsible for

5    the trust fund companies, correct?

6        A    Well, LBM Inc. and -- it became

7    obvious that the person of interest was the

8    same person whose name or anagram or some

9    other moniker that they liked to use a lot

10   to self-describe themselves would be the

11   person I'd look to first.  In this case, I

12   looked at Louise Blouin Media Inc., and the

13   first two words are repeated all over the

14   place, with the exception of Art Now, which

15   was an acquisition, so that name of that

16   company was something else before she

17   acquired it.

18       Q    Yeah, but my question kind of goes

19   to, did you look at the 941s that were filed

20   by LTB Inc. to determine who executed and

21   signed on behalf of the company?

22       A    No, I didn't.

23       Q    Is that something that might lead

24   you to some clue as to who a responsible

25   party might be?

57

1

2      A      It would certainly add to the

3    investigation, but it was not required.

4      Q      No, I'm not saying it's required.

5    You're looking, right, as the IRS, you're

6    looking.  Basically what happens is you have

7    a bunch of employment tax returns not being

8    paid, correct?

9      A      Yes, sir.

10     Q      And you come to realize at some

11   point that neither one of these companies

12   have any assets in the United States; is

13   that correct?

14     A      That's correct.

15     Q      And so you start hunting, for lack

16   of a better word, or investigating, who prey

17   tell might be responsible to pay those

18   employment taxes that were withheld from the

19   employees but not turned over to the IRS,

20   correct?

21     A      Correct.

22     Q      And part of that is you're trying

23   to find a responsible person -- and I'm

24   using that as a defined term, right?

25        A     Yes, sir, we know what that means.

➤

1              ROUGH DRAFT - FEBRUARY 10, 2023

2        Q     And the responsible person can be

3   all sorts of people, right?  It could be --

4   for example, it could be a member of a

5   vendor that does payroll, couldn't it?

6        A     It all depends on whether it's a

7   payroll service provider.  The key thing is,

8   is who was directing -- oh, there's that

9   work "director," who was directing this?

10       Q     You're funny.

11       A     No, I'm observant.

12       Q     Okay.  Well, we'll get to that

13   word in a little bit, but being a -- there

14   could be multiple directors of a company, do

15   you agree?

16       A     Why not?

17       Q     Well, you've seen that, right?

18   Some of the largest companies in the world

19   have multiple people that are on the board

20   of directors, right?

21      A     Right.  And they all direct

22   something.  It all depends on who is

23   responsible for directing what.

24      Q     Right.  And that's what I was

25   going to ask you next, so thank you.  So a

⬆

59

1           ROUGH DRAFT - FEBRUARY 10, 2023

2    lot of directors have different type of

3    responsibilities, you would agree, right?

4      A      In the case of a large corporation

5    where there were a multiple directors, I

6    cannot disagree.

7      Q      And one of those directors might

8    have the ability to direct the payment or

9    turnover to the IRS of funds withheld.

10   There may be a person that's involved with

11   that, right?

12     A     Right.

13     Q     That's the person you're looking

14   for, right?

15     A     But when there's only one

16   director, what am I to assume then?

17      Q    Which company are you talking

18  about?

19      A    Which company are you talking

20  about?

21      Q    Let's talk about -- first, let's

22  talk about Louise T. Blouin Media Inc.

23      A    You mean Louise Blouin Media Inc.?

24      Q    Right.

25      A    Like I said, I looked at the name

♠

60

1           ROUGH DRAFT - FEBRUARY 10, 2023

2  Louis Blouin.  All of my attempts to contact

3  anyone that had fiduciary responsibilities

4  came up negative.  All I got was overseas,

5  Louise.

6      Q    Okay.  And so you have found that

7  there's actually a Louise Blouin that is not

8  a fictitious person that has the namesake of

9  herself in the company's name, and from

10  that, you said, Must be my gal?

11      A    I wouldn't simplify it like that.

12      Q    Okay.  Tell me what you found.  I

13    have your investigation file; we're going to

14    get into that.

15         A    Why don't we just get into that

16    and see --

17         Q    No, I want you to answer, because

18    I want to get some background information.

19         A    Because I relied on the

20    investigative results that you have in the

21    file there.

22         Q    And that's it?  So -- and you

23    produced that whole file to me, right?

24         A    Yes, sir, I did.

25         Q    Now, the other thing that I wanted

61

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    to ask you about is, for Art Now Inc., you

3    did and produced to me the reports of the

4    W2s from those three employees; is that

5    right?

6         A    Yes.  I did not do all of the

7    calculations for Art Now.  The service

8    center did the first batch, and then I did

9    the last batch.

10        Q    Okay.  My question is a little bit

11    more simple than that.

12        A    Okay.

13        Q    You didn't produce to me any

14    similar W2 report in record to Louise Blouin

15    Media Inc., did you?

16        A    I believe I didn't have to do the

17    W2 but I didn't use that in my calculation;

18    I used the BMFOLUs.

19        Q    Tell me what that's all about.

20        A    Okay.  This builds upon an earlier

21    explanation that I provided where it shows

22    the mismatch, and I believe if we go to

23    Exhibit 7, second-to-last page, this is what

24    a BMFOLU looks like.  You'll see it will

25    have a column of posted, 941s, right, and

↑

62

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    then it'll have reported W3 and processed

3    W2s.  So we watch these numbers all three

4    ways.  Now, in case of this document

5    production, 2014 was good, right?

6         Q    Okay.

7         A    But if you -- but in the case of

8    LBM, the numbers didn't match all the way

9    across.  So that's how I derived the

10   numbers.

11        Q    I gotcha.

12        A    To prepare the returns.

13        Q    Was the information regarding the

14   W2s, was it available or not available?

15        A    Mostly they were, but I didn't

16   need them.

17        Q    If I were to pull those, would I

18   see those W2s --

19        A    I don't know how far back they go,

20   but I believe there should be some still on

21   file.  I did not print them at the time.

22        Q    Okay.  And moreover, in your --

23   you didn't use them, so you didn't produce

24   them, right?

25        A    I did not use those W2 documents

1              ROUGH DRAFT - FEBRUARY 10, 2023

2      for LBM.  There were just too many.  There

3      were, like, 167 of them.  When I have a

4      summary, why would I want to pull all the

5      individual ones and calculate each single

6      one to make sure it matches what I know it's

7      going to match on the summary?

8          Q    Okay.  And did you -- you

9      interviewed subpoenaed -- not you, but the

10     IRS subpoenaed the three employees from Art

11     Now, didn't you?

12         A    Okay.  I subpoenaed the employees,

13     and there were two.

14         Q    Okay.  Oh, you subpoenaed the two

15     that were last on the payroll?

16         A    Yes, sir.

17         Q    And you did that in order to make

18     a connection between Louise Blouin, the

19     individual, and some control authority that

20     she had over Art Media -- Art Now Inc.,

21     correct?

22         A    I agree.

23         Q    And you didn't do that for Louise

24     Blouin Media Inc., correct?

25         A    I couldn't find any employees for

⬆

64

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    LBM.

3          Q    Right.  Well, my point goes back

4    to your point is, you didn't pull the W2s

5    for Louise Blouin Media, because, for God's

6    sakes, they had 160 employees, right?

7          A    Something like that.

8          Q    But don't you agree that that

9    information may have been helpful to you to

10   use it the same way you did the Art Now Inc.

11   subpoenas and try to subpoena some of those

12   individuals that may have given you

13   information that might be relevant to

14   whether Louise Blouin was a control person

15   or not?

16         A    Well, I knew that the Art Now

17   people were at that -- I believe it was the

18   80 Broad Street address, one of the many

19   that she had gone through.  I never

20   encountered any employee from LBM, and I

21   choose not to pull those W2s because I

22   didn't think I had to for that part of the

23   equation.  I didn't have to do one for the

24   other.  It's not -- it's not if I do it

25   here, I have to do it there.  That was my

⬆

65

1            ROUGH DRAFT - FEBRUARY 10, 2023

2   discretion.

3       Q    Well, so isn't part of your job --

4   part of your job is to collect revenue for

5   the United States of America, right, unpaid

6   taxes?

7       A    Yes.

8       Q    And isn't part of your job also to

9   protect people from the IRS seeking taxes

10   from them that they may not be responsible

11   for?  I mean, in other words, aren't you an

12   objective person?  In other words, I seek

13   collection of taxes from people that owe it.

14   And I'll try to guard people that are said

15   to owe taxes that I find don't owe taxes.  I

16   mean, don't you kind of have the protection

17   element to your job?

18      A    I can't agree with your definition

19  there, and I'm not going to help you correct

20  it either.

21      Q    Okay.  Well, I'm good at this.

22      A    No, go ahead; keep trying.

23      A    Let's just finish this question.

24      Q    No.

25      A    No, let's finish the question.

66

1           ROUGH DRAFT - FEBRUARY 10, 2023

2       Q    Come on, you're on a roll, man.

3       Q    You're challenging me here, bro.

4       A    No, I'm not.  I want to get past

5   this point, because I know you have other

6   items on your agenda and we should address

7   them all.

8       Q    Okay.  So do you also have a duty

9   to discover when assessed liability is not

10  properly assessed?

11      A    To discover -- I'm assuming you

12  mean that I'm looking for that?

13      Q    Um-hmm.

14      A    No, when I come across it, I

15   address it in the scope of my investigation.

16   I don't go out and look for someone that's

17   been wrongfully assessed.  I usually

18   discover that during the interactions with

19   the taxpayer.

20      Q    But here it's a little different,

21   isn't it, because you don't accuse Louise

22   Blouin of owing tax?

23      A    Accuse.

24      Q    What's that?

25      A    You used the word "accused," I'm

67

1        ROUGH DRAFT - FEBRUARY 10, 2023

2   just -- it's just -- that's not what I do,

3   sorry.

4      Q    You don't -- you did not

5   investigate Louise Blouin for owing tax, but

6   only for the imposition of a penalty for the

7   nonpayment of tax against her; am I right?

8      A    Can I explain it in terms that --

9      Q    That you're comfortable with?

10      A    No.  Because obviously, the way

11  you phrased the question, you're boxing me

12  into an answer that's incorrect.  So I will

13  try to answer your question.

14      Q    Of course.  I'm not trying to

15  trick you.

16      A    My job is, somebody doesn't

17  file -- in this case, doesn't file their tax

18  return but has every indication that they

19  are paying employees, withholding funds from

20  those employees, not turning them over to

21  the government, and oh, by the way, not

22  paying their employer portion of the payroll

23  tax if we may call it that.  It starts

24  there.

25          My job is to bring that taxpayer

↟

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  into compliance by trying to establish

3  contact and a dialogue with that taxpayer so

4  that we can resolve these things so that I

5  don't have to make estimates.  What I got in

6    response was nothing.  I had no response.  So

7    I had to take step after step that, you know,

8    follows -- follows -- I'm going to call it a

9    program for lack of a better word -- that

10   tries to resolve the unfiled taxes within my

11   authority.  And at any point the taxpayer can

12   surface and say, Stop.  We need to talk about

13   this.  We need to resolve this truthfully and

14   file the returns that are accurate to the

15   payroll records of the company.

16        Q    Okay.  Fair enough.

17             In your investigation, you visited

18   various locations, correct?

19        A    All of them.

20        Q    One on Light Street?

21        A    That's 88 Lake Street.

22        Q    Lake Street, okay.  And some other

23   addresses that you had within New York,

24   right?

25        A    Yes, sir.

69

2      Q      You went out to the houses on Gin

3    Lane, correct?

4      A      That was after the trust fund

5    recovery penalty was assessed.

6      Q      Okay.  And so putting that

7    aside -- thank you for that clarification.

8    Is you were trying to find someone in

9    furtherance of your investigation that was

10   going to talk to you about who was

11   responsible for the payment of the tax,

12   right?

13            You're shaking your head, yes, is

14   that a yes?

15     A      Yes, sir.  See, that's part of the

16   rules I -- you should have said in the

17   beginning.

18     Q      I got you, right.  You didn't ever

19   speak with Louise Blouin, did you?

20     A      No.

21     Q      You never went out to try to meet

22   with her, did you?

23     A      I was given to understand she was

24   overseas.  When I did encounter employees --

25   I believe it was an employee by the name of

1           ROUGH DRAFT - FEBRUARY 10, 2023

2    Julie.  The only one I ever spoke to at LBM.

3    She was an editor.  I asked her a question,

4    I said, Please, get her to or somebody to

5    respond to this.  And that was, I'll pass

6    this on was the answer.  I don't have any

7    response -- fiduciary responsibility.  If I

8    may paraphrase it.  That's not exactly what

9    I wrote in the history, but that's more or

10   less what happened in that conversation.

11        Q    Okay, let's take a break.

12        A    Yes, sir, very good.

13             (Whereupon,

14             Description

15             were/was              marked as

16             Party                        for

17             identification, as of this date.)

18        Q    I'm showing you what we've marked

19   as Exhibit 11.  I know what it says, but can

20   you tell me what this is?

21        A    Well, this is -- let's see if

22   you've included all of it.  So you

23    consolidated -- okay.

24          This is the complete ICS history

25    for the business entity known, formerly known

🔺

71

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    as Art Now.  And if you're going to ask, I'll

3    beat you to the punch.  ICS is an anagram for

4    Integrated Collection System, ICS.  And

5    basically -- I'm sorry.  You ask the

6    question.

7          Q    I got it.

8          So is there's -- and I'll show it

9    to you.  There's one for Louise Blouin

10   Media, which we've not marked yet.  There's

11   one for Art Now, which is Exhibit No. 11.

12   And there's a larger one for Louise Blouin,

13   right?

14         A    Yeah.

15         Q    Each -- there's three different

16   recordkeeping systems?

17         A    Three different entities.

18         Q    Okay.  And I also noticed going

19    through sort of the documents, that some of

20    the stuff that's in one is the other as

21    well; is that correct?

22        A    You are correct.

23        Q    And sometimes looks like they're

24    pasted from somewhere.  Is it just pasted

25    from one record to another?

⬆

72

1              ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Yes.

3        Q    And there became a point in time

4    where Art Now Inc., Louise Blouin Media Inc,

5    and Louise Blouin were all being worked by

6    you, even though that hadn't been

7    historically the case; is that right?

8        A    Yes.

9        Q    Why is it you don't sort of

10   consolidate all your work into a single

11   record?

12        A    Because the system is incapable of

13   that.

14        Q    Okay.

15    A    So when I cut and paste some of

16    the concurrent history from Art Now to LBM,

17    that was my attempt at least connecting the

18    two.

19    Q    And am I correct that there was at

20    one point a different revenue officer

21    investigating Louise Blouin Media Inc.

22    before you got assigned it?

23    A    For a brief period of time, yes.

24    Q    And I also see -- I gleaned this

25    from looking at the records, is that the

⬆

73

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    investigation regarding Art Now Inc. is

3    older, in other words, dates back to an

4    earlier time period as its begin date than

5    Louise Blouin Media Inc.?

6    A    Yes.

7    Q    Okay.

8    A    Correct.

9    Q    And there a reason for that, or

10    just one was picked up earlier than the

11  last?

12      A    I can't give you a definitive

13  answer because I don't know; I can only

14  suppose.

15      Q    What do you suppose?

16      A    Well, Art Now, there was a

17  resolution to the earlier delinquent returns

18  when the service center prepared assessments

19  for those unfiled returns.  And that turned

20  them into balances due that needed to be

21  collected.  So the system took them out and

22  sent them out to -- eventually, they ended

23  up into collections.  Louise Blouin or LBM

24  Inc. was a little more complicated because

25  there were a series of unfiled returns with

↟

74

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  these deposits scattered all over the place.

3          And, again, this is -- I'm not

4  swearing to this; I'm just giving you my

5  supposition to try to satisfy your question.

6  The system really didn't know what to do with

7    it.  It looked like there were different

8    functions looking at it to see if they were

9    going to do the same thing that they did to

10   Art Now, but it looked a little bit more

11   complicated to that function that would

12   normally do it.  It wasn't, you know, a

13   straight calculation like it was in Art Now.

14   And that's why I picked it out of this -- I'm

15   going to say it was stayed up in a way.  It

16   was suspended.  That's the correct word.  It

17   was suspended from elevating out into

18   collections.  So in the course of doing my

19   full compliance check -- and I noticed that

20   LBM had issues that were on an order of

21   magnitude by ten over Art Now.  That's when I

22   accelerated the process to get it out into

23   the field.

24       Q    So they're different because Art

25   Now never filed the 941s, and there was some

&uarr;

75

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    history with Louise Blouin Media Inc. doing

3    so, although periodically?

4        A    I don't think it's as simple as

5    that to be honest with you, but I don't know

6    how I would tease out your explanation.

7        Q    So let's just kind of go through.

8    You can see that page, the pages are on the

9    bottom.  So I'll refer to those pages

10   beginning with Exhibit No. 11, and hopefully

11   that copied right where they're

12   double-sided; is that right?

13       A    Yes.  All you have to do is say

14   the page number; they're at the bottom of

15   every page.

16       Q    And one of the things on Page 6

17   is, there's a thing called a BMF/IMF.  And

18   what does that -- what does that actually

19   refer to?  It's 2/3 of the way down?

20       A    And you say Page 6, correct?

21       Q    Correct.

22       A    You mean BMF/IMF online?

23       Q    Well, yeah, what does that mean?

24       A    Okay.  BMF stands for business

25   master file.

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    Okay.

3      A    IMF stands for individual master

4  file.  It's a generic term meaning -- this

5  is from a pick list on the history that you

6  can choose to put.  Now, the revenue officer

7  that did this 4311, if I may call that

8  person that.

9      Q    What is the person's name?

10     A    4311, I don't know.  I don't know

11  who -- because this was back in 2012.

12     Q    Okay.

13     A    I didn't know Art Now at all.  It

14  was a rather minor thing.  But on their pick

15  list when they -- they said, Well, I'm going

16  to look at the BMI/IMF online.  You're

17  looking at IDRS, and you're looking at

18  summaries of what the tax account looks

19  like.  It could be an individual or a

20  business.  In this case it's a business.

21          When they -- the template stops

22  where it says, results, and you have your

23  colon.  And then IMF means that that is the

24    actually record that the revenue officer

25    looked at.  BMF literally stands for -- I

⬆

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    might have one letter wrong -- business

3    master file online, and "I" means

4    informational, I believe.  And that would be

5    a summary, a snapshot of all of the returns

6    that the taxpayer would be required to file

7    and whether they were filed and whether there

8    were balances due, remaining balances due on

9    them.

10            Did I answer your question?

11    Q    You did, thank you.

12            And just so -- this Exhibit 11,

13    the investigation into Art Now it began in

14    July of 2012; is that right?

15    A    Yes.

16    Q    And then -- and it was opened

17    because of -- tell me if I got this right,

18    two unfiled 941s.

19    A    Where do you see that?

20      Q    I see it on Page 6.

21      A    TP has two 941s, bal due

22  outstanding.

23      Q    Right.

24      A    Then you're correct.

25      Q    And is that normal for an

78

1           ROUGH DRAFT - FEBRUARY 10, 2023

2  investigation to cue after just the missing

3  941s for two quarters?

4      A    What do you mean by the word

5  "cue."

6      Q    To be opened as an investigation.

7      A    That word is actually -- queue

8  means you stick it in a queue meaning you've

9  set it aside.

10     Q    Well, no -- or it could mean --

11     A    No, I just mean it's an IRS term,

12  so I don't know your familiarity.  So we

13  have a thing called the queue, which this

14  case actually went to after this revenue

15  officer, 4311, if I might use the last four

16    digits, went to afterwards.  And the queue

17    is a place where these cases go waiting for

18    them to be assigned out to somebody.  So I

19    would say triggered, maybe, the balance due?

20        Q    Yeah.

21        A    Is that the word you're looking

22    for?

23        Q    Yeah.

24        A    Okay.  So that was one of the

25    things that triggered it out when he

79

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    analyzed it.  This is the case analysis.

3    All revenue officers should review a case,

4    all of the information, internal information

5    they have accessible to them to at least get

6    an idea of what this case is about before

7    they go out and try to make contact with the

8    taxpayer.

9        Q    Okay.  So Page 25.  And if I think

10    that if you go to the prior page, it's a

11    note -- Page 25 includes notes from April

12    15, 2013; is that correct?

13        A    Yes, sir.

14        Q    And part of what's being done here

15    is that there's an investigation by you --

16        A    This wasn't me.

17        Q    Oh, this wasn't you.  Okay.

18        A    Yes, sir.

19        Q    There is an investigation by 4311?

20        A    4311.  I wish I knew the person's

21    name, but it was a long time ago.

22        Q    And he's trying to figure out --

23    he or she is trying to figure out whether

24    there is some corporate officer that can be

25    found to impose the penalty for the failure

➤

80

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    to turn over the trust money, right?

3        A    No.  That's not the primary aim of

4    when you go out on a balance due issue where

5    you're trying to -- you're actually just

6    trying to collect from the actual business.

7    The trust fund recovery penalty is not

8    something you shoot for right away.  I mean,

9    you can see certain indications from a case

10   that you may have to go that route.  But

11   really what we want to do is get that

12   taxpayer into voluntary compliance and come

13   up with some collection alternative --

14   installment agreement, or, you know, if they

15   can't pay, then maybe we'll address the

16   trust fund recovery penalty so that we'll

17   see how much we can get paid by the

18   responsible parties.  That's general

19   collection.

20           Did that answer your question?

21   Q    It did.

22           So I want you to turn to Page 45.

23   A    Okay.

24   Q    And it says, Action date, July 8

25   2016.  That's what I'm referring to, okay?

81

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    Do you see that?

3    A    Yes.

```
4        Q    And below that, it says, General

5    history.  It says, NFTL, Notice of Federal

6    Tax Lien.

7             Do I have that right?

8        A    Yes, sir.

9        Q    For periods of -- and then it

10   says -- let's see if I get this, 20 --

11   December 2010 to September 2014.

12            Did I get that right?

13       A    Yes, sir.

14       Q    Was returned.

15            Do you see that?

16       A    It says, Not deliverable as

17   addressed, afterwards, Unable to forward.

18       Q    And is this -- are you involved at

19   this point?

20       A    No.  This is the guy immediately

21   before me.

22       Q    This is still 4311?

23       A    No, this is 4342.

24       Q    Who is 4342?

25       A    ^ Thomas Von Leaven.  He's the guy
```

1        ROUGH DRAFT - FEBRUARY 10, 2023

2 I got the case from.

3     Q   And I see, okay, Thomas.  And who

4 was the NFTL's issued to, do you know?

5     A   The NFTL was filed against Art Now

6 Inc. using the address of record at the

7 time.  I can't tell really from the history,

8 although, you know, if you go back a couple

9 of pages to Page 42, you see he actually

10 made a field visit to 88 Lake Street for

11 that.

12        He entered the office and asked the

13 woman at the front desk her company.  And she

14 stated it was the company and she was the

15 office manager.  Ronata was her name.  I

16 asked why the envelope I had left was

17 returned last week.  I showed her the

18 overnight envelope, and she stated she sent

19 it back to me and was unsure why.  I don't

20 know why.  She stated she would get

21 accountant, Ron, that's, I guess, the account

22 manager came out.  I asked about the letter

23 that was left.  He advised he was unsure what

24 it was about.  I asked if he was aware of

25   941s returns and payroll.  He advised that he

&#x2191;

83

1            ROUGH DRAFT - FEBRUARY 10, 2023

2   just made payments on balance for company.

3   So he said, I made payments.

4            Do you want me to continue to read

5   it?

6       Q    I don't.  I don't need you to read

7   it.  I just don't like interrupting people

8   when they're in the middle of things.

9       A    That's why I gave you an

10   opportunity.

11       Q    I appreciate that, sir.

12       A    So now I'm trying to say, like, it

13   looks to me like he filed the NFTL based

14   upon the address, the official record of the

15   address at the time.  Now, it may have been

16   88 Lake Street, it may have been 601 West

17   26th Street, which was the preceding address

18   they had left.

19       Q    Okay.  So when you say the address

20   of record, that's what you mean by the last

21    known address, right?

22          A     No.  Because last known is a much

23    broader term than that.

24          Q     Okay.

25          A     Than just what's on record.


↟


84

1              ROUGH DRAFT - FEBRUARY 10, 2023

2          Q     Oh, I see.  Because someone can

3    file a return from the last address of

4    record and then not file one even though you

5    know them to exist somewhere.

6          A     I'll make it even simpler.  You

7    could come in to me and say, Mr. Gould,

8    don't send any notices to my house

9    anymore --

10         Q     My wife --

11         A     Yeah.  My wife threw me out of the

12    house and I have to live in the apartment,

13    my basement apartment, here's the number.

14    And then guess what?  As the IRS, that's

15    your last known record.

16         Q     All right.  Because we'll get to

17    that in just a little while.

18              And just with regard to the guy,

19    Ron?

20       A    The account manager?

21       Q    Yeah.  On Page 42, and it

22    continues on to Page 43.  He comes out and

23    tells your revenue officer that he's the

24    account manager, right?

25       A    I'm just going to read what he

85

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    said.

3       Q    No, don't read it.  Just kind of

4    summarize it for me.

5       A    Well, no, I have to go by what he

6    says.  That's why we make these history

7    entries.

8       Q    Okay, go ahead.

9       A    Ron, the accounting manager came

10   out.

11             That's all I know.

12       Q    Okay.  So if someone -- first of

13    all, if an account manager is responsible

14    for making sure that payroll is being done,

15    you can hold him responsible as a

16    responsible person for the nonpayment of

17    employment tax, correct?

18        A    Not based on that statement.  Ron,

19    the accounting manager came out.

20        Q    My question is different.  If it

21    turns out that the account manager in any

22    corporation in the world didn't -- was

23    responsible for payroll, the penalty for the

24    nonpayment of the trust fund can be assessed

25    against him, right, or her?

&#10144;

86

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Not based upon the statement, Ron,

3    the --

4        Q    Not based upon the -- I'm just

5    saying as a general rule --

6        A    Not based upon his title either.

7            (Reporter clarification.)

8        A    Oh, I'm sorry.  I'm messing you

9   up.

10        Q     We were doing --

11        A     No, no.  That's cool.

12        Q     She blamed you.

13        A     Yeah, I --

14        Q     But I think we were doing --

15        A     No, that's all right.  I got this

16   one and I've got to take it.

17        Q     So what I'm saying is -- and the

18   only point I'm making is -- forget Ron --

19   you can impose as the IRS under the code

20   under your investigation, if you determine

21   that the lowest-end employee is required to

22   turn over or is responsible for the payment

23   of the trust -- of the withheld money to the

24   IRS, it doesn't matter what the title is,

25   it's anybody who has responsibility to turn

✦

87

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    it over you can go after.  Is that a fair

3    statement?

4          A     Yeah.  I think you conflated two

5    things, but it's not just I impose the trust

6    fund penalty on someone?

7        Q    Right.

8        A    There's a process.

9        Q    Right.  And, in fact, if it turns

10   out that the person has a dual role and is

11   at the lowest end of your employee scale

12   where he might be the janitor but also in

13   charge of payroll, and if he's in charge of

14   turning the money over to the IRS that's

15   withheld from the employees, you can go

16   after that guy as easily as you can against

17   the president of the company.

18       A    That's a heck of a scenario

19   you've -- so I don't know how to answer that

20   to be honest with you.  I mean, you've

21   conflated a janitor to a director of

22   payroll.  I can't agree with that.

23       Q    Well, on its surface --

24       A    Because it's ridiculous.

25       Q    The point being is, is that it

1          ROUGH DRAFT - FEBRUARY 10, 2023

2   doesn't matter the person's title; it only

3   matters whether they're a responsible person

4   or not.

5        A    I agree with that rather

6   simplified explanation.  Thank you for

7   clarifying it.

8        Q    And conversely, the fact that

9   someone is an officer or director of a

10  company doesn't make them a responsible

11  person as it could be defined by you, right?

12       A    You need to gather all of the

13  information to determine who is responsible.

14       Q    Right.  But my question stands.

15  The question is, the fact that someone holds

16  a particular title, it doesn't make them a

17  responsible person just because they're in

18  that position or hold that title?

19       A    Right.  Title is just one

20  indicator of where to begin to ask or whom

21  to begin to ask questions of.

22       Q    Okay.  I want to go to Page 49.

23       A    Skipping around.  All right.

24       Q    I'm not skipping around.

25       A    I don't know, we've gone to 43,

89

1             ROUGH DRAFT - FEBRUARY 10, 2023

2    46 -- well, I took you to 42.  Okay, sorry.

3                (Discussion held off the record.)

4         A    Okay.  So 49.  Here we go.

5         Q    So August 23, 2016, were you yet

6    in charge of the case?

7         A    No, I was not.

8         Q    And this was the prior guy; I

9    forget his name.

10        A    Let's just call him Tom.

11        Q    Tom.  And Tom had -- do you

12   know -- did you know in reviewing the case

13   file that Tom had had problems with his

14   computer?

15        A    I remember him telling me that he

16   had problems with his computer.  I didn't

17   know it coincide with all of these events,

18   though.

19        Q    Back to what Ms. Sylvia said.

20   Like her, did you and did Tom also have an

21   IRS-issued computer?

22      A    To clarify the record with IRS,

23   all of us are issued -- at least in

24   investigative roles that we have for the

25   purposes of this discussion, we have our own

⬆

90

1          ROUGH DRAFT - FEBRUARY 10, 2023

2   laptops which are hooked into a network,

3   okay, and a server that is secure.  And it

4   gives us -- that is our portal to the

5   database to get what we need to research and

6   develop cases.

7      Q    Okay.  When you're developing and

8   researching cases, do you store documents as

9   part of your -- as part of your

10   investigation locally on the laptop that

11   you're issued by the IRS?

12      A    Well, in this particular case, in

13   ICS, right, that generated the history,

14   there were various functions in that

15   program.  We can generate -- these, I did

16   this on ICS.  We can generate our notices of

17   intent to levy on ICS as well.  Those

18    documents either you have the option to

19    print, and certainly the copies that you

20    want to send to the taxpayer, that you may

21    have copies there, you print those because

22    you can't send them an electronic file.  Now

23    you can, but for the purposes of this, you

24    couldn't.  You needed to mail it.  And the

25    records that are kept of that correspondence

↟

91

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    are in what we call a File Explorer, meaning

3    it's a specific, you know, looks like a

4    manila envelope icon and you click on it and

5    all of a sudden it will display all the

6    documents you generated.

7              Now, does anyone else have access

8    to it?  No.  Those are specific just to the

9    person that has that laptop.  When ^

10   Mr. Bronleewe, I assumed the case from ^

11   Mr. Bronleewe, and I looked in the File

12   Explorer, I didn't have access to any of the

13   documents he generated because the system

14    isn't designed that way.

15         Q    Okay.  And do you know and did you

16    investigate whether any of the information

17    that ^ Mr. Bronleewe was lost and could not

18    be recovered?

19         A    I had no reason to do that.

20         Q    Okay.  And that's not what I asked

21    you.  So you didn't do the investigation.

22    Do you have any knowledge as to whether

23    there was information in ^ Mr. Bronleewe's

24    computer that was lost and could not be

25    retrieved from a different source?

➤

                                        92

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         A    Okay.  Are you -- can you restate

3    that question in conjunction with 49,

4    because I'm trying to reconcile you brought

5    me to this page.

6         Q    Yeah.  It says, Computer will be

7    given to IT at noon for reimaging.

8         A    Okay.

9         Q    It also says, the first sentence

10    says, Assignee revenue officer is having

11    laptop issues.

12         A    Um-hmm.

13         Q    And so my question is, is did you

14    understand that any of the information that

15    would otherwise have been available to  ^

16    Mr. Bronleewe was lost and not recovered?

17         A    Well, you know, I'm looking at the

18    history, and it seems to progress, so I

19    don't see lost information here.

20         Q    But you don't know for sure?

21         A    Well, what kind of information

22    would I be looking for other than what he

23    did on the case, and that's what he wrote.

24    So I had no reason to investigate whether he

25    lost any documentation as a result of what

&#10138;

93

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    we see on 8/23/2016.O.

3         Q    Well, maybe, maybe not.  But you

4    did an investigation on Louise Blouin,

5    right?

6        A    Yes, sir, I did.

7        Q    You saved things like newspaper

8   articles that you had seen on her, right?

9        A    Public record, yes.

10       Q    And you saved that information on

11   your computer, correct?

12       A    Actually, I printed it.

13       Q    Okay.  But you could have saved it

14   to your computer, correct?

15       A    In my history entry, I think you

16   find links to articles.  I'm not supposed to

17   download stuff from the public domain onto a

18   secure laptop because it may have viruses or

19   other threats.

20       Q    Let's talk about a different

21   topic.

22            You had a document that seemed to

23   indicate the names of directors of one of

24   the BVI companies, right?

25       A    Can you direct my attention to --

94

2        Q    We'll get to it later, but --

3        A    Well, no, I can't answer that

4    question unless you show me what --

5        Q    I withdrew the question.  I said

6    we'll answer that question later?

7        A    Okay.  I'm sorry.

8        Q    Okay.  So my question is, is do

9    you have the capability of storing

10   information on your laptop computer that

11   only you can access?

12       A    In that File Explorer, those

13   notices that I generated, as well as the

14   copies of these things that were on my

15   computer, okay, I had just happened to have

16   prints of these.  But what I was doing was I

17   was saving the other copies, the filing

18   copies on my computer so I wouldn't have to

19   have a big paper file.

20       Q    Yeah?

21       A    But nobody else could get in

22   there.  It could be in my File Explorer.

23   After a certain time after the case is

24   closed, that File Explorer just dumps out

25   and all those --

↑

95

1              ROUGH DRAFT - FEBRUARY 10, 2023

2      Q     And all that stuff is gone?

3      A     All those copies of the copies,

4    they -- I don't know where they go.

5      Q     Okay.  Now, I want you to turn to

6    Page 59.  So you see the entry that says May

7    22, 2017?

8      A     Yes, sir.

9      Q     Is this you?

10     A     Yes, sir.

11     Q     That's you, right?

12           And it says, Follow-up on a case

13   issue to find no actions taken by ^ Attorney

14   Fish, right?

15     A     That's what it says.

16     Q     No action taken on request to do

17   direct assign the related Louise Blouin

18   Media entity to a revenue officer.

19           And it says, Determined that a

20   TFRP needs to be asserted against

21   Ms. Blouin.

22           Do you see that?

23      A     Yes, sir.

24      Q     And at the time that you wrote

25   this, did you have sufficient information to

↑

96

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   assert a TFRP against Ms. Blouin?

3      A     She -- at this time, she was a

4   significant -- no, she wasn't just

5   significant.  She was the sole person of

6   interest at the time.

7      Q     And -- but my question is

8   different.  Did you, in May of 2017, have

9   the information you needed in order to

10   assert the TFRP claim against Ms. Blouin?

11      A     Well, at this point, I couldn't

12   assert it against Ms. Blouin.

13      Q     Why is that?

14      A     She didn't have a Social Security

15   number.

16      Q     Okay.  But my question is still

17   different.  Not -- so you couldn't execute

18   on it, but did you have sufficient

19   information had she had a Social Security

20   number to impose the TFRP penalty against

21   her?

22        A    Okay, well, may I answer the

23   question?

24        Q    I wish you would.

25        A    Okay.  I determined that a TFRP

➤

97

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    needs to be asserted against Ms. Blouin

3    because she was the only person at that

4    point that I could see that had any physical

5    responsibility for any of the entities that

6    are -- Art Now and LBM.

7        Q    Okay.

8        A    Wait.  There's more.  Okay?

9        Q    Okay?

10        A    This statement is misleading.  I

11   was really speaking to myself.  I was

12   looking down the road at the end, but what

13   this statement doesn't take into account is

14   that there was a process involved with

15    making an assertion, which means proposing

16    the assertion, waiting the 65 days for the

17    potentially responsible person, in this case

18    Ms. Blouin, to respond, and then I make the

19    assertion.

20         But even before that, I still had

21    to find a way to assign her an SSN because

22    she was a foreign entity.

23         Q    Okay?

24         A    So you're reading this as if I'm

25    going to turn around and go bang.  What I

↟

                                        98

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    was stating was I needed to begin the

3    assertion process.  That is what I meant by

4    that statement, so I apologize for the

5    misreading of it.

6         Q    That's okay.  That's okay.  That's

7    why I'm asking you.

8         A    Okay.

9         Q    At the time you wrote that, what

10   information did you have about Ms. Blouin

11  that made you believe that you should assert

12  the TFRP against her that?

13      A    That there was nobody else to

14  consider because she was -- all roads led to

15  Ms. Blouin.

16      Q    Okay.  And you knew that Ms.

17  Blouin was not a citizen of the United

18  States; is that correct?

19      A    Correct.

20      Q    Okay.  And was living -- did you

21  figure out where she was living?

22      A    I -- you know, at the time, from

23  articles, it says Switzerland.  It said that

24  she add -- her business was in the UK,

25  perhaps London, because I did see some of

99

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  the addresses.  Then there was a connection

3  to the British Virgin Islands.  So she was

4  all over, so I didn't have a specific

5  address, but I knew one thing.  She

6  controlled assets here in the United States,

7    the most significant of which is the company

8    that beared her name.

9         Q    Okay.

10        A    And about -- if you look in the

11   history earlier, ^ Mr. Bronleewe actually

12   found several companies in the very

13   beginning, and they all had LTB or some --

14   some concoction of her initials which made

15   it obvious that this was hers.  This was

16   hers gig.

17        Q    Are you 4346?

18        A    Yes, sir, I am.

19        Q    And on page --

20        A    Oh, no wait.  Excuse me.  I'm 41.

21   I don't know who -- where are you looking at

22   4346?

23        Q    65.

24        A    Oh, okay.

25        Q    4341, that's you, right?

^

100

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         A    Yes, sir.

3      Q    Okay.  So on Page 65, on August 4,

4    2017, you're being assigned the Louise

5    Blouin Media case, right?

6      A    Correct.

7      Q    And there was, and I saw it in

8    your notes is that, there were some efforts,

9    and you had never done it before, I think,

10   to assign Louise Blouin a TIN number so that

11   you could pursue her?

12     A    Right.  The process was not off --

13   if I might speak off the cuff but on the

14   record, the process was changed since the

15   last time I did it.

16     Q    Okay.

17     A    Once upon a time when I worked

18   Chinatown cases and there were all these

19   foreigners there running their sweat garment

20   industry shops --

21     Q    Yeah.

22     A    -- none of them had Social

23   Security numbers, or at least the owners, so

24   I had to find the owner, and I knew that

25   they were in control of the situation, but

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    they didn't have a tax ID number.  So we had

3    a streamlined process where I could get an

4    ITN.  It was a matter of just put in a piece

5    of paper and you got it within a week.

6        Q    Okay.  And I'm just curious,

7    what's this whole business about the

8    asterisk?  What is that?  Do you know what

9    I'm talking about.

10       A    Well, the asterisk is an -- and

11   I'll just be specific to this.

12       Q    Yeah.

13       A    Instead of being general.  That

14   means that the number was assigned to her;

15   it's not a number she applied for.

16       Q    Okay.  And they put an asterisk

17   next to it?

18       A    Yeah.

19       Q    Okay?

20       A    And hopefully, we wanted to change

21   to a number that she applies for when we

22   merged the accounts.

23       Q    Right.  If she should be --

24    necessary to pay taxes, right?

25        A    Let's just say if she is applies

&uarr;

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    for a tax ID number, that asterisk number

3    goes away.  Whether she pays taxes or not, I

4    haven't seen much tax paying here, so.

5        Q    Do you know the tax number?

6        A    What?

7        Q    The tax number that was assigned

8    to her?

9        A    It's on the history there.  And

10    it's also on the liens.  Personally, no, I

11    don't.

12        Q    I think it's been redacted.

13            MR. MURPHY:  It's redacted.

14            MR. MESSINGER:  Could someone

15        provide that to me?

16            MR. MURPHY:  You want the full ID

17        number?

18            THE WITNESS:  I can do that.

19            MR. MESSINGER:  Yeah, I do.  I

20          don't want it on the record.  I was

21          going to as you to write it down on a

22          piece of paper.

23              THE WITNESS:  Okay, yeah.  I don't

24          know it offhand, but I should with all

25          the times I've had to write it down.

↟

                                              103

1              ROUGH DRAFT - FEBRUARY 10, 2023

2              MR. MURPHY:  We'll write it down

3          and pass it to you in a minute.

4              MR. MESSINGER:  Okay.

5      Q    So on Page 67.  Are we there?

6      A    I'm there.

7      Q    There's some indication that in

8   November of 2017, that the IRS had

9   determined to assess a penalty against -- is

10  that Ms. Blouin; is that right?

11     A    Let's see.  Let's read the

12  history.

13             MR. MURPHY:  I'm going to hand you

14         a paper with the number on it.

15             MR. MESSINGER:  I don't know where

16     to put it.

17         A    What line in the history are you

18   referring to.  I drew a blank.

19         Q    The second to last sentence on

20   Page 67 at the bottom where it says,

21   quote -- the quote's in the original --

22   complete 620B package.  If assessed, the

23   result will be a total of 5,797,000.

24              Do you see that?

25         A    Yes, sir, I do.

104

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    What's going on here?

3         A    Okay, actually, this -- this

4   relates partially or includes, not just a --

5   oh, this is the total amount of trust funds

6   that would be due from Art Now and LBM.

7         Q    Combined?

8         A    Combined.

9         Q    Okay.

10        A    And this was a manual calculation

11   because these numbers weren't in the system.

12      Q    Okay.  I saw that.  You handwrote

13  it, right?

14      A    Yeah, you know, I've been doing

15  this a long time, so I know how to -- you

16  just -- I can show you through here, but

17  that would just slow us down.

18      Q    Now, on Page 73, there's a note

19  from you, dated January 19, 2018.

20           Do you see that?

21      A    7328 or 26?

22           MR. MURPHY:  1/19/2018 --

23      A    Yeah, 1/19 --

24           MR. MURPHY:  Is what he said.

25      A    Okay.  Patricia Rich?

                                              105

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    And was she the person helping you

3  get a --

4      A    ITN.

5      Q    And then on February 7, 2018, the

6  next page, is when you make a determination

7  to contact the two employees of Art Now,

8   right?

9        A    Yes, sir.

10       Q    Okay.  We talked about that a

11  little bit.

12       A    Um-hmm.

13       Q    And that was -- that was in order

14  to determine, basically, whether or not

15  there was efficacy to your theory that

16  Louise Blouin is a controlling person of

17  either Art Media and/or Louise Blouin -- I'm

18  sorry, Art Now or Louise Blouin Media Inc.;

19  is that correct?

20       A    Yes.

21       Q    Is it safe to assume that, as of

22  that date, you did not feel that you had

23  sufficient evidence to make a claim for the

24  penalties against Louise Blouin?

25       A    I was trying to gain as much

↟

106

1        ROUGH DRAFT - FEBRUARY 10, 2023

2   information as I could in the absence of

3   being able to speak to Louise Blouin

4    herself, even though I'm sure she knew I

5    was -- I assume she knew I was trying to

6    reach out to her.  That was my intent, to

7    try get her to respond to my efforts to

8    collect, because all the other low level

9    employees just threw their hands up in the

10   air and said somebody else who never

11   materialized.

12       Q    Now, did you come to learn that

13   the payroll was actually handled by both Art

14   Now and Louise Blouin Media Inc. by a

15   company called Paychex?

16       A    Paychex?

17       Q    Yeah.

18       A    You mean the payroll service?

19       Q    Um-hmm.

20       A    I don't recall at this point in

21   time.  Is there an instance in the history

22   you can point to me and refresh my memory.

23       Q    Yes, on Page 81?

24       A    Okay.  And we are looking at --

25       Q    Right over here.

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         A     Well, if it's in the history, then

3    I made that determination, yes.

4         Q     And Paychex -- and that's Paychex

5    with an "X" at the end -- is a company that

6    provides a number of different services, but

7    one of the services they provide is they're

8    a vendor for payroll, right?

9         A     Yes, sir.

10        Q     And like many payroll companies,

11   do you have the understanding that they

12   actually manage the payment of employment

13   taxes for the underlying entity that they

14   serve as vendor for?

15        A     They manage, but they don't pay.

16        Q     No, no, I get that.  They manage

17   but they don't pay, right?

18        A     Yes.

19        Q     And there have been cases -- at

20   least I've read about them and maybe you're

21   aware of -- where certain, not vendors, also

22   don't pay employment tax, right, you've seen

23   these cases, right?

24        A     Um-hmm.

25      Q     Yes.

↑

1            ROUGH DRAFT - FEBRUARY 10, 2023

2       A     Yeah.

3       Q     Okay.  And did you contact Paychex

4    to determine whether they actually had been

5    paid the amount that was due for the

6    employment tax but simply hadn't turned it

7    over to the IRS?

8       A     I've known Paychex a long time.

9    And Paychex, the terms of their service are,

10   if they don't have enough to cover the 941

11   tax returns, they will not file a balance

12   due return for the taxpayer.

13      Q     Okay?

14      A     So they may have been managing the

15   payroll, meaning there might have been money

16   in account -- it could have been in a

17   different account under a different name

18   line.  She could have been -- actually a

19   couple of the responses I got from these two

20   employees, showed that their payroll came

21    from a different entity, BTB or something.

22    It's on there.  I'm sure you looked at it.

23              So at that point, I kind of

24    realized that, well, you know, they had her

25    on a -- they were paying her from a different

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    entity, which at that point was a little

3    outside the scope of my investigation.  Also,

4    if they were paying under Art Now, but they

5    didn't have sufficient deposits against the

6    account as it was accruing, meaning in this

7    case, I believe they would have been a month

8    monthly depositor, they would not have filed

9    the returns for them because Paychex does not

10    want to be even remotely be considered liable

11    for the filing of a balance due return.

12              And in many cases that I see where

13    I go to an employer and I was like, you don't

14    have any filed returns.  I see a few

15    deposits.  The employees got paid.  They got

16    paid, but the returns aren't there.  And

17    said, well, I use Paychex.  Talk to them.  I

18    was like, well, Paychex has a policy, if you

19    don't keep enough in your account to make all

20    the timely federal tax deposits, we absolve

21    ourselves of the responsibility of filing the

22    return.  And then they send the taxpayer a

23    copy of the partially completed return, right

24    up to, like, one of these lines here, saying,

25    yeah, where it says, deposits, we left that

↑

110

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    blank.  You take care of it.

3          And there are cases where I've

4    seen, like, look in that draw over there.

5    Q    Isn't it true that Paychex will

6    actually handle, for certain of its

7    customers, the payment of the employee tax?

8    A    They do have that service.  They

9    do offer that service.

10    Q    And if Paychex had been in charge

11    of that service for any of the companies

12    that you were investigating and hadn't

13    turned over the money, Paychex could

14    actually be liable for the penalty for Art

15    Media and Louise -- I'm sorry -- Art Now and

16    Louise Blouin Media Inc., the same as any

17    other person who would be responsible for

18    turning over the money?

19         A    I've never seen that in my 32

20    years.

21         Q    I'm just saying theoretically it's

22    possible, right?

23         A    I've never seen that in my 32-year

24    career, and I figured that was a dead end

25    right there after -- I put it in the history

111

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    at the time, but then later on I thought

3    better f it and said, Nope, that's a slow

4    BOAT to China.

5         Q    The point being this, is you are

6    familiar with Paychex, right?

7         A    Yes, sir, I am.

8         Q    And there are other companies like

9    them, right?

10        A    Yep.

11        Q    And from time to time those

12   companies do make mistakes, correct?

13        A    They make a lot of mistakes.

14        Q    And that's why you know of them,

15   right?

16        A    You know, I see where you're going

17   with this.

18        Q    Yeah, but you've got to go down

19   the path with me.

20        A    No, because you're going to try to

21   get me to agree with a supposition that is

22   so far off the base of this scenario, I'm

23   not going there.

24        Q    Okay.  But so answer the question

25   anyway, because that's what you're required

✦

112

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    to do.

3         A    Can you please restate the

4    question in a -- in another fashion so I can

5    answer.  Because, really, what you were

6    doing was you were compounding this and this

7    and this, and then you were getting to --

8        Q    Okay.

9             MR. MESSINGER:  Can I get the

10       question read back, please.

11            (Record read.)

12       A    I'm going to take the question you

13   way you put it together.  And at times those

14   companies make mistakes, yes, and that's why

15   you know of them, right?  That's two

16   questions, no.

17       Q    Okay.  Touche.

18            When you've approached those

19   companies before, haven't you, to inquire

20   about payroll when you're doing your

21   investigation, right?

22       A    Do you really want me to explain

23   my experience --

24       Q    I want you to answer the question.

25   Is part of the reasons you go to the

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    companies is because --

3        A    I don't normally go to Paychex.

4        Q    Okay.

5        A    Because of experience with their

6    bloated bureaucracy and their indifference

7    to many of their low level and maybe

8    mid-level clients.  I've had complaints from

9    taxpayers saying, they're not responding to

10   me.

11       Q    Okay.  So you're aware, at least

12   in your opinion, Paychex makes mistakes,

13   right?

14       A    That's on record.

15       Q    Okay.  And Paychex is not as

16   responsive to inquiries from revenue

17   officers as you would like them to be,

18   right?

19       A    True.

20       Q    And here, you are making a serious

21   allegation regarding a company that has not

22   turned over employee tax, correct?

23       A    That's correct the way you stated

24   it.

25       Q    And you're also dealing with a

⬆

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    person, Louise Blouin, who says she doesn't

3    have -- well, you never spoke to her, but

4    you would have --

5          A    Never.  Go ahead.

6          Q    -- you would assume that she would

7    say, I'm not the responsible person?

8          A    She never responded.

9          Q    Okay, but still, you didn't go to

10   Paychex and ask them whether Art Now or

11   Louise Blouin Media Inc. had the service

12   where they gave the employee tax to Paychex

13   to provide to the government, right?  You

14   didn't do that part?

15         A    No, I did not.

16         Q    Okay.  So when I read your notes,

17   I see that you focused your attention on

18   Louise Blouin, and you had stated the reason

19   why you did that is because her namesake or

20   initials were in the names of at least one

21   of the companies you were investigating, but

22    you saw her namesake in other ones, right?

23         A    Not just that, but, yes.   There

24    was more to it.

25         Q    And I love TV, and they always

⬆

115

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    say, Follow the evidence.

3         A    It's not just TV.

4         Q    And what I see from TV is a lot of

5    the detective shows say, don't draw your

6    conclusion, follow the evidence to the

7    conclusion.

8              Do you agree with that?

9         A    If we take the TV out of it, I am

10   an investigator and I'm not a TV show.   But,

11   yeah, you follow the evidence.

12        Q    And here, you made a conclusion,

13   because I see it in your documents, that you

14   were going to conclude that Louise Blouin

15   was going to be the target of your

16   investigation, correct?

17        A    That's how you read it.

18      Q      Okay.

19      A      My answer to your question is,

20    from the outset, it became evident that all

21    of the financial decisions were being made

22    or at least finalized or approved of by

23    Louise Blouin, which means what got paid was

24    from Louise saying, Pay it.  What didn't get

25    paid was from Louise either saying, Don't

↑

116

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    pay it, or dismissing it, or ignoring it.

3            There were no records in any of my

4    contacts or ^ Mr. Bronleewe's to show any

5    coherent, responsible fiscal management of

6    these U.S.-based entities that were paying

7    payroll taxes that had a responsibility to

8    withhold Social Security contributions from

9    employees, withhold federal income tax from

10    employees, and then trust them over to the

11    government.  That is what I saw.

12      Q      Okay.

13      A      So I hope I answered your

14    question.

15         Q    On Page 85 there is, on April 16,

16    2018, an indication of an address that says,

17    Change requested.  Address 376 Gin Lane,

18    Southampton, New York 11968.  And it says,

19    to, and it seems to change the address to

20    the same thing.

21              Do you see that?

22         A    Yep.

23         Q    What's going on here?

24         A    I respelled Lane from L-N to

25    L-A-N-E.

117

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    Oh, okay.

3         A    You got me.

4         Q    And what is an IDRS mailing

5    address?  What does that mean?

6         A    The IDRS address is the address

7    that is on IDRS, the Integrated Data

8    Retrieval System.

9         Q    And is this all in conjunction

10    with your attempts to assign to Ms. Blouin a

11    TIN number?

12         A    Are you saying -- are you using

13    the 4/16/2018 history entry to help me

14    clarify what your question is asking for?

15         Q    Well, let me ask you differently.

16         A    I'm not understanding.

17         Q    Yeah, yeah, that's okay.  So I'll

18    reask it.

19              What is this address being used

20    for?  Why is the address in this document to

21    begin with?

22         A    During the life of the

23    investigation, there were many different

24    address changes for Louise Blouin and all of

25    her entities, including Art Now, LBM.  I

➴

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    believe there was 165 Charles Street LLC,

3    Aberdeen, and they all bounced around and

4    you could see in my history I walked from --

5    take you on a tour, take an hour to do the

6    loop downtown.

7            And every one, they all ended up

8    being vacated.  In one case, I think the 80

9    Broad Street, she was evicted, then she paid

10   her -- paid her back rent and moved over to

11   77 Water Street, but in between there she put

12   in an address change to 376 Gin Lane for LBM

13   Inc.  I've got the envelope.

14            MR. MURPHY:  Those were Art Now,

15        isn't it?

16            THE WITNESS:  Was it Art Now?

17        It's one of those two.  But anyway,

18        that's how -- that's one of the reason,

19        like, whoa, this is now the mailing

20        address.  And then when I sent it out

21        to get mailed, they change it to

22        77 Water Street.  So this woman changed

23        addresses from 601 26th Street, to

24        what, five, six different addresses for

25        various reasons.

↑

1            ROUGH DRAFT - FEBRUARY 10, 2023

```
2              So the only address that I knew

3         for sure that I could rely on that was

4         not an address that was not as a tenant

5         of a building that is subject to being

6         evicted or just moving for reason of,

7         you know, unsuitability, was that

8         address that was, for all intent and

9         purposes, Louise Blouin's property.

10        Whether she's the director or owner or

11        whatever name you want to call it.

12             (Whereupon,

13             Description

14             were/was              marked as

15             Party                         for

16             identification, as of this date.)

17    Q    I'm showing you what we've marked

18   as your deposition Exhibit 12.

19             Do you see that?

20    A    Yes, sir.

21    Q    What is that?

22    A    That is a letter 1153.

23    Q    Got it.  What is it trying to do?

24    A    It's self-explanatory in the body

25   of the letter.  Without reading it, it is a
```

1          ROUGH DRAFT - FEBRUARY 10, 2023

2     proposal for the assessment of liabilities

3     covered under IRC Section 6672, also known

4     as the trust fund recovery penalty.

5          Q     And you sent the same letter in

6     regard to Louise Blouin Media, too, correct?

7          A     Yes.

8          Q     And they were both addressed the

9     same way, right?

10         A     They looked similar to this.

11         Q     And the address on it was the

12    same, which is 3663-76 Gin Lane, correct?

13         A     Yes.

14         Q     And did you come to realize --

15    this letter was returned, right?

16         A     The letter was returned.

17         Q     And it was returned, as you can

18    see, as undeliverable, right?

19         A     Yes.

20         Q     And just so we know how this

21    letter kind of operates is, is the IRS uses

22    envelopes with windows in them, right?

23      A    In this case it did.

24      Q    And there are different types of

25  envelopes with windows.  Sometimes you fold

↥

121

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   them in half and it will show through one

3   window; you trifold it, it shows through

4   another window.  You get what I mean, right?

5       A    Yes.

6       Q    Okay.  And this is a trifold

7   letter, correct?

8       A    Yes, sir.

9       Q    And the window, is -- the window

10  will show through it the address that's on

11  the letter so someone doesn't have to go

12  through and write the letter, right?

13      A    Yes.

14      Q    What's manually done is you also

15  have a green card, right, that you attach to

16  the letter?

17      A    Yes, sir.

18      Q    And you hope to get that green

19    card back signed so that you can prove that

20    the person you sent to received it, right?

21        A    Exactly.

22        Q    And in regard to this letter, it

23    got returned as undeliverable, right?

24        A    Yes, sir.

25        Q    And there is no explanation

⬆

                                        122

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    regarding why the letter was returned

3    undelivered except it says, Return to

4    center.  Undeliverable as addressed.  Unable

5    to forward.

6            Isn't that what the post office

7    said to you?

8        A    If it's there --

9        Q    Oh, did I not give it to you?

10        A    No.  I know exactly what you're

11    talking about.

12        Q    It's right in front of you.

13        A    No, I looked at the letter as

14    recently as about a month ago, maybe not

15    even, maybe less, yes.  And that is correct.

16         Q    And when you got it back, you

17    wrote the address on the envelope; isn't

18    that what you did?

19         A    For Art Now, I did.

20         Q    Okay.  And you wrote it after it

21    already came back to you?

22         A    Yes, I did.

23         Q    And you wrote that address

24    differently than what the letter's addressed

25    to; isn't that correct?

&#9650;

                                         123

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         A    Are you referring to the line on

3    the bottom in blue?

4         Q    I'm referring to Exhibit No. 12 --

5         A    Okay.

6         Q    -- the first page.

7         A    Let me take a look at it.

8         Q    The first page.

9         A    Okay, yeah --

10        Q    And the address that shows through

11   the window to direct the mailman where to

12   deliver it is 366376 Gin Lane, correct?

13       A    The numbers do run into each

14   other.

15       Q    And did you make a determination

16   as to why the letter was returned to the IRS

17   as undeliverable?

18       A    I considered the possibility that

19   nobody was there to receive it.  As far as,

20   as addressed, I could assume that perhaps

21   the mail carrier looked at that address and

22   said, I don't know a 366376 Gin Lane.

23   That's within the realm of possibility, yes.

24       Q    In fact, today when I'm pointing

25   that out to you is actually the first time

✦

124

1        ROUGH DRAFT - FEBRUARY 10, 2023

2   you thought about why it wasn't delivered,

3   correct, in the way I said?

4       A    Well, I looked at both letters

5   because there's one for LBM Inc. too, and if

6   you look at that one, you'll see that the

7    mail delivery response was different than

8    Art Now.

9         Q    Okay.  And we'll see that.

10        A    And also, if I might direct your

11   attention, if you look at the green card,

12   any mail carrier could have turned over and

13   seen that the address was a little bit

14   more -- no, no, this one said Southampton

15   too.

16        Q    Yeah.  So I'm not here to

17   criticize postal workers, but --

18        A    But the ZIP code was right.

19        Q    Right.  And, again, I don't want

20   to criticize our fine postal workers because

21   I think they do a great job, as I believe

22   the IRS does.

23        A    I'm not here for -- yeah.

24        Q    But the reason why you were

25   sending this letter is in order to advise,

↑

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    as you're required to do, the responsible

3    party of the IRS's intention to impose the

4    TR --

5         A    TFRP.

6         Q    -- TFRP penalties, correct?

7         A    Correct.

8         Q    And moreover, you sent -- and

9    that's why you mailed this letter, right?

10        A    Yes, sir.

11        Q    And that's why you mailed the

12   letter to Louise Blouin in regard to Louise

13   Blouin Media, right?

14        A    Both the letters were sent for the

15   same purpose.

16        Q    And they both came back?

17        A    They both came back at different

18   times.

19        Q    And you didn't resend them, did

20   you?

21        A    No, I did not.

22        Q    And you didn't notice that the

23   house number on the letters was not correct

24   on either letter, correct?

25        A    I did notice that they ran

⬆

126

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    together, that's why I put the line in

3    between the two.

4         Q    Did you do that before or after

5    you mailed the letter?

6         A    What do you have there?  Is this

7    on the mail?

8         Q    I can tell you that, on every

9    single one that I have, there's a cross

10   through the two numbers.

11        A    So, yes, this went on before I put

12   it in the trifold letter.

13        Q    You're not using, like, an

14   automatic printer with a fold machine and

15   that does your mass mailings and you --

16        A    No, I manually put this in.

17        Q    And did you get any stamp from the

18   post office to represent that you had sent

19   the letter out by a certified mail?

20        A    Yes, it was the -- I believe --

21   well, it's the other portion on the

22   second-to-last page here where you see the

23   green thing here that was the certificate

24   that we paid the postage on it.

25         Q    And did you walk that to the post

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    office to do that?

3         A    No, I dropped it in my mail drop.

4         Q    And tell me where your mail drop

5    is.

6         A    It would have been in a box on the

7    floor of 290 Broadway, Sixth floor.

8         Q    And do you actually know how it

9    gets from 290 Broadway, Sixth Floor, or do

10   you just rely upon them to do it?

11        A    No, I know the mailroom process,

12   too.

13        Q    All right.  And is that your

14   handwriting on the U.S. Postal Service

15   Certified Mail receipt?

16        A    That is mine.

17        Q    And besides the two notices, one

18   in regard to Art Now Inc and the other in

19   regard to Louise Blouin Media, did you send

20  any other notices regarding the possible

21  imposition of the TFRP on Ms. Blouin?

22      A    Prior to the assessment, no.

23  These are the only two notices.

24      Q    And to the best of your knowledge,

25  neither one of the notices were delivered;

128

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  is that right?

3      A    I -- I'm having a tough time

4  understanding what the postal service meant

5  when they returned these, because if you

6  look at the one for Louise -- LBM Inc. which

7  I see you haven't entered in as --

8          (Discussion held off the record.)

9          (Whereupon, at time            , a

10         recess was taken to time

11                  )

12         (The proceeding resumed with all

13         parties present.)

14         (Whereupon,

15         Description

```
16              were/was            marked as

17              Party                     for

18              identification, as of this date.)

19       Q    I'm showing you what we marked as

20   your Deposition No. 13.  This is the letter

21   that is similar.  It's 1153 letter, right?

22   I'm learning all your terminology.  But this

23   is the one that was sent to Ms. Blouin for

24   Louise Blouin Media Inc., correct?

25       A    Yes, sir.
```

⬆

129

```
1          ROUGH DRAFT - FEBRUARY 10, 2023

2       Q    And it's addressed the same,

3    366376.

4       A    Yes, sir.

5       Q    And it has -- also it was returned

6    as undeliverable, right?

7       A    Yes.  But not in the same context

8    as the Art Now.

9       Q    Okay.  What is -- I mean, I can't

10   read what it says, so what do you think it

11   says?
```

12      A    Well, having the benefit of having

13    had access to the original before I produced

14    the document, it says -- when it says,

15    Returned to, under there it -- in the

16    beginning, before that IRS sticker, it says,

17    Unclaimed, unable to forward.  Unclaimed,

18    which means an attempt -- this certifies an

19    attempt was made to deliver the envelope to

20    that address.

21      Q    Okay.  And at the time you sent

22    this letter, these two letters, both Exhibit

23    12 and 13, you knew that Louise Blouin was a

24    Canadian citizen, correct?

25      A    Yes.

130

1         ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    You knew that she did not live in

3    the United States, correct?

4      A    Yes.

5      Q    You knew that she either had her

6    residence in Switzerland or the United

7    Kingdom, correct?

8       A    Yes.

9       Q    Okay.  You didn't undertake any

10  investigation to determine her address in

11  either Switzerland or the United Kingdom,

12  did you?

13      A    I had no one to ask what her

14  actual address was.

15      Q    Okay.  But here in United States,

16  you can run an ^ Accurate report, correct?

17      A    I did run it.

18      Q    Okay, you did run it?

19      A    That was part of the evidence.

20      Q    And that will pull up information

21  that, as you know, that coordinate people

22  with certain locations, correct?

23      A    ^ Accurate, despite its title, ^

24   --

25      Q    Yeah, I agree.

↑

                                    131

1          ROUGH DRAFT - FEBRUARY 10, 2023

2       A    -- is not as accurate.  And it

3   really can't be used as a source of

4      information to change someone's address to

5      mail IRS notices such as this.

6          Q    Okay.  So you're required under

7      the code to send notices of the type of the

8      1153 letter to a person's last known

9      address, correct?

10         A    Exactly.

11         Q    And you've been out to the house

12     before you mailed this notice, right,

13     because you were doing your investigation?

14         A    No, I did not.

15         Q    When you went out to the house,

16     did you find anybody home?

17         A    Okay.  No, I didn't.  But I went

18     out to the house in an effort to collect the

19     assessments.  So there was a significant

20     period of time that had elapsed, I think

21     maybe a year.

22         Q    Okay.  And there are methods.  In

23     fact, I saw either you or one of your

24     counterparts in one of the notes saying that

25     they had -- and maybe I can find it for you,

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    but you may recall it -- had contacted their

3    counterpart with the name of the person to

4    investigate certain addresses over there,

5    right?

6        A    The question is worded too

7    vaguely; I don't know what you're asking

8    for.

9        Q    Well, didn't someone who was a

10   revenue officer contact in Europe, the

11   counterpart -- I'm using the word that's in

12   the note -- to investigate certain

13   addresses?

14       A    Where, might I ask, are you

15   getting this information?

16       Q    I might be able to find it.

17       A    Because that, you've got me

18   stumped on that.

19       Q    Well, is there a way that you can

20   find someone's last known address in Europe

21   if you wanted to?

22       A    I will actually answer the

23   question that you're ultimately going to get

24   to.  Why didn't I.  A --

25      Q     No, first answer my question is,

↟

1            ROUGH DRAFT - FEBRUARY 10, 2023

2      aren't there ways to locate people in

3      Europe?

4      A     There is an international unit,

5      and it depends upon what country has a

6      treaty with us that will allow us to operate

7      or carry out certain functions in their

8      country.  Like Greece, forget about it.  I

9      don't know what Switzerland was.  UK, I

10     would imagine, yes.

11     Q     And what efforts did you take to

12     locate a last known address for Ms. Blouin

13     who you knew was a Canadian citizen living

14     in Europe?

15     A     I didn't have to.  The last known

16     address is 366376 Gin Lane.

17     Q     But you never confirmed that she

18     actually lived there, right?

19     A     That was her last best confirmed

20     address of a U.S.-based interest that she

21  owned.  I knew that wasn't going to change.

22  And that is all I was required.  I was not

23  required to go overseas and send whatever

24  agent that may be allowed to walk around the

25  streets of a foreign country to start

↑

134

1           ROUGH DRAFT - FEBRUARY 10, 2023

2  knocking on doors.

3      Q    No, I don't think agree with that;

4  I think you were required.

5      A    No, sir.  You show me in the

6  manual where it's required, and I will

7  change the response to this question.

8      Q    And you spoke about a manual, what

9  manual are you speaking of?

10     A    Internal Revenue Manual, IRM for

11  short.

12     Q    And did you produce that?

13     A    It's official use only.  I don't

14  believe I can provide the IRM, that you

15  would have to go through some other

16  disclosure process to get access to that.  I

17    don't walk with one in my back pocket -- I

18    mean, they do have them online.

19        Q    Accessible to me?

20            MR. MURPHY:   IRM is on the

21        Internet, yeah.

22            MR. MESSINGER:   Okay.   I guess I

23        should have known that before I got out

24        here, huh?  Oh, well.

25        Q    Now, at some point, you determined

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    to recommend that TFTR penalties -- it's not

3    actually penalties, it's TPRP -- should be

4    imposed or notified Ms. Blouin that they

5    should be imposed against her, correct?

6        A    I correct your terminology;

7    assessed.   It's two processes.   This letter

8    proposes --

9        Q    Yeah.

10        A    -- failure to respond in a timely

11    fashion results in assessment.

12        Q    Okay.   So what happened is, after

13    the March -- or sorry, the July 10, 2018,

14    letter went out, 45 days passed, and then

15    they were imposed; is that fair?

16        A    Yes.  Actually, it's 65 days.

17        Q    Did you allow for some

18    back-and-forth?

19        A    Well, actually, the IRM specifies

20    60 days, but we allow five days for mailing.

21        Q    Okay.  And your investigation, you

22    wrote a memo, right?  You wrote a big long

23    memo about your investigation, right?

24            MR. MURPHY:  Are you talking about

25        the TFRP?

♠

136

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Are you talking about the TFRP?

3        Q    Yeah, yeah.

4        A    There are a lot of memos.

5        Q    There's a memo that's prepared for

6    someone to review before the TFRP is --

7        A    No, there is not.

8        Q    Okay.  Well, what was the memo

9    that you wrote -- and, frankly, it's been

10   redacted.

11        A    Okay.  Now you're going into -- is

12   that the file for Louise Blouin?

13        Q    Yes.

14        A    That's after the penalty was

15   assessed, and the memo you're referring

16   to -- I hope you don't mind me volunteering

17   stuff.  We want to get to it.

18             This is a memo recommending

19   approval to file the nominee lien.

20        Q    I got you.  I got you.  That is

21   what I meant to say.

22             So after the assessment is

23   approved, now you're looking for -- after

24   the assessment is imposed --

25        A    Assessed.

✦

137

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         MR. MURPHY:  After the assessment

3    is made.

4         Q    After the assessment is made --

5    thank you -- you're now looking to collect

6    on it, right?

7        A    Yes, sir.

8        Q    And one of the ways the IRS may

9    try to check on it is by searching for

10   information that links certain property,

11   companies, other people, to the person that

12   has been assessed, right?

13       A    We look for assets on which to

14   effect collection is how I would put it.

15       Q    And first of all, why is this

16   redacted, this memo that you wrote?

17       A    Attorney/client privilege.

18            MR. MURPHY:  The redaction was

19            done by me, so I can direct you to the

20            privilege log entry.

21       Q    So when you wrote the memo, it

22   hadn't yet been determined yet whether you

23   could proceed against Brickchurch as

24   nominee, correct?

25       A    Correct.

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    Okay.  And you were actually

3  considering two companies to impose nominee

4  liability against for the penalties imposed

5  against Ms. Blouin, correct?

6      A    If you mean file a nominee lien,

7  yes.

8      Q    One company was a Delaware

9  corporation called Brickchurch Enterprises

10  Inc., correct?

11      A    Correct.

12      Q    The other company was -- and I

13  know about the recent filings, don't

14  worry -- but the other company was called

15  Aberdeen Enterprises Holdings BVI Limited,

16  correct?

17      A    I did request filing a nominee

18  lien on that.

19      Q    Okay.  And why did you ask for

20  authority to file it against Aberdeen

21  Enterprises Holdings BVI Limited?

22      A    Because I thought Aberdeen Holding

23  BVI was owner of the property of 366, right?

24  Yeah, Brickchurch is 376?

25      Q    No, it's the other way.

✦

139

1          ROUGH DRAFT - FEBRUARY 10, 2023

2       A    Okay.  Got it.

3       Q    So you thought through your

4    research that the company I'm going to call

5    it the holding company, the BVI holding

6    company, was the owner the 376 Gin Lane?

7       A    Right.

8       Q    And you figured that out how?

9       A    To be honest, I confused the

10   two -- there are three Aberdeens.

11      Q    I know that?

12      A    Three layers of Aberdeen, and they

13   all end up at Louise Blouin, and I when I

14   summonsed for information from Mazars for

15   her, you know, accounting stuff, it became

16   clear to me that Aberdeen was owner of, you

17   know, that property vis-a-vis through

18   Aberdeen Enterprises.

19      Q    So here's what has transpired

20   since, okay.  You filed a federal tax lien

21   against the property for Aberdeen Holding --

22    Aberdeen Holdings BVI Limited.  And you now

23    recently, I think you know, filed another

24    lien, federal tax lien seeking the same

25    stuff against Aberdeen Enterprises Inc.; is

↑

140

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    that right?

3         A    Correct.

4         Q    Did you withdraw the ones against

5    Holdings?

6         A    No, I did not.

7         Q    Why not?

8         A    Because I established the fact

9    that Aberdeen Holdings BVI is also a nominee

10   of Louise Blouin, as well as all three of

11   those Aberdeens, they're all her.

12        Q    Okay.  But be that as it may --

13        A    At least that's the conclusion I

14   draw.  And then I had gotten counsel

15   approval to file it on Aberdeen BVI.

16        Q    True or false, right?  You'll love

17   this question.  The reason why you filed

18    against -- in the clerk's office of Suffolk

19    County is you because you believe you're

20    creating a lien against the property, right?

21         A    Yes, I am.

22         Q    And in order to file a federal tax

23    lien, you have to name the owner of the

24    property; isn't that correct?

25         A    Actually, I have to identify the

141

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    taxpayer.

3         Q    Okay?

4         A    I don't necessary file a lien just

5    specifically against the property.  It

6    depends on what the entity is.  Usually, if

7    it's a business, you would file that lien

8    with the Secretary of State of New York,

9    right, unless you know that there's property

10   that that company has an interest.  Now,

11   true, I mistook the fact that Aberdeen

12   Enterprises and Aberdeen Enterprises BVI

13   Inc., because there were a lot of Aberdeens

14   for me to weed through, yet I had evidence

15   to show that Louise Blouin was Aberdeen BVI,

16   and at the end of the day, there is title --

17   or at least some -- because Aberdeen is --

18   Enterprises is owned by Aberdeen BVI, the

19   next on the list.  You have a chart right

20   there, actually.

21        Q    Actually, the chart would reveal

22   that that's not correct either.  And we'll

23   look at the chart.

24        A    Okay.

25        Q    But I want to first talk to you

➤

1         ROUGH DRAFT - FEBRUARY 10, 2023

2   about, do you agree that filing the federal

3   tax lien against Aberdeen Enterprises

4   Holdings BVI Limited was an error, and

5   that's why you filed these new liens?

6        A    I'm not going to call it an error.

7   I'm going to call it, it wasn't as precise

8   as it could be, because Aberdeen BVI, by

9   having the lien on file, clouds the title to

10    that property just in case the taxpayer

11    chooses to refinance it or sell it.

12        Q    Okay.  But you now have two liens

13    filed against one property, and is that

14    appropriate?

15        A    It does not necessarily mean that

16    we are going to collect the liability twice,

17    so, no.

18        Q    But you've clouded the title,

19    correct?

20        A    Correct.

21        Q    And you're clouding the title

22    because --

23        A    I want full payment of the

24    liability.

25        Q    No, I understand that.  Did

↟

                                                143

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    there's laws about this, right?  The reason

3    why you thought you meant to name the owner

4    of the property when you filed the original

5    tax lien, correct?

6      A    It was property specific.

7      Q    And you named the wrong owner in

8  that lien, correct?

9           Let me ask you this question.  I

10  know the names are similar, right?

11      A    Um-hmm.

12      Q    Do you think you can effectuate a

13  federal tax lien by filing a tax lien much

14  the way you did with a proper property

15  address but name Brett Messenger as the

16  owner of the property?

17      A    You kind of threw me for a loop by

18  throwing your name into this.  Could you

19  rephrase the question, please?

20      Q    Yeah, I will.  Could you name

21  Mr. Murphy, Edward Murphy as the owner of a

22  property filed against the property with

23  that property description.  Could you do

24  that?  Does it matter what the name is?

25      A    Yes, it does matter.

144

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      Q      And the reason why it matters is

3   because part of the federal tax lien, you

4   need to file it against the owner of the

5   property, right?

6            MR. MURPHY:  I'm going to object

7         this calls For a legal analysis.

8            MR. MESSINGER:  But he files them.

9            MR. MURPHY:  The law will be

10        whatever it is.  You can make your

11        arguments on the record.

12     Q      What's the answer.

13     A      I don't have an answer for you.

14   Can I say that?

15     Q      You can say you don't know the

16   answer.

17     A      I don't know the answer to your

18   question.

19     Q      Okay.

20            (Whereupon,

21            Description

22            were/was            marked as

23            Party                      for

24            identification, as of this date.)

25     Q      I'm showing you what we marked as

145

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    your deposition Exhibit No. 14.

3               Do you have it in front of you?

4        A    Yes, sir.

5        Q    Okay.  So we talked about the memo

6    that you drafted that is privileged

7    according to your counsel.  The memo set

8    forth -- don't tell me what's in it because

9    he asserts privilege -- the reasons why you

10   believe that Aberdeen Holdings and

11   Brickchurch Enterprises were the alter ego

12   of Louise Blouin, got it?

13       A    That's incorrect.  Nominee.

14       Q    What I did say?

15       A    Alter ego.

16       Q    You don't claim that it's the

17   alter ego, you claim the nominee?  You're

18   nodding yes.

19       A    Yes.  I'm sorry.

20            MR. MURPHY:  The memo was only

21       about the nominee.

22       Q    And do you claim that there is any

23    alter ego liability on behalf of any entity

24    called Brickchurch, any entity called

25    Aberdeen for Louise Blouin?

↟

                                          146

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         A    In that memo, I did not.

3         Q    Okay.  What about today, as you're

4    sitting here today?

5         A    Yes.  Because of the subsequent

6    alter ego liens that I filed that I gave

7    notice to your partner, Tom Ostrander?

8         Q    Yeah, he said you're a really nice

9    guy by the way.

10        A    Don't let anybody know that.  So,

11   yeah, there you go.  I did come to that

12   conclusion, alter ego.

13        Q    And did you write a memo on that

14   too?

15        A    No, I did not.

16        Q    And what do you base the alter ego

17   on?

18        A    Advice of counsel.

19      Q      Okay.  Did you do any further

20   investigation.

21      A      I didn't need to; advice of

22   counsel.

23      Q      So in regard to the -- attached to

24   the memo was a number of exhibits, right?

25   You're shaking your head.

➤

1              ROUGH DRAFT - FEBRUARY 10, 2023

2      A      Yes, sir.

3      Q      Okay.  And the exhibits that were

4   attached to your memo was your evidence that

5   Brickchurch and Aberdeen should be treated

6   as the nominee of Louise Blouin, correct?

7      A      Yes, sir.

8      Q      And do you agree that Exhibit 14

9   are those exhibits?

10      A      My cursory glance through without

11   going through every page if you'd like me

12   to.  Should I go through every page?

13   Should --

14              THE WITNESS:  I ask my counsel,

15      should I go through every page?

16          MR. MURPHY:  If that's what he

17      wants you to do.

18      Q    If you want to.  I will tell you

19  this, that I printed them out as they were

20  produced.

21          MR. MURPHY:  Exhibit A through R

22      that I sent to you?

23          MR. MESSINGER:  Yeah, you did.

24      You actually had them bookmarked.

25          MR. MURPHY:  Oh, okay.

↟

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      A    I have to go with advice of

3  counsel.

4      Q    Yeah.

5      A    I don't have any reason to believe

6  you would leave anything out, so, yes, these

7  look familiar.

8      Q    Okay.  First one is a private

9  corporate structure, you see that, right?

10     A    Yes.

11      Q    And this is something you created,

12  right?

13      A    No, I got this from Mazars.

14      Q    Okay.  And by the way, there's

15  nothing -- in your view, there's nothing

16  wrong with people having single asset

17  entities, right?

18      A    If it's provided for in the law,

19  no.

20      Q    And not everybody who has -- I

21  meant to single purpose entity.  Not

22  everybody who has a single purpose entity is

23  avoiding, illegally, tax liability, right?

24      A    Not everybody is, thankfully.

25      Q    Okay.  And so long as it's allowed

⬆

                                        149

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  under the law, the IRS doesn't have any

3  objection to it, so long as there is no law

4  violated, right?

5      A    You are correct.

6      Q    Can't use them to avoid the

7    payment of taxes that are due and the like,

8    right?

9         A    That sounds like a universal

10   statement here.  I can't agree with a

11   universal statement.  Every taxpayer

12   operates their single purpose entity

13   differently.  In this case, I did not see

14   this being operated as a single purpose.

15        Q    Now, let's just talk about a

16   couple of things in regard to nominee

17   liability, okay?

18             One of the things that the IRS is

19   trying to determine is whether certain

20   property has been transferred from the

21   liable party to an entity in order to avoid

22   tax liability?

23        A    Is that the case here?

24        Q    I'm just asking, it's not one of

25   the things you're looking for.

↑

150

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         A    In this case, no.  The property

3    stayed right where it was at.

4         Q    In fact, you learned from your

5    investigation that the property has been

6    titled the same way for about ten years

7    prior to any liability being imposed against

8    Art Now or Louise Blouin; isn't that right?

9         A    I agree.

10        Q    And moreover is, there seems to be

11   another lapse of approximately 18 years from

12   the time that the property was titled into

13   Brickchurch Enterprises Inc. and Aberdeen

14   Enterprises Inc. before the IRS even tried

15   to assess any liability against Louise

16   Blouin.

17             Do you agree with that?

18        A    Yes, I do.

19        Q    And there was never any finding on

20   your behalf that the property was placed in

21   either Brickchurch's or Aberdeen's name in

22   anticipation of any lawsuit or claim by the

23   IRS; isn't that right?

24        A    Yeah.

25        Q    Okay.  And there are no allegation

     1              ROUGH DRAFT - FEBRUARY 10, 2023

     2     that any of the deeds to the property were

     3     not recorded in the public regard; isn't

     4     that correct?

     5          A     Absolutely correct.

     6          Q     And, in fact, there's no

     7     allegation or no discovery during your

     8     investigation that Louise Blouin actually

     9     ever owned these properties or was the

    10     titled owner to these properties; is that

    11     correct?

    12          A     Well, the documents that I

    13     discovered that she signed all of the

    14     pertinent things with respect to returns and

    15     directing, you know, the financial

    16     management of those properties, so she was,

    17     obviously --

    18          Q     I'm just going through the

    19     elements.

    20          A     Because -- because wait.  I've got

    21     to stop you, because the line of questioning

    22     that you led up to just to that last one

    23     when were you saying long before the

24    liabilities of Art Now and LBM Inc., the

25    scenario you were describing is a transferee

&uarr;

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    liability, which places things beyond reach

3    of the government in anticipate of a

4    liability, which you alluded to, didn't

5    exist at the time that she owed it, and

6    that's not the scenario that I was trying to

7    establish here, so that line of question

8    is -- is wrong.

9        Q    Okay.  Well, it's not wrong, and

10    I'm going to ask the questions in the way I

11    want.

12        A    Yes, sir.

13        Q    I've done --

14        A    I'm just clarifying.

15        Q    -- that your counsel did also is,

16    I also researched the law.

17        A    I'd love to see the code.  Show

18    me, please.

19        Q    Well, it's in cases interpreting

20    code.

21        A    Oh, okay.  Continue, please,

22    Counselor.

23        Q    Did you find that Brickchurch or

24    Aberdeen, when the property was originally

25    transferred to them, that there was lack of

153

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    consideration or any enumeration paid for

3    the properties?

4        A    Well, Aberdeen was the original

5    owner of both properties.  It was one lot.

6    And they granted for no consideration the

7    property be split in two between 376 and

8    366, even though the physical boundaries of

9    the property really are two houses on one

10    lot.

11        Q    Yeah.  So but during your

12    investigation, did you determine why that

13    might have been done?

14        A    No.  I didn't really see a need

15    for it.  I saw it as one piece of property

16    that was ultimately owned by Louise Blouin,

17    irrespective of the -- and I'll use the word

18    "sham entities" that she used to at least

19    hold them here in the United States without

20    the benefit of any other tax ID number, much

21    like her private companies, LBM Inc., Art

22    Now, and some of these other alphabet letter

23    entities that are still floating out to

24    there that I did poke into too.  So I looked

25    at this in a much broader term.

                                                        154

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    So you got the information from a

3    subpoena from Louise -- Ms. Blouin's

4    accountant Marza or whoever, correct?

5      A    Mazars, yeah.

6      Q    Okay, Mazars.  And they produced

7    to you a corporate structure --

8      A    Yes.

9      Q    This right here.

10     A    Sorry.

11     Q    And you came to learn that Louise

12   Blouin owns a holding company in the British

13   Virgin Islands, correct?

14       A    Aberdeen Enterprises Holdings BVI.

15       Q    Okay.  And you learned that that

16   holding company had three other companies,

17   correct, in the British Virgin Islands,

18   right?

19       A    Yes.

20       Q    Correct?

21       A    Yes, sir.

22       Q    And that each of those three

23   British Virgin Island companies owned

24   various corporations that then owned three

25   different pieces of property, right?

➤

155

1            ROUGH DRAFT - FEBRUARY 10, 2023

2       A    Yes.

3       Q    And anything unusual about --

4   illegal or unusual or anything about that

5   that's illegal?

6       A    When I started reading the emails

7   back-and-forth between Mazars, it became

8    evident to me that the accountants were

9    having a tough time explaining the

10   relationship, and they were the ones who

11   came up with this chart so that they could

12   file returns so that they could get current

13   on the unfiled returns, for at least

14   Aberdeen, I believe it was BVI, right?

15        Q    Um-hmm.

16        A    And Aberdeen here so they could

17   sell the 165 Charles Street.

18        Q    Right.

19        A    So they ended up having to, much

20   as in the case of Brickchurch where they had

21   unfiled returns at the time they were trying

22   to enter into a financing agreement, they

23   had to get current on those returns that

24   they filed.  And they suddenly were all

25   filed on the same day.

⬆

                                          156

1         ROUGH DRAFT - FEBRUARY 10, 2023

2         Q    Okay.  Well, that's what you want

3    them to do, right?

4       A    And by the way, this is, when I

5   did my research on, you know, these various

6   entities, I saw the same pattern.  You see,

7   you know, you're trying to box me into a

8   very narrow, defined scope of investigation,

9   when I was looking -- I was looking at

10  patterns and habits that all of Louise

11  Blouin's entities exhibited.  And I found

12  commonalties in all of them.  And that too

13  went into my calculation to determine that

14  these were all nominees of her.

15      Q    Okay.

16           So, just moving on here.  The next

17  exhibit that you had in your memo was, you

18  searched the clerk's office for reported

19  deeds involving -- I don't know what

20  property this is, but I think it's 366 Gin

21  Lane; is that right?

22      A    Let me see where you're at.  Is it

23  fairly on the top here?

24      Q    It's actually on the second page

25  of the exhibit.

157

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      A    Got it.  This one.

3      Q    And then you pulled all the deeds,

4  right, and you also pulled the mortgage,

5  right?

6      A    I pulled the ones that I could.

7  The original deed for Aberdeen wasn't on the

8  system.

9      Q    Oh, really.

10     A    I didn't see it.

11     Q    Okay.

12     A    So the earliest one I pulled was

13  for the Brickchurch Enterprises, where it

14  says grantor or grantee, and that was when

15  they granted the easement between the two.

16     Q    Okay?

17     A    And from there, I just deduced

18  that Aberdeen was the original owner of the

19  property.

20     Q    And you just got the -- you got

21  the wrong Aberdeen property?

22     A    Well, the way the records were,

23  they were incomplete too, because, you know,

24  there were Aberdeen Enterprises and well,

25    here you have Brickchurch Enterprises Inc.,

⬆

158

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    Aberdeen Enterprises Inc., but now you're

3    telling me Brickchurch is DE, and then

4    suddenly we learn Aberdeen is DE.  So the

5    names kept changing, really, to make things

6    confusing.  Now I don't know whether that

7    was done purposefully or whether it was just

8    poor management of their property and losing

9    track of their names.

10       Q    Okay.  So when we look at the deed

11    from Aberdeen Enterprises Inc., the one that

12    you had, right?

13       A    Um-hmm.

14       Q    The one that's dated August 23,

15    2000.

16            Do you see that?

17       A    Yes, sir.

18       Q    Okay.  And it says Aberdeen

19    Enterprises Inc., right?

20       A    Yes, sir.

21      Q    And it says to Brickchurch

22   Enterprises Inc., right?

23      A    Um-hmm.

24      Q    And that's how 366 gets to be

25   owned by Brickchurch, right?

➤

159

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      A    Agree.

3      Q    Okay .is there anything that's

4   unsound about or made you believe from this

5   deed that Aberdeen Enterprises Inc. was not

6   the prior owner of that property?

7      A    Nope.

8      Q    Okay.  And did you also -- you

9   also got from, as another one of your

10   exhibits if you keep paging through, is that

11   you got from the accountant's information

12   regarding the identity historically of the

13   directors of Aberdeen Enterprises Holdings

14   BVI Limited, right?

15      A    Yes, I see that.

16      Q    And did that identify Louise

17    Blouin as being even a director of Aberdeen

18    Enterprises Holdings BVI Limited?

19        A    The first three resigned.

20        Q    Right.

21        A    And they resigned, obviously,

22    because they were investors, you know,

23    Morgan Trust Company, so they probably had

24    some fiscal financing agreement in there and

25    requested that they be listed as directors.

♠

160

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    Matthew A. Kabatoff is Louise's husband.

3        Q    Right.

4        A    And I also found out when Matthew

5    was her state-side representative for, you

6    know, the transactions, especially during

7    the sales of the Charles Street apartment,

8    he was the one who came in her behalf to

9    sign the returns and to, you know, make sure

10    the sale went through and, you know, act as

11    her agent.

12        Q    Did you talk to him?

13      A    No.  He wasn't in the country.

14      Q    Okay.  He's also not a U.S.

15  citizen, correct?

16      A    He's Canadian if I'm not mistaken.

17      Q    You're not mistaken.

18      A    But he was educated in California;

19  he went to the University of --

20      Q    A lot of the Canadians come

21  through the great United States.

22      A    There's no harm in it.  No law

23  against Canadians.

24      Q    We love our brothers up to the

25  north.

161

1        ROUGH DRAFT - FEBRUARY 10, 2023

2            Anyway, please.  I'm sorry.  I

3  didn't mean to slow this down.

4            Okay.  And then you also had -- if

5  you go a few more pages, you have Aberdeen

6  Enterprise Holdings BVI, and then the -- you

7  had this before you -- when did you get

8  this?

9       A    This?

10      Q    Yeah.

11      A    I got this from Mazars as well.

12      Q    Okay?

13      A    And if you'll notice MTV Clients

14  Limited, and they were all canceled, and as

15  of 2003, Louise Blouin is the only member.

16      Q    Okay.

17      A    So, summation, these two

18  documents, it was, like, her and her

19  husband.

20      Q    Right.  Well, one is a list of the

21  directors, correct?

22      A    Right.

23      Q    And one is a listing of the

24  members, correct?

25      A    Correct.

↟

162

1       ROUGH DRAFT - FEBRUARY 10, 2023

2       Q    And the corporate structure that

3  you got showed the same thing.

4       A    Where is Matt Kabatoff's name on

5   that?

6       Q    Well, that's not a director's

7   list; that's an ownership list, right?

8       A    I'm not sure if I agree with you,

9   but I will say okay.

10      Q    Okay.  Well, do you understand

11  that limited companies in the British Virgin

12  Islands are determined by members, right?

13      A    I'm not familiar with law of the

14  British Virgin Islands.

15      Q    Let's go to the United States.  A

16  LLC, a limited liability company in every

17  United States, in every single state, the

18  owners are called members, right?

19      A    Or partners.

20      Q    If it's a partnership, correct.

21      A    It could be called different

22  things.

23      Q    Right.  And when you own a

24  corporation, you're a stockholder, right, if

25  you own it?

1          ROUGH DRAFT - FEBRUARY 10, 2023

2          A    You can be called a lot of things.

3    Please continue with where you're going with

4    this.  I haven't got a question yet, sir.

5          Q    What did this stuff so far, the

6    corporate structure and the deed and the

7    membership, what did this all lead you to

8    believe?  What's going on here?

9          A    Well, I mean, if you're asking me

10    to limit it to just the document you pointed

11    out, I would say there's more information

12    here that I gathered, because the

13    investigation was not just, you know, these

14    pages.  It was some of the other evidence.

15    And also patterns that I noticed with

16    respect to the development of LBM Inc. and

17    Art Now.

18          Q    Well, we're only talking about the

19    nominee part right now, right?  Or are we

20    talking about something different?

21          A    No.  We're talking about Louise

22    Blouin.

23          Q    Okay.

24          A    Without her, you take Louise

25    Blouin out of this, there is nothing.

➤

1          ROUGH DRAFT - FEBRUARY 10, 2023

2          Q    Okay.  So if you go to the next

3    page, there is an application for employer

4    identification number, right?

5          A    All right.

6          Q    Do you see that?

7          A    Yes, sir.

8          Q    This is what the IRS wants done,

9    right, that people apply for identification.

10         A    The reason why this was filed is

11   because when Mazars was tasked with

12   preparing the returns for selling the

13   Charles Street property --

14         Q    Yeah?

15         A    -- Aberdeen Enterprises Holdings

16   BVI had no tax ID number, even though they

17   were the owner, so they were like, oh, wait,

18   we've got to go back and we've got to get a

19   tax ID number to make sure we can file

20   returns and then sell the property.

21         Q    But you're suggesting --

22      A    No, I'm telling you what this is.

23      Q    Listen to my question; you'll see

24   it's different.

25           You are suggesting that there was

↑

165

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   a reason for Aberdeen Holdings BVI --

3   Aberdeen Enterprises BVI -- Aberdeen

4   Enterprises Holdings BVI Limited, they don't

5   need a tax identification number until they

6   have to file a tax return, correct?  You're

7   shaking your head yes.  Are you saying yes?

8      A    I'm nodding that I'm hearing you,

9   and I'm formulating my answer.

10     Q    Okay.

11     A    Obviously, there will be capital

12   gains on the sale of that property.  That's

13   the responsibility of a foreign-based

14   withholding agent.  I think I have that

15   terminology correctly, of which all of this,

16   you know, endeavor to, you know, own these

17   properties here in the United States ended

18   up being.

19        Q    But here -- but that entity that's

20   the holding company in the BVI doesn't need

21   to file tax returns until there's a

22   reason -- there's a taxable reason for it.

23   In other words, we know from the chart that

24   Aberdeen Enterprises Holdings BVI Limited

25   didn't own anything in the United States.

&uarr;

166

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    It's sole ownership was in another BVI

3    company; isn't that right?

4         A    I do not fully agree with your

5    description of it.

6         Q    Okay.

7         A    Although, I at present lack the

8    specific legal skills to phrase it any

9    different that would satisfy your inquiry.

10        Q    Okay.  And then the next thing you

11   have is the 1120.  That's an informational

12   return, right?

13        A    No.  It's an 1120F, meaning it's a

14    foreign entity.

15        Q    Okay.  And that was filed, right?

16        A    Yeah.

17        Q    Okay.  And was a tax ID number

18    needed to do this, to file it?

19        A    If you'll notice --

20        Q    It was applied for, right?

21        A    It was applied for.  This all

22    happened at the same time leading up to the

23    sale of --

24        Q    Okay.

25        A    -- the 165 Charles Street

↟

167

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    property.

3        Q    Okay, and --

4        A    Because they didn't want to slow

5    down the financing for all of this, so they

6    had to get some returns out there, you know,

7    to say, hey, we got these on file.  Let's

8    get the deal done.

9        Q    Okay.

10       A     Because it takes a little while to

11   process that SS4.

12       Q     And keep going through, right --

13   by the way, when did you get these

14   documents?

15       A     I got those documents the

16   beginning, I believe, of 2022.  It should be

17   in my history.

18       Q     Okay.  And just kind of paging

19   through this, a lot of tax returns.

20       A     And they all say Louise on it.

21       Q     Well, they all have her --

22             Well --

23       A     ^ Cara Louise, Cara Louise.

24       Q     Yeah, but --

25       A     Signed by her husband because she

&

168

1             ROUGH DRAFT - FEBRUARY 10, 2023

2   wasn't here in the states --

3       Q     Okay.

4       A     -- to sign the returns when they

5   were prepared for the deal.

6        Q    And you found that suspicious?

7        A    I found that as evidence to show

8    that Louise Blouin is -- was using either

9    alter ego or nominee, I choose nominee, to

10   manage her property here.  Those properties

11   really belonged to her, not -- and I believe

12   she even admitted it in some court filings,

13   but anyway.

14       Q    Okay.

15            MR. MURPHY:  Just answer the

16       question.

17       Q    You have to have an address,

18   right?

19       A    An address for what?

20       Q    For your tax returns.  You have to

21   put an address on it, right?

22       A    I see 376 Gin Lane right here.

23       Q    And is it uncommon for

24   companies -- anywhere in the world, or the

25   United States if you prefer -- to have the

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    sole member of that company -- of that

3    company to use their -- an address that

4    might receive mail for them?

5        A    That was a vague question.  What

6    address are you referring to specifically?

7    Can we be specific?

8        Q    The address that's on the tax

9    returns, right?  On one return I see --

10       A    376 Gin Lane, okay.

11       Q    On another one I see ^ Haus

12   Blauherd Weissenstein in Zermatt, right?

13   But regardless is, I mean, what's wrong with

14   putting an address where mail can be

15   received?

16       A    That's nothing wrong with that.

17       Q    And then the other thing you got

18   from the accountants is an email chain

19   between Mr. Kabatoff and Mr. Balsam, right?

20       A    Yes.

21       Q    Why is this so important to make

22   an exhibit to your memo?

23       A    Because it just demonstrates who

24   is making the ultimate decisions on how the

25   finances and the -- or the fiscal affairs of

170

1          ROUGH DRAFT - FEBRUARY 10, 2023

2     these entities are being managed.

3          Q     Okay.  And there is another email

4     which appears to be duplicative, but just

5     referencing it, this September -- there's

6     some highlights in it, right?  One's the

7     question and the other one's the answer?

8     And is that why you're saying that these

9     email strings are significant, because it

10    shows who is making financial decisions?

11         A     Yes, sir, I am.

12         Q     Okay.  And then there's a letter

13    from Mr. Hryck of Reed Smith, right?

14         A     No, actually, he works for Duane

15    Morris.

16         Q     I know that, but there's a letter

17    from him.

18         A     I want it on the record, please.

19         Q     Yes.  He works for Duane Morris.

20         A     He actually brought Louise Blouin

21    to this firm as a client.

22         Q     And tell me why this is

23   significant?

24      A    Which?

25      Q    Yeah.  It's the letter in the

171

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   attachment, which is the 8832 entity

3   classification letter.

4      A    Single owner elected to be

5   disregarded as a separate entity.  To me,

6   this tells meals it's Louise Blouin.

7      Q    Okay.  And then --

8      A    I thought that was fairly

9   significant, actually.

10     Q    And then after you got to the tax

11  returns, through the tax returns that are

12  attached, you come to an advice statement

13  from Bank of America, correct?

14     A    Okay.  So we're nearing the end

15  here?  Before the --

16     Q    Do you see that?

17     A    Can you hold the page up that

18  you're looking at?  There's a lot of stuff

19    here.

20        Q    Yeah, there is?

21            MR. MURPHY:   There you go.

22        A    There we go.

23        Q    And why did you attach this page?

24        A    It -- this shows who was paying

25    for the accounting fees to prepare the

⬆

172

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    returns.

3        Q    And where does it show that?

4        A    If you take a look at the

5    description where it says wire type?

6        Q    Right.

7        A    165 Charles Street/ -- and I

8    circled Blouin.

9        Q    That's it?

10        A    Yes.

11        Q    And do you know whose account this

12    is?

13        A    It comes from Deutsche Bank.  I

14    would -- I don't know.  I know that she

15   directed the payment.

16        Q     And did you make a determination

17   as to whether this was a corporate or

18   personal account?

19        A     At this point, I saw it was 165

20   Charles Street, and I saw Blouin.

21        Q     So you saw a description that had

22   Blouin in the name, correct?

23        A     Yes, sir, I did.

24        Q     And was there also a company 165

25   Charles Street?

173

1             ROUGH DRAFT - FEBRUARY 10, 2023

2        A     That was the owner of the 165

3   Charles Street property.

4        Q     But there was a company called 165

5   Charles Street, wasn't there?

6        A     According this to this there was.

7        Q     Okay?

8        A     Two of them, right?

9        Q     And it does -- doesn't seem to be

10   a personal account, does it?

11      A    I don't know.

12      Q    Well, it says business company

13  checking, doesn't it?

14      A    Yes, it does.

15      Q    And the IRS, you as a revenue

16  officer, can issue a subpoena, right?

17      A    Yes, I can.

18      Q    And, in fact, you did it with

19  regard to subpoenaing the accountings,

20  right?

21      A    I did not subpoena this account.

22      Q    But you di that to other people,

23  right?  You subpoenaed two employees, right?

24      A    Yes, sir.

25      Q    And you issue a subpoena to the

✦

174

1        ROUGH DRAFT - FEBRUARY 10, 2023

2  accounting firm, correct?

3      A    Yes, sir.

4      Q    Okay.  And go two more pages.  I

5  start to see screen shots, and I just want

6  you to tell me what these screen shots are.

7        A    These screen shots are the tax

8    payments against the property in Gin lane,

9    366.

10       Q    And what is significant about

11   this?

12       A    Her name is titled as the account.

13       Q    Okay, so the --

14       A    Louise Blouin.

15       Q    And does that mean, do you know

16   that listed is listed as the owner of the

17   property, or is she the one that receives

18   tax bills on behalf of the owner of the

19   property.  Or do you not have an

20   understanding?

21       A    I personally went out to the tax

22   recorder and I spoke to the tax recorder.

23       Q    And?

24       A    They said these are the screen

25   shots.  I said is this the title of the

&uarr;

                                              175

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    account.  She said, yes.  It is absent

3    Brickchurch.  It is absent Aberdeen.  ^ So

4    what?  Louise Blouin pays or is responsible

5    for paying the taxes because her name is on

6    the account.

7         Q    So certainly after you got this

8    information, you went and tried to figure

9    out from which account the taxes were being

10   paid, right?

11        A    I did look at some -- where some

12   of the payments were.

13        Q    And?

14        A    I looked at them.

15        Q    Okay.  And what did you find?

16        A    Do you have any specific

17   questions.

18        Q    Yeah.  What did you find?  That's

19   my specific question.

20        A    I found that the taxes were paid

21   by a bunch of different entities.

22        Q    And were some of those entities

23   title companies?

24        A    Yes.

25        Q    Okay.  And did you presume by

⬆

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    that, that those coordinated with the

3    refinance or finance of some of the

4    properties?

5         A    Yes, I did because I look at the

6    timing.

7         Q    And that's not unusual, right?

8         A    That's not unusual.

9         Q    Okay.  In fact, title companies do

10   require taxes to be brought to date as a

11   condition of closing, correct?

12        A    Correct.  But the title companies

13   do not pay the taxes for the taxpayer.

14        Q    Oh, so that -- so how do you think

15   the title company gets money?

16        A    From the taxpayer.

17        Q    Oh, do you think that?  So when

18   you --

19        A    Or from the closing?  Sorry.

20        Q    Okay.  Right.  When you refinance,

21   I mean, I hope that you came across this in

22   your investigations, but when you refinance

23   a house or a property, do you understand

24    that there's a new bank coming in to to fund

25    the refinance, right?  You're nodding yes.

177

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      A    Yes.

3      Q    Okay.  And do you also know in

4    your experience that from time to time they

5    use things called title companies?

6      A    Yes.

7      Q    And do you know through your

8    experience that the new lender may wire

9    money to the title company for disbursement.

10           Do you understand that?

11     A    That is possible, yes.

12     Q    And do you also know from your

13    experience that from time to time the title

14    company will actually pay the taxes that are

15    outstanding from the proceeds that were

16    wired to them from the new vendor?

17     A    Yes.

18     Q    Nothing suspicious about that,

19    right?

20      A    Nothing suspicious about that.

21      Q    Okay.  And did you, when you came

22   across a payment from a title company,

23   subpoena the title company to see what other

24   disbursements there might be?

25      A    No, I did not.

1         ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    And there were other companies,

3   other financial companies that also pay

4   taxes, correct?

5      A    Are you speaking specifically to

6   this?

7      Q    Yes.

8      A    I did try to look for ^ Fred Bynum

9   is one of them.

10      Q    Okay.  And did you --

11      A    I called the guy.  I couldn't even

12   see any connection.  I got no response.

13      Q    And did you figure out anything

14   about that?

15      A    I decided to not pursue it any

16   further because when I was at the tax

17   recorder or the tax receiver's office in

18   Southampton --

19      Q    Right.

20      A    -- they had -- I had asked a

21   series of questions, one of which was, why

22   are there so many different payments, and

23   there were also some payments in there that

24   were unspecified from who it was.  You

25   couldn't tell.

♠

179

1            ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    Right.

3      A    And the recorder said --

4            MR. MURPHY:  ^ Objection.  I'm

5      going to -- this is hearsay.

6            By guy objection this is here

7      said.

8            MR. MURPHY:  He asked what he

9      looked into on this.  He's responding

10     on that.

11     Q    Go ahead.  It's okay.

12      A    You okay with it?

13           Man man you can keep answer I just

14  noded.

15      A    Anyway, the recorder said anybody

16  can come in and pay anybody's taxes.

17      Q    Okay.

18      A    And then when I produced the

19  summons for the information, she asked me,

20  do you have a good address for these people,

21  because they owe us taxes and everything we

22  sent them billing them for taxes comes back

23  as undeliverable.

24      Q    Okay.

25      A    And I responded, as an IRS agent,

✦

180

1           ROUGH DRAFT - FEBRUARY 10, 2023

2  I can't divulge that information.

3      Q    Okay.

4           THE WITNESS:  Did you get that?

5      Thank you.

6      Q    What is this?  Just look at it

7  first before you answer anything.

8       A     Okay.  I can explain this.  You

9   want to ^

10      Q     Yeah, but tell me off the record.

11            (Discussion held off the record.)

12      Q     I'm showing you what we've marked

13   as your deposition Exhibit 15.

14            Do you have that?

15      A     Yes, sir.

16      Q     Just tell me what this is.

17      A     This is a breakdown of every

18   single assessment that has been made against

19   Louise Blouin under the ITIN number that was

20   assigned to her.

21      Q     And just so that we don't have to

22   spend too much time on this, it's broken

23   down by quarter?

24      A     Yes.

25      Q     And does it -- is it -- does it

↟

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   include both at assessments for Louise

3   Blouin Media Inc. and/or Art Now?

```
4       A    Yes.

5       Q    They're combined in it?

6       A    Yes.  Where they overlap, you'll

7  see evidence of two assessments.

8       Q    Okay?

9       A    On some assessments, some period

10  were Art Now only and some assessments were

11  LBM only, but most of them overlapped.

12                (Whereupon,

13                Description

14                were/was            marked as

15                Party                    for

16                identification, as of this date.)

17       Q    I'm going to show you what we've

18  marked as your deposition Exhibit No. 16.

19                We talked about the employees that

20  you got in touch with, and ^ Mr. Bostick was

21  one of them, correct?

22       A    ^ Corey.  It was a female.

23       Q    Okay, so ^ Ms. Bostick was one of

24  them, correct?

25       A    Yes.
```

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    Do you talk to her on the phone?

3      A    Yes, I did.

4      Q    Okay.  And I saw notes in regard

5    to really short conversations, right, with ^

6    Ms. Bostick.

7      A    Yes.

8      Q    And Ms. Bostick was one of the

9    remaining employees at Art Now Inc.,

10   correct?

11     A    Yes.

12     Q    And she provided to you an

13   employment agreement between Louise Blouin

14   Media and herself, and you asked her to

15   provide you with information, correct.

16     A    Yes.

17     Q    Okay.  And is there anything on

18   any of these documents that made you believe

19   that Louise Blouin was somehow in control of

20   Louise Blouin Media Inc.?  Oh, it includes

21   also the information from Ms. Carroll.

22     A    Um-hmm.  Well, one of the things

23   it provided me was she wasn't being paid by

24   Art Now, and she wasn't being paid by LBMI.

25      Q      Okay?

⬆

183

1                ROUGH DRAFT - FEBRUARY 10, 2023

2      A      She was being paid by BCI

3   Management Services, which is, I come to

4   find out, also the care of name for

5   Brickchurch now down there on Broadway.

6      Q      You're saying the address is

7   similar?

8      A      The name line on the account,

9   HSBC.

10      Q      And how does that link Ms. Blouin

11   to decision-making determinations on behalf

12   of Art Now Inc.?

13      A      Well, you know, I highlighted the

14   letter from Charissa M. Carroll.

15      Q      Yeah.

16      A      Dated March 2, where she said she

17   was the staff gallery guide, as well as

18   other publications owned by Louise Blouin

19   Media Inc.  What was happening here was she

20   was being asked to -- well, actually, here

21    it's in this BSI LTB Limited -- and there's

22    Louise's initials again -- which by the way,

23    wasn't the same thing that was the payroll.

24    And what they wanted to do is they -- let me

25    read the letter.

&#8593;

184

1         ROUGH DRAFT - FEBRUARY 10, 2023

2              They were --

3    Q    Just so the record is --

4    A    They were using her as --

5    Q    You're talking about Ms. Carroll?

6    A    I'm on Carroll, right.

7    Q    Okay.

8    A    And the same thing was true in

9    statements that I had, you know, in the

10   conversation that I had with ^ Ms. Bostick,

11   they wanted to dissolve the payroll and make

12   these employees independent contractors

13   responsible for actually paying their own

14   self-employment tax because they didn't --

15   Art Now was no longer going to have a 941.

16   Q    And you understood that, and your

17   investigation revealed, that in or around

18   this same time Art Now Inc. and Louise

19   Blouin Media Inc. were relocating their

20   prime operations to another country,

21   correct?

22       A    I didn't know what was going on

23   with them.  They disappeared, they --

24   because nobody was talking to me.  And I was

25   hoping to get something from these folks to

♠

185

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   understand what was going on.

3       Q    Were you ever told or did you ever

4   learn that substantially all the operations

5   of the company were moved from the United

6   States to India?

7       A    I had to assume that they moved

8   somewhere else.  I never got any call or

9   correspondence from anyone of fiduciary or

10   fiscal responsibility for either entity.

11       Q    Okay.  And when you -- you

12   learned -- you're saying there's something

13    nefarious maybe about the fact that they're

14    moving people from employees to independent

15    contractors, right?  Isn't that what you --

16    you thought that?

17         A    I disagree with the word

18    nefarious.

19         Q    Okay.  Well, you thought it was

20    significant in your investigation that

21    people were being moved from employees to

22    independent contractors?

23         A    I saw this as further evidence of

24    Ms. Blouin in one of her -- I was convinced

25    Ms. Blouin was making all of the fiscal

⬆

                                                  186

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    decisions on what to do with her various

3    U.S. holdings -- certainly I knew nothing of

4    anything overseas -- to cut expenses and/or

5    just not pay people.

6         Q    And did you do any investigation

7    regarding the purpose for which people were

8    being moved from employees to independent

9    contractors?

10       A    The only people I talked to were

11   these two employees because there was no one

12   else for me to talk to.

13       Q    And in regard to the employment

14   contracts that are attached here to Exhibit

15   No. 16, there's some employment contracts,

16   correct, and addendums?

17       A    ^^ Are you talking about the

18   letter from BSILTB Limited?

19       Q    Well, let's first talk about --

20       A    ^^ This looks like an employment

21   contract; are we talking about that?

22       Q    Yeah, but let's first talk about

23   the letter about four pages deep from Louise

24   Blouin Media Inc. to ^Ms. Bostick?

25            MR. MURPHY:  February 20, 2014.

⬆

187

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Yes, February 20, 2014.  And did

3    you get the full letter, because I only have

4    part of it here.

5        A     I have what you have.

6        Q     Okay.  And did you notice -- did

7   you have to signed part of it?  Did you have

8   the -- I don't know if this was the full --

9   but you did you ever see anything signed by

10  Louise Blouin in regard to employment?

11       A     No, I did not.

12       Q     In fact, when we look at the BSI

13  Limited thing where it talks about an offer

14  of employment to Ms. Carroll, that's not

15  signed or acknowledged by Louise Blouin or

16  anybody else for that matter, right?

17       A     No, it wasn't.

18       Q     And if you go further, there is a

19  letter to Ms. Carroll regarding termination

20  of her employment, and that's not signed by

21  Louise Blouin, is it?

22       A     No, it is not.

23       Q     It's signed by a person named ^

24  Lachesh Jay, correct?

25       A     Yes.

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      Q     And then you also got some W2s

3   from a couple of the employees, but you

4   already had this information anyway, right?

5      A     Yes.

6      Q     And so, tell me again what you

7   thought was significant --

8      A     Well, wait, can I bring this back?

9      Q     Sure.

10     A     To be honest with you, you know,

11  this was done in 2018.  And one of the

12  things when I spoke to these folks was they

13  were worried about getting their W2s on time

14  to file their returns.  And if you'll

15  notice, like, the response date here, they

16  gave me -- they didn't memorial it, so maybe

17  it's -- you're relying upon my testimony.

18     Q     Yeah, that's okay.

19     A     But I want to say at the time that

20  I served the summons -- it should be in the

21  history -- was probably, maybe two or three

22  weeks before March 20, and they were

23  concerned that they didn't get their W2s,

24  because they were afraid the way the company

25  was evaporating and they were suddenly

➤

189

```
1              ROUGH DRAFT - FEBRUARY 10, 2023

2    having this agreement forced on them to work

3    1099 under this contract, and they were also

4    concerned, speaking to me directly, because

5    they were afraid if their management found

6    out that they spoke to the IRS, that they

7    would somehow have that held against them

8    and they would lose their jobs.

9              (Whereupon,

10             Description

11             were/was           marked as

12             Party                        for

13             identification, as of this date.)

14       Q    So I'm showing you what we've

15   marked as your deposition Exhibit 17.

16       A    Tell me what page you want me to

17   go to.

18       Q    I'm not going to tell you any of

19   that, but I'm going to ask you what it is.

20            What is it?

21       A    That would be -- this is the ICS
```

22    history for Louise Blouin of the case which

23    is still active that I'm working on.

24         Q    And this was opened to you as a

25    case, am I right, October 13, 2018?

↑

1              ROUGH DRAFT - FEBRUARY 10, 2023

2         A    Yes, it was.

3         Q    And you're the one that caused it

4    to be opened?

5         A    By the assessment of the trust

6    fund recovery penalty and the balance due

7    that followed, yes --

8         Q    Okay.

9         A    -- the case came into being.

10        Q    Can you go please go to Page 9 of

11   287.

12        A    I'm there.

13        Q    And here's another -- in the

14   middle of the page -- where it had a change

15   of address.

16             Do you see that?

17        A    Yes.

18      Q      And the reason why you made this

19   change of address is because of the problem

20   realized by you in regard to the delivery of

21   the notice of the -- the 1153 letters,

22   right?

23      A      I recognized that it was an

24   imprecise address.

25      Q      And when you recognized it was an

191

1          ROUGH DRAFT - FEBRUARY 10, 2023

2   imprecise address, you went into the system

3   and you cued -- maybe that's not the

4   right -- you directed that the address be

5   directed?

6      A      I actually changed the addressed

7   on ICS, yes.

8      Q      You're able to do it?

9      A      I did that; that was my action.

10      Q      Are you able to go into the system

11   and delete things and remove things?

12      A      It all depends on what system.

13   There are a number of systems.  The master

14    file from which this original address came

15    out, that came out -- if you want an

16    explanation of that?

17        Q    I just want to know if you can

18    change the system.

19        A    It requires another input document

20    to be processed to change it.

21        Q    But you could -- you would delete

22    something from it and replace it with

23    something else, right?

24        A    Yeah, there's a process, but the

25    effect is what you say.

⬆

192

1        ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    And just in regard to testifying

3    here today, do you have a memory of most of

4    the things you testified for, or did you

5    rely on the business records of the IRS in

6    order to prepare yourself?

7        A    A combination.

8        Q    And do you remember every single

9    thing that's in your reports in your

10    investigation files?

11        A    Not every single thing.

12        Q    Some of the things you had to

13    resort to the business records of the IRS in

14    order to testify in regard to it?

15        A    Yes, sir.

16        Q    And these same business records,

17    for example, the document that we've marked

18    as your deposition Exhibit 17, can you go

19    into the system and change things that are

20    in the business record?

21        A    No.

22        Q    And in regard to any of the

23    records that we see -- saw today, is there

24    any ability for you to change -- go into the

25    systems and change any of the records?

193

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        A    No.

3        Q    Okay.  And so the systems that you

4    could change are different than the ones

5    that you actually used in this

6    investigation; is that right?

7         A    I don't understand the question.

8         Q    Yeah.  So you told me before that

9    there's certain records that can be changed,

10   and I'm wondering whether or not any of the

11   records that have been produced in this case

12   are included in the type of records that can

13   be changed?

14        A    Your question phrased the way it

15   does means the records can be changed for

16   information going forwards, not backwards.

17        Q    Okay.  So in other words, you can

18   continue to enter -- you can change the --

19   you could input additional information, but

20   you can't go back and change things that

21   have already been entered?

22        A    As an example to answer your

23   question, I changed this address so that

24   every notice I generated afterward from ICS

25   would have that address.

194

 2      Q    Okay.  All right.  I get what

 3  you're saying.  Okay.

 4           And in the same page, ^ in 287,

 5  you actually say, ICS address should be

 6  revised as 366, 376 is not correct.

 7           Do you see that?

 8      A    Yes, I did not put that -- that's

 9  another revenue officer.

10      Q    Who is that person?

11      A    I don't know his name, but I know

12  his number is 2230.

13      Q    Okay.  And after you made the

14  change, you didn't resend the 1153 letters;

15  is that correct?

16      A    The trust fund recovery penalty

17  had already been assessed.  Two different

18  actions and time lapse.

19      Q    I --

20      A    You send the 1153 before the

21  assessment; you don't send it afterwards.

22      Q    But the letter you sent got

23  returned, right?

24      A    Yes, it did.

25      Q    Okay.  And then you realized that

1          ROUGH DRAFT - FEBRUARY 10, 2023

2     the reason why it got return was because you

3     had the bad address in there, right?

4          A    I'm not going to say bad; I'm

5     going to satisfy it was imprecise.

6          Q    And then you went back and changed

7     the imprecise address, correct?

8          A    Yes, I did.

9          Q    And then you didn't send a new

10    letter of the type that was returned to you?

11         A    Actually, the timely -- the time

12    line for issuing 1153 had passed.  The

13    taxpayer was no longer entitled to the

14    rights specified in that letter, so the

15    subsequent letter that was sent was a notice

16    of intent to levy.

17         Q    Okay?

18         A    And that was addressed correctly.

19    And it was returned as undeliverable,

20    unclaimed.

21         Q    And there are requirements to the

22    taxpayer to provide notice of the intent to

23    assess the penalties, right?  That's why the

24    1153 letter is sent, right?

25        A    Yes, sir.

↑

196

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Okay.  And the reason why there's

3    a requirement for the letter is because

4    Congress made a determination that, prior to

5    the imposition of the penalties against a

6    person who's not responsible for the payment

7    of taxes as of -- as a direct taxpayer, that

8    we should send a letter to them notifying

9    them of the right to appeal and to challenge

10    and to do all that type of stuff, right?

11        A    Correct.

12        Q    Okay.  And so the purpose of the

13    letter isn't for the administrative task of

14    sticking something in your file, but it's

15    actually to provide notice to the person to

16    whom you seek to impose the penalty,

17    correct?

18        A    Correct.

19      Q    And there's this thing called the

20   Constitution, and that implies due process,

21   and that's what the IRS is trying to provide

22   the taxpayer, right?

23      A    Correct.

24      Q    And that's one of the purposes for

25   that letter, correct?

➜

1              ROUGH DRAFT - FEBRUARY 10, 2023

2      A    Correct.

3      Q    And so what you are telling me is

4   we tried to send the letter, right?  Isn't

5   that -- you tried to send the letter, right?

6      A    I sent a letter.

7      Q    Okay.  And the letter came back,

8   right?

9      A    The letter came back.

10      Q    And you then updated the address

11   because it was imprecise, to use your word,

12   correct?

13      A    That's what I said.

14      Q    But you didn't resend the letter

15    in order to have the same person that you

16    directed your return letter to have that due

17    process right that Congress gave her,

18    correct?

19         A    Correct.

20         Q    Okay.  Now, on Page 29 of 287, you

21    noted an address of Louise Blouin at has ^

22    Haus Blauherd Weissenstein in Zermatt 3920

23    Switzerland, did you not?

24         A    Yes, I did.

25         Q    And you had that as an address

↥

198

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    where Ms. Blouin resided, correct?

3         A    On May 1, 2019, I did.

4         Q    And on July -- and you never

5    confirmed address, right?

6         A    No, I did not.  I did not have the

7    tools to do that.

8         Q    Okay.  And you didn't call your

9    IRS agents in Europe -- you got them there,

10    right?

11      A    I don't know if they're in

12   Switzerland.

13      Q    Well, you've got them in Europe,

14   right?

15      A    Certainly the UK, France I know,

16   and I don't know about Germany.

17      Q    Okay.  And you didn't call anybody

18   to see if you had anybody that could assist

19   you?

20      A    No, I did not.

21      Q    And as of May 1, 2019, the last

22   known address of Louise Blouin was in

23   Switzerland?

24      A    That's what the history says here.

25           Can ask a question?

↑

                                        199

1           ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    Sure.

3      A    Do you have a copy of that 2014,

4   2015, 2016 1120 returns for Aberdeen

5   Enterprises.

6      Q    I'm not sure.

```
 7        A    I believe they're part of the

 8   evidence.

 9        Q    I'm not sure.

10        A    Because these returns were filed

11   in 2017.

12        Q    Okay.

13        A    Timeline; that's all I'm trying to

14   establish here, but please continue with

15   your line of questioning.

16        Q    So if you go to Page 69 of 287 .

17        A    Um-hmm.

18        Q    You see on the bottom, it talks

19   about your ^ Accurate report that you

20   received, correct?

21        A    Um-hmm.

22        Q    Yes?

23        A    Yes.

24        Q    Okay.  And in regard to that it

25   says, it was most helpful cross-referenced
```

^

```
 1        ROUGH DRAFT - FEBRUARY 10, 2023

 2   information between Louise, Brickchurch
```

3      Enterprises, and Aberdeen Enterprises,

4      correct?

5          A    Yup.

6          Q    And then you talk about, again,

7      this whole concept of 192 -- here you say

8      192 Highland Terrace LLC and ^ F Bynum Jr.

9      paying certain taxes, right?

10         A    Yes, sir.

11         Q    Did you ever investigate what

12     those companies or person was?

13         A    The next history, dated 1/13/22, a

14     call was made to counsel on company to speak

15     with ^ Frank Bynum --

16         Q    Yup?

17         A    -- regarding the real estate

18     payments on the Southampton property.

19     Message left for call back.

20         Q    So you never talked to him?

21         A    No, sir, I did not.

22         Q    And did you ever come to realize

23     whether or not that these companies were

24     management companies?

25         A    I relied on the information that I

1              ROUGH DRAFT - FEBRUARY 10, 2023

2     had from the county clerk or the receiver of

3     taxes in Southampton that said anybody can

4     pay the taxes.

5         Q    And do you -- have you come

6     across, in your experience during any of

7     your investigations, properties being owned

8     by a company but being managed by a

9     management company?  Have you ever seen that

10    before?

11        A    Yes, sir, I have.  It happens a

12    lot here in --

13        Q    In New York, yeah.

14             And is there anything illegal or

15    suspicious about a management company making

16    payments of property taxes on behalf of the

17    company for whom they're managing?

18        A    No.  But my motivation for

19    reaching out to ^ Frank Bynum was really to

20    find out, you know, who was directing you to

21    pay the taxes for that property.

22        Q    But you never figured that out,

23    did you?

24      A    Never got in touch with the

25    person; they never responded.

⬆

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    So that concludes what?

3      A    That concludes that I never got

4    that information.

5      Q    So were you not able to factually

6    represent one way or the other whether there

7    was something wrong with what was being

8    done --

9      A    I didn't say there was anything

10    wrong.

11      Q    Okay.  You didn't come to any

12    information that suggested that there was

13    something that suggested that there was

14    something that wasn't right about that?

15      A    I beg to disagree.  I think your

16    line of questioning is misreading my

17    motivations for wanting to speak with Frank

18    Bynum.

19      Q    Okay.

20      A    I wanted to know who's directing

21   you to pay the taxes against the property.

22   That's all I wanted to know.

23               (Whereupon,

24               Description

25               were/was              marked as


↑


                                      203

1               ROUGH DRAFT - FEBRUARY 10, 2023

2               Party                      for

3               identification, as of this date.)

4      Q    I'm showing you what we've marked

5   as your deposition Exhibit 18.

6               Have you got that in front of you?

7      A    Yes, sir.

8      Q    This is stuff you printed from the

9   Internet, right?

10      A    Yes, sir.

11      Q    And you highlighted certain stuff,

12   right?

13      A    Yes, sir.

14      Q    And the first article that you

15   have, was this -- was this packet of

16    stuff -- there's a bunch of articles you can

17    go through.  Was any of this stuff -- did it

18    influence your decision regarding whether to

19    file the -- first, the penalties again

20    Ms. Blouin?

21         A    Yes.

22         Q    And did you -- what did you do --

23    so the first one is an article from The

24    Star; is that right?

25         A    I believe it says The World,

↑

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    right?

3         Q    I'm just looking down at the

4    bottom.

5         A    And then there's a banner that

6    says -- but that's an advertisement.

7         Q    But way up top it says,

8    WWW.TheStar.

9         A    It says -- yeah, guess it says The

10    Star and then all the bylines.

11         Q    What do you know about that

12   magazine?

13        A    Very little.

14        Q    Gossip?  Is it a tabloid?  Is it

15   more like CNN?  Do you know anything about

16   it?

17        A    No, I know nothing about it.

18        Q    And do you know anything about the

19   author, what type of work he performs?

20        A    You mean Tanya Talaga, global

21   economics reporter?

22        Q    Yes.  I want to know what you know

23   about her.

24        A    That she's Tanya Talaga, global

25   economics reporter.

↑

1          ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    Did you call her?

3        A    No, sir, I did not.

4        Q    And you used this information

5    to -- towards your investigation, a news

6    article, right?  Right?

7        A    I did include this in the package.

8        Q    A magazine or online news blog,

9    whatever it is, that you never heard of,

10    right?

11        A    Yes, sir.

12        Q    Okay.  By an author you never

13    heard of, correct?

14        A    By an author I never heard of.

15        Q    With no -- nothing done by you to

16    confirm anything in the article, correct?

17        A    Your line of questioning

18    presupposes that I used this specific thing

19    here as the basis.  There is a preponderance

20    of evidence I was drawing upon to make my

21    determination.

22        Q    Okay.

23        A    So I included this as a part of a

24    larger body of evidence.

25        Q    And the article is about people

⬆

206

1        ROUGH DRAFT - FEBRUARY 10, 2023

2    that use offshore tax shelters, and it has a

3    picture of Louise Blouin on the front there,

4   right?

5        A    Yes, sir, it does.

6        Q    Is there anything illegal about a

7   properly set up tax shelter by people who

8   are not citizens of the United States?

9        A    It depends upon if the tax shelter

10  is legal or not.

11       Q    Right.  But you never made a

12  determination that anything of Louise

13  Blouin's entities that she may or may not

14  have used as tax shelters were legal or not

15  legal, did you?

16       A    I was not developing a case for

17  fraud or referral for a tax shielder.

18       Q    Okay.

19       A    I was just using this as

20  additional information to draw a profile of

21  Louise and her ability to, or inability to

22  manage her finances responsibly here in the

23  United States.

24       Q    And then there's another article

25  that follows that one where it is talks

207

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    about -- it's an article from The

3    Observer.com.

4            Do you see that?  It's the next

5    one.  It has the big shot of Ms. Blouin.

6       A    So I'm going through all of these

7    pages here and I'm going to this guy, right?

8    Oh, no.  I missed some.

9       Q    You're going to go beyond that.

10      A    Okay, this one.

11      Q    What do you know about The

12   Observer.

13      A    I've heard the name, but I know

14   nothing specific about The Observer.

15      Q    And what about Mr. Steadman who

16   wrote the article?

17      A    I've heard the name before, but I

18   couldn't tell you anything about him and his

19   character.  And did I not call him.

20      Q    And this is one of the articles

21   you also used as part of -- relied upon in

22   your investigation to bring penalties

23   against Ms. Blouin?

24      A    I included this into the file,

25    yes, I did.

↟

208

1            ROUGH DRAFT - FEBRUARY 10, 2023

2        Q    And the next article is from News

3    Artnet.

4        A    Is it titled The Rise and Fall of

5    Louise Blouin Art Media Empire.

6        Q    That's correct.

7        A    I'm here.

8        Q    And what about that News Artnet,

9    have you ever heard of that company before?

10       A    No.

11       Q    And you highlighted a bunch of

12   stuff in here, right?

13       A    Yes, sir.

14       Q    Did you consult with your

15   counsel -- don't tell me what they told you,

16   but did you consult with them as to whether

17   or not these articles that you took off the

18   Internet are even admissible in court, that

19   would help you prove your case if put to the

20   test?

21      A     Which case are you referring to?

22      Q     Any case which seeks to impose the

23  penalties against Ms. Blouin.

24      A     Okay.  I just wanted to make sure

25  I knew what you were talking about.

↟

209

1           ROUGH DRAFT - FEBRUARY 10, 2023

2       Q     Okay.

3       A     No, I did not have to seek counsel

4   for the authority.

5       Q     Do you already know the answer?

6       A     Again, your misrepresentation of

7   your line of question is assuming I relied

8   on this and solely this to make the

9   assessment determination.  I'm not required

10  to consult with counsel, generally, making

11  trust fund recovery penalties.

12      Q     Now, the next one is the New York

13  Post, right?

14      A     Let me get there.

15      Q     Is that a tabloid --

16      A     This one here.

17     Q    Yeah.  Is that like entertainment

18  news in New York, or is that where everybody

19  gets their solid news in New York?

20     A    It all depends on who you talk to

21  and who reads it.  But it's widely

22  circulated and there are a lot of people who

23  believe it's gospel.

24     Q    But it's a tabloid, right?

25     A    It's not my call here.  You're

⬆

210

1          ROUGH DRAFT - FEBRUARY 10, 2023

2  asking for my opinion; I don't feel it's

3  relevant.

4     Q    Well, I can tell this, is that you

5  seem to be worldly enough to read the

6  newspaper, the Internet, or something like

7  that, right?  You do that, right, keep up on

8  the news?

9     A    Obviously, I did read the Internet

10  here, right?

11     Q    Yeah.  But in regard to where you

12  go for your information, is the New York

13    Post one of those things?

14        A    It tells me what one sector of the

15    population is thinking is true.

16        Q    Okay.  And if you were to compare

17    the New York Times, for example, with the

18    information that you read in the New York

19    Post, which would you more likely rely upon

20    if given the choice?

21        A    The New York Times is a better

22    researched paper.

23        Q    And what about The Observer where

24    your next article comes?

25        A    Well, they all seem to be

                                                          211

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    documenting the same thing.  Can all of

3    these papers be wrong?  They all seem to say

4    thing about this woman.

5        Q    Is The Observer.com, is that a

6    paper that you had heard before printing

7    this article?

8        A    Didn't we refer to The Observer

9    earlier in this?

10        Q    We didn't?

11        A    You didn't.  Maybe I have that

12   confused with.

13            MR. MURPHY:  There are two

14        articles from The Observer.

15            MR. MESSINGER:  Oh, is there.  You

16        might be right.

17        A    Okay.  So whatever the answer to

18   that question was, I'll --

19            MR. MURPHY:  ^ Hold on.  Repeat

20        it, please.  You don't have to read it

21        back, just take it down.

22            MR. MESSINGER:  I got it.

23        Q    Okay.  Now, have I missed the gist

24   of any information that you relied upon in

25   making the determination that the penalty

♠

212

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    should be imposed or assessed against Louise

3    Blouin?

4            MR. MURPHY:  Objection; that calls

5        for a summary.

6        A    Well, actually I do have

7    something.  I mean, you know, as you were

8    flipping through The Observer, The Observer

9    says, In recent years, Ms. Blouin's media

10   empire has begun to show signs of stress.

11       Q    Okay.

12       A    In July 2010, a group of long

13   unpaid art info freelances formed an

14   organized movement -- blah, blah, blah --

15   and then at various time employees have been

16   locked out of their Chelsea offices by

17   building management and shut out of their

18   own website by its web hosting firm.

19       Q    Okay.

20       A    The lights and Internet have been

21   shut off.  According to New York State court

22   filings, Louise Blouin, her company, and her

23   foundation have variously been sued by their

24   landlord, their printer Fed Ex, an office

25   supply company, a marketing consultant, a

```
 1          ROUGH DRAFT - FEBRUARY 10, 2023

 2   freelance web developer and two interior

 3   directors for nonpayment.

 4       Q    Okay?

 5       A    And I might add one more thing,

 6   please.  There was a filing for unpaid

 7   employees that were trying to get paid wages

 8   that were due them that were not paid.

 9       Q    There's nothing wrong with a

10   company going out of business, right, or

11   struggling financially?

12       A    It happens.

13       Q    Right.

14       A    Whether it's wrong or not, it's

15   immaterial.

16       Q    That might be a moral issue, but

17   it's not a legal issue, right?

18       A    Well, if they're not paying their

19   employees or they're not paying their taxes

20   when they go out of business and they're

21   leaving behind a bill, there is a legal

22   issue, is there not?  That's what you do for

23   a living, isn't it Mr. Messinger?

24       Q    ^ I don't think so.

25       A    No, representing people who don't
```

214

| | | |
|---|---|---|
| 1 | | ROUGH DRAFT - FEBRUARY 10, 2023 |
| 2 | pay their bills or can't pay their bills, |
| 3 | bankruptcy, come on. |
| 4 | Q | No. |
| 5 | A | All right. |
| 6 | Q | Anyway, I'm sorry.  I apologize. |
| 7 | We've got to keep it down.  We've got to |
| 8 | move this along.  We're almost done. |
| 9 | | (Whereupon, |
| 10 | | Description |
| 11 | | were/was        marked as |
| 12 | | Party                 for |
| 13 | | identification, as of this date.) |
| 14 | Q | Mr. Gould, I'm showing you what |
| 15 | we've marked as your deposition Exhibit No. |
| 16 | 19. |
| 17 | | Do you have that in front of you? |
| 18 | A | I have that in front of me. |
| 19 | Q | And this is the recommendation to |
| 20 | assess the penalty against Ms. Blouin that |
| 21 | was signed by your group manager, Jeff |

22    Payton, just prior to sending out the

23    letters in July to Ms. Blouin, correct?

24        A    Correct.

25        Q    And did you type the summary that

1            ROUGH DRAFT - FEBRUARY 10, 2023

2    appears in Section 1?

3        A    Yes, I did.

4        Q    And where is this submitted?

5    Like, what's the process here?

6        A    Basically, this narrative in here

7    is my recommendation, as it says on the top,

8    to assess the penalty -- or no, to begin the

9    penalty assessment process.  Meaning, issue

10    the 1153.  I cannot issue an 1153 until

11    after this is prepared and submitted for

12    approval by Mr. Payton.

13        Q    Now, the first sentence, you

14    write, Ms. Blouin is the owner and president

15    of the debtor corporation.

16            And my question to you is:  How

17    did you conclude that?

18      A      Because she acquired it, she was

19   the --

20      Q      In her name?

21      A      I had come to determine that she

22   owned the company, whether it was through

23   namesakes or whatever, so I drew a direct

24   conclusion that she was the owner and

25   president of the debtor corporation from all

216

1           ROUGH DRAFT - FEBRUARY 10, 2023

2    the information I had available at the time.

3       Q      Okay.  And the next sentence says,

4    During the course of the TFRP investigation,

5    it was discovered that she had made all the

6    decisions regarding the financing of the

7    payroll and noncompliance with the 941

8    filing and depository requirements?

9           Do you see that?

10      A      That was the determination that I

11   made to request approve to issue the 1153.

12      Q      Yeah, I got that you wrote that

13   and I got that that was one of your

14   recommendations, what I don't understand is

15   how you made that conclusion.

16        A    All of my dealing with the

17   employees and/or incidental case actions

18   that happened on Art Now led me to that

19   conclusion.

20        Q    Two employees that you

21   interviewed, right?

22        A    Right.

23        Q    And did you have statements from

24   them, affidavits from them, a letter from

25   them saying that she made all the decisions

➤

217

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    recording the financing of the payroll and

3    the filings of the 941s?

4        A    Well, actually, the decisions were

5    to ignore the filing and payment of the

6    941s.

7        Q    Okay.

8        A    So that is a misstatement in a

9    way, but this was, you know, I would say

10    boilerplate language that I normally used

11    when I, you know, when I get the approval to

12    send out the letter.  But, really, it was

13    her nonpayment and nonfiling and refusal to

14    designate anything to resolve unfiled unpaid

15    taxes at the time that I was making an

16    effort to collect them.  That's what that

17    statement means.

18         Q    Your next sense it says, Her role

19    as employer, right -- what do you mean by

20    her role as an employer?

21         A    Well, it's -- it's -- what's the

22    word I'm looking for?

23         Q    False?

24         A    There you go.

25              Predicated is the word I'm looking

↟

                                        218

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    for.  That sentence is predicated on the

3    sentences I drafted before it.

4         Q    Okay.  And what does the fact that

5    Ms. Blouin, as you write here, controls

6    multiple businesses, what does that have to

7    do with anything?

8        A    It establishes a pattern that

9    she's a repeater.

10       Q    A repeater of what?

11       A    Nonfiling and nonpayment.

12       Q    And with the other companies that

13   you found that besides the one that's called

14   Louise Blouin Media Inc., did you find that

15   to be the case?

16       A    Actually, there were entities

17   listed in the beginning of Art Now.  And,

18   you know, when you directed my attention to

19   the statements of ^ Corey Bostwick, and --

20   when they told me the payroll company, there

21   were readouts in the back of that where I

22   actually tried to take a look at what these

23   entities were, and I saw they weren't filing

24   returns, and --

25       Q    Were they required to?

⬆

219

1        ROUGH DRAFT - FEBRUARY 10, 2023

2        A    Well, they were making payroll;

3    they were doing something.

4        Q    What do you do about that?

5        A    I wish I had more energy and time

6    to devote to the world that comprises all of

7    Louise Blouin's holdings, but I had to say

8    focused on the trust funds.

9        Q    Okay.  Now, you also write in your

10   last sentence that she's not a U.S. citizen.

11            That's not significant, right?

12       A    It's just a statement of fact.

13       Q    Okay.  And she owns significant

14   real estate holdings through various LLCs

15   and corporate entities.  And you say and

16   Upon which to effect collection.

17            Why would you write that?

18       A    Okay.  So, basically, I'm

19   establishing three elements here.

20       Q    Go on.

21       A    Responsibility, willfulness, and

22   collectibility.  So that last statement

23   speaks directly to collectability.

24       Q    Well, the fact that the IRS can't

25   collect something doesn't mean they can just

⬆

220

1            ROUGH DRAFT - FEBRUARY 10, 2023

2   do whatever they want, right?  You can't

3   just, without grounds, impose a penalty

4   against a person.  We talked about due

5   process, right?

6       A    Can you restate that sentence; it

7   didn't sound right.

8       Q    Yeah.  The IRS can't to whatever

9   they want just because they're not

10  collecting tax for employee tax or something

11  other thing that's due them, right?

12      A    I can't agree with that statement

13  because it doesn't apply to this scenario.

14      Q    I think I'm done with you.

15          MR. MESSINGER:  And for the

16          purposes of time, I'll pass him with

17          the right to come back.

18          MR. MURPHY:  I'm going to make my

19          same objection that I made earlier

20          today that ^ Mr. Al dinning does not

21          represent a party to the contested

22          matter, and it's the IRS's position

23      that he should not be asking questions.

24      I hope you can be brief.

25          MR. MESSINGER:  Oh, can I ask one

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      more question.  Sorry.

3   BY MR. MESSINGER

4      Q    You've had in the past

5   communications with Tom Ostrander of my

6   office, right?

7      A    Yes.

8      Q    And Mr. Ostrander had asked you at

9   some point in time to provide certain

10  information regarding proof of mailing of

11  the 1153; is that correct?

12     A    I remember his question to be, can

13  you show me the letter that you sent.

14     Q    And did he follow up with you at

15  some point and say, can you show me prove of

16  mailing?

17     A    Well, basically, he observed that

18  there was no date on this letter.

19      Q    Right.

20      A    So he was unsure of when this

21  letter was sent out.  I don't remember if I

22  conveyed to him the date.

23      Q    Well, why when you were able to

24  produce to Mr. Murphy the letter dated and

25  also with prove of mailing, with the return,

⬆

222

1           ROUGH DRAFT - FEBRUARY 10, 2023

2   the envelope coming about, says

3   undeliverable, why did you not send that to

4   Mr. Ostrander when he had asked for it?

5       A    The copy that we went over earlier

6   noted as Exhibit -- whatever.

7       Q    Yeah.

8       A    -- was taken from the actual file,

9   the assessment file that was in Fresno,

10  California.

11      Q    Okay.

12      A    When Mr. Ostrander asked me for a

13  copy of this letter, I did not have that

14  file.  So to produce this file, I just went

15    on the ATFR system from which all these

16    documents were -- what's the word I'm

17    looking for?

18        Q    Stored?

19        A    Yeah, they're stored.  Generated.

20    That's the word, generated.  And when the

21    letters come out -- if you'll notice the

22    original one --

23        Q    You wrote the date.

24        A    I wrote the date, because they

25    don't come out with a date on them.  You

↑

223

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    have to handwrite a date on it.  So

3    basically, what I gave him was a copy of the

4    letter that was issued 7/16/2017, 2018

5    whatever.  But to satisfy Mr. Ostrander's

6    request, I said, here this is a copy of the

7    letter that was sent.  I did not turn around

8    and backdate it.  I just gave him what the

9    system gave me.

10        Q    But the other thing you didn't do

11    is you didn't tell Mr. Ostrander that the

12    letter that you sent came back as

13    undelivered, right?

14        A    He didn't ask he.

15        Q    Oh, okay.  I get it.  If he would

16    have asked, you would have said, yeah, this

17    is the letter.

18            But he did ask you for proof of

19    mailing, didn't he?

20        A    I don't recall.

21        Q    Okay.  I think I do.

22            And if he would have asked for it,

23    would you have given it to him?

24        A    I didn't have it in my possession

25    to give it to him.

☗

224

1        ROUGH DRAFT - FEBRUARY 10, 2023

2        MR. MESSINGER:  I will now pass

3    the witness.

4        MR. MURPHY:  And I have the same

5    objections.  ^ asking question is not a

6    party to ^ matter, and I hope in the

    7        interest of the hour he can try to be

    8        brief.

    9            @@ I always try to be brief.  Now

   10        if the witness is able to be brief.

   11        And, again, I have my same response.

   12        We are the largest creditor of the

   13        estate.  We have standing in that

   14        regard, and ^ our.

   15        Q    Mr. Gould, Exhibit 14.  Do you

   16   still have that in front of you?

   17        A    I can find it.  What does it look

   18   like?

   19        Q    I understand it to be the

   20   documents, the exhibits to a memorandum that

   21   you may have written to a nominee ^ nome

   22   nice.

   23            Rick Rick it has the Mazors chart

   24   on it at the end.

   25        A    Okay, I got it.

   ↑

                                            225

    1        ROUGH DRAFT - FEBRUARY 10, 2023

    2        Q    So did I understand your earlier

3    testimony correct, these are exhibits to a

4    memorandum that you wrote where in you

5    concluded that there was nominee liability

6    on behalf of writing church enterprises

7    Inc.?

8        A    You are correct.

9        Q    Are these all of the documents

10   that support that conclusion?

11       A    There was also the memo itself in

12   which an analysis was made explaining all of

13   their inner connect tiff which is

14   attorney/client privilege.

15       Q    Rate I asked are these all the

16   documents that support that that analysis

17   was based on something.  Is this what it's

18   based on?  All the documents?

19       A    I would say, yes.

20       Q    And I think you said earlier in

21   your testimony that you choose nominee over

22   alter ego.

23            Why did you choose nominee?

24       A    Because I saw the property as

25   existing in place and that Louise was using

1             ROUGH DRAFT - FEBRUARY 10, 2023

2     it as a nominee for her own interest,

3     financial interest.  And then I wasn't the

4     last word on this because I'm not an

5     attorney.  I do have a good -- fairly decent

6     knowledge of law, but that's why I went to

7     counsel and counsel agreed it was a nominee

8     situation.  So I wasn't the last word.

9         Q    Is that the full and complete

10    answer to that question?

11        A    I have nothing further to add.

12        Q    Is there was a question earlier

13    about compensation or consideration that was

14    paid for the property nothing we never got

15    an answer to it let me ask it again it's my

16    understanding that Aberdeen bought the

17    property itself I'm talking about the

18    property that consist of 366 begin rain and

19    376 examine lane.

20        Q    That's what the records tell.

21        Q    Do you have any reason to believe

22    it didn't pay compensation when it bought

23    it?

24      A    I'm confused you said no

25   consideration and you cited that from

&#x2706;

1          ROUGH DRAFT - FEBRUARY 10, 2023

2   earlier testimony.  No consideration phrase

3   I got right off of the Dee where Aberdeen

4   transfer I had it's interest in 376 to

5   Brickchurch for know consideration it's on

6   the document.  Now the question you're

7   asking me is did Aberdeen get the property

8   for know consideration is that what you

9   saying.

10      Q    Did it -- I think my question was

11   do you have any reason to believe that

12   Aberdeen didn't pay fair consideration for

13   the property when it purchased it?

14      A    I never even said that, no.  They

15   bought it at length but I never saw the deed

16   who they bought it from there is a record

17   obviously from the things you guys submitted

18   in bankruptcy who showed who the prior owner

19   was I didn't know who it was.

20      Q    Do you have any reason to believe

21    that Aberdeen didn't pay fair consideration

22    for the property when it purchased it?

23      A    From whom.

24      Q    From whoever?

25      A    I would have to say they paid fair

↟

228

1          ROUGH DRAFT - FEBRUARY 10, 2023

2    consideration for it.

3      Q    What information do you have that

4    Ms. Blouin exercuses control or dominium

5    over Brickchurch Enterprises Inc.?

6      A    The preponderance of evidence I

7    gather and what I drew from em.

8      Q    What evidence?

9      A    Everything we went through today

10    here.

11      Q    Anything else?

12      A    I answered all of Mr. Messinger's

13    questions regard go question, so I'll let

14    the record speak to.

15      Q    I don't believe you did.  I'll ask

16    you to answer my question.  Anything else?

17              Ted Ted we talked about it for

18    hours today.  I think it's clear.

19        A    Not that I can think of at the

20    moment.

21        Q    Are there any documents that you

22    need to review to refresh that recollection?

23        A    No, sir.

24        Q    What information do you have that

25    miss blue enjoys the again fits of the joint

⬆

229

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    the property I'm talking about brick search?

3        A    She owns it and she finances it

4    and I believe she's trying to make rent on

5    it.  Other than that it's an es it assets

6    can be enjoined.

7        Q    She owns it?

8        A    That was my conclusion as a

9    nominee.

10        Q    All right air saying she owns it

11    isn't that a circular arresting all air

12   Craig that Mabon Cruz he meets the element?

13       A    It wasn't my conclusion I had

14   counsel.

15       Q    It says makes it circular to is

16   the legal owner Ted Ted it's the totality of

17   the evidence that.

18       Q    Breath breath you're a lows not to

19   loud?

20       A    I don't recognize your standing.

21       Q    It doesn't matter what you?

22       A    I'm trying to answer your question

23   whether you like the answer or not.  There's

24   nothing more I can say.

25       Q    Who is the legal owner of the

&uarr;

                                        230

1            ROUGH DRAFT - FEBRUARY 10, 2023

2   property?

3       A    According to the deed which

4   property are we talking about.

5       Q    366 begin lane.

6       Q    That would be Brickchurch

7   according to the title there.

8       Q     And what evidence do you have that

9    Ms. Blouin enjoys or benefits that property?

10      A     The preponderance of evidence that

11   I gathered to make the nominee lien filing

12   request.

13      Q     Again what evidence, again what

14   evidence the stuff you pointed to plus.

15      Q     Fair enough?

16      A     You want to hear the answer please

17   give me a moment to take for you so you

18   don't have to ask me again.

19      Q     Okay?

20      A     This evidence here the conclusions

21   that I drew from it because as you go

22   through individual pieces of paper they say

23   they gave you a little bit of a picture it's

24   the analysis that gives you the bigger

25   figure.

⬆

231

1        ROUGH DRAFT - FEBRUARY 10, 2023

2       Q     And air referring to Exhibit 14,

3    right when you make the prior statement?

4        A     This is Exhibit 14, yes.

5        Q     You would agree with me that

6  analysis are facts are evidence its

7  analysis, right?

8        A     Analysis is conclusions drawn from

9  a set of data an dated point.

10       Q     And the set have data is what we

11  marked as Exhibit 14 right?

12       A     Not solely this but yes this is

13  what has been entered into the record.

14       Q     What else that as than the been

15  enter into the record.

16       Q     As I was answering Mr. messenger

17  question there were conversations I had like

18  with the tax account there and let's see

19  what else I'm going to leave it at that

20  because that's all I can recall at this

21  point in time.

22       Q     Any records that you are aware of

23  that might we fresh your recollection?

24       A     I don't recall at this time.

25       Q     What evidence do you have that Ms.

232

1          ROUGH DRAFT - FEBRUARY 10, 2023

2     Blouin pace the expenses directly or is a

3     spores solve funds for payments of the

4     Spencer for 366 begin lane?

5          A     The light bell or the electricity

6     list for starter or the name on the property

7     tax records, the water.

8          A     I can't see further if I do I'll

9     let you know.

10         Q     Do you know if link chin maintains

11    its own books and records and I'm talking

12    Louise Blouin or any other entities?

13         A     It appears it doesn't maintain

14    it's own records.

15         Q     Based on what?

16         A     The packet.

17         A     They team to be sign when

18    something came up with respect to a

19    refinanced and they add to meed that legal

20    sufficient cyst for a deal to go through.

21         Q     Other than what you dated there

22    any other reason to believe that Brickchurch

23    Enterprises Inc. doesn't maintain it's own

24    books and records?

25       A     The conclusion that I drew that

↟

233

1              ROUGH DRAFT - FEBRUARY 10, 2023

2    brick is a nominee and now a alter ego,

3    there was no alter ego Norwick church I have

4    to back off that it's a nome fee everything

5    I was able to determine is she didn't keep

6    books and records I didn't see any, I was.

7       Q     What efforts cough that miss ever

8    commingled funds well according to the tax

9    returns there is evidence that she is a debt

10   or, right it's in the bankruptcy petition

11   it's in the returns I believe in the sense

12   agreement you agreed to she was due to get,

13   10 million, Ms. Blouin?

14      A     Yes.

15      Q     You understand he's a accident for

16   in bankruptcy?

17      A     No I'm saying that, what I mean to

18   say is that Brickchurch Ozer money, right.

19      Q     What do you base that on?

20      A     Base I remember seeing a document

21    that said that as far as the financing

22    agreement was concerned specific funds were

23    segregated to Ms. Blouin from that financing

24    agreement $10 million, so she had a

25    financial interest in that property which

↟

234

1         ROUGH DRAFT - FEBRUARY 10, 2023

2    means the property owes her 10 million.

3    I -- it's fair to assume that those funds

4    are, well let's just say they're fungible

5    there is no boundary between the two how

6    does bring church over her money when it's.

7         Q    You understand Brickchurch is a

8    company, correct?

9         A    Brickchurch owns the Brown's and

10   Louise Blouin owns Brickchurch Enterprises

11   Inc. and those are the conclusions that were

12   draw.

13        Q    Any other evidence of commingling

14   of assets?

15        A    I have nothing here in the

16   evidentiary file.

17      A    Can I ask a question.

18      Q    No you may not.

19      Q    On Exhibit 14 I'm going to show

20  you so you can find it it's these black

21  boxes?

22      A    Yep I'm on that page.

23      A    These black boxes are not IRS

24  records, are they.

25      A    No they are a the not.

♠

235

1          ROUGH DRAFT - FEBRUARY 10, 2023

2      Q    They weren't created by the IRS

3  were they?

4      A    They were not.

5      Q    I don't have any further questions

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25