## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | |
| | Case No. 22-70914-ast |
| BRICKCHURCH ENTERPRISES, INC., | |
| | Chapter 11 |
| Debtor. | |

## PLAN PROPONENT BAY POINT CAPITAL PARTERS II, LP'S RESPONSE TO THE OBJECTION OF THE INTERNAL REVENUE SERVICE TO THE DISCLOSURE STATEMENT FOR BAY POINT CAPITAL PARTNERS II, LP'S PROPOSED FIRST AMENDED PLAN OF LIQUIDATION OF BRICKCHURCH ENTERPRISES, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (ECF NO. 291)

Plan Proponent Bay Point Capital Partners II, LP ("Bay Point" or the "Plan Proponent") hereby files this Response to *Creditor Internal Revenue Service's Objection to Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (ECF No. 291, the "Objection"). The Internal Revenue Service's (the "IRS") Objection prematurely raises numerous issues related to plan confirmation, but it doesn't raise a single issue as to whether the Proposed Disclosure Statement[1] provides "adequate information so that an informed determination can be made whether to accept or reject a reorganizational plan." *See In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992). As such, the IRS faces the heavy burden of establishing that Bay Point's Proposed Plan[2] is "patently unconfirmable on its face." *See In re Quigley Co.*, 377 B.R. 110, 115-116 (S.D.N.Y. 2007). The IRS falls far short of meeting this high standard.

---

[1] *Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (ECF No. 288, the "Proposed Disclosure Statement").

[2] *Bay Point Capital Partners II, LP's First Amended Proposed Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (ECF No. 287, the "Proposed Plan").

# I.     Relevant Background

### a.   *Debtor and Related Parties Corporate Structure*

Brickchurch Enterprises, Inc. ("<u>Debtor</u>") is part of a corporate structure designed to hold the luxury real estate. Debtor owns the real property commonly known as 366 Gin Lane, Southampton, New York 11968 (the "<u>Debtor Property</u>"), which includes a luxury guest house, pool, and tennis court. Related party Aberdeen Enterprises, Inc. ("<u>Aberdeen</u>") owns 376 Gin Lane, Southampton, New York 11968, which includes the historic manor (the "<u>Aberdeen Property</u>"). Collectively, the Debtor Property and Aberdeen Property (collectively, the "<u>Properties</u>") comprise more than 400' of ocean frontage on one of the most exclusive streets (if not the most exclusive street) in The Hamptons.

The following diagram details the overall corporate structure of the various companies related to Debtor:



### b. *The Morgan Stanley Loan*[3]

On December 30, 2011, Blouin borrowed Fifteen Million Dollars ($15,000,000.00) (the "MS Loan") from Morgan Stanley Private Bank, National Association ("Morgan Stanley") and executed a promissory note evidencing her obligation to repay the same. On December 30, 2011, to secure the amounts due and owing under the MS Loan, Blouin caused Aberdeen to grant Morgan Stanley a mortgage on the Aberdeen Property (the "MS Mortgage"). The MS Mortgage was filed with the Suffolk County Clerk Records Office on February 6, 2012 and constitutes a first lien on the Aberdeen Property.

### c. *The JGB Loan*

On July 25, 2018, Debtor and Aberdeen entered into the JGB Loan.[4] As part of the JGB Loan, Debtor and Aberdeen executed the JGB Loan Documents,[5] including (i) that certain Secured Promissory Note, dated July 25, 2018 and in the original principal amount of Twenty-Six Million and 00/100 Dollars ($26,000,000.00), executed by Debtor and Aberdeen, as borrowers, in favor of JGB (the "JGB Note"); and (ii) that certain Mortgage, dated July 25, 2018, granted by Debtor and Aberdeen, as Mortgagors, with respect to the Properties (the "JGB Mortgage").[6]

### d. *The JGB Foreclosure Action*

Debtor and Aberdeen defaulted on their respective obligations under the JGB Loan Documents on or about May 31, 2019 by failing to remit required payments due under the JGB

---

[3] This loan relates to non-Debtor Aberdeen. However, Aberdeen is a co-borrower with Debtor under the DIP Loan (defined below) and its property is security for the DIP Loan.

[4] The term "JGB Loan" shall have the same meaning as ascribed to such term in the *Order (i) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, and (ii) Granting Liens and Super-Priority Claims* (ECF No. 172, the "DIP Financing Order").

[5] The term "JGB Loan Documents" shall have the same meaning as ascribed to such term in the DIP Financing Order.

[6] The JGB Mortgage was subordinate to the MS Mortgage for the Aberdeen Property, but was in a first priority for 366 Gin Lane.

Note,[7] and, as a result, JGB initiated a foreclosure action the with respect to the Properties (the "JGB Foreclosure Action").[8] Morgan Stanley was not named in the JGB Foreclosure Action because JGB could not foreclose the MS Mortgage on the Aberdeen Property, which was senior in priority to the JGB Mortgage on that same Property.

The New York state court presiding over the JGB Foreclosure Action (the "JGB Foreclosure Court") entered the JGB State Court Judgment[9] against Debtor and Aberdeen and ordered the sale of the Properties. The JGB Foreclosure Court ordered that the Properties be sold separately, with the Debtor Property being sold first, followed by the Aberdeen Property. Upon information and belief, the JGB Foreclosure Court's instruction with respect to the timing of the successive sales was based on the fact that JGB held a first priority mortgage on the Debtor Property, but only a second priority mortgage on the Aberdeen Property.

### e. *The Morgan Stanley Foreclosure Action*

On November 25, 2019, just three days after the JGB Foreclosure Action was filed, Morgan Stanley filed its own foreclosure action against the Aberdeen Property (the "MS Foreclosure Action"). JGB, Blouin, and the IRS were all named as defendants in the MS Foreclosure Action. Although the IRS Lien (as defined below) was not of record at the time the MS Foreclosure Action was filed, the *Order Confirming Referee Report and Judgment of Foreclosure and Sale* entered in the MS Foreclosure Action (the "MS Foreclosure Judgment")[10] noted that all liens filed after the initiation of the MS Foreclosure Action were also being foreclosed as part of that action. Specifically, MS Foreclosure Judgment stated:

---

[7] Subsequent defaults under the JGB loan documents also occurred.
[8] The term "JGB Foreclosure Action," as the same is used herein, shall have the same meaning as ascribed to the term "Foreclosure Action" in the DIP Order.
[9] The term "JGB State Court Judgment" shall have the same meaning as ascribed to such term in the DIP Order.
[10] A true and correct copy of the MS Foreclosure Judgment is attached hereto as Exhibit 1.

4

ORDERED, ADJUDGED AND DECREED that the Defendants in this action and all persons claiming through them ***and any person obtaining an interest in the property after the filing of the Notice of Pendency*** are barred and foreclosed of all right, Claim, lien, title, and interest in the property after the sale of the mortgaged property.

MS Foreclosure Judgment at 7 (emphasis added).

### f.    *Debtor's Bankruptcy Case and the IRS Filing of Notices of Tax Liens*

On April 30, 2022, Debtor filed a bankruptcy petition (ECF No. 1, "Debtor's Bankruptcy Petition") initiating the above-captioned case (this "Bankruptcy Case").[11]

On August 17, 2022, the IRS filed Notices of Federal Tax Lien against Debtor (the "Debtor Notice of Tax Lien," Exhibit 2) and Aberdeen BVI (***not Aberdeen***) (the "Aberdeen BVI Notice of Tax Lien," Exhibit 3).[12] The IRS's Notice of Lien against Brickcurch were void *ab inito* as they were filed in violation of the automatic stay. The IRS's lien against Aberdeen BVI did not encumber either of the Properties because (i) the Notice of Lien was filed against a non-title owner (i.e., the Notice of Lien was filed against Aberdeen BVI – who is not a title holder of record with respect to either of the Properties; and (ii) the Notice of Lien did not correctly identify the Properties as being the subject of any lien. *See* Ex. 3.

On September 30, 2022, Debtor filed its motion seeking approval of debtor-in-possession financing. (ECF No. 115, the "DIP Financing Motion"). The IRS received notice of DIP Financing Motion. *See* Certificate of Service (ECF No. 119). On October 21, 2022, Debtor filed an unexecuted version of the DIP Loan Agreement[13] and a proposed version of the DIP Financing Order negotiated by Debtor and Bay Point. On October 26, 2022, the Court held a hearing on the

---

[11] The IRS received notice of the Debtor's Bankruptcy Petition and was added to Debtor's mailing matrix in Debtor's Bankruptcy Case. *See* Debtor's Bankruptcy Petition, Official Form 204, § 2.1, and Mailing Matrix.

[12] The Notices of Tax Lien are alleged to be the result of unpaid employment taxes of a third-party company for whom Blouin was the sole shareholder.

[13] The term "DIP Loan Agreement" shall have the same meaning as ascribed to it in the DIP Financing Order.

DIP Financing Motion where it approved Debtor's post-petition financing as the terms of that financing were set forth in the DIP Loan Agreement (the "DIP Loan" or "DIP Financing"). *See* October 31, 2022 Hearing Transcript (ECF No. 165).

In preparing for closing the DIP Loan, on or around November 9, 2022, Debtor, Aberdeen, and Bay Point discovered that the IRS had filed the Debtor Notice of Tax Lien.[14] On November 11, 2022, Debtor filed a motion to strike any lien created by the Debtor Notice of Tax Lien as having been filed in violation of the automatic stay.[15]

On November 16, 2022, the Court entered the DIP Order (ECF No. 172). The DIP Order provided, *inter alia*, that all of the DIP Loans (as that term is defined in the DIP Order) were automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage or other instrument. (DIP Order, § 4.) The DIP Order defined "DIP Liens" to include all liens of Debtor and Aberdeen that were granted as security for the DIP Loan. Thus, Bay Point's lien on Aberdeen to secure the DIP Loan was properly perfected on November 16, 2022.

On November 29, 2022, the IRS filed its Objection to Motion to Strike.[16] In that objection, the IRS indicated that it wasn't aware of Debtor's Bankruptcy Case. (Objection to Motion to Strike at 1.) The IRS took this position despite having been served with the Bankruptcy Petition, the DIP Financing Motion, and various other documents. Regardless, the IRS indicated that it would withdraw the Debtor Notice of Tax Lien. (Objection to Motion to Strike at 1.)

---

[14] Bay Point ran its initial title report as part of its due diligence process on August 15, 2022 – two days before the IRS filed its Debtor Notice of Tax Lien in violation of the automatic stay.

[15] *See Debtor's Motion for Entry of an Order Striking, Voiding and Avoiding Lien Field in Violation of the Automatic Stay (11 U.S.C. § 362(k) and for Sanctions)* (ECF No. 168, "Debtor's Motion to Strike").

[16] The term "Objection to Motion to Strike" shall mean the *Internal Revenue Service's Opposition to "Debtor's Motion for Entry of an Order Striking, Voiding and Avoiding Lien Filed in Violation of the Automatic Stay (11 U.S.C. § 362(k) and for Sanctions"* (ECF No. 185).

On December 9, 2022, the DIP Loan closed (the "Closing"). As part of the Closing, and as provided for in the DIP Order and the DIP Loan Agreement, Bay Point was assigned the JGB Mortgage, which consisted of (i) a valid, first priority secured lien on the Debtor Property; and (ii) a valid, second-priority lien on the Aberdeen Property.

g.  *The IRS Files a Tax Lien Against Aberdeen*

On February 17, 2023 – more than three months after Bay Point's DIP Liens were automatically perfected by the DIP Order – the IRS filed new Notices of Federal Tax Lien that correctly identified the property owner of the Aberdeen Property (i.e., Aberdeen) and (the "Aberdeen Notice of Tax Lien") and the property address. The Aberdeen Notice of Tax Lien is attached hereto as Exhibit 4.

h.  *Debtor Subsequent Inaction*

Despite making representations to Bay Point and the Court that purpose of the DIP Loan was to effectuate a reasonable marketing process and sale of the Properties, the Debtor and Aberdeen failed to make progress on their promises. Instead, in the ensuing months after the closing of the DIP Loan, Debtor requested certain protective advances under the DIP Loan Documents to both protect the Properties and to prevent liens from being placed upon the Properties (including liens for unpaid utility charges). Bay Point agreed to make protective advances for those reasonable expenses that could be substantiated. Shortly after the Closing, Debtor and Blouin did a one-eighty and ceased any such efforts to sell or refinance the Properties in bankruptcy. Instead, Debtor and Blouin began arguing that the Properties could not be sold or refinanced while in bankruptcy. *See* Debtor Motion to Dismiss, ¶ 3 ("[Debtor] remaining in bankruptcy is adversely affecting the property's marketability. . . . REYL will not enter the financing Transaction with [Debtor] until [Debtor] is no longer in bankruptcy. [Debtor]'s ability

to refinance on favorable terms and sell the property at market value has been hampered by the bankruptcy."). As s result, Blouin was allowed to spend another summer in The Hamptons without paying rent, utilities, or maintenance.

As shown by Aberdeen's recent bankruptcy filing Blouin has now down yet another 180-degree shift to wanting the Properties in bankruptcy. *See* Debtor's Declaration Pursuant to Local Rule 1007-4 filed in the Aberdeen Bankruptcy Case, ¶ 9 ("The Debtor believes that the two Properties can be sold or refinanced to satisfy all legitimate debts in full."). Thus, it appears Blouin's efforts in this Bankruptcy Case were solely to delay any sale of the Properties.

i. <u>Debtor Defaults on the DIP Loan Obligations</u>

On June 9, 2022, Debtor (and the other DIP Loan obligors) defaulted on the DIP Loan by failing to payoff the DIP Loan obligations on that date (i.e., the maturity date). Bay Point provided notices of default to Debtor, Aberdeen, the Pledgors, and the Guarantors (as those terms are defined in the DIP Loan Documents). After months of negotiating with Debtor, Bay Point came to the realization that it needed to take unilateral action to bring this matter to a close through an orderly sale of both Properties.

j. <u>Bay Point's Parallel Paths to Sell the Property and Maximize Return to the Creditors.</u>

Amongst all of the disagreement between the various parties, there does appear to be one point of agreement – the Properties are iconic, special, and likely most valuable when sold together as a single estate. *See IRS Objection*, at 5 ("Everyone appears to agree that selling the two properties together is most likely to maximize the sale proceeds."). But the situation of selling both Properties was complex. They have different debt structures, different creditors, one owner was in bankruptcy and one was not, there were imminent foreclosure sales, and the ultimate decision

maker for the owners was more interested in continuing to live rent and expense free than she was in maximizing the value of the assets.

Thus, Bay Point came up with two solutions to accomplish a free and clear sale of both Properties through an orderly sale process: a parallel process whereby the ultimate course of action would depend on Bay Point's ability to remove the officers and directors of Debtor and Aberdeen.

         i.    <u>First Path: Replacement of the Officers and Directors and a Jointly Administered Bankruptcy Process</u>

The first path begins with the removal and replacement of Debtor's and Aberdeen's board of directors and officers pursuant to the rights granted to Bay Point through the DIP Loan Documents and applicable law. With the Debtor's and Aberdeen's board of directors replaced by directors that will act in the best interests of creditors (as opposed to Blouin acting in her own self-interest), the ability to consummate a sale of both Properties becomes a realistic option. This could be accomplished through a jointly administered bankruptcy proceeding run by the new directors and officers. In fact, the new officer/director of Aberdeen intends to retain an independent chief restructuring officer and separate bankruptcy counsel to guide him through a jointly administered sale process. Bay Point believes that a sale of both Properties, together, through a jointly administered bankruptcy process will generate sale proceeds to pay all creditors (including all administrative expense claims of both estates and any claims that the IRS may have).[17]

---

[17] While reserving all of its rights under the DIP Loan Documents, Bay Point has not yet sought to foreclose on the equity interests of the Debtor and Aberdeen – or the pledged interests held by Holdings BVI in Aberdeen BVI and Brickchurch BVI. As such, Bay Point has not yet sought to acquire through foreclosure the equity interests that are ultimately held by Blouin. Bay Point may need to exercise such rights to protect its interests in the Properties in the near term. However, such a proceeding would not impact the rights of creditors of the Debtor in Aberdeen.

ii.    Second Path: A sale of both "Properties" Through Debtor's Bankruptcy Case

The second contemplated path is a non-consensual bankruptcy plan (i.e., the Proposed Plan) whereby the Plan Proponent could consummate an orderly sale of both Properties through combining its state court rights (if necessary) with its rights in bankruptcy. This option will become necessary only if it is determined that Bay Point's removal and replacement of Aberdeen's officers and directors was not effective.

The Proposed Plan starts with Bay Point exercising its right to automatic relief from stay with respect to the Aberdeen Property. Bay Point is entitled to such automatic relief from stay unless the pending default under the DIP Loan is cured within sixty days of the filing of Aberdeen's bankruptcy petition. (DIP Order, § D(i); DIP Loan Agreement, § 6.11.)

Bay Point will next exercise its state court credit bid rights to submit a winning bid at a state court foreclosure sale of Aberdeen (the "Proposed Foreclosure Sale"). This process is expected to move relatively quickly (i.e., approximately 60 days) due to the fact that Bay Point currently holds an order of foreclosure sale with respect to the Aberdeen Property.

The Proposed Foreclosure Sale of the Aberdeen Property will be free and clear of all liens junior to Bay Point's liens. Because Bay Point undisputedly holds liens senior to the IRS on the Aberdeen Property, the Proposed Foreclosure Sale will be free and clear of any lien that the IRS may have with respect to the Aberdeen Property.[18]

Bay Point will then allow its rights with respect to the winning foreclosure bid (i.e., the right to purchase the Aberdeen Property free and clear of all other liens) (the "Foreclosure Bid

---

[18] While the IRS and Bay Point appear to have a dispute regarding the validity, priority, and extent of any liens arising from the Aberdeen BVI Notice of Tax Lien, there can be no dispute regarding the priority of the JGB Mortgage on the Aberdeen Property and the MS Mortgage on the same Property, both of which are now held via assignment by Bay Point.

Rights") to be sold as part of a combined transaction with the Debtor Property – with the Debtor Property being sold pursuant to the Proposed Plan. To be clear, the Proposed Plan does not propose to affect any rights with respect to the Aberdeen Property. Instead, the sole purpose to include the right to close the foreclosure sale of the Aberdeen Property is to increase the value of both Properties – which is beneficial to Debtor's bankruptcy estate. In fact, it is the synergy and value created by the sale of the Properties as a whole that Bay Point believes will generate the value necessary to pay off all of Debtor's creditors (including all administrative claims, the IRS's employment tax claim (if any), and any capital gains tax associated with a sale of the Debtor Property).

### k.  *The MS Foreclosure Sale*

As part of the DIP Loan, Bay Point remitted $2.6 million to Morgan Stanley as a paydown of the MS Foreclosure Judgment in return for Morgan Stanley agreeing to a forbear from exercising rights against the Aberdeen Property for a period simultaneous to the DIP Loan. Thus, just as the DIP Loan matured on June 9, 2023, the Morgan Stanley forbearance agreement terminated on that same date.

While Bay Point tried to engage the Debtor and Blouin to find a consensual resolution to this matter, Morgan Stanley had run out of patience with Blouin. Morgan Stanley scheduled a foreclosure sale of the Aberdeen Property for August 3, 2023.

### l.  *Bay Point purchases the Morgan Stanley Debt to Adjourn the Foreclosure Sale*

Bay Point engaged with Morgan Stanley in an effort to postpone the foreclosure sale in the Morgan Stanley Foreclosure Action (the "MS Foreclosure Sale").[19] In fact, Bay Point went so far

---

[19] Bay Point sought to postpone the MS Foreclosure Sale due to the fact that, among other reasons, the sale order entered by the court presiding over the MS Foreclosure Case did not provide credit bid rights for anyone other than Morgan Stanley.

Case 8-22-70914-ast    Doc 296    Filed 08/23/23    Entered 08/23/23 01:11:30

as to offer Morgan Stanley a $900,000 paydown of the Morgan Stanley in return for a thirty-day extension of the MS Foreclosure Sale. Morgan Stanley declined. They were done with Blouin.

Thus, on May 2, 2023, in order to prevent the MS Foreclosure Sale, Bay Point purchased Morgan Stanley's loan (the "MS Loan"), including the MS Foreclosure Judgment, Morgan Stanley's note (the "MS Note"), and the mortgage securing the same (the "MS Mortgage"). As a result of Bay Point's purchase of the MS Loan, the referee overseeing the MS Foreclosure Sale indicated that she was adjourning that sale.

### m. _Aberdeen Files for Bankruptcy_

On May 2, 2023, the same date that Bay Point completed the purchase of the MS Loan, and despite the fact that she had been removed as an officer and/or director of Aberdeen,[20] Blouin caused a law firm to file a bankruptcy petition on behalf of Aberdeen. In the filing, Blouin made several sworn statements that contradicted her previous sworn statements. She further offered a litany of reasons and excuses to forgive her inability to honor the DIP Loan Documents. The common theme – and indeed the same theme that every other lender has encountered with Blouin in relation to the Properties while this bankruptcy case has been pending, if not before – is that her inability to perform is not her fault and, in fact, is the fault of [_insert name of current lender_]. Indeed, Bay Point is just the latest lender to be the subject of Blouin's habit of following the deny, deny, and then accuse practice. Further, her additional extreme actions and false promises appear to be repetitive as well:

> The post-petition conduct of Blouin is consistent with her pre-petition conduct: multiple counsel changes, multiple lawsuits with her own advisors, et cetera. We've heard about the refinancing

---

[20] The basis for the removal of Blouin and her husband, Mathew Kabatoff, as officers and/or directors of Aberdeen is set forth in greater detail in Bay Point's Motion for an Order (i) Dismissing Bankruptcy Case; or (ii) Granting Alternative Relief (the "Bay Point Motion to Dismiss") filed in the Aberdeen bankruptcy proceeding, Bankr. E.D.N.Y. Case No. 23-72834 (the "Aberdeen Bankruptcy Case"). The Bay Point Motion to Dismiss is attached hereto as Exhibit 5.

before. We've heard about sales before. We are going nowhere with this debtor.

Comments of JGB's counsel at the ***June 29, 2022*** Hearing, Transcript at 11:13-19. Unfortunately, those words ring as true as ever.

## II.    <u>The IRS Objection to the Proposed Plan Should be Overruled</u>

As noted above, the IRS doesn't raise a single issue as to whether the Proposed Disclosure Statement provides "adequate information so that an informed determination can be made whether to accept or reject a reorganizational plan." *See In re 266 Washington Assoc.*, 141 B.R. at 288. Instead, the IRS attacks the confirmability of the Proposed Plan. As such, the IRS faces the heavy burden of establishing that Bay Point's Proposed Plan is "patently unconfirmable on its face." *See In re Quigley Co.*, 377 B.R. at 115-116. The IRS falls short of meeting this high standard.

### a.    *The Proposed Plan Does Not Propose to Sell Non-Debtor Property*

The IRS's first argument is based on a misreading of the Proposed Plan. The Proposed Plan does not propose to sell the Aberdeen Property (i.e., the Aberdeen Property). Instead, the Proposed Plan proposes two parallel – but distinct – sales: (i) Debtor's sale of the Debtor Property through the Proposed Plan; and (ii) Bay Point's sale of the Foreclosure Sale Rights (i.e., the Aberdeen Property).[21] Aberdeen does not get a release or a discharge through the Proposed Plan. The two primary ties between the Plan and the Aberdeen Property are as follows: (i) there is a method for allocating sale proceeds of a combined sale so that both the Debtor and Bay Point can enjoy in the additional value created by the combined sale; and (ii) the Court is given the power to ensure that no parties interfere with the combined sale – which, due to the expect additional value expected to be generated by the combined sale, has a sufficient nexus to the Debtor's bankruptcy case and is a

---

[21] It is certainly possible that the foreclosure sale of 366 Gin Lane can be avoided by both Properties sold in a single sale. That will ultimately depend on the future ruling by this Court with respect to the issue of the duly appointed board of directors of Debtor and Aberdeen.

valid exercise of this Court's jurisdiction under the Bankruptcy Code, including, but not limited to, 11 U.S.C. § 105(a).

Thus, there is no attempt to sell non-debtor property through the Proposed Plan and the IRS's objection on this ground can be overruled.

### b. *Bay Point's Motion to Dismiss the Bankruptcy Shows Good Faith*.

The IRS (and the Debtor) have argued that the Bay Point Motion to Dismiss somehow evidences bad faith. That could not be farther from the truth. Bay Point's preferred course of action is to sell the Properties through a jointly administered bankruptcy – and, if its appointed officer and director is found to be in control of Aberdeen – it is hopeful that is what will ultimately occur.[22]

Bay Point could simply foreclose on the properties outside of bankruptcy given that it already has relief from stay in Debtor's case and will have relief from stay in less than 40 days in the Aberdeen bankruptcy case. That would eliminate the IRS liens, avoid any need for Bay Point to address capital gains taxes, and potentially eliminate any equity that the shareholders have in the property that would otherwise be realized on an orderly sale. Bay Point didn't do that.

Bay Point could simply foreclose on the pledged equity to take control of the Debtor and Aberdeen. This would result in Bay Point capturing any equity after an orderly of the sale instead of the current shareholders. Bay Point didn't do that.[23]

Instead, Bay Point exercised its rights to take control of the Debtor and Aberdeen so that it could do what Blouin has failed to do for more than 16 months while in bankruptcy – move this case forward towards final resolution. Despite all Blouin's baseless allegations made by an ever-growing and changing legal team, Bay Point did not foreclose on her indirect the equity interests.

---

[22] Ultimately, the decision of what to do with Aberdeen will be up to the director/officer and the company's proposed independent, third-party chief restructuring officer and legal counsel.

[23] Bay Point reserves all rights to take such actions (and all of its rights under the DIP Loan Documents, at law or equity) and may need to do so to protect its' interests in the Properties.

To date, it has left the financial upside for Blouin, still seeking a win-win for all parties in this transaction, despite the fact that the DIP Loan is now well past maturity.

The Bay Point Motion to Dismiss is not inconsistent with this strategy. Indeed, the Bay Point Motion to Dismiss seeks alternative relief that would allow for Aberdeen to remain in bankruptcy under the direction of its newly appointed director (Charles Andros) and officers. If it is determined that Bay Point's appointed director and officer was not duly appointed, the Proposed Plan permits a sale of the combined Properties (via a direct sale of the Debtor Property and the Foreclosure Sale Rights with respect to the Aberdeen Property) despite Blouin remaining in control of Debtor and Aberdeen.

c. _The Proposed Plan is Not Merely a Tax Avoidance Strategy_

The IRS's next argument is that this Court should not confirm the Proposed Plan because it is merely a tax avoidance strategy. The IRS does not cite any case law in support of the proposition that a plan of liquidation should not be confirmed merely because it incidentally results in the lawful avoidance of tax liability. In fact, the Bankruptcy Code specifically provides for the avoidance of certain tax liabilities as part of a confirmed plan of liquidation. *See, e.g.,* 11 U.S.C. § 1146(a).

More importantly, the Proposed Plan is not proposed as a tax avoidance strategy. Of all the disagreements in this case, the one thing that seems clear to everyone is that the value of the Debtor Property will be maximized if it is sold alongside the Aberdeen Property. *See IRS Objection*, at 5 ("Everyone appears to agree that selling the two properties together is most likely to maximize the sale proceeds."). The Proposed Plan is intended to provide a path forward out of bankruptcy – one that does exactly what everyone appears to agree is in the best interest of the Debtor (i.e., provides for a sale of both Properties together) – if it is determined that Bay Point's appointed officer and

director is not in control of Debtor and Aberdeen. That is the primary motivation for the Proposed Plan – not the avoidance of taxes.

      *d.*   *Any IRS Liens on Aberdeen will be Lawfully Eliminated by the Proposed Foreclosure Sale*

The IRS next argues that the Proposed Plan cannot be confirmed because the Proposed Foreclosure Sale will not eliminate the IRS's liens on Aberdeen. This is just simply wrong. The MS Mortgage, which is now held by Bay Point, is a first priority lien on the Aberdeen Property. There is currently an order of foreclosure sale with respect to the MS Mortgage. That foreclosure sale will likely eliminate the IRS's lien – regardless of whether the IRS lien was recorded in August 2022 or February 2023. The DIP Order includes a factual finding that the JGB Mortgage is a second priority lien on the Aberdeen Property. There is currently an order of foreclosure sale with respect to the JGB Mortgage. That foreclosure sale would also likely likely eliminate the IRS's lien – regardless of whether the IRS lien was recorded in August 2022 or February 2023.[24]

      *e.*   *The Proposed Plan Does Not Treat the IRS Claim as a Disallowed Claim*

The IRS's next argument is that the Proposed Plan cannot be confirmed because it treats the IRS's claim as disallowed. That is simply not true. Nowhere in the Proposed Plan does it take a position on the disallowance of any specific claims. Instead, the Proposed Plan simply sets up a claims reconciliation process and a structure whereby those claims that are not disputed do not have to wait for all other claims to be allowed or disallowed before receiving distributions for Debtor's bankruptcy estate. If the IRS's claims are allowed, they will be paid in the same manner as other allowed claims. If the IRS's claims are disallowed, they will not be paid. This is not controversial.

---

[24] Bay Point is unaware of any valuations for the Aberdeen Property, as a stand-alone property, that would satisfy all obligation that are senior to the claimed IRS Lien, regardless of when the IRS Lien was filed.

f.  _The Proposed Plan Does Not Defer Payment to the IRS_

The IRS argues that the Proposed Plan cannot be confirmed because it "defer[s] payment on the claim even though it is no longer disputed." The fact that Blouin decided that she would try to spite Bay Point by filing a bankruptcy statement in her bankruptcy petition that indicated that the IRS lien on the Aberdeen Property had priority over Bay Point is not binding on Bay Point and, if it is determined that Blouin was removed as an officer and director of Aberdeen, will not be binding on Aberdeen.

The IRS claims are not treated any different than similarly situated claims. If the IRS claim is allowed, it will be paid the same as other allowed claims of equal priority. If the IRS claim is disputed, it will not be paid until that dispute is resolved – just like all other claims. The IRS's arguments that it is being treated differently from other creditors is simply wrong.

g.  _Any Capital Gains Taxes Will be Paid Through the Plan_

The IRS's next objection is that the Proposed Plan does not pay capital gains taxes due on the sale of the Debtor Property. The IRS even goes so far as to argue that Bay Point previously admitted that it needed the IRS's consent to propose a plan of liquidation that included a combined sale of both Properties.

First, the IRS's characterization of Bay Point's previous comments is not accurate. Bay Point previously indicated that a sale of **only the Brickchurch Property** would not generate sale proceeds sufficient to pay all secured claims and all administrative expense claims (including any claim for capital gains taxes). The additional value created by **a combined sale of both Properties** is one of the primary reasons that Bay Point came up with the new structure set forth in the Proposed Plan.

Next, the IRS's objection assumes that there will be capital gains taxes due. The IRS fails to provide any support for that position. While the Debtor and Aberdeen certainly paid less for the Properties than the projected amount of sale proceeds, that alone does not establish that there will be capital gains taxes due. The significant amount of interest paid by the Debtor and Aberdeen, along with the significant investment in improvements made to the Properties, will reduce the capital gains tax liability. Because the IRS has the burden to show that the Proposed Plan is "patently unconfirmable on its face," its speculative objection related to capital gains can be overruled. *See In re Quigley Co.*, 377 B.R. at 115-116.

Moreover, the IRS is just wrong (again) in its understanding of the Proposed Plan. If a capital gain tax qualifies as an administrative expense of Debtor, it will be paid. If a capital gain tax does not qualify as an administrative expense of Debtor, it will not be paid. Again, there is nothing controversial about this.

The IRS's real issue seems to be that it knows that it cannot block the Proposed Foreclosure Sale of ***the Aberdeen Property***, even if the proceeds from the Proposed Foreclosure Sale are not sufficient to pay any capital gains taxes that would be ***due from Aberdeen*** from such sale. That is not a ground to object to the Proposed Plan.

In analyzing this issue, it is important to remember that Bay Point is not selling the Aberdeen Property through the Proposed Plan and Aberdeen is not getting any releases or discharges. Bay Point is simply setting up a private sale of the Foreclosure Sale Rights (which it has every right to do) and running that sale parallel to the Debtor's sale of 366 through the Proposed Plan so that value of both Properties are maximized. The Proposed Plan then sets up a fair system of allocating the sale proceeds from a combined sale. Bay Point has put additional capital at risk

as part of this Proposed Plan and is seeking a path forward that maximizes the value of Debtor's assets.

      h.    **_The IRS is Wrong that Capital Gains Taxes have Priority over Bay Point's Superpriority Claim_**

The IRS's position that there is no basis for subordinating capital gains tax to Bay Point's claim because "the IRS is not a party to [the loan documents]" shows a misunderstanding of the basis for Bay Point's Superpriority Claim. The superpriority status of Bay Point's claim arises from the grant of that status by the DIP Order pursuant to the authority granted to this Court by Congress under 11 U.S.C. § 364(c)(1). DIP Order, § 3(l). That grant of status was statutorily authorized by Congress and ordered by this Court – not granted by the DIP Loan Documents.

      i.    **_Bay Point Agrees with the IRS that the Proposed Plan and Disclosure Statement Should be Revised to Eliminate the Automatic Disallowance of Late-Filed Claims_**

Bay Point agrees with the IRS that the provision in the Proposed Plan providing for the automatic disallowance of late-filed claims is problematic. As such, if the Proposed Disclosure Statement is approved, Bay Point will remove references to that provision in the Proposed Disclosure Statement and the Proposed Plan.

**III.**    **Conclusion**

For the foregoing reasons, as well as those that may be raised at the hearing on the Proposed Disclosure Statement, Bay Point respectfully asserts that the IRS Objection should be overruled.

Dated:  August 23, 2023              Respectfully submitted,

                                        */s/ John C. Allerding*
                                        By: John C. Allerding (admitted pro hac vice)
                                        Thompson Hine LLP
                                        3560 Lenox Road, Suite 1600
                                        P: 404.407.3676 / F: 216.566.5800
                                        John.Allerding@ThompsonHine.com

                                        *Counsel for Bay Point Capital Partners II, LP*