**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BRICKCHURCH ENTERPRISES, INC.,<br><br>Debtor. | Case No. 22-70914-ast<br><br>Chapter 11 |

**PLAN PROPONENT BAY POINT CAPITAL PARTERS II, LP'S RESPONSE TO THE DEBTOR'S OBJECTION AND RESERVATION OF RIGHTS TO DISCLOSURE STATEMENT FOR BAY POINT CAPITAL PARTNERS II, LP'S PROPOSED FIRST AMENDED PLAN OF LIQUIDATION OF BRICKCHURCH ENTERPRISES, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (ECF NO. 293)**

Plan Proponent Bay Point Capital Partners II, LP ("Bay Point") hereby files this Response to the *Debtor's Objection and Reservation of Rights to Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (ECF No. 293, the "Objection").

As a threshold matter, the Bay Point disputes that the Objection was authorized by the duly appointed officer and/or director of Debtor Brickchurch Enterprises, Inc. ("Debtor"). As the Court is aware, Bay Point exercised certain rights under the DIP Loan Documents to remove and replace Debtor's former officer(s) and director(s). *See, generally,* Bay Point Motion to Dismiss.[1] It is the Bay Point's understanding and belief that Debtor's new officer/director, as appointed by Bay Point, did not authorize the filing of the Objection. As such, Debtor's Objection can be overruled on that basis. However, out of an abundance of caution and transparency, and with a compete reservation

---

[1] The term "Bay Point Motion to Dismiss" shall mean *Bay Point's Motion for an Order (i) Dismissing Bankruptcy Case; or (ii) Granting Alternative Relief* filed in the Aberdeen Enterprises, Inc. ("Aberdeen") bankruptcy proceeding, Bankr. E.D.N.Y. Case No. 23-72834 (the "Aberdeen Bankruptcy Case"). The Bay Point Motion to Dismiss is fully incorporated herein by reference.

of rights with respect to the duly authorized officer and director of Debtor, Bay Point will address the specific objections raised in the Objection.

As a second threshold issue, the Debtor's Objection prematurely raises numerous issues related to plan confirmation, but it doesn't raise a single issue as to whether the Proposed Disclosure Statement provides "adequate information so that an informed determination can be made whether to accept or reject a reorganizational plan." *See In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992). As such, the Debtor faces the heavy burden of establishing that the Proposed Plan is "patently unconfirmable on its face." *See In re Quigley Co.*, 377 B.R. 110, 115-116 (S.D.N.Y. 2007). The Debtor falls far short of meeting this high standard.

## I. Relevant Background[2]

### a. *Debtor's Bankruptcy Case*

On April 30, 2022, Debtor filed a bankruptcy petition (ECF No. 1, "Debtor's Bankruptcy Petition") initiating the above-captioned case (the "Debtor's Bankruptcy Case").

On May 25, 2022, this Court held a hearing where Debtor – through Blouin as it's then principal – made the following representations to the Court:

> Notwithstanding the fact that this has been her home for the past twenty-plus years, she's come to the realization that it's basically time to sell.
>
> So our objective is to confirm a plan that will result in the liquidation of the property, the sale of the property. And we anticipate paying all creditors in full, one hundred percent. I expect to have a plan and disclosure statement within a few weeks that contemplates the sale of the debtor's property.

---

[2] For purposes of efficiency and to ease the burden on the parties, Bay Point fully incorporates the Relevant Background section of the *Plan Proponent Bay Point Capital Partners II, LP's Response to the Objection of the Internal Revenue Service to the Disclosure Statement for Bay Point Capital Partners II, LP's Proposed First Amended Plan of Liquidation of Brickchurch Enterprises, Inc. Under Chapter 11 of the Bankruptcy Code* (ECF No. 296, the "IRS Objection Response"). Those background facts will be supplemented as necessary herein. All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the IRS Objection Response.

> . . .
>
> [I]t would be most advantageous to sell both properties as one compound, which is the way both properties have been used for the past twenty years. However, there is a possibility of just selling the debtor property, but our emphasis will be to sell both properties.
>
> . . .
>
> I've had several discussions with Richard Kanowitz, attorney for [JGB], and he has expressed a concern that the main house owned by a separate nondebtor entity could pose an issue. Because the principal owns both properties, we don't believe that there will be any issue whatsoever. She is very motivated to sell the compound, and we can count on her full cooperation.
>
> . . .
>
> We've decided that it would not be advantageous to rent the premises for the summer season. We believe that the emphasis here should be on showing the property and making sure there are no impediments to that because Ms. Blouin is very motivated to sell the entire compound as a whole, and we don't want a summer tenant getting in the way of her ability to let the broker show the house.
>
> . . .
>
> The value, that sixty-three million dollars is the value just for [the Brickchurch Property].
>
> . . .
>
> And another important issue is that [JGB] has made a request for adequate protection payments. We don't feel that they're appropriate. We believe the subject premises is adequately protected, totally secured, oversecured.

May 25, 2022 Hearing Transcript (ECF No. 29) at 7:4-12; 8:9-13; 8:14-20; 10:18-24; 12:13-16; 24:3-12.

As evidenced by the following exchange, when the Court summarized its understanding that the parties sought to have a sale process concluded within 90 days (30 days for approval of bid procedures and a 60-day marketing process), the Debtor confirmed that was appropriate and its intention:

3

> COURT: All Right. All Right. So if the game plan is what the parties are describing it to be, I would think, by 30 days from now, I should already have in front of me a retention application for a realtor or broker and a set of bid procedures to establish an auction sale process, either with or without unwrapping the package, the package being both properties, the unwrapped package being just the debtor's property, so that by the end of the summer, we can be at a sale confirmation hearing.
>
> That seems to be what you all are contemplated about having said ninety days. But what I'm hearing from the parties is tee it up with thirty days, get the auction done, get it sold, and potentially close before Labor Day. That's what I'm hearing.
>
> Are you all saying something different?
>
> [JGB]: We are not, Your Honor.
>
> [DEBTOR]: That would be our – I'm sorry. That would be our objective, Your Honor. Yes.

May 25, 2022 Hearing Transcript at 19:10-20:2. As the summer months went by, Blouin enjoyed another summer in The Hamptons and no bid procedures were proposed. Blouin's representations of being "very motivated" to sell the Properties turned into ambiguous statements about potential refinancing efforts. At the June 29, 2022 hearing – which was supposed to be the hearing on bid procedures – the Court astutely noted not only a lack of progress, but a movement in the wrong direction:

> THE COURT: [O]ther than the motion for new counsel, it doesn't appear that anything much has happened since the last hearing.
>
> . . .
>
> [DEBTOR:] I guess since the decision is to go ahead and move forward, that we were – originally, there was a sale contemplated, and now, our restructuring efforts are to consider a number of options, including one possibility in the refinancing, and that refinancing with the goal to pay creditors, particularly JGB. Refinance the loan to take out JGB's loan.
>
> Another option is to sell 366 Gin Lane in Southampton to get funds in order to fund a restructuring. And there is adjacent property that

> is not the subject of this bankruptcy that could possibility be sold along with 366 Gin Lane.
>
> So we are right now within the exclusivity period that we're in, where the Debtor is formulating its own plan, are pursuing a number of options. We're moving on parallel tracks.
>
> . . .
>
> THE COURT: Isn't that exactly where we were thirty-four days ago when the case was first in?
>
> . . .
>
> So the three options that you've outlined, which are the traditional three exit strategies, and at a minimum [in] any real estate case, sell it in a sale or to refinance being the big two. The third one would be a boot-strapping organization, which wasn't in the list, I guess, because the debtor doesn't generate any revenue. But it sounds as if the answer to my questions, has anything happened since the last hearing, is no. . . . At the last hearing, the discussion was going to oversee (indiscernible) in place, move toward a liquidation of this property, worked out – liquidation of the generic sense, not the sell it for the lowest dollar amount – work out some agreement with the adjacent property affiliate so that it doesn't interfere with the sale of this property and/or bundle the two estates for sale.
>
> It sounds as if not only has nothing happened since the last hearing, but the debtor is actually treading backwards.

June 29, 2022 Hearing Transcript (ECF No. 46) at 7:22-10:13.

On July 11, 2022, JGB finally ran out of patience and filed a motion to dismiss Debtor's Bankruptcy Case (ECF No. 44, the "JGB Motion to Dismiss") and a motion for relief from the automatic stay (ECF No. 45, the "JGB Stay Relief Motion"). In its response, Debtor argued that (i) JGB has substantial equity cushion in the property; and (ii) the property has the potential for significant income to fund the plan and operating expenses, such as taxes and undisputed debt service. Debtor's Response to JGB Motion to Dismiss, ¶ 2.[3]

---

[3] The term "Debtor's Response to JGB Motion to Dismiss" shall mean *Debtor's Response in Opposition to JGB's Motion to Dismiss Pursuant to 11 U.S.C.§§ 305(A) and 1112(B) of the Bankruptcy Code* (ECF No. 77).

5

On August 31, 2022, the Court held a hearing on the JGB Motion to Dismiss and the JGB Stay Relief Motion. *See* August 31, 2022 Hearing Transcript (ECF No. 100). The Court ruled from the bench and agreed to provide Debtor until September 30, 2022 to file either (i) a motion seeking approval of a bona fide, noncontingent contract for the purchase of 366 Gin Lane for no less than $52 million; or (ii) a motion to approve noncontingent, takeout finance or a loan of no less than $52 million. August 31, 2022 Hearing Transcript at 76:11-78:8. The Court further ruled that Debtor's failure to timely file one of the two above-referenced motions would result in the automatic stay terminating, without further order of the Court, at midnight on September 30, 2022. August 31, 2022 Hearing Transcript at 78:13-15.

On September 30, 2022, Debtor filed the DIP Financing Motion seeking approval of debtor-in-possession financing that met the Court's above-referenced requirements. On October 21, 2022, Debtor filed an unexecuted version of the DIP Loan Agreement and a proposed version of the DIP Financing Order negotiated by Debtor and Bay Point. On October 26, 2022, the Court held a hearing on the DIP Financing Motion where it approved the DIP Financing pursuant to the terms of the DIP Loan Agreement. *See* October 31, 2022 Hearing Transcript (ECF No. 165).

On November 16, 2022, the Court entered the DIP Order, in which it incorporated the terms of the DIP Loan Agreement in full (ECF No. 172). On December 9, 2022, the DIP Loan closed. As discussed in greater detail in the IRS Objection, Debtor failed to take any meaningful action towards moving this Bankruptcy Case towards resolution post-Closing.

As shown by the recent bankruptcy filing of Aberdeen, Blouin has now pulled another 180 and says that she wants the Properties in bankruptcy and that bankruptcy will facilitate and promote the sale and or refinancing of the Properties.

| Position in Debtor Motion to Dismiss | Position in Aberdeen bankruptcy petition |
|---|---|
| • BEI remaining in bankruptcy is adversely affecting the property's marketability.<br>• REYL will not enter the financing Transaction with BEI until BEI is no longer in bankruptcy. BEI's ability to refinance on favorable terms and sell the property at market value has been hampered by the bankruptcy. | • I respectfully submit this Declaration pursuant to Local Rule 1007-4 to assist the Court, creditors and other parties-in-interest in understanding the circumstances necessitating the filing of this Chapter 11 case and the Debtor's plan to emerge from bankruptcy . . . The Debtor believes that the two Properties can be sold or refinanced to satisfy all legitimate debts in full. |

Debtor Motion to Dismiss, ¶¶ 3, 27; Debtor's Declaration Pursuant to Local Rule 1007-4 filed in the Aberdeen Bankruptcy Case (the "Aberdeen Declaration"), ¶¶ 1, 9.

But despite Blouin's representations about the benefits of bankruptcy in the Aberdeen Declaration, she did not instruct Debtor's counsel to file a dismissal of the Debtor Motion to Dismiss. Instead, she instructed Debtor's counsel to oppose the Proposed Plan. And so, the marry-go-round goes on.

## II. The Debtor's Objection to the Proposed Plan Should be Overruled[4]

As noted above, Debtor doesn't raise a single issue as to whether the Proposed Disclosure Statement provides "adequate information so that an informed determination can be made whether to accept or reject a reorganizational plan." *See In re 266 Washington Assoc.*, 141 B.R. at 288. Instead, Debtor attacks the confirmability of the Proposed Plan. As such, Debtor faces the heavy burden of establishing that the Proposed Plan is "patently unconfirmable on its face." *See In re Quigley Co.*, 377 B.R. at 115-116. Debtor falls short of meeting this high standard.

> a. *The Inclusion of a Contingency Clause in the Proposed Plan is Not a Basis to Refuse Approval of a Disclosure Statement.*

---

[4] Debtor raises an issue regarding whether Bay Point's exercising of rights under the DIP Loan Documents to replace Debtor's and Aberdeen's officer and director (i.e., Blouin and her husband) was a violation of the DIP Order. Bay Point's actions were not a violation of the DIP Order. Because Debtor does not actually object to the Disclosure Statement on those grounds, Bay Point will address that issue at the appropriate time.

Debtor's first argument is that the Disclosure Statement cannot be approved because the Proposed Plan has a "possibility of failure." Objection, ¶ 25. The "possibility of failure" is far short of "patently unconfirmable on its face." *See id.* For that reason alone, Debtor's objection on this ground should be overruled.

Moreover, all plans have a potential of failure if some unforeseen circumstance occurs. Bay Point's inclusion of direction on what would occur if it failed to be deemed the winning bidder at the Proposed Foreclosure Sale was a good faith attempt to be thorough in planning for all potential variables in the Proposed Plan. Bay Point was in no way suggesting that it thought that the Proposed Plan would fail. In fact, Bay Point is unaware of any valuation for the Aberdeen Property that would exceed Bay Point's secured debt. As such, Bay Point fully anticipates that it will be the winning bidder at the Proposed Foreclosure Sale.[5]

    b. *<u>The Separate Classification of Blouin's Claim is Not a Basis for Objection</u>.*

The Debtor's second objection shows that Blouin has been controlling and utilizing Debtor (and Debtor's assets) solely for her own benefit. Why is the ***Debtor*** concerned about the classification of ***Blouin's*** general unsecured claim? Although the objection fails regardless of who raises it, the fact that Debtor's counsel spent the time – and estate money – to draft an objection for the benefit of Blouin in her capacity as a general unsecured creditor is concerning.

As to the substance of Debtor/Blouin's objection, it is common practice for the general unsecured claims of insiders to be separately classified. This is particularly true when those claims dwarf the other general unsecured claims and, thus, can be used by an insider to control the

---

[5] If the Proposed Plan does fail on the grounds that Bay Point was not the winning bidder at the Proposed Plan, Bay Point expects that its debt will be reduced to the point that it may be able to confirm a new plan of liquidation that includes only the sale of the Brickchurch Property.

bankruptcy plan process to the detriment of general unsecured claims and for the benefit of the insider's equity interest.

However, to the extent that Debtor/Blouin want additional "credible proof of a legitimate reason for separate classification" of Blouin's unsecured claim, they can look at the amount of money that Blouin has paid Debtor and Aberdeen for rent over the past 16 months for her exclusive use and enjoyment of the luxury estate belonging to Debtor and Aberdeen. Zero. They can look at the amount that Blouin has paid Debtor and Aberdeen for the extensive utility bills that Debtor has paid for utilities that were used exclusively by Blouin. Zero. The fact is that Blouin isn't concerned about a resolution that pays general unsecured claims – Blouin wants to continue living at the Properties rent and expense free. For that reason, her interests are not aligned with the other general unsecured creditors – none of whom have been permitted (or are expected to be permitted) to live at the Properties rent and expense free.

### c. *The Debtor's Speculative Objection to the Proposed Foreclosure is Misplaced*

The Debtor objects to the Proposed Plan on the grounds that it does not specify that Bay Point will comply with New York foreclosure law. The Proposed Plan does not seek to alter any rights of Aberdeen with respect to the Proposed Foreclosure Sale. If, after the Proposed Foreclosure Sale, Aberdeen has a basis for challenging the amount that should be credited to the DIP Loan, *Aberdeen* will be free to assert that challenge.[6] *Debtor's* attempt to assert that challenge to deny the approval of the Proposed Disclosure Statement is misplaced and premature.

### d. *Bay Point will Carve Out Debtor's Meritless Objections to Bay Point's Claim from the Power of Attorney Granted Under the Proposed Plan*

Debtor agreed to pay late fees and default interest if there was a payment default under the DIP Loan. Debtor asked this Court to approve its payment of the same. And the Court approved

---

[6] Bay Point reserves all of its rights with respect to any such challenge that may be asserted.

the imposition of those fees and interest. Against this backdrop, Bay Point agreed to extend the DIP Loan. Now, Debtor seeks to try to pull a fast one by saying that Bay Point can't collect this fees and default interest under New York law and that this Court could not authorize the payment of the same. The equitable problems with permitting a Debtor to make this argument are obvious.

In addition to the equitable issues, the DIP Order itself prevents Debtor from challenging Bay Point's claim. And the applicable law on the underlying issue of whether a lender can charge default interest and a late fee also favors Bay Point – and will be discussed at the appropriate time.

However, with all of that said and with a complete reservation of rights, Bay Point will agree to carve out any objections to Bay Point's claim from the power of attorney granted to the Disbursing Agent.[7]

### III. Debtor's Complaints Regarding Bay Point's Post-Closing Actions Lack Merit

Although it doesn't object to the Proposed Disclosure Statement on these grounds, Debtor makes several unfounded and unwarranted accusations regarding Bay Point's post-closing actions. Debtor's accusations are misplaced, factually inaccurate, and contrary to the clear terms of the DIP Loan Agreement and the DIP Order. However, out of an abundance of caution, Bay Point provides the following initial response, and reserves all of its rights with respect to these issues (including the right to supplement the below) at the appropriate time.

    a. *Excess Cash Flow Sweep / Origination Fee*

        I. "Excess Cash Flow Sweep. On or before 2:00 pm on Monday each week, or, if such Monday is not a Business Day, then on or before 2:00 pm on the next Business Day immediately following such Monday, all Excess Cash Flow shall be applied to prepay the Obligations." DIP Loan Agreement, § 2.3(c)(iii).

---

[7] To be clear, Bay Point does not believe Debtor can challenge Bay Point's claim, does not waive or release any protections that it may have under the DIP Loan Documents, the DIP Order, applicable law, or otherwise, and reserves all of its other rights with respect to any objection or claim that Debtor or any other Obligor (as that term is used in the DIP Loan Agreement), or anyone on behalf of Debtor or any other Obligor, may seek to raise.

II. "'Excess Cash Flow' means, as measured by the aggregate balance in the Specified Deposit Accounts, that amount of [cash] in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) that is not otherwise allocated to the payment of (i) previously earned services, accountants, real estate brokers, real estate appraisers, and maintenance and repair costs associated with the Managed Property; (ii) and due and payable taxes." DIP Loan Agreement, § 1.1.

III. "Application of Prepayments. Any prepayments made by any Borrower pursuant to Section 2.3(b) or (c) shall be applied as follows: first, to Lender's fee and reimbursable expenses then due and payable pursuant to any of the Loan Documents; second to interest then due and payable hereunder; and third, to principal installments due on the Loan (in the inverse order of maturity), until the same shall have been paid in full." DIP Loan Agreement, § 2.3(d)

IV. "Origination Fee. On the Closing Date, out of the proceeds of the Loan, Borrowers shall, jointly and severally, pay an origination fee to Lender equal to Five Million Five Hundred Eighty Thousand and 00/100 Dollars ($5,580,000.00) (the "Origination Fee"), which Origination Fee shall be fully-earned immediately as of funding of the Loan and shall be nonrefundable." DIP Loan Agreement, § 1.1.

V. To ensure an amount of cash sufficient to pay off all of Debtor's prior secured debt, mechanics liens, unpaid property taxes, then existing-legal fees, etc., Bay Point reserved $62 million (less the fees and expenses that Bay Point was entitled to under the DIP Loan Agreement) for Debtor's DIP Financing. These were funds that Bay Point had to reserve and could not otherwise deploy to other projects during the 3+ months between the proposal and the Closing. As such, Bay Point was entitled to include such funds in the calculation of the Origination Fee – and Debtor expressly agreed to (and this Court approved) the same by agreeing to the specific dollar amount of the Origination Fee.

VI. After funding, it was determined that not all of the amount funded was required to be paid for the various debts, expenses, and reserves contemplated by the DIP Loan Agreement – which caused there to be a balance in Debtor's bank account. Pursuant to the agreed upon (and Court-approved) cash flow sweep provision, Debtor was required to remit those funds to Bay Point as a prepayment.

VII. Contrary to Debtor's unsupported allegations, Bay Point did not charge interest on the amount prepaid. The prepayment was applied in accordance with the DIP Loan Agreement's agreed upon (and Court-approved) prepayment application provision – which resulted in the vast majority (if not all) of the prepaid funds being applied to principal (thus,

11

saving the Debtor interest on funds that would otherwise have been sitting idle in its bank account).

b. *Protective Advances / Maintenance and Repairs*

I. The DIP Loan Agreement provided for a Maintenance Reserve Account of $300,000 that could be used to fund maintenance on the Properties consistent with a budget approved by Bay Point.[8] The Maintenance Reserve Account provision expressly confirmed that Debtor was responsible for completing necessary maintenance and repairs. DIP Loan Agreement, § 2.10 ("***Notwithstanding anything to the contrary herein, Borrowers remain solely liable for repair and maintenance of the Mortgaged Property***, and Lender shall have no liability for the payment or non-payment of any costs or expenses associated with the maintenance of the Mortgaged Property.") (emphasis added).

II. Section 6.14 of the DIP Loan Agreement further confirmed that Debtor, not Bay Point, was liable for preforming all repairs to preserve and protect the Properties. DIP Loan Agreement, § 6.14 (Each Borrower will do all things necessary to maintain, preserve, protect and keep the Mortgaged Property and any Equipment located thereat, in good repair and working and saleable condition, except for ordinary wear and tear with respect of such Equipment.").

III. Sections 9.1 and 11.4 of the DIP Loan Agreement provided Bay Point with the right – but not the obligation – to make any advances necessary to preserve and maintain the Properties. DIP Loan Agreement, § 9.1(d) (Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election . . . [m]ake such payments and take such actions as Lender considers necessary or reasonable to protect its security interest in the Collateral."); § 11.4 ("Borrowers jointly and severally agree to pay promptly after demand therefor, all reasonable and documented out-of-pocked costs and expenses of Lender in connection with the due diligence, preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable) . . . .").

IV. Blouin's and Debtor's argument that Bay Point somehow breached its obligations under the DIP Loan Agreement by failing to fund all maintenance requests demanded by Blouin is absurdly contradictory to the clear terms of the DIP Loan Agreement.

---

[8] As a result of a drafting error, the DIP Loan Provision providing for a maintenance account inadvertently included language applicable to a tax reserve account. *See* DIP Loan Agreement, § 2.10(a). Despite this error, Bay Point – in good faith – agreed to allow the funds in the referenced Maintenance Reserve Account to be used for maintenance and repairs.

## IV. Conclusion

For the foregoing reasons, as well as those that may be raised at the hearing on the Proposed Disclosure Statement, Bay Point respectfully asserts that Debtor's Objection should be overruled.

Dated:  August 23, 2023

Respectfully submitted,

*/s/ John C. Allerding*
By: John C. Allerding (admitted pro hac vice)
Thompson Hine LLP
3560 Lenox Road, Suite 1600
P: 404.407.3676 / F: 216.566.5800
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*